```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU:  PART 49
 2   ---------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3                                   Ind. No.
                                     436N/08
 4        -against-
                                     Jury Trial
 5   RICARDO WALTERS,

 6                   Defendant.
     ---------------------------------------X
 7

 8                               October 29, 30, 31, 2008

 9                               Nassau County Court
                                 262 Old Country Road
10                               Mineola, NY 11501

11   B E F O R E :

12        THE HONORABLE JAMES P. MC CORMACK,
                               Acting Supreme Court Justice
13        (and a jury of twelve plus two alternates.)

14   A P P E A R A N C E S :
     For the People:
15        THE HONORABLE KATHLEEN M. RICE,
          District Attorney, Nassau County,
16        By:  MADELINE SINGAS, ESQ.,
               THERESA TEBBETT, ESQ.
17        Assistant District Attorneys

18   For the Defendant:
          DENNIS LEMKE, ESQ.
19
                               CATHERINE R. PARKER,
20                             MARY OCSKAI,
                               Official Court Reporters
21

22

23

24

25
```

```
 1                    THE CLERK:  Case on trial, Ricardo Walters,

 2      indictment 436N of 2008.

 3                    MS. SINGAS:  For the People, Assistant

 4      District Attorneys Madeline Singas and Theresa Tebbett.

 5                    MR. LEMKE:  Dennis Lemke, 114 Old Country

 6      Road, Mineola, New York.

 7                    Your Honor, I just waive his appearance for

 8      this discussion.

 9                    THE COURT:  All right.  As we know, the

10      defendant apparently was brought over in inmate

11      fatigues, if you will, in orange.  My sergeant had told

12      me in calling downstairs, that he was advised from

13      Corrections downstairs, that someone from the DA's

14      office had taken him defendant's clothes, meaning the

15      suit, court clothes.

16                    My law secretary has called over to

17      Corrections and they've -- she's been told that a Bill

18      Bowler (phonetic) from the DA's Office, on the

19      authority of Kathleen Rice, came over yesterday and

20      took his clothes.  Now I don't know whether that's true

21      or not true.  I'm only repeating what I'm being told.

22      You know, I'm at a loss to explain why anyone would

23      want to take his clothes.

24                    Can anybody shed any light?

25                    MS. SINGAS:  Yes, I can.  Bill Bowler is a
```

1    paralegal, works in my bureau.  I had a list for an

2    inventory of his personal property.  I wanted to see

3    what was brought with him to the jail if anything came

4    up during the trial, you know, that I could -- I didn't

5    want the property.  I wanted a list.  And they said --

6    Corrections said, we can't give you anything, not a

7    list, not his property unless you get a so-ordered

8    subpoena.  So I said, okay, if the need arises, and I

9    need something, I will bring it to your attention and I

10   will get a so-ordered subpoena with counsel advised,

11   but I dropped it.  Fine.  Forget it.  Let's move on.

12   So I don't know if they, on their own, collected his

13   personal property.  We had asked for an inventory of

14   his personal property, which I know, you know, they

15   list.  I've gotten it before.

16              THE COURT:  When he came into the system?

17              MS. SINGAS:  Yes, what he came into the

18   system with.  So after his release, what arrest was --

19   was released back to him.  Sometimes police officers

20   give back things that should have been evidence, so on,

21   so forth, but I needed to see what he went into jail

22   with, but that required no other action.  Once they

23   said we needed a so-ordered, I dropped it for the time

24   being.  I said, if something comes up, I'll get the

25   so-ordered and we'll deal with it.

 1          THE COURT:  Mr. Lemke, does your client know

 2     anything, I mean to the extent that you feel you can

 3     indicate that?

 4          MR. LEMKE:  I have not had the opportunity to

 5     speak with him between just finding that out now.  I do

 6     know that many times during trial, the District

 7     Attorney's Office does receive a list of the inventory

 8     at the Sheriff's Department from property that he had,

 9     because I know sometimes at trial, there may be an

10     issue if an officer said that my client had "X" on him,

11     but the police didn't inventory it, and yet, the

12     sheriffs didn't inventory it.

13          Obviously, as defense counsel, I have some

14     cross material, so on, so forth, so I have no problem

15     with that.  Obviously, to the extent that they took his

16     court clothes which is clearly what he not -- I have no

17     explanation.  I will talk to my client.  Hopefully, it

18     can be rectified by 2 o'clock.  I don't know if that's

19     the case.

20          THE COURT:  I don't know either.  I'm going

21     to get off the bench and go over, call Corrections.

22     I'm assuming Mr. Bowler didn't get possession of any

23     clothes.

24          MS. SINGAS:  No, Judge, no.  It ended there.

25          THE COURT:  All right, so let me call

cp

1    Corrections.  If there's a problem with us not being

2    able to start at 2, I'll be in touch with both of you.

3              MR. LEMKE:  Situation we should probably have

4    a call made with Corrections because they'll have to

5    make a special trip to bring Richardo Walters back to

6    get dressed.

7              THE COURT:  Right.  I understand, so let me

8    see what I could do.  I'll be in touch with both of

9    you.

10             (Pause.)

11             (The following took place without the

12   presence of the attorneys or the defendant.)

13             (Whereupon, the jury panel entered the

14   courtroom.)

15             THE COURT:  Just pick any seats.  You're not

16   going to be seated here together, at least not right

17   now.

18             THE COURT:  Good morning, prospective members

19   of our jury panel.  My name is Judge McCormack.  For

20   those of you who don't know where you are, you're in

21   the County Court here in Nassau County.  You may notice

22   that the lawyers are not seated here at the moment.  We

23   were anticipating beginning jury selection in a

24   criminal case this morning.

25             An issue has arisen that is precluding us at

1    the moment from beginning the jury selection.  I know

2    all of you came over here.  We didn't realize that this

3    issue had arisen until you were all actually here in

4    the building.  I don't want you to think this is our

5    normal course that we bring everyone over when we're

6    not exactly sure when we're going to start.  Everybody

7    had every anticipation and expectation of starting here

8    this morning.  However, something's come up in the last

9    ten minutes or so that's keeping us from beginning our

10   jury selection, and when I say beginning, we have yet

11   to begin jury selection in this case.

12          When you come back here this afternoon, I'm

13   going to get into a little bit more about the case,

14   tell you about the case, the length of the case, and at

15   that point, I'll conduct some prescreening of you as

16   far as your ability to sit during the case.  I didn't

17   want to just send you back to central jury.  I want to

18   keep you since you were all sent over here from central

19   jury a few moments ago, but I wanted to -- just want

20   you you to come in and apologize for the delay.  It was

21   something totally out of everybody's control.

22          At this point, I'm hopeful that we can start

23   at 2 o'clock, so what I want to do is, one, advise you

24   what was going on and not leave you hanging downstairs

25   and ask your indulgence and your patience, if you

cp

```
 1        would, to please report back.  My sergeant will tell
 2        you where to go, but we need all of you back here at 2
 3        o'clock, at which point, we'll begin jury selection in
 4        this case.  So again, I apologize.  I appreciate your
 5        cooperation, your patience.  I know it's cold outside,
 6        but we all very much need you to be here at 2 o'clock,
 7        so those of you that are seated in the jury box,
 8        doesn't necessarily mean you're going to be seated
 9        there when you come back, or for that matter, that
10        you've been sworn or selected as a juror.  Don't get
11        nervous because you are sitting in the jury box at this
12        point, so at this point, I'm going to excuse you.  My
13        sergeant, James, will tell you where to report back.
14        We'll see you back here, if you would, please, at 2
15        o'clock.  Thank you very much.
16                   AFTERNOON SESSION.
17                   THE CLERK:  Case on trial, People of the
18        State of New York against Ricardo Walters, indictment
19        436N of 2008.
20                   Are the People ready?
21                   MS. SINGAS:  Yes, the People are ready,
22        Judge.
23                   THE CLERK:  Defense counsel?
24                   MR. LEMKE:  Defense ready, your Honor.
25                   THE COURT:  All right.  Before we bring in
```

Proceedings

```
 1          our first panel of 75 people, is there any
 2          applications?
 3                  MS. SINGAS:  Judge, I have some things I need
 4          to put on the record.  The first is I'd like to --
 5          indictment says, you know, all read Jane Doe.  I'd like
 6          to supplement the names of the victims for the
 7          different counts in the indictment.
 8                  THE COURT:  Okay.
 9                  MS. SINGAS:  Okay.  As to counts one, two and
10          three which are the crimes which were committed on
11          September 9th of '07, the complainant's name is Sarah
12          Sandoval.  As to the next group of counts, I think it's
13          counts four, five, six, seven and eight, and those are
14          the crimes of 4-17-05.  That complainant's name is
15          Shamika Dottin.  As to counts nine, ten, eleven,
16          twelve, thirteen, fourteen, the crimes which occurred
17          on November 28th of '05, complainant's name is Delsey
18          Sanchez.  As to the last two counts, fifteen and
19          sixteen, crimes which occurred on 11-9-06, the Jane Doe
20          in that indictment is Ilsa Morales, so I'd like the
21          indictment to reflect that.  I'll hand up a copy of the
22          consolidated indictment and the order of the counts.
23          I've already handed one to defense counsel.
24                  THE COURT:  Thank you.
25                  MS. SINGAS:  Also like to put on the record
```

```
 1        that I handed additional Rosario to Mr. Lemke as well

 2        as showed him photographs that we intend to use at

 3        trial.  I've made a Rosario packet for your Honor with

 4        a list of all the Rosario.  As to -- okay, there's one

 5        more thing.  Then I told Mr. Lemke there's some Brady

 6        that I told him the other day before with regards to

 7        Sarah Sandoval who is also one of the complainants in

 8        this case.  She uses a different name at work.  At her

 9        employment, she uses another name, and my office will

10        not be prosecuting her for that, but that's what she

11        does.  So that was the Brady that I handed over, and as

12        to the defendant, should he take the stand, Judge, and

13        this is, you know, part of it is Sandoval and part of

14        it isn't Sandoval.  There are some disciplinary issues

15        for excessive use of force; two incidents, I believe as

16        well as not handing in some paperwork for coming in

17        late.  I don't intend to elicit it, but if the

18        defendant takes the stand and opens the door to that

19        somehow implying that everything at work, he's never,

20        you know, been penalized for any of those issues, then

21        certainly, I have would go into it.  And there was also

22        a period in 2006, actuality, entire year where the

23        defendant was on sick leave, so again, it's not a bad

24        act.  I mean, he was legitimately not at work, but that

25        might be something that comes up, and I don't want to
```

1 surprise anybody if the defendant testifies and it does

2 come up.

3    THE COURT:  All right.  And the details in so

4 far as the disciplinary issues are concerned, they deal

5 almost exclusively with excessive use of force?

6    MS. SINGAS:  There's -- I believe there's one

7 excessive use of force which, as I understand, is not

8 unusual for a corrections officer.

9    THE COURT:  Right.

10    MS. SINGAS:  There's one for not reporting

11 the excessive use of force, and I'm not sure if that's

12 a separate excessive use of force or related to the

13 first one, but it's two different years.  Waiting for

14 some details on that, and there's one for not handing

15 in a late slip and following the proper procedure for

16 which he was docked I think 40 vacation days, so --

17    THE COURT:  All right.  Mr. Lemke, you want

18 to be heard on that?

19    MR. LEMKE:  Your Honor, first, I don't mind

20 basically the order or reordering in the indictment

21 indicating the complaining witness in those cases, so I

22 have no problem.  Makes it easier for I think the jury

23 at some point to follow.

24    As far as the situation regarding not

25 necessarily I think prior bad acts, but in any case, I

 1      think in which there's a witness that testifies, or in

 2      this case, my client was to take the stand and in his

 3      testimony regarding his occupation, and perhaps

 4      responsibilities in that vein as a Riker's corrections

 5      officer, certainly if the door was to be opened

 6      regarding I never had any problems, certainly opens up

 7      the door.  I don't anticipate that, so I don't expect

 8      that to be a problem.  I'm aware of it.  I've been put

 9      on notice.  My client's aware of it.

10              MS. SINGAS:  One more thing.  There's also an

11      incident that the defendant was involved in where he

12      shot and killed someone who was breaking into his car,

13      and again, I don't sui sponte intend to go into that if

14      the defendant testifies, but if something I feel opens

15      the door, that would be something that I would bring to

16      your attention so that we could discuss anything about

17      his peacefulness or so on, so forth that I think might

18      open that door.

19              THE COURT:  Obviously, if there's anything

20      you think should defendant testify that in your view

21      opened the door to that, one thing I would ask you to

22      do is to obviously approach, so you can get a ruling on

23      it before we start asking questions of it.

24              MS. SINGAS:  Okay.

25              THE COURT:  In front of the jury.

1         MR. LEMKE:  There would be another

2  application.  I have gone over once again the

3  Antommarchi rights with my client, waiver right to be

4  present during side bar conferences.  I have explained

5  it to my client.  He's aware of it.  He has executed it

6  as well as I have as well, your Honor.

7         THE COURT:  Mr. Walters, have you gone over

8  the paper Mr. Lemke was just referring to?

9         THE DEFENDANT:  Yes, your Honor.

10        THE COURT:  Is it your wish at this time to

11  waive your rights to be present during any side bar

12  conferences or discussions about prospective jurors or

13  issues of law that may come up during the course of the

14  trial?

15        THE DEFENDANT:  Yes.

16        THE COURT:  That's your signature that

17  appears on this document.

18        THE DEFENDANT:  Yes.

19        THE COURT:  It was gone over by Mr. Lemke

20  with you?

21        THE DEFENDANT:  Yes, your Honor.

22        THE COURT:  Do you have any questions of me

23  with respect to that document?

24        THE DEFENDANT:  No, sir.

25        THE COURT:  Do you understand that if at any

Proceedings

```
 1          point in time should you wish to revoke this waiver,

 2          you're entitled to do so.  Do you understand that?

 3                    THE DEFENDANT:  Yes, sir.

 4                    THE COURT:  Okay.  We'll mark this as a

 5          Court's exhibit.

 6                    Mr. Lemke, I think before we were about to

 7          begin yesterday, you indicated you do want me to charge

 8          preliminarily that should your client elect not to

 9          testify, it's not a fact that an adverse inference can

10          be drawn by the jury; is that right?

11                    MR. LEMKE:  Yes, your Honor.

12                    THE COURT:  Anything in the way of any type

13          of preliminary legal principles either one of you, all

14          three of you want me to go over with the jury?  I will

15          indicate to them I will go over presumption of

16          innocence, burden of proof, proof beyond a reasonable

17          doubt, and police witnesses in my preliminary

18          instructions.

19                    Anybody want me to go over anything else?

20                    MR. LEMKE:  Not on behalf of the defendant.

21                    THE COURT:  All right.  So at this point,

22          what I'm going to do is bring the 75 people.  They came

23          in after we broke this morning.  I told them they'd be

24          back.  I'm going to tell them about the length of the

25          case, between two and a-half to three weeks, hopefully
```

1    concluding the early part of the week of November 17th,

2    and then I'll conduct a prescreening for those that

3    have either vacation plans, business plans that they've

4    already booked, any type of issue with respect to child

5    care or elder care that would preclude them from

6    sitting.

7              MS. SINGAS:  Judge, only request People would

8    have if you wouldn't mind asking under the law

9    enforcement question if they know anyone or relatives

10   in the Corrections Department.

11             THE COURT:  Yes, I will do that.  I made a

12   note of that already, actually.  All right.  So we'll

13   bring in the prospective jurors.

14             (Whereupon, the jury panel entered the

15   courtroom.)

16             THE CLERK:  Case on trial, People of the

17   State of New York against Ricardo Walters, indictment

18   436N of 2008.

19             Are the People ready?

20             MS. SINGAS:  People are ready, Judge.

21             THE CLERK:  Defense?

22             MR. LEMKE:  Defense ready, your Honor.

23             THE COURT:  Good afternoon, prospective

24   members.  Welcome back again.

25             As I indicated to you this morning when I had

1       you in, this is a criminal trial that we are about to

2       begin jury selection.  Before I start going into the

3       nature of the trial, make sure the case, the

4       anticipated length of the trial, I'm going to ask you

5       all kindly stand.  I know you all got comfortable.  We

6       are to swear you in at this point, so if you would just

7       listen to my Clerk.

8                   (Whereupon, the jury panel was duly sworn by

9       the Court Clerk.)

10                  THE COURT:  Members of our prospective panel,

11      as I indicated to you this morning, this is a criminal

12      case.  My name is Judge McCormack.  The title of this

13      action is the People of the State of New York versus

14      Ricardo Walters.

15                  At this point, I'm going to introduce the

16      parties to this action.  The case is being prosecuted

17      by the District Attorney of Nassau County, Kathleen

18      Rice.  Two of her assistant district attorneys are

19      appearing on behalf of the district attorney.  They'll

20      be presenting this case on behalf of the People of the

21      State of New York.  Ms. Madeline Singas is one of the

22      prosecutors.

23                  MS. SINGAS:  Good afternoon.

24                  THE COURT:  And joining her is Ms. Theresa

25      Tebbett as well.

1          MS. TEBBETT:  Good afternoon.

2          THE COURT:  Seated at the second table is the

3     defendant, Ricardo Walters.

4          THE DEFENDANT:  Good afternoon, jurors.

5          THE COURT:  And seated next to him is his

6     attorney, Mr. Dennis Lemke.

7          MR. LEMKE:  Hello.

8          THE COURT:  Now, as I indicated, the title of

9     the action is People of the State of New York versus

10    Ricardo Walters.  The indictment in this case, ladies

11    and gentlemen, covers a series of allegations

12    commencing in 2005, and the last allegation concerns a

13    date that took place, I believe, in September of 2007.

14          Some of the charges --- this is not all of the

15    charges, but just to give you an idea, some of the

16    charges are rape in the first degree, robbery in the

17    first degree, kidnapping in the second degree, sexual

18    abuse in the first degree.  The actions and the

19    allegations that are alleged in this indictment, and

20    might I just say at this time, an indictment, ladies

21    and gentlemen, or the fact that an indictment has been

22    filed, is in no way indicative of the defendant's

23    guilt.  It is merely an accusatory instrument that

24    brings this action here.  The defendant in this case

25    has pled not guilty to this indictment.

Proceedings                                                              17

1          The location of these allegations concern the

2    Village of Hempstead, as I indicated a few moments ago.

3    What I'm going to do at this time is give you an idea

4    of the anticipated length of the trial.  In speaking to

5    the attorneys, it's anticipated that the trial is going

6    to take place over a period of two and a-half to three

7    weeks.  We will not be sitting I should say on November

8    4th which is obviously Election Day, and also, on

9    Veteran's Day, the following day -- following Tuesday,

10   I should say, which is November 11th.  It's my best

11   guess, if you will, that the case will last, and

12   hopefully go to the jury sometime the week of November

13   17th.  That's a Monday, so at this particular point, I

14   want all of you to, in your mind, consider that this

15   case is going to last approximately three weeks,

16   conclude the week of November 17th.

17          Before we begin the jury selection, I want to

18   conduct, if I may, a prescreening, if you will, for

19   those of you, and I want you to listen very carefully

20   to the following criteria, and please keep in mind if

21   you are excused from this particular jury panel, I

22   cannot excuse you from jury service.  You must go back

23   to central jury and report back there.  If you're

24   excused from this case, it does not mean you're excused

25   from jury duty, but those of you that meet the

cp

18

Proceedings

```
 1              following criteria, what we're going to do is we're
 2              going to try to go in an orderly fashion.  You're going
 3              to follow my sergeant's instructions.  Those of you
 4              over that time period who either have a planned
 5              vacation, a planned business trip, any issue with
 6              respect to child care, now generally, we begin around
 7              10:30 in the morning or I try to get going as close to
 8              10:30 as possible.  We usually finish by 4:40 in the
 9              afternoon or 4:30.  There's no sequestration, meaning
10              that you will not be held overnight once the case does
11              go to the jury; any issue with respect to elder care as
12              well.  Any of you that have an elderly adult living at
13              your home that needs to be taken care of or cannot be
14              taken care of during the time periods that I'm
15              referring to.  So what we're going to do is -- and
16              again, only those criteria.  I cannot excuse you unless
17              it's an extreme financial hardship.  I cannot excuse
18              you for financial reasons alone.  I want you to please
19              keep that in mind.  I know it's difficult in today's
20              circumstances, but I cannot do that unless it's such a
21              hardship that we feel that you cannot be fair and
22              impartial as a juror in this case, so what we're going
23              to do, we're going to first start with the first set of
24              jurors, prospective jurors, I should say that are
25              sitting in front of me in the front row.  If you meet
```

1           that criteria, please come up with your -- give me your

2           name as you come up and please bring your personal

3           belongings and watch your step as you come up.  Can I

4           see both attorneys?

5                     Anybody in this first row?  First row I see

6           nobody stepping forward.  Second row anybody?

7                     (Whereupon, a discussion was held off the

8           record, at the bench, among the Court, defense counsel

9           and the assistant district attorneys and a juror.)

10                    THE COURT:  All right.  Members of our

11          prospective panel, as I indicated to you, this is --

12          can I just see all three attorneys again?

13                    (Whereupon, a discussion was held off the

14          record, at the bench, among the Court, defense counsel

15          and the assistant district attorneys and a juror.)

16                    THE COURT:  All right.  Prospective members,

17          at this particular time, we're going to call 14 names.

18          I think we have 14 seats here in this courtroom.  We're

19          going to call 14 names randomly.  If you hear your name

20          called, please step forward, bring your belongings and

21          please just follow my officer's instructions as to

22          where to sit.

23                    THE CLERK:  Seat 1, Mary McNeil, M-C-N-E-I-L;

24                    Seat 2, Enid Kreindler, K-R-E-I-N-D-L-E-R;

25                    Seat 3, Martin Mohr, M-O-H-R;

Proceedings

```
 1              Seat 4, Cheryl Dluginski, D-L-U-G-I-N-S-K-I;

 2              Seat 5, Gina Eannucci, E-A-N-N-U-C-C-I;

 3              Seat 6, Annie Pescow, P-E-S-C-O-W;

 4              Seat 7, Rory Santo, S-A-N-T-O;

 5              Seat 8, Carol Oerzen, O-E-R-Z-E-N;

 6              Seat 9, Barbara Unger, U-N-G-E-R;

 7              Seat 10, Anuja Lee, L-E-E;

 8              Seat 11, Jonathan Fogarty, F-O-G-A-R-T-Y;

 9              Seat 12, Yves Jeremie, J-E-R-E-M-I-E;

10              Seat 13, Diane Harris, H-A-R-R-I-S;

11              Seat 14, Luke Tarnowski, T-A-R-N-O-W-S-K-I.

12              THE COURT:  All right.  Those of you who have

13      just joined the jury box, I'm just waiting for one of

14      your members to come back and we'll proceed.

15              (Whereupon, a juror entered the courtroom.)

16              THE COURT:  All right.  At this time, I'm

17      going to address myself to those 14 of you that have

18      joined the jury box.  However, it's important for those

19      of you that are sitting out in the audience to kindly

20      listen to not only what I'm going to say, but also the

21      attorneys when they get up to question those that have

22      been selected to sit in the jury box.  At this time, I

23      can virtually assure you that those of you who are

24      sitting out in the audience will at some point come

25      into the jury box.  We just began jury selection in
```

Proceedings                                                          21

1      this case, so more than likely, at some point, you will

2      be summoned to sit in the jury box.  Those of you that

3      are in the jury box at this point, again, welcome.  I

4      told you a little bit about the nature of the case, the

5      nature of the charges.

6               What I would like to do at this time, does

7      anybody here either recognize either the attorneys or

8      myself from any past dealings of any kind whatsoever?

9      Okay.  At this point, what I'm going to do is,

10     obviously a number of people that will either testify

11     or whose names will be testified to, if you will,

12     during the course of the trial, what I would like to do

13     at this time is read off a list of those names and

14     listen carefully if any of you recognize any person

15     whose name I list, when I'm finished, just kindly raise

16     your hand, if you could tell me which name you

17     recognize and what the association is.

18               Hempstead Police Officer Dale Jones,

19     Hempstead Police Officer Eugene Este, Nassau County

20     Detective Sheila Wimberly, Nassau County Detective John

21     Lavelle, Nassau County Detective Wayne Birdsall, Nassau

22     County Detective Bob Dunn, Nassau County Detective

23     Daniel Perez, Detective Edward Moran, Police Officer

24     Ralph Morales, Sandy Hayne, Anna Fernandez, Barbara

25     Heffernan, Delsey Sanchez, Ilsa Morales, Delmy Morales,

Proceedings                                    22

```
 1      Shamika Dottin, Sarah Sandoval, Allyson Davilar, Sandra

 2      Dottin, Thomas Lynch, Greg Navoy, Rosa Portillo,

 3      P-O-R-T-I-L-L-O, and Investigator Richard Lombardi.

 4              Do any of the 14 people that are sitting

 5      here, anybody recognize any of the names I've just

 6      listed?  Okay.  One thing I do want to bring to your

 7      attention is that the -- this particular case has

 8      received, at some point in the past, some media

 9      attention either by way of news reports, television

10      news reports and newspaper reports.  Is there anybody

11      who sits here now that thinks of any situation or any

12      reason why they remember this case from the news media

13      for any reason whatsoever?  Okay.  All right.

14              At this time, I'm just going to go into some

15      basically general principles with respect to what your

16      role will be if you're selected as a juror.  Then I'm

17      going to go over some legal principles with you,

18      discuss them with you.  That's then going to be

19      followed by questions I will speak or I will ask

20      individually of all of you as you're sitting here in

21      the jury box.  And then followed by that, each of the

22      attorneys will then have an opportunity themselves to

23      ask you questions at that point.  Then both myself and

24      the attorneys will retire back to begin our selection

25      process.  One thing I want to stress to you, we're not
```

cp

1    here looking to obviously embarrass anybody or make

2    anybody feel that they have to reveal personal

3    information that you would not be comfortable revealing

4    to strangers in, obviously, this kind of setting.  So

5    if there's any question that either gets asked either

6    by myself or attorneys, please, for any reason you feel

7    you want to discuss is it privately at the bench, by

8    all means, indicate that to me and we'll certainly

9    afford you that privacy and that right to speak to us

10   privately here at the bench:  This process is the

11   process that determines if the defendant is guilty or

12   not guilty of the charges -- some of the charges that I

13   indicated to you earlier.  In that process, those of

14   you who are selected as jurors, and I as judge, perform

15   separate functions.  As jurors, you're going to be

16   called upon to determine whether or not the evidence

17   which you shall hear and see in this case, establishes

18   the defendant's guilt beyond a reasonable doubt.  In

19   other words, to do this at the end of the trial, you'll

20   have to evaluate all the evidence and determine what

21   evidence that you have heard from the witnesses and

22   seen as exhibits is credible and what it all means.

23   That is called finding the facts.  That will be your

24   function alone.  I will not find facts in this trial.

25   Your ultimate decision is called to a verdict.  Your

1    verdict will either be guilt or not guilty.   The

2    attorneys will present usually by calling witnesses and

3    may suggest in their closing arguments that you draw

4    certain conclusions from the evidence.   You are not

5    bound by what the attorneys say.   Only you can decide

6    what really happened and the verdict as to each of the

7    counts will remain your decision alone.

8            As Judge, I make no determination of guilt or

9    lack of guilt.   My role at trial is to ensure that you

10   reach your verdict in accordance with the applicable

11   law as I will explain it to you.   In order for the

12   People and defendant to receive a fair trial, I may

13   have to rule on questions concerning the conduct of the

14   trial.   Those rules have nothing to do with whether the

15   defendant is guilty or not guilty.

16           I may also rule on questions concerning what

17   evidence you may consider and for what purpose.   When I

18   make a ruling concerning whether you may hear some

19   testimony or see some exhibit which is offered in

20   evidence, I will be ruling on whether or not you're

21   permitted to hear or see it as a matter of law.

22   Likewise, if I instruct you to disregard something you

23   might have heard, I will do so because that is the law.

24   None of my rules should be taken by you as any

25   indication at all of whether you should believe all or

1    part of what's offered in evidence or whether the

2    defendant is guilty or not guilty.  That is solely for

3    you determine.  You must accept the law, however, as I

4    give it to you if the defendant and People are to have

5    a fair trial to which they are entitled.

6              Now at this point, prospective members, I

7    want to address certain basic principles that apply in

8    any criminal case, and afterwards, I want to ask all of

9    you if you could follow these principles of law which

10   you would be sworn to follow if you're selected as a

11   juror in this case.  We turn at this point to

12   fundamental principles that apply in all criminal

13   trials; the presumption of innocence, the burden of

14   proof and the requirement of proof beyond a reasonable

15   doubt.

16              Throughout these proceedings, the defendant

17   is presumed to be innocent.  As a result, you must find

18   the defendant not guilty unless, on the evidence

19   presented at this trial, you conclude that the People

20   have proven the defendant guilty beyond a reasonable

21   doubt.  The fact that a defendant does not testify as a

22   witness is not a factor from which any inference

23   unfavorable to the defendant may be drawn.  The

24   defendant is not required to prove that he is not

25   guilty.  In fact, the defendant is not required to

1    prove or disprove anything.  To the contrary, the

2    People have the burden of proving the defendant guilty

3    beyond a reasonable doubt.  That means before you can

4    find the defendant guilty of a crime, the People must

5    prove, beyond a reasonable doubt, every element of the

6    crime including that the defendant is the person who

7    committed the crime.  The burden of proof never shifts

8    from the People to the defendant.  If the People fail

9    to satisfy their burden of proof, you must find the

10   defendant not guilty.  If the People satisfy their

11   burden of proof, you must find defendant guilty.

12            What does our law mean when it requires proof

13   of guilt beyond a reasonable doubt?  The law uses the

14   term proof beyond a reasonable doubt to tell you how

15   convincing the evidence of guilt must be to permit a

16   verdict of guilty.  The law recognizes that in dealing

17   with human affairs, there are very few things in this

18   world that we know with absolute certainty.  Therefore,

19   the law does not require to prove a defendant guilty

20   beyond all possible doubt.  On the other hand, it is

21   not sufficient to prove that the defendant is probably

22   guilty.  In a criminal case, the proof of guilt must be

23   stronger than that.  It must be proof beyond a

24   reasonable doubt.

25            A reasonable doubt is an honest doubt of the

1    defendant's guilt for which a reason exists based on

2    the nature and quality of the evidence.  It is an

3    actual doubt, not an imaginary doubt.  It is a doubt

4    that a reasonable person, acting in a matter of this

5    importance, would be likely to entertain because of the

6    evidence that was presented or because of the lack of

7    convincing evidence.  If you are not convinced beyond a

8    reasonable doubt that the defendant is guilty of a

9    charged crime, you must find the defendant not guilty

10   of that crime.  However, if you are convinced beyond a

11   reasonable doubt that the defendant is guilty of a

12   charged crime, you must find the defendant guilty of

13   that crime.

14           As judges of the facts, you alone determine

15   the truthfulness and accuracy of the testimony of each

16   witness.  You must decide whether a witness told the

17   truth and was accurate or, instead, testified falsely

18   or was mistaken.  You must also decide what importance

19   to give to the testimony you accept as truthful and

20   accurate.  It is the quality of the testimony that is

21   controlling, not the number of witnesses who testify.

22           There's no particular formula for evaluating

23   the truthfulness and accuracy of another person's

24   statement or testimony.  You bring to this process all

25   of your varied life experiences.  In life, you

Proceedings

1    frequently decide the truthfulness and accuracy of

2    statements made to you by other people.  The same

3    factors used to make these decisions should be used in

4    this case when evaluating the testimony.  At the end of

5    this trial, I'll give you some examples from these

6    factors.

7              As you heard me list the potential witnesses

8    in this case, prospective members of the jury, you

9    heard me list a number of either police officers and/or

10   detectives either affiliated with the Hempstead Police

11   Department or the Nassau County Police Department.

12             The testimony of a witness should not be

13   believed solely and simply because the witness is a

14   police officer.  At the same time, a witness's

15   testimony should not be disbelieved solely and simply

16   because a witness is a police officer.  In other words,

17   you must not believe or disbelieve a police officer

18   just because he or she is a police officer.  You must

19   listen to a police officer's testimony just like you

20   would listen to any other witness and you must evaluate

21   a police officer's testimony for truthfulness and

22   accuracy in the same way you would evaluate the

23   testimony of any other witness.

24             Does anybody here that's sitting in the first

25   row here, anybody here for any reason would not be able

cp

1        to follow those instructions I've just given to you?

2        Presumption of innocence, proof beyond a reasonable

3        doubt; that a defendant does not have to testify?

4                 Artie, can I have the board?  Give me your

5        name, sir.

6                 PROSPECTIVE JUROR:  Martin Mohr.

7                 THE COURT:  Okay.  Mr. Mohr, which of those

8        would you have difficulty with?

9                 PROSPECTIVE JUROR:  I'm a sole practitioner

10       and in my -- prior to being a sole practitioner --

11                THE COURT:  Practitioner of what?

12                PROSPECTIVE JUROR:  Field of law.  Prior to

13       being a practitioner, I was an assistant district

14       attorney in the Bronx, Bronx County, and I was in the

15       Sex Crimes Bureau in addition to the grand jury and

16       Criminal Court Bureau.

17                THE COURT:  All right, and that would render

18       you --

19                PROSPECTIVE JUROR:  I think I've heard many,

20       many cases involving -- without getting into specifics,

21       I've had a great deal of experience in these types of

22       cases, and I think it would make me unable to make a

23       fair judgment based on the nature of the crime.

24                THE COURT:  And given your prior experience,

25       you feel you couldn't be fair and impartial?

Proceedings                                                                30

```
 1                    PROSPECTIVE JUROR:  I have a strong belief

 2        for this particular type of crime, yes.

 3                    THE COURT:  Anybody have any objection to

 4        excusing Mr. Mohr?

 5                    MR. LEMKE:  No.

 6                    MS. SINGAS:  No, Judge.

 7                    THE COURT:  All right.  Mr. Mohr, just step

 8        up and see my clerk.

 9                    PROSPECTIVE JUROR:  Thank you, Judge.

10                    MS. SINGAS:  Judge, can we come up one

11        minute?

12                    THE COURT:  Sure.

13                    (Whereupon, a discussion was held off the

14        record, at the bench, among the Court, defense counsel

15        and the assistant district attorney.)

16                    THE COURT:  Ms. Lee, would you step up for a

17        moment, bring your belongings?  You obviously got put

18        in the box.  We're going to excuse you.

19                    All right, Mr. McNeil -- no, pardon me.

20                    PROSPECTIVE JUROR:  Santo.

21                    THE COURT:  Santo.

22                    PROSPECTIVE JUROR:  Yes, I have an incident

23        in my past that I don't think I could be fair in this

24        case.  I was robbed at gunpoint.

25                    THE COURT:  All right.  All right.  I'm going
```

cp

Proceedings                                          31

1    to get to that.  We're going to cover that at some

2    point.  Right now I just want to concentrate on the

3    principles of law I talked about.

4              Anybody else in the firs row could not follow

5    the principles of law that I just went over?  Anybody

6    in the second row?  Anybody have any inability for any

7    reason that would not be able to follow those

8    principles that I discussed?  Okay.

9              As I indicated, we need jurors that can make

10   a decision; either guilty or not guilty.  Is there

11   anyone seated here, and again, I'm addressing myself to

12   now the twelve of you that are sitting in the box.  Is

13   there anyone who can't do that because of any religious

14   or personal beliefs?  First row anybody?  Second row?

15             At this point, what I'm going to do is I'm

16   going to speak to each of you individually in the order

17   in which you were seated.  What I'm going to ask you is

18   the following questions.  By the time we get to

19   prospective juror number 8 or 9, you've heard

20   everyone's answers, so by that point, you'll kind of

21   have the routine down, if you will.  What I'm going to

22   ask you is the neighborhood in which you live; okay?

23   Don't have to give me your street address; the

24   neighborhood in which you live, your marital status or

25   if you are in a committed relationship, if you have any

Proceedings

```
 1        children and what kind of work, if any, you're doing at
 2        the present time.  I will also ask you something as to
 3        whether or not you've been in many -- ever served in
 4        any prior criminal or civil trial, either federal or
 5        state court or grand jury.  I will also ask you if you
 6        or a member of your family ever worked for the police,
 7        district attorney or the court system, and the
 8        corrections system as well, and then I will also ask
 9        you as to whether or not you have anyone close to you
10        who's been in law enforcement, police, any type of law
11        enforcement, the people close to you in your background
12        that you could tell us about.
13               I will also ask you as to whether or not any
14        of you have been the victim of a crime or anyone close
15        to you been accused or convicted, for that matter, of a
16        crime, so at this point, we're going to start with
17        Ms. McNeil.  Good afternoon.
18               PROSPECTIVE JUROR:  Hi.
19               THE COURT:  Hi.  How are you?
20               PROSPECTIVE JUROR:  Fine.
21               THE COURT:  Okay.  Could you tell me the
22        neighborhood, ma'am, which you live?
23               PROSPECTIVE JUROR:  Hempstead, New York.
24               THE COURT:  Okay.  You heard me indicate that
25        the allegations in this case concern certain areas, I
```

1    believe, in the confines in the Village of Hempstead.

2    I don't know the particular locations.  One or both of

3    the attorneys may ask you about that, but is there

4    any -- do you have any -- have you heard anything about

5    this case at all from living in Hempstead?  Do you know

6    anything about the allegations or the defendant at all?

7              PROSPECTIVE JUROR:  No, I don't.

8              THE COURT:  Okay.  Could you tell us if

9    you're married or in a committed relationship?

10             PROSPECTIVE JUROR:  No, I'm divorced.

11             THE COURT:  Okay.  Any children?

12             PROSPECTIVE JUROR:  Yes, three.

13             THE COURT:  Approximately their ages,

14   approximate ages?

15             PROSPECTIVE JUROR:  41 the oldest, youngest

16   39 and in between.

17             THE COURT:  And their occupations, if they're

18   currently working?

19             PROSPECTIVE JUROR:  Yes, they're working.

20   One is in medical, my daughter's a claim adjustor and

21   my son in California is white collar.

22             THE COURT:  Son is --

23             PROSPECTIVE JUROR:  California.

24             THE COURT:  And --

25             PROSPECTIVE JUROR:  Body guard, body guard

Proceedings                                                    34

```
 1                for the stars.
 2                        THE COURT:  Are you currently working?
 3                        PROSPECTIVE JUROR:  No, I'm retired.
 4                        THE COURT:  You're retired.  And before you
 5                retired, what kind of work did you do?
 6                        PROSPECTIVE JUROR:  Nassau County Juvenile
 7                Detention.
 8                        THE COURT:  Down in Westbury?
 9                        PROSPECTIVE JUROR:  Yes.
10                        THE COURT:  How many years did you work
11                there?
12                        PROSPECTIVE JUROR:  About ten.
13                        THE COURT:  Okay.  Had contact with people
14                from the Correctional Department, I assume?
15                        PROSPECTIVE JUROR:  Yes.
16                        THE COURT:  Okay.  The defendant in this case
17                has worked for the New York City Correction Department.
18                Would that in any way affect your ability to sit as a
19                juror in this case?
20                        PROSPECTIVE JUROR:  No.
21                        THE COURT:  You feel you can give both sides
22                a fair trial?
23                        PROSPECTIVE JUROR:  Yes, I do.
24                        THE COURT:  Anything about your prior
25                experience working at the juvenile detention center
```

1        that would in any way, as you sit here, cause you to be

2        less than fair and impartial to both sides?

3                    PROSPECTIVE JUROR:  No.

4                    THE COURT:  Okay.  Have you had any prior

5        jury service at all?

6                    PROSPECTIVE JUROR:  No. Have I served before?

7                    THE COURT:  Yes.

8                    PROSPECTIVE JUROR:  No.

9                    THE COURT:  And just so I'm clear, when you

10       worked for the juvenile detention office, in what

11       capacity was that?

12                   PROSPECTIVE JUROR:  I do like security guard,

13       security guard, the prison.

14                   THE COURT:  And employed by the County?

15                   PROSPECTIVE JUROR:  Yes.

16                   THE COURT:  Ms. Kreindler?

17                   PROSPECTIVE JUROR:  Yes.

18                   THE COURT:  Good afternoon.  Could you tell

19       me the neighborhood in which you live?

20                   PROSPECTIVE JUROR:  Port Washington.

21                   THE COURT:  Marital status or if you're in a

22       committed relationship?

23                   PROSPECTIVE JUROR:  Married.

24                   THE COURT:  Children, if any?

25                   PROSPECTIVE JUROR:  Yes, three sons.

Proceedings

```
1                    THE COURT:  Their ages, approximately?
2                    PROSPECTIVE JUROR:  Early 40s.
3                    THE COURT:  Type of work, if any, they're
4       doing?
5                    PROSPECTIVE JUROR:  Retail.
6                    THE COURT:  Are you currently employed?
7                    PROSPECTIVE JUROR:  Yes.
8                    THE COURT:  What kind of work did you do?
9                    PROSPECTIVE JUROR:  Industrial real estate.
10                   THE COURT:  Miss, you're going to have to
11      help me with this.
12                   PROSPECTIVE JUROR:  Mine?
13                   THE COURT:  No, thank you.  I'm going to get
14      back to you.
15                   PROSPECTIVE JUROR:  Dluginski.
16                   THE COURT:  One more time.
17                   PROSPECTIVE JUROR:  Dluginski.
18                   THE COURT:  Neighborhood in which you live?
19                   PROSPECTIVE JUROR:  Mineola.
20                   THE COURT:  Married or committed
21      relationship?
22                   PROSPECTIVE JUROR:  Married.
23                   THE COURT:  Children?
24                   PROSPECTIVE JUROR:  Three daughters, all
25      young adults.
```

cp

Proceedings

1          THE COURT:  Any of them working currently?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  What kind of work do they do?

4          PROSPECTIVE JUROR:  Public relations.

5          THE COURT:  Are you currently working?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  What kind of work?

8          PROSPECTIVE JUROR:  I'm a personal trainer.

9          THE COURT:  And occupation of your husband?

10         PROSPECTIVE JUROR:  New York City Transit.

11         THE COURT:  What capacity?

12         PROSPECTIVE JUROR:  Supervisor on the tracks.

13         THE COURT:  Thank you, Miss -- is it

14    Eannucci?

15         PROSPECTIVE JUROR:  Eannucci.

16         THE COURT:  Neighborhood in which you live?

17         PROSPECTIVE JUROR:  Westbury.

18         THE COURT:  Married or committed

19    relationship?

20         PROSPECTIVE JUROR:  Separated.

21         THE COURT:  Children?

22         PROSPECTIVE JUROR:  Two; 13 and 9.

23         THE COURT:  Currently working?

24         PROSPECTIVE JUROR:  Working.

25         THE COURT:  What kind of work?

```
 1                    PROSPECTIVE JUROR:  I run a process serving

 2        court service company.

 3                    THE COURT:  Is that in the Mineola area?

 4                    PROSPECTIVE JUROR:  Islip.

 5                    THE COURT:  Okay.  Thank you.  Ms. Pescow?

 6                    PROSPECTIVE JUROR:  Pescow.

 7                    THE COURT:  Neighborhood in which you live?

 8                    PROSPECTIVE JUROR:  Great Neck.

 9                    THE COURT:  Married or committed

10        relationship?

11                    PROSPECTIVE JUROR:  Not married and a

12        relationship.

13                    THE COURT:  Okay.  Children?

14                    PROSPECTIVE JUROR:  I have one surviving son.

15                    THE COURT:  Currently working?

16                    PROSPECTIVE JUROR:  Retired.

17                    THE COURT:  Retired.  Are you currently

18        working?

19                    PROSPECTIVE JUROR:  No, I'm not.  Retired.

20                    THE COURT:  All right.  Thank you.

21                    Mr. Santo, neighborhood in which you live?

22                    PROSPECTIVE JUROR:  Oyster Bay.

23                    THE COURT:  Married or committed

24        relationship?

25                    PROSPECTIVE JUROR:  Married.
```

Proceedings                                                                 39

1          THE COURT:  Children?

2          PROSPECTIVE JUROR:  One.

3          THE COURT:  Approximately how old?

4          PROSPECTIVE JUROR:  She's first year college,

5    student age.

6          THE COURT:  Nature of your work, if any?

7          PROSPECTIVE JUROR:  Accountant.

8          THE COURT:  Okay.  Your spouse, what kind of

9    work?

10         PROSPECTIVE JUROR:  Homemaker.

11         THE COURT:  All right.  Thank you.  All the

12   way in the back, Ms. Oerzen?

13         PROSPECTIVE JUROR:  Oerzen.

14         THE COURT:  Oerzen.  I'm sorry.  I better

15   take my glasses off.  All right, Ms. Oerzen,

16   neighborhood in which you live?

17         PROSPECTIVE JUROR:  Garden City.

18         THE COURT:  Married or committed?

19         PROSPECTIVE JUROR:  Married, three children;

20   25, 24, 22, one's a writer, one is an

21   importer-exporter, one's a teacher.

22         THE COURT:  Okay, and yourself?  Are you

23   currently working?

24         PROSPECTIVE JUROR:  I'm a teacher.

25         THE COURT:  Okay.  What grade, if I may ask?

Proceedings

```
 1                    PROSPECTIVE JUROR:  Third.

 2                    THE COURT:  Okay.  Ms. Unger, good afternoon.

 3                    PROSPECTIVE JUROR:  Hi.

 4                    THE COURT:  How are you?

 5                    PROSPECTIVE JUROR:  Good.

 6                    THE COURT:  Neighborhood in which you live?

 7                    PROSPECTIVE JUROR:  Roslyn.

 8                    THE COURT:  Married or committed

 9      relationship?

10                    PROSPECTIVE JUROR:  Widow, widowed.

11                    THE COURT:  Okay, children, if any?

12                    PROSPECTIVE JUROR:  One daughter.

13                    THE COURT:  How old?

14                    PROSPECTIVE JUROR:  College, 19.

15                    THE COURT:  Currently are you yourself

16      currently working?

17                    PROSPECTIVE JUROR:  Yes, sales.

18                    THE COURT:  In sales.  Okay.

19                    Mr. Fogarty, good afternoon, sir.

20      Neighborhood in which you live?

21                    PROSPECTIVE JUROR:  North Merrick.

22                    THE COURT:  Married or committed

23      relationship?

24                    PROSPECTIVE JUROR:  Not married, in a

25      relationship.
```

cp

Proceedings                                                     41

```
1              THE COURT:  Okay, and children, if any?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Type of work, if any, you're

4    doing?

5              PROSPECTIVE JUROR:  Sales.

6              THE COURT:  Sales, okay.  Mr. Jeremie?

7              PROSPECTIVE JUROR:  Jeremie.

8              THE COURT:  Am I pronouncing that correctly?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Neighborhood, sir, you live in?

11             PROSPECTIVE JUROR:  Massapequa.

12             THE COURT:  Married or committed

13   relationship?

14             PROSPECTIVE JUROR:  Separated.

15             THE COURT:  Children, if any?

16             PROSPECTIVE JUROR:  One, 22.

17             THE COURT:  Type of work that they do?

18             PROSPECTIVE JUROR:  He works for Time Warner?

19             THE COURT:  You, yourself, sir, are you

20   currently working?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  Ms. Harris, good afternoon.

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Neighborhood in which you live?

25             PROSPECTIVE JUROR:  I live in Valley Stream.
```

Proceedings

```
 1              THE COURT:  Married or committed

 2    relationship?

 3              PROSPECTIVE JUROR:  I'm in a committed

 4    relationship.

 5              THE COURT:  Children?

 6              PROSPECTIVE JUROR:  No children.

 7              THE COURT:  Your current work, if any?

 8              PROSPECTIVE JUROR:  I'm a licensed social

 9    worker.

10              THE COURT:  For a particular agency?

11              PROSPECTIVE JUROR:  Yeah, right now working

12    for a Catholic -- St. Christopher's Family Dynamics.

13              THE COURT:  In any particular field or area?

14              PROSPECTIVE JUROR:  I do family counseling.

15              THE COURT:  Family counseling.  Okay.  All

16    right.  Thank you.  Finally, Mr. Tarnowski.  Sir,

17    neighborhood which you live?

18              PROSPECTIVE JUROR:  Wantagh.

19              THE COURT:  Married or committed

20    relationship?

21              PROSPECTIVE JUROR:  Single.

22              THE COURT:  And your current work?

23              PROSPECTIVE JUROR:  Freelance graphic design,

24    web design, but currently unemployed, technically.

25              THE COURT:  Okay.  All right.  What I'm going
```

Proceedings                                                    43

1    to do, trying to address myself here with the following

2    questions to the first row.  If the answer is yes to

3    any of these questions, just kindly indicate by raising

4    your hands.

5              Have any of you sitting first row as a juror

6    in either a criminal, civil, or federal trial or grand

7    juror?  First row?

8              Ms. Pescow?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Which of the three?

11             PROSPECTIVE JUROR:  I was in a criminal trial

12   in this court and it was of a similar indictment as has

13   been brought against the current defendant.

14             THE COURT:  How many years ago was that?

15             PROSPECTIVE JUROR:  About 25 years ago.

16             THE COURT:  And were you, shall I say, one of

17   the twelve jurors or an alternate?

18             PROSPECTIVE JUROR:  One of the twelve.

19             THE COURT:  And the jury, without telling me

20   what the verdict is, the jury reached a verdict in that

21   case?

22             PROSPECTIVE JUROR:  It was -- the jury did

23   not reach a verdict.  It was a hung jury, I think you

24   would call it.

25             THE COURT:  Yes, okay.  So there was a

Proceedings                                                    44

1        mistrial declared at some point?

2                    PROSPECTIVE JUROR:  Yes.

3                    THE COURT:  Okay.

4                    PROSPECTIVE JUROR:  Anybody else in the first

5        row?  Okay.  All right.  How about the second row,

6        criminal trial, state, federal, grand jury?

7                    Ms. Unger?

8                    PROSPECTIVE JUROR:  Criminal.

9                    THE COURT:  Which county?

10                   PROSPECTIVE JUROR:  Queens.

11                   THE COURT:  And how many yours ago was that?

12                   PROSPECTIVE JUROR:  I would say probably like

13       18 years ago, a long time ago.

14                   THE COURT:  You recall the nature of the

15       charges?

16                   PROSPECTIVE JUROR:  Someone broke into a

17       house.

18                   THE COURT:  And did the jury reach a verdict?

19                   PROSPECTIVE JUROR:  No, they settled.

20                   THE COURT:  Okay, so it resolved before the

21       jury reached a verdict?

22                   PROSPECTIVE JUROR:  Yes.

23                   THE COURT:  Anybody else in the second row

24       prior, prior jury service?

25                   Ms. Harris?

1           PROSPECTIVE JUROR:  Yes, I was in a jury

2    before.  It was in the Bronx, but I don't think -- it

3    was a civil case.

4           THE COURT:  Okay.

5           PROSPECTIVE JUROR:  We didn't reach a

6    verdict.  They settled also.

7           THE COURT:  Right.  Okay.  All right.  The

8    next question I have for those of you sitting there,

9    again, I'm going to go row by row.  Have any of you or

10   a member of your family either worked either for the

11   police department, the corrections department, the

12   district attorney's office?  Doesn't necessarily have

13   to be in this County, or the court system in general.

14           In the first row?  Ms. Dluginski?

15           PROSPECTIVE JUROR:  My brother-in-law is a

16   Nassau County detective, a whole bunch of people in my

17   husband's family are in law enforcement.

18           THE COURT:  The brother?  You said a

19   brother-in-law?

20           PROSPECTIVE JUROR:  Brother-in-law.

21           THE COURT:  Brother-in-law.  Do you know

22   what -- do you know what particular unit he's assigned

23   to?

24           PROSPECTIVE JUROR:  No, I don't.

25           THE COURT:  Okay.  Is it somebody you speak

proceedings                                                46

1          to frequently?

2                    PROSPECTIVE JUROR:  Yeah.

3                    THE COURT:  Does he, on occasion, speak about

4          his cases at all?

5                    PROSPECTIVE JUROR:  In a vague way.

6                    THE COURT:  I'm sorry.  In a vague way?

7                    PROSPECTIVE JUROR:  Vague way.

8                    THE COURT:  You have heard me before give my

9          instruction about police witnesses which occurs in

10         almost every criminal trial.  There will be some police

11         witnesses called.  The law does not require you, as a

12         juror, to give any extra advantage or anymore

13         credibility to a police officer than any other witness.

14         In fact, you're obligated to evaluate a police officer

15         or a detective's testimony just like you would anybody

16         else.  Police officers and detectives could tell the

17         truth, they could be mistaken, or they can lie.  Is

18         there any reason why you wouldn't be able to follow

19         that instruction on the law with regard to police

20         officers in light of your experience and evaluate them

21         as you would anybody else?

22                    PROSPECTIVE JUROR:  Not really sure.

23                    THE COURT:  All right.  Well, I'm sure one or

24         both of the attorneys are going to get back to you on

25         that, so I want you to examine, if you will, your

cp

Proceedings                                                    47

1    conscience as you sit there, and I'm sure one of them

2    will follow up with that.

3              Anybody else who's got members of their

4    family or close associations that are involved in, if

5    you will, in general, the law enforcement system?

6              Ms. McNeil?

7              PROSPECTIVE JUROR:  Yes, my cousin, Cornell

8    Fosky, Judge Cornell Fosky?

9              THE COURT:  Right.  He's the supervising

10   judge down in Family Court.

11             PROSPECTIVE JUROR:  Yeah, I'm on his

12   campaign.

13             THE COURT:  Anything about your relationship

14   with Judge Fosky that you feel you couldn't serve as a

15   juror in this case?

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  Other than the fact he may want

18   you out there working on his campaign?

19             PROSPECTIVE JUROR:  That's about it.

20             THE COURT:  Okay.  Any reason why you

21   couldn't -- anybody else, I should say, other than

22   Judge Fosky?

23             PROSPECTIVE JUROR:  Yes, but not in this

24   state.

25             THE COURT:  Okay.  Anybody that's close to

1    you?

2            PROSPECTIVE JUROR:  Yes, my first cousin.

3    He's chief judge.

4            THE COURT:  Okay.  All right.  How about

5    police officers, detectives?

6            PROSPECTIVE JUROR:  No.

7            THE COURT:  All right.  And you indicated to

8    us previously that you're working at the

9    correctional -- pardon me -- juvenille detention center

10   in Westbury; that in no way would affect you as a juror

11   in this case; is that right?

12           PROSPECTIVE JUROR:  Right.

13           THE COURT:  Anybody else in that first row?

14   How about the second row?

15           Mr. Fogarty?

16           PROSPECTIVE JUROR:  My grandfather was a

17   police officer, my uncle was a police officer, my

18   mother actually also works for Judge Fosky as well.  I

19   think that's it.

20           THE COURT:  Okay.  All right.  You heard me

21   give the instruction before about police officers and

22   detectives.  Any reason why you couldn't follow that?

23           PROSPECTIVE JUROR:  Uhm, I'd like to say I

24   believe I could.  I have to say I was very close to my

25   grandfather, so I don't want to say it leads me to

```
 1    believe that police officers are completely always

 2    honest.  I know it might not be true, but I would do my

 3    best.

 4                 THE COURT:  Okay.  All right.  Anybody else

 5    in that second row the law enforcement question?

 6    Police, detectives, DAs, Corrections, court system?

 7    Nobody?

 8                 PROSPECTIVE JUROR:  Attorney that's not in

 9    the DA.  That might be corporate, my brother.  I'm

10    really close with him.

11                 THE COURT:  Okay.

12                 PROSPECTIVE JUROR:  I don't know if that

13    counts.

14                 THE COURT:  They don't practice in the

15    criminal field?

16                 PROSPECTIVE JUROR:  No, it's corporate.

17                 THE COURT:  Okay.  We're not worried about

18    those corporate lawyers here.

19                 PROSPECTIVE JUROR:  Just checking.

20                 THE COURT:  Victim of a crime question.

21    Again going back to the first row.  This is your

22    moment, Mr. Santo.  I know you indicated --

23                 PROSPECTIVE JUROR:  I was the victim of a

24    crime.

25                 THE COURT:  Without getting into too much
```

Proceedings

```
 1              detail.
 2                        PROSPECTIVE JUROR:  Right.
 3                        THE COURT:  Let me just ask you this.  How
 4        long ago was that?
 5                        PROSPECTIVE JUROR:  27 years ago.
 6                        THE COURT:  So that's quite a long time.  Was
 7        it you, yourself?
 8                        PROSPECTIVE JUROR:  Yes.
 9                        THE COURT:  Did you -- were you involved in
10        the court process at all?
11                        PROSPECTIVE JUROR:  No.
12                        THE COURT:  Okay.  And your approximate age?
13                        PROSPECTIVE JUROR:  I'm 47.
14                        THE COURT:  No, at the time it happened.
15                        PROSPECTIVE JUROR:  I was 19 or 20, yes.
16                        THE COURT:  As you sit here now, are you of a
17        mindset that because of that particular experience, you
18        couldn't be fair and impartial?
19                        PROSPECTIVE JUROR:  Yes, I believe I could
20        not be fair.
21                        THE COURT:  Okay.  All right.  Anybody else
22        first row?  Ms. Dluginski again?  I'm talking about
23        either you or a close family member that's been the
24        victim of a crime.  Go ahead.
25                        PROSPECTIVE JUROR:  I was the victim of a
```

Proceedings                                                         51

1    crime.

2            THE COURT:  Ms. Dluginski, how long ago I

3    should say was the incident.

4            PROSPECTIVE JUROR:  Uhm, it was multiple

5    incidents when I was a child.

6            THE COURT:  Okay.  Anything in terms of those

7    particular experiences that in any way are similar to

8    the allegations that I indicated here earlier?

9            PROSPECTIVE JUROR:  Yes.

10           THE COURT:  And again, my question, as I

11   asked Mr. Santo, is do you feel as you sit here now

12   that you'd be of a mindset that you could not be fair

13   and impartial because of those experiences?

14           PROSPECTIVE JUROR:  Yeah, I think I probably

15   could not be fair.

16           THE COURT:  Okay.  Anybody else in the first

17   row the crime victim question, if you will?  Moving to

18   the second row, anybody here, you, yourself or close

19   family member been the victim of a crime?

20           Ms. Harris?

21           PROSPECTIVE JUROR:  Yes, I was the victim of

22   a crime and a witness to a crime around twenty years

23   ago.

24           THE COURT:  All right.  The victim to a crime

25   to the extent you're comfortable telling us what kind

1    of incident was it.  If you're not comfortable, you

2    don't have to say it out loud.

3            PROSPECTIVE JUROR:  Violent.

4            THE COURT:  Were you involved in the court

5    system at all as a result of it?  In other words, was

6    there an arrest?  Was there a prosecution?  Did you

7    testify in court, grand jury?

8            PROSPECTIVE JUROR:  It was everything,

9    everything you just said.

10           THE COURT:  So you actually were called as a

11   witness to testify in court?

12           PROSPECTIVE JUROR:  Yes.

13           THE COURT:  Okay.  Would you be able to put

14   that aside, because what I tell the jury is you have to

15   decide this case without, you know, fear, favor, bias,

16   prejudice, and if you can give me your assurance that

17   you could put that experience aside and make a

18   determination in this case based upon the evidence you

19   hear in court, I'll take you on your word.  If you feel

20   as you sit here now that you have can't, then now is

21   the time for us to know.

22           PROSPECTIVE JUROR:  I think I can, your

23   Honor.  I worked at it and now I'm working.  You know,

24   I work as a social worker now, so I think I can.

25           THE COURT:  All right.  Anybody else second

Proceedings                                    53

1    row victim of a crime, you, yourself, close family

2    person?  Okay.

3              The next question, again I'll ask it kind of

4    collectively going through first row, has anyone close

5    to you or yourself -- this is usually the time I repeat

6    if there's anything about this question you want to

7    speak to us privately about, by all means, we

8    understand that, whose been either accused or convicted

9    of a crime?  First row?  Anybody?

10             Anybody close to you, yourself, either been

11   accused or convicted of a crime?

12             Okay, Ms. Dluginski?

13             PROSPECTIVE JUROR:  My father was accused.

14             THE COURT:  Okay, and how long ago was that?

15             PROSPECTIVE JUROR:  25 years ago.

16             THE COURT:  Okay.  Anybody else first row?

17   How about the second row accused or convicted of a

18   crime?

19             Mr. Fogarty?

20             PROSPECTIVE JUROR:  My cousin was I believe

21   convicted of -- he just recently got out of jail, I

22   believe.

23             THE COURT:  And you said it's a cousin.  Do

24   you know what he was convicted of?

25             PROSPECTIVE JUROR:  I believe it had to do

1          with drugs.  I'm not sure.

2                      THE COURT:  Did you go to court for him at

3          all?

4                      PROSPECTIVE JUROR:  No.

5                      THE COURT:  Okay.  Anything about that

6          incident that would prevent you from sitting as a juror

7          in this case?

8                      PROSPECTIVE JUROR:  I don't believe so.

9                      THE COURT:  All right.  Ms. Singas, are you

10         ready?

11                     All right.  Members of the prospective panel,

12         the attorneys at this point are going to be given a

13         certain allotted time to question you, and again,

14         members of the audience, even though you're not sitting

15         in the box, I ask you please kindly pay attention to

16         the questions the attorneys are going to ask.

17                     MS. SINGAS:  Oh, good afternoon.  You're

18         going to have to hang in there a little while longer

19         until we get to the end of the day.  I just want to

20         follow up on some of the questions that Judge McCormack

21         asked.  I know all of us sort of have a tendency

22         because it's a difficult situation that placed in here,

23         and we ask you these questions and a lot of you say I

24         think I can be fair, I think I can do that, and

25         sometimes for us, we have to know that you can be fair

1    and we have to know that we're playing on a level

2    playing field because that's really the name of the

3    game here; that the people sitting in this box, when

4    they listen to the evidence from the People's

5    perspective and from the defense perspective can give

6    each of us a fair shake.  So I'll be pressing you more

7    on the "I think I can answer", so I warn you now.

8              MS. McNeil, you said that you retired from

9    the juvenille detention center; is that correct?  So

10   that's where they kept juveniles accused of crimes?

11             PROSPECTIVE JUROR:  Yes.

12             MS. SINGAS:  And was that 14, 15 and 16?

13             PROSPECTIVE JUROR:  Yes.

14             MS. SINGAS:  How long did you do that?

15             PROSPECTIVE JUROR:  About ten I worked.

16             MS. SINGAS:  Did you have a lot of contact

17   with other members of law enforcement?

18             PROSPECTIVE JUROR:  Yes, transferring them to

19   court and different things.

20             MS. SINGAS:  Okay.  So you were pretty

21   familiar with how the system worked and the court

22   system and everything like that.

23             PROSPECTIVE JUROR:  Yes.

24             MS. SINGAS:  And did you have any connection

25   with people who were like you, but from other agencies

1          like corrections agencies or the Sheriff's Department?

2                   PROSPECTIVE JUROR:  Yes, that worked with us

3          and --

4                   MS. SINGAS:  You have to keep your voice up,

5          so I'm going to stand over here.  Okay.  So you did

6          work with other sorts of brother agencies --

7                   PROSPECTIVE JUROR:  Yes.

8                   MS. SINGAS:  -- that did the same kind of

9          work that you do?

10                  PROSPECTIVE JUROR:  Yes.

11                  MS. SINGAS:  Now you said you're also from

12         Hempstead?

13                  PROSPECTIVE JUROR:  Yes, I am.

14                  MS. SINGAS:  Okay, and as the Judge said, a

15         number of these crimes happened in Hempstead?

16                  PROSPECTIVE JUROR:  Yes.

17                  MS. SINGAS:  Are you unfamiliar with the fact

18         that a corrections officer from Hempstead was arrested

19         in connection with some of these crimes?

20                  PROSPECTIVE JUROR:  I haven't heard of this

21         particular one because I've been away a lot.  I've been

22         for a couple of years, but I've seen the party, the

23         client, the gentleman.  I've seen him around in the

24         area.

25                  MS. SINGAS:  Okay.  Anything about that that

1    makes you think maybe this isn't the case for you to

2    sit on?

3              PROSPECTIVE JUROR:  Well, since I've seen

4    him, I wouldn't want to sit on it, and I live in

5    Hempstead.

6              MS. SINGAS:  Okay.  Fair enough.  Okay.  I

7    believe a number of you also said that you have people

8    in your backgrounds who are law enforcement people.

9    Mr. Fogarty, you were one of them, Ms. Dluginski, I'm

10   sorry.  It's late.  Okay.

11             Again, and I know both of you said you think

12   you can be fair if you ever hear police testimony, so

13   the question I have for you is, let's say a witness is

14   on the stand and it's a police officer, and they're

15   saying something that is completely nonsensical,

16   doesn't make any sense, not reasonable, totally out of

17   left field, do you think if you listen to that

18   testimony you're going to go in the back when

19   deliberating and say, you know, I know that testimony

20   sounded ridiculous, but that guy's a cop.  Since my

21   grandfather's a cop, I'm going to just believe what he

22   has to say because they're police officers.

23             You think you would do that, Mr. Fogarty?

24             PROSPECTIVE JUROR:  Uhm, it's absolutely

25   ridiculous.  I would have to say no, but like I said,

1    it's very -- being very close to my grandfather, it's

2    very hard for me to think, but cops do lie, but I know

3    it's possible just like anyone else, but --

4           MS. SINGAS:  Can you promise me this?  Can

5    you promise me that you can fairly and impartially

6    listen to the evidence and call it like you see it?

7           PROSPECTIVE JUROR:  Yes.

8           MS. SINGAS:  Do you think you can do that?

9    Okay.

10          How about you, Ms. Dluginski?  Or do you

11    think --

12          PROSPECTIVE JUROR:  Yes, I think I can.

13          MS. SINGAS:  Again, you know the "I think I

14    can."  You know, and again, these questions, you're the

15    only ones who can answer these questions for us.  You

16    have to look deep say, you know what?  I can listen to

17    the evidence.  I can apply my common sense because

18    that's all we're going to ask you to do, and apply the

19    law as the judge gives it to me, and whatever happens

20    is whatever, you know, whatever happens.  Nobody gets

21    extra credit right before they start just because

22    they're wearing a uniform.

23          Can you promise me that?

24          PROSPECTIVE JUROR:  Uh-hum.

25          MS. SINGAS:  Mr. Fogarty?

1        PROSPECTIVE JUROR:  Uh-hum.

2            MS. SINGAS:  And now how about the opposite?

3    Ms. Kreindler, a lot of us are law enforcement people.

4    Is there anyone here that believes that someone who's

5    law enforcement, someone who's a corrections officer

6    could not possibly have committed some of the crimes

7    that you heard the Judge say?

8            Ms. Kreindler, do you believe that a law

9    enforcement officer would never rape somebody, would

10   never rob something?

11           PROSPECTIVE JUROR:  I think it can.

12           MS. SINGAS:  Mr. Fogarty, given your law

13   enforcement connections, do you think it would be

14   impossible?  Would you say, I don't think a law

15   enforcement officer could ever commit those crimes?

16           PROSPECTIVE JUROR:  No, I wouldn't say that

17   it's not possible.

18           MS. SINGAS:  Mr. Jeremie, how about you?  Any

19   feelings about that?

20           PROSPECTIVE JUROR:  None whatsoever.

21           MS. SINGAS:  Okay.  So you can accept the

22   possibility that someone who's in a law enforcement

23   capacity can be found guilty, could have committed

24   these crimes?

25           PROSPECTIVE JUROR:  Yeah, might say.

```
 1              MS. SINGAS:  Ms. Pescow, when we were talking

 2      about your jury service, you seemed a little agitated

 3      by that.  Did the experience bother you at all or

 4      anything about that experience that you didn't like

 5      that would make you uncomfortable in this case?

 6              PROSPECTIVE JUROR:  Yes.

 7              MS. SINGAS:  And what is it if you can share

 8      it with us?

 9              PROSPECTIVE JUROR:  It was very difficult

10      dealing with sitting in a room and thinking that some

11      of the people that were in the jury were not being fair

12      to both parties, and it was a very difficult experience

13      for me under those circumstances.

14              MS. SINGAS:  Okay.  And, again, I don't know

15      if the rest of you have been jurors, but you're going

16      to be in a room and you have to express your feelings

17      and express your concerns and so on, and some people

18      that comes very naturally to, and other people that,

19      you know, sometimes it really emotionally takes a toll

20      on them, so Ms. Pescow, having been through the

21      experience, you're probably one of the few who have.

22      Do you think you're ready to do it again or you think

23      anything that happened in that --

24              PROSPECTIVE JUROR:  I'm not sure I'm ready to

25      do it when rape may be involved, because that was the
```

1    kind of case that I was on.

2              MS. SINGAS:  So do you think the nature of

3    this crime is too closely connected to the nature of

4    the crime that you dealt with before, and that you

5    wouldn't be able to separate it out?

6              PROSPECTIVE JUROR:  Well, I wouldn't go to

7    the extreme, but I think I would have some difficulty

8    because of my prior experience.

9              MS. SINGAS:  Okay, fair enough.  Was anybody

10   else criminal jury service?

11             Yes, Ms. Unger, is it?

12             PROSPECTIVE JUROR:  Yeah.

13             MS. SINGAS:  Anything about that experience?

14   Again, there's a different judge, different prosecutor.

15             PROSPECTIVE JUROR:  Not related to this,

16   really.

17             MS. SINGAS:  You think you can put that all

18   aside, take the law as this judge gives it to you, the

19   facts as you hear in this courtroom and apply that?

20             PROSPECTIVE JUROR:  As related to that, yeah,

21   has nothing to do with the other case.

22             MS. SINGAS:  You can put it aside?  Okay?

23             PROSPECTIVE JUROR:  Okay.

24             MS. SINGAS:  Ms. Harris, you also said, as

25   Mr. Santo did, that you were the victim of a crime.

1      Mr. Santo, you're saying there's no way anything that

2      you can do psychologically --

3              PROSPECTIVE JUROR:  Even though it was many

4      years, it's as fresh in my mind as if it happened

5      yesterday.

6              MS. SINGAS:  Ms. Harris, you said you think

7      you can, but there's going to be some victims of crimes

8      who come into this courtroom and take this stand and

9      they're going to give some emotional testimony.  Do you

10     think that you will be able to sit, you know, fairly,

11     impartially, and listen to that evidence and not call

12     into play your own emotions as a victim or anything

13     that happened during that process?  The jury system, I

14     think you testified in the grand jury, you were very

15     much involved and it's all going to sound very familiar

16     to you as you hear the evidence in this case of how the

17     procedure works.  Do you think you can separate out

18     your own experiences and listen to this evidence?

19             PROSPECTIVE JUROR:  I can, I can, I can.  I

20     have counseled both sides now, so I think I can be

21     fair.  I can be fair.

22             MS. SINGAS:  Okay.  Good.  And have you

23     counseled rape victims or victims of sexual abuse?

24             PROSPECTIVE JUROR:  Yes.

25             MS. SINGAS:  Okay.  Again same question.  You

1    can put aside what you know from like, let's say for

2    example you see a reaction from a woman on the stand.

3    Do you say, know what?  That's not the typical reaction

4    of a rape victim, and I know because I deal with rape

5    victims, and I know how they're supposed to behave.

6    Can you promise me you wouldn't do that?

7            PROSPECTIVE JUROR:  Yeah, because there's no

8    way they're supposed to behave.

9            MS. SINGAS:  Exactly, but you'll take the

10   evidence as it comes from the witness stand?

11           PROSPECTIVE JUROR:  Yes, I will.

12           MS. SINGAS:  Mr. Jeremie, you said that

13   you're currently not working?

14           PROSPECTIVE JUROR:  No.

15           MS. SINGAS:  What kind of work did you do

16   when you were working?

17           PROSPECTIVE JUROR:  Senior lab technician.

18           MS. SINGAS:  There's going to be evidence in

19   this case coming from a lab and coming from lab

20   technicians; okay?  You think you're going to give them

21   extra credit just because they're lab technicians and

22   you were once?

23           PROSPECTIVE JUROR:  It was a long time ago.

24           MS. SINGAS:  It was a long time ago.  Okay.

25   And you wouldn't substitute your knowledge of lab

1        techniques for what the witnesses say?

2                PROSPECTIVE JUROR:  No.

3                MS. SINGAS:  Okay.  Ms. Oerzen, anything

4        about the nature of the counts you have heard so far

5        being read, the nature of the crime that makes you

6        think that this isn't a case you'd want to sit on?

7                PROSPECTIVE JUROR:  I've never done this

8        before.

9                MS. SINGAS:  Okay, and that's, you know, I'm

10       sure how many of you went to jury school before you got

11       here?  Okay.  Nobody does; right?  And that's why we

12       need people like you, because we ask you to bring your

13       everyday life experiences and bring them into this

14       courtroom and assess the evidence as you hear it

15       applying your own common sense.  Can you do that?

16       Okay.  Then you just graduated from jury school.  Okay.

17               Ms. Kreindler, one of the main issues you're

18       going to have to resolve in this case is was there a

19       proper identification made of defendant; okay?  So

20       let's talk about that.  Being able to identify someone,

21       Mr. Santo, I'm going to go to you for a minute.  Where

22       you were a victim of a crime, and if you don't want to

23       talk about it, you don't have to, but were there more

24       than one?  Was there more than one victim or was it

25       just you?

1          PROSPECTIVE JUROR:  It was me and my father,

2     actually.

3          MS. SINGAS:  And was the perpetrator caught?

4          PROSPECTIVE JUROR:  Uhm, I don't believe so.

5          MS. SINGAS:  And approximately how long did

6     the whole crime take?

7          PROSPECTIVE JUROR:  A minute, minute and

8     a-half.

9          MS. SINGAS:  And was it light out or was it

10    dark out?

11         PROSPECTIVE JUROR:  It was dusk.  It was just

12    starting to get dark.  I can -- I don't know if you

13    want more details.

14         MS. SINGAS:  I'm just going through some

15    factors that we're going to talk about in a minute with

16    the jurors.  Okay.  So do you think you would have been

17    able to identify the person if you saw him again?

18         PROSPECTIVE JUROR:  Yes.

19         MS. SINGAS:  Now, Ms. Kreindler, do you think

20    something like what the lighting was like when the

21    crime was committed is significant in determining

22    whether or not a correct identification was made?

23         PROSPECTIVE JUROR:  Yes, I do.

24         MS. SINGAS:  How about the distance, how far

25    the person was standing from you?

1        PROSPECTIVE JUROR:  Yes, very important.

2        MS. SINGAS:  Ms. Eannucci, what do you think

3    about?  You think it would be important if the person

4    had obstructed his face whether or not a person would

5    be able to make a correct identification?

6        PROSPECTIVE JUROR:  Uh-hum.

7        MS. SINGAS:  Okay.  How about how much of the

8    person was seen by the victim of a crime?  You think

9    that would help making an identification?

10       PROSPECTIVE JUROR:  Repeat the question.

11       MS. SINGAS:  How much of the person was seen,

12   whether somebody just saw somebody's hands, their face,

13   their whole body?

14       PROSPECTIVE JUROR:  That would have an

15   effect.

16       MS. SINGAS:  Right.  Okay, and how about how

17   much time the person spent with the crime?

18       PROSPECTIVE JUROR:  I think that would have

19   an effect as well.

20       MS. SINGAS:  Okay.  Common sense; right?

21   Longer you spent with him, probably more likely you'd

22   make a correct identification?

23       PROSPECTIVE JUROR:  Yes.

24       MS. SINGAS:  Now, Mr. Tarnowski, if I asked

25   you to tell me how tall I was, what would you say?

1          PROSPECTIVE JUROR:  I'm not really good at

2    estimation.  I'll be honest.  I never get it right.

3          MS. SINGAS:  Take a stab at it.

4          PROSPECTIVE JUROR:  I really --

5          MS. SINGAS:  Definitely not going to ask you

6    how much I weigh, so stick with the height; okay?  Come

7    on, throw a number out, somebody.

8          PROSPECTIVE JUROR:  5'7.

9          MS. SINGAS:  Okay.  Ms. Harris, how about

10   you?

11         PROSPECTIVE JUROR:  I'd say about 5'6, 5'7.

12         MS. SINGAS:  Miss Ms. Unger?

13         PROSPECTIVE JUROR:  5'4.

14         MS. SINGAS:  5'4.  Okay.  All right.  Now,

15   how would you describe my hair, Ms? Dluginski what

16   color would you call it?

17         PROSPECTIVE JUROR:  Brown.

18         MS. SINGAS:  Ms. Kreindler, would you agree

19   dark brown, light brown?

20         PROSPECTIVE JUROR:  Dark brown.

21         MS. SINGAS:  Ms. McNeil, you think my my hair

22   is long, short, medium?

23         PROSPECTIVE JUROR:  Medium.

24         MS. SINGAS:  Now, suppose, Ms. Pescow, you're

25   out to dinner and and I walk into the restaurant that

```
 1        you're having dinner.  You think you'd be able to
 2        recognize me?
 3               PROSPECTIVE JUROR:  Yes.
 4               MS. SINGAS:  How about you, Mr. Tarnowski?
 5        Think you'd recognize me?
 6               PROSPECTIVE JUROR:  If -- I'm sorry?
 7               MS. SINGAS:  If I walk into a restaurant
 8        where you were having dinner tonight, think you'd be
 9        able to recognize me?
10               PROSPECTIVE JUROR:  Uhm, probably not,
11        depends on the amount of time, depends how long.  If I
12        had dinner with you, yes.  If I just saw you around,
13        no.
14               MS. SINGAS:  If we left here today and we
15        went into a restaurant, you don't think --
16               PROSPECTIVE JUROR:  Oh, I'm sorry.  I thought
17        you mean seeing someone in a restaurant for -- oh, yes,
18        absolutely.
19               MS. SINGAS:  Ms. Unger?
20               PROSPECTIVE JUROR:  I have a very bad memory
21        for faces and names.
22               MS. SINGAS:  Now, Mr. Fogarty, think you'd
23        recognize me?
24               PROSPECTIVE JUROR:  Yes.
25               MS. SINGAS:  Okay.  Now what I'm calling upon
```

1    are two different things, being able to identify and

2    describe someone versus being able to recognize them,

3    because I'm telling you that I'm about 5'8 and a-half.

4    I'm wearing two-inch heals, so I'm closer to 5'11.

5         Ms. Unger, nowhere near 5'4; okay, but the

6    question is even you were off, Mr. Tarnowski, but if

7    you saw me again, think you'd be able to recognize me?

8         PROSPECTIVE JUROR:  Yes.

9         MS. SINGAS:  Okay.  So Ms. Pescow, you get

10   the idea what I'm driving at, sort of.  There's a

11   different skill involved in being able to describe

12   someone and there may be a different skill involved in

13   being able to recognize someone again.

14        PROSPECTIVE JUROR:  Uh-hum.

15        MS. SINGAS:  Ms. Eannucci, anything about

16   that that troubles you?

17        PROSPECTIVE JUROR:  No.

18        MS. SINGAS:  Okay.  Make sense?

19        PROSPECTIVE JUROR:  Yes.

20        MS. SINGAS:  All right.  Now, suppose that

21   you hear from only one witness to one incident; okay,

22   and you believe that witness, and you believe that the

23   People have given enough evidence to sustain their

24   burden of proof, but when you go in the back,

25   Ms. Oerzen or someone says to you, you know what?  I

```
 1    believe that witness and you believe that witness, but

 2    there was only one of them, and I would really like a

 3    lot more witnesses, so I can't convict somebody on the

 4    basis of one witness even though I believe that

 5    witness, I believe the prosecutor has met all the

 6    elements of the crime, but it troubles me a little bit

 7    'cause there's only one.  What would you say to that

 8    person?  Do you think that's fair?

 9              PROSPECTIVE JUROR:  No, specifically if the

10    judge had instructed us that, you know, that's the way

11    the criteria to judge them, then what number does it

12    matter so long as it's quality evidence?

13              MS. SINGAS:  So you'd agree with me it's the

14    quality of the evidence that you hear and not the

15    quantity of the evidence?  Okay?  Can you promise

16    you'll keep that concept in your mind?

17              MS. Kreindler, anything about that that

18    troubles you; one witness?

19              PROSPECTIVE JUROR:  Yeah, one witness

20    troubles me.

21              MS. SINGAS:  And why is that?

22              PROSPECTIVE JUROR:  Well, we're playing with

23    somebody's life, their future, so I couldn't just

24    convict somebody just because one person gave

25    convincing evidence.
```

Case 2:14-cv-01993-JMA   Document 12-4   Filed 01/29/16   Page 71 of 142 PageID #: 533

1          MS. SINGAS:  Well, what if the nature of the

2     crime is such that there's only one witness there?

3     Like let's suppose that you get into an elevator as you

4     leave here, somebody walks into the elevator after you,

5     takes out a gun, said, you know what?  I'd like your

6     purse, please, and you give them your purse at gunpoint

7     and you walk outside and you walk over to a court

8     officer and say, someone just pointed a gun at me and

9     took my purse.  And they said, well, bring me more

10    witnesses 'cause I can't take your report on your word

11    alone would.  That be fair?

12         PROSPECTIVE JUROR:  That wouldn't be fair.

13         MS. SINGAS:  Right.  Okay.  So can you see

14    where I'm going; that sometimes the circumstances are

15    such that there may only be one witness, the victim of

16    the crime.  That might be all we have, but do you think

17    that even given that example that I just gave you,

18    because this is a important issue for us, that even

19    despite that, that you wouldn't be able to find the

20    defendant guilty on the word of a single witness?

21         PROSPECTIVE JUROR:  If there were multiple

22    witnesses and just one gave very convincing evidence, I

23    couldn't convict just on the one.

24         MS. SINGAS:  Okay.  And how about if there

25    weren't multiple witnesses?

1      PROSPECTIVE JUROR:  Then I could.

2          MS. SINGAS:  Really depends on what the

3   circumstances of the crime were?

4          PROSPECTIVE JUROR:  Yes.

5          MS. SINGAS:  All right.  Ms. Eannucci, does

6   it make sense?  You think most crime is committed in

7   front of rooms full of people?

8          PROSPECTIVE JUROR:  No.

9          MS. SINGAS:  Okay.  So any issue with the one

10  witness who comes in here and testifies about a crime

11  that happened to them?

12         PROSPECTIVE JUROR:  No.

13         MS. SINGAS:  Ms. Harris, anything about that

14  that troubles you, a single witness?

15         PROSPECTIVE JUROR:  No.

16         MS. SINGAS:  If you believe that witness and

17  you go in the back, somebody says, listen, one witness

18  isn't enough for me, so there's no way without that

19  person --

20         PROSPECTIVE JUROR:  I'd tell them if I was

21  convinced.  I would tell them I was convinced that it

22  was the truth they were saying or whatever.

23         MS. SINGAS:  Again, quality versus the

24  quantity?

25         PROSPECTIVE JUROR:  Yes.

cp

1          MS. SINGAS:  Mr. Jeremie?

2          PROSPECTIVE JUROR:  Same.

3          MS. SINGAS:  Same thing; right?

4     Mr. Tarnowski?

5          PROSPECTIVE JUROR:  Absolutely.

6          THE COURT:  You have about two minutes.

7          MS. SINGAS:  I think I'll stop.  Thank you

8     all very much.

9          THE COURT:  Mr. Lemke?

10         MR. LEMKE:  Thank you, your Honor.  20, a

11    quarter after 4, long day.

12         I think from the type of questions you've

13    been asked now by the Court, by the prosecutor and by

14    myself, and I may only be ten minutes, not going to be

15    much longer than that, but whether you're selected as

16    the first juror, the third juror or the twelfth juror,

17    when it comes time to deliberate, doesn't mean that you

18    say, well, I'm the first juror, therefore, I should

19    carry more wait, so forth, but there are still certain

20    questions I think are important to ask that nobody

21    asked at this time, and it's a matter that these

22    questions are asked that jurors that are going that be

23    selected that can evaluate and listen to testimony.

24    And we're at an advantage now.  You know what is in the

25    indictment, what the evidence or lack of evidence would

1    be so that we can argue to you to consider the evidence

2    in this case, so that's why we ask various questions,

3    and I think that the question that was posed to, I

4    think it's Mr. Fogarty and Ms. Dluginski about your

5    experiences with police officers and whether or not if

6    you were selected as a juror and a police officer or

7    law enforcement officer takes the stand, whether or not

8    you're going to give that witness, a police officer or

9    law enforcement, more credibility.  And it's not

10   whether or not, as Ms. Singas had asked, well, an

11   officer gets up there.  That would be for anyone that

12   got up, said something, as Ms. Singas has indicated,

13   off the wall, but it's a matter of whether an officer

14   takes the stand, if the question is whether the light

15   was green or red, and a civilian said it was green when

16   I went through and the officer says it was red, and not

17   having anything else to look at, is it going to be that

18   you're going to give credibility to the police officer

19   over the civilian because of your life experiences?

20          Mr. Fogarty, I think you had indicated very

21   close to your father or grandfather, law enforcement as

22   well, I think, Ms. Dluginski, same thing, so as much as

23   it's a situation, not whether the answer's on the wall,

24   but whether or not two questions are asked, two answers

25   are given, and that's why I'm coming back to that

Voir Dire - Defense                                    75

1     because in a case such as this where there may be and

2     will be police officer testimony, it's a situation at

3     the end of the case, I come up to you, say, listen for

4     anybody that takes the stand.  They should hope you'll

5     be telling the truth.  But in this particular case,

6     this particular officer or individual is embellishing,

7     is not telling the truth and you say, I'm sorry.

8     That's a police officer.  I don't know anything more

9     about it.  I'm going to believe him anyway.  Then

10    that's not a case you should be sitting on because it's

11    not a fair playing field or not something the judge

12    instructs you on the law.

13              There are cases where perhaps police officer

14    credibility would not be an issue, but I guess

15    Mr. Fogarty and Ms. Dluginski, is that my understanding

16    if it came down to that situation; not that it's an

17    off-the-wall situation that you'd give more credibility

18    to the police officer?

19              Mr. Fogarty, again putting you on the spot.

20    I apologize.

21              PROSPECTIVE JUROR:  No, no, if they're both

22    convincing.

23              MR. LEMKE:  Right.  Well, one says the

24    light's red, one says the light's green.  Now you got

25    to make a decision.

Voir Dire - Defense

```
1              PROSPECTIVE JUROR:  Like just from what I
2    know, I would believe the police officer, but it's hard
3    to say it's something that simple and then being put in
4    that situation.
5              MR. LEMKE:  I have no -- that's why I'm
6    asking.
7              PROSPECTIVE JUROR:  I'd have to say most
8    likely I would believe the police officer if they just
9    both said flat out this and this.
10             MR. LEMKE:  Same answer, Ms. Dluginski.  I
11   know it's a tough question in kind of a vacuum, but --
12             PROSPECTIVE JUROR:  I think I could get over
13   that.  The issue would be that I'm a victim of a
14   similar crime.
15             MR. LEMKE:  There are a couple that have
16   already indicated that they couldn't be a fair juror on
17   this case.  Not going to ask you in particular those
18   questions.  In fact, any questions for that matter.  I
19   think it has been, is it Ms. Unger?
20             PROSPECTIVE JUROR:  Yes.
21             MR. LEMKE:  Unless you're selected as a
22   juror, you're selected in this case, if you had to
23   reach a verdict now, what would your verdict be?
24             PROSPECTIVE JUROR:  I'm going to be biased.
25   I have a daughter.
```

cp

1        MR. LEMKE:  And this is a sex-abuse type of

2    case.  Very emotional.

3        PROSPECTIVE JUROR:  I think I've seen his

4    paper in the newspaper -- his pictures now that I look

5    at him longer.

6        MR. LEMKE:  Without hearing anything else, if

7    you had to do a verdict, it would be guilty?

8        PROSPECTIVE JUROR:  I'm sorry?

9        MR. LEMKE:  Not a matter of being sorry.

10       This is very emotional in part with young

11   women coming in.  No question they've been raped and

12   violated.  That's not going to be an issue.  This isn't

13   it's consent, not that they're lying.  It's a matter of

14   whether or not the individual that committed the crime

15   is Ricardo Walker.  That's why you still hear that type

16   of testimony and certainly having daughters or sons --

17       PROSPECTIVE JUROR:  I feel like I lost my

18   husband already.  I just can't emotionally handle it.

19       MR. LEMKE:  I apologize to put you on the

20   spot.  Better now than to be selected as a juror.  Is

21   it Mrs. Oerzen?  You teach, I think third grade?  Okay.

22   If you were in a case again selected as a juror in this

23   case and you hear already from the Court that there are

24   four different dates that rapes have occurred or

25   robberies have occurred and you're sitting here as a

```
 1    juror and it's not just one case now.  You got four and

 2    there's different elements, different dates, different

 3    crimes with different dates.  When you hear that as far

 4    as the number four, whether it be two, whether it be

 5    eight, it's kind of hard to sit as a juror and say,

 6    wait a second.  I have somebody coming in four times

 7    saying he's the one that did this, kind of what's going

 8    on here; right, as opposed if it was separate or just

 9    one.  Now, knowing that, knowing the cases without

10    hearing anything else, I'll ask you now if you had to

11    reach a verdict now, what would your verdict be?

12         PROSPECTIVE JUROR:  That's exactly what I was

13    thinking, if it's so many times, someone must have --

14    why would they pick the same person four times?

15         MR. LEMKE:  The person must be guilty; right?

16    What about if there's a misidentification?  There may

17    be someone similar and, in fact, you were asked by the

18    prosecutor in this case about descriptions, about

19    having the ability to observe.  Certainly watching the

20    prosecutor in court myself for an hour and a-half,

21    lighting is bright, we're talking to you.  Great.  You

22    may say, well, he's 5'9, 6'1, whatever the case is,

23    there's an identification and so that's a concern.  If

24    you have something in a case such as this, will you be

25    able to take a look at the evidence, the
```

1    identification, how that identification would have been

2    made, the observations, the opportunity to make an

3    observation, the circumstances to make that

4    observation?  I mean, would you agree with me then if

5    you're selected as a juror in this case, would you

6    expect a young lady to come in to testify and then say,

7    oh, and by the way, the individual that did this to me

8    was a white Caucasian, a male about 5'2, look over,

9    wait a second; right?  You certainly wouldn't expect

10   that in this case, so would you agree, and it's

11   Ms. Kreindler, regarding identifications, if you were

12   selected as a juror in this case, without hearing

13   anything else yet or regarding any ability to observe

14   what might have been reported at the time an incident

15   occurs such as the lighting, so forth, where you were

16   selected in a case, this young woman gets up there and

17   at that particular moment after she describes this is

18   what am, and she's asked by the prosecutor, do you see

19   the individual that viciously raped you or viciously

20   robbed you that day, they point to Ricardo; is that

21   going to be it for you emotionally as well as making a

22   decision in this case or will you be able to, as the

23   Judge will tell you everyday you leave the courtroom,

24   don't discuss this case, don't form any opinions,

25   haven't heard charges on the law, keep an open mind

1     until after summations, after the charge, it's an

2     emotional aspect for somebody to sit in here and do

3     that.  Do you believe -- in fact, I'll ask you

4     Mr. Jeremie, do you believe that individual can make a

5     mistake in identifying somebody?  Ever seen somebody

6     you thought perhaps was somebody and was not?

7              PROSPECTIVE JUROR:  Yeah.

8              MR. LEMKE:  Mr. Fogarty, think you see

9     someone, not too sure where you've seen them from,

10    would there be anybody out of the potential jurors that

11    has never had that opportunity, never had a situation

12    where they saw someone, but you know that they're

13    mistaken?

14             Ms. Pescow?

15             PROSPECTIVE JUROR:  Yes.

16             MR. LEMKE:  Mr. Tarnowski?

17             PROSPECTIVE JUROR:  Yes, sir.

18             MR. LEMKE:  But yet you're selected in a case

19    where there's four different women, four different

20    dates still coming in, still going to be able to take a

21    look and evaluate that and determine and consider what

22    other evidence there would be?

23             PROSPECTIVE JUROR:  Oh, absolutely.

24             MR. LEMKE:  That maybe there's an individual

25    that maybe similar in height description, so forth?

1        You could do that?

2                    PROSPECTIVE JUROR:  Sure.

3                    MR. LEMKE:  Mr. Jeremie, lab technician?

4                    PROSPECTIVE JUROR:  Yeah, used to be.

5                    MR. LEMKE:  What lab?

6                    PROSPECTIVE JUROR:  Hematology.

7                    MR. LEMKE:  Blood?

8                    PROSPECTIVE JUROR:  Yeah.

9                    MR. LEMKE:  Blood work-up?

10                   PROSPECTIVE JUROR:  Lab for diseases, that

11       type of thing, yes.

12                   MR. LEMKE:  You ever evaluate for say blood

13       for whether there's alcohol or drugs in the blood as

14       well?

15                   PROSPECTIVE JUROR:  No.

16                   MR. LEMKE:  DNA?

17                   PROSPECTIVE JUROR:  That was before, before

18       DNA.

19                   MR. LEMKE:  Don't have basically some basis

20       regarding DNA and the manner in which it's tested

21       whether accurate, all that kind of stuff?

22                   PROSPECTIVE JUROR:  I have some idea.

23                   MR. LEMKE:  Do you have a position that it's

24       foolproof or a matter which it's tested, there's a lot

25       written about it and if you're a juror, testimony

Voir Dire - Defense                82

```
 1    regarding either a lack of DNA or in some cases there

 2    was DNA, from your opinion, have you ever formed an

 3    opinion?  Have you ever published?

 4            PROSPECTIVE JUROR:  No.

 5            MR. LEMKE:  That you've read, so would you

 6    have formed such an opinion that you couldn't fairly

 7    evaluate the testimony as to the manner in which the

 8    sample was seized, tested, integrity?  Could you do all

 9    that, evaluate whether or not it was an accurate

10    reading, finding or not?

11            PROSPECTIVE JUROR:  I could.  I could

12    understand very well.

13            MR. LEMKE:  Okay, so but do you have such an

14    opinion at this point, yes or no, that no matter what's

15    testified here to, it's not going to change your

16    evaluation?

17            PROSPECTIVE JUROR:  Oh, no, no, no.

18            MR. LEMKE:  You could listen to it?

19            PROSPECTIVE JUROR:  Yes.

20            MR. LEMKE:  Good.  Like I said, I wasn't

21    going to be that long.

22            Is it Mrs. Eannucci?  Didn't ask you any

23    questions.  Process server in Islip?

24            PROSPECTIVE JUROR:  I run a process serving

25    and court service company.  I'm not a process server.
```

Voir Dire - Defense                                    83

1           MR. LEMKE:  So you run it?

2           PROSPECTIVE JUROR:  Yes.

3           MR. LEMKE:  Dealing with attorneys?

4           PROSPECTIVE JUROR:  Attorneys, process

5    servers, court runners.

6           MR. LEMKE:  Criminal, Family Court, whatever?

7           PROSPECTIVE JUROR:  Surrogates.

8           MR. LEMKE:  Surrogates as well?

9           PROSPECTIVE JUROR:  Uh-hum.

10          MR. LEMKE:  Deal with either attorneys,

11   probably mostly private counsel I would guess, not too

12   much the DA's Office?

13          PROSPECTIVE JUROR:  Not DA's Office.

14          MR. LEMKE:  Private counsel?

15          PROSPECTIVE JUROR:  Uh-hum.

16          MR. LEMKE:  Anything regarding that, probably

17   not that would influence you, be able to sit in a case

18   such as this?

19          PROSPECTIVE JUROR:  No, it wouldn't enter.

20          MR. LEMKE:  Last question.  I ask each of you

21   take a moment, ask yourselves, some have already

22   answered, so I'll skip over you.  Don't mean to be rude

23   in that sense, but a matter again could be fair, cases

24   such as this hearing the little bit, a lot of questions

25   from the Court, prosecutor and myself, do you have the

1    frame of mind, the frame of mind after hearing a little

2    bit about the facts of the case, emotional aspect of

3    it, the charges, do you have the frame of mind that you

4    would want somebody judging you?  In other words, a lot

5    of experience; totally you've been really two and

6    a-half hours between some preliminaries, not a lot of

7    time.  Knowing all of that, is there any reason that

8    you could not be a juror in this case?

9            I know some already said they couldn't, but

10   for the others, would you want somebody with your frame

11   of mind judging the evidence in this case and

12   evaluating the evidence in this case?

13           MS. SINGAS:  I'm going to object to that

14   question.

15           THE COURT:  Overruled.

16           MR. LEMKE:  Mr. Santo, I think you already

17   indicated your experience.  Ms. Pescow, I believe, same

18   thing, case similar with this case.  Ms. Eannucci, you

19   want somebody with your frame of mind judging you if

20   you're selected in this case?

21           PROSPECTIVE JUROR:  I would think so, yes.

22           MR. LEMKE:  So would I, so would the

23   prosecutor?

24           PROSPECTIVE JUROR:  Yeah.

25           MR. LEMKE:  Mrs. Dluginski, I believe because

1    of the police officers and the number of other things

2    you indicated; right, the crimes?

3                PROSPECTIVE JUROR:  The crimes.

4                MR. LEMKE:  Is it Ms. Kreindler?

5                PROSPECTIVE JUROR:  You're asking would I

6    want to be my own?

7                MR. LEMKE:  Would you want somebody with your

8    frame of mind?  You're sitting there as Ricardo, ready

9    to sit two and a-half weeks, possibly three, listen to

10   testimony, listen to evidence, keeping an open mind and

11   then evaluating it at the end of this case?  Would you

12   want somebody with your frame of mind in that instance?

13               PROSPECTIVE JUROR:  I'm kind of emotional

14   with some of this stuff.

15               MR. LEMKE:  It's going to be extremely

16   emotional.

17               PROSPECTIVE JUROR:  I wouldn't want me.

18               THE COURT:  Ms. Kreindler, let me just tell

19   you what I ask every juror to do is to put aside, you

20   know, emotion, fear, favor, bias, sympathy, prejudice.

21   Quite frankly, most jurors are able to do that cooly,

22   calmly, evaluate the evidence, make a decision based

23   upon the facts you have here in this case; the

24   testimony of the witnesses, the exhibits, and my

25   instructions on the law.

1          Many instances emotional testimony in the

2    course of the trial.  My question to you, when you go

3    back to deliberate, can you do that, in other words,

4    cooly calmly evaluate the evidence, make a decision

5    about the evidence as you heard it?

6               PROSPECTIVE JUROR:  I guess I could.

7               MR. LEMKE:  Ms. McNeil?

8               PROSPECTIVE JUROR:  Yes.

9               MR. LEMKE:  Sit on this case Ms. Oerzen?

10   Ms. Unger?  Thank you.  I know.  Mr. Fogarty?

11              PROSPECTIVE JUROR:  Uhm, I would like to say

12   yes.

13              MR. LEMKE:  Again, Mr. Jeremie?

14              PROSPECTIVE JUROR:  Yes.

15              MR. LEMKE:  Ms. Harris, don't think I asked

16   you any questions.

17              PROSPECTIVE JUROR:  You have asked me some

18   questions.  You didn't leave me out.

19              MR. LEMKE:  Good.  Anything you want to tell

20   me about your frame of mind?

21              PROSPECTIVE JUROR:  Yeah.  I think I would

22   like someone just like me to judge me, him.  I mean,

23   you know --

24              MR. LEMKE:  That's what we're asking.

25              PROSPECTIVE JUROR:  In a legal sense, yes.

1        MR. LEMKE:  Mr. Tarnowski?

2        PROSPECTIVE JUROR:  Yes.

3        MR. LEMKE:  Okay.  Thank you.  Thank you,

4   your Honor.

5        THE COURT:  All right.  I know you've been

6   sitting for a while.  We want to get up, stretch

7   including those people in the back, please.  I'm going

8   to be back out here in a few minutes once I go over the

9   attorneys selections.  Those of you seated in your

10  seats, take a look around.  You see who your neighbors

11  are so you don't sit in the wrong seat when we come

12  back and we'll be with you in a few moments.

13        (Whereupon, the jury panel left the

14  courtroom.)

15        (Whereupon, the following took place in

16  chambers:)

17        THE COURT:  We have twelve people in the box.

18  We're going to consider the entire board.

19        People cause?

20        MS. SINGAS:  All right.  Number 1,

21  Ms. McNeil.

22        MR. LEMKE:  Consent.

23        MS. SINGAS:  Said she'd seen the defendant in

24  the neighborhood.  Number 4, Ms. Dluginski who said she

25  was the victim of a crime.

1        THE COURT:  That's granted.

2        MS. SINGAS:  Can't forget.

3        MR. LEMKE:  Consent.

4        MS. SINGAS:  Ms. Pescow, number 6, who said

5    her experience at the last criminal trial she was on

6    was very upsetting to her and she couldn't separate it

7    out.

8        MR. LEMKE:  Consent.

9        MS. SINGAS:  Mr. Santo.

10       MR. LEMKE:  We'll consent.  What did he have?

11       MS. SINGAS:  Said he can not be --

12       MR. LEMKE:  Because of the robbery.

13       MS. SINGAS:  27 years.

14       THE COURT:  40 years had gone, can't get it

15   out of his head.

16       MS. SINGAS:  Number 9, Ms. Unger, who cried

17   when Mr. Lemke was questioning her.

18       MR. LEMKE:  For cause, consent.

19       MS. SINGAS:  I think that's it for cause.

20       THE COURT:  Defendant?

21       MR. LEMKE:  Judge, Mr. Fogarty, but I don't

22   know if he was on the fence or not.  I mean he'd be the

23   only one I was questioning regarding his relationship

24   with his grandfather.  I tried to ask some questions.

25       THE COURT:  I'm inclined to grant it.  I

1    think he was rather -- I don't think he was rather

2    unequivocal in his assurance.  Over your objection.

3              MS. SINGAS:  No.  I'll consent.

4              THE COURT:  Fogarty is gone for cause.  All

5    right.  That leaves us with Kreindler, Eannucci,

6    Oerzen, Jeremie, Harris and Tarnowski.  15 peremptories

7    each.

8              People?

9              MS. SINGAS:  Number 2, Ms. Kreindler.

10             THE COURT:  Okay.

11             MS. SINGAS:  Number 12, Mr. Jeremie, and

12   number 14, Mr. Tarnowski.

13             THE COURT:  That's three peremptories used by

14   the People.  That leaves us with Ms. Eannucci and

15   Ms. Harris.

16             MR. LEMKE:  And Mrs. Oerzen.

17             THE COURT:  Beg your pardon, and Oerzen.

18             MR. LEMKE:  Number 5 is Eannucci, number 8 is

19   Oerzen and number 13, Ms. Harris.

20             THE COURT:  Didn't do too well.

21             (Whereupon, the following took place in open

22   court:)

23             (Whereupon, the jury panel entered the

24   courtroom:)

25             THE COURT:  All right.  Those 12 of you, I

1     should say that are in the jury box, none of you have

2     been selected.  At this particular point, I'm going to

3     excuse you from this case with the thanks of the Court.

4     My officer will direct you as to where to report when

5     you step out, but before you do, those of you that are

6     in the audience, I'm directing you all to be back here

7     tomorrow morning at 10 o'clock.  We will continue with

8     jury selection.  Obviously we've got a long way to go,

9     so at this point, ask you to be back here.  Probably

10    going to be downstairs on the first floor in the same

11    courtroom that we're kind of in now except down on the

12    first floor, Judge Robbins' courtroom.  Be there

13    tomorrow morning, 10 o'clock.  Please report back to

14    the first floor of this building.  My sergeant will

15    tell you where to go.  Those of you in here with my

16    thanks, thank you very much.  You're excused at this

17    particular time.  Those of you in the audience, see you

18    back here tomorrow morning, 10 o'clock.

19               (Whereupon, the jury panel left the

20    courtroom.)

21               THE COURT:  See you back here tomorrow.

22               (Whereupon, the trial was adjourned to

23    October 30, 2008.)

24

25

cp

Voir Dire - Defense                        91

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NASSAU:  PART 49
2   ----------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
3                                   Ind. No.
                                    436N/08
4           -against-
                                    Jury Trial
5   RICARDO WALTERS,

6                 Defendant.
    ----------------------------------------X
7

8                           October 30, 2008

9                           Nassau County Court
                            262 Old Country Road
10                          Mineola, NY 11501

11  B E F O R E :

12          THE HONORABLE JAMES P. MC CORMACK,
                            Acting Supreme Court Justice
13          (and a jury of twelve plus two alternates.)

14  A P P E A R A N C E S :
    For the People:
15      THE HONORABLE KATHLEEN M. RICE,
        District Attorney, Nassau County,
16      By:  MADELINE SINGAS, ESQ.,
             THERESA TEBBETT, ESQ.
17      Assistant District Attorneys

18  For the Defendant:
        DENNIS LEMKE, ESQ.
19

20                          CATHERINE R. PARKER,
                            Official Court Reporter
21

22

23

24

25

cp

Proceedings                                                          92

1              (Whereupon, the jury panel entered the

2        courtroom.)

3              THE CLERK:  Case on trial, People of the

4        State of New York against Ricardo Walters, indictment

5        436N of 2008.

6              Are the People ready?

7              MS. SINGAS:  Yes, they are, Judge.

8              THE CLERK:  Defense counsel ready?

9              MR. LEMKE:  Yes, your Honor.

10             THE COURT:  All right.  Good morning,

11       prospective members.  I apologize to you.  We got a

12       little bit of a late start.  As I'm sure you figured

13       out by now, we've been changing courtrooms.  My regular

14       courtroom has to be upstairs.  The problem with my

15       courtroom is that we cannot accommodate, in terms of

16       spectator seats, the number of seats both this

17       courtroom, which is Judge Robbins' courtroom and Judge

18       Sullivan's courtroom which is upstairs, so that's kind

19       of why we've been jumping around.  I normally have

20       calendar matters to take care of in addition to the

21       trial which we've been trying to accomplish before we

22       begin so we don't get interrupted.

23             At this time, my clerk is going to again call

24       out fourteen names.  Please listen carefully.  If your

25       name is called, please step with your belongings,

1     listen to one of my officers as you come up to the

2     rail.  Please watch your step as you step into the jury

3     box.

4                    Artie?

5                    THE CLERK:  Seat number 1, Janita Williams,

6     W-I-L-L-I-A-M-S;

7                    Seat number 2, Jackie Rappa, R-A-P-P-A;

8                    Seat number 3, Michael Zisman, Z-I-S-M-A-N;

9                    Seat number 4, Kimberly Temple, T-E-M-P-L-E;

10                    Seat number 5, Carolyn Flynn, F-L-Y-N-N;

11                    Seat number 6, Matthew Blankman,

12     B-L-A-N-K-M-A-N;

13                    Seat number 7, Thomas McMichael,

14     M-C-M-I-C-H-A-E-L;

15                    Seat number 8, Virginia Gambino,

16     G-A-M-B-I-N-O;

17                    Seat number 9, Robert Slawski, S-L-A-W-S-K-I;

18                    Seat number 10, Mary Smith, S-M-I-T-H;

19                    Seat number 11, Cherese Townsend,

20     T-O-W-N-S-E-N-D;

21                    Seat number 12, Lois Monetti, M-O-N-E-T-T-I;

22                    Seat number 13, Anthony Porcelli,

23     P-O-R-C-E-L-L-I;

24                    Seat number 14, Gary Wersan, W-E-R-S-A-N.

25                    THE COURT:  All right.  For those of you who

 1          have joined the box, welcome again.

 2                   At this point, let me just ask all of you,

 3          when I read the list of potential witnesses yesterday,

 4          is there anybody here who either recognized a name or

 5          perhaps thought they recognized a name, and for any

 6          reason, want me to repeat it?

 7                   Yes, Ms.  --

 8                   PROSPECTIVE JUROR:  Monetti.

 9                   THE COURT:  Ms. Monetti?

10                   PROSPECTIVE JUROR:  Ilsa Morales.

11                   THE COURT:  Yes.

12                   PROSPECTIVE JUROR:  It's a common name, but I

13          think it's the parent -- well, maybe just the same

14          name, but there was a parent in school that I worked in

15          the Davidson Avenue School in Malverne.

16                   THE COURT:  Okay.  So there's a parent of the

17          school you work in has the same last name?

18                   PROSPECTIVE JUROR:  That I did work in three

19          years ago.

20                   THE COURT:  Okay.  All right.  I'll let the

21          attorneys, if they feel they want to explore them, I'll

22          let them.

23                   Yes, sir?

24                   PROSPECTIVE JUROR:  I think Officer Estes,

25          and I don't think it's a big deal, but I think I got a

Voir Dire - Court                                    95

1    ticket from him at one point.  I remember the name

2    because my uncle's name also is Estes so I remembered.

3              THE COURT:  All right.  How long ago was

4    that?

5              PROSPECTIVE JUROR:  It's got to be five, six

6    years.

7              THE COURT:  Would that affect you if you're

8    selected as a juror in this case?

9              PROSPECTIVE JUROR:  No, I don't believe so,

10    no, it would not.

11              THE COURT:  Is it something you went to court

12    on and he testified?

13              PROSPECTIVE JUROR:  Nah, it wasn't.

14              THE COURT:  You resolved it without having to

15    see Officer Estes again, if that's the same one?

16              PROSPECTIVE JUROR:  If it was.  Yeah, the

17    name, I remember the last name, E-S-T-E-S.

18              THE COURT:  All right.  I believe Officer

19    Estes is a Village of Hempstead police officer.

20              PROSPECTIVE JUROR:  Right.

21              THE COURT:  And that you also think --

22              PROSPECTIVE JUROR:  It was in the Village of

23    Hempstead I remember.

24              THE COURT:  All right.  Anybody else?

25    Anybody else want me to repeat any of the names?  I

cp

1    know there's about -- looks to be about twenty, and if

2    anybody wants me to, I'll certainly do it again.  Okay.

3              Yesterday I indicated to you that at some

4    point during the course of this case, there was some

5    media, if you will, exposure, either by way of print,

6    news media.  Is there anybody of the 14 of you that are

7    sitting here now that believes that they may have heard

8    or read anything about, anything they may have heard in

9    this case?  Anybody?

10             Mr. -- I'm sorry, Mr. McMichael?

11             PROSPECTIVE JUROR:  Yes -- I remember reading

12   something in the paper about it.  It's a while back.

13             THE COURT:  A while back?

14             PROSPECTIVE JUROR:  A little while back.

15             THE COURT:  Did you recall specifics?

16             PROSPECTIVE JUROR:  Not specifics, no.

17             THE COURT:  Okay.  And Mr. Blankman?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  Yes.

20             PROSPECTIVE JUROR:  Yeah, I recall vaguely

21   reading something on-line, an article, a news article

22   on line or two maybe earlier this year, a while back.

23             THE COURT:  And either one of you,

24   Mr. McMichael and Mr. Blankman, as a result of reading

25   that, have you formed any opinion about that as you sit

1      here about the case as a result of that?

2                PROSPECTIVE JUROR:  No.

3                PROSPECTIVE JUROR:  No.

4                THE COURT:  One thing I will tell all the

5      jurors, if they're selected as a juror, it's part of

6      the admonitions you'll get everyday is that you're not

7      to access any media either through the internet, not

8      read any articles about the case should it be reported.

9                Is there any reason either Mr. McMichael or

10     Mr. Blankman you would not be able to follow that

11     instruction if I told it to you?

12               PROSPECTIVE JUROR:  No.

13               THE COURT:  Mr. Blankman?

14               PROSPECTIVE JUROR:  No.

15               THE COURT:  Anybody else?  Anybody else

16     either heard anything about the case, perhaps they

17     think they read about it?  All right.

18               You'll recall yesterday I basically told all

19     of you, and I was directing myself to the fourteen in

20     the box at that time, what your function is as jurors

21     in a criminal case.  You are the fact finders.  You

22     will determine the facts as you find them to be.  That

23     is an area that even I cannot intrude upon.  My area is

24     the law.  You find the facts as you determine them to

25     be.  You're sworn to apply the law to those facts as I

Voir Dire - Court                                    98

1    give them to you.  And then, as I indicated yesterday,

2    your verdict on the various counts will either be

3    guilty or not guilty.

4              Is there anybody here who, for either

5    personal or religious reasons, will not be able to do

6    that?  Anybody here first row?  Second row?

7              Miss Townsend?

8              PROSPECTIVE JUROR:  Yes.  I have friends have

9    been victims of some of the crimes that he's committed.

10             THE COURT:  Well --

11             PROSPECTIVE JUROR:  Well --

12             THE COURT:  Go ahead.  I'm going to get into

13   that in a minute with the rest of you.  Go ahead.

14             PROSPECTIVE JUROR:  I don't think I would be

15   able to be fair.

16             THE COURT:  And these are close friends of

17   yours?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  And you feel that because of

20   their experiences, it would affect you in this case?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Okay.  Ms. Gambino?

23             PROSPECTIVE JUROR:  Yes.  Yeah, I don't think

24   I would be able to be fair either.

25             THE COURT:  Because of the nature of the

1    charges?

2            PROSPECTIVE JUROR:  Uhm, I have relatives

3    that are police officers.  I have relatives that are

4    court officers.  One of the court officers actually

5    worked here.  I have another cousin that's a court

6    officer in Long Beach.  I have three people that are

7    cops, and also I have a daughter, and I think

8    emotionally, I wouldn't be a fair person.

9            THE COURT:  Okay.  Mr. McMichael?

10           PROSPECTIVE JUROR:  Yes I've been a

11   correction officer for 29 years.

12           THE COURT:  Okay.  Where?

13           PROSPECTIVE JUROR:  Nassau County.

14           THE COURT:  All right, and I'm sure you've

15   come across corrections officers that you thought

16   highly of and some you didn't think so highly of.

17           PROSPECTIVE JUROR:  Absolutely.  First, the

18   ones I didn't think highly of, my background is all law

19   enforcement; my father, my brother, you know --

20           THE COURT:  All right.  You've heard from

21   both of the attorneys that the defendant in this case

22   is a correction officer.

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  Are you telling me that you

25   couldn't serve as a juror because of him being a

1      correction officer?

2                  PROSPECTIVE JUROR:  Actually, both.

3                  THE COURT:  You feel you couldn't pass

4      judgment on him because of the nature of his

5      employment?

6                  PROSPECTIVE JUROR:  Actually, well, like I

7      said, both because -- because of my background and what

8      I've been involved in for 29 years.

9                  THE COURT:  Right.

10                 PROSPECTIVE JUROR:  My outlook is if

11     somebody's in the profession, if they go bad, I looked

12     at that more harshly than I do anyone else.

13                 THE COURT:  Right.

14                 PROSPECTIVE JUROR:  And, on the other hand, I

15     probably have some feelings otherwise about anybody

16     else anyway.

17                 THE COURT:  Okay.  You heard me talk

18     yesterday about basic principles of law that apply in

19     every criminal case, and that is, number one, any

20     person accused of a crime is presumed to be innocent

21     unless and until the jury is convinced beyond a

22     reasonable doubt of their guilt.

23                 Is there any reason that you would not be

24     able to follow that?

25                 PROSPECTIVE JUROR:  I just think that because

```
 1    of my job, perhaps I've been around it too much and I

 2    can't give a fair judgment.

 3            THE COURT:  All right.  Fair enough.

 4    Yesterday when I talked about the presumption of

 5    innocence, members of the jury, one of the attorneys

 6    was asking a question about if you were asked to vote,

 7    if you will, guilty or not guilty at this point, you

 8    know, what would your answer be?  And, obviously, if

 9    someone's presumed innocent unless and until the jury

10    finds them otherwise by proof beyond a reasonable

11    doubt, the answer is not guilty; okay?  And the reason

12    that is is that you haven't heard any of the evidence.

13            As a matter of fact, at some point during the

14    middle of this trial, I suspended the trial and said

15    members of the jury, go, which I wouldn't do,

16    obviously, but go and then vote either guilty or not

17    guilty.  Even if it was at the close of the People's

18    case or near the close of the People's case, your

19    verdict would still have to be not guilty.  Why?

20    Because you still haven't heard my instructions on the

21    law, so before you can arrive at a decision about

22    guilty or not guilty, you not only have to find the

23    facts and make a determination about the facts, but you

24    also have to apply what your conclusions are with

25    respect to the facts, to the law as I give it to you.
```

1      Does everybody understand that?  That's an

2  important concept.  Ms. Townsend, and I know before you

3  said you used the word "committed" as if we've already

4  had a trial in this case and verdict already been made.

5          PROSPECTIVE JUROR:  Accusations.

6          THE COURT:  Accusations at this point.

7          PROSPECTIVE JUROR:  I don't believe I'd be

8  able to deal with listening to the witnesses and all of

9  that.

10         THE COURT:  All right.  You think emotionally

11 it would be very difficult?  I know you said

12 experiences with your friend.  That's a different issue

13 in a sense, but it's one that's still relevant to your

14 qualifications as a juror.

15         Anybody have any problem with the concept of

16 presumed innocent unless proven beyond a reasonable

17 doubt?  I talked about also, yesterday the burden of

18 proof.  The burden of proof is always on the People,

19 the prosecutor.  They must satisfy you beyond a

20 reasonable doubt not only of every element of the crime

21 as I charge it to you at the end of the case, but also

22 the defendant's identity as the perpetrator of that

23 crime, and at no point in time does the burden shift to

24 the defendant.  Defendant's not required to testify.

25 If the defendant chooses not to testify, that's not a

1    fact from which you can draw an adverse inference.

2           Anybody have any problem with that?  Just

3    give me your name.

4           PROSPECTIVE JUROR:  Smith.

5           THE COURT:  Smith.

6           PROSPECTIVE JUROR:  I have a major problem

7    with that.  I believe if a defendant will not testify

8    on his own behalf, you will never convince me otherwise

9    that he is not guilty.

10           THE COURT:  Right.  Well, and then I would

11    take it that you would feel that the defendant, whether

12    it's this defendant or any defendant in a criminal

13    case, has an obligation, if you will, to prove his or

14    her innocence.

15           PROSPECTIVE JUROR:  Absolutely.

16           THE COURT:  So then you would not be able to

17    follow my instruction on the law that the burden of

18    proof is not on the defendant at any point in time

19    during the course of a criminal trial?

20           PROSPECTIVE JUROR:  That's how I feel.

21           THE COURT:  Anybody else feel similarly?

22    Okay.  At this point, I'm going to go into the

23    questions that I spoke to yesterday with the previous

24    panel, individual questions that we just want to again

25    remind everybody that if, during the course of these

Voir Dire - Court                                        104

1      questions, if there's anything that you feel

2      uncomfortable in speaking out loud, if you will, among

3      strangers, again, and we're not here to embarras here,

4      not here to make it anymore uncomfortable perhaps as it

5      may be already, but we're trying to get as much

6      information as we can so we can select jurors in this

7      case who can be fair and impartial to both sides.  So

8      I'm going to go through those questions about your

9      marital status, committed relationship, children, if

10     any, what kind of work yourself do, if your children

11     are old enough what they may be doing at the present

12     time.  And then I will go into different questions as I

13     asked yesterday about your prior experience, either

14     criminal or civil trials, any prior crime victim

15     experience as well as any of you have close ones that

16     are involved in law enforcement.

17              I'm going to go in the manner in which you

18     were seated.  Before I do that, though, I want to have

19     the attorneys up real quick.

20              (Whereupon, a discussion was held off the

21     record, at the bench, among the Court, defense counsel

22     and the assistant district attorney.)

23              (Whereupon, the following took place at the

24     bench:)

25              THE COURT:  Ms. Smith for cause,

cp

1      Ms. Townsend, cause, Mr. McMichael, cause, Ms. Gambino,

2      cause.

3              MR. LEMKE:  Consent by the defendant.

4              MS. SINGAS:  And People.

5              (Whereupon, the following took place in open

6      court:)

7              THE COURT:  All right.  There are those of

8      you that, at this point, we're going to excuse with my

9      thanks.  Just kindly listen for your name as it's

10     called.  My clerk will give you your card.  One of my

11     officers will give you the card.  You'll be directed

12     back to central jury.

13             THE CLERK:  Following jurors have been

14     excused, must report back to central jury:  Virginia

15     Gambino, Thomas McMichael, Charese Townsend and Mary

16     Smith.

17             (Whereupon, the excused jurors left the

18     courtroom.)

19             THE COURT:  All right.  Those of you still in

20     the audience, kindly listen to your name.  If your name

21     is called, please bring your personal belongings with

22     you.  We're going to fill the the seats that are

23     currently unoccupied.

24             THE CLERK:  Seat 7, Jonathan Oritz,

25     O-R-I-T-Z; seat 8, Charlene Aubin, A-U-B-I-N.

1          THE COURT:  Just watch your step, Ms. Aubin,

2     as you step up there.

3          THE CLERK:  Seat 10, Maria Rodriguez

4     R-O-D-R-I-G-U-E-Z.

5          THE COURT:  Ms. Aubin, one seat -- there you

6     go.

7          THE CLERK:  Seat 11, Laurel Vanhouten,

8     V-A-N-H-O-U-T-E-N.

9          THE COURT:  All right.  Those four that have

10    come into the box, welcome.  I'm going to kind of

11    direct my questions just to the four of you who just

12    came in.  You heard me going over some of the legal

13    concepts with the remainder of the people that are in

14    the box.

15         Does anybody have any or would have any

16    difficulty in following any of those basic principles

17    of law that apply in every criminal case?

18         Mr. Ortiz?

19         PROSPECTIVE JUROR:  Uhm, well, if the

20    question you had before, yes, with I'm not the type of

21    person that could put my emotions aside to be able to

22    deal with this kind of thing.

23         THE COURT:  Okay.  Why would that be?

24         PROSPECTIVE JUROR:  Just in my life

25    experience and myself and other friends.

1          THE COURT:  And you feel -- you feel if you

2     got in the jury room, you would call upon some prior

3     emotional experience in deciding the facts?

4          PROSPECTIVE JUROR:  Most definitely, yes.

5          THE COURT:  All right.  Ms. Aubin any

6     difficulty in following or wouldn't follow any of the

7     instructions that I gave that apply in every criminal

8     case about presumption of innocence, burden of proof,

9     fact that a defendant's not obligated to testify?  Any

10    problems at all?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  All right.  And, I'm sorry,

13    Ms. Rodriguez, any problems at all?

14         PROSPECTIVE JUROR:  I don't see any problems.

15         THE COURT:  And, fine, Ms. VanHouten, any

16    difficulties?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Do any of you that would feel

19    that -- anybody who feels they need to have any

20    witnesses names repeated?  Okay.  All right.

21         So let me kind of go back to where I was

22    about to begin with regard to questions concerning the

23    neighborhood in which you live, marital status,

24    committed relationship, children, what kind of

25    employment you have.

1           We're going to start, Ms. Williams, with you

2    since you were first called.  Can you tell me the

3    neighborhood which you live?

4           PROSPECTIVE JUROR:  Uniondale.

5           THE COURT:  And married or committed

6    relationship?

7           PROSPECTIVE JUROR:  No, I'm divorced.

8           THE COURT:  Children, if any?

9           PROSPECTIVE JUROR:  Yes, I have two.

10          THE COURT:  Their approximate ages?

11          PROSPECTIVE JUROR:  36 and 40.

12          THE COURT:  And are they currently working at

13   this time?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Can you tell us what kind of work

16   they do?

17          PROSPECTIVE JUROR:  My daughter works for

18   Lehman Brothers, and my son works for UPS.

19          THE COURT:  And yourself, Ms. Williams?

20          PROSPECTIVE JUROR:  I'm retired.

21          THE COURT:  Okay.  Ms. Rappa, I beg pardon,

22   neighborhood which you live?

23          PROSPECTIVE JUROR:  Massapequa Park.

24          THE COURT:  Married or committed

25   relationship?

1          PROSPECTIVE JUROR:  Relationship.

2          THE COURT:  Work currently?  You're employed?

3          PROSPECTIVE JUROR:  Yes, legal secretary for

4     an insurance company.

5          THE COURT:  Mr. Eisman (sic).

6          PROSPECTIVE JUROR:  Zisman.

7          THE COURT:  I'm sorry.  I got to take my

8     glasses off again.  Mr. Zisman, the neighborhood which

9     you live?

10         PROSPECTIVE JUROR:  I live in Glen Head,

11    married, committed relationship, no children and I'm

12    sole proprietor of a tuxedo rental store.

13         THE COURT:  All right.  Ms. Temple?

14         PROSPECTIVE JUROR:  I live in East Rockaway.

15    I'm married.  I have two children.  They're 8 and 5,

16    ultrasound tech.

17         THE COURT:  Okay.  Ms. Flynn?

18         PROSPECTIVE JUROR:  Hi.  I live -- excuse me.

19    I have laryngitis, so --

20         THE COURT:  Okay.

21         PROSPECTIVE JUROR:  I live in New Hyde Park.

22    I am widowed.  I have two children.  I work for Nassau

23    County.

24         THE COURT:  Okay.

25         PROSPECTIVE JUROR:  And my children's

1      occupations?

2             THE COURT:  Yes, one is a teacher and the

3      other works at a psychiatric hospital.  He's a

4      therapist.  In what area in the county do you work?

5             PROSPECTIVE JUROR:  I work at 1 West Street.

6             THE COURT:  Okay.  All right.  And for how

7      many years have you been working at 1 West?

8             PROSPECTIVE JUROR:  I actually was at traffic

9      court first year I worked for the County.  Now I am ten

10     years.  I worked for general services and I work for

11     real estate.

12            THE COURT:  Okay.  All right.  Thank you.

13     Mr. Blankman, town?

14            PROSPECTIVE JUROR:  Port Washington.

15            THE COURT:  Married?

16            PROSPECTIVE JUROR:  Single, no kids.

17            THE COURT:  Okay.  Work?

18            PROSPECTIVE JUROR:  Assistant manager of a

19     yacht club.

20            THE COURT:  All right.  Mr. Ortiz?

21            PROSPECTIVE JUROR:  Valley Stream, single,

22     committed relationship, no children, and I work

23     full-time and part-time, full-time sponsor,

24     professional roller blader, part-time teach skating

25     after school, Bronx, in the City.

```
1              THE COURT:  Ms. Aubin?

2              PROSPECTIVE JUROR:  I'm from Elmont.

3              THE COURT:  Keep your voice up so my Reporter

4     can take it down.

5              PROSPECTIVE JUROR:  I'm from Elmont.  I am

6     married.  I have three stepchildren, and I work for

7     American Airlines as a flight attendant.

8              THE COURT:  Okay.  Mr. Slawski?

9              PROSPECTIVE JUROR:  Slawski.

10             THE COURT:  Neighborhood in which you live

11    in?

12             PROSPECTIVE JUROR:  Live in Seaford, single.

13    I have no children and I work as a machinist.

14             THE COURT:  Okay.  Thank you.  Ms. Rodriguez?

15             PROSPECTIVE JUROR:  I live in Island Park.

16    I'm single, but I'm in a committed relationship.  I

17    work for a major lending institution, mortgage sales

18    associate.

19             THE COURT:  Mortgage sales associate.  Thank

20    you.

21             Ms. VanHouten, town?

22             PROSPECTIVE JUROR:  I live in Hicksville,

23    single, I have one son, 24.  He goes to school and

24    tutors on the side.  I work at Waldbaum's in the

25    seafood department.
```

1          THE COURT:  Okay.  All right.  Ms. Monetti,

2     town which you live?

3          PROSPECTIVE JUROR:  I live in Malverne.  I'm

4     married.  I have three children; 28, 25, 22.  My oldest

5     son is in the national parks department.  Next one is

6     in the sheet metal union and my daughter is an

7     accountant.

8          THE COURT:  I'm sorry.  Accountant?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Yes.

11          PROSPECTIVE JUROR:  Anything else?

12          THE COURT:  No.

13          PROSPECTIVE JUROR:  And I'm a teacher fifth

14     grade in Queens.

15          THE COURT:  In Queens.  Okay.  Thank you.

16     Mr. Porcelli, town which you live in?

17          PROSPECTIVE JUROR:  Massapequa, I'm married,

18     ever three children, work for an airline last 30 plus

19     years as a mechanic.

20          THE COURT:  Children old enough to be

21     working?

22          PROSPECTIVE JUROR:  One works in finance,

23     other one's in college, other one's in high school.

24          THE COURT:  Okay.  Thank you.  Finally,

25     Mr. Wersan.

113

```
 1              PROSPECTIVE JUROR:  I live in Bellmore, Long
 2      Island.  I'm single, committed relationship, 21 years
 3      same girlfriend.  I work in IT.
 4              THE COURT:  Okay.  Thank you.  At this point,
 5      what I'm going to do, go row by row as I did yesterday
 6      with the following questions, dealing with the first
 7      row, initially.
 8              Have any of you sitting here in the first row
 9      either been or have served either on a criminal or
10      civil trial in the state court system or federal court
11      system or has served for any period on a grand jury?
12      Anybody first row, just by a show of hands?
13      Mr. Zisman?
14              PROSPECTIVE JUROR:  I served on a civil trial
15      here.  I thought it was about five years ago, six years
16      ago.
17              THE COURT:  Did they reach a verdict?
18              PROSPECTIVE JUROR:  Yes, I was an alternate
19      juror though.
20              THE COURT:  Okay.  All right.  Ms. Rappa, did
21      you indicate -- did I see your hand?
22              PROSPECTIVE JUROR:  No.
23              THE COURT:  Ms. Williams?
24              PROSPECTIVE JUROR:  Civil.  I had a civil
25      trial.
```

1          THE COURT:  I'm sorry?

2          PROSPECTIVE JUROR:  Served on a civil jury.

3          THE COURT:  Okay.  Did that jury reach a

4    verdict?

5          PROSPECTIVE JUROR:  No they settled.

6          THE COURT:  They settled.  Okay.  Anybody

7    else first row?  How about the second row, jury service

8    or grand jury service?

9          Mr. Slawski?

10          PROSPECTIVE JUROR:  Civil case about five

11   years ago, just settled.

12          THE COURT:  Okay.  And Mr. Porcelli?

13          PROSPECTIVE JUROR:  About 20 years ago there

14   was a barroom fight and I was on that jury.

15          THE COURT:  Here in Nassau?

16          PROSPECTIVE JUROR:  Here in Nassau, yes.

17          THE COURT:  Without telling us the verdict,

18   was there a verdict in the case?

19          PROSPECTIVE JUROR:  Yes, there was.

20          THE COURT:  You served as a juror, not an

21   alternate?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Okay.  Anybody else second row?

24   Okay.

25          Have any of you or member of your family ever

1    worked either for the police department, corrections

2    department, DA's office or for the court system, in

3    general?

4            First row, anybody?  Ms. Flynn?

5            PROSPECTIVE JUROR:  Well, I worked in traffic

6    court for a year.

7            THE COURT:  Right.  All right.  Anybody else

8    first row?  Law enforcement, police, DA's office,

9    corrections?  Okay, how about second row?

10           Mr. Porcelli?

11           PROSPECTIVE JUROR:  My wife just started

12   working for Nassau County as a liaison for crime

13   victims.

14           THE COURT:  Okay, and she's employed by the

15   County?

16           PROSPECTIVE JUROR:  Yes, she just left.

17   American Airlines had a buyout, left them, came over to

18   Nassau County, started work there.

19           THE COURT:  Do you know how long she's been

20   there?

21           PROSPECTIVE JUROR:  Two, three months.

22           THE COURT:  Okay.  Do you know physically

23   where she would be located?

24           PROSPECTIVE JUROR:  I think it's on Franklin

25   Street over here by the precinct.

1          THE COURT:  Okay.  Anybody else second row,

2    law enforcement, DA's office, corrections, court

3    system?  Okay.  Seeing no hands, I'll assume the answer

4    is no.

5          Victim of a crime first row, either yourself

6    or family members been the victim of a crime?

7          Mr. Zisman?

8          PROSPECTIVE JUROR:  All right.  Well, my wife

9    and sister-in-law were a victim.  It goes back, years

10   but it was a rape that had to do with in the family, so

11   it wasn't, you know, it wasn't something brought to

12   trial, and they were younger.  I don't know if you

13   consider it rape, child molestation.  They were in

14   their teens, but something I want to bring to your

15   attention here today.

16         THE COURT:  Okay.  All right.  Anybody else

17   first row?  Mr. Ortiz?

18         PROSPECTIVE JUROR:  Yeah, me and friend I've

19   grown up with were victims of assault and rape, other

20   stuff.

21         THE COURT:  Okay, all right.  Anybody else

22   first row, victim of a crime, yourself, close family

23   member?  How about second row?  Anybody?

24         Ms. VanHouten?

25         PROSPECTIVE JUROR:  Yeah, child abuse case

1    about 19 years ago.  I'm the mother.

2              THE COURT:  Okay, and is it something you

3    want to talk privately about or --

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Okay.

6              PROSPECTIVE JUROR:  I'm fine.

7              THE COURT:  All right.  Anybody else second

8    row?  Ms. Monetti?

9              PROSPECTIVE JUROR:  You consider students you

10   work closely with?

11             THE COURT:  If it's something you feel that

12   would affect your ability to serve as a juror in this

13   case, then it's obviously something we would want to

14   know about.  You want to use that as kind of a, you

15   know, standard by which you want to tell us?

16             PROSPECTIVE JUROR:  Well, I just reported a

17   parent of one of my students that I believe there's

18   sexual abuse going on, and I tutored a student in

19   Lakeview for about six months who was sexually abused

20   by her older brother.  We became close, but we don't

21   keep in touch now, so --

22             THE COURT:  Okay.  All right.  Anybody else

23   in that second row victim of a crime, yourself, close

24   family member?  All right.

25             And, finally, anyone close to you or yourself

1       who's ever been accused or convicted of a crime?  First

2       row?  Anybody?

3                    Ms. Rappa?

4                    PROSPECTIVE JUROR:  Close friend of mine was

5       indicted and he's upstate now for, I think it was

6       something to do with drugs and money laundering.

7                    THE COURT:  I'm sorry.  I heard something to

8       do with drugs.

9                    PROSPECTIVE JUROR:  And money laundering.

10                   THE COURT:  Money laundering.  Okay.

11                   PROSPECTIVE JUROR:  It was a friend, yes.

12                   THE COURT:  Were you involved in going to

13      court with the person at all?

14                   PROSPECTIVE JUROR:  No.

15                   THE COURT:  All right.  Was there any --

16      would that experience in any way affect you as a juror

17      in this case?

18                   PROSPECTIVE JUROR:  I don't think so.

19                   THE COURT:  Anybody else first row accused,

20      convicted of a crime?  Anybody?

21                   Mr. Ortiz?

22                   PROSPECTIVE JUROR:  Yeah, I mean lots of

23      friends I've grown up with back in my neighborhood.

24                   THE COURT:  Okay.  How about second row?

25      Anybody?  Ms. Rodriguez?

1          PROSPECTIVE JUROR:  I have two relatives that

2     were convicted of crimes.

3          THE COURT:  Okay.  Would you characterize

4     them as close relatives, people you were close with?

5          PROSPECTIVE JUROR:  Close in blood relation.

6          THE COURT:  Okay.  How long ago were these

7     incidents?

8          PROSPECTIVE JUROR:  One was about 15 years

9     ago, the second was maybe five years ago.

10          THE COURT:  Okay.  Was it here, some other

11     county, some other jurisdiction?

12          PROSPECTIVE JUROR:  It was in Brooklyn.

13          THE COURT:  Brooklyn?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Did you -- I don't know if I just

16     asked you, did you go to court, at all involved in the

17     court process for emotional support of any kind?

18          PROSPECTIVE JUROR:  A visit.

19          THE COURT:  A visit at the correctional

20     facility?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Would that, the fact that you had

23     a couple of relatives, had that happen to them, would

24     you in any way feel partial to the defendant in this

25     case or just any reason not be able to give the People

cp

1     a fair trial if you sat as a juror, selected as a juror

2     in this case?

3                PROSPECTIVE JUROR:  No, not at all.  I

4     believe I could.

5                THE COURT:  Anybody else second row there

6     accused or convicted of a crime?  No?  Okay.  All

7     right.  Before I have the attorneys question you, they

8     sent me over my next round of jurors.  Obviously, we're

9     going to be going through some more people, so what I'm

10    going to do, with your patience, and I appreciate it,

11    I'm going to ask everybody in the room, including the

12    people, please take a look see where you're seated

13    because you're going to be coming back here seated in

14    these spots.  I'll ask you to step out.  We'll take our

15    usual break at this point, have you back in once we

16    direct the next round of people to come back at 2

17    o'clock.  All of you in the courtroom, including you

18    still in the audience, please don't go anywhere.

19    Follow my officer.  We'll be back in a few minutes,

20    about five minutes.

21               (Whereupon, the jury panel left the

22    courtroom.)

23               THE COURT:  I don't know how the three of you

24    feel about it.  To me, Mr. Ortiz doesn't exactly look

25    like he wants to be here.  I could tell by his

```
 1    expression of exasperation when we broke here

 2    yesterday, and so he seems intent on excusing himself,

 3    but unless either of you feel differently about it,

 4    I'll let him stay there.  If you want me to replace him

 5    when we come back in, at a minimum, my feeling is he

 6    should be excused for cause.  If you want to leave him

 7    here, I would just indicate so nobody wastes any time

 8    with questions on him.

 9                 MR. LEMKE:  On behalf of Mr. Walters, I'd

10    feel fine in excusing him now, filling that seat in.

11                 MS. SINGAS:  That's fine, Judge.

12                 THE COURT:  We'll do that when we come back

13    in.  Just stay here.  I want to bring in the next round

14    of people, tell them to come back at 2 o'clock.

15                 (Whereupon, the second jury panel entered the

16    courtroom.)

17                 THE COURT:  All right.  Good morning,

18    prospective members of the jury.  Welcome to the Nassau

19    County Court.  My name is Judge McCormack.  I want to

20    thank you for being here.  You were just summoned from

21    central jury.  In a few moments, I'm going to just --

22    I'm going to excuse you actually in a minute.  You're

23    directed to come back at 2 o'clock.  We're actually in

24    the middle of picking a jury in a criminal case.  We

25    actually have a number of jurors that we're actually in
```

cp

Voir Dire - Court                                          122

1    the middle of questioning.  I didn't want to have you

2    sitting here for the next hour, if you will, to tell

3    you the same thing.  I'm going to tell you right now,

4    I'd rather get you in here as quickly as possible,

5    direct that you come back at 2 o'clock.

6              What I'm trying to do, however, before I let

7    you go, I'm going to ask my clerk to please swear you

8    in so when we come back later on today, we'll be able

9    to get going rather quickly.  Artie, if you would?

10             (Whereupon, jury panel number 2 was duly

11   sworn by the Court Clerk.)

12             THE COURT:  You can stay seated.  What I'm

13   going to ask you to do, since we do have a number of

14   jurors we're still questioning, I'm going to ask you to

15   come back at 2:30.  My sergeant will tell you where to

16   report, and more than likely, we're going to have you

17   back in here sometime this afternoon to continue our

18   jury selection.  So I'm very appreciative of your

19   cooperation.  I'd ask you to please come back here

20   2:30, so you can follow my officers at this point.

21             (Whereupon, the second jury panel left the

22   courtroom.)

23             THE COURT:  Give me your name

24             PROSPECTIVE JUROR:  Donna Werkmeister

25   (phonetic.)

1      THE COURT:  Ms. Werkmeister, if you could

2    come back here 2:30, we'll swear you in at that time.

3    We let the rest of you go.  We're in the middle of

4    picking a jury, didn't want you to be waiting here only

5    to send you off for another hour.  You can go now.

6    Please come back, my officer will tell you where to

7    come back at 2:30.  Thank you.

8            (Whereupon, one prospective juror from jury

9    panel two left the courtroom.)

10           (Whereupon, jury panel one entered the

11   courtroom.)

12      THE COURT:  Okay.  The reinforcements have

13   been told to come back at 2:30.  We're ready to

14   continue.  However, before we do that, Mr. Ortiz, with

15   the parties' consent and my thanks, you're going to be

16   excused at this point.  Take your card.  My clerk will

17   tell you where to go.  We're going to fill seat number

18   7, so if you hear your name called in the audience,

19   kindly step forward with your belongings, watch your

20   step.

21      THE CLERK:  Michael Talbot, T-A-L-B-O-T.

22      THE COURT:  All right, Mr. Talbot, welcome.

23   Just preliminarily, you heard me talk about the

24   different principles of law that apply in all criminal

25   cases; burden of proof, presumption of innocence, proof

cp

1    beyond a reasonable doubt, defendant's not obligated to

2    testify.  In a criminal case, that's not a fact any

3    adverse inference, if you will, can be drawn against

4    him by a juror.

5              Is there any problem with you following any

6    of those instructions at all?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  As far as, if you will, pedigree

9    questions, just tell us the town which you live.

10             PROSPECTIVE JUROR:  Levittown.

11             THE COURT:  Married, committed relationship?

12             PROSPECTIVE JUROR:  Married.

13             THE COURT:  Children?

14             PROSPECTIVE JUROR:  Three.

15             THE COURT:  Old enough to be working?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Tell us what they do.

18             PROSPECTIVE JUROR:  Cablevision one,

19    student-teacher, and retail.

20             THE COURT:  I'm sorry.  Last one?

21             PROSPECTIVE JUROR:  Retail.

22             THE COURT:  Retail.  Okay.  And yourself, are

23    you presently working?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  What kind of work?

1          PROSPECTIVE JUROR:  I work for the State.

2          THE COURT:  For the State?

3          PROSPECTIVE JUROR:  MTA bus company.

4          THE COURT:  As far as any prior jury service

5     at all; criminal, state, civil?

6          PROSPECTIVE JUROR:  Alternate on a civil

7     case.

8          THE COURT:  Did that jury reach a verdict?

9          PROSPECTIVE JUROR:  Never went to court.

10          THE COURT:  Okay.  And as far as law

11     enforcement experience, police, DA, corrections, you or

12     close family member, friends involved in any?

13          PROSPECTIVE JUROR:  I have a family member

14     who has a friend I'm acquainted with also as a police

15     officer.

16          THE COURT:  Is that locally?

17          PROSPECTIVE JUROR:  New York City.

18          THE COURT:  Anything about that relationship

19     for any reason you wouldn't be able to serve in this

20     case?

21          PROSPECTIVE JUROR:  I don't think so.

22          THE COURT:  Victim of a crime, anybody, you

23     yourself?

24          PROSPECTIVE JUROR:  My father.

25          THE COURT:  Something recently or something

1     many years ago?

2                 PROSPECTIVE JUROR:  About 20 years ago.

3                 THE COURT:  Anything about that experience

4     feel you couldn't serve as a juror in this case?

5                 PROSPECTIVE JUROR:  Assaulted, that's all.

6                 THE COURT:  Situation where someone was

7     arrested, prosecuted?

8                 PROSPECTIVE JUROR:  Never caught the person.

9                 THE COURT:  Any other incident that involved

10    victim of a crime?

11                PROSPECTIVE JUROR:  No.

12                THE COURT:  Anybody close to you ever been

13    accused or convicted of a crime?

14                PROSPECTIVE JUROR:  No.

15                THE COURT:  Okay.  At this point, I'm going

16    to turn it over to Ms. Singas.

17                MS. SINGAS:  Thank you, Judge.

18                Okay.  Good morning, jurors.  How are you?

19    All right.  I'm going to go through some of the

20    follow-up on some of the questions that the Judge asked

21    you.  First, before we get into some of the concepts we

22    spoke about yesterday, Ms. Williams, you said you're

23    retired?

24                PROSPECTIVE JUROR:  Yes.

25                MS. SINGAS:  What kind of work did you do?

1          PROSPECTIVE JUROR:  Call center.  I was a

2     customer service manager.

3          THE COURT:  Ms. Rappa, you said you had a

4     close friend I believe you said who was indicted and

5     then ultimately convicted of a crime?

6          PROSPECTIVE JUROR:  I believe he was

7     convicted.  I haven't followed up with him for awhile.

8          MS. SINGAS:  At the time of this person's

9     arrest, were you close to that person?

10          PROSPECTIVE JUROR:  Yes.

11          MS. SINGAS:  Did you feel he was being

12     treated fairly by the police or prosecutors involved in

13     the case?

14          PROSPECTIVE JUROR:  Not so much.

15          MS. SINGAS:  And do you think maybe you might

16     have concern about police officer testimony in this

17     case, in a criminal case?  Do you think you might feel

18     more comfortable sitting in a civil case because of

19     that experience that you had with this friend?

20          PROSPECTIVE JUROR:  No.

21          MS. SINGAS:  Okay.  Mr. Zisman, Officer Estes

22     gave you a particular --

23          PROSPECTIVE JUROR:  Yes.

24          MS. SINGAS:  Let's say it's the same Officer

25     Estes who comes into this courtroom and takes that

1   stand.  Are you going to be like, ah-ha, now I got you

2   were I want you and I'm not going to believe anything

3   that guy says?

4                PROSPECTIVE JUROR:  No.  Listen, if it was a

5   slip and fall accident, things in a parking lot,

6   something, probably wouldn't bring up, but this is a

7   serious case.  I wanted to disclose that.

8                MS. SINGAS:  Did you feel were you treated

9   fairly by Officer Estes?

10               PROSPECTIVE JUROR:  Yeah.

11               MS. SINGAS:  Okay.  No --

12               PROSPECTIVE JUROR:  It was really -- yeah, it

13   would be no ill will.

14               MS. SINGAS:  Nothing really on your radar?

15   You heard the name, figured you'd bring it up?

16               PROSPECTIVE JUROR:  Yes.

17               MS. SINGAS:  No effect on.  You once you hear

18   testimony, you'll treat him just like any other

19   witness?

20               PROSPECTIVE JUROR:  Yes.

21               MS. SINGAS:  Can you promise me that?

22               PROSPECTIVE JUROR:  Yes, yes, yes.

23               MS. SINGAS:  Miss Flynn, you said you work

24   for the County?

25               PROSPECTIVE JUROR:  Yes.

1          MS. SINGAS:  Do you work with assistant

2    district attorneys or with the district attorney?

3          PROSPECTIVE JUROR:  No, not with the district

4    attorney, but I do work with the county attorneys at

5    times.

6          THE COURT:  Can you assure us just because

7    you work for the County and I work for the County,

8    you're not going to give me extra credit because I work

9    for the County?

10          PROSPECTIVE JUROR:  Well, I don't think so.

11    I mean I can't assure you on that, but I don't think so

12    so.

13          MS. SINGAS:  Okay.  You know, and this is one

14    of those moments why I don't think so might not be good

15    enough.  You know, it has to be that your association

16    with the County cannot enter into your deliberations,

17    'cause that just frankly wouldn't be fair.

18          PROSPECTIVE JUROR:  Of course not.

19          MS. SINGAS:  Do you think you can put

20    aside -- are you going to give any county workers who

21    may include police officers, detectives any other

22    witnesses you might hear who work for the County extra

23    credit just because you work for the County?

24          PROSPECTIVE JUROR:  I don't think so, but I

25    mean, I'm not 100 percent sure.  I mean is anybody ever

1    100 percent sure on anything?

2              MS. SINGAS:  No.  A lot of times it's not,

3    but this is sort of what we need to get at.  Basically

4    the question is, can you follow the judge's

5    instructions when the judge tells you you can't let

6    anything other than what you hear in the evidence come

7    into play when you're deliberating, and that's

8    basically the question.  Can you follow the Judge's

9    instructions and listen to the evidence?

10             PROSPECTIVE JUROR:  I think I can, yeah.  I

11   do have a little problem though with, and maybe I

12   should have brought this to your attention before.  I

13   had a neighbor who was a police officer in New York

14   City and I found him to be mentally unstable.  He

15   kind --

16             MS. SINGAS:  That's unfortunate.

17             PROSPECTIVE JUROR:  Kind of made the

18   neighborhood crazy, and I don't know if that would come

19   into this, what's going on in here.

20             MS. SINGAS:  So this unstable neighbor was a

21   police officer?

22             PROSPECTIVE JUROR:  Yes.

23             MS. SINGAS:  And you think you're going to

24   draw any conclusions about all police officers because

25   of that?

Voir dire - People                                                    131

```
 1            PROSPECTIVE JUROR:  No, but he was mentally
 2    unbalanced.
 3            MS. SINGAS:  Okay.
 4            PROSPECTIVE JUROR:  I mean there are great
 5    police officers, don't get me wrong.  I worked with
 6    them at traffic court and all, but I do not --
 7    sometimes people --
 8            MS. SINGAS:  I'm sure you see a lot of county
 9    workers, some exceptional, some of them I'm sure not so
10    exceptional.
11            PROSPECTIVE JUROR:  That's true.
12            MS. SINGAS:  My question is can you just
13    listen to the evidence fairly and assess it, and if you
14    can't, you can't.
15            THE COURT:  More importantly, Ms. Flynn, and
16    I said it yesterday, I don't think I said it this
17    morning, you know, police officers, detectives, anybody
18    in law enforcement, they're all human beings.
19            PROSPECTIVE JUROR:  Yes.
20            THE COURT:  Like all of us think could be
21    telling the truth, they could be mistaken sometimes and
22    sometimes people, you know, law enforcement can lie.  I
23    mean it does happen on occasion.  My question is, and I
24    think that's what Ms. Singas is asking, you know, can
25    you put the experience with the neighbor aside for a
```

1       moment?  And your neighbor's not coming in here to

2       testify.  Somebody's here from the New York City Police

3       Department coming to testify, so can you just say,

4       look, I'm going to decide this case based upon the

5       facts and evidence as I find them to be with my fellow

6       jurors and with the law as I give it to you?  Can you

7       give us your assurance on that?

8                   PROSPECTIVE JUROR:  I don't think so, no.  I

9       really I might hold that in the back of my head 'cause

10      for three years, he absolutely tortured the

11      neighborhood.

12                  THE COURT:  Okay.  And you feel as you sat

13      deliberating to the extent that a police officer's

14      testimony is crucial in this case, you think that that

15      would somehow either skew or alter your opinion and

16      conclusions about the testimony here in this case by

17      some other officer?

18                  PROSPECTIVE JUROR:  It might, it might.

19                  THE COURT:  Go ahead, Ms. Singas.

20                  MS. SINGAS:  Thank you, Judge.

21                  Mr. Talbot, you said your father was the

22      victim of a crime, person never caught?

23                  PROSPECTIVE JUROR:  Right.

24                  MS. SINGAS:  Anything about that experience?

25      Do you blame the police for not catching the

1    perpetrator?

2           PROSPECTIVE JUROR:  It might have been job

3    related.

4           MS. SINGAS:  The actual incident?

5           PROSPECTIVE JUROR:  Someone who assaulted

6    him.

7           MS. SINGAS:  So you harbor no ill will

8    towards the police in investigating that case?

9           PROSPECTIVE JUROR:  No.

10          MS. SINGAS:  Okay.  Mr. Porcelli, you said

11   your wife started working as a victim advocate?

12          PROSPECTIVE JUROR:  Yes.

13          MS. SINGAS:  Does she work for the district

14   attorney's office?

15          PROSPECTIVE JUROR:  No, just started a couple

16   months, really been training how to do everything.  A

17   ticket agent she was for the last 25 years for the

18   airlines, so chance to get out of the airline industry

19   was a good move.  We were both in that chaos, so she

20   had a chance to get in, so she's trying it out.

21          MS. SINGAS:  Anything about her job as victim

22   advocate that you think you would place extra emphasis

23   on the victims that you hear in this case?

24          PROSPECTIVE JUROR:  No, she just gets a phone

25   call, relates it to somebody else, does no counseling

1    or anything like that.

2            MS. SINGAS:  Okay.  Good.  Ms. Monetti, you

3    said you might know an Ilsa Morales.  Do you know how

4    old that woman is around, approximately?

5            PROSPECTIVE JUROR:  I think late 30s.

6            MS. SINGAS:  Is this someone you were close

7    to?

8            PROSPECTIVE JUROR:  No, it was just a parent

9    of a student in school.

10           MS. SINGAS:  I mean I don't know if it will

11   be, but if it is the same person that comes in to

12   testify, I think this one is younger, but in any event,

13   if it is the same person, do you think just because she

14   was the parent of a student had you, would give her

15   defference?

16           PROSPECTIVE JUROR:  I never really had any

17   experience with her that sticks in my mind.

18           MS. SINGAS:  Okay.  Ms. VanHouten, I'm sorry.

19   When you were talking about being a prior victim, I

20   wasn't sure.  Did you say you were a prior victim?

21           PROSPECTIVE JUROR:  My son.

22           MS. SINGAS:  Your son was a prior victim.

23   Okay.  And without going into too much detail, what

24   kind of case was it?

25           PROSPECTIVE JUROR:  They were about four

1      families on our block who were involved with a child

2      abuser on the block and it went to court and he was let

3      loose.

4                   MS. SINGAS:  Okay.  Were you angry about?

5      That?

6                   PROSPECTIVE JUROR:  Oh, yes.

7                   MS. SINGAS:  Did that happen in Nassau

8      County?

9                   PROSPECTIVE JUROR:  Yeah.  I believe we were

10     right next door here when we came in.

11                  MS. SINGAS:  So do you think that because of

12     that experience, maybe this isn't the kind of case you

13     want to sit on?  You heard the judge give you the

14     charges.

15                  PROSPECTIVE JUROR:  I understand.  I mean one

16     has nothing to do with the other and this person is not

17     that person.

18                  MS. SINGAS:  Okay.  Let me ask you this.

19     Some of the detectives that will be testifying in this

20     case are from the Special Victims Squad, which is

21     probably same squad that investigated the case that had

22     something to do with the case of the person on your

23     block.  Do you think that maybe if you saw one of those

24     detectives, that that might influence you in a way that

25     wouldn't be positive.

Voir Dire - People                                136

```
 1              PROSPECTIVE JUROR:  I don't believe so,

 2    because like I said, one has nothing to do with the

 3    other.  I mean it's two separate cases.

 4              MS. SINGAS:  Okay.

 5              THE COURT:  Ms. VanHouten, you heard me

 6    yesterday.  I went into a little more detail about, you

 7    know, what proof beyond a reasonable doubt is, and my

 8    question to you is at the close of the case, I'm going

 9    to instruct the jury about what proof beyond a

10    reasonable doubt is, and that's the kind of standard,

11    if you will, that you, as a juror, have to determine as

12    to whether you find the defendant guilty or not guilty.

13              Can you give me your assurance as you sit

14    here now that whatever that legal instruction is that I

15    give you with regard to the burden of proof that you're

16    going to follow that?

17              PROSPECTIVE JUROR:  Yes.

18              THE COURT:  And not take it upon yourself to

19    apply some other standard of proof because of what

20    happened a number of years ago?

21              PROSPECTIVE JUROR:  No, I don't believe so.

22              THE COURT:  Go ahead, Ms. Singas.

23              MS. SINGAS:  Ms. Rodriguez, you mentioned you

24    had two relatives who -- were they convicted or just

25    accused?
```

1        PROSPECTIVE JUROR:  Convicted.

2        MS. SINGAS:  Can you tell us the nature of

3    those crimes.

4        PROSPECTIVE JUROR:  Yes, one was auto theft,

5    other one was drug related.

6        MS. SINGAS:  Nothing to do with the charges

7    in this case?

8        PROSPECTIVE JUROR:  No.

9        MS. SINGAS:  Did you feel your relatives were

10   treated fairly by the system?  By the system, I mean

11   the police officers, prosecutors, judges.

12       PROSPECTIVE JUROR:  Prior to that, I had no

13   experience with the system, so I just believed the

14   system was the system.  I took it at face value.  Like

15   in any business or other area, you rely on the

16   individuals working in the company, system or area.

17       MS. SINGAS:  Did you feel that the system

18   worked for your relatives or didn't work for your

19   relatives.

20       PROSPECTIVE JUROR:  They went through the

21   system, so --

22       MS. SINGAS:  Do you think they were treated

23   fairly?

24       PROSPECTIVE JUROR:  I believe so.  They

25   committed a crime.

 1              MS. SINGAS:  Anything about that experience

 2      that you think you would bring into this courtroom

 3      someone's accused of a crime here?  Do you think that I

 4      would get your benefit because you said, listen, I know

 5      this.  I've been through it with my relatives.  Going

 6      to give him the benefit of the doubt.  Think that would

 7      happen, or --

 8              PROSPECTIVE JUROR:  I would definitely listen

 9      to the evidence being presented and make a decision

10      based on that.

11              MS. SINGAS:  Okay.  Good.  Thank you.  Okay.

12      I want to talk a little bit about law enforcement

13      because many of you have law enforcement in your

14      background, but the question I have for you is the

15      defendant get extra credit because he's law

16      enforcement.

17              Ms. Williams, you're in the back deliberating

18      and you say, you know what?  I think the People have

19      proven he's guilty, but I'm kind of close, and because

20      he's law enforcement, he was a corrections officer, and

21      I really can't believe that a corrections officer would

22      do the kind of crimes that the people are accusing him

23      of.  I'm going to vote not guilty because I just

24      believe someone in law enforcement is not capable of

25      committing these crimes.

1          PROSPECTIVE JUROR:  I'm sorry.  Everybody is

2     human.  We all make mistakes, so I would base my

3     decision on what evidence is brought before me and how

4     the judge charges me.

5          MS. SINGAS:  Okay, good.  How about you,

6     Ms. Aubin?  How do you feel about that; law

7     enforcement?  Some good, some bad?

8          PROSPECTIVE JUROR:  Always two sides to every

9     story.  I have to process the information given before

10    you can judge.  You have to listen.

11         MS. SINGAS:  Okay.  Will he get extra credit

12    because he's a law enforcement member?

13         PROSPECTIVE JUROR:  No, unless I would say

14    you'd have to listen to everything before you could

15    give credit to anybody.

16         MS. SINGAS:  Listen to the evidence?

17         PROSPECTIVE JUROR:  Yeah.

18         MS. SINGAS:  How about you, Ms. Temple?

19         PROSPECTIVE JUROR:  Just because he's former

20    officer, no, doesn't make a difference to me.

21         MS. SINGAS:  Mr. Slawski, anything about his

22    law enforcement background that you think would enure

23    to his benefit in this case?

24         PROSPECTIVE JUROR:  No, I don't think so.

25         MS. SINGAS:  Okay.  All right.  How about

```
 1    some of the issues we talked about yesterday?  I know

 2    all of you were paying attention even though it was 4

 3    o'clock.

 4         Mr. Slawski, we talked about sort of some

 5    factors that would help in making a correct

 6    determination.  Do you remember we had that discussion?

 7         PROSPECTIVE JUROR:  Not really.

 8         MS. SINGAS:  Okay.  I know.  Like to think

 9    that people listen.  Okay.  If one of the issues you're

10    going to have to decide in this case is were the

11    victims correct when they identified the defendant as

12    the perpetrator of the crime, and we talk a little bit

13    about some of the things that either help an

14    identification or hurt an identification.  Remember we

15    talked about something like lighting?  Does that make

16    sense?  More light it is more likely they made a

17    credible identification?  Does it make sense?

18         PROSPECTIVE JUROR:  Yeah, that makes sense.

19         MS. SINGAS:  How about distance?  Closer

20    someone is to a person, the more likely they'll be able

21    to get a better look at them as opposed to the person

22    standing 30 feet away?  Makes sense?

23         PROSPECTIVE JUROR:  Makes sense.

24         MS. SINGAS:  Okay.  Mr. Blankman, how about

25    you?  Remember any other factors we talked about about
```

1    helping an identification or hurting it?

2                    PROSPECTIVE JUROR:  Not really specific to

3    identification, no.

4                    MS. SINGAS:  Would you agree with those

5    statements that I just made?  You have to look at the

6    overall circumstances of how an identification is made

7    to determine whether or not it's accurate?

8                    PROSPECTIVE JUROR:  I would I say so.

9                    MS. SINGAS:  Okay.  Remember we talked a

10   little bit, I asked someone how tall I was and about

11   description.  Think you're good at describing people?

12                   PROSPECTIVE JUROR:  I'm not sure.

13                   MS. SINGAS:  Not going to ask you any

14   questions about me.  Let me ask you this.  Do you think

15   that things can influence it?  For example, if I were

16   to ask you again how tall I was, do you think it would

17   matter that you're sitting and I'm standing in front of

18   you as opposed if you were standing next to me and had

19   to tell me how tall I was?

20                   PROSPECTIVE JUROR:  Yeah, and the fact I'm on

21   a raised platform, sure.

22                   MS. SINGAS:  Does that all make sense,

23   Mr. Wersan, on the identification?

24                   PROSPECTIVE JUROR:  Yes.

25                   MS. SINGAS:  Lots of factors to consider