1        before you can determine if an ID is a correct one?

2                PROSPECTIVE JUROR:  Yes.

3                MS. SINGAS:  How about that whole concept of

4        being able to recognize someone as opposed to being

5        able to describe someone?  Do you agree sometimes that

6        might be two different things like you couldn't

7        describe the person to save your life, but you know if

8        you saw him them again, you'd be able to recognize it?

9                PROSPECTIVE JUROR:  I agree.

10               MS. SINGAS:  And I think Mr. Lemke brought up

11       the point of sometimes you might see somebody that you

12       think is your neighbor.  Has that ever happened to you?

13               PROSPECTIVE JUROR:  Yes.

14               MS. SINGAS:  You realize that you're wrong?

15               PROSPECTIVE JUROR:  Yes.

16               MS. SINGAS:  Once you realize you're wrong,

17       you don't continue after that person, hey, hey, gee,

18       come on, it's me, Joe.  I'm your neighbor; right?

19               PROSPECTIVE JUROR:  Has to be the person.

20               MS. SINGAS:  Now, the other thing we talked

21       about is sort of a lot of these women are going to be

22       testifying through interpreters.  That's an opinion.

23       Anything about that fact you're not going to be able to

24       hear these women speaking the way I'm speaking to you.

25       They're going to be speaking and, there's going to be

 1      an interpreter saying to the jury, interpreting for the

 2      jury.  Anything about that interpretation, the fact you

 3      won't be able to get it sort of first hand from the

 4      victim that troubles you?

 5              PROSPECTIVE JUROR:  Absolutely not, 'cause in

 6      my work, that happens all the time.

 7              THE COURT:  Just so everybody is clear, the

 8      interpretation is going to be in English when it comes

 9      back.  We're not going to test your language

10      proficiency during the course of the trial.

11              MS. SINGAS:  Thank you, Judge.

12              Mr. Zisman, anything about interpretation

13      that gives you pause, you won't be able to hear first

14      hand from the victims?  You're going to have to wait a

15      drum beat and then hear the interpretation in English?

16              PROSPECTIVE JUROR:  No, that doesn't bother

17      me.  The recognition thing, I thought a lot about that

18      yesterday, and the describing, 'cause I saw this

19      program a while ago, some research about it, and really

20      interested, I think 20/20, Dateline goes through my

21      head, did this kind of study about recognizing

22      somebody, picking someone up out of a line-up, it was

23      mistaken a lot and a lot of things that, you know, to

24      me.  I thought about that a lot, actually.

25              MS. SINGAS:  All right.  So you think you'd

1    have to study really the circumstances of how something

2    happened in order to determine about an identification

3    whether accurate or not?

4              PROSPECTIVE JUROR:  Absolutely.

5              MS. SINGAS:  I mean is there anything about

6    that that you think whatever knowledge that you have,

7    you know, that came from outside sources, do you think

8    that's going to affect the way you're going to look at

9    the evidence here or can you -- I mean, do you think --

10   I know you said it stayed with you?

11             PROSPECTIVE JUROR:  It did.

12             MS. SINGAS:  Obviously thinking about it, but

13   you can't go in the back, say, listen, 20/20 says that,

14   you know, 30 percent of people blah, blah, blah when

15   you're deliberating.  Can you promise me you're not

16   going to do that kind of thing?

17             PROSPECTIVE JUROR:  No, but it's something I

18   would think about because I was, you know, amazed how

19   wrong they were on these things, really blatant stuff.

20   I know it's one show, that type of thing, but it stuck

21   with me.  It did.  I won't, you know, tell everbody

22   that starts the deliberations, but something I would

23   think about.

24             THE COURT:  One of the instructions,

25   Mr. Zisman, I would give anticipate giving I should say

```
 1          in a case like this, certain factors, certain criteria

 2          that you can use in evaluating the correctness of an

 3          identification and whatever they may be when I give

 4          them to you at the close of the case, can you give us

 5          your assurance that's what you'll use in making the

 6          determination as to whether or not the identification

 7          is correct?

 8                    PROSPECTIVE JUROR:  What you instruct, yes.

 9                    THE COURT:  Okay.

10                    MS. SINGAS:  Okay, Ms. Monetti, some of the

11          testimony you're going to hear has to do with, you

12          know, varios sorts of private and embarrassing

13          testimony that's going to come from these women.  I'm

14          not going to ask you this, but if I were to ask you to

15          describe a sexual experience, do you think that would

16          be a comfortable experience for you in front of a room

17          full of strangers or you think you might be a little

18          tentative about doing that?

19                    PROSPECTIVE JUROR:  If I was to describe?

20                    MS. SINGAS:  Yeah.  If I were asking you

21          questions that had to do with things of a sexual

22          nature, do you think for the person that's going to be

23          telling us about that, do you think that's something

24          come easy for them or it might be a little difficult?

25                    PROSPECTIVE JUROR:  I think it would be
```

1     difficult for them.

2              MS. SINGAS:  This kind of case with these

3     kind of charges, you know, calls for very difficult

4     testimony than something like a car theft or street

5     robbery; that these victims might get emotional.  Some

6     of them might some of them might not.  Can you promise

7     me if they appear nervous, you'll take everything into

8     consideration including what it is that they're

9     testifying about?

10             PROSPECTIVE JUROR:  Sure.  They should be

11    nervous.

12             MS. SINGAS:  How about you, Mr. Slawski?

13    Anything about, you know, about the way the victims

14    might testify in this case?  Can you promise me you'll

15    take everything into consideration, nature of their

16    testimony, as well as the way they're saying it when

17    you're making your determination about how credible or

18    not they are?

19             PROSPECTIVE JUROR:  Yes, I can do that.

20             THE COURT:  Couple minutes.

21             MS. SINGAS:  I think I'm done.  Thank you

22    all.

23             THE COURT:  Mr. Lemke.

24             MR. LEMKE:  Thank you, your Honor.  Now that

25    I guess it's good afternoon, round two again.  As I

1    mentioned yesterday, very rarely read about or see on

2    any of the television shows or movies much time spent

3    on voir dire.  It becomes somewhat tedious, especially

4    this is the second round.  There'll be a third round

5    and I'm sure a fourth round until we get twelve jurors.

6    Yesterday was kind of a rarity in that we went through

7    the whole panel without getting at least one juror, and

8    you hope perhaps to get perhaps two, three, four from

9    this panel and so forth, and when there's questions

10   that are asked and there's an answer, maybe I think --

11   I think you can be fair, I'm not sure.  Sometimes we

12   ask a follow-up question, because as I said yesterday,

13   we're at somewhat of an advantage.  We know what

14   witnesses will be testifying, to some extent.  We know

15   what the law will be at the end of the case, and we try

16   to pick jurors and we ask questions, so that at the end

17   of the case or halfway through the case, a juror

18   doesn't all of a sudden become very concerned that

19   something from their past now creeps into their

20   mindset, and they say, I can no longer be fair to one

21   side or the other without even waiting 'till the end of

22   the case, and that's why we ask those type of

23   situations now.

24          It's Mr. Eisman (sic)?

25          PROSPECTIVE JUROR:  Zisman.

1          MR. LEMKE:  In fact, for the others as well,

2     has there been any -- does everybody drive -- let me

3     ask that.  Has there been anybody that has never been

4     stopped by a police officer either to give a ticket as

5     a result of speeding or failing to signal?  Anybody?

6          Mr. Talbot?

7          PROSPECTIVE JUROR:  I've been stopped.

8          MR. LEMKE:  If you're stopped, in fact, I

9     think who hasn't been stopped, let me ask that

10    question.  Okay.  Most everybody else has.

11         Police officers.  I think it's been mentioned

12    by Ms. Aubin, like any other profession, I think

13    Ms. Williams indicated there's good, bad, those perhaps

14    in the middle, so forth.  Police officers as a whole,

15    they take the stand and they testify, and the question

16    that's been posed is this, and I use the example

17    yesterday, if a officer testifies that the light was

18    red and a civilian says it's green, without hearing

19    anything else, nothing anything else because of common

20    experiences, because of anything else, are you going to

21    say, I'm going to believe the police officer, going to

22    give the police officer more credibility than the

23    civilian just because he's a police officer or will you

24    say, no, let me listen to what else is there.

25         Do you understand kind of that type of

1   questioning as well, and if selected as a juror in this

2   case, officers as well as civilians take the stand,

3   testify.  Will you listen to all of the evidence or

4   lack of evidence, follow-up, judge's instructions in a

5   case such as this?

6           PROSPECTIVE JUROR:  I think I should be.

7           MR. LEMKE:  Can you do that?

8           PROSPECTIVE JUROR:  I think I can.

9           MR. LEMKE:  You say you think you can.  I'm

10  going to ask you something.  You're married?

11          PROSPECTIVE JUROR:  Yes.

12          MR. LEMKE:  You play golf at all?

13          PROSPECTIVE JUROR:  Yes, I do.

14          MR. LEMKE:  Go away maybe for a day or two

15  with the friends, play golf?

16          PROSPECTIVE JUROR:  No.

17          MR. LEMKE:  Okay.  Let's say you're going

18  away for the day, leave early in the morning, your

19  friend pulls up, you give your wife a kiss at the door,

20  going out east for the whole day, play golf.  And for

21  some reason, she says one of your buddies said

22  afterwards you're going to stop at a topless place, so,

23  I'm asking you if they put pressure on you to stop at

24  the topless place, are you going to go in or stay

25  strong?  Can you promise -- or stay strong and you turn

1    around and say, I think I can, but I'm not too sure

2    she's going to be happy about you getting in that car,

3    going away?

4                    PROSPECTIVE JUROR:  No.

5                    MR. LEMKE:  But this is again the reason I'm

6    asking, because this is a highly emotional case, no

7    question.  I think, Ms. Monetti, you've been asked, and

8    again, individuals coming in.  This isn't a case you're

9    going to have to worry if you're selected as a juror

10   that there wasn't physical sexual contact with these

11   young ladies had been sexually violated and raped,

12   horrible crime, not a consent case.  It's not anything

13   other than forcible sex, as the Judge will give you the

14   instructions on that.  If you're selected in this case,

15   issue is going to be identification; is this individual

16   the one.

17                    So, Ms. Monetti --

18                    PROSPECTIVE JUROR:  Monetti.

19                    MR. LEMKE:  In this case, individual gets

20   sworn in to tell the truth.  As the Judge used the

21   example yesterday that witnesses could either be lying,

22   mistaken or telling the truth, basically in between.

23   Young lady takes the stand, testifies to what happened

24   to her, and at some point, very emotional witnesses,

25   going to be Mrs. Tebbett or Mrs. Singas will say, do

1   you see the individual that did that to you, and she

2   points and says, that's him.  That's the guy.

3           Knowing that from the outset, we're here.

4   You'll have to determine whether that identification is

5   mistaken or not based upon a number of other factors,

6   but knowing that that would occur, can you still sit in

7   this case if you're selected as a juror with the

8   emotions, with everything that's building and still

9   follow the Judge's instructions and make a

10  determination at the end of the case as to whether that

11  identification, along with anybody else is accurate,

12  mistaken or credible?  Can you do that?  Can you

13  follow?  It's kind of putting the issues before you.

14  Not easy, not a matter of being easy.  It's a matter of

15  can you do that in a case like this.  What do you

16  think?

17          PROSPECTIVE JUROR:  Whether or not I can?

18          MR. LEMKE:  No.  From the outset, witness

19  takes the stand, says, he's the one who did this.

20  Obviously, look at the other factors to see if she's

21  mistaken.  My question to you if you listen to the

22  other factors actually decide, you know, whether she's

23  mistaken based on other factors, can you do that as a

24  juror in this case?

25          PROSPECTIVE JUROR:  I think so.

1          MR. LEMKE:  Just as well as go back that

2    example if you're convicted you believe based on all

3    the evidence that it was an accurate identification?

4          Mr. Porcelli.

5          PROSPECTIVE JUROR:  Porcelli.

6          MR. LEMKE:  Do you understand that question?

7    You're selected as a juror, witnesses come in, it's a

8    matter of whether or not that identification -- think,

9    Mr. Zisman, you had seen some other shows indicating

10   regarding identifications?

11         PROSPECTIVE JUROR:  Uh-hum.

12         MR. LEMKE:  Parts of those shows may show

13   sometimes there's other evidence years later to show

14   that conviction was overturned because of a mistake

15   somewhere along the line.  Question again,

16   emotionally --

17         PROSPECTIVE JUROR:  Yes.

18         MR. LEMKE:  If you're selected as a juror in

19   this case, police officers take the stand, does it

20   matter how many police officers take the stand or would

21   you take a look at what their testimony is, the

22   quality, quantity not necessarily what is important,

23   really the quality.  I think you have to put it in

24   context of all the evidence that you heard during the

25   trial.

1          In a case in witness People, as the Judge has

2     instructed, has the burden throughout and I know

3     Ms. Aubin indicated two sides to every story.  There

4     was a very strong opinion earlier at the end of the

5     People's case.  They look over.  I say, Judge, we rest,

6     and Ricardo doesn't take the stand to testify; that she

7     wouldn't hear or want to listen to anything else.  He

8     might be hiding something and it's okay initially to

9     say, why is that, and that's why we discuss that.

10         Now how would you feel about that scenario?

11         PROSPECTIVE JUROR:  I would have to think

12    about what I've heard.  There's too much.  It's a very

13    intricate process.  I think you have to really look at

14    the situation.  There could be a mistake.  Nothing is

15    perfect, so you have to weigh everything and think and

16    process during the trial.

17         MR. LEMKE:  That's all we could ask.

18    Mr. Slawski?

19         PROSPECTIVE JUROR:  Yes.

20         MR. LEMKE:  Another concern why I'm asking is

21    now at some point in time, you're going to be asked if

22    selected as a juror in a case such as this, that

23    there's not one individual came in here and said he did

24    this to me, but perhaps three or perhaps four talk a

25    little bit about yesterday a couple of judges said four

1      people make a mistaken, somebody else similar in

2      nature, again not guilty charges.  Themselves, without

3      hearing more of the specifics and again, if selected as

4      a juror, again, kind of hard to ask questions for you

5      to answer in a vacuum.  But again, as the Judge

6      indicated, not 'till the end of the case did you get

7      the charge from the Court as well, but in that

8      scenario, can you still sit here and evaluate each of

9      the individuals' testimony alone because you're going

10     to be asked to separate one from the other to the other

11     to the other.  What you may find on one may not be what

12     you find on the other, so on, so forth.

13             MR. LEMKE:  Could you do that in a case where

14     you have a number of dates of incident dating back to

15     2005?  Could you do that if selected in the case?

16             PROSPECTIVE JUROR:  Yes, I think I can.

17             MR. LEMKE:  If, at the end of the case,

18     People's case on behalf of Ricardo stand up, say,

19     Judge, fine, we rest.  People still have the burden,

20     follow the Judge's instructions regarding that?

21             PROSPECTIVE JUROR:  Yes.

22             MR. LEMKE:  Role of a police officer, I think

23     Mr. Zisman --

24             PROSPECTIVE JUROR:  Zisman.

25             MR. LEMKE:  Issued speeding summons.

1    Whatever the case may be, Mr. Slawski, would you agree

2    with me certainly there's a role that police officers

3    have in either investigating cases, maybe a detective

4    that picks it up and so forth, but there are certain

5    roles that police officers have regarding

6    investigations.  Do you agree in that sense,

7    Mr. Slawski, regarding that?

8              PROSPECTIVE JUROR:  Yes.

9              MR. LEMKE:  Mr. Blankman?

10             PROSPECTIVE JUROR:  Yes.

11             MR. LEMKE:  You wouldn't expect a police

12   officer to come in here halfway through his testimony,

13   instruct you on the law of the case; right?  That would

14   be the Judge's function, and the prosecution in the

15   case wouldn't expect the officer, when he gets up here,

16   to start telling you, okay, whatnot, only the burdens

17   are, but start asking various questions that would be

18   the role of the prosecutor.

19             PROSPECTIVE JUROR:  Yes.

20             MR. LEMKE:  Defense counsel, whether he

21   chooses to ask questions or not and so forth, so if

22   you're seleced as a juror in the case, police officer,

23   police officers, civilians testifying at the end of the

24   case, if seleced based upon the evidence or lack of

25   evidence at the end of the case, I submit to the jury

1    that police officer whether it's Estes or another

2    officer, went beyond their role.  They arrived at say a

3    location, took certain information, but now they jumped

4    to play judge, now jumping to say, give an opinion as

5    to whether they think somebody is guilty or not.  My

6    question that I asked of you and everybody else, if

7    selected as a juror, can you take the role that you'd

8    be asked to perform as a juror and evaluate the

9    evidence and know the roles of the police officer do

10   certain things.  If I came to you at the end, say this

11   police officer may be credible, I submit to you, in

12   this case, take a look what this officer is saying.  It

13   doesn't make sense.  Can you follow that kind of

14   scenario?  Can you do that if selected in this case?

15            PROSPECTIVE JUROR:  Yeah.

16            MR. LEMKE:  See if it makes sense or not

17   regardless of whether they come in, put a shield in

18   their pocket, so forth.

19            PROSPECTIVE JUROR:  Yes.

20            MR. LEMKE:  Okay.  Mr. Talbot, I believe?

21            PROSPECTIVE JUROR:  Yes.

22            MR. LEMKE:  You sat on a civil case?

23            PROSPECTIVE JUROR:  Yes.

24            MR. LEMKE:  Did that settle?

25            PROSPECTIVE JUROR:  No, they settled out of

1    court.

2              MR. LEMKE:  And I think it was Mr. Zisman.

3              PROSPECTIVE JUROR:  Zisman.

4              MR. LEMKE:  Alternates.  In addition, if it's

5    too personal regarding your wife and sister-in-law?

6              PROSPECTIVE JUROR:  Yeah.

7              MR. LEMKE:  Because of the allegations in

8    this case, anything which should concern --

9              PROSPECTIVE JUROR:  I thought a lot about

10   that last night, think about that and, you know, don't

11   want to be wishy-washy.  I'll try.  I just think it was

12   a real emotional thing.  They're still dealing with it

13   today and stuff, that I deal with, also with them, and

14   all that stuff and then, you know, I know everything is

15   different, every case is different, but I thought about

16   what you said.  So, you know, I think it might play

17   something into what I would think about on that.

18             MR. LEMKE:  Because, and you're right in that

19   case, these types, all crimes, but these type of

20   vicious crimes last forever, the woman, child, so

21   forth, and if you're selected as a juror sitting here,

22   knowing many times things come up, perhaps your wife

23   and sister, yourself, get very emotional twenty years

24   later, see something on TV or something.

25             PROSPECTIVE JUROR:  Uh-hum.

cp

Voir Dire - Defense                           158

1              MR. LEMKE:  Sitting as a juror and hearing

2      testimony perhaps to what has occurred whether it's two

3      years ago, so forth, question is does your experience

4      now come into play.  A very young woman going to have

5      to go through this.  Does that now cloud your ability?

6      Take a look at the charges and see whether or not

7      correct identification.  Think about that for a second.

8      We'll go back.

9              Okay.  Ms. Rappa?

10             PROSPECTIVE JUROR:  Yes.

11             MR. LEMKE:  Claims secretary for insurance

12     company.  I take it you don't necessarily deal with

13     attorneys usually?

14             PROSPECTIVE JUROR:  I send out a lot of

15     letters.  I know the detail of the cases.

16             MR. LEMKE:  I wouldn't think anything in

17     regards to that that would influence you one way or the

18     other?

19             PROSPECTIVE JUROR:  No.

20             MR. LEMKE:  Ms. Williams, civil jury?  That

21     was settled?

22             PROSPECTIVE JUROR:  Yes.

23             MR. LEMKE:  So you didn't.  Those of you who

24     sat on a civil jury, instructions obviously are much

25     different than criminal.  The burden is different.  As

1     a whole, anybody sat on a civil case, anything from

2     that in any way influence?  No?  Okay.  The last

3     question I would have, and I'll ask it to Mr. Slawski,

4     there's been a lot over he last ten years, a lot of

5     things, come a long way.  Are you familiar to some

6     extent with DNA?

7                    PROSPECTIVE JUROR:  Yes.

8               MR. LEMKE:  From reading about it or just as

9     a whole, what experiences, if any, have you had with

10    DNA?  What's your opinion of it, so forth?

11                   PROSPECTIVE JUROR:  Just mainly on TV, what I

12    see at home, TV, and I know it's like the latest

13    technology for identifying people.

14              MR. LEMKE:  Testing, actually scientific

15    testing and result.  If there's some testimony

16    regarding that, experts come in, so forth, if you're

17    selected as a juror regarding DNA profiling, so forth,

18    is that, in and of itself, going to be enough for you

19    to either acquit or convict, or again, you'll take a

20    look, listen to the manner in which the testing was

21    done or not done to determine whether or not that's

22    accurate or not?

23                   PROSPECTIVE JUROR:  I think I would have to

24    weigh all the evidence, but I would say it has a great

25    effect on my decision.

1          MR. LEMKE:  That you feel be pretty strong?

2          PROSPECTIVE JUROR:  Pretty strong.

3          MR. LEMKE:  But what you know is basically

4    what you read and seen on TV?

5          PROSPECTIVE JUROR:  Yes.

6          MR. LEMKE:  Everybody feel pretty much the

7    same way?  DNA?  A lot to say.  An expert comes in,

8    says, by the way, we tested this substance, doesn't

9    match somebody, but all of a sudden, we have something

10   here that's a match.  The question is, if that's the

11   case, without listening to how the protocol may be to

12   have that tested, the question to potential jurors is,

13   again, you have to take everything together in

14   evaluating.  If there's some testimony regarding DNA

15   one way or the other, they come in, say some type of

16   DNA, not a match.  That mean you're going to acquit or

17   take a look and all the other evidence or if they come

18   in say, hey, there's a match with Ricardo, he must be

19   guilty without looking at anything else?

20          Ms. Rappa, what do you think about that?

21   Again, tough question.  All of a sudden again in a

22   vacuum.  You have something else to consider?

23          PROSPECTIVE JUROR:  I think you can't base it

24   all on one factor.  You have to base it on all the

25   testimony, but that's not the whole thing.

```
1              MR. LEMKE:  For anything, one officer's
2    testimony.  Ms. Williams, question whether there's
3    scientific or expert testimony regardless whether
4    ballistics evidence, gun is operable, it works?  Going
5    to just take the expert testimony or consider, evaluate
6    it as you would do anything else whether it's accurate
7    or not?  Now, all of a sudden you, got not just a
8    civilian testimony, you have an expert.  Twenty years,
9    written books, published and I say this again, you want
10   to get so influenced because someone says they're an
11   expert or take a look at the manner which the sample
12   was collected, tested, so forth.  Be able to do that?
13             PROSPECTIVE JUROR:  I could do that.
14             MR. LEMKE:  Ms. Rappa, I think you indicated
15   you can do that.
16             Ms. Temple, I don't think I asked too many
17   questions.  Ultrasound tech?
18             PROSPECTIVE JUROR:  Yes.
19             MR. LEMKE:  Maternity?
20             PROSPECTIVE JUROR:  Mostly general though.
21             MR. LEMKE:  Out of North Shore?
22             PROSPECTIVE JUROR:  No, in a private
23   practice.
24             MR. LEMKE:  I don't think there's been too
25   many questions.  Police officers, you can evaluate the
```

cp

```
 1          testimony, emotional aspect of the testimony with them

 2          testifying and so forth?

 3                    PROSPECTIVE JUROR:  Yes.

 4                    MR. LEMKE:  Last 30 seconds.  Ask yourselves

 5          as I did to the first group I believe yesterday, you

 6          know, somewhat obviously, the charges, allegation.

 7          You've heard a number of answers from a number of

 8          people.  One had a friend that was assaulted like the

 9          acts here.  Someone else indicate this reason, that

10          reason, kind of go through, screen out those reasons

11          for those situations.  Ask yourselves, would you want

12          somebody with your frame of mind with your life

13          experiences, everything you either read, haven't read,

14          so forth, you want somebody with your frame of mind

15          sitting on a case such as this, significant seriousness

16          to the charges, so forth, case like this if you were

17          sitting that seat.  Mr. Walters --

18                    MS. SINGAS:  I object to that question,

19          Judge.

20                    THE COURT:  Overruled.

21                    MR. LEMKE:  Ms. Williams, you ready to sit on

22          this case?

23                    PROSPECTIVE JUROR:  Yes.

24                    MR. LEMKE:  Ms. Rappa?

25                    PROSPECTIVE JUROR:  Yes.
```

Voir Dire - Defense                          163

```
 1              MR. LEMKE:  Mr. Zisman?

 2              PROSPECTIVE JUROR:  No.

 3              MR. LEMKE:  That's because of --

 4              PROSPECTIVE JUROR:  It's a serious thing.

 5      You said about the frame of mind, if I can give a fair

 6      shake.  Just too --

 7              MR. LEMKE:  General in specific?

 8              PROSPECTIVE JUROR:  Yes.

 9              MR. LEMKE:  Ms. Temple?

10              PROSPECTIVE JUROR:  Yeah.

11              MR. LEMKE:  Ms. Flynn?

12              PROSPECTIVE JUROR:  No.

13              MR. LEMKE:  Because, again, the questions you

14      had answered.  Okay.  Mr. Blankman?

15              PROSPECTIVE JUROR:  Well, I know I could be

16      fair, but at the same time, I have slight concerns

17      about media exposure that I had previously.  I don't

18      think it necessarily would in newspapers, my opinion.

19              MR. LEMKE:  Let me ask a question, keep it

20      simple.  Pick up the paper, you read so and so is

21      acquitted of murder, acquitted all these charges.  Is

22      your initial instinct to say, gee, how did this guilty

23      guy get off?  Another one?  Or you're saying, okay,

24      justice was served whatever the case; right?

25              PROSPECTIVE JUROR:  Probably neither until I
```

1          read more about it.

2                    MR. LEMKE:  So in this case, there will

3          probably be some publicity, be instructed everyday not

4          to Google, on-line, anything, yet still maybe reading

5          may turn to something, see something kind of like,

6          okay, read other magazines as opposed to newspapers,

7          but doesn't seem to be anything that just sits there.

8          Fact is we're in court. Fact is these are serious

9          charges.  The indictment, the Judge instructed you, no

10         basis other than bringing him here.  We're all here

11         ready to go.  You're going to have to decide the

12         identificaion, guilt or innocence of these four

13         separate incidents, so forth, so doesn't concern me you

14         may have seen something.  That's okay.

15                    PROSPECTIVE JUROR:  Yeah.

16                    MR. LEMKE:  Mr. Talbot?

17                    PROSPECTIVE JUROR:  Really don't think so.

18                    MR. LEMKE:  I may have missed something

19         because of friends who are police officers.  Why don't

20         you think you could follow the Judge's instructions?

21                    PROSPECTIVE JUROR:  I could follow the

22         Judge's instructions.  I don't know that I can fairly

23         evaluate the evidence.

24                    MR. LEMKE:  Got a little bit more because of

25         friends, police officers?  I don't remember why.  Seems

1          to me you'd be perfect.  That's why I'm asking.

2                    PROSPECTIVE JUROR:  Don't think I could go

3          through all of the aspects of the case and still be

4          fair.

5                    MR. LEMKE:  Mr. Wersan?

6                    PROSPECTIVE JUROR:  Yes.

7                    MR. LEMKE:  Mr. Porcelli?

8                    PROSPECTIVE JUROR:  Yes.

9                    MR. LEMKE:  Ms. Monetti?

10                   PROSPECTIVE JUROR:  I think so, yeah.

11                   MR. LEMKE:  Ms. VanHouten, I think you

12         indicated -- don't think I asked you many questions.

13         What about yourself?

14                   PROSPECTIVE JUROR:  I would hope I can be

15         fair.  I mean I would do my best.  I would want, if I

16         was in his seat --

17                   MR. LEMKE:  Want somebody like yourself?

18                   PROSPECTIVE JUROR:  I know my son says I'm an

19         emotional person, but goes with anything whether it's

20         stub my toe to something extreme.  I mean --

21                   MR. LEMKE:  Fine.  Nothing wrong with that.

22                   PROSPECTIVE JUROR:  That I was who I am.

23                   MR. LEMKE:  That's fine.  Nothing wrong.

24         Ms. Rodrigue?

25                   PROSPECTIVE JUROR:  Yes.

1          MR. LEMKE:  Mr. Slawski?

2          PROSPECTIVE JUROR:  Yes.

3          MR. LEMKE:  Ms. Aubin?

4          PROSPECTIVE JUROR:  Yes.

5          MR. LEMKE:  Great.  Thank you.

6          THE COURT:  Prospective members, you've been

7    sitting for a while.  Attorneys are going to make their

8    selections.  Don't want you to disappear for lunch,

9    just in a few minutes, you'll know who's been selected,

10   who's been excused.  What I will do for the people that

11   are out in the audience, at this point obviously we've

12   begun jury selection.  It's like a guarantee.  When you

13   come back this afternoon, all of you, I think about

14   fourteen of you left in the box, are going to be asked

15   to sit in here, so there's no reason for those of you

16   sitting out in the audience to stick around.  Going to

17   ask you please report back.  James, my sergeant, will

18   tell you where to go.  Be back here 2 o'clock for the

19   continuation of our jury selection.  If you could step

20   out at this point, be back 2 o'clock.

21          (Whereupon, the jury panel left the

22   courtroom.)

23          (Whereupon, the following took place in

24   chambers:)

25          THE COURT:  Back to the entire board since we

```
 1              don't have anybody at this point.

 2                      People challenges cause entire board?

 3                      MS. SINGAS:  Number three, Mr. Zisman.

 4                      MR. LEMKE:  Consent.

 5                      MS. SINGAS:  Number 5, Ms. Flynn.

 6                      MR. LEMKE:  Consent.

 7                      THE COURT:  Yes.

 8                      MS. SINGAS:  I think that's it for cause.

 9                      THE COURT:  That's it cause, People?

10                      MS. SINGAS:  Yes.

11                      MR. LEMKE:  Mr. Talbot, did he say something

12              I missed?

13                      THE COURT:  He didn't.  I just think as he

14              sat there, had obviously a change of heart about

15              sitting as a juror in this case.

16                      MR. LEMKE:  Usually I get a little more

17              specific.  He made it clear no, so I make sure I

18              rehabilitate, but I'm going to move for cause for

19              Talbot because at this point he said --

20                      MS. SINGAS:  Judge, again, now what I mean,

21              we can't operate in a vacuum.  All his other answers

22              seemed okay, said he could follow your instructions,

23              but that's a tricky question, so --

24                      THE COURT:  He did say he could follow my

25              instructions, but then when I think Mr. Lemke asked him
```

Proceedings                                    168

```
 1        why he couldn't sit as a juror in this case, said kind
 2        of like a general answer about other things, about this
 3        case.  Look, I don't want to take a chance.  To me, I
 4        think he's, you know, said enough to excuse him for
 5        cause; may not have been exactly explicit.
 6                    Anything else cause?
 7                    MR. LEMKE:  No.
 8                    THE COURT:  People peremptory, entire board?
 9                    MS. SINGAS:  Entire board?
10                    THE COURT:  Yes, each of you used three so
11        far.
12                    MS. SINGAS:  We're doing all fourteen?
13                    MR. LEMKE:  Two knocked out for cause.
14        There's twelve left.
15                    MS. SINGAS:  All right.
16                    THE COURT:  Whatever you got left.
17                    MS. SINGAS:  Number 2, Ms. Rappa, number 8,
18        Ms. Aubin, number 10, Ms. Rodriguez, and number 11,
19        Ms. VanHouten.  That's it.
20                    THE COURT:  Four by the People.  Now you've
21        used seven.
22                    Defendant peremptory?
23                    MR. LEMKE:  Number 4, Ms. Temple, number 12,
24        Ms. Monetti, number 13, Mr. Porcelli.
25                    THE COURT:  Defendant you used three.  You
```

Proceedings                    169

1    used a total of six.  People used four, total seven.

2    That leaves us with Janita Williams will be our

3    foreperson, Mr. Blankman will be juror number 2,

4    Mr. Slawski will be juror number 3, Mr. Wersan will be

5    juror number 4.

6              When do we want to tell -- when do I want to

7    tell these people to come back?  Let me ask you this.

8    Are we going to sit tomorrow in the morning?  I mean,

9    if everyone has plans with their kids, I'll, you

10   know --

11             MS. SINGAS:  Rather not, Judge.  Don't want

12   to hold us up, but just as soon work on Monday with

13   whoever we have left.

14             THE COURT:  You got plans?

15             MR. LEMKE:  That's fine, yes.

16             THE COURT:  Tell them Wednesday morning 10

17   o'clock or you want me to say --

18             MS. SINGAS:  I don't mind them sitting in for

19   some more jury selection.  I don't know how you got it.

20   It would have to be Wednesday then for openings.

21             THE COURT:  Unless we can do openings Monday

22   and tell them to come back Monday at 2.

23             MS. SINGAS:  I can open, but won't have any

24   witnesses.

25             THE COURT:  That means we're going to sit for

1        the rest of the day.  Might as well tell them

2        Wednesday, 10 o'clock.

3                   MR. LEMKE:  That's fine.

4                   THE COURT:  Be prepared to put a full day in.

5        Tell them actually be here 9:30.  James, we're going to

6        tell them Wednesday at 9:30, the ones that have been

7        sitting; okay?

8                   Both sides agree to letting the sworn ones

9        go?

10                   MS. SINGAS:  Yes.

11                   MR. LEMKE:  Yes.

12                   (Whereupon, the following took place in open

13        court:)

14                   THE COURT:  All right.  Please listen to my

15        clerk as he lists the names of those who have been

16        selected.

17                   THE CLERK:  Following jurors names I call

18        have been selected to be on this jury.

19                   Juror number 1, Janita Williams, juror number

20        2, Matthew Blankman, juror number 3, Robert Slawski,

21        juror number 4, Gary Wersan.  If your name has been

22        called, please remain in your seat, name not been

23        called, you're excused from this case.  You must report

24        back to central jury.

25                   THE COURT:  Those of you who have been

1    excused, again, my thanks on behalf of the entire

2    Nassau County Court System for participating in jury

3    selection.  Please be careful as you step passed your

4    fellow prospective jurors.  Watch your step as you step

5    out and my officers will tell you where to go.  Those

6    of you who have been selected, sit tight.  Don't go

7    anywhere.

8              (Whereupon, the excused jurors left the

9    courtroom.)

10             THE CLERK:  Remaining jurors satisfactory to

11   the People?

12             MS. SINGAS:  They are.

13             THE CLERK:  To the defense?

14             MR. LEMKE:  Yes, your Honor.

15             (Whereupon, four jurors were duly sworn by

16   the Court Clerk.)

17             THE COURT:  Again, thank you.  You're our

18   first selected jurors.  Ms. Williams, you will be our

19   foreperson in this case since you were the first juror

20   selected.  What I'm going to do, obviously you're going

21   to be excused for the balance of the day.  Obviously,

22   we have a number of jurors still to pick.  Do not

23   anticipate sitting tomorrow.  Depending how many jurors

24   we get, more than likely going to be doing this on

25   Monday, so with both partys' consent, what I'm going to

1    do, we don't sit Tuesday 'cause it's Election Day, so

2    with everybody's consent, what I'm going to do is ask

3    you to report back to the courthouse Wednesday, 9:30 in

4    the morning.  That's when I anticipate giving my

5    preliminary instructions to the jury.  We'll have

6    opening statements and we'll begin the case at that

7    point, so don't want to take a chance having you come

8    here Monday in the afternoon, still picking a jury.

9    Rather than having you spinning your wheels sitting

10   around wasting your time, I feel fairly confident we'll

11   be ready to go first thing Wednesday morning.  James,

12   my sergeant, will give you some instructions as you

13   step out with respect to parking, where to report.

14           Have a good weekend.  See you back here

15   Wednesday.  That's the 5th, Wednesday the 5th, 9:30.

16           Please step out.  The officers will speak to

17   you outside.

18           L U N C H E O N   R E C E S S.

19           AFTERNOON SESSION.

20           (Whereupon, jury panel one entered the

21   courtroom.)

22           THE COURT:  Welcome back.  At this point,

23   we're going to fill our jury box, so please listen to

24   your name and follow my officers and please watch your

25   step as you step in the jury box.

1              THE CLERK:  Seat number 1, Bernard Nichols,

2      N-I-C-H-O-L-S;

3              Seat number 2, Patricia Lewis, L-E-W-I-S;

4              Seat number 3, Arthur Gold, G-O-L-D;

5              Seat number 4, Alicia Jewell, J-E-W-E-L-L;

6              Seat number 5, Thomas Gorman, G-O-R-M-A-N;

7              Seat number 6, Ann Bonet, B-O-N-E-T;

8              PROSPECTIVE JUROR:  May I ask a question

9      before I sit about my availability?

10             THE COURT:  Just have a seat.  I'll get to

11     you first thing.

12             PROSPECTIVE JUROR:  Okay.

13             THE CLERK:  Seat number 7, Richard Russo,

14     R-U-S-S-O;

15             Seat number 8, Adam Cirker, C-I-R-K-E-R;

16             Seat number 9, Karen Armstrong,

17     A-R-M-S-T-R-O-N-G;

18             Seat number 10, Jack Binder, B-I-N-D-E-R;

19             Seat number 11, Ellen Gulli, G-U-L-L-I;

20             Seat number 12, Abul Hossain, H-O-S-S-A-I-N;

21             Seat number 13, Annette Catania,

22     C-A-T-A-N-I-A;

23             Seat number 14, Diane Pugent -- no response.

24             Mary Siring -- no response.

25             THE COURT:  All right.  We're just obviously

1    checking on the last two names.  All right.  While

2    we're waiting to see if the other person is here --

3    please join us, Ms. Nugent.

4                   PROSPECTIVE JUROR:  I went to the restroom.

5    I'm sorry.

6                   THE COURT:  Relax have a seat.  All right.

7                   Ms. Bonet, you said something about your

8    availability?

9                   PROSPECTIVE JUROR:  I'm sorry.  I didn't

10   mention it yesterday.  It slipped my mind.  I have a

11   pre-scheduled dental surgery on November 10th and I

12   know the trial may last a couple weeks.

13                  THE COURT:  I'm sorry.  Didn't hear.

14                  PROSPECTIVE JUROR:  You said the trial would

15   last?

16                  THE COURT:  I have every expectation of

17   sitting Monday the 10th.  That's already scheduled.

18                  PROSPECTIVE JUROR:  It is?

19                  THE COURT:  Any objection to excusing

20   Ms. Bonet?

21                  MS. SINGAS:  No.

22                  MR. LEMKE:  No.

23                  THE COURT:  Ms. Bonet, I have to send you

24   back to central jury.

25                  Mr. Russo?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Beg pardon.  Mr. Cirker?

3          PROSPECTIVE JUROR:  Yeah, I should have

4    mentioned something.  Didn't know if it was time to

5    mention it, but I have a medical issue that may affect

6    me sitting on this jury.

7          THE COURT:  Something you want to discuss

8    privately?

9          PROSPECTIVE JUROR:  If you want.

10          THE COURT:  All right.  Come up.

11          (Whereupon, a discussion was held off the

12    record, at the bench, among the Court, defense counsel

13    and the assistant district attorney.)

14          THE COURT:  Any objection?

15          MS. SINGAS:  No.

16          MR. LEMKE:  No.

17          THE COURT:  Excused.  Return to central jury.

18          Okay.  To the twelve of you that are

19    remaining, welcome again.  Good afternoon.  Thank you

20    for being here.  You've now sat through two rounds.

21    You've heard me with both jurors go over certain legal

22    principles.  You've heard the attorneys ask certain

23    questions.

24          First and foremost, does anybody recognize

25    any of the names that I listed yesterday?  I know it

1    was yesterday.  If you wanted me to repeat them, I

2    certainly would.  Okay.  I'm sorry.  You had your hand

3    raised, Ms. Armstrong?

4              PROSPECTIVE JUROR:  I do work with a Morales,

5    don't remember the name you said, but do work with a

6    teacher, Morales.  Her daughter's a cop.

7              THE COURT:  Delmy Morales?  I'm sorry, you

8    said --

9              PROSPECTIVE JUROR:  Co-worker.  The mother is

10   a co-worker, not of this person, but I'm saying I do

11   work with a Morales.

12             THE COURT:  Okay.  All right.  What kind of

13   work do you do?

14             PROSPECTIVE JUROR:  Parent coordinator and

15   that person is a teacher.

16             THE COURT:  Can you give us the location or

17   the area where you work?

18             PROSPECTIVE JUROR:  Queens.

19             THE COURT:  In Queens?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  It doesn't appear that that would

22   be the same Morales.  All right.  Anybody else as far

23   as names are concerned?  Anybody who's heard, read

24   anything about this case in the past either through the

25   Internet, TV?

1          Mr. Nichols?

2          PROSPECTIVE JUROR:  Yes, I live in Hempstead.

3          THE COURT:  Okay.

4          PROSPECTIVE JUROR:  I read it in the paper.

5          THE COURT:  All right.  You read it in the

6     newspaper.  Okay.  Do you remember anything specific

7     about what you read?

8          PROSPECTIVE JUROR:  Just the basic actions

9     that day claiming what he did.

10          THE COURT:  Is there anything about the

11     information that you read or anything that you've

12     learned about the case that you feel as you sit here

13     now would make you less than fair and impartial, favor

14     one side over the other without hearing any evidence at

15     this point?

16          PROSPECTIVE JUROR:  No, just I live in

17     Hempstead, you know.  Everybody talk in Hempstead.  You

18     know what mean?

19          THE COURT:  I understand, I understand.  Do

20     you have any familiarity at all with the defendant or

21     his family?

22          PROSPECTIVE JUROR:  I have seen him before.

23          THE COURT:  Okay.  Any encounters with him at

24     all?

25          PROSPECTIVE JUROR:  No.  I worked for the

1    school system, so I take care of nine schools, so, you

2    know, I'm always around Hempstead.

3                THE COURT:  Okay, and you see a lot of faces.

4    All right.  Do you feel that you could serve as a juror

5    in this case?

6                PROSPECTIVE JUROR:  No, I don't.

7                THE COURT:  Because of the fact of where you

8    live and the nature of the allegations?

9                PROSPECTIVE JUROR:  Yeah, where it happened

10   at.  It's around my neighborhood.

11               THE COURT:  Okay.  All right.  Anybody else

12   read or heard anything in the newspaper at all?  Bear

13   with me.  Mr. Binder?

14               PROSPECTIVE JUROR:  I just a while ago saw

15   the headline and the basic facts of the case, but

16   nothing else about it.

17               THE COURT:  You haven't formed any opinion

18   one way or another at this point.  Okay.

19               Ms. Gulli?

20               PROSPECTIVE JUROR:  The same thing.  I just

21   remember reading it in the paper, but no facts.

22               THE COURT:  All right.  Nothing that sticks

23   with you, nothing at this point that would color your

24   opinion about the case?

25               PROSPECTIVE JUROR:  No.

1    THE COURT:  Anybody else.  All right.  You

2    also heard me go over the basic principles of law that

3    apply in every criminal case, the presumption of

4    innocence; that the defendant is presumed innocent

5    unless and until a jury unanimously finds that the

6    defendant's guilt has been proven beyond a reasonable

7    doubt; that the People have the burden of proof

8    throughout the course of the trial, the burden of

9    proving each and every element of the crimes as I

10   define them to you at the end of the case, and the

11   defendant's identity as the person who committed those

12   crimes.  Also, that if the defendant chooses not to

13   testify, that is a right that he is accorded, and that

14   is not a factor from which you should draw any type of

15   adverse inference.

16         Does anybody here feel that they could not

17   follow those instructions?

18         PROSPECTIVE JUROR:  Gorman.  Yeah, I have

19   five daughters; don't think I could sit through that

20   and listen to that and be objective.

21         THE COURT:  All right.  Were any members of

22   your family a crime victim or --

23         PROSPECTIVE JUROR:  One daughter was in an

24   abusive relationship and just found out about it

25   recently.

1            THE COURT:  And you feel that would affect

2      you as a juror in this case?

3            PROSPECTIVE JUROR:  Definitely.

4            THE COURT:  All right.  Somebody else had

5      their hand up.  Mr. Binder?

6            PROSPECTIVE JUROR:  Yeah, the defendant

7      didn't testify in his own defense, I couldn't help but

8      think that as a negative as evidence.

9            THE COURT:  All right.  Well, it's a normal

10     human reaction, expectation that when somebody makes an

11     accusation, you expect someone to respond to the

12     accusation.

13            Under our system of justice and this kind of

14     ties into the burden of proof, the burden of proof is

15     upon the People.  Defendant doesn't have to prove his

16     or her innocence.  The People have to prove to your

17     satisfaction his or her guilt beyond a reasonable

18     doubt, and, therefore, that's why a defendant is not

19     obligated to testify.  If the the defense decides that

20     the People have not met their burden, they could not

21     put on any witnesses, doesn't have to testify in his

22     defense and you're going to be asked to make a

23     determination as you find the facts to be and the law

24     as I give it to you as to whether or not the People

25     have satisfied that burden.

1          Do you think you could do that?

2          PROSPECTIVE JUROR:  I think I can.

3          THE COURT:  Okay.  I mean what we may expect

4    in perhaps our normal day-to-day human affairs is one

5    thing, but in a courtroom, in a court of law, our

6    system is such that the burden of proof is always in

7    any criminal case, you know, not just this case, upon

8    the prosecution.

9          You understand that?

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  Okay.  Anybody else have any

12   difficulties following my instructions with regard to

13   the basic principles I discussed with you?  Anybody?

14         PROSPECTIVE JUROR:  You know what, your

15   Honor?

16         THE COURT:  Yes, Ms. Nugent?

17         PROSPECTIVE JUROR:  I'm sorry, but I have to

18   say I was engaged to a homicide detective and I'm on

19   both sides of the fence because here it is I'm still

20   disgruntled a little bit.  I must say I love our police

21   officers and stuff, but after what happened to me about

22   two months ago in Freeport, I live in Freeport, I'm

23   still a little disgruntled because I was pulled over by

24   a cop stating that I ran a stop sign.  I know blatantly

25   it was a lie because I stopped there and the other

1    person directed me to go.  Upon that happening, a block

2    and a-half later, this cop pulls me over and I ask her

3    what for and she was telling me, oh, you ran the stop

4    sign.  I had to pay 100 -- was it 125 plus surcharge,

5    whatnot for that fine that I think was so wrong and

6    didn't commit that crime.

7              THE COURT:  This was the Village of Freeport

8    police officer.

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  I don't think anybody from the

11   Village of Freeport is going to be testifying in this

12   case in terms of police.  Having said that, there

13   obviously is going to be testimony from police

14   officers, detectives in this particular case.  You

15   heard me with both panels previous to yours say that

16   you've got to treat a police officer like you would

17   anybody else.  They're human.  They're subject to the

18   same human frailties that we all are.  They can tell

19   the truth, they could be mistaken, honestly, so -- or

20   they can lie.  If you're telling me that if a police

21   officer testifies and I'm not going to believe a word

22   they say or I'm not going to give them the same full

23   level playing field that I would somebody else either

24   because your personal relationship in the past or

25   because of this experience with the Freeport police

1    officer who gave you the ticket, now is the time to

2    tell us.  If you feel that you could put that aside and

3    judge these police officers and these detectives based

4    upon what you hear here in this case, we'd be glad to

5    have you.

6              PROSPECTIVE JUROR:  Well, your Honor, I've

7    had another incident with a cop as well.  I was abused

8    when I was in my twenties quite a few years ago, and I

9    went to the police in Harlem, and honestly, they were

10   trying to have me lie on this guy to give me makeup put

11   on my face, all that, so after I had that done with me,

12   I'm kind of --

13             THE COURT:  You got advice from police

14   officers?

15             PROSPECTIVE JUROR:  From the police officer.

16             THE COURT:  Good enough.  Anybody else?  And

17   I indicated this to you yesterday and you just heard me

18   say this again to Ms. Nugent, anybody here have any

19   problem in evaluating a police officer, detective, law

20   enforcement person?  Anybody else?  Ms. Lewis?

21             PROSPECTIVE JUROR:  Well, my father was a

22   Nassau County detective for 28 years.  My brother's a

23   New York City cop, two cousins that are transit cops.

24   My brother-in-law's a sheriff who works here in the

25   jail and, you know, I have a lot -- I have a hard time

Voir Dire - Court                                    184

1       believing that a cop could lie.  I don't know why but,

2       I just grew up around that, so --

3                   THE COURT:  And you feel that you feel that

4       you would give them a certain leg up?

5                   PROSPECTIVE JUROR:  I don't want to, but I

6       think I would.

7                   THE COURT:  Ms. Armstrong?

8                   PROSPECTIVE JUROR:  A brother CO and an uncle

9       just retired also CO.

10                  THE COURT:  I'm sorry?

11                  PROSPECTIVE JUROR:  A brother correction

12      officer.

13                  THE COURT:  You have a brother correction

14      officer?

15                  PROSPECTIVE JUROR:  Yes, currently.

16                  THE COURT:  Where?

17                  PROSPECTIVE JUROR:  In Riker's, Riker's

18      Island.

19                  THE COURT:  And, I'm sorry, the other person?

20                  PROSPECTIVE JUROR:  Uncle, uncle.

21                  THE COURT:  Also in Riker's?

22                  PROSPECTIVE JUROR:  No, retired.

23                  THE COURT:  Okay.  You've heard that the

24      defendant in this case, Mr. Walters, works for the New

25      York City Department of Corrections.  Knowing that,

1    would you be able to sit as a juror in this case?

2              PROSPECTIVE JUROR:  Probably not, probably

3    not.

4              THE COURT:  You think -- I'm sorry.  You said

5    it's your brother?

6              PROSPECTIVE JUROR:  Right, it's a brother.

7              THE COURT:  You think you'd have difficulty

8    perhaps giving the People a fair trial in light of your

9    brother's work?

10             PROSPECTIVE JUROR:  It's possible.  It's

11   possible, not saying yes.

12             THE COURT:  All right.  At this point, I'm

13   going to go through certain questions of you as I

14   indicated earlier about where you live, whether or not

15   you're in a committed relationship, what type of work

16   did you do and that your children may do.

17             I want to see the attorneys though before I

18   begin.

19             (Whereupon, a discussion was held off the

20   record, at the bench, among the Court, defense counsel

21   and the assistant district attorney.)

22             THE COURT:  Mr. Nichols, Mr. Gorman,

23   Ms. Armstrong, Ms. Pugent all being excused for cause.

24             MR. LEMKE:  On consent.

25             MS. TEBBETT:  On consent of the People.

1          (Whereupon, the following took place in open

2     court:)

3          THE COURT:  What I'm going to do at this

4     point, if you hear your name called, please take your

5     belongings and report back to central jury at this

6     particular point.  Can I just see one more time the

7     attorneys?

8          (Whereupon, a discussion was held off the

9     record, at the bench, among the Court, defense counsel

10    and the assistant district attorney.)

11         THE COURT:  Ms. Lewis is being excused for

12    cause.

13         MR. LEMKE:  On consent.

14         MS. TEBBETT:  On consent.

15         THE COURT:  If you hear your name called,

16    you're excused with my thanks.  We'd ask you to take

17    your cards back, go back to central jury, Mr. Nichols,

18    Ms. Lewis, Mr. Gorman, Ms. Armstrong, and Ms. Nugent.

19         (Whereupon, the excused jurors left the

20    courtroom.)

21         THE COURT:  Okay.  Down to a precious few.

22    Mr. Gold, I'll start with you since you're our closest

23    in order in terms of called jurors.

24         Could you tell us the neighborhood, sir,

25    which you live?

```
 1                  PROSPECTIVE JUROR:  Oceanside.

 2                  THE COURT:  Married or committed

 3       relationship?

 4                  PROSPECTIVE JUROR:  Married, two children,

 5       one's almost 14, other one's 16.

 6                  THE COURT:  Type of work, if any, that you

 7       do?

 8                  PROSPECTIVE JUROR:  Me, I'm a retired teacher

 9       and I work part-time as a tutor.

10                  THE COURT:  Okay.  Thank you.  Ms. Jewell?

11                  PROSPECTIVE JUROR:  I live in Rockville

12       Centre.  I'm in a committed relationship.  I have a

13       four-year-old son and I'm a photographer.

14                  THE COURT:  You're a photographer?  Okay.

15       Very good.

16                  Mr. Russo, sir?

17                  PROSPECTIVE JUROR:  I'm married, live in Port

18       Washington, have three kids, son 26, son 25, my

19       daughter is 23.

20                  THE COURT:  Okay.

21                  PROSPECTIVE JUROR:  My oldest son is an

22       aspiring actor which means he's a waiter, another son

23       is at Adelphi and my daughter is in advertising.

24                  THE COURT:  Great.  Mr. Binder, sir,

25       neighborhood which you live?
```

1           PROSPECTIVE JUROR:  Great Neck, married, two

2     children, 40 and 39.  I'm a retired dentist and I work

3     part-time now at the Town of North Hempstead.

4           THE COURT:  What capacity?

5           PROSPECTIVE JUROR:  I'm the arborist there.

6           THE COURT:  Oh, very interesting.  The

7     occupations of your children?

8           PROSPECTIVE JUROR:  One is an accountant,

9     other one takes care of two little children.

10           THE COURT:  Ms. Gulli, town which you live?

11           PROSPECTIVE JUROR:  In Bethpage.

12           THE COURT:  Married or committed?

13           PROSPECTIVE JUROR:  Married, and I have three

14     daughters, 27, 25 and going to be 21.  Both two are

15     teachers, younger one goes to college and works in

16     retail.  I work for Geico.  I have a son-in-law who's a

17     correction officer in Riker's.

18           THE COURT:  Son-in-law?

19           PROSPECTIVE JUROR:  In-law:

20           THE COURT:  Okay.

21           PROSPECTIVE JUROR:  That I'm fine with.

22           THE COURT:  That doesn't pose a problem to

23     you?

24           PROSPECTIVE JUROR:  No.

25           THE COURT:  All right.  And, I'm sorry, you

1           said you work for Geico?

2                   PROSPECTIVE JUROR:  Yes.

3                   THE COURT:  What capacity?

4                   PROSPECTIVE JUROR:  A trainer in the medical

5           area.

6                   THE COURT:  All right.  And Mr. Hossain, town

7           which you live?

8                   PROSPECTIVE JUROR:  I live in Hicksville.

9                   THE COURT:  Married, committed relationship?

10                  PROSPECTIVE JUROR:  I'm married.

11                  THE COURT:  Children?

12                  PROSPECTIVE JUROR:  I have two children; one

13          daughter and a son.  The daughter's a student and the

14          25, 29 both of them are doctors and I'm an engineer.  I

15          work for the New York City Department of Transportation

16          and I'm the director.  I take care of the bridges, New

17          York City bridges.

18                  THE COURT:  And finally Ms. Catania, town

19          which you live?

20                  PROSPECTIVE JUROR:  I live in Seaford.  I'm

21          married.  I have three children.  My oldest is 29, 27

22          and youngest is 23.  Oldest daughter works for Quest

23          Diagnostic in Human Resources, middle one works in

24          Virginia.  She's a special ed teacher and son's

25          learning to be a plumber.

1          THE COURT:  So he's an apprentice?

2          PROSPECTIVE JUROR:  Yes, an assistant right

3   now.

4          THE COURT:  All right.  I didn't ask this

5   before, though I did ask the other panel.  Is there any

6   of the -- God bless -- seven of you seated here that

7   have, for religious or personal reasons, could not not

8   serve as a juror on this case given the type of case it

9   is?  Anybody?  All right.

10          I'm going to again go by row, if you will,

11  although there's only three of you in the first row.

12  Any of the three seated in front of me here served on a

13  jury before?  State, federal, criminal, grand jury?

14  Mr. Gold?

15          PROSPECTIVE JUROR:  Yes, I served on a

16  criminal case in Bronx County.

17          THE COURT:  Okay.  How many years ago?

18          PROSPECTIVE JUROR:  Quite some time, probably

19  about -- about twenty years ago or more.

20          THE COURT:  Do you remember the nature of the

21  case?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Would you tell tell us, I assume

24  you went to a verdict?

25          PROSPECTIVE JUROR:  Yes.

1     THE COURT:  Without telling us what the

2  verdict is, could you just tell us what the nature of

3  the charges are, if you remember them?

4          PROSPECTIVE JUROR:  It was robbery and

5  murder.

6          THE COURT:  Okay.  Anything about that

7  experience as a juror in that case that you feel you

8  couldn't serve as a juror in this case?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  Okay.  Anybody else in the first

11 row prior jury, civil, criminal, federal, grand jury?

12 About second row?  Anybody?  All right.

13         Law enforcement question.  You or close

14 friend or family member either been or worked for at

15 one point the police, corrections department, the DA's

16 office or the court system?  First row anybody?

17         Mr. Russo?

18         PROSPECTIVE JUROR:  Yeah, probably about 80

19 percent of my closest friends have 30 years in law

20 enforcement; three in Westbury, one in Nassau, some in

21 the City.  Godson's an officer in Montclaire, New

22 Jersey.

23         THE COURT:  Obviously, you know, there's

24 going to be a number of police officers and detectives

25 that are going to testify.  Would those associations of

1    yours and relationships in any way affect your ability

2    to evaluate evidence here objectively and make a

3    determination about the defendant's guilt or non-guilt

4    based upon the evidence as you sit here in this

5    courtroom?

6              PROSPECTIVE JUROR:  I don't think it would

7    affect me evaluating the evidence.  You know,

8    generally, I mean I believe anybody can do anything.

9    There are rogue police and there are rogue in whatever.

10   I've met great ones.  All these people I surround

11   myself with do a good case work and are -- which can,

12   at times --

13             THE COURT:  I understand.

14             PROSPECTIVE JUROR:  I hope and I would think

15   that I just evaluate things honestly.

16             THE COURT:  That's what we're looking for.

17   Anything in the second row law enforcement?

18   Ms. Catania?

19             PROSPECTIVE JUROR:  My son-in-law.  He was a

20   New York City police officer and he's moved down to

21   Virginia.  He's a police officer there and my nephew

22   just graduated in July for New York City Police.

23             THE COURT:  Okay.  All right.  Again, same

24   question I had with Mr. Lewis.  No problems?

25             PROSPECTIVE JUROR:  No, I don't believe so.

1          THE COURT:  Anybody else second row?  Ms.

2     Gulli?

3          PROSPECTIVE JUROR:  I have the correction

4     officer son-in-law, my brother-in-laws retired Nassau

5     County Marine Bureau, and --

6          THE COURT:  What would his name be?

7          PROSPECTIVE JUROR:  Matt Eowi (phonetic).

8     You know him?

9          THE COURT:  The name sounds familiar.

10         PROSPECTIVE JUROR:  From Port Washington.

11         THE COURT:  Okay.

12         PROSPECTIVE JUROR:  Good guy.

13         THE COURT:  Anything about those

14    relationships?  I know you indicated the corrections

15    officer, son-in-law.  Doesn't pose a problem?

16         PROSPECTIVE JUROR:  No, none at all.  Now,

17    also, I don't know if it matters.  I have a friend

18    that's a retired judge, Judge McCaffrey.

19         THE COURT:  Thank you.  All right.

20    Mr. Binder, no associations with any law enforcement?

21    Okay.

22         Crime victims?  Anybody here, themselves,

23    close family members, first row?  Mr. Gold, looks like

24    your hand's about to go up.

25         PROSPECTIVE JUROR:  Long time ago my

Voir Dire - Court                                    194

1    apartment was robbed, car was attempted to be stolen,

2    no success, and my mother was mugged.  Those are all

3    three separate incidents.

4              THE COURT:  All right.  Most recent of which

5    would be how long?

6              PROSPECTIVE JUROR:  Probably about twenty

7    years ago.

8              THE COURT:  Anything about those incidents?

9              PROSPECTIVE JUROR:  No.

10             THE COURT:  Anything from Ms. Jewell,

11   Mr. Russo, crime victims?  How about the second row?

12   Anybody there, Mr. Hossain?

13             PROSPECTIVE JUROR:  Yeah, my son was the

14   victim of some kind of violence some years back, but he

15   was young.  He was mugged on a Queens platform and he

16   was given an punch, got a black eye when he was

17   walking.  The other time he was mugged downtown

18   Manhattan, and another time, my daughter was also the

19   subject of some kind of crime, so her bag was snatched

20   off, and that's about it, and it was reported, but it

21   wasn't, so --

22             THE COURT:  Okay.  Would that -- would any of

23   those experiences affect you as a juror in this case if

24   you were selected?

25             PROSPECTIVE JUROR:  I don't think so.

1        THE COURT:  Okay.  Anybody else in that

2    second row a victim?  Ms. Catania?

3        PROSPECTIVE JUROR:  I was molested when I was

4    about 16 years old, a senior in high school.

5        THE COURT:  Okay.  There was no case.  I mean

6    there were other young girls that were affected by it

7    as well, but he ended up committing himself into a

8    mental hospital, so, you know, nothing ever went to

9    court.  Other than that --

10       THE COURT:  Okay.  Obviously, there's

11   allegations of a sexual nature in this particular case,

12   more than one.  Could you give me your assurance that

13   if you're selected as a juror in this case, that you

14   could put aside your own experience and decide this

15   case based upon the evidence you hear or see.

16       PROSPECTIVE JUROR:  I thought about that a

17   little last night, and I think it's just too emotional

18   for me to make any kind of commitment or judgment of --

19   what's the word?

20       THE COURT:  Judgment is the right word.

21       PROSPECTIVE JUROR:  I really don't think I

22   could be fair, in my judgment.

23       THE COURT:  Right.  You think you wouldn't be

24   able to put that aside?

25       PROSPECTIVE JUROR:  No.

1        THE COURT:  All right.  Fair enough.

2   Finally, anybody who's been, family members or

3   themselves, again, something you want to approach

4   about, don't be shy about asking either been accused or

5   convicted of a crime.

6        First row anybody?  How about the second row?

7   Mr. Binder?

8        PROSPECTIVE JUROR:  Do you consider

9   malpractice?

10       THE COURT:  No, that's not for this question.

11       PROSPECTIVE JUROR:  Okay, then no.

12       THE COURT:  Okay.  All right.  We'll turn it

13   over at this point to Ms. Tebbett, I believe.

14       MS. TEBBETT:  Yes.  Thank you, Judge.

15       Good afternoon, everyone, the last few.  I

16   know it's late in the afternoon.  I'm just going to

17   follow up again on some of the questions that the Judge

18   was just asking you, and then just some other questions

19   about some of the topics and the issues that we've

20   covered with the other groups that were sitting in the

21   chairs that you're sitting in, so forgive me that we're

22   repeating a little bit.  Hopefully, you were paying

23   attention a little bit, but I'll just start with

24   following up on some of those very general questions.

25       I didn't catch what you did.

```
 1            PROSPECTIVE JUROR:  Creative director at an

 2    ad agency.

 3            MS. TEBBETT:  A lot of friends in law

 4    enforcement, you mentioned?

 5            PROSPECTIVE JUROR:  Yeah, that's how we all

 6    kind of grew up.

 7            MS. TEBBETT:  Okay.  And Ms. Jewell, you said

 8    you were a photographer, and you have a four year old?

 9            PROSPECTIVE JUROR:  Yeah.

10            MS. TEBBETT:  I have two four-year-olds,

11    actually, at home.  Any issue that would cause you a

12    problem sitting, any issue with child care, anything

13    like that?

14            PROSPECTIVE JUROR:  Nope they're taken care

15    of five days a week.

16            MS. TEBBETT:  Mr. Gold, you mentioned you had

17    been the victim of crimes in the past?

18            PROSPECTIVE JUROR:  Yes.

19            MS. TEBBETT:  Nothing about that that

20    troubles you here with some of the allegations that

21    you've heard here?

22            PROSPECTIVE JUROR:  No.

23            MS. TEBBETT:  Charges of robbery, rape,

24    sexual assault, nothing that was too similar to what

25    you had experienced.
```

1          PROSPECTIVE JUROR:  Everything is different.

2     I mean, you know, the charges might be similar, but if

3     you're asking me if I could be fair, yes.

4          MS. TEBBETT:  Okay.  That's exactly my

5     question, so good.  Thank you for that.  Okay.

6          Now, Ms. Gulli, you mentioned you have

7     several members of your family also in law enforcement

8     and you mentioned you have a son-in-law that works at

9     Riker's?

10         PROSPECTIVE JUROR:  Yes.

11         MS. TEBBETT:  I'm sure you've heard it's been

12    mentioned several times already in this courtroom that

13    the defendant was a correction officer at Riker's

14    Island.

15         PROSPECTIVE JUROR:  Yes.

16         MS. TEBBETT:  You don't have any reason to

17    believe that your son-in-law knows him; right?

18         PROSPECTIVE JUROR:  No.

19         MS. TEBBETT:  Have you heard anything about

20    this from your son-in-law?

21         PROSPECTIVE JUROR:  No.

22         MS. TEBBETT:  Didn't mention to you that he

23    heard of a correction officer who was arrested or

24    accused of any of these crimes?

25         PROSPECTIVE JUROR:  No.

1          MS. TEBBETT:  Fact you have a son-in-law who

2     works in Riker's island, does that give the defendant

3     any extra credit?

4          PROSPECTIVE JUROR:  No.  I don't even

5     think -- it's just his job and that's what he does and

6     I really don't think too much about it.

7          MS. TEBBETT:  You wouldn't sit as you're

8     hearing evidence in this trial and like we've

9     mentioned, heard the nature of allegations, certainly

10    serious charges, sensitive charges, emotional charges.

11    That's what you're going to be hearing about.  You

12    know, think of this question as you're listening to all

13    of that.  Anywhere in the back of your mind, would you

14    be thinking, you know what?  My son-in-law's a

15    correction officer and I'm sure he's a good correction

16    officer.  I just can't believe a correction officer

17    would commit those type of crimes?

18         PROSPECTIVE JUROR:  Definitely not.

19         MS. TEBBETT:  Allegations I'm hearing about?

20         PROSPECTIVE JUROR:  Definitely not.

21         MS. TEBBETT:  You would he agree with me

22    there are good officers and not good officers?

23         PROSPECTIVE JUROR:  Everybody.

24         MS. TEBBETT:  And I'm sure that's true in

25    every profession.  Everybody has experienced that in

1    their line of work.  So then can you promise me that

2    you would not have that thought in the back of your

3    mind; that just the fact you would learn defendant was

4    a correction officer would automatically make you think

5    he could never do the things they are saying he did?

6              PROSPECTIVE JUROR:  No, I wouldn't think

7    about that.

8              MS. TEBBETT:  Okay.  Okay.  Now, again police

9    officers are going to come in and testify and you

10   mentioned your brother-in-law had been a police

11   officer?

12             PROSPECTIVE JUROR:  Uh-hum.

13             MS. TEBBETT:  You're not going to just take

14   what the police officer who testify in this trial say,

15   you know, any of the testimony that they give and

16   automatically believe it just because they're police

17   officers?

18             PROSPECTIVE JUROR:  No.

19             MS. TEBBETT:  If they're telling you

20   something that to you doesn't make any sense, you

21   wouldn't just give them more credit because they're

22   wearing a uniform?

23             PROSPECTIVE JUROR:  Only my brother-in-law

24   would I believe.

25             MS. TEBBETT:  You didn't hear his name on the

1    witness list; right?  We're not calling him.

2              Now, Ms. Catania, would you agree with that?

3          PROSPECTIVE JUROR:  Uh-hum.

4          MS. TEBBETT:  That you have to listen to what

5    they're saying, see if it makes sense?

6          PROSPECTIVE JUROR:  Sure.

7          MS. TEBBETT:  Just like any other witness?

8    Would you agree with that?

9          PROSPECTIVE JUROR:  Uh-hum.

10         MS. TEBBETT:  And if it doesn't make sense,

11   you don't believe them just because they're a police

12   officer; right?

13         PROSPECTIVE JUROR:  Yes.

14         MS. TEBBETT:  Mr. Russo, did you hear

15   Mr. Lemke give the example of the red light and the

16   green light?  The officer says it's red and you ran

17   through it and someone else says, no, it was green?  Do

18   you give automatic credit to the police officer just

19   because he's a police officer?

20         PROSPECTIVE JUROR:  If it's that cold of a

21   question, if it's red or it's green and he's swearing

22   he's doing his job and swears it was green, I would

23   give him the benefit of the doubt.  I don't see what

24   his motivation would be.

25         MS. TEBBETT:  Well, let me ask you this.

1  Before you did that, would you listen to everything --

2                 PROSPECTIVE JUROR:  Sure.

3                 MS. TEBBETT:  -- that he had to say and what

4  any of the other witnesses had to say?

5                 PROSPECTIVE JUROR:  Right.

6                 MS. TEBBETT:  And would you listen to what

7  the circumstances were surrounding what they tell you

8  they saw?

9                 PROSPECTIVE JUROR:  That's a very different

10  question.  Sure.

11                 MS. TEBBETT:  Would you do that?

12                 PROSPECTIVE JUROR:  Uh-hum.

13                 MS. TEBBETT:  Would you want to know how

14  close each of them were to the light, how well could

15  they see, was anything obstructing their view, how long

16  did they look at it?  Would you take all those other

17  factors into consideration?

18                 PROSPECTIVE JUROR:  Sure.

19                 MS. TEBBETT:  Okay.  So even if, you know, a

20  police officer says one thing and a civilian says

21  something else, up want to know those circumstances

22  surrounding it?

23                 PROSPECTIVE JUROR:  Right.

24                 MS. TEBBETT:  Before you make a judgment.

25  Can you promise me you would do that?

1          PROSPECTIVE JUROR:  He could be wrong.  I

2     wouldn't say he was lying if it was just black and

3     white.

4          MS. TEBBETT:  And you heard the Judge mention

5     certainly people could be telling the truth.  They

6     could be lying or they could just make a mistake.

7     Okay.  But you would want to hear all those

8     circumstances before you made up your mind?

9          PROSPECTIVE JUROR:  Sure.

10         MS. TEBBETT:  And, Mr. Binder, would you

11    agree with that?  Would you want to hear all of the

12    circumstances before you made up your mind about

13    something?

14         PROSPECTIVE JUROR:  Yes, it's not just red or

15    green.

16         MS. TEBBETT:  Okay.  It's probably more than

17    that?

18         PROSPECTIVE JUROR:  Yes.

19         MS. TEBBETT:  What did they see, were they

20    talking on the phone when looking at the light,

21    difficulty things that might impact --

22         PROSPECTIVE JUROR:  Yes.

23         MS. TEBBETT:  -- what they're telling you.

24    Would you be able to do that if you were a juror in

25    this case?

1                    PROSPECTIVE JUROR:  Yes.

2                    MS. TEBBETT:  Listen to the evidence, not

3        just take it black or white, but look at all the

4        surrounding circumstances?  Would you be able to do

5        that?

6                    PROSPECTIVE JUROR:  Yes, yes.

7                    MS. TEBBETT:  Mr. Gold, how about you?  Would

8        you be able to do that?

9                    PROSPECTIVE JUROR:  Yes.

10                    MS. TEBBETT:  How about you, Mr. Hossain?

11        Would you be able to do that?

12                    PROSPECTIVE JUROR:  See what happened, my

13        children were subject to crime, small crime though,

14        three times, so at one point, I feel really, really bad

15        about that, and then the appearance of cops, cops

16        anywhere gave me, okay, some kind of protection,

17        security, so this is something I just wanted to tell

18        you honestly about that.

19                    MS. TEBBETT:  And certainly we all want to

20        feel like that when we see police officers that they're

21        there.

22                    PROSPECTIVE JUROR:  They're there to protect

23        us.

24                    MS. TEBBETT:  But would you listen to what

25        they say if they're testifying about an incident or

1    something that they saw, you know, on the street, for

2    example, and see if it made sense to you or would you

3    just automatically believe them because they are police

4    officers?

5              PROSPECTIVE JUROR:  But not exactly, but you

6    can believe them, but again because of the perception

7    of cops, they're here to protect us, that gives him,

8    you know --

9              MS. TEBBETT:  Right, right.  That's certainly

10   what their job is, and we all hope that they do that,

11   but you would listen to what they say?

12             PROSPECTIVE JUROR:  Absolutely.

13             MS. TEBBETT:  And evaluate it, see if it

14   makes sense, and would you agree with that also,

15   Ms. Catania?

16             PROSPECTIVE JUROR:  Uh-hum, yes.

17             MS. TEBBETT:  Mr. Hossain, let me ask you

18   this question.  The incident that happened to your son

19   and daughter, they reported those to the police; right?

20             PROSPECTIVE JUROR:  No.  They came back home,

21   no.  They came back home and they told us and they

22   didn't follow up.  They didn't fight it.

23             MS. TEBBETT:  Do you know if there were any

24   witnesses who saw what happened?

25             PROSPECTIVE JUROR:  I'm sure there were

1        probably on the subway platform.  It happened when the

2        guy took out and punched, black eye.  It wasn't -- it

3        happened actually 14, 15 years ago when he was going to

4        school.

5               MS. TEBBETT:  Well, let me ask you this

6        question.  Let's say your son was alone on the subway

7        platform, just him and the person who was committing

8        that crime against him, and if happened, he punched

9        your son and ran away, your son's left at the subway

10       station, went to the police station to make a report

11       and he went into the police station and said, I want to

12       make a report, I was just alone on the subway platform

13       and this is what happened to me, this man punched me,

14       took my Walkman, I want to make a report.  I want you

15       to find him and arrest him.  Would you think that it

16       would be fair if the police officer said to him, do you

17       have any witnesses?  Did anybody else see that?  And

18       your son says, well, no, I was alone on the platform.

19       Would it be fair if the officer said to him then, I'm

20       not taking your report if you don't have any witnesses.

21       If you're the only one, we're not taking the report.

22       Would that be fair?

23               PROSPECTIVE JUROR:  That would not be.

24               MS. TEBBETT:  That would not be fair?

25               PROSPECTIVE JUROR:  You have to --

1           MS. TEBBETT:  You have would want him to

2     still take that report; right?

3           PROSPECTIVE JUROR:  Yeah, of course.

4           MS. TEBBETT:  Ms. Gulli, would you agree with

5     that?

6           PROSPECTIVE JUROR:  Yes.

7           MS. TEBBETT:  Would you agree with me that

8     often times things don't happen in front of a lot of

9     people?

10          PROSPECTIVE JUROR:  Most times they don't.

11          MS. TEBBETT:  Most times they don't, and that

12    makes sense to you; right?

13          PROSPECTIVE JUROR:  Yes.

14          MS. TEBBETT:  But would you agree with me

15    that it wouldn't be fair if the police didn't take a

16    report or didn't investigate a case just because there

17    were no other witnesses to say I saw what he did to her

18    also?

19          PROSPECTIVE JUROR:  That would not be fair.

20          MS. TEBBETT:  So would you agree with me, we

21    talked about the concept before.  It would be not the

22    quantity of the witnesses, but the quality of what they

23    say when they come in and testify?

24          PROSPECTIVE JUROR:  Yes.

25          MS. TEBBETT:  And you would need to evaluate

1    what they're telling you?

2              PROSPECTIVE JUROR:  Uh-hum.

3              MS. TEBBETT:  Not how many of them come in

4    and say what they saw.  Would you agree with that?

5              PROSPECTIVE JUROR:  Yes.

6              MS. TEBBETT:  Ms. Jewell, how about you?

7    Would you agree with that as well?

8              PROSPECTIVE JUROR:  Yes.

9              MS. TEBBETT:  Mr. Binder, would you agree

10   with that?

11             PROSPECTIVE JUROR:  Yes.

12             MS. TEBBETT:  How about you, Mr. Russo?

13             PROSPECTIVE JUROR:  Yes.

14             MS. TEBBETT:  You would agree with that, and

15   would you be able to listen to the what the witnesses

16   are saying, evaluate it based on everything else that

17   you hear and not give us less credit just because

18   there's only one witness to a particular incident?

19   That wouldn't be fair; right?  Okay.

20             Now, Ms. Singas was talking a lot about the

21   difference between being able to give a description of

22   someone and being able to recognize them.  Again, I'm

23   not going to ask anybody to give a description of me,

24   but do you understand the difference between the two;

25   that maybe you might not be completely accurate when

1   you give a description of someone, but you would know

2   them if you saw them again?

3          PROSPECTIVE JUROR:  Yeah.

4          MS. TEBBETT:  You think you would be good at

5   that if you saw me later today?  Do you think you would

6   recognize me?

7          PROSPECTIVE JUROR:  Yes.

8          MS. TEBBETT:  You may not remember my name?

9          PROSPECTIVE JUROR:  Right.

10          MS. TEBBETT:  You may not remember --

11          PROSPECTIVE JUROR:  I'm sure I wouldn't

12   remember your name.

13          MS. TEBBETT:  That's okay.  I probably

14   wouldn't remember yours either.  You might not recall

15   what color shoes I'm wearing, probably can't see them

16   where you're sitting, but --

17          PROSPECTIVE JUROR:  She was in court

18   tomorrow.

19          MS. TEBBETT:  She was the woman I saw in

20   court today.  How about you, Ms. Catania?  Think you'd

21   be able to recognize someone if you saw them again even

22   if you didn't describe them perfectly the way they

23   appeared to you?

24          PROSPECTIVE JUROR:  Yes.

25          MS. TEBBETT:  Because it's a different sort

1      of set of skills you would need to use.  Would you

2      agree with that?

3                PROSPECTIVE JUROR:  Yes.

4                MS. TEBBETT:  And that's, you know, that's

5      one of the issues you're going to have to decide in

6      this case if the witnesses have identified the correct

7      person that committed these crimes against them whether

8      they make a correct identification of the person.

9                We talked a little bit with the other jurors

10     in the box about the factors that you would want to

11     hear about when you're considering or deciding did they

12     make a correct identification or not.  You know, how

13     far apart they are from each other if you're looking at

14     me from here or looking at me from the end of the

15     courtroom, what the lighting is like, how much time

16     they spend together.  Would you agree with all those

17     factors as things you would consider in determining did

18     they identify the correct person or not?

19               PROSPECTIVE JUROR:  Right, but you're talking

20     about rape cases; are you not?  So that --

21               MS. TEBBETT:  Yes.

22               PROSPECTIVE JUROR:  This isn't something

23     that's far away.  These are close, you know, you're

24     looking very close at the person.

25               MS. TEBBETT:  Right.  So would you agree with

1     me then that what the interaction is between the people

2     also would play into how well they'd be able to

3     identify them or recognize them?

4            PROSPECTIVE JUROR:  Yes.

5            MS. TEBBETT:   Not just someone who steals

6     your purse and takes off.  Would you agree with me that

7     that is a factor as well you would consider what's

8     happening between the two people?

9            PROSPECTIVE JUROR:  Most definitely.

10           MS. TEBBETT:  Certainly.  Is that what you

11    said?  Okay.  Mr. Hossein, how about you?

12           PROSPECTIVE JUROR:  Yes.

13           MS. TEBBETT:  Would you agree with all of

14    those factors?

15           PROSPECTIVE JUROR:  Of course.  I have to

16    consider all the factors.

17           MS. TEBBETT:  Okay; how much time they spent

18    together, what their interaction actually is together?

19           PROSPECTIVE JUROR:  Yes.

20           MS. TEBBETT:  Those are all things you would

21    consider?

22           PROSPECTIVE JUROR:  Yes.

23           MS. TEBBETT:  Ms. Gulli, would you agree with

24    that?

25           PROSPECTIVE JUROR:  Yes, I would.

1           MS. TEBBETT:  And Ms. Jewell, how about you?

2   Anybody disagree with that?  Okay.

3           Let me give you another example.  Sure we all

4   heard the example actions speak louder than words.

5   Have you heard that before?  Let's say you go up to the

6   newsstand on the corner, take your 50 cents out of your

7   pocket, you put it on the counter, guy behind the

8   counter hands you the Newsday.  How did he know to hand

9   you the Newsday?  You didn't say a word to him, but

10  would you agree with me your actions can indicate to

11  you what you wanted, what you wanted to do, what you

12  were intending on doing at that point?  Do you follow

13  what I'm saying?

14          PROSPECTIVE JUROR:  Oh yeah.

15          MS. TEBBETT:  You're shaking your head, but

16  the Court Reporter's got to take it down.

17          PROSPECTIVE JUROR:  Oh, you're talking to me?

18          MS. TEBBETT:  Yes.

19          PROSPECTIVE JUROR:  Oh, sorry.  Yeah,

20  absolutely.

21          MS. TEBBETT:  You follow?

22          PROSPECTIVE JUROR:  I didn't know you were

23  talking to me.  I'm sorry.

24          MS. TEBBETT:  That's okay.  Mr. Gold, what

25  about you?  Would you agree with that?

1          PROSPECTIVE JUROR:  Yes.

2          MS. TEBBETT:  That someone can understand

3     what you're intending by what you do, not just what you

4     say?

5          PROSPECTIVE JUROR:  That's correct.

6          MS. TEBBETT:  Sometimes you don't have to say

7     anything and someone can understand what you mean, what

8     you're intending to do like the example I gave about

9     the newspaper?

10         PROSPECTIVE JUROR:  Yes.

11         MS. TEBBETT:  You follow what I'm saying?

12         PROSPECTIVE JUROR:  Yes.

13         MS. TEBBETT:  Mr. Binder, would you agree

14    with that?

15         PROSPECTIVE JUROR:  Mostly, but must be some

16    other things maybe involved.  Perhaps there's a pack of

17    chewing gum 50 cents.  He may ask what you do you want,

18    maybe inclusive.

19         MS. TEBBETT:  So you would want to look at

20    all the circumstances surrounding what's taking place

21    before you make a decision?

22         PROSPECTIVE JUROR:  Yes.

23         MS. TEBBETT:  Okay.  And maybe making that

24    sort of inference is one of the things you would look

25    at, but you'd look at other things as well?

1          PROSPECTIVE JUROR:  Correct.

2          MS. TEBBETT:  Maybe what happens before, what

3     happened after.  Would you consider that also?

4          PROSPECTIVE JUROR:  Oh, yes.

5          MS. TEBBETT:  Ms. Gulli, what about you?

6          PROSPECTIVE JUROR:  I would have to consider

7     everything.

8          MS. TEBBETT:  Okay.  So but would I -- could

9     you accept the fact maybe someone doesn't come in and

10    announce what they're going to do?

11         PROSPECTIVE JUROR:  Uh-hum.

12         MS. TEBBETT:  But you could make a

13    determination based on their actions as to what their

14    intention was looking at what happened before, what

15    happened during, what happened after looking at

16    everything?

17         PROSPECTIVE JUROR:  Uh-hum.

18         MS. TEBBETT:  You don't necessarily need them

19    to announce what they were doing?

20         PROSPECTIVE JUROR:  Right.

21         MS. TEBBETT:  And you would be able to make a

22    determination as to that.  Would you agree with that?

23         PROSPECTIVE JUROR:  Yes, I would.

24         MS. TEBBETT:  How about you, Mr. Russo?

25    Would you agree?

1          PROSPECTIVE JUROR:  Actions are a great

2     indicator, but one indicator.

3          MS. TEBBETT:  One of several that you would

4     consider?

5          PROSPECTIVE JUROR:  It's a strong one.

6          MS. TEBBETT:  I'm sorry?

7          PROSPECTIVE JUROR:  It's a strong one.

8          MS. TEBBETT:  Okay.  Sometimes it is.

9          PROSPECTIVE JUROR:  Sometimes it is.

10     Ms. Catania, what about you?  Would you agree with

11     that?

12          PROSPECTIVE JUROR:  Yes, unless you're

13     talking about a teenager.

14          MS. TEBBETT:  What do you mean by that?

15          PROSPECTIVE JUROR:  It's a joke.

16          MS. TEBBETT:  You don't know what they're

17     talking about?

18          PROSPECTIVE JUROR:  It was a joke.

19          MS. TEBBETT:  You never know.  I haven't

20     gotten there yet, but I'm sure it will be interesting.

21     Okay.

22          PROSPECTIVE JUROR:  All right.

23          MS. TEBBETT:  Thank you.

24          PROSPECTIVE JUROR:  Thank you.

25          THE COURT:  All right.  Thank you.

1     Mr. Lemke?

2               MR. LEMKE:  Is it pronounced Mr. Hossein?

3               PROSPECTIVE JUROR:  Yes.

4               MR. LEMKE:  You're an engineer?

5               PROSPECTIVE JUROR:  I'm an engineer.

6               MR. LEMKE:  Was it for the Department of

7     Highway?

8               PROSPECTIVE JUROR:  No, I work for the

9     Department of Transportation, and specifically in the

10    Bureau of Bridges.

11              MR. LEMKE:  Regarding bridges, are you

12    involved with any certifications of piers or cement?

13              PROSPECTIVE JUROR:  No, not involving

14    construction, involving design.

15              MR. LEMKE:  Regarding there's a current

16    investigation regarding the industry.  Do you have

17    anything to do with that?

18              PROSPECTIVE JUROR:  No, it is not exactly

19    under my purview, but the other groups I know there's

20    some issue with the testing, yes, but I'm not involved

21    with that.

22              MR. LEMKE:  Okay.  So you haven't in any

23    way --

24              PROSPECTIVE JUROR:  No.

25              MR. LEMKE:  -- been involved with that

1    investigation or anything else like that?

2                 PROSPECTIVE JUROR:  No.

3                 MR. LEMKE:  And part of your responsibilities

4    are their certifications you get involved with as well?

5                 PROSPECTIVE JUROR:  No, actually the

6    engineering plans, go out and I have a team of

7    engineers like fifteen engineers that they do review

8    the engineering, the drawings and everything, standards

9    and all that, and these are only part of my work, but

10   the other importance certification, my engineer review

11   certification of the balloons, the Macy's balloons, and

12   they are, at this time, currently being reviewed.

13                MR. LEMKE:  Thanksgiving Day Parade?

14                PROSPECTIVE JUROR:  And I've been away and

15   they must be very worried.

16                MR. LEMKE:  Do you have a favorite balloon?

17                PROSPECTIVE JUROR:  Yeah, three balloons

18   coming up this time and when I left, when it came for

19   they just submitted those specifications and I did

20   transfer to my engineers who are right now in the

21   process of doing the review, so they are waiting.

22                MR. LEMKE:  Yet those responsibilities, if

23   you're selected in this case and it lasts for two

24   weeks, is that going to interfere with your ability to

25   sit, been fair in this case?  I know it's difficult for

1    anybody to sit two and a-half weeks from their

2    responsibilities and their employment, so forth.  Is

3    that going to create a major concern or a problem or,

4    you know, there's a responsibility here, you can accept

5    it, sit here if selected as a juror in this case?

6              PROSPECTIVE JUROR:  No, we do have engineers

7    there, other engineers.  I am the boss of the engineers

8    and I involve the chief engineer, but of course being

9    involved myself, I may not be as concerned as they are

10   concerned.

11             MR. LEMKE:  Is it Mr. Gold?

12             PROSPECTIVE JUROR:  Gold.

13             MR. LEMKE:  Again, the Judge indicates,

14   without telling us what the verdict was, you sat on a

15   case twenty years ago?

16             PROSPECTIVE JUROR:  Yes.

17             MR. LEMKE:  In that case, do you recall any

18   of the instructions, probably not that the Court had

19   given you regarding what you needed to consider before

20   you can either acquit or convict an individual in that

21   case?

22             PROSPECTIVE JUROR:  Uhm, I'm not exactly sure

23   what you mean.

24             MR. LEMKE:  Judge charges you.  This is what

25   you must find, A, B, C, D, for example, before you can

1    convict and if there are any elements that are not

2    proven beyond a reasonable doubt, you must acquit.  I

3    mean, is there anything from that case even though it's

4    twenty years ago that would interfere with the

5    instructions the Judge would give you today?

6              PROSPECTIVE JUROR:  No, I don't think so.

7              MR. LEMKE:  In that case, you deliberated in

8    that case?

9              PROSPECTIVE JUROR:  Yes.

10             MR. LEMKE:  Was it a case that was on the

11   facts pretty simple and there was a quick verdict or

12   had there been much discussion during deliberations?

13             PROSPECTIVE JUROR:  Well, I mean I don't know

14   how much detail you want me to give.

15             MR. LEMKE:  Don't give me detail.  For

16   example, was there a verdict within an hour or a day or

17   two?

18             PROSPECTIVE JUROR:  Yeah, it was a couple

19   days.

20             MR. LEMKE:  During that time, would you say

21   you were more of a leader during those deliberations, a

22   follower?  Did you change your initial opinion or did

23   you change the others to see it your way?  Do you

24   remember?

25             PROSPECTIVE JUROR:  I wasn't a leader, I

1    wasn't a follower, and I didn't change my mind as to

2    what I felt when we went into deliberate.

3              MR. LEMKE:  And you were able to discuss with

4    others, obviously, quite an experience as to what

5    deliberations are, what needs to be done.  You could do

6    that again if selected in a case such as this?

7              PROSPECTIVE JUROR:  Correct, I think so.

8              MR. LEMKE:  Ms. Jewell?

9              PROSPECTIVE JUROR:  Yes.

10             MR. LEMKE:  The issue regarding a number of

11   factors such as police officers testifying, a number of

12   witnesses who will get up, testifying in part to

13   something very emotional.  If you're selected as a

14   juror, obviously my concern in asking is can you sit,

15   listen to that emotional testimony, anyone that's a

16   potential juror, and still again wait until the end of

17   the case until the Judge instructs you on the law as to

18   what the elements are of each of the crimes charged and

19   whether or not they are proven beyond a reasonable

20   doubt that it's Ricardo Walters?  It's a difficult

21   thing to do, but can you do that if selected as a juror

22   in this case?

23             PROSPECTIVE JUROR:  Absolutely.

24             MR. LEMKE:  Regardless of how many witnesses

25   there are, regardless of what at least initially he's

1    the individual that did this to me, it's going to be

2    something you can take a step back, look at the other

3    evidence as to whether or not how an identification was

4    made?

5              PROSPECTIVE JUROR:  Absolutely.

6              MR. LEMKE:  Is it Ms. Gulli?

7              PROSPECTIVE JUROR:  Yes.

8              MR. LEMKE:  Same type of questioning as well.

9    Selected as a juror, you know, emotionally charged

10   situation; four jurors, we need another eight and a

11   couple of alternates.  Anything that I or the

12   prosecutors or the Court should be concerned with if

13   you're selected as a juror in this case in sitting,

14   listening to the evidence?

15             PROSPECTIVE JUROR:  No, I don't think so.

16   It's going to be enjoyable.

17             MR. LEMKE:  No, it's not.  It's not.

18             PROSPECTIVE JUROR:  I'd be happy to hear it.

19   And, Judge, wanted to make one correction where my

20   son-in-law is.  He's at Sing-Sing, not Riker's.

21             MR. LEMKE:  Okay.  So it's Sing-Sing; two

22   different things.  That's after somebody's sentenced.

23             PROSPECTIVE JUROR:  That's why I don't even

24   know.  I don't pay attention.

25             MR. LEMKE:  Again, nothing from any of that?

1          PROSPECTIVE JUROR:  No, I wanted to make -- I

2    was thinking, oh, my God, I'm saying wrong name.

3          MR. LEMKE:  Okay.  I know I haven't asked all

4    of the questions.  Don't have anything else.  Thank

5    you, your Honor.

6          PROSPECTIVE JUROR:  Can I say something?

7          THE COURT:  You have a question?

8          PROSPECTIVE JUROR:  I do.  I meant to

9    interrupt, but things were moving.  You said would you

10   be at a disadvantage by only having one witness.  That

11   was the question?  I have actually -- I was thing about

12   this over lunch, actually affects me the other way

13   which is -- it's always bothered me, women who

14   prosecute rape cases usually are at a disadvantage.

15         THE COURT:  All right.  Well, whether they're

16   at an advantage or disadvantage is not something you,

17   as a juror, are going to necessarily make any

18   determination, if I'm following you right.

19         PROSPECTIVE JUROR:  Okay.

20         MR. LEMKE:  Is there something about the

21   facts that about the witnesses in this case?

22         PROSPECTIVE JUROR:  No, no.

23         MR. LEMKE:  You're talking about prosecution

24   itself?  Okay.  All right, Ms. Tebbett, Ms. Singas,

25   Mr. Lemke, whenever you're ready.  Step forward.

Proceedings                                                    223

1     Anybody in the box need the bathroom?  When you come

2     back, use that door there.

3              THE COURT:  Those of you seated here if you

4     could just kindly have a seat in the back out in the

5     audience, then again, any of you that needs to use the

6     facilities.

7              (Whereupon, the following took place at the

8     bench:)

9              THE COURT:  We have seven, so we can consider

10    the whole board.

11             People cause?

12             MS. TEBBETT:  10, Ms. Catania.

13             MR. LEMKE:  Consent.

14             THE COURT:  Defendant cause?

15             MR. LEMKE:  None.

16             THE COURT:  People peremptory?

17             MS. TEBBETT:  No.

18             THE COURT:  No perempts.  Mr. Lemke?

19             MR. LEMKE:  Mr. Gold, Mr. Russo, Mr. Binder

20    and Ms. Gulli.

21             THE COURT:  You've used five.

22             MR. LEMKE:  Yes.

23             THE COURT:  Defendant has used 11 -- 10 you

24    used 4, so you've used 10.  People, you still have 8

25    left, didn't use any this round.

Proceedings                                                             224

1                Going to make Ms. Jewell and Mr. Hossein

2       jurors 5 and 6.

3                (Whereupon, the following took place in open

4       court:)

5                THE COURT:  All right.  Now next issue We're

6       going to, if we can pick up at 3:30 after we take care

7       of these people, we got pre-screen the next 30.  We're

8       really going to be cutting it close, even figure to

9       like 4:45.  I'm not bringing these people back on

10      Monday.

11               MS. SINGAS:  Think we should just start again

12      on Monday.  Don't think we're going to get to them,

13      Judge, obviously.

14               THE COURT:  Everybody got their hearts set on

15      not being here tomorrow?

16               MS. SINGAS:  I could come in tomorrow.

17               MR. LEMKE:  9:30 with this group?

18               THE COURT:  At the rate we're going --

19               MS. SINGAS:  I put in all my witnesses and

20      everything for Wednesday.

21               MR. LEMKE:  Still open Wednesday.

22               THE COURT:  Still not doing anything until

23      Wednesday.  That's not changing anything.  I'll try to

24      push it.  If I can do it, I'll do it.

25               (Whereupon, the following took place in open

1          court:)

2                    THE COURT:  Step back into the jury box.  You

3          don't have to remember the seats you were in.  Listen

4          to my clerk, if you would.

5                    THE CLERK:  Following jurors names I call

6          have been selected to be on this jury.  Number 5 is

7          Alicia Jewell, juror 6, Abul Hossein.  If your name has

8          been called, please remain in your seat.  If your name

9          has not been called, you're excused from this case and

10         you must return to central jury.

11                   THE COURT:  Those of you that have been

12         excused, again, with my thanks, thank you very much.

13         Wish you all the best.  Please be careful as you step

14         out of the jury box.

15                   (Whereupon, the excused jurors left the

16         courtroom.)

17                   THE CLERK:  Remaining jurors satisfactory to

18         the People?

19                   MS. TEBBETT:  They are.

20                   MR. LEMKE:  Yes, your Honor.

21                   THE COURT:  Selected jurors please rise.

22                   (Whereupon, two jurors were duly sworn by the

23         Court Clerk.)

24                   THE COURT:  Ms. Jewell, Mr. Hossein, thank

25         you.  Welcome.  I believe our fifth and sixth jurors

1    respectively.  As I indicated to those that were

2    selected this morning, going to direct you both report

3    back here next Wednesday, the 5th, it's the day after

4    Election day, 9:30.  My sergeant, James, will give you

5    some further instructions.  Please don't come here

6    tomorrow.  Don't come here Monday.  Wednesday, November

7    5th, 9:30.  We'll give you further instructions

8    regarding parking where to report.  Follow my officer.

9    See you on Wednesday.  We'll begin with opening

10   statements and calling of witnesses on that day.

11            (Whereupon, the sworn jurors left the

12   courtroom.)

13            (Whereupon, a brief recess was taken.)

14            (Whereupon, the second jury panel entered the

15   courtroom.)

16            THE COURT:  Good afternoon.  Welcome back.

17   We ran, I should say a little bit over.  We were in the

18   middle of jury selection for the past hour.  I

19   appreciate everybody's indulgence.  I know you've been

20   inconvenienced, but I want to first say, I appreciate

21   you being here.  All of you are, obviously, now into my

22   courtroom at this particular time.  We're in the

23   process of picking, as I said to you earlier, a jury in

24   a criminal case.

25            The title of the action is the People of the

1    State of New York against Ricardo Walters.  The People

2    in this particular County are represented by the

3    district attorney, which is Kathleen Rice.  Two of

4    Ms. Rice's rises assistant district attorneys will be

5    prosecuting this case behalf of the District Attorney's

6    office.  Seated at the first table is Ms. Madeline

7    Singas.

8                    MS. SINGAS:  Good afternoon.

9                    THE COURT:  Seated next to her is Ms. Theresa

10   Tebbett.

11                   MS. TEBBETT:  Good afternoon.

12                   THE COURT:  Seated at the second table is the

13   defendant, Ricardo Walters.

14                   THE DEFENDANT:  Good afternoon.

15                   THE COURT:  Seated next to his right is his

16   attorney, Mr. Dennis Lemke.

17                   MR. LEMKE:  Hello.

18                   THE COURT:  Now, before we begin, fill the

19   jury box, what I'd like to do is conduct a

20   prescreening, if you will.  I'm going to tell you a

21   little bit about the nature, going to tell you about

22   the nature of the case as well as its anticipated

23   length, if you will.  The indictment in this case

24   accuses the defendant of various accounts of robbery,

25   rape, sexual abuse and kidnapping over a period of a

1    number of, I believe three to four different dates I

2    believe commencing in 2005 and I believe ending in

3    2007.  The fact that I mentioned an indictment is, by

4    no means, any evidence of guilt.  The fact that an

5    indictment has been filed has no evidentiary value

6    whatsoever.  It's the means and mechanism by which a

7    felony case is brought to trial in the State of New

8    York.

9              Defendant in this case has pled not guilty to

10   the indictment and, therefore, that's why we are here

11   to begin jury selection in the trial of this particular

12   action.  It's anticipated that the trial is going to

13   take about a two and a-half to three-week period of

14   time.  It's anticipated that we will finish, hopefully,

15   sometime the early part of the week of November 17th.

16   We will not be sitting I should say obviously November

17   4th, this upcoming Tuesday, Election Day, nor the

18   following Tuesday which is November 11th which is

19   Veteran's Day.  What I'm going to do with that in mind

20   is ask those of you that either of the following

21   criteria, and I want to emphasize the following

22   criteria, I cannot excuse you from jury service.

23   Depending on whether or not you meet the following

24   criteria, you may get excused, however, from this

25   particular case, but those of you that have a planned

1    vacation between now and November 21st, a planned

2    business trip, I emphasize both of those, planned, any

3    type of medical procedure that you cannot reschedule,

4    any issue with respect to child care, and for that

5    matter, elder care that would impact on your ability to

6    serve as a juror in this particular case.  We generally

7    sit until about 4:40, 4:45 each day.  Just keep in

8    mind, there's no longer sequestration in New York

9    State, meaning we do not hold people overnight in

10   hotels once a jury is out to deliberate, so you will be

11   going home each and every day, even during the course

12   of deliberations.

13           I cannot excuse you for economic reasons, as

14   unfortunate as that may be, unless it is a particular

15   hardship for you, so at this point, what I'm going to

16   do, I'm going to ask for you to kindly pay attention to

17   James, my sergeant who's standing here.  Those of you

18   who meet -- he's going to go row by row -- that meet

19   the criteria, going to ask you to please step forward

20   with your belongings.  Jim, if you would.

21           Whereupon, a discussion was held off the

22   record, at the bench, among the attorneys and

23   prospective jurors.)

24           (Whereupon, the following took place in open

25   court:)

```
 1              THE COURT:  For those of you who are still

 2     seated, I know at least one of you wasn't here when we

 3     swore everybody in this morning.  Other than the one

 4     potential or prospective I should say juror, anyone

 5     else that wasn't here this morning when everyone was

 6     sworn in?  Ma'am, if you could kindly just stand up for

 7     a moment while my Clerk swears you in?

 8              (Whereupon, one prospective juror was duly

 9     sworn by the Court Clerk.)

10              THE COURT:  All right.  Those of you that are

11     here, kindly listen as my Clerk is going to read off

12     fourteen names.  If your name is called, kindly step

13     forward with your belongings, bring whatever you have

14     with you and follow my officers.  They'll tell you

15     where to go in terms of sitting in the jury box.

16              THE CLERK:  Seat 1, Debra Apgar, A-P-G-A-R;

17              Seat 2, Dana Sway Gobin, G-O-B-I-N;

18              Seat 3, Simon Yefrem, Y-E-F-R-E-M;

19              Seat 4, Michael Miller, M-I-L-L-E-R;

20              Seat 5, Robert Honan, H-O-N-A-N;

21              Seat 6, Donna Werkmeister,

22     W-E-R-K-M-E-I-S-T-E-R;

23              Seat 7, Christian Ramos, R-A-M-O-S;

24              Seat 8, Helen Jacobson, J-A-C-O-B-S-O-N

25              Seat 9, Michael Smith, S-M-I-T-H;
```

1          Seat 10, Francis Baxter, B-A-X-T-E-R;

2          Seat 11, Steven Rovere, R-O-V-E-R-E;

3          Seat 12, Edward Lebright, L-E-B-R-I-G-H-T;

4          Seat 13, Steven Liesveld, L-I-E-S-V-E-L-D;

5          Seat 14, Glen Marrus, M-A-R-R-U-S.

6          THE COURT:  Those of you that have been

7     called to the jury box, again, welcome.  Anybody here

8     before I get into some further questions explaining

9     certain principles of law?  Does anybody here either

10    recognize any of the parties to this case, either the

11    assistant DA, defense attorney, defendant?  Okay.  As I

12    indicated to you the nature of some of the charges, the

13    title of the action, this particular case over he past

14    has received some degree of media attention either in

15    the newspapers or on the TV or Internet.  The defendant

16    in this case is a New York City Correction Officer.

17    Does that mean anything to anybody in terms of the

18    question with respect to media?  Everyone sits here,

19    has anybody heard of anything about the case, read

20    anything about the case of any significance?

21          Mr. Marrus?

22          PROSPECTIVE JUROR:  I'm familiar just by

23    reading about what went on in the paper and on

24    television.

25          THE COURT:  Anything about what you either

cp

1   read or saw on the TV that you formed an opinion one

2   way or another in this case?

3               PROSPECTIVE JUROR:  No, your Honor.

4               THE COURT:  I'm going to now list a number of

5   names that are either going to be potential witnesses

6   in the case or names you may hear during the course of

7   the trial.  Hempstead Police Officer Dale Jones,

8   Hempstead Police Officer Eugene Este, Nassau County

9   Detective Sheila Wimberly, Nassau County Detective John

10  Lavelle, Nassau County Detective Wayne Birdsall, Nassau

11  County Detective Bob Dunn, Nassau County Detective

12  Danielle Perez, I believe Nassau County Detective

13  Edward Moran, Police Officer Ralph Morales, Sandy Hayn,

14  Anna Fernandez, Barbara Heffernan, Delsey Sanchez, Ilsa

15  Morales, Delmy Morales, Shamika Dottin, Sara Sandoval,

16  Allyson Davilar, Sandra Dottin, same spelling, Thomas

17  Lynch, Greg Navoy, Rosa Portillo, Investigator Richard

18  Lombardi.  Any of those names for any reason sound

19  familiar to any of the fourteen of you who are seated

20  here?  Anybody?  I'm sorry.  Ms. Jacobson?

21              PROSPECTIVE JUROR:  Yes, Thomas Lynch.  I

22  don't know why it's so familiar to me, but I know that

23  name.

24              THE COURT:  The Thomas Lynch that you may

25  know, do you know from where you know him or what

1    capacity you know him?  Social relationship, business

2    relationship?

3                  PROSPECTIVE JUROR:  No, if he walks in here,

4    maybe I'd say, oh.

5                  THE COURT:  Lynch is obviously a fairly

6    common name.

7                  PROSPECTIVE JUROR:  Okay.

8                  THE COURT:  Anybody else recognize any of the

9    names?  At this point, I'm going to basically go over

10   what your role is going to be if selected as a juror in

11   this case, what my role is.  I'm going to explain some

12   principles that apply in any criminal case, certain

13   principles of law that you're going to be sworn to

14   follow if selected as a juror in this case.  Followed

15   by that, I'm then going to ask questions such as

16   neighborhood which you live, whether or not you're

17   married, in a committed relationship, whether or not

18   you have any children, nature of your employment, also

19   ask you about any prior jury service, anybody's close

20   to you in law enforcement that you feel would be

21   something you think we should know about as well as any

22   prior crime victim history and whether or not anybody

23   close to you has ever been accused or convicted of a

24   crime.

25                  Prospective members of our panel, a trial is

1    the process by which the jury determines if a defendant

2    is guilty or not guilty of the charges, some of which I

3    have just indicated to you a few moments ago.  In that

4    process, you are selected as jurors, and I as the judge

5    perform separate functions as jurors.  You're going to

6    be called upon to determine whether or not the evidence

7    that you hear and see in this case established

8    defendant's guilt beyond a reasonable doubt.  In order

9    to do this at the end of the trial, you'll have to

10   evaluate all the evidence and determine what evidence

11   you have heard from the witnesses, seen as exhibits is

12   credible and what it all means.  This is called finding

13   the facts.  That would be your function alone.  I will

14   not find facts in this trial.

15           Your ultimate decision is called a verdict.

16   Your verdict will either be guilty or not guilty.  The

17   attorneys will present evidence usually by calling

18   witnesses and may suggest in their closing arguments

19   that you draw certain conclusions from the evidence.

20   You are not bound by what the attorneys say.  Only you

21   can decide what really happened and the verdict as to

22   each of the counts will remain your decision alone.

23           As judge, I make no determination of guilt or

24   lack of guilt.  My role at trial is to insure that you

25   reach your verdict in accordance with the applicable

235

law as I explain it to you.  In order for the People
and defendant to receive a fair trial, I may have to
rule on questions concerning the conduct of the trial.
Those rules have nothing to do with whether the
defendant is guilty or not guilty.  I may also rule on
questions concerning what evidence you may consider and
for what purpose.  When I make a ruling concerning
whether or not you may hear some testimony or see some
exhibit which is offered as evidence, I will be ruling
on whether or not you're permitted to see or hear it as
a matter of law.  Likewise, if I instruct you to
disregard something you might have heard, I will do so
because that is the law.  None of my rulings should be
taken by you as any indication at all of whether you
should believe all or part of what's offered as
evidence or that the defendant is guilty or not guilty.
This is solely for you to determine.

          You must accept the law as I give it to you
if the defendant and the People are to have a fair
trial to which they are both entitled.  At this
particular point, I'm going to turn to some fundamental
principles of law that apply in all criminal trials;
presumption of innocence, burden of proof, and the
requirement of proof beyond a reasonable doubt.
Throughout these proceedings, the defendant is presumed

```
 1      to be innocent.  As a result, you must find the

 2      defendant not guilty unless, on the evidence presented

 3      at this trial, you conclude that the People have proven

 4      the defendant guilty beyond a reasonable doubt.  That a

 5      defendant does not testify as a witness is not a factor

 6      from which any inference unfavorable to the defendant

 7      may be drawn.  The defendant is not required to prove

 8      that he is not guilty.  In fact, the defendant is not

 9      required to prove or disprove anything.  To the

10      contrary, the People have the burden of proving the

11      defendant guilty beyond a reasonable doubt.  That means

12      before you can find the defendant guilty of a crime,

13      the People must prove beyond a reasonable doubt every

14      element of the crime, including that the defendant is

15      the person who committed that crime.  The burden of

16      proof never shifts from the People to the defendant.

17      If the People fail to satisfy their burden of proof,

18      you must find the defendant not guilty.  If the People

19      satisfy their burden of proof, you must find the

20      defendant guilty.

21                 What does our law mean when it requires proof

22      of guilt beyond a reasonable doubt?  The law uses the

23      term proof beyond a reasonable doubt to tell you how

24      convincing the evidence of guilt must be to permit a

25      verdict of guilty.  The law recognizes that in dealing
```

1   with human affairs, there are few things in this world

2   that we know with absolute certainty.  Therefore, the

3   law does not require the People to prove a defendant

4   guilty beyond all possible doubt.  On the other hand,

5   it is not sufficient to prove that the defendant is

6   probably guilty.  In a criminal case, the proof of

7   guilt must be stronger than that.  It must be beyond a

8   reasonable doubt.  A reasonable doubt is an obvious

9   doubt of the guilt for which a reason exists based upon

10  the nature and quality of the evidence.  It is an

11  actual doubt, not a an imaginary doubt.  It is a doubt

12  that a reasonable person, acting in a matter of this

13  importance would be likely to entertain because of the

14  evidence that was presented or because of the lack of

15  convincing evidence.  Proof of guilt beyond a

16  reasonable doubt is proof that leaves you so firmly

17  convinced of the defendant's guilt that you have no

18  reasonable doubt of the existence of any element of the

19  crime or of the defendant's identity as the person who

20  committed the crime.

21          In determining whether or not the People have

22  proven the defendant's guilt beyond a reasonable doubt,

23  you should be guided solely by a full and fair

24  evaluation of the evidence.  After carefully evaluating

25  the evidence, each of you must decide whether or not

1    that evidence convinces you beyond a reasonable doubt

2    of the defendant's guilt.  Whatever your verdict may

3    be, it must not rest upon baseless speculation nor may

4    it be influenced in any way by bias, prejudice,

5    sympathy or by a desire to bring an end to your

6    deliberations or to avoid an unpleasant duty.

7              As judges of the facts, you alone determine

8    the truthfulness and accuracy of the testimony of each

9    witness.  You must decide whether a witness told the

10   truth and was accurate, or instead, testified falsely

11   or was mistaken.  You must also decide what importance

12   to give to the testimony you accept as truthful and

13   accurate.  It is the quality of the testimony that is

14   controlling, not the number of witnesses who testify.

15             There's no particular formula for evaluating

16   the truthfulness and accuracy of another person's

17   statements or testimony.  You bring to this process all

18   of your varied life experiences.  In life, you

19   frequently decide the truthfulness and accuracy of

20   statements made to you by other people.  The same

21   factors used to make those decisions should be used in

22   that case when evaluating the testimony.  At the end of

23   the trial, I will give you some examples of those

24   factors.  As I indicated, you heard me list the number

25   of police officers and/or detectives in this case.  The

1   testimony of a witness should not be believed solely

2   and simply because the witness is a police officer.  At

3   the same time, a witness's testimony should not be

4   disbelieved solely and simply because the witness is a

5   police officer.  In other words, you must not believe

6   or disbelieve a police officer just because he or she

7   is a police officer.  You must listen to a police

8   officer or detective's testimony just like you would

9   listen to any other witness and you should evaluate a

10  police officer or detective's testimony for

11  truthfulness and accuracy in the same way you would

12  evaluate the testimony of any other witness.

13          Is there anybody here seated, going to go by

14  the first row, anybody here who cannot follow those

15  instructions, basic principles of law that apply in any

16  criminal case?  Anybody here first row?  By show of

17  hands, anybody in the second row who couldn't follow

18  those basic principles of law?

19          As I indicated to you, your -- should you be

20  selected as a juror in this case, you, along with your

21  fellow jurors, must come to a unanimous verdict if you

22  can do so; guilty or not guilty.  In the first row, is

23  there anybody here, for religious reasons, who would

24  not be able to do that?  Anybody in the second row?

25  Okay.  At this point, what I'm going to do, I'm going

1       to ask you some questions individually again.  I want

2       to emphasize not here to embarrass or make anybody feel

3       they have revealed certain personal information.  If

4       there's anything about any of the questions I ask or

5       any of the questions that the attorneys ask you feel

6       you would want to discuss at the bench here privately

7       out of earshot, if you will, of the rest of the

8       prospective jurors and the rest of the court, by all

9       means, please indicate so and we'll be more than

10      willing to accommodate you.  Going to ask you questions

11      in the manner in which were you selected.

12              Ms. Apgar?

13              PROSPECTIVE JUROR:  Hi.

14              THE COURT:  Could you tell me the

15      neighborhood?  Nobody has to give exact street address,

16      the neighborhood which you live.

17              PROSPECTIVE JUROR:  A town name you want?

18              THE COURT:  Yes.

19              PROSPECTIVE JUROR:  Plainedge.

20              THE COURT:  And whether you're married or in

21      a committed relationship.

22              PROSPECTIVE JUROR:  Married.

23              THE COURT:  Is your spouse working?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  What kind of work does he do?

1          PROSPECTIVE JUROR:  He's a computer

2     programmer.

3          THE COURT:  Children, if any?

4          PROSPECTIVE JUROR:  Yes, two boys.

5          THE COURT:  Approximate ages?

6          PROSPECTIVE JUROR:  20.

7          THE COURT:  All right.  Either one of them

8     working at this time?

9          PROSPECTIVE JUROR:  Both students.

10          THE COURT:  You, yourself, currently working?

11          PROSPECTIVE JUROR:  Part-time teacher aid.

12          THE COURT:  Okay.  Thank you.

13          PROSPECTIVE JUROR:  Should I say?  Student in

14     law school.

15          THE COURT:  Fine.  You can tell us about

16     that.  That doesn't exclude you.

17          PROSPECTIVE JUROR:  Oh.

18          THE COURT:  Good.  Mr. Gobin, town which you

19     live?

20          PROSPECTIVE JUROR:  West Hempstead.

21          THE COURT:  Married or committed

22     relationship?

23          PROSPECTIVE JUROR:  Married, one daughter.

24          THE COURT:  And what kind of work are you

25     currently doing?

1          PROSPECTIVE JUROR:  Work in the airline

2     industry.

3          THE COURT:  Can you tell us what capacity?

4          PROSPECTIVE JUROR:  Supervisor of JFK for

5     Korean Airlines.

6          THE COURT:  All right.  Mr. Yefrem, am I

7     pronouncing that correctly?  Town which you live in?

8          PROSPECTIVE JUROR:  Cedarhurst.

9          THE COURT:  Married or committed

10    relationship?

11         PROSPECTIVE JUROR:  Married.

12         THE COURT:  Children?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Type of work that you do?

15         PROSPECTIVE JUROR:  Restaurant owner.

16         THE COURT:  Okay.  Is your spouse currently

17         PROSPECTIVE JUROR:  She runs the restaurant.

18         THE COURT:  She runs the restaurant.  Okay.

19    All right.  Mr. Miller, good afternoon.

20         PROSPECTIVE JUROR:  Oceanside, married, two

21    children.

22         THE COURT:  Approximate ages?

23         PROSPECTIVE JUROR:  Late twenties, early

24    thirties.

25         THE COURT:  And you're currently working?

1          PROSPECTIVE JUROR:  Retired, part-time.

2          THE COURT:  When you were working I guess

3   full-time, what was your occupation?

4          PROSPECTIVE JUROR:  GED, math educator.

5          THE COURT:  At a local school?

6          PROSPECTIVE JUROR:  In the City.

7          THE COURT:  City.  Okay.  Your spouse

8   currently working?

9          PROSPECTIVE JUROR:  Part-time.

10          THE COURT:  What type of work does she do?

11          PROSPECTIVE JUROR:  College adjunct.

12          THE COURT:  And Mr. Honan is it?

13          PROSPECTIVE JUROR:  Honan, yes.

14          THE COURT:  Town in which you live?

15          PROSPECTIVE JUROR:  Long Beach.

16          THE COURT:  Married or committed

17   relationship?

18          PROSPECTIVE JUROR:  44 years married.

19          THE COURT:  Okay.  Children?

20          PROSPECTIVE JUROR:  Two sons.

21          THE COURT:  I assume --

22          PROSPECTIVE JUROR:  They're married.

23          THE COURT:  The work that they do?

24          PROSPECTIVE JUROR:  One is an electrician,

25   the other works with the blind.

1          THE COURT:  Are you, yourself, still working?

2          PROSPECTIVE JUROR:  Not this year.

3          THE COURT:  Not this year.  Okay.

4          PROSPECTIVE JUROR:  I retired and I consult,

5     but --

6          THE COURT:  What type of work did you do when

7     working?

8          PROSPECTIVE JUROR:  Banking.

9          THE COURT:  Banking.  Okay.  Thank you.

10    Ms. Werkmeister?

11         PROSPECTIVE JUROR:  Baldwin Harbor.

12         THE COURT:  Married or committed

13    relationship?

14         PROSPECTIVE JUROR:  Committed relationship.

15         THE COURT:  Children, if any?

16         PROSPECTIVE JUROR:  I have one daughter.

17         THE COURT:  Approximately how old is she?

18         PROSPECTIVE JUROR:  16.

19         THE COURT:  Type of work, if any, you're

20    doing now?

21         PROSPECTIVE JUROR:  I'm unemployed right now.

22         THE COURT:  Ms. Ramos, good afternoon.  Town

23    which you live?

24         PROSPECTIVE JUROR:  Valley Stream.

25         THE COURT:  Married or committed

1    relationship?

2          PROSPECTIVE JUROR:  Committed relationship.

3          THE COURT:  Children?

4          PROSPECTIVE JUROR:  Yes, three.

5          THE COURT:  Their approximate ages?

6          PROSPECTIVE JUROR:  10, 11, 16.

7          THE COURT:  Are you currently working?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  What type of work?

10          PROSPECTIVE JUROR:  Data coordinator,

11    computers.

12          THE COURT:  Going to the second row,

13    Ms. Jacobson, town?

14          PROSPECTIVE JUROR:  Valley Stream.

15          THE COURT:  Married?

16          PROSPECTIVE JUROR:  Widowed.

17          THE COURT:  Children?

18          PROSPECTIVE JUROR:  I have three sons.

19          THE COURT:  Their work, if any?

20          PROSPECTIVE JUROR:  They're plumbers.  One's

21    a commercial artist.

22          THE COURT:  Are you currently working?

23          PROSPECTIVE JUROR:  I'm retired now, but I

24    was working in an insurance company.

25          THE COURT:  Thank you.  Mr. Smith, town you

1          live?

2                    PROSPECTIVE JUROR:  Valley Stream.

3                    THE COURT:  Married, committed relationship?

4                    PROSPECTIVE JUROR:  Married, sir.

5                    THE COURT:  Children?

6                    PROSPECTIVE JUROR:  Two.

7                    THE COURT:  Approximately how old?

8                    PROSPECTIVE JUROR:  23 and 14.

9                    THE COURT:  Okay, twenty-three-year old

10     working?

11                   PROSPECTIVE JUROR:  She goes to school.

12                   THE COURT:  Going to school, okay, and the

13     work that you do, if any, at this time?

14                   PROSPECTIVE JUROR:  Math teacher.

15                   THE COURT:  New York City Board of Education?

16                   PROSPECTIVE JUROR:  Yes.

17                   THE COURT:  He said in the City.  Mr. Baxter,

18     town?

19                   PROSPECTIVE JUROR:  Long Beach.

20                   THE COURT:  Long Beach?

21                   PROSPECTIVE JUROR:  Yes.

22                   THE COURT:  Married or committed

23     relationship?

24                   PROSPECTIVE JUROR:  Married.

25                   THE COURT:  Children, if any?

```
 1            PROSPECTIVE JUROR:  We have six between us,
 2   ten grandchildren.
 3            THE COURT:  Okay, the six children are all
 4   adults, I assume?
 5            PROSPECTIVE JUROR:  Yes.
 6            THE COURT:  Tell us nature of their work.
 7            PROSPECTIVE JUROR:  One's in Wall Street,
 8   rest of them are housewives, mainly.
 9            THE COURT:  Are you yourself currently
10   working or retired?
11            PROSPECTIVE JUROR:  Retired.
12            THE COURT:  Nature of your work?
13            PROSPECTIVE JUROR:  Banking.
14            THE COURT:  Banking.  Okay.  Mr. Rovere?
15            PROSPECTIVE JUROR:  Yes.
16            THE COURT:  Town?
17            PROSPECTIVE JUROR:  Rockville Centre.
18            THE COURT:  Married or committed
19   relationship?
20            PROSPECTIVE JUROR:  Married, two children.
21            THE COURT:  Ages?
22            PROSPECTIVE JUROR:  18 and 15.
23            THE COURT:  Okay, and your occupation?
24            PROSPECTIVE JUROR:  I'm an accountant.
25            THE COURT:  Mr. Lebright?
```

Voir Dire - Court                                      248

```
 1                 PROSPECTIVE JUROR:  Yeah.

 2            THE COURT:  Town in which you live?

 3                 PROSPECTIVE JUROR:  Levittown.

 4            THE COURT:  Married or committed

 5      relationship?

 6                 PROSPECTIVE JUROR:  Married.

 7            THE COURT:  Children?

 8                 PROSPECTIVE JUROR:  Three; 13 twins and 8

 9      year old.

10            THE COURT:  Again, your work?

11                 PROSPECTIVE JUROR:  I work for Con Edison and

12      my wife is a defense attorney in Queens.

13            THE COURT:  Criminal defense?

14                 PROSPECTIVE JUROR:  Yes.

15            THE COURT:  For how long has she been?

16                 PROSPECTIVE JUROR:  16, years 15 years.

17            THE COURT:  Does she use her maiden name or

18      your name?

19                 PROSPECTIVE JUROR:  My name.

20            THE COURT:  Your name is Lebright?

21                 PROSPECTIVE JUROR:  Yes.

22            THE COURT:  All right.  Is it Liesveld?

23                 PROSPECTIVE JUROR:  Liesveld.

24            THE COURT:  Town which you live?

25                 PROSPECTIVE JUROR:  Freeport.  I'm married
```

1       for 33 years.  I have a daughter 28 years old that's

2       married to a JAG officer in the army.

3                  THE COURT:  Okay.

4                  PROSPECTIVE JUROR:  And I am director of

5       security and risk management in the hospitality

6       industry.

7                  THE COURT:  Very good.  Finally, Mr. Marrus?

8                  PROSPECTIVE JUROR:  Plainview, married, one

9       daughter 20 years old who's a student and my occupation

10      is a compliance officer and quality assurance.

11                 THE COURT:  Okay.  All right.  All right.

12      I'm going to go kind of go first row and move into the

13      second row.

14                 Anyone in the first row ever sat -- prior to

15      today, ever sat in a criminal or civil trial, either

16      state or federal?  Any prior jury -- basically any

17      prior jury service or any prior grand jury service.

18                 Mr. Honan?

19                 PROSPECTIVE JUROR:  Yes.

20                 THE COURT:  What kind of case and where?

21                 PROSPECTIVE JUROR:  A number of years ago, a

22      DWI over in Hempstead.

23                 THE COURT:  District Court?

24                 PROSPECTIVE JUROR:  Yes.

25                 THE COURT:  Jury went to verdict in the case?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Anybody else first row,

3     Mr. Miller?

4          PROSPECTIVE JUROR:  Yes, it was in Mineola,

5     and it was I think it was auto theft.

6          THE COURT:  How many years ago, if you know?

7          PROSPECTIVE JUROR:  I would guess about six

8     years ago.

9          THE COURT:  Okay, jury reached a verdict.

10         PROSPECTIVE JUROR:  Yes, it did.

11         THE COURT:  Okay.  All right.  Anybody else

12    in the first row prior criminal or civil jury service

13    either in the state system or federal system or grand

14    jury?  Okay.  In the second row, anybody?

15         Mr. Rovere?

16         PROSPECTIVE JUROR:  Yes, embezzlement case

17    here in Mineola.

18         THE COURT:  How many years ago?

19         PROSPECTIVE JUROR:  Boy, at least 15.

20         THE COURT:  Again, jury reach a verdict?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Okay.  Mr. Liesveld?

23         PROSPECTIVE JUROR:  Yes.  Been to lots of

24    trials, but never as a juror.

25         THE COURT:  You said you've been to lots of

```
 1    trials.  You mean called?

 2                PROSPECTIVE JUROR:  As a witness.  I've made

 3    arrests.

 4                THE COURT:  So you testify in your work

 5    capacity?

 6                PROSPECTIVE JUROR:  Yes, yes.

 7                THE COURT:  All right.  We're going to get to

 8    that in a minute.  Anybody else in terms of prior jury

 9    service, Mr. Baxter?

10                PROSPECTIVE JUROR:  I sat in one civil case,

11    but they threw it out once we sat down, almost lasted

12    about two days.

13                THE COURT:  Okay.  Often happens in the civil

14    arena.  Mr. Marrus, you're shaking your head.  Same

15    experience?

16                PROSPECTIVE JUROR:  Federal case, drugs in

17    Brooklyn about 15 years ago.  We sat and we were

18    excused.

19                THE COURT:  Before you went to verdict?

20    Okay.  Anybody else in that second row who's had any

21    kind of prior jury service?

22                PROSPECTIVE JUROR:  Okay.  All right.  Going

23    back to the first row, this question deals with any of

24    you who have loved ones, close family members, close

25    personal friends who are in law enforcement.  By law
```

1    enforcement, I mean police, detectives, Corrections,

2    District Attorney's Office.  Doesn't necessarily have

3    to be in this County or court system in general.

4              First row, Ms. Apgar?

5              PROSPECTIVE JUROR:  I don't know how close

6    you mean.

7              THE COURT:  Husband, cousin, you know, close

8    to the extent that you would have, you know, somewhat

9    regular contact with them and discuss perhaps what they

10   do.

11             PROSPECTIVE JUROR:  Yeah, not in detail.

12             THE COURT:  Anybody else first row,

13   Mr. Miller?

14             PROSPECTIVE JUROR:  Nephew's a federal

15   prosecutor.

16             THE COURT:  Okay.  Which jurisdiction, if you

17   know?

18             PROSPECTIVE JUROR:  I think the Eastern

19   District.

20             THE COURT:  Okay.  Anything about his job you

21   feel would influence your ability to serve?

22             PROSPECTIVE JUROR:  Only that we've discussed

23   cases and how, you know, evidence is compiled, that

24   kind of stuff.

25             THE COURT:  If I told you what I tell every

1    jury and you probably heard that when you sat in that

2    last trial you said you sat on a number of years ago, I

3    tell all my jurors everyday, close of the day not to

4    form any opinions, not to talk among themselves or

5    anyone else about the case.  Can you give me your

6    assurance you're not going to talk to the federal

7    prosecutor about this case if you're selected?  You can

8    at end of the case, just not while sitting as a juror.

9    Any problem with that?

10             PROSPECTIVE JUROR:  No, only that we have

11   discussed cases in the past.

12             THE COURT:  That's fine.  That's fine.  Okay.

13   Anybody else law enforcement, close friends, family,

14   personally?  Ms. Ramos?

15             PROSPECTIVE JUROR:  My brother's a parole

16   officer or probation officer, one of those, in

17   Columbia, Maryland.

18             THE COURT:  Would that affect you as a juror

19   in this case in terms of ability to be fair and

20   impartial?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  Anybody else first row who I

23   haven't spoken to?  How about second row?

24   Mr. Liesveld?

25             PROSPECTIVE JUROR:  Yeah, I was a police

 1      officer for a couple of years in the 70s late, 70s.

 2                  THE COURT:  Where?

 3                  PROSPECTIVE JUROR:  Warren County, Lake

 4      George, New York.

 5                  THE COURT:  Okay.  Again, you indicated a few

 6      moments ago you made an arrest also.  I take it your

 7      current occupation you've testified?

 8                  PROSPECTIVE JUROR:  Right.

 9                  THE COURT:  You heard me a few moments ago

10      talk about the fact that a police officer and

11      detectives are going to be testifying in this case, and

12      the same instruction I would give to you now, I would

13      give to every jury in any criminal case; that is that a

14      police detective must be treated no different or any

15      less or any more than anybody else.

16                  Is there any reason why you would not be able

17      to follow that because of your occupation?

18                  PROSPECTIVE JUROR:  No.

19                  THE COURT:  Okay.  You have no problem in

20      evaluating a police officer?

21                  PROSPECTIVE JUROR:  No.

22                  THE COURT:  You can accept a proposition that

23      a police officer could be telling the truth, can be

24      mistaken and on occasion can possibly lie?

25                  PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Anybody else that has close

2    personal friends in law enforcement?

3          Mr. Lebright?

4          PROSPECTIVE JUROR:  Beside my wife, most of

5    my friends are police officers between the City and

6    Nassau County and lots of my neighbors.

7          THE COURT:  Again, at the same time, can we

8    have -- I asked Mr. Liesveld, would you be able to sit

9    here, evaluate the officers you may hear in this case

10   and the detectives as you would any other civilian

11   person that would come in here?

12         PROSPECTIVE JUROR:  Yeah, probably.

13         THE COURT:  Not give them any greater or

14   lesser weight because of their particular position?

15         PROSPECTIVE JUROR:  Yeah, probably.

16         THE COURT:  Anybody else second row?

17   Mr. Rovere?

18         PROSPECTIVE JUROR:  Yes, three neighbors who

19   are; two in the City correction system, one who works

20   here in Mineola in the court system.

21         THE COURT:  Neighbors you say in the City

22   correction system.  Are they working in Riker's Island?

23         PROSPECTIVE JUROR:  One works Riker's, other

24   one I believe works in Brooklyn.

25         THE COURT:  Okay.  Again, the question I

1    asked I believe Mr. Miller for his assurance about a

2    few moments ago, I would ask you, if you get selected

3    as a juror in this case, I'm going to ask you not to

4    speak to anybody, particularly including the neighbors

5    or neighbor that may be affiliated with the New York

6    City Department of Corrections.

7              Can you give me your assurance you'll do that

8    for me?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Anybody else second row?

11   Mr. Baxter?

12             PROSPECTIVE JUROR:  Brother-in-law who's a

13   retired New York Police Department worker.  I spent a

14   lot of time with him, and a good friend of mine was a

15   retired detective in Long Beach.  His son is now a

16   corrections officer.

17             THE COURT:  Okay.

18             PROSPECTIVE JUROR:  But I don't see them that

19   often.

20             THE COURT:  And your relationships in the

21   past wouldn't affect you in this case?

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  Anybody else in that second row?

24   All right.  Moving on to what I call the crime victims

25   question, going back first row, anybody here who either

1    themselves or a family member that's been a victim of a

2    crime?

3              Mr. Miller?

4              PROSPECTIVE JUROR:  Contractor who defaulted

5    on and took the money and left.

6              THE COURT:  Okay.  That's in your personal

7    circumstance?  Is that something recently?

8              PROSPECTIVE JUROR:  Took place I'd say

9    between four and five years ago.

10             THE COURT:  All right.  Did it happen in

11   Nassau County?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Was there any contact on your

14   part with either the police department or the DA's

15   Office?

16             PROSPECTIVE JUROR:  Yes, actually money was

17   obtained through the Sheriff's Department.

18             THE COURT:  Okay.  In other words, money was

19   collected and then given to you as a result?

20             PROSPECTIVE JUROR:  Correct.

21             THE COURT:  Okay.  Any other experience with

22   crime victims?

23             I see you, Mr. Honan, Mr. Miller, anything

24   else?  Only thing?

25             PROSPECTIVE JUROR:  Criminal involvement,

1    yes.

2              THE COURT:  Mr. Honan, I'm sorry?

3              PROSPECTIVE JUROR:  I had a cousin who was

4    shot dead in the commission of a robbery.

5              THE COURT:  How long ago was that?

6              PROSPECTIVE JUROR:  About 15 years ago.

7              THE COURT:  All right.

8              PROSPECTIVE JUROR:  Driving a cab, and the

9    perpetrator blew his brains out.

10             THE COURT:  Okay.  And did that happen in

11   Nassau County?

12             PROSPECTIVE JUROR:  No, it happened in the

13   Bronx, actually, Manhattan.

14             THE COURT:  Okay.  Was that someone that was

15   close to you?

16             PROSPECTIVE JUROR:  Him first cousin.

17             THE COURT:  First cousin.  Okay.  Would that

18   in, and of itself, make you unable to serve as a juror

19   in this case?

20             PROSPECTIVE JUROR:  Yeah, I also had a

21   brother who was shot too.

22             THE COURT:  So you feel because of those

23   experiences, you wouldn't be able to?

24             PROSPECTIVE JUROR:  Yeah, probably.  I mean

25   I've also -- which I don't want to discuss in open

```
 1              court --
 2                      THE COURT:  Okay.  All right.  We'll get back
 3      to you with that in a second.  Anybody else first row?
 4      Miss Apgar, crime victim question?
 5                      PROSPECTIVE JUROR:  House was robbed.
 6                      THE COURT:  That qualifies.  How long ago?
 7                      PROSPECTIVE JUROR:  Twenty years ago.
 8                      THE COURT:  Okay.  Would that experience, as
 9      I was asking Mr. Honan, would that affect your ability
10      to serve as a juror in this case?
11                      PROSPECTIVE JUROR:  No.
12                      THE COURT:  Anything else in that first row?
13      Going to the second row, crime victim, you, your
14      family, close personal friend?
15                      Mr. Lebright?
16                      PROSPECTIVE JUROR:  My uncle was murdered.
17      He was a token booth clerk murdered for the change when
18      he was cleaning out the tolls.
19                      THE COURT:  How long ago was that?
20                      PROSPECTIVE JUROR:  About ten years ago.
21                      THE COURT:  I would assume that happened
22      somewhere in New York City?
23                      PROSPECTIVE JUROR:  In Queens.
24                      THE COURT:  In Queens.  All right.  Same
25      question I asked of your fellow prospective jurors in
```

1    the front.  Would that experience affect your ability

2    to serve as a juror in this case?

3                PROSPECTIVE JUROR:  I don't really know if

4    what this case is really about, so I don't know.

5                THE COURT:  You heard me earlier say, if

6    selected as a juror in this, case you have to put

7    aside?

8                PROSPECTIVE JUROR:  I'm just trying to be

9    honest.

10               THE COURT:  Right, right.  I'll let the

11   attorneys kind of follow up on that.

12               Anybody else in that second row?

13   Mr. Liesveld, beg your pardon?

14               PROSPECTIVE JUROR:  Cousin who was assaulted

15   and robbed in Queens.

16               THE COURT:  Okay.  And again, you know the

17   question I'm going to ask.  Do you feel because of that

18   that, that's going to affect your ability -- I'm sorry?

19               PROSPECTIVE JUROR:  Not sure.  I would try.

20               THE COURT:  Okay.  Can you give me your

21   assurance that, you know, this is this case, and that's

22   that case?

23               PROSPECTIVE JUROR:  Yeah.

24               THE COURT:  And that obviously doesn't have

25   anything to do with --

1      PROSPECTIVE JUROR:  Yes.

2           THE COURT:   -- anybody's guilt or lack of

3      guilt in this case?

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  Okay.  Anybody else in that

6      second row crime victim question?  And anybody who's

7      close to you and either been accused or convicted of a

8      crime?  First row, anybody?  Okay.  Second row anybody

9      close accused or convicted of a crime?  All right.

10          Mr. Honan, I know you wanted to say something

11     in private.  Why don't you step up at this point?

12          (Whereupon, the following took place at the

13     bench:)

14          PROSPECTIVE JUROR:  Yes, also my father was

15     murdered in Manhattan a number of years ago, so, and my

16     neighbor is a supervising DEA officer across the

17     street, FBI.  A lot of my friends are cops retired and

18     stuff.

19          THE COURT:  And it sounds to me like --

20          PROSPECTIVE JUROR:  Get through all the

21     stuff, you know, DWI I can sit on.  I don't know about

22     this.

23          THE COURT:  You don't know about the nature

24     of the case?  Feel like you'd have some difficulty

25     sitting?

cp

1          PROSPECTIVE JUROR:  I also have friends in

2     Corrections up here, Club Med and stuff.

3          THE COURT:  What did you call it?  Club Med?

4          PROSPECTIVE JUROR:  Club Med, and my

5     father-in law was a federal prosecutor, ADA in

6     Brooklyn.  We would never discuss cases, by the way.

7          THE COURT:  Good.  Any questions, Mr. Lemke,

8     of Mr. Honan?

9          MR. LEMKE:  No.

10          PROSPECTIVE JUROR:  It wouldn't be fair if I

11     sat.

12          THE COURT:  Okay.  Any objection to excusing

13     him?

14          MS. SINGAS:  No.

15          MR. LEMKE:  No objection, no.

16          THE COURT:  All right.  Mr. Honan, excuse you

17     for cause, just going to go back to central jury.  Give

18     your name to my clerk.

19          Let me -- everybody, is there anybody,

20     obviously given the time, I'm going to break to

21     tomorrow morning.  Is there anybody, either of you at

22     this point you can agree on for cause so we don't bring

23     them back here up necessarily?

24          MS. SINGAS:  Nothing struck me.

25          MR. LEMKE:  Nothing struck me.

1          MS. SINGAS:  And I was listening, so --

2          THE COURT:  All right.  Very good.

3          MS. SINGAS:  Let these other ones go.

4          THE COURT:  I'm going to let them go for

5     good.

6          MR. LEMKE:  Want to fill the one seat, use

7     the one, maybe?

8          THE COURT:  We'll do that, yes.  Not going to

9     start questioning anymore.  Somebody just remind me

10    whoever we put in for seat number 5, I've got to --

11         MS. SINGAS:  Yes.

12         (Whereupon, the following took place in open

13    court:)

14         THE CLERK:  Seats 5, Ralph Hurfadtado,

15    H-U-R-F-A-D-T-A-D-O.

16         THE COURT:  Step forward, Mr. Hurfadtado,

17    join us.  All right.  Mr. Hurfadtado, I'm going to

18    speak to you with the remainder of the 13 jurors

19    tomorrow morning.  At this hour, ladies and gentlemen,

20    it's not wise for me -- we're at the point now

21    generally turn it over to both prosecution and defense

22    attorney.  I a lot them basically around twenty minutes

23    I'm not going to to want to interrupt, or for that

24    matter, don't want to begin.  We'll break until

25    tomorrow, so what I'm going to do is I'm going to

1    excuse you for now, direct you to be back here tomorrow

2    morning.  We will not be in this courtroom tomorrow,

3    going to be in the big building directly -- you're

4    looking at right now on the first floor.  We're going

5    to be in Judge Calabrese's courtroom.

6              What I'm going to do is ask you to come here

7    tomorrow.  If you could come here 10 o'clock, hopefully

8    parking on Fridays is usually a little bit lighter than

9    it is during the week Monday through Thursday.  We're

10   going to pick it up tomorrow morning with the attorneys

11   questioning you, then selections, if you will, so if

12   you would follow the instructions my sergeant gives,

13   I'll excuse you for now.  Again, tomorrow morning 10

14   o'clock.  That's 262 Old Country Road.  It's the Nassau

15   County big courthouse, as I call it, the big courthouse

16   building.  James, my sergeant will tell you where to go

17   when you come here 10 o'clock, not going to be coming,

18   I don't believe, to this building.  If I'm mistaken,

19   James will tell you otherwise, so if you would watch

20   your step as you step out.

21             (Whereupon, the jury panel left the

22   courtroom.)

23             (Whereupon, a discussion took place, off the

24   record, at the bench, among the Court, defense counsel,

25   the assistant district attorney and a prospective

265

```
1          juror.)

2                    THE COURT:  On the record, Mr. Yefrem,

3     prospective juror, is being excused with the consent of

4     both sides.  Good luck.

5                    (Whereupon, the prospective juror left the

6     courtroom.)

7                    (Whereupon, the trial was adjourned to

8     October 31, 2008.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Voir Dire - Court                                266

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NASSAU:  PART 49
 2    ----------------------------------------X
      THE PEOPLE OF THE STATE OF NEW YORK,
 3                                  Ind. No.
                                    436N/08
 4            -against-
                                    Jury Trial
 5    RICARDO WALTERS,

 6                     Defendant.
      ----------------------------------------X
 7

 8                          October 31, 2008

 9                          Nassau County Court
                            262 Old Country Road
10                          Mineola, NY 11501

11    B E F O R E :

12            THE HONORABLE JAMES P. MC CORMACK,
                           Acting Supreme Court Justice
13            (and a jury of twelve plus two alternates.)

14    A P P E A R A N C E S :
      For the People:
15        THE HONORABLE KATHLEEN M. RICE,
          District Attorney, Nassau County,
16        By:  MADELINE SINGAS, ESQ.,
               THERESA TEBBETT, ESQ.
17        Assistant District Attorneys

18    For the Defendant:
          DENNIS LEMKE, ESQ.
19
                              CATHERINE R. PARKER,
20                            Official Court Reporter

21

22

23

24

25
```

1

2

3

4

5

6                    (Whereupon, the jury panel entered the

7          courtroom.)

8                    THE CLERK:  Case on trial, People of the

9          State of New York against Ricardo Walters, indictment

10         4336N of 2008.

11                   Are the People ready?

12                   MS. SINGAS:  Yes, People are ready.

13                   THE CLERK:  Defendant ready?

14                   MR. LEMKE:  Defendant ready, your Honor.

15                   THE COURT:  Good morning, prospective members

16         of the jury.  At this time, we're going to continue

17         with our jury selection.  What I would like to do,

18         however, is fill seat number 3, and our remaining

19         prospective juror, I'm going to also ask you to step up

20         when your name, whoever of the two of you is called,

21         and join us here and we're going to use everybody and

22         we'll have fifteen prospective jurors.

23                   MS. SINGAS:  Judge, this is seat 3, so I

24         think Mr. Hurfadtado is in 5.

25                   MR. LEMKE:  Mr. Hurfadtado should move down

```
 1    two seats.

 2              THE COURT:  I'm sorry, Mr. Hurfadtado, one

 3    more time.  All right.

 4              THE CLERK:  Seat 3, Leonard Mancuso,

 5    M-A-N-C-U-S-O, seat 15, Delsalina Sepulveda,

 6    S-E-P-U-L-V-E-D-A.

 7              THE COURT:  Come up, Ms. Sepulveda, we have a

 8    seat for you.  You just can't see it.  There it is.

 9              All right.  All right.  Let me, before I let

10    the attorneys begin their questioning, I just want to

11    cover the two -- actually three new members to the

12    prospective panel.  Mr. Hurfadtado and Mr. Mancuso and

13    finally, Ms. Sepulveda, everybody heard yesterday my

14    preliminary instructions.  Mr. Mancuso, Mr. Hurfadtado

15    and Ms. Sepulveda, with regard to the different

16    principles of law that apply in a criminal case; burden

17    of proof, presumption of innocence, proof beyond a

18    reasonable doubt.  Everybody understand what I said

19    yesterday?  Anybody -- would anybody have any problem

20    in following that?  Anybody?  The three of you?  Okay.

21    I also -- Mr. Hurfadtado?

22              PROSPECTIVE JUROR:  Well, I have to say, your

23    Honor, I feel predisposed towards a guilty verdict.

24              THE COURT:  Okay.  Without hearing any

25    evidence?
```

1           PROSPECTIVE JUROR:  Yes.

2           THE COURT:  Okay.  Just on the basis of what

3      you've heard and seen so far?

4           PROSPECTIVE JUROR:  Well, on the basis of the

5      fact that he was arrested and that he's being tried by

6      the District Attorney's Office.

7           THE COURT:  Okay.  All right.  Mr. Mancuso,

8      do you feel that way at all?

9           PROSPECTIVE JUROR:  No.

10          THE COURT:  Ms. Sepulveda, do you have any

11     problem with following my instructions about

12     presumption of innocence, proof beyond a reasonable

13     doubt?

14          PROSPECTIVE JUROR:  No problem.

15          THE COURT:  Either Mr. Mancuso or

16     Ms. Sepulveda, is there any either personal or

17     religious reasons that you could not vote either guilty

18     or not guilty?

19          Mr. Mancuso?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Ms. Sepulveda?

22          PROSPECTIVE JUROR:  No.  I was mugged long

23     time ago.

24          THE COURT:  We're going to get to that in a

25     second.

```
 1              PROSPECTIVE JUROR:  Right now, no, no

 2    religious.

 3              THE COURT:  All right.  Mr. Mancuso, let me

 4    just ask you, sir, tell us the neighborhood in which

 5    you live.

 6              PROSPECTIVE JUROR:  Franklin Square.

 7              THE COURT:  Married or committed

 8    relationship?

 9              PROSPECTIVE JUROR:  Married.

10              THE COURT:  Children?

11              PROSPECTIVE JUROR:  Two children.

12              THE COURT:  Their respective ages?

13              PROSPECTIVE JUROR:  My son, 5, autistic, and

14    I have a two-year-old daughter.

15              THE COURT:  And your spouse, her employment?

16              PROSPECTIVE JUROR:  She's a housewife.

17              THE COURT:  Okay, and you yourself currently

18    working?

19              PROSPECTIVE JUROR:  Yes.

20              THE COURT:  Okay.  And Ms. Sepulveda, could

21    you tell us the neighborhood in which you live?

22              PROSPECTIVE JUROR:  Levittown.

23              THE COURT:  Okay, and whether or not you're

24    married or committed relationship?

25              PROSPECTIVE JUROR:  Yes, I am married.
```

Proceedings                                                271

1              THE COURT:  Children?

2              PROSPECTIVE JUROR:  Four children in their

3      forties.

4              THE COURT:  Okay, Mr. Lemke.  Can you hear

5      Ms. Sepulveda?

6              MR. LEMKE:  I can, yes.  Thank you.

7              THE COURT:  I'm just going to ask you to keep

8      your voice up a little bit because I know you're

9      sitting down there.

10             Are you currently working?

11             PROSPECTIVE JUROR:  No, I am retired.

12             THE COURT:  What kind of work did you do?

13             PROSPECTIVE JUROR:  New York City teacher.

14             THE COURT:  Okay.  In Queens?

15             PROSPECTIVE JUROR:  In Queens.

16             THE COURT:  And, Mr. Mancuso, did I ask you

17     what kind of work you did?  Okay.

18             Ms. Sepulveda, your children, what type of

19     work?  If they're working, what type of work?

20             PROSPECTIVE JUROR:  Uhm, my oldest one works

21     for a computer associate, and the second one is a truck

22     driver.  The other one is a police officer in Queens,

23     and the other one is a housewife.

24             THE COURT:  Okay.  The questions that I asked

25     of everybody yesterday, Mr. Mancuso, I'll start with

1    you.  Any prior jury service, criminal, civil, state,

2    federal, grand jury?

3                PROSPECTIVE JUROR:  22 years ago in Staten

4    Island.

5                THE COURT:  Okay.  What kind of case was it?

6                PROSPECTIVE JUROR:  It was a car accident

7    case.

8                THE COURT:  Civil case?

9                PROSPECTIVE JUROR:  Yes.

10               THE COURT:  How about you, Ms. Sepulveda, any

11   prior jury service at all?

12               PROSPECTIVE JUROR:  No, no.

13               THE COURT:  Mr. Mancuso, anybody close to

14   you, family member, friend, close associate that's

15   involved in law enforcement whether it's the police

16   department, DA's office, corrections department, court

17   system?

18               PROSPECTIVE JUROR:  No family, just a

19   neighbor.

20               THE COURT:  Just a neighbor?  Okay.  Is that

21   someone that you speak to regularly?

22               PROSPECTIVE JUROR:  Yeah, next-door neighbor.

23               THE COURT:  What type of law enforcement is

24   he in?

25               PROSPECTIVE JUROR:  He's a court officer in

```
 1    Hempstead.

 2             THE COURT:  How about you, Ms. Sepulveda?

 3    You said your son --

 4             PROSPECTIVE JUROR:  My son.  My son is a

 5    police officer in Queens and a nephew is a police

 6    officer in Manhattan.

 7             THE COURT:  Okay.  You heard me yesterday

 8    talk about that police officers are to be evaluated as

 9    witnesses in the trial just like anybody else.  They're

10    given no lesser or no more weight or credibility, if

11    you will, just by virtue of their position.  Would you

12    have any problem in following that?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  No?  How about you, Mr. Mancuso?

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  Even though you indicated there's

17    nobody that close to you?  No problem?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  You, Mr. Mancuso, anybody close

20    to you or yourself been the victim of a crime?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  How about you, Ms. Sepulveda?

23    Anybody close to you or yourself who's been a victim of

24    a crime?

25             PROSPECTIVE JUROR:  Well, I was.  I was
```

cp

1          mugged a couple of years ago.

2                    THE COURT:  Where did that happen?

3                    PROSPECTIVE JUROR:  That happened in Queens

4          by the school and I was robbed in my house about ten

5          years ago right here in Levittown.

6                    THE COURT:  The incident with the -- you said

7          you were mugged in Queens?

8                    PROSPECTIVE JUROR:  Yes.

9                    THE COURT:  Was there an arrest made?  Was

10         anybody arrested in that incident?

11                   PROSPECTIVE JUROR:  No one was arrested

12         because I was not able to identify, and there was no

13         witness because it was nighttime coming out from

14         college.

15                   THE COURT:  I assume you had contact with the

16         police?

17                   PROSPECTIVE JUROR:  Yes, I did.  Yes, I did,

18         and they hit me and I have a scar on my right eye since

19         from that, but, yes, it was reported.  It was reported

20         to the police.

21                   THE COURT:  Okay.  But no one was arrested?

22         No one was arrested?

23                   PROSPECTIVE JUROR:  No, no one.

24                   THE COURT:  All right.  You heard -- you've

25         heard me indicate that some of the charges in this case

1    are robbery, among others, and they're allegations at

2    this point.  There's been no evidence put forward.

3    They're allegations.  This is why we're having a trial,

4    but I want to ask you as you sit here now, in light of

5    that that one experience or both of experiences, do you

6    feel that you can sit as a juror in this case and be

7    fair to both sides?

8                 PROSPECTIVE JUROR:  I think I will be fair.

9                 THE COURT:  If I tell you that you have to

10   decide this case without fear, favor, bias, prejudice

11   based upon calmly looking at the evidence, the

12   testimony and the law as I give it to you, you'll be

13   able to do that?

14                PROSPECTIVE JUROR:  I will try.

15                THE COURT:  Okay.  And that should those

16   feelings or memories about what happened to you in the

17   past, obviously, it's obviously two separate incidents,

18   you'll be able to put that aside, say, I'm going to

19   decide this case based upon what I hear in this

20   courtroom?

21                PROSPECTIVE JUROR:  Yes, I will be able to

22   separate them from what happened to me.

23                THE COURT:  Let me ask you this.  The fact

24   that nobody was arrested in the incident with regard to

25   the mugging, do you hold any resentment or bad feelings

1   about the police about how they may have handled that

2   situation?

3            PROSPECTIVE JUROR:  Uhm, not really, because

4   like I say, they were not witnesses and I wasn't able

5   to identify them.  I just knew that they were

6   teenagers.  They were teenagers maybe around 17, 18

7   years old.  They were tall, skinny, but that's all I

8   could say about them at that time, but, you know --

9            THE COURT:  Would it be fair for me to say

10  that you never looked at what's called a line-up at all

11  or any pictures at all when you were with the police?

12  Did that happen at all?

13           PROSPECTIVE JUROR:  No, no, it didn't happen.

14           THE COURT:  With respect to the incident in

15  Levittown with your house, was there any arrest or

16  prosecution as a result of that incident?

17           PROSPECTIVE JUROR:  I really don't know.

18           THE COURT:  As far as you know, there was

19  none?

20           PROSPECTIVE JUROR:  Well, I had detectives in

21  my house and police officers in my house looking for

22  fingerprints and all that, and they said that there

23  were many other robberies around the area, the same

24  type of mine; that it was everything was left clean and

25  neat the way it was, the way I left it, and there was

1    no mess or nothing.  And they say it's maybe the same

2    people that robbed my house were the same people that

3    robbed all the other houses, and, but --

4              THE COURT:  Other than that --

5              PROSPECTIVE JUROR:  Other than that, all I

6    know is that I called the insurance, also have to put

7    an alarm and new windows and new doors and it cost me

8    more, but no one was arrested.  We have suspicions, but

9    that was it, no evidence.

10             THE COURT:  Okay.  All right.  Mr. Mancuso,

11   you said you had no close family members or yourself

12   that had been the victim of a crime?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Finally, anybody close to either

15   of you, Mr. Mancuso, that's been either accused of

16   convicted of a crime?  Ms. Sepulveda?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  All right.  All right.  At this

19   point, I'm going to turn it over to the attorneys.

20             Ms. Singas, if you would, please?

21             MS. SINGAS:  Thank you, your Honor.  Okay.

22   Good morning, jurors.

23             As the Judge told you, my name is Madeline

24   Singas.  I'm an assistant district attorney.  It is my

25   duty in this case to present evidence against the

1    defendant, Ricardo Walters.  And as the Judge told you,

2    we're going to be asking you some questions and the

3    reason we ask you these questions is to determine if

4    you are the right jurors to sit on this particular

5    case; okay?

6         And as the Judge told you, the charges in

7    this case include rape, robbery, kidnapping.  You know,

8    they're serious allegations.  They're serious crimes.

9    The testimony is going to be emotional, and we'd look

10   to know based on your life experiences, if this is the

11   kind of case that you'll be able to sit on and listen

12   to the evidence fairly and impartially; okay?

13        The Judge also mentioned to you and you heard

14   the list of witnesses that the People plan to call.  A

15   lot of those witnesses are police witnesses now, I know

16   several of you have said that you have police officers

17   as friends or in your family.

18        Mr. Miller, I think you said that.

19        PROSPECTIVE JUROR:  Yes, prosecutor.

20        THE COURT:  So the question I have for you,

21   and it's going to be the same question for all of you

22   who have law enforcement in your background, it's

23   really two questions.  The first question is, do you

24   think that because you have a nephew who's a federal

25   prosecutor, and I'm a prosecutor, that you're going to

cp

1    give me extra credit and my case extra credit just

2    because of your association with your nephew?  You

3    think that would be fair?

4              PROSPECTIVE JUROR:  Well, I think I know from

5    discussing many cases with him, I know the amount

6    that's necessary to bring forth before a case can ever

7    get on a docket.

8              MS. SINGAS:  My question now is, do you think

9    that you can put aside your discussions with your

10   nephew about, you know, the quantity of evidence they

11   need in a federal case versus what goes on straight

12   case, take instructions only from the Judge as the

13   Judge gives it to you?  Will you be able to follow the

14   Judge's instructions, and sort of put aside what you

15   know from your nephew?  Can you separate that?

16             PROSPECTIVE JUROR:  I don't know.  I don't

17   know if anybody can answer that question.  I really

18   don't know if I can.

19             THE COURT:  Well put.

20             PROSPECTIVE JUROR:  It's like saying what

21   will you do in a certain instance.  You don't really

22   know until it happens.

23             THE COURT:  No, we're not.  We're not asking

24   to you look at a crystal ball, tell us what are you

25   going to do two, three weeks from now.  The only

1    concern that I would have is if, at the end of this

2    case, when I give you the law on this case, that

3    either, A, you would not follow it, or for reasons of

4    information that you may have learned from your

5    association with this federal prosecutor, or, B, that

6    you would turn to that person and say, look, the Judge

7    told me this is -- this is what we need, the elements

8    that need to be met and this is what has to be shown in

9    order for us to either vote guilty or not guilty.  And

10   in either case, you'd be violating your oath as a juror

11   were you to do so.

12          So what we're asking you now at this point is

13   can you give us your assurance that whatever the law is

14   that I give you at the end of this case, that's what

15   you'll follow when you make -- after you make your

16   determination about the facts and apply the law to the

17   facts as I've given them to you.

18          PROSPECTIVE JUROR:  It would not be

19   intentional to disregard.

20          THE COURT:  I understand.

21          PROSPECTIVE JUROR:  Can I say sitting here

22   today that the 15 years of discussions with my nephew

23   would not have some effect?  I can't honest say yes or

24   no.

25          THE COURT:  For example, the federal system