is different. There's some differences, some of which may be considered substantial, depending on your point of view about evidence and what's sufficient in a particular criminal case. So again, my question is whatever the law is that I give you in this case, can you tell me that, Judge, whatever the law is you give me, that's what I'm going to follow in this case.

PROSPECTIVE JUROR: That would be my intent, but like I said, I'm not a mindreader how it's going to affect.

MS. SINGAS: Thank you, Judge. Thank you, Mr. Miller.

Mr. Baxter, I think you also said you had a brother-in-law who's a New York City police officer?

PROSPECTIVE JUROR: That's right.

MS. SINGAS: And you also have some law enforcement connections?

PROSPECTIVE JUROR: Right.

MS. SINGAS: You're going to hear, throughout this trial, that the defendant was a New York City corrections officer. Do you think you're going to give him extra credit because he's also law enforcement because of your association with people in law enforcement? Are you going to go in the back, say, you know what? They've proven their case, but I cannot

believe someone in law enforcement could commit and be guilty of these crimes, so I'm going to vote not guilty just because he's a corrections officer?

PROSPECTIVE JUROR: No, I don't think I would have that problem.

MS. SINGAS: Okay. How about the opposite of that? Do you think just because there's going to be several detectives and police officers who testify in this case, that automatically you're going to believe them no matter what they say or do? You promise me that you're going to use what the Judge tells you to assess the credibility of witnesses, listen to what they have to say and take what they have to say from this witness and not what you know or what your brother-in law has told you, but listen to the evidence in this case as it comes from that witness stand and assess that? Can you promise me you'll do that?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: How about you said, Mr. Rovere, you said two neighbors corrections officer?

PROSPECTIVE JUROR: Yes, they are.

MS. SINGAS: Same question. Do you think that because a defendant is a corrections officer that he gets extra credit because, you know your neighbors, you talk to them about their work, you think they're

good guys and you can't fathom that a corrections officer would do something like that?

PROSPECTIVE JUROR: No.

MS. SINGAS: And, again, the opposite question. Do you think if I bring in law enforcement officials that just because they're law enforcement officials, you're going to take whatever they say at face value, or do you promise us you'll listen to the evidence as it comes from the witness stand and judge it accordingly?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: Have you had any discussions with your neighbors about this specific case? Has that ever come up?

PROSPECTIVE JUROR: No.

MS. SINGAS: Mr. Lebright, you're an interesting juror for us because your wife is a criminal defense attorney.

PROSPECTIVE JUROR: Right.

MS. SINGAS: But you also have lots of law enforcement ties as well.

PROSPECTIVE JUROR: They call my wife the enemy.

MS. SINGAS: But what do you call your wife is what I want to know; okay?

PROSPECTIVE JUROR: No.

MS. SINGAS: The question is again, you know, and it's a tough question because we all of hour life experiences, and all of you are sitting as jurors, potential jurors, because we want you to bring in your life experiences into this courtroom, but the question is do you think that your discussions -- do you discuss your wife's cases with her?

PROSPECTIVE JUROR: Not ongoing cases, but we have discussed, you know, cases in the past, things that -- experiences she's had, because she defended a broad range of people and, you know, abused and neglected children, so I've heard lots of different stories on things she's done.

MS. SINGAS: Okay. Now, do you think that anything that she said to you about how cases are investigated --

PROSPECTIVE JUROR: Well, I know a lot about, really, how things she watches, lots of the shows and movies, and so we discuss law in my house quite often my children actually want to be lawyers.

MS. SINGAS: Would you -- okay. How do you feel about that?

PROSPECTIVE JUROR: Whatever.

MS. SINGAS: Okay. So again, do you think if

you hear testimony here and, again, hard to say in a vacuum, don't know what you're going to hear, but you think you'll be so influenced?

PROSPECTIVE JUROR: Probably more influenced by police officers.

MS. SINGAS: Okay, but do you think now given what I've just told you that you can separate out however you feel about the police officers that you know because I think you didn't hear any of the names.

PROSPECTIVE JUROR: No, I don't know any of those.

MS. SINGAS: So can you listen to what they have to say?

PROSPECTIVE JUROR: Yes, but I would probably also lean on believing what they say.

MS. SINGAS: Okay. Do you think that you would -- so if you sat on a jury, are you telling me it probably wouldn't be a level playing field for the defense?

PROSPECTIVE JUROR: I would say no. I would listen to everybody's, you know, argument, but I personally would say I would lean toward, even if there's a question or a gray area, I would tend to believe a police officer.

MS. SINGAS: Okay. How about you,

Mr. Liesveld?

PROSPECTIVE JUROR: Liesveld.

MS. SINGAS: You have made arrests, you've been in the position that several of these detectives, you know, will testify about. Do you think you can separate out your own personal experiences and listen to the evidence as it comes from the witness stand?

PROSPECTIVE JUROR: I can.

MS. SINGAS: Okay. Are we on a level playing field if you sit on this jury?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: Ms. Sepulveda, you said your son is a New York City police officer. Same question. Your son's not going to be testifying here; okay, but do you think you can listen to police testimony and not be influenced by the fact that your son is a police officer, so therefore, you're going to believe everything the police officer says or you're going to listen to what the judge says and judge everything according to the circumstances and the facts of this case?

PROSPECTIVE JUROR: Well, it depends what your testimony is.

MS. SINGAS: Exactly. So you'll listen to the testimony. If it makes sense to you, you'll accept

it, if it doesn't, and based on everything else that you hear, you wouldn't? Can you promise me that you'll just do that?

PROSPECTIVE JUROR: I will try to be as objective as I can be.

MS. SINGAS: Good. Okay. Thank you.

One of the other issues we're going to have to decide in this case that you're going to have to decide if you're chosen as jurors is he the correct person? Is he the right man? Did the victims identify the correct person in this case.

Now, I believe, Ms. Sepulveda, I'm not picking on you, but you said you were mugged; right?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: And you said that you couldn't make an identification?

PROSPECTIVE JUROR: No. I don't know because the fear, you know, because I was shocked, but no, I was not.

MS. SINGAS: Okay. So let me ask you this. Mr. Gobin, do you think it's fair to consider a person's frame of mind when they're the victim of a crime to see whether or not they made a correct identification? Like how -- what's that?

PROSPECTIVE JUROR: After hearing the

evidence, then, you know, like to get in touch, so you have to listen to the person.

MS. SINGAS: Let's talk about all those things. You said it was just talking in a vacuum, not talking about Ms. Sepulveda's case anymore. Would the fact -- would lighting come into play when you're determining whether or not someone made an accurate identification, how they describe what the lighting was like?

PROSPECTIVE JUROR: A lot to do with fear too, could never tell if that is the person.

MS. SINGAS: Well, we're just talking about what kind of things would make it more likely that a correct identification was made or what kind of things would make it more likely that an incorrect identification would be made. So my question, Ms. Apgar, do you think that lighting is a factor that you would consider in determining whether or not the person was able to see who the perpetrator was?

PROSPECTIVE JUROR: Yes.

THE COURT: Does that make sense to you?

PROSPECTIVE JUROR: Yes.

MS. SINGAS. Okay. How about the distance? How about how far away the person was when the crime was committed from the victim? You think that's fair

to look at? Okay. How about you, Mr. Mancuso? Can you think of anything else? How about how much time was spent with the person? You think that's a factor you would consider?

PROSPECTIVE JUROR: Sure, more time you spend with somebody, the more you could remember.

MS. SINGAS: Okay, and how about sort of what kind of encounter there was; if it was a split second in an alleyway, somebody grabs your purse and runs or if it was a more lengthy and involved, you know, seeing more parts of the person?

PROSPECTIVE JUROR: I guess both.

MS. SINGAS: Right. Okay. Makes sense; right? Oh. All right. Ms. Werkmeister, that sort of make sense to you, those identification factors that we're talking about? The lighting, how close someone is to you?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: How about if their face is covered or face is exposed?

PROSPECTIVE JUROR: Yeah.

MS. SINGAS: Makes sense; right? If their face is covered, more of a problem as opposed to if they had nothing on their face; right?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: Ms. Ramos, Mr. Goldman mentioned something about the description of people; okay? Let me ask you how tall do you think I am?

PROSPECTIVE JUROR: 5'4.

MS. SINGAS: Okay. Mr. Marrus, how tall do you think I am?

PROSPECTIVE JUROR: 5'6.

MS. SINGAS: Okay. Mr. Rovere, what do you think?

PROSPECTIVE JUROR: 5'5, 5'6.

MS. SINGAS: Okay. Now let me ask you in a vacuum, do you think it's affected by the fact that you guys are sitting and I'm standing, so maybe your perspective is a little off? Make sense? Okay. If I told you that I am 5'8 and a-half and I'm wearing about two-inch heals, would you be surprised, Mr. Marrus?

PROSPECTIVE JUROR: No.

MS. SINGAS: Ms. Ramos, what do you think?

PROSPECTIVE JUROR: I would be surprised, yes.

MS. SINGAS: Now let me ask you this, Ms. Ramos, suppose tonight you're having dinner with a friend of yours and you're sitting in a restaurant and I walk into the restaurant and you think you'd recognize me again if you saw me?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: Even though you think I'm 5'4 and I'm really closer to 5'10 and a-half?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: Okay. So what I'm getting at is that there might be two -- there's two different skill sets, if you will, involved in describing someone and then being able to recognize them like what color would you say my hair was.

PROSPECTIVE JUROR: Dark brown.

MS. SINGAS: How about you, Ms. Apgar?

PROSPECTIVE JUROR: Brown, a little tint of red in it.

MS. SINGAS: Okay. My highlighter will be very happy with you. Would you say it's short, long, medium?

PROSPECTIVE JUROR: Medium.

MS. SINGAS: How about you, Ms. Jacobson?

PROSPECTIVE JUROR: Yeah, I agree.

MS. SINGAS: Okay, and now all of you are laughing at me, but I want you to think, Mr. Smith, what if I asked you those questions and you weren't able to see me, and I asked you two hours from now somebody said, hey, I know some prosecutors in Nassau. Why don't you describe for me what your prosecutor

looked like? You think you'd be able to do it?

PROSPECTIVE JUROR: Definitely, yes.

MS. SINGAS: Definitely? Okay. Are you one of those people that has a good eye that you can describe well?

PROSPECTIVE JUROR: I think so, yes.

MS. SINGAS: Okay. And you said you're a teacher, sir?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: What grade and what subject?

PROSPECTIVE JUROR: High school, grades 9 through 12, teach math.

MS. SINGAS: Teach math, and is that here in Nassau or in the City?

PROSPECTIVE JUROR: That's in Queens.

MS. SINGAS: It's in Queens. Okay. And have you ever had to call police or for one of your students have you been involved in being a witness in any altercation at school, anything like that?

PROSPECTIVE JUROR: No.

MS. SINGAS: Okay. All right. So back to what we were talking about, Mr. Smith. It makes sense that being able to describe someone is different than being able to recognize that person again. I mean sometimes people can describe very well and then be

able to recognize some people's descriptions are way off, 5'4, 5'10; okay? But that doesn't mean just because Ms. Ramos describe me as 5'4, 5'5 doesn't mean that when she says she's going to be able to recognize me later that she's mistaken about that. Make sense?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: Right? You with me?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: Okay. Good. Right. Mr. Baxter?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: Those issues make sense to you, identification versus recognition?

PROSPECTIVE JUROR: Uh-hum.

MS. SINGAS: Sort of some of the factors that we spoke about concerning identification.

PROSPECTIVE JUROR: Yes.

MS. SINGAS: Can you promise me you'll keep those in the back of your mind as you listen to the evidence should you sit on this jury?

PROSPECTIVE JUROR: Uh-hum, yes.

MS. SINGAS: Now, Ms. Apgar, you said that your house was burglarized?

PROSPECTIVE JUROR: Right.

MS. SINGAS: Was anyone home at the time?

PROSPECTIVE JUROR: No.

MS. SINGAS: Did you call the police?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: And did they take a report?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: Okay. Now, suppose that when you called the police and they came to your house, they said, listen, I know you say your house was burglarized, but you don't have any witnesses, so if you don't have any witnesses, we're not taking a report. Would that seem fair to you?

PROSPECTIVE JUROR: Well, there were things that were obvious like a window was broken, you know, so I don't know if that plays into it.

MS. SINGAS: It might. You might say to the police officer, look window's broken, and he says, listen, I don't have a witness. If I don't have a witness, I'm not taking a report. You think that's fair?

PROSPECTIVE JUROR: I don't know if that's his duty to do this. Might be if he has to.

MS. SINGAS: How about you? Do you think that's fair?

PROSPECTIVE JUROR: I don't think that's fair because I've just been a victim and, you know, stuff

missing in my house, somebody broke into it, and you want to take a report.

MS. SINGAS: Okay. How about you, Mr. Mancuso? Is it fair to say that most crimes -- crime is it not committed in front of a lot of witnesses? Would you agree with that statement?

PROSPECTIVE JUROR: In general, what the statistics are, but I do agree if you've been victimized, law enforcement should take statements to make a record that something did happen with or without.

PROSPECTIVE JUROR: I mean I could have made it up, said my ring was stolen and how does he know? I'm just saying it, but I'm saying it, so --

MS. SINGAS: right.

PROSPECTIVE JUROR: So I don't know what the law is.

MS. SINGAS: Not on a human level that doesn't make any sense. Do you like -- clearly, your house was burglarized.

PROSPECTIVE JUROR: Yes.

MS. SINGAS: Just because no one was there to see, it doesn't mean it didn't happen.

PROSPECTIVE JUROR: Right.

MS. SINGAS: Mr. Mancuso, what I'm getting at

is there maybe a situation where there may only be one witness to the crime. The victim of the crime might be the only witness to that crime. If, after you hear testimony from that witness, and you hear the Judge's instructions on the law and you say to yourself, I really believe that witness, and I think the People have met their burden and have proven their case, but, you know what? I can't vote guilty because it was only one witness. Do you think you would find yourself in that situation or do you think that you would say, I'm going to follow the Judge's instructions that one witness is good enough for me because most crimes don't happen in front of a lot of people. Makes sense there would only be one witness? How do you feel about that?

PROSPECTIVE JUROR: I feel that I agree, take into consideration what was just said. It was all the persons in the case.

MS. SINGAS: All the circumstances?

PROSPECTIVE JUROR: All the circumstances in addition to the witness.

MS. SINGAS: Okay. How about you, Ms. Werkmeister? How do you feel about that?

PROSPECTIVE JUROR: Same way.

MS. SINGAS: One witness wouldn't trouble you?

PROSPECTIVE JUROR: It depends. I have to hear the witness.

MS. SINGAS: Right, exactly. You have to hear the witness.

PROSPECTIVE JUROR: Yeah.

MS. SINGAS: Ms. Ramos, what if you went in the back, you were ready to vote guilty, one of the other jurors said, you know what, that's not enough. They didn't give us enough witnesses. Could you promise me that it will be the quality of the witnesses that you hear versus the quantity of the witnesses?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: Mr. Marrus, any issues with that?

PROSPECTIVE JUROR: Yeah. With eyewitness testimony, I might have an issue if that was the only evidence presented.

MS. SINGAS: How about you, Mr. Liesveld?

PROSPECTIVE JUROR: One witness works for me.

MS. SINGAS: One witness, Mr. Lebright?

PROSPECTIVE JUROR: One witness. Who wants to commit a crime in front of a lot of people? More of a chance of getting caught.

MS. SINGAS: All right. Other thing I want to talk about is you know someone's intent. Mr. Smith,

ever hear the saying, actions speak louder than words? Okay. Is it fair to say that sometimes people don't even have to say much? Like, for example, suppose that you have a friend in from out of town and you live near a movie theater and there's a Blockbuster movie opening up in a weekend and the line is wrapped all around the block, and you're walking with your friend going out to dinner. Your friend can't see the front of the movie theater, but sees this line of people and says, hey, you know, what's going on here? Why are all these people standing in line? What are you going to say to your friend why are those people waiting on line?

PROSPECTIVE JUROR: If I knew the Blockbuster movie, I would inform them because of the movie.

MS. SINGAS: Right, probably waiting on line to see the movie. You didn't have to speak to every person on that line to know what their intent was; that they were going to the movies; right?

PROSPECTIVE JUROR: Right.

MS. SINGAS: There might be one person; right, Ms. Jacobson, that really loves the popcorn in that movie theater, they're willing to wait an hour for that popcorn.

PROSPECTIVE JUROR: Do you know me?

MS. SINGAS: Are you one of those people?

PROSPECTIVE JUROR: No.

MS. SINGAS: So I mean, that wouldn't be reasonable to assume that the people waiting on line are there for popcorn? They're there to go see the movie; right? Okay. So that's sort of what I'm talking about when I say that actions speak louder than words. Sometimes people don't announce their intent.

Ms. Ramos, can you promise me you're going to look at things like what happened before an event, what happened during an event, what happens after an event to figure out sort of what someone's intent is?

PROSPECTIVE JUROR: Yes.

MS. SINGAS: The other thing I want to talk to you a little bit about is, again, when you sit on the jury, there can't be sort of guessing. Might be things you don't ever know the answer to, might be some questions that are asked that get objected to that you'll never know the answer to.

Mr. Baxter, do you think that if there are some things like that that really don't have much to do with you and your deliberations about whether or not the defendant is guilty, but, you know, you say to yourself, I really want to know the answer to that question and I'm not going to be able to rest until I know the answer to that question?

PROSPECTIVE JUROR: No. I think sometimes there are no answers and you have to come up with the positive and the negative. If it's positive, then vote positive. The majority comes out on one side.

MS. SINGAS: All right. Now, how about Ms. Apgar? Can you promise me if you're in the back, and one of those questions arises that you're not going to just guess and just come up with an answer and then tell everybody, well, that was the answer. We're going to have to accept that. Just guessing here, but I need to know the answer to that question. Can you promise me that you'll focus on the evidence and what comes from that witness stand?

PROSPECTIVE JUROR: Yeah, I wouldn't make up an answer in my mind.

MS. SINGAS: Right.

PROSPECTIVE JUROR: But I might want to know the answer.

MS. SINGAS: Okay. Do you think you'd want to know it so badly that you wouldn't be able to deliberate, follow the Judge's instructions?

PROSPECTIVE JUROR: I guess if I thought it was very important for me to know that to make my decision, then you would, yeah.

MS. SINGAS: What about if it's something

that's sort of extraneous?

PROSPECTIVE JUROR: If I feel it's not to do with it, yeah.

MS. SINGAS: Other thing I want to raise briefly with you is that, Mr. Miller, do you think all victims of crime behave the same way? You think there's a standard way that a victim should act when they're a victim of a crime?

PROSPECTIVE JUROR: I'm not sure what you're trying to get at.

MS. SINGAS: Well, you're going to see different witnesses on the stand and each of them may have different ways of expressing what happened to them. Do you think that there's a standard reaction that a victim -- that you expect to see from the witness stand before you can believe that witness?

PROSPECTIVE JUROR: I think we all see things differently.

MS. SINGAS: Okay. Ms. Werkmeister, do you think that you'll take into account sort of the people's education, someone's age, whether or not they speak English as their first language, all of those things when you hear testimony from the witness stand?

PROSPECTIVE JUROR: No.

MS. SINGAS: You wouldn't take that into

consideration? You think everyone sort of has to react the same way?

PROSPECTIVE JUROR: No, everybody acts different.

MS. SINGAS: Right. Okay. All right. Thank you all very much.

THE COURT: Okay. Thank us, Ms. Singas. Mr. Lemke?

MR. LEMKE: Thank you, your Honor, and also good morning.

I think by now you can see to some extent why, when you watch television or law enforcement shows, CSI, so forth, they don't spend more than two minutes on jury selection. That show would be probably cancelled in a second. It's important. Your answers, all right, as to why we spend the time to go through the questions and approach it in that way, and I think already, Mr. Hurfadtado, I've said maybe 33 words in about 30 seconds. I'm up here. You already made it clear. You came in yesterday, you were back this morning, and without hearing anything, that you already said you think my client's guilty, and I think it's significant and important those of you that feel that way express that concern. Because if not, if nothing is said and you have that already decision made, then

where are we? We're in a situation where everybody's just obviously spinning their wheels and you don't have a jury that is fair, that is willing to sit and listen to the evidence and reach a verdict based on the Judge's instructions on the law at the end of that, and so I ask you, and again, you've come in, you've indicated because there was an arrest and I'll ask Mr. Liesveld.

PROSPECTIVE JUROR: Yes.

MR. LEMKE: You have been a police officer in the 70s?

PROSPECTIVE JUROR: Yeah.

MR. LEMKE: Out on the road, I take it?

PROSPECTIVE JUROR: It was Lake George. Are you familiar with Lake George?

MR. LEMKE: You made some arrests back then?

PROSPECTIVE JUROR: Yeah.

MR. LEMKE: Ever maybe have to testify in court at all?

PROSPECTIVE JUROR: No, they all pled out.

MR. LEMKE: All pled out because they were all guilty?

PROSPECTIVE JUROR: Yeah.

MR. LEMKE: Well, in this case, nobody's pled out.

PROSPECTIVE JUROR: I understand.

MR. LEMKE: We're here; right? There's an arrest that's made, and in those cases, I take it probably had to -- was it once every two weeks or once a week? When did they hold court up there?

PROSPECTIVE JUROR: Well, it was a justice of the peace with the village, so we walked them in, came in even at midnight to hear cases.

MR. LEMKE: Pled guilty, pay a fine, go home. Okay. In the years -- then that was back in the 70s, but then you left as a police officer?

PROSPECTIVE JUROR: Right.

MR. LEMKE: You were at some point with security?

PROSPECTIVE JUROR: Yeah, I manage security for hotels.

MR. LEMKE: Also involved with perhaps whether there's employee theft?

PROSPECTIVE JUROR: Yeah, trespassing, the late 70s, early 80s were really difficult in the City with, you know, I've had armed robberies. I've had a security agent shot, you know, sexual assaults, that type of thing.

MR. LEMKE: Now, if you're selected in the case, and again, for all of you, I'll ask Ms. Apgar.

PROSPECTIVE JUROR: Yeah.

MR. LEMKE: Again, haven't said much. If you had to reach a verdict now, what would your verdict be? I know, Mr. Hurfadtado, you already have him convicted, sentenced, he's gone.

What about you?

PROSPECTIVE JUROR: No, I don't.

MR. LEMKE: If you had to reach a verdict, what would your verdict be?

PROSPECTIVE JUROR: Right now?

MR. LEMKE: Yes, right now. Guilty? I don't know. I don't know; haven't heard anything.

PROSPECTIVE JUROR: Right; haven't heard anything.

MR. LEMKE: How about you, Mr. Gobin, what would your verdict be?

PROSPECTIVE JUROR: Not guilty until proven guilty.

MR. LEMKE: Now, does that bother you? That's a principle of law the Judge will instruct you on. Some people feel that that's offensive to them.

Mr. Mancuso, do you understand I don't have to do anything in this case? The prosecutor in this case will call the witnesses, they'll answer questions, then you have to follow the instructions on the law in

the end. You think that that is unfair in a criminal case; that I don't have to do anything? I don't have to prove or disprove anything on behalf of Ricardo. I feel I have to hear all the facts in order to make that decision.

MR. LEMKE: Well, hearing all the facts, if at the end of the People's case, I don't care, 20 witnesses, 30 witnesses, you'll take a look at that testimony and basically take a look not just at the number of witnesses, but the quality, what they're testifying to and if, at the end of the People's case, the People say they rest, Judge McCormack would look over at me, all of you look over at me, and I say, Judge, we rest. Now, some of you have already indicated, and I believe is it I guess Mr. Rovere?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: If, at the end of their case, the People rest, People have indicated serious charges, one person has been excused, I don't care if the individual doesn't testify, they might be hiding something. They must be guilty. What is your feeling regarding a situation where if selected as a juror in this case, serious allegation, serious charges, vicious crimes, yet he doesn't get up to testify, what do you think that of that?

PROSPECTIVE JUROR: I might have some doubt.

MR. LEMKE: Why?

PROSPECTIVE JUROR: It's the sense of defense in my mind.

MR. LEMKE: Sits in your stomach, if you're accused of something, you want that individual to stand up, say, wait a second?

Mr. Baxter, what about you?

PROSPECTIVE JUROR: Probably same feeling a little.

MR. LEMKE: Would anybody feel any differently if at the end of the People's case, Ricardo doesn't take the stand? He may, may not. That will be a decision that I'll make based upon the People's case and the lack of evidence in the case, but if that's the case, does anybody feel any differently? It's going to be a level playing field at that point?

What I mean by that is knowing that, and the reason I addressed it is if I have 14, 15 people sitting in the box, usually everyone raises their hand, says, I have somewhat of a problem. However, they then, after thinking about it now, not later on at the end of the case, next question is Judge McCormack will instruct you on the law. I can't instruct you on the law, but in law, and the Judge will stop me to some

extent, is that you can't draw any negative inference to Mr. Ricardo Walters. It's still placed on the People. The burden of proof is on the People to establish beyond a reasonable doubt the elements, each of the elements of the charges against Mr. Ricardo Walters, so now -- it's pronounced Rovere?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: Knowing that, and I'm putting you on the spot, and I know that now that it's going to bother you a little bit, that's fine, but the Judge is going to tell you you can't make anything of that, you still have the burden placed on the People. All I'm asking at this point is ask you follow that instruction from the Court.

PROSPECTIVE JUROR: Yes.

MR. LEMKE: And do that. Mr. Baxter?

PROSPECTIVE JUROR: Yes.

THE COURT: Mr. Rovere, if I can interrupt for a minute, Mr Rovere, Mr. Baxter, there's a very common, if you will, misconception in a criminal case that many people have, many intelligent people have, and that is that a defendant has an obligation to prove his or her innocence. The reality is that that's not the case. The burden always rests on the prosecution, whether it's this case or any other case, and the fact

that a defendant is not obligated to testify, ties into that burden, because if the defendant was obligated to testify, that would mean that a defendant would have some burden to prove his or her innocence which, in our criminal justice system, for hundreds of years, is not the case. So it's important that when I say to you with regard to my instructions on the law, when I say, look, if a defendant doesn't testify, that's a right that a defendant in a criminal case has, and the burden of proof doesn't shift to the defendant that requires him to testify.

You have to judge this case based upon the evidence that's presented, you know, during the course of the case. Either of you have any problem with following that instruction? I know it's a natural reaction. People may say somebody accusing me of something, I have to respond to it, and we all, on a human level, may feel that way, but it's not what's required in a criminal case.

Ms. Apgar, I see a hand go up.

PROSPECTIVE JUROR: Yeah. When you say the defendant, do you mean the person or also his lawyer? Like are we expecting him to give facts?

THE COURT: In a sentence, a defendant doesn't have to testify in a criminal case. If they

want to, they can, but the fact that they choose not to is not something you should draw a negative inference against, number one. Number two, if Mr. Lemke decides, who's the attorney --

PROSPECTIVE JUROR: To say nothing?

THE COURT: He may question some witnesses, he may decide not to question certain witnesses, and maybe for strategic reasons, maybe for other reasons, but again, the fact as far as what the defendant does or does not do or his attorney in no way should influence what your determination is in terms of the burden in this case, ultimately, at the end of the case.

PROSPECTIVE JUROR: Okay. Yes, but if the prosecutor is saying, here's the evidence he did it, and he doesn't say anything --

THE COURT: You have to make a determination whatever the evidence is in the case.

PROSPECTIVE JUROR: Okay.

THE COURT: As to whether or not you're satisfied beyond a reasonable doubt that the People have proven each and every element of the crime that I give to you at the end of the case and the definitions I give in the courtroom. Do you understand that?

Anybody have any problem with what I've just

been speaking about?

Mr. Lebright?

PROSPECTIVE JUROR: Yeah, my only problem when you explained that, you said it might be his strategy not to have him testify. That's -- see, now I find that to be a problem. His strategy, like it's a strategy to get something done. It's his job to really get him off, and I have a problem with that. When you use -- I'm not saying you, all respect to you, use that term "strategy", when you said that, it bothered me.

THE COURT: It's interesting hearing you say that coming from a wife who's a criminal defense attorney, and maybe that's part of why you're raising that.

PROSPECTIVE JUROR: Well, when you said it, it bothered me.

THE COURT: The fact of the matter is, Mr. Lebright, that --

MR. LEMKE: Judge, may I continue for a minute? Don't want to interrupt.

You had indicated your wife's a criminal lawyer?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: You have a lot of friends in law enforcement?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: They call her the enemy?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: So you're looking at me as defense counsel as the enemy?

PROSPECTIVE JUROR: No, my wife, I love her.

MR. LEMKE: Good answer. All right. Now you've already said strategy, my job is to get him off.

PROSPECTIVE JUROR: Yes.

MR. LEMKE: If that's the case, is it the prosecutor's job to convict him?

PROSPECTIVE JUROR: Yeah. That's what we think.

MR. LEMKE: Prosecutor's trying to convict him, he has a defense attorney, me, trying to hold the People to their burden. If a woman gets up, says, I was viciously raped and that's not an issue, the identification is an issue, I might not ask any questions. If selected as a juror, perhaps one of the most vicious crimes you can commit against another individual other than perhaps murder, would be rape of a woman or a child. That's not what we're here for, but if you're selected, I'll go to Ms. Apgar, witness takes the stand. She's testifying in horrible detail about what had occurred to her, and she said that it

was was done to me by someone about 5'10, a white person. You're going to look over, say, yo, would he -- would he wait a second? I may not even ask any questions, because the issue at the end of the case, because the People have proven beyond a reasonable doubt that he committed that crime, so do you understand the principle is that you will be the determining individuals, if selected as a juror, to determine whether the prosecutor has met their burden, so you want to put it in simplest form.

PROSPECTIVE JUROR: I just didn't like that terminology. It might be your strategy, so that's what I said when he said anybody have a problem with it. Well, that was the immediate issue I had was the terminology used as his strategy. I find that to be -- because this is supposed to be serious.

MR. LEMKE: If his --

PROSPECTIVE JUROR: Somebody's life is in the valance here, so the whole strategy angle thing, I just took it -- it bothered me.

MR. LEMKE: Strategy decisions are basically defense counsel's decisions, but it's still a matter of whether the People, if you're selected as a juror in a case such as this, and that's where I'll go to.

Mrs. Ramos, there's been an issue regarding

police officers testifying. If a police officer testifies, and the Judge has already asked you that, I think your experience with police officers have all been good?

PROSPECTIVE JUROR: I haven't had any experiences with police officers.

MR. LEMKE: Traffic tickets? Any tickets?

PROSPECTIVE JUROR: No.

MR. LEMKE: Anyone speeding ticket, traffic ticket? Most of you? Is it Ms. Jacobson?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: And in that case, maybe you were speeding. You received a ticket, either you pled and you had somewhat of a positive experience with the police officer even though it was a ticket, but nevertheless, you may feel, I was speeding, shouldn't have been, I received a ticket. But if a police officer takes the stand, you don't know these individuals. That's why you're given the witness list. Police officer says, for example, that the light was red and a civilian comes in and says, no, the light was green, without knowing anything else at all, are you going to be more inclined to believe the police officer in that situation?

PROSPECTIVE JUROR: No.

MR. LEMKE: Okay. You can follow the Judge's instructions just to see, okay, what were the circumstances, the witnesses involved and so forth? Mr. Gobin?

PROSPECTIVE JUROR: Yes, sir.

MR. LEMKE: Airline supervisor JFK?

PROSPECTIVE JUROR: Yes, sir.

MR. LEMKE: What tape of work do you do?

PROSPECTIVE JUROR: I work for Caribbean Airlines. We have a service company that handles airliners.

MR. LEMKE: How long have you been doing that?

PROSPECTIVE JUROR: Nine years.

MR. LEMKE: Any involvements with any Port Authority police or anything like that?

PROSPECTIVE JUROR: Uhm, no, unless we have a cancelled flight and passengers start getting kind of, you know, then we'd call them.

MR. LEMKE: And I would take it from that, there'd be no indication, no problem I would be concerned with or the prosecutor, for that matter, that would interfere with your ability to be fair in this case?

PROSPECTIVE JUROR: No.

MR. LEMKE: DNA. Mr. Mancuso, familiar at least with DNA in principle what it is?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: What do you think of it, DNA?

PROSPECTIVE JUROR: I think it's a tool that's used in law enforcement to I guess identify certain things that happened, people related to it.

MR. LEMKE: Mr. Gobin, DNA, your opinion of it? What do you think of it?

PROSPECTIVE JUROR: I mean, like he says, identify if that's the person, you know.

MR. LEMKE: Ever read any stories regarding somebody that has been convicted and then after the Innocence Project --

PROSPECTIVE JUROR: Yes, I just read that; John Grisham. I shouldn't have read that book.

MR. LEMKE: So do you think, though, it's an infallible science?

PROSPECTIVE JUROR: DNA?

MR. LEMKE: Yes, if selected as a juror, Ms. Apgar, and someone comes in and testifies that there was a substance and it was tested and it's not a match, doesn't match, does that mean you're not going to listen to anybody, anything else and say, okay, this guy couldn't have done it, or for that matter, someone

comes in, says, we had some saliva that seems to match and the expert testifies that's it's an exact science, I don't care. There's been a lot written about it, a lot of shows on it, so my question is, if selected as a juror in this case, what are your opinions regarding DNA and whether or not, again, you had a decision rendered in your mind that if there's some DNA, that I don't need to listen to anything else.

PROSPECTIVE JUROR: I guess you bring in experts, but, you know, I know -- can I say what was in the books with the hair samples?

MR. LEMKE: Hair samples, follicles?

PROSPECTIVE JUROR: Said that for many people, not one specific person, so like it contains what it is. If they say this narrows it down specifically, then that's different, but, you know --

MR. LEMKE: An expert testifies, but there's question regarding perhaps the manner in which the sample was taken?

PROSPECTIVE JUROR: Right, right, could be questions. Right.

MR. LEMKE: Whether it's tainted. So again, that line of questioning, Ms. Ramos, you follow DNA? Have you formed in any way, either read about DNA which is basically if testimony comes in, it's like a

fingerprint. There may be one in a million or two million or three. Have you formed an opinion? What is your opinion, if any, regarding DNA?

PROSPECTIVE JUROR: I've read cases where people were falsely arrested and then DNA proved that they were innocent, so --

MR. LEMKE: If an expert comes in to testify that there was either a substance that was recovered, tested, will you be able to listen again to the manner in which the sample may have been collected, the manner in which it was tested? Do you have an open mind as to whether it's an exact science or whether or not there could be mistakes regarding that DNA and so forth? Or again, there's a been a lot -- I make reference to it now, or can you at least take a look and listen to see whether or not there were reports in the manner it was tested and so forth?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: Mr. Marrus?

PROSPECTIVE JUROR: Sir?

MR. LEMKE: DNA. I think you indicated something about a federal case years ago?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: But were you an alternate, excused?

PROSPECTIVE JUROR: It was never -- we were in the box, never came to trial.

MR. LEMKE: Also a compliance officer?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: Compliance officer regarding the manner in which brokers are maintaining --

PROSPECTIVE JUROR: No, health care.

MR. LEMKE: Health care. Which company?

PROSPECTIVE JUROR: NYU College of Dentistry, College of Nursing.

MR. LEMKE: Okay. I don't believe there's anything else. You had made some mention you may have read or saw something regarding this case and so forth. However, I think you also indicated that prevents you from reading --

PROSPECTIVE JUROR: I usually don't take much weight about sensationalism about cases. You have to form your own opinion.

MR. LEMKE: Basically, based upon those that sat, have you ever read, and I think you all may agree, read something in the paper someone found not guilty, and I'd ask you, Ms. Werkmeister, you read the newspaper, you open it up, and headlines are so and so found not guilty. When you first read that, is there a gut reaction that you have when you see that headline,

a gut reaction, wait a second. Somebody must have messed up here. How did this guy get off? Must have been a guilty guy let go, or do you say, wait a second there, guy accused, what happened to his life?

PROSPECTIVE JUROR: Oh, yeah.

MR. LEMKE: Which way?

PROSPECTIVE JUROR: The second way.

MR. LEMKE: Okay.

PROSPECTIVE JUROR: You hear somebody spent some time in jail for a long time and they find out they were innocent, I mean, a lot of years, and their whole life was ruined.

MR. LEMKE: I think -- is it Mrs. Sepulveda, couple more questions.

PROSPECTIVE JUROR: Okay.

MR. LEMKE: You indicated, I think you answered that question pretty much. Four children?

PROSPECTIVE JUROR: correct.

MR. LEMKE: Right, one is a police officer in Queens?

PROSPECTIVE JUROR: Correct.

MR. LEMKE: Daughter? Son?

PROSPECTIVE JUROR: It's a son.

MR. LEMKE: How long has he been on the job in Queens?

PROSPECTIVE JUROR: About 15 years, 15, 16 years, something like that.

MR. LEMKE: I would take it again, everybody, that a potential juror usually has some friends, neighbors, some family members that are in law enforcement and so forth, and if that was a basis to excuse everybody, probably wouldn't have a jury. So the question is in that situation, do you talk to your son? Is there anything about his work, tough job to do, if you were selected as a juror in this case and at the end of the case, I submit to you that you had all these police officers, however, there's one police officer embellishing. He's lying regarding a certain factor here that not knowing that particular officer, would you have an open mind to that? What are your feelings regarding that? Nobody ever wants a police officer to lie, nor wants to believe someone would come in and do so. My question to you though is based upon factors, based upon some of the evidence or lack of evidence, it just doesn't quite measure up to what the police officer said and you had to make basically a decision in evaluating all this and you come to the conclusion that the police officer is not being truthful, would you be able to at least discuss that and deliberate with that and come back? I mean, or

you're going to put your son's situation, say, I know my son would never lie. Great, but your son's not testifying here.

PROSPECTIVE JUROR: Well, that is something you cannot really say, because everyone lies.

MR. LEMKE: Regardless; right?

PROSPECTIVE JUROR: Regardless. Even myself. I can say I know I can lie and pretend that I'm saying the truth.

MR. LEMKE: Okay, and you take a look?

PROSPECTIVE JUROR: Take a look, yes.

MR. LEMKE: Okay. Last question for each of you. I know there's a couple. Mr. Hurfadtado already made it pretty clear as well I think Mr. Lebright, I think you pretty much have indicated you couldn't be fair in this case. Is that my understanding based on conversations you've had with your wife?

PROSPECTIVE JUROR: Like I said, if it was a gray area, I'd probably lean toward the testimony of a police officer. That's basically how I feel.

MR. LEMKE: To the rest of you, take a moment, ask yourselves if you were brought to the courtroom by an indictment, serious charges as Ricardo is sitting here, would you want someone with your frame of mind? I mean, it's only been, for me, maybe

basically twenty minutes. Judge McCormack had asked a number of questions as well as the prosecutor, so sometimes there are questions that are not asked that would bring out perhaps a bias. So ask yourselves if you want somebody with your frame of mind judging you if you were brought to court charged with such serious charges.

MS. SINGAS: I'm going to object to that question, Judge.

THE COURT: Objection overruled.

MR. LEMKE: I apologize. But clearly --

PROSPECTIVE JUROR: That's all right.

MR. LEMKE: You've made it clear no. The others, I think Mr. Lebright, ask yourselves. Mrs. Ramos, would you want somebody with your frame of mind judging you?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: Mrs. Werkmeister?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: Mr. Miller?

PROSPECTIVE JUROR: Yes. I'm not sure I would.

MR. LEMKE: Okay. Those were a couple answers you gave to the prosecutor as well; okay. Mr. Mancuso?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: Mr. Gobin?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: Ms. Apgar?

PROSPECTIVE JUROR: I don't know if I can do it. You know, I'm answering.

MR. LEMKE: It's a different question. Nobody's asking that question. We probably get everybody saying they couldn't quite do it. It's a question. It's difficult. It's emotional. This is a petit larceny, someone steals a shirt or bicycle. That's why we go through it. There's family members sexually abused, whatnot, not easy.

Can you follow the Judge's instructions because you seemed to answer every other question that you can be fair, sit in this case.

PROSPECTIVE JUROR: Yeah, but you didn't ask the questions I'm waiting for you to.

MR. LEMKE: Ask me what questions?

PROSPECTIVE JUROR: Are you nervous? Are you scared?

MR. LEMKE: Everybody knows that you're scared.

PROSPECTIVE JUROR: Can you make a decision? I'm not a good person with decisions like you could see

when you ask me questions. You know, I'm just trying to be honest because I don't want to waste your time with me either.

MR. LEMKE: You work part-time as a teacher?

PROSPECTIVE JUROR: Yeah, I used to be in computer programming. I have like a different kind of mind and I don't know if I can say one way or the other. It's hard for me being honest with who I am like in life. It's hard for me to make decisions.

MR. LEMKE: This is not going to be an easy decision.

PROSPECTIVE JUROR: Maybe other people feel that way, but I'm saying it.

MR. LEMKE: Ms. Sepulveda, frame of mind you could sit on this case?

PROSPECTIVE JUROR: I don't know.

MR. LEMKE: Because?

PROSPECTIVE JUROR: Honestly, I don't know. It's hard. You get nervous. I don't think so. It's very hard.

THE COURT: Let me just say this. Nobody here should think, either myself or the attorneys, think that sitting on this case, or for that matter, most cases is easy. It wasn't meant to be easy.

In a criminal case, the jury's verdict has to

be unanimous, and many times when a jury goes back in to deliberate, there's not unanimity, if you will, as to what the verdict should be. Many times juries will deliberate, debating back and forth. What we're looking from you and yourself, Ms. Apgar, is can you listen to the evidence and deliberate with your other jurors, listen to my instructions on the law and whatever you feel in your conscience the evidence shows, be able to verbalize it and say that.

Do you think you could do that, Ms. Sepulveda?

PROSPECTIVE JUROR: I can listen to the evidence and listen to the Judge. Yeah, I would be able.

MR. LEMKE: Mrs. Jacobson?

PROSPECTIVE JUROR: Well, if you sent me a letter asking me to come to the jury, I'd like you -- I'd tell, you know, but I do believe it's my responsibility as a United States citizen. I'm happy to be here and other things other people do for our country. In spite of the fact that I'm nervous, I know I'm going to do the best I could, so, and my train of thought would be yeah, I'd be fine.

MR. LEMKE: Mr. Smith?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: Mr. Baxter?

PROSPECTIVE JUROR: I don't know if -- I'll be fine, but just everything going to go on here, something that makes me very queasy like you don't want to a juror. So nervous.

MR. LEMKE: Mr. Rovere?

PROSPECTIVE JUROR: Yeah.

MR. LEMKE: Mr. Liesveld?

PROSPECTIVE JUROR: Yes.

MR. LEMKE: Mr. Marrus? Just a few minutes. Thank you, your Honor.

THE COURT: All right. Members, prospective members, the attorneys are going to take a few moments to review their answers, make their determinations. I know you've been sitting for a little bit, under an hour. If anybody needs to use the bathroom, please feel free to do so. James, let me see you for a second.

(Pause.)

THE COURT: Prospective members, I'm going to ask you to just follow my sergeant. There's no room upstairs I could kind of put you in. Our jury rooms are downstairs. Just take a look around, see who your neighbors are so when you come back, you know where to sit. Have you back here in about ten minutes or so.

(Whereupon, the jury panel left the courtroom.)

THE COURT: We have six sworn. People, you've used seen peremptories, defendant ten. We're going to deal with the first six starting with Ms. Apgar and going to Ms. Werkmeister.

People cause?

MS. SINGAS: Number 1, Ms. Apgar, Number 4, Mr. Miller, number 5, Mr. Hurfadtado.

MR. LEMKE: Consent.

THE COURT: All right. Cause?

MS. SINGAS: None.

THE COURT: 2, 3, 6?

MR. LEMKE: None.

THE COURT: People peremptory 2, 3, 6? Mr. Gobin, Mr. Mancuso, Ms. Werkmeister?

MS. SINGAS: Number 2, Mr. Gobin, 6, Ms. Werkmeister.

THE COURT: That leaves us with one of the first six. Mr. Lemke, Mr. Mancuso?

MR. LEMKE: No, fine for number 7.

THE COURT: Mr. Mancuso will be number 7. We've got to deal with the next five. That's 7 through 11.

People cause?

MS. SINGAS: No cause.

THE COURT: Ramos through Rovere.

MR. LEMKE: None for cause.

THE COURT: People peremptory?

MS. SINGAS: Number 7, Ms. Ramos. That's fine. That's it.

THE COURT: Defendant cause? I beg pardon. Defendant peremptory 8 through 11.

MR. LEMKE: Number 8, Jacobson, and 10, Baxter. That's it.

THE COURT: And Baxter. At this point, People have used ten, defendant used twelve.

MR. LEMKE: Yes.

THE COURT: All right, Mr. Smith. So we're clear, Smith is 8, Rovere is 9.

MR. LEMKE: Right.

THE COURT: Smith is 8, Rovere -- I'm writing on the back the numbers. All right. So now we're 12 through 15, Lebright, Liesveld, Marrus, Sepulveda.

People cause?

MS. SINGAS: Number 12, Mr. Lebright.

MR. LEMKE: Consent.

THE COURT: Any further cause, People?

MS. SINGAS: No, Judge.

MR. LEMKE: No, not for cause.

THE COURT: People peremptory Liesveld, Marrus, Sepulveda?

MS. SINGAS: Yes, number 14, Mr. Marrus.

THE COURT: All right. People, that's it?

MS. SINGAS: Yes.

THE COURT: For peremptories. Defendant, that leave us with Liesveld and Sepulveda.

MR. LEMKE: Liesveld. That's my thirteenth one; right?

THE COURT: Yes. You're up to 15 if you strike --

MR. LEMKE: Liesveld, isn't that thirteen?

THE COURT: That's fourteenth.

THE CLERK: He used twelve so far.

MR. LEMKE: That would be thirteen. Thirteen is Liesveld.

THE CLERK: You're challenging Liesveld peremptory?

THE COURT: All right. So Sepulveda is good, Mr. Lemke?

MR. LEMKE: It's going to be the least of all evils. She's good for 10.

THE COURT: All right. Ms. Sepulveda is number 10.

MR. LEMKE: Know what? I'm going to use my

peremptt on her.

THE COURT: All right. He just used a peremptt on her. All right. So at this point, People have five remaining.

MS. SINGAS: I've four four remaining.

THE CLERK: People have four, judge.

THE COURT: Each of you used four this round, so you've got four left. He's got one left.

(Whereupon, the following took place in open court:)

THE COURT: Just so we're clear, Artie?

THE CLERK: Mancuso is 7, Smith is 8 and Rovere is 9.

THE COURT: Okay. Smith, Mancuso, Rovere.

MR. LEMKE: Yes.

(Whereupon, the jury panel entered the courtroom.)

THE COURT: Okay. Prospective members, kindly listen, give your attention to my clerk as he reads the names.

THE CLERK: Following jurors names called have been selected to be on this jury. Juror number 7, Leonard Mancuso, juror number 8 is Michael Smith and juror number 9 is Steven Rovere. If your name has been called, please remain in your seat. If your name was

not called, you're excused from this case and must return back to central jury.

THE COURT: For those of you that have been excused, I want to thank you on behalf of the entire Nassau County Court System for participating in jury selection. I wish you well. Be careful as you step out of the jury box. Have a good weekend. Follow my sergeant.

(Whereupon, the jury panel left the courtroom.)

THE CLERK: Remaining jurors satisfactory to the People?

MS. SINGAS: They are.

THE CLERK: To the defense?

MR. LEMKE: Yes, they are, your Honor.

THE CLERK: Selected jurors, please rise.

(Whereupon, three jurors duly sworn by the Court Clerk.)

THE COURT: Mr. Mancuso, Mr. Smith, Mr. Rovere, welcome again. At this particular time, I'm going to likewise excuse the three of you. I'm going to direct that you be back to the courthouse on Wednesday. That's November 5th. We're going to still be doing jury selection on Monday. We'll probably wrap that up at some point on Monday. Tuesday is obviously

Election Day. The courthouse is not open, so we're going to commence the trial Wednesday morning. I'm going to ask you to be back here at 9:30. One of my officers or the sergeant will give you some further instructions, and I believe they give you a parking placard so when you come here on Monday, hopefully, you'll have a place to park.

We're going to begin on Wednesday, I should say, with preliminary instructions, opening statements and we'll be getting into the trial Wednesday morning. So have a good weekend. Be careful as you step out of the jury box. My officer here will give you some further instructions. And, again, Wednesday, 9:30 back here in the courthouse; okay? So if you would kindly follow my officer?

(Whereupon, the three sworn jurors left the courtroom.)

THE COURT: 9:45 Monday morning. I'm going to ask for 75. We'll do the prescreening and hopefully by the end of the morning, we'll have a jury, couple of alternates.

(Whereupon, the trial was adjourned to.

November 3, 2008.)

* * *

CERTIFIED THAT THE FORGOING IS A TRUE AND ACCURATE TRANSCRIPT OF THE ORIGINAL STENOGRAPHIC MINUTES IN THIS CASE.

CATHERINE R. PARKER,
Official Court Reporter

STATE OF NEW YORK : NASSAU COUNTY

COUNTY COURT PART 49

- - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK, SCI/IND. NO. 436N-2008

-against-

JURY TRIAL

RICARDO WALTERS,

Defendant.

- - - - - - - - - - - - - - - - - - - -X

262 Old Country Road
Mineola, New York
November 3, 2008

B e f o r e:

HON. JAMES McCORMACK, Acting Supreme Court Justice

A p p e a r a n c e s:

HON. KATHLEEN M. RICE
District Attorney, Nassau County
By: MADELINE SINGAS, ESQ.
THERESA TEBBETT, ESQ.
Assistant District Attorneys

DENNIS LEMKE, ESQ.
Attorney for Defendant
114 Old Country Road
Mineola, N.Y.

Mary Ocskai
Official Court Reporter

THE CLERK: Any applications before we bring in the panel?

MR. LEMKE: None.

MS. SINGAS: No.

MR. LEMKE: There is one thing I need to address off the record.

(Whereupon, there was a discussion held off the record.)

THE CLERK: Case on trial, People of the state of New York against Ricardo Walters, 436N-2008.

People ready?

MS. SINGAS: People are ready, Judge.

THE CLERK: Defense counsel ready?

MR. LEMKE: Defense ready, Your Honor.

THE COURT: Good morning prospective members of the jury. My name is Judge McCormack. Welcome to the Nassau County Court. We are in the process of picking a jury in a criminal case, some details of which I am going to go into with you in a few moments, and again our pre-screeing process, and tell you a little bit about the case, the length of the case. However, before I do that I need to have my clerk swear you in. If you would kindly at this time rise and listen to my clerk.

THE CLERK: Please raise your right hand. Do

each of you solemnly swear to answer truthfully all questions asked of you relevant to your qualifications to serve as trial jurors in this action so help you God?

Please answer I do.

(Whereupon, the prospective jury panel collectively answered in the affirmative.)

THE COURT: Okay. You can have a seat.

Again, good morning. And first and foremost let me thank all of you for being here this morning.

We have been picking a jury in this case since the later part of last week. We still need some further jurors to complete our jury selection.

The title of this action is the People of the State of New York versus Ricardo Walters. Just to give you an idea of some of the charges in this particular case, they include robbery, kidnapping, rape, sexual abuse, the allegations concern or actually the location of the allegations are in the Village of Hempstead. They cover different time periods beginning in 2005 and English in 2007.

What I am going to do at this point is tell you the length of the case. In speaking with all the parties it's anticipated the trial should last approximately two and-a-half to three weeks. I expect the trial to be concluding the week of November

seventeenth. That is obviously the week before Thanksgiving just to give you a frame of reference, if you will. Obviously tomorrow will be Election Day, we will not be sitting nor will we be sitting the following Tuesday which is Veterans Day. And that is November eleventh.

In this time, keeping that in mind, the trial's going to conclude the week of the seventeenth. What I am going to try to do is calmly and without causing chaos, if you will, we're going to pre-screen those of only the following criteria, if you will. If you meet the following criteria, what we're going to do is ask you to step up with your belongings, we want to hear from you as to the reason why you could not sit, those of you that have either a planned vacation, and I empathize the word planned, between now and that week ending November 21st, a planned business trip, a planned medical procedure that you cannot reschedule, for yourself or a close family member that you have to attend with that person. Any issue with regard to your child care, or for that matter, elder care. We generally sit until 4:45. Usually the trial begins about 10:30 in the morning. There is no longer sequestration in the State of New York. So, once jury deliberations begin you are allowed to go home, you're

not held overnight. No one has to worry about being away from home at any point throughout the course of the trial.

I want you to bear in mind if you're excused from this case, it doesn't mean you're excused from jury duty. We have to send you back to central jury. So, again, those of you that either have a planned vacation, planned business trip, medical procedure you cannot reschedule for yourself or a loved one, any issue with respect to your children, that you don't have child care available for them during the course of the day, any issue with respect to elder care, what I am going to ask you to do is please pay attention to my sergeant who is standing to your right at this time, and he will direct the manner in which we will proceed at this point.

(Whereupon, there was a discussion held off the record.)

THE CLERK: Do you solemnly swear to answer truthfully all questions relative to your qualifications to serve as a trial juror in this action so hope you God.

A PROSPECTIVE JUROR: I do.

THE COURT: All right. Prospective members, that completes our pre-screening, if you will. At this point we're going to fill the jury box here to my left.

If your name is call, please kindly step up, bring all of your personal belongings with you, and as you step into the jury box one of the officers will direct you where to go. Be careful as you step in. There's a step up on both levels. Okay.

THE CLERK: Seat number one, Michael Burke.
Seat two, Peter Fergurson.
Seat three, Lynn Potenza.
Seat four, Patricia Bartolomeo.
Seat five, James Math.
Seat six, Aedile Ramotar.
Seat seven, Kevin Coleman.
Seat eight, Sandra Tomko.
Seat nine, Tara Lyle.
Seat ten, Richard Trapani.
Seat eleven, Louis Grasso.
Seat twelve, Riaz Shah.
Seat thirteen, Brook Lodge.
Seat fourteen, Migale Cummings.

THE COURT: Okay. Our fourteen prospective jurors that are in the box, welcome. Good morning again. Those of you still sitting in the audience, although I will be addressing my comments to the fourteen that are in the box, there's a fairly good chance that some of you will be coming into the jury box

as we proceed along with our jury selection this morning.

As I indicated to you this is a criminal case that we're in the process of picking a jury. I want to introduce you first to the parties in the case, then I am going to list a number of names who are either potential witnesses or names you may hear during the course of the trial.

The People in this case are represented by the District Attorney of Nassau County who is Kathleen Rice. Two of her assistant district attorneys will be prosecuting the case on her behalf. Seated at the first table to my immediate left is Miss Madeline Singas from the District Attorney's Office.

MS. SINGAS: Good morning, jurors.

THE COURT: And seated next to her is Theresa Tebbett also an Assistant District Attorney.

MS. TEBBETT: Good morning.

THE COURT: Seated at the second table is the defendant, Ricardo Walters.

THE DEFENDANT: Good morning.

THE COURT: Seated next to Mr. Walters is his attorney, Mr. Dennis Lemke.

MR. LEMKE: Hello.

THE COURT: Do any of you recognize the

attorneys, the defendant or myself from any dealings of any kind? No.

At this point what I am going to do is list or give you the names of potential witnesses and/or names you may hear during the course of the case. After I finish the list, if anybody from the fourteen, those of you seated in the fourteen seats in the jury box, recognize any of the names, please just raise your hand and tell me who it is you think you may recognize and from what situation that may be.

Hempstead Police Officer Dale Jones. Hempstead Police Officer Eugene Este. Nassau County Detective Sheila Wimberly. Detective Nassau County Detective John Lavelle. Nassau County Detective Wayne Birdsall. Nassau County Detective Robert Dunn. Nassau County Detective Daniel Perez. Nassau County Detective Edward Moran. Police Officer Ralph Morales. Sandy Hayn, H-A-Y-N, Anna Fernandez. Barbara Heffernan. Delmy Morales. Shamika Dottin. Sara Sandoval. Allyson Davilar. Sandra Dottin. Same spelling. Thomas Lynch. Greg Navoy. Rosa Portillo. Investigator Richard Lombardi.

I did mention at least twenty plus names. Anybody here recognize any of those names, those in the jury box, anybody? Okay.

The case itself has received in the past some degree of media exposure or attention. The defendant in this case is employed by the New York City Department of Corrections. Anybody here thinking about it now has read about it, seen anything about the case in any way, shape or effect up to this point?

Sir.

A PROSPECTIVE JUROR: My uncle's whose actually a lead homicide detective mentioned the case to me.

THE COURT: Your uncle.

A PROSPECTIVE JUROR: Jack McHugh. Just retired.

THE COURT: And, how recently was he mentioning the case to you?

A PROSPECTIVE JUROR: I don't know, that too recently, about a month or so ago. We talk about all the things he went through.

THE COURT: As a result of speaking to you, did he tell you anything about this case?

A PROSPECTIVE JUROR: Didn't go into detail.

THE COURT: Anything he said to you, or for that matter, anything about your relationship with Detective McHugh which would make you think you wouldn't be able to sit as a juror?

A PROSPECTIVE JUROR: I know how hard they work. I don't think they, you know, usually what they come up with is usually truthful.

THE COURT: Okay. You feel you would be somewhat predisposed to believe a police officer or detective opposed to a civilian?

A PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Anybody else here recognize any of the names that I listed here?

Miss Bartolomeo, do you know anything about the case.

A PROSPECTIVE JUROR: Two things. I don't know anything to do with anything. My daughter I think actually was picked a week or two ago as a potential juror. I think this was the case. She didn't --

THE COURT: We just started picking last, I think we started last Tuesday or Wednesday.

A PROSPECTIVE JUROR: Yeah. Well, sounds like it, but that is nothing. Also I work for court reporters, some of the detectives you mentioned I just think I had cases of theirs.

THE COURT: You have been in the courtroom?

A PROSPECTIVE JUROR: No, no, I transcribe transcripts.

THE COURT: I see. Okay.

Anybody else?

Anybody else?

Miss Bartolomeo, for any reason would that affect you in terms of being fair and impartial in a case like this?

A PROSPECTIVE JUROR: No.

THE COURT: Let me basically at this point go into what your role would be if you're selected as a juror in this case and what my role is and then I'm going to get into basic principles that apply in all criminal cases, principles of law, that you will be required to follow if you're sworn as a juror in this particular case. And then I am going to follow that up with some individual questions of you in terms of your background and then finally both attorneys will have a limited amount of time to speak with you concerning your qualifications to serve as a juror in this case.

A trial is the process which determines if the defendant is guilty or not guilty of the charges that I have just read. In that process, those of you who are selected as jurors and I as the judge will perform separate functions as jurors. You are going to be called upon to determine whether or not the evidence which you hear and see in this case establishes the defendant's guilt beyond a reasonable doubt.

In order to do this, at the end of the trial you will have to evaluate all the evidence and determine what evidence you have heard from the witnesses and seen as exhibits is credible and what it all means. That is called finding the facts. That will be your function alone. I will not find facts in this trial. Your ultimate decision is called a verdict. Your verdict will either be guilty or not guilty.

The attorneys in this case will present evidence usually by calling witnesses and may suggest in their opening and closing arguments you draw certain conclusions from the evidence. You're not bound by what the attorneys say, only you can decide what really happened, and the verdict as to each of the counts will remain your decision alone.

As judge I make no determination of guilt or lack of guilt. My role at trial is to ensure you reach your verdict in accordance with the applicable laws I will explain to you. In order for the People and defendant to receive a fair trial, I may have to rule on questions concerning the conduct of the trial. Those rulings have nothing to do with whether the defendant is guilty or not guilty. I also rule on whether questions concerning what evidence you may consider and for what purpose.

When I make a ruling concerning whether you may hear some testimony or see some exhibits which is offered as evidence, I will be ruling on whether or not you are permitted to hear or see it as a matter of law. Likewise, if I instruct you to disregard something you might have heard, I will do so because that is the law.

None of my rulings should be taken by you as any indication at all whether you should believe all or part of what is offered as evidence or that the defendant is guilty or not guilty. That is solely for you to determine. You must accept the law as I give it to you if the defendant and the People are to have the fair trial to which they are entitled.

At this point members of the prospective panel I am going to go into some principles of law that apply to all criminal cases. And that is the presumption of innocence, burden of proof, and the requirement of proof beyond a reasonable doubt.

Throughout these proceedings the defendant here is presumed to be innocent. As a result you must find the defendant not guilty unless on the evidence presented at this trial you conclude that the People have proven the defendant's guilt beyond a reasonable doubt. That a defendant does not testify as a witness is not a factor from which any inference unfavorable to

the defendant may be drawn. The defendant is not required to prove he is not guilty. In fact, the defendant is not required to prove or disprove anything.

To the contrary, the People have the burden of proving the defendant guilty beyond a reasonable doubt. That means before you can find the defendant guilty of a crime, the People must prove, beyond a reasonable doubt, every element of the crime, including that the defendant is the person who committed that crime.

The burden of proof never shifts from the People to the defendant. If the People fail to satisfy their burden of proof you must find the defendant not guilty. If the People satisfy their burden of proof you must find the defendant guilty.

What does our law mean when it requires proof of guilt beyond a reasonable doubt? The law uses the term proof beyond a reasonable doubt to tell you how convincing the evidence of guilt must be to permit a verdict of guilty. The law recognizes that in dealing with human affairs there are very few things in this world we know with absolute certainty. Therefore, the law does not require the People to prove a defendant's guilt beyond all possible doubt. On the other hand, it is not sufficient to prove that the defendant is

probably guilty.

In a criminal case the proof of guilt must be stronger than that, it must be beyond a reasonable doubt. A reasonable doubt is an honest doubt of the defendant's guilt in which a reason exists based upon the nature and quality of the evidence. It is an actual doubt, not an imaginary doubt. It is a doubt that a reasonable person acting in a matter of this importance would be likely to entertain because of the evidence that was presented, or because of the lack of convincing evidence. Proof of guilt, beyond a reasonable doubt, is proof that leaves you so firmly convinced of the defendant's guilt you have no reasonable doubt of the existence of any element of the crime or of the defendant's identity as the person who committed the crime.

In determining whether or not the People have proven the defendant's guilt beyond a reasonable doubt you should be guided solely by a full and fair evaluation of the evidence. After carefully evaluating the evidence each of you must decide whether or not that evidence convinces you beyond a reasonable doubt of the defendant's guilt.

Whatever your verdict may be, it must not rest upon baseless speculations nor may it be influenced in

any way by prejudice, sympathy or by a desire to bring an end to your deliberations or to avoid an unpleasant duty. If you're not convinced beyond a reasonable doubt that the defendant is guilty of a charged crime, you must find the defendant not guilty of that crime. If you are convinced beyond a reasonable doubt that the defendant is guilty of the charged crime, you must find the defendant guilty of that crime.

As judges of the facts you alone determine the truthfulness and accuracy of the testimony of each witness. You must decide whether a witness told the truth and was accurate, or instead testified falsely or was mistaken. You must also decide what importance to give to the testimony which you accept as truthful and accurate. It is the quality of the testimony that is controlling, not the number of witnesses who testify.

There is no particular formula for evaluating the truthfulness and accuracy of another person's statements or testimony. You bring to this process all of your varied life experiences. In life you are frequently asked to decide the truthfulness and accuracy of statements made to you by other people. The same factors used to make those decisions should be used in this case when evaluating the testimony. At the end of the trial I will give you some exhibits of those factors

in this case.

You will hear testimony of police officers and/or detectives or investigators. The testimony of a witness should not be believed solely and simply because the witness is a police officer or a detective. At the same time a witness's testimony should not be disbelieved solely and simply because the witness is a police officer or a detective. In other words, you must not believe or disbelieve a police officer or detective just because he or she is a police officer or a detective. You must listen to a police officer's testimony just like you would listen to any other witness, you must evaluate a police officer's testimony for truthfulness and accuracy in the same way you would evaluate the testimony of any other witness.

Before questioning you individually, just dealing with the people here in front of me in the first row, anybody here who for any reason would not be able to follow those essential and basic elements of a criminal trial I just discussed here?

Anybody in the first row?

Anybody in the second row would not be able to follow my instructions on the law with respect to the issues concerning the presumption of innocence, the burden of proof, proof beyond a reasonable doubt.

Anybody here? Okay.

Is there anybody, again I am addressing myself to the first row, anybody who for religious reasons would not be able to vote either guilty or not guilty? In the first row, anybody here? Okay.

Anybody in the second row. Okay.

Before I get to your questions individually, I want to see the attorneys real quick.

(Whereupon, there was a bench conference held off the record.)

THE COURT: Mr. Trapani will be excused on consent of both sides.

Is it Mr. Trapani.

A PROSPECTIVE JUROR: Yes.

THE COURT: Mr. Trapani, on the consent of both sides we're going to excuse you. You can step down. Bring your personal belongings. Watch your step as you step as you pass your fellow prospective jurors when you reach the end of the box.

THE CLERK: Seat ten, Michele McCann.

THE COURT: Welcome, Miss McCann, your late arrival to the panel here.

Did you hear my instructions before? Any issue with you in terms of not being able to follow those basic principles of law that I just discussed.

A PROSPECTIVE JUROR: No.

THE COURT: Okay. Anything about any kind of religious conviction of any kind that would prevent you from voting guilty or not guilty in this case?

A PROSPECTIVE JUROR: No.

THE COURT: All right. What I am going to do now is go through individually each of you in the manner in which you're seated. I'm going to basically ask whether you're married or in a committed relationship. Whether you have any children, I may more than likely ask your occupations, if you're currently working, and those of your spouses and children, if they're of age. I am going to ask also, also ask you some questions about prior jury service, whether or not you have been a victim of a crime. Also, whether or not you ever served or have any members, I should say, in law enforcement.

Let me deal with the questions of you individually. Let me just say before I get into this, if for any reason any of you who, that would want to discuss anything privately, you would not be comfortable speaking publicly in front of a group of strangers, by all means, we're not looking to embarrass anybody or make you feel uncomfortable. Tell me, judge, can I approach, I'd like to speak to you privately, you can approach. I do need to have both attorneys here, all

three attorneys here, as well as my court reporter. Okay. Bear that in mind as we go through the questions. That applies not only to me but also when the attorneys have an opportunity to speak to you as well.

Mr. Burke, sir, can you tell me the neighborhood in which you live?

A PROSPECTIVE JUROR: Bellmore.

THE COURT: Married or committed relationship.

A PROSPECTIVE JUROR: No.

THE COURT: And, your current occupation.

A PROSPECTIVE JUROR: High school science teacher.

THE COURT: And, particular school district?

A PROSPECTIVE JUROR: Plainview.

THE COURT: Mr. Fergurson, tell us the neighborhood in which you live.

A PROSPECTIVE JUROR: Hicksville.

THE COURT: Married or committed relationship.

A PROSPECTIVE JUROR: Married.

THE COURT: Children.

A PROSPECTIVE JUROR: Two.

THE COURT: Approximately how old?

A PROSPECTIVE JUROR: 32 and would have been 27.

THE COURT: Are you currently working?

A PROSPECTIVE JUROR: Yes.

THE COURT: Tell us the type of work you do.

A PROSPECTIVE JUROR: Electrical mechanic, New York State Power Authority.

THE COURT: And, is your spouse currently working.

A PROSPECTIVE JUROR: Yes.

THE COURT: Tell us what kind of work she does.

A PROSPECTIVE JUROR: Ethan Allen.

THE COURT: How about your children?

A PROSPECTIVE JUROR: No, my daughter's a housewife, my son passed away.

THE COURT: Okay. All right. Miss Potenza, the neighborhood in which you live.

A PROSPECTIVE JUROR: Farmingdale.

THE COURT: Married or committed relationship.

A PROSPECTIVE JUROR: Married.

THE COURT: Children?

A PROSPECTIVE JUROR: One.

THE COURT: Approximately how old is your child?

A PROSPECTIVE JUROR: 35.

THE COURT: And, are you currently employed?

A PROSPECTIVE JUROR: Yes.

THE COURT: Tell us what kind of work you do.

A PROSPECTIVE JUROR: Administrative assistant, Nassau Community College.

THE COURT: Spouse currently working.

A PROSPECTIVE JUROR: No, he is retired.

THE COURT: And, you're, I am sorry, you said your son or daughter?

A PROSPECTIVE JUROR: My daughter.

THE COURT: What work, if any, she does.

A PROSPECTIVE JUROR: She is a physical therapist, owns her own business.

THE COURT: Okay. Miss Bartolomeo.

A PROSPECTIVE JUROR: Franklyn Square.

THE COURT: Married or committed relationship.

A PROSPECTIVE JUROR: Married.

THE COURT: Number of children.

A PROSPECTIVE JUROR: Two children.

THE COURT: Their ages.

A PROSPECTIVE JUROR: 26 and 23.

THE COURT: And, are you currently working?

A PROSPECTIVE JUROR: Yes.

THE COURT: What kind of work do you do?

A PROSPECTIVE JUROR: I have two jobs. I work as a secretary in the dean's office at St. John's

University and also I do transcripts for court reporters.

THE COURT: Your spouse, could you tell us what he does?

A PROSPECTIVE JUROR: Truck driver.

THE COURT: And your children, if they're working.

A PROSPECTIVE JUROR: My oldest daughter is a Geico marketing coordinator and my younger daughter is in school, graduate school and is working in retail.

THE COURT: Thank you.

THE COURT: Mr. Math.

A PROSPECTIVE JUROR: Correct.

THE COURT: Just the way it looks. The neighborhood, sir, you live in.

A PROSPECTIVE JUROR: Jericho.

THE COURT: And, married or committed relationship.

A PROSPECTIVE JUROR: Married.

THE COURT: Number of children.

A PROSPECTIVE JUROR: Two.

THE COURT: Approximately how old?

A PROSPECTIVE JUROR: 34 and 31.

THE COURT: Tell me the respective jobs everybody has including yourself.

A PROSPECTIVE JUROR: Current career investment advisor. Prior to that I was an attorney.

THE COURT: Okay.

A PROSPECTIVE JUROR: Assistant District Attorney. That goes back a long way, but I did that for five years. And currently I work for David Lerner Associates as an investment advisor.

THE COURT: How about either your children or spouse.

A PROSPECTIVE JUROR: My wife is a bank officer, Astoria Federal, and the children are, older one is married, marketing director for a company that puts on shows, trade shows, and the younger one is a physical therapist who works with two and three year old children.

THE COURT: And, when you were practicing as an attorney, you know, you said you were an Assistant District Attorney at one time. What kind of work did you do when you were practicing?

A PROSPECTIVE JUROR: Criminal defense and plaintiff work. Some corporate. Basically trial work.

THE COURT: Basically trial work, in this county or another county?

A PROSPECTIVE JUROR: This county, and others.

THE COURT: Mr. Ramotar, the neighborhood in which you live, the town.

A PROSPECTIVE JUROR: Elmont.

THE COURT: And, married or committed relation.

A PROSPECTIVE JUROR: Married.

THE COURT: Children.

A PROSPECTIVE JUROR: Three.

THE COURT: Approximately how old.

A PROSPECTIVE JUROR: Eighteen, sixteen and nine.

THE COURT: And, your occupation.

A PROSPECTIVE JUROR: Accountant.

THE COURT: And your spouse.

A PROSPECTIVE JUROR: She assists in the office. More of a homemaker.

THE COURT: Your own business?

A PROSPECTIVE JUROR: Yes, self-employed.

THE COURT: Mr. Coleman, sir, good morning.

A PROSPECTIVE JUROR: Good morning.

THE COURT: The neighborhood in which you live.

A PROSPECTIVE JUROR: Merrick.

THE COURT: Married or committed relationship.

A PROSPECTIVE JUROR: Married, two children,

son 29, daughter is 27, I have 19 month old granddaughter.

THE COURT: And, everyone's occupation including yours.

A PROSPECTIVE JUROR: My son is a driver for a water company. My daughter-in-law is a teacher. My daughter is an administrator at Dowling College. My wife's a reading specialist in Manhasset, clinical social worker director of the inpatient detox at Nassau University Medical Center.

THE COURT: Thank you. Miss Tomko, how are you?

A PROSPECTIVE JUROR: Good.

THE COURT: The neighborhood in which you live.

A PROSPECTIVE JUROR: East Rockaway.

THE COURT: Married or committed relationship.

A PROSPECTIVE JUROR: Committed relationship.

THE COURT: And, children, if any.

A PROSPECTIVE JUROR: No.

THE COURT: You're current occupation, if you're working.

A PROSPECTIVE JUROR: Flight attendant for Jet Blue Airways.

THE COURT: Miss Lyle, good morning. The

neighborhood in which you live.

A PROSPECTIVE JUROR: Malvern.

THE COURT: Married or committed relationship.

A PROSPECTIVE JUROR: Married.

THE COURT: Children.

A PROSPECTIVE JUROR: Two.

THE COURT: Approximately how old?

A PROSPECTIVE JUROR: One and two.

THE COURT: And, are you currently working?

A PROSPECTIVE JUROR: Yes.

THE COURT: What type of work do you do?

A PROSPECTIVE JUROR: High school special ed. teacher.

THE COURT: And, I am sorry, did you say you were married?

A PROSPECTIVE JUROR: Yes.

THE COURT: The occupation of your spouse.

A PROSPECTIVE JUROR: He is in medical sales.

THE COURT: Miss McCann, the neighborhood in which you live.

A PROSPECTIVE JUROR: Roslyn Heights.

THE COURT: And married or committed relationship.

A PROSPECTIVE JUROR: Married.

THE COURT: Children.

A PROSPECTIVE JUROR: One daughter.

THE COURT: And, how old would your daughter be?

A PROSPECTIVE JUROR: 22.

THE COURT: Current occupation of everyone including yourself, if they're working.

A PROSPECTIVE JUROR: I am a letter carrier in Roslyn Village. My husband is also a letter carrier in Roslyn Village. My daughter works for the postal plant in Melville as a mail handler.

THE COURT: You must of met on the job.

A PROSPECTIVE JUROR: Not on the job.

THE COURT: Mr. Grasso, good morning.

A PROSPECTIVE JUROR: Good morning.

THE COURT: Neighborhood in which you live.

A PROSPECTIVE JUROR: New Hyde Park.

THE COURT: Married or committed relationship.

A PROSPECTIVE JUROR: Married.

THE COURT: Children.

A PROSPECTIVE JUROR: Two daughters, 26 and 28.

THE COURT: And, can you tell us everyone's employment and if they're working.

A PROSPECTIVE JUROR: Yes. Myself. CVS

pharmacist on the North Shore, Manhasset. My wife is currently disabled due to spinal problems. My two daughters, one is an EKG tech and the other one is a partner in a Manhattan investment firm.

THE COURT: Thank you. Very much.

Mr. Shah. Yes, sir. Good morning.

THE COURT: The neighborhood in which you live?

A PROSPECTIVE JUROR: Elmont.

THE COURT: And, married or committed relationship.

A PROSPECTIVE JUROR: Yeah, I was married, but divorced in 2005. And I got married and I live over here. I married overseas. I have two daughters from that, daughters' over there. I spoke to them they're going to come.

THE COURT: And the nature of your work.

A PROSPECTIVE JUROR: I work in Papa John's Pizza.

THE COURT: And, Miss Lodge.

A PROSPECTIVE JUROR: Yes.

THE COURT: The neighborhood in which you live.

A PROSPECTIVE JUROR: Bellmore.

THE COURT: Married or committed relationship.

A PROSPECTIVE JUROR: Married.

THE COURT: Children.

A PROSPECTIVE JUROR: No.

THE COURT: And, can you tell us your current occupation, if any.

A PROSPECTIVE JUROR: I work in Model's sporting goods. My husband's director of an operations facility.

THE COURT: Finally, Miss Cummings. Good morning. The neighborhood in which you live.

A PROSPECTIVE JUROR: New Hyde Park.

THE COURT: Married or committed relationship.

A PROSPECTIVE JUROR: Married.

THE COURT: Children.

A PROSPECTIVE JUROR: Daughter, 34 years old.

THE COURT: Everybody's occupation, if they're working including yourself.

A PROSPECTIVE JUROR: Data entry computer, office in the city. Husband's retired detective. And my daughter just got laid off.

THE COURT: Your husband who is a retired detective, where is that?

A PROSPECTIVE JUROR: New York City.

THE COURT: We will talk about that in a little bit more in detail in a moment.

At this point what I am going to do is go through a number of questions. I am going to ask them collectively and go row by row. To the extent that your answer would be yes to these questions, if you can kindly raise your hands and we will speak about them more in detail.

With respect to the first row, any of you ever served on jury service either in a criminal case, civil case, either in a state court system, federal court system, or for that matter any type of Grand Jury service.

Mr. Burke.

A PROSPECTIVE JUROR: Civil case about five or six years ago.

THE COURT: And --

A PROSPECTIVE JUROR: In Nassau County.

THE COURT: Did you reach a verdict or was it resolved beforehand.

A PROSPECTIVE JUROR: A verdict. I think to set a precedent we were asked one question, it was a yes or no question.

THE COURT: Anything, any reason why you wouldn't be able to, obviously a civil trial and criminal trial have different legal issues with different purposes. Does anything stick out from the

civil experience in your mind about the law?

A PROSPECTIVE JUROR: No.

THE COURT: Okay.

Anybody else in the first row, Miss Potenza.

A PROSPECTIVE JUROR: Civil case.

THE COURT: Okay. And, did that go to verdict?

A PROSPECTIVE JUROR: No, they settled.

THE COURT: That was in Nassau County?

A PROSPECTIVE JUROR: Yes.

THE COURT: Anybody else in the first row, Mr. Fergurson.

A PROSPECTIVE JUROR: Grand Jury in Brooklyn.

THE COURT: How long ago?

A PROSPECTIVE JUROR: Ten, twelve years ago I guess.

THE COURT: The Grand Jury process is very different from the trial process in a number of important respects particularly when it pertains to the burden of proof and what the Grand Jury needs to find in order to vote an indictment opposed to in a trial setting like this, whether or not a defendant has been proven guilty beyond a reasonable doubt.

Would you have any problem in following my instructions that I give to you here?

A PROSPECTIVE JUROR: No problem.

THE COURT: Anybody here have prior jury service, Grand Jury, Miss Bartolomeo.

A PROSPECTIVE JUROR: Six years ago a civil case.

THE COURT: Did that reach a verdict?

A PROSPECTIVE JUROR: Yes.

THE COURT: Anybody else in the first row.

How about the second row, prior jury service, criminal, civil, state, federal, Grand Jury?

Miss Tomko.

A PROSPECTIVE JUROR: Criminal, right here in this courtroom, first seat, January of 2003.

THE COURT: Do you recall what kind of case it was?

A PROSPECTIVE JUROR: It took place in Uniondale. Trying to think. It was a criminal case. Trying to think, victim of, well, didn't die, he had a rap sheet, three years, I can't get into it, explain it, but it was convicted.

THE COURT: It was a criminal case that went to verdict. Without telling us the verdict, was there anything about that jury service that would make you not want to serve as a juror again?

A PROSPECTIVE JUROR: No, I am fine with it.

THE COURT: Anybody else in that second row, Miss Cummings.

A PROSPECTIVE JUROR: I was in a case, criminal.

THE COURT: Okay. What kind of case, if you remember.

A PROSPECTIVE JUROR: It was with drugs, but it was resolved.

THE COURT: Resolved before you reached a verdict?

A PROSPECTIVE JUROR: Yes.

THE COURT: Had the trial been going on?

A PROSPECTIVE JUROR: Yes, it had started.

THE COURT: Anybody else in the second row, miss Lodge.

A PROSPECTIVE JUROR: It wasn't a criminal case. It got settled before it went to verdict.

THE COURT: You were picked but there were no deliberations, no calling of witnesses, things of that nature?

A PROSPECTIVE JUROR: No.

THE COURT: Anybody else in the second row, state, grand jury, federal?

Next question, again, going back to the first row, have you or any either family members or personal

friends or people that you are in somewhat regular contact with that are in law enforcement? By that I mean, police officers, detectives, corrections department, District Attorney's offices or for that matter the Court system.

Anybody here in the first row, Mr. Burke.

A PROSPECTIVE JUROR: Yes, my brother's, in the Fourth Precinct, Nassau County:

THE COURT: He is currently employed?

A PROSPECTIVE JUROR: Yes.

THE COURT: Okay. We're going to get back to you with regard to law enforcement. Let me ask you rather than pass on it.

Obviously you heard from my reading of the witness list there's a number of police officers that will be testifying here. Some of them are from Nassau County. Some of them are from the Village of Hempstead.

You also heard me say that if you're selected as a juror you're to evaluate a police officer just like anybody else, and/or detective. They can be telling the truth, they can be mistaken, they can be sometimes lying on occasion.

Is there any reason you wouldn't be able to evaluate these officers with that in mind?

A PROSPECTIVE JUROR: No reason at all.

THE COURT: You would treat them just like you would treat anybody else?

A PROSPECTIVE JUROR: Yes.

THE COURT: Anybody else in the first row, law enforcement, Mrs. Ramotar.

A PROSPECTIVE JUROR: Yes, as an accountant I have several detectives and police officers from New York City especially that are clients of mine.

THE COURT: Okay. Same question I asked Mr. Burke.

A PROSPECTIVE JUROR: Haven't had a problem.

THE COURT: You would treat them like anybody else?

A PROSPECTIVE JUROR: Sure.

THE COURT: Anybody else in the first row, Mr. Math?

A PROSPECTIVE JUROR: Myself.

THE COURT: Myself, which District Attorney's Office did you work for.

A PROSPECTIVE JUROR: Kings County.

THE COURT: For how many years?

A PROSPECTIVE JUROR: Five plus.

THE COURT: And, I don't want you to try to date yourself, how long ago, how many years ago,

A PROSPECTIVE JUROR: No reason at all.

THE COURT: You would treat them just like you would treat anybody else?

A PROSPECTIVE JUROR: Yes.

THE COURT: Anybody else in the first row, law enforcement, Mrs. Ramotar.

A PROSPECTIVE JUROR: Yes, as an accountant I have several detectives and police officers from New York City especially that are clients of mine.

THE COURT: Okay. Same question I asked Mr. Burke.

A PROSPECTIVE JUROR: Haven't had a problem.

THE COURT: You would treat them like anybody else?

A PROSPECTIVE JUROR: Sure.

THE COURT: Anybody else in the first row, Mr. Math?

A PROSPECTIVE JUROR: Myself.

THE COURT: Myself, which District Attorney's Office did you work for.

A PROSPECTIVE JUROR: Kings County.

THE COURT: For how many years?

A PROSPECTIVE JUROR: Five plus.

THE COURT: And, I don't want you to try to date yourself, how long ago, how many years ago,

approximately.

A PROSPECTIVE JUROR: I left to go into practice in '77.

THE COURT: Okay. Obviously more recently you did criminal defense work?

A PROSPECTIVE JUROR: Yes.

THE COURT: As you indicated you obviously know the situation you're in now, can you give both sides your word you would be fair to both of them and follow the law as I give it to you, irrespective of what you may think of it with your own personal experience maybe as an attorney.

A PROSPECTIVE JUROR: I would give it as good a shot I can give it. That is the answer. Okay.

THE COURT: Okay. You said you did some trial work.

A PROSPECTIVE JUROR: Tons.

THE COURT: So, is there any reason that the two assistant district attorneys would think that because of your prior criminal defense work, maybe this isn't the kind of person I would want on my jury, would be more inclined to be favorable to Mr. Lemke for any reason?

A PROSPECTIVE JUROR: If I were them I wouldn't use a peremptory on me.

THE COURT: I think that answers it.

Anybody else in that first row?

Miss Bartolomeo.

A PROSPECTIVE JUROR: One of the deans I work with at St. John's was a former captain in New York City Corrections. And also my daughter whose, I hope some same day, will be my son-in-law, dating a New York City cop, but doesn't mean anything to me.

THE COURT: You would treat them like anybody else?

A PROSPECTIVE JUROR: Yes.

THE COURT: Anybody else in the first row?

How about the second row? Anybody have any close friends, family members, associates that are in law enforcement?

Miss Lyle.

A PROSPECTIVE JUROR: My father was a New York City police officer, retired, and my sister is a New York City police officer.

THE COURT: Your father, how many years did he work before he retired?

A PROSPECTIVE JUROR: 21 years.

THE COURT: Okay. And, I am sorry, the other person was?

A PROSPECTIVE JUROR: My sister.

THE COURT: She is currently active?

A PROSPECTIVE JUROR: Yes.

THE COURT: Again, same question I would pose to you as well as the other people that have indicated they have the same kind of background.

As you sit there now, you're going to hear from police officers and detectives in this case who are obviously not your father and your sister. Can you give me your assurance you will treat those police officers as you would anybody else, and evaluate their testimony based upon everything else you hear in the case?

A PROSPECTIVE JUROR: Yes, I can try, yes.

THE COURT: Okay. Any difficulty with that at all?

A PROSPECTIVE JUROR: No. Not, I mean, I don't know if that is my family relationship with them would I, the fact the way I look at a police officer as opposed to someone else.

THE COURT: Well --

A PROSPECTIVE JUROR: I get a little hesitant. I guess I am more predisposed to believe a police officer because that is what I was taught.

THE COURT: Right, and I think almost all of us are kind of brought up in that sense, but on the other hand we're all human. Like I said before police

officers could be telling the truth, sometimes they can be mistaken, sometimes they can lie. They're no different than anybody else other than the fact they have a certain job and certain position.

So, would you, just because of their position or because of their job, if you will, or occupation, would you just automatically believe them without listening to what, how they say things, the manner in which it's said. Compare their testimony with what you hear from other evidence in the case before arriving at a determination whether or not they're being truthful and being accurate.

A PROSPECTIVE JUROR: No, I feel I would be able to fairly listen to what they're saying and be able to judge that.

THE COURT: Okay. That is all we can ask.

Anybody else in that second row? Miss Tomko.

A PROSPECTIVE JUROR: Back to the first question, it was a gang related stabbing. That was the answer. And my next door neighborhood is a police officer in Lynbrook but we really don't, it's a very light relationship. I don't have any problems.

THE COURT: All right. Anybody else in that second row? Mr. Grasso.

A PROSPECTIVE JUROR: Yes. I have personal

friends that are police officers, play ball, soft ball, you know, socialize. Mainly we don't get into anything heavy. We don't talk about the job per se.

THE COURT: Would you be able to give me your assurance you will treat them like anybody else?

A PROSPECTIVE JUROR: Of course.

THE COURT: Anybody else in that second row? Miss Lodge.

A PROSPECTIVE JUROR: My grandfather's retired police officer, detective.

THE COURT: Okay.

A PROSPECTIVE JUROR: Wouldn't affect me.

THE COURT: Miss Cummings.

A PROSPECTIVE JUROR: Yes. My husband's retired, all of the above. We have a lot of police officers, police friends, and you know, but I wouldn't be --

THE COURT: Predisposed to giving them an edge without hearing what they have to say and comparing it to everything else you hear in the case, you can tell me you can do that.

A PROSPECTIVE JUROR: Yes.

THE COURT: Moving to the, if you will, the crime victim question. Going back to the first row. Any of you, yourselves, close family members, friends

that would be important to you, that have been victims of a crime?

Anybody in that first row? Mr. Math.

A PROSPECTIVE JUROR: House was burglarized twice, two cars stolen.

THE COURT: Anybody else?

Mr. Ramotar.

A PROSPECTIVE JUROR: Last year I had a burglary at the house.

THE COURT: That was in Elmont, yes?

A PROSPECTIVE JUROR: Yes, in Elmont.

THE COURT: You dealt with the police?

A PROSPECTIVE JUROR: Right.

THE COURT: Was there any, as a result of your dealings with the police in that encounter, any reason you would be predisposed either in favor of police or not in favor of the police?

A PROSPECTIVE JUROR: No.

THE COURT: Any arrests as a result of that?

A PROSPECTIVE JUROR: No arrest was made.

THE COURT: Anybody else in the first row?

Mr. Coleman.

A PROSPECTIVE JUROR: Car stolen in '96, I think '95.

THE COURT: Same questions I was asking Mr.

Ramotar. Anything about that encounter, either with the police, if there was any encounters with them?

A PROSPECTIVE JUROR: No.

THE COURT: How about the second row, crime victims? Nobody in the second row?

A PROSPECTIVE JUROR: My daughter was stalked eight years by an neighbor. We had encounters with the police.

THE COURT: Out here in Nassau?

A PROSPECTIVE JUROR: Yes.

THE COURT: When did that whole thing end?

A PROSPECTIVE JUROR: Well, they had to remove the person from the house, but I wanted to kill him but --

THE COURT: All right. Anybody else in that second row?

Mr. Math.

A PROSPECTIVE JUROR: I just thought of something. My daughter was the victim of an attempted assault in Manhattan which resulted in the arrest and the conviction of the Eastside rapist.

THE COURT: And she obviously was in touch with and dealt with both the police and the District Attorney's Office?

A PROSPECTIVE JUROR: Yes.

THE COURT: That was, how long ago was that?

A PROSPECTIVE JUROR: Between six and seven years.

THE COURT: Okay. Anybody else?

Finally, have any of you, family members or friends either been accused or convicted of a crime?

Okay. First row anybody?

How about the second row, anybody?

Mr. Grasso.

A PROSPECTIVE JUROR: I have to say one of the gentleman I used to play ball with in the town the Long Beach, he was arrested and sentenced. He murdered his wife.

THE COURT: Okay. This was somebody you occasionally played ball with.

A PROSPECTIVE JUROR: Once a week.

THE COURT: Basketball.

A PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Before the attorneys question you we're going to take a very quick break to let everybody use the facilities. You can take your belongings, you can leave them there, just look around and see who your neighbor is so that when you come back you know where to sit.

We'll be back in about five minutes and pick

it up with the attorneys. Okay. At this point, if you want to step out, get a breath of fresh air. I am going to open up the windows.

(Whereupon, there was a recess in the proceedings.)

(Whereupon, the following takes place at a bench conference.)

A PROSPECTIVE JUROR: Michele McCann.

I don't remember any specifics about everything that went on, but my father's two brothers were members of organized crime and my father apparently did something stupid and he went to prison. He was in prison for a year and out on parole I am not sure how long.

THE COURT: Okay.

THE COURT: This is twenty plus years ago?

A PROSPECTIVE JUROR: More than that, yes.

THE COURT: All right. Do you know how old you were?

A PROSPECTIVE JUROR: I was about twelve. I find it very embarrassing.

THE COURT: That is why I say you can come up and speak to us privately so do you feel that way.

Do you feel you can sit as a juror in this case?

A PROSPECTIVE JUROR: I feel I can.

THE COURT: Any problem?

A PROSPECTIVE JUROR: No, just talking about it stirs up stuff.

THE COURT: I understand. It's easily understood.

THE COURT: Anybody have any questions?

MS. SINGAS: No.

MR. LEMKE: No.

THE COURT: Thank you.

(Whereupon, there was a recess in the proceedings.)

THE CLERK: Juror thirteen also wants to approach.

THE COURT: Miss Lodge, come up.

(Whereupon, the following takes place at a bench conference.)

A PROSPECTIVE JUROR: It's no, it's irrelevant, but I'm the only person to do what I do at my company. I am training someone new. Without me they can't do what I do. I am in the operations department for communications for the company.

THE COURT: Do you feel like if you got selected you wouldn't be able to concentrate.

A PROSPECTIVE JUROR: In part, yes, because I

am going to have to do the work anyway.

THE COURT: There is nobody to replace you.

A PROSPECTIVE JUROR: I'm training someone new whose been there three weeks. She can't replace me.

THE COURT: You can have a seat.

She is going to go. Don't waste time questioning her.

MR. LEMKE: Want to fill her seat now?

THE COURT: At this point let me get going. I want to give her twenty minutes and then I will break.

(Whereupon, the following takes place in open court.)

THE COURT: Miss Tomko.

A PROSPECTIVE JUROR: I can't remember if you were the judge. It was January 28, 2003.

THE COURT: No, may have been the lawyer on the case.

A PROSPECTIVE JUROR: No, district attorney was, I remember the district attorney. No, it was -- no, then it wasn't you.

THE COURT: Gang assault?

A PROSPECTIVE JUROR: Stabbing. It was a gang related stabbing of a lot of other incidents.

THE COURT: I remember a gang related shooting, not stabbing.

At this point we're going to hear from Miss Singas.

MS. SINGAS: Good morning. I want to follow up with some of the things the judge asked. Okay.

As the Judge told you my name is Madeline Singas. Along with Assistant District Attorney Tebbett it's our duty to present evidence in this case against the defendant, Ricardo Walters.

The reason we ask a lot of these questions is just to determine whether or not all of you have the right mind set to sit on this particular case. All of us have our own personal life experiences that we ask you to you bring into the courtroom. We ask you to bring your life experiences, we ask you to bring your common sense into this courtroom. Because that is what you will need as jurors.

But at the same time, we ask you to examine your own personal beliefs to see if there is anything in your life experiences which predisposes you towards either believing the prosecution's case more, disbelieving the prosecution case, being unfair to the defendant or unfair to the People.

So, is there is anything in your background that causes that level of playing field we're looking for to sort of be disrupted, that is why we ask you

these questions.

For example we talked about people's connection to law enforcement. We talked about the nature of the charges. You heard the Judge read the charges, rape, robbery, kidnapping. I am sure all of you would rather not sit on a case that involves rape, robbery, kidnapping, and so on. Okay.

But the question is, is there anything in your life experience that makes it impossible for you to sit on this case? Is there any connection to law enforcement that is so powerful you will not be able to sit and listen to the evidence as it comes from the witness stand in such a way you can't be impartial because of that connection? That is what we're looking for.

Clearly, in our family lives, our neighbors, we know people in law enforcement. We'd like to believe they do their job well, but the question remains, can you separate out your own life experiences, your own impressions, and listen to the witnesses from the witness stand?

Okay. Mr. Burke, can you promise me you will do that?

A PROSPECTIVE JUROR: Yes.

MS. SINGAS: Mr. Math.

A PROSPECTIVE JUROR: I might have difficulty with it.

MS. SINGAS: You think it's because of your experiences as an Assistant District Attorney or as a criminal defense attorney or both, a combination.

A PROSPECTIVE JUROR: Because as I recall my daughter was I will call it a near assault, she actually trapped the assailant in the door as he was chasing, trying to chase her into her apartment building three in the morning. I may have empathy for the victims here.

MS. SINGAS: Again, might have. You know it's hard for you sitting here in this chair to say what the future holds, but do you think because of that association, it was so close to home so to speak that you probably will look at the victims in this case with a more sympathetic light?

A PROSPECTIVE JUROR: I raise it because there's certainly the possibility of that. I can't discount that.

MS. SINGAS: Fair enough.

Miss Lyle, again, you talked about your father and sister being in law enforcement. In this case, do you think you're going to give any extra credit because he is law enforcement, he is a corrections officer, because of your law enforcement ties, that you will give

the defendant extra credit. You may go in the back when it's time to deliberate and say, you know what, I think the People proved their case, but I can't imagine someone in law enforcement would commit these crimes, therefore, I will give him the benefit of the doubt.

Do you think you will do that?

A PROSPECTIVE JUROR: No.

MS. SINGAS: How about you, Mr. Fergurson. Do you think you will give my witnesses, the People's witnesses, any extra credit because they're in law enforcement?

A PROSPECTIVE JUROR: No.

MS. SINGAS: Do you think you will give the defendant any extra credit because he's in law enforcement?

A PROSPECTIVE JUROR: No.

MS. SINGAS: I know you mentioned that you had a son who passed. I don't want to touch on something that is sensitive, but was it as a result of a crime.

A PROSPECTIVE JUROR: No, it was cancer.

MS. SINGAS: Sorry to hear that.

Is there anything about your Grand Jury experience you think would lead to that frame of mind that you wouldn't be able to sit and listen to the evidence in this case?

A PROSPECTIVE JUROR: It's been a while ago. I don't remember what it was about other than drugs. I don't know nothing --

MS. SINGAS: Miss Potenza, is there anything you heard so far in this case that causes you some concern as you sit here that you will not be able to listen to the evidence, apply your common sense, and apply the law as the judge gives it to you?

That is all we're asking from you.

A PROSPECTIVE JUROR: Should be able to.

MS. SINGAS: Miss Cummings, you mentioned your daughter had an incident and the police were called. Did the police follow up?

A PROSPECTIVE JUROR: It was eight years. He was talking to her.

MS. SINGAS: Were you happy with the police response.

A PROSPECTIVE JUROR: Yeah. I mean to what they were allowed to do.

MS. SINGAS: And, nothing about that experience that causes you, if you see a police officer, you don't think they're doing their job well, or the District Attorney's Office, was that person prosecuted by the District Attorney's Office?

A PROSPECTIVE JUROR: It was but it was in a

small court, not a regular, yeah.

MS. SINGAS: Okay. All right. Miss Bartolomeo, you say you may have transcribed transcripts which may have concerned some detectives here. Again, you raised it to us.

A PROSPECTIVE JUROR: Because I recognize the names. I don't know them at all.

MS. SINGAS: Nothing about that experience would cause you to give greater weight to a police witness or anything else?

A PROSPECTIVE JUROR: No.

MS. SINGAS: Mr. Coleman, you said you were a clinical social worker. You work in the area. Is it drug related.

A PROSPECTIVE JUROR: Director of the Inpatient Detox Medical Center.

MS. SINGAS: And, do you have any clients that are there as a result of arrests or any involvement with the police or is it purely --

A PROSPECTIVE JUROR: Well, it's a volunteer, unit. A lot of my patients are currently in the court system or waiting to go into the court system, all the time, sure.

MS. SINGAS: Is there anything about your training as a social worker you think might impact you

as you listen to the evidence in this case?

And what I am getting at, for example, let's say you see a victim on the stand and clinically you may think she is not reacting the way she should be reacting, just an example. Do you think you will bring sort of your training as a social worker into the deliberating room? Do you think you can take the evidence as it comes from the witness stand.

A PROSPECTIVE JUROR: I would think my training would allow me to be impartial.

MS. SINGAS: Is there anything you heard up to this point which gives you pause about your frame of mind, if you can be a fair and impartial juror in this case?

A PROSPECTIVE JUROR: No, nothing would get in the way.

MS. SINGAS: All right.

Miss Tomko, is there anything about that prior jury service, you deliberated I assume with your other jurors, you know that sometimes that could get heated, that could get, you have to express your opinions, you have to listen to the opinions of others, anything about that experience that gives you pause?

A PROSPECTIVE JUROR: No, not at all.

MS. SINGAS: The law has to come from the

judge. You can't remember the law they gave you, you can't mix up any of the facts you heard from that case with this case. Any problem with that?

A PROSPECTIVE JUROR: Not at all.

MS. SINGAS: Okay. Mr. Burke, one of the things you will have to decide if you sit on this jury is did the witnesses make a correct identification of the defendant. I'd like to talk a little bit about identification.

Can you think of some factors, some things, that would make, some circumstances that make it more likely that a person would make an accurate identification versus an inaccurate identification.

A PROSPECTIVE JUROR: This is a traumatic event, probably would remember clearly or in more detail than something that was superficial.

MS. SINGAS: The frame of mind and how that experience affected that person might be something you would consider, right?

A PROSPECTIVE JUROR: Yes.

MS. SINGAS: How about something like how far away the person was standing from the victim? Do you think that would be something you would consider?

A PROSPECTIVE JUROR: Distance is a factor in observing details.

MS. SINGAS: Mr. Fergurson, does that make sense, the closer you are versus standing far away.

A PROSPECTIVE JUROR: Yes.

MS. SINGAS: How about the lighting, do you think that may have an impact?

A PROSPECTIVE JUROR: Yes, it would.

MS. SINGAS: Okay. Miss Potenza, how about the type of interaction, how much of the person you saw versus how little, do you think that would impact on whether or not you can make a correct identification?

A PROSPECTIVE JUROR: Yes.

MS. SINGAS: How about how much time you spent with that person, do you think that would be something you would consider?

A PROSPECTIVE JUROR: What you mean time?

MS. SINGAS: Let's say someone spent thirty seconds with a perpetrator of a crime versus fifteen minutes.

A PROSPECTIVE JUROR: Yes.

MS. SINGAS: Do you think that sort of makes sense, the more time you spend with somebody the more likely, probable, you'd be able to make an accurate identification?

A PROSPECTIVE JUROR: Yes.

MS. SINGAS: Miss Bartolomeo, does that make

sense?

A PROSPECTIVE JUROR: The timing?

MS. SINGAS: Yes.

A PROSPECTIVE JUROR: Absolutely.

MS. SINGAS: The factors, distance, time together, the circumstances under which the attack happened, light versus dark?

A PROSPECTIVE JUROR: Yes. Common sense.

MS. SINGAS: Let me ask you this question. You have been watching me now for a little while. How tall do you think I am?

A PROSPECTIVE JUROR: 5'7", 5'6".

MS. SINGAS: How about you, Mr. Math, how tall do you think I am?

A PROSPECTIVE JUROR: With heels or without?

MS. SINGAS: With heels.

A PROSPECTIVE JUROR: 5'7" and-a-half.

MS. SINGAS: How about you, Mr. Ramotar.

A PROSPECTIVE JUROR: 5'8".

MS. SINGAS: Do you think, not going to tell you if you're correct. Mr. Ramotar, do you think it matters that I am standing and you're sitting when you give a description of me and how tall I am, do you think that has something to do with it?

A PROSPECTIVE JUROR: Not necessarily.

MS. SINGAS: How about you, Mr. Coleman, do you think you'd be able to eyeball me a little bit if you were standing a distance from me opposed to me standing in front of you now?

A PROSPECTIVE JUROR: Yes.

MS. SINGAS: How about hair color. What would you call it.

A PROSPECTIVE JUROR: I would call it, it's definitely brown; I would say medium to dark.

MS. SINGAS: Miss Tomko, if I walked away from you and someone asked you later to describe me, would you say my hair was short, long, medium.

A PROSPECTIVE JUROR: Medium length, close to dark brown, about 5'9".

MS. SINGAS: Miss Tomko is the closest because I am 5"8" and-a-half. I have on two inch heels. I am closer to 5'11" than I am to 5'6" to 5'7".

Mr. Math, let me ask you, suppose tonight you were having dinner with a friend at a restaurant and I walked into that restaurant, do you think you'd be able to recognize me?

A PROSPECTIVE JUROR: Yes.

MS. SINGAS: How about you, Mr. Ramotar?

A PROSPECTIVE JUROR: Sure.

MS. SINGAS: Even though you said I was only

5'7".

A PROSPECTIVE JUROR: Yes, sure.

MS. SINGAS: What I am getting at, is there a difference in being able to describe someone and then being able to recognize them again at a later time. Do you agree with Mr. Fergurson, some people could be good at giving a description, other people might not be so good, but that doesn't affect their ability to recognize a person.

Does that make sense?

A PROSPECTIVE JUROR: Yes, it does.

MS. SINGAS: Miss Tomko, does that make sense?

A PROSPECTIVE JUROR: I'll tell you, you look like my friend's mother and her name is Madaline.

MS. SINGAS: Mother.

A PROSPECTIVE JUROR: Not old, she's very young.

MS. SINGAS: Thank you I think.

A PROSPECTIVE JUROR: Didn't tell us your name, we were just listening, I saw you in a restaurant, I'd remember you, I have a photographic memory versus names.

MS. SINGAS: How about you, Miss McCann, any of those concepts don't make sense to you?

A PROSPECTIVE JUROR: They do.

MS. SINGAS: Identifying factors we use in identification, being able to recognize someone versus being able to identify.

A PROSPECTIVE JUROR: Everything makes sense.

MS. SINGAS: Mr. Grasso, anything about that experience with your friend that you played ball with, were you involved at all going into court for him?

A PROSPECTIVE JUROR: No, no, had nothing to do with it, although he did call me once from where he is being held out on Long Island in before he was arraigned and sentenced. I did speak to him. It was nothing about the case believe it or not.

MS. SINGAS: Anything about that that makes you uncomfortable to sit on this case.

A PROSPECTIVE JUROR: Very fair person.

MS. SINGAS: Can give both sides a fair shake?

A PROSPECTIVE JUROR: That's right. That's right. Always look at both sides of the story. Pretty well rounded.

MS. SINGAS: Mr. Shah, anything you heard so far that doesn't make sense to you, troubles you, about your ability to sit fairly and impartially.

A PROSPECTIVE JUROR: Yes.

MS. SINGAS: You're okay, you can sit you think.

A PROSPECTIVE JUROR: Yes.

MS. SINGAS: And listen to the evidence that comes from the witness stand.

A PROSPECTIVE JUROR: Yes.

MS. SINGAS: Apply your common sense to it.

A PROSPECTIVE JUROR: Yes.

MS. SINGAS: I think that is it for me. Thank you very much.

THE COURT: Thank you. Mr. Lemke.

MR. LEMKE: Thank you, Your Honor.

Good afternoon, I think, although we're moving pretty quick, sitting here you may not think so. We have nine jurors already selected. Trying to find three more and a couple of alternates. I believe we will have that out of the potential panel sitting here now, although Mr. Math, you may think you, you have been in that situation before, next thing you know you have one juror and you're picking another round.

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: You've done a lot of litigation.

A PROSPECTIVE JUROR: Lots.

MR. LEMKE: You were a prosecutor for five years.

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: You did defense work for another --

A PROSPECTIVE JUROR: Ten.

MR. LEMKE: Certainly have a lot of experience both as a prosecutor and defense counsel. If you're selected as a juror, often wonder myself, I'd like to sit, however, a lot of things that you may have either experience with, and you said, you don't want to use a peremptory, one of the challenges when we approached the Court. We already got nine that we have selected. We could knock off a few who feel they may not be fair in this case. You indicated to the People you don't want to waste a perempt on me. What about defense counsel? I know you indicated something regarding your daughter's situation and the question, based on your experiences as you know them to be, I will get to Miss Tomko, you mentioned something about a rap sheet, I guess, you learned from your last trial.

A PROSPECTIVE JUROR: Partially.

MR. LEMKE: After the case, maybe in discussions.

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: Okay. Certainly conversations, feelings you have after a case you discussed all of

that. I will come back. I want to ask you about the things you learned outside the trial that would in any way affect your ability to sit here.

In that case did the individual charged with that crime, again, you told us what the verdict was. Don't tell us again. In that case, did the individual charged, did that person, he or she, take the stand?

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: That is when you found out a number of things, priors and so forth?

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: If I had, I had to ask Mr. Grasso what is this case about, this case here.

A PROSPECTIVE JUROR: Well, like you said, rape, robbery.

MR. LEMKE: Mr. Burke, anything else?

A PROSPECTIVE JUROR: Kidnapping.

MR. LEMKE: Rape, robbery. Over the years how many, couple years, Miss Lyle.

A PROSPECTIVE JUROR: I believe he said 2005 to seven.

MR. LEMKE: 2005 to seven. Robbery, rape, kidnapping. Anything else mentioned.

A PROSPECTIVE JUROR: Where. Hempstead.

MR. LEMKE: Hempstead. What about witnesses,

Mr. Coleman JUROR:

A PROSPECTIVE JUROR: They read a list of people who would be witnesses.

MR. LEMKE: We got kidnapping, rape, robbery, Hempstead, 2005 to roughly 2007. Number of incidents, Mr. Ramotar.

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: If you had to reach a verdict now, what would your verdict be?

A PROSPECTIVE JUROR: Can't give an answer. Haven't heard anything.

MR. LEMKE: Mr. Coleman.

A PROSPECTIVE JUROR: Now, no.

MR. LEMKE: Miss Lodge.

A PROSPECTIVE JUROR: No.

MR. LEMKE: Anybody other than perhaps Mr. Math at this point, give a verdict.

A PROSPECTIVE JUROR: I haven't heard anything. I don't know.

MR. LEMKE: Mr. Math.

A PROSPECTIVE JUROR: Not guilty.

MR. LEMKE: Not guilty. Why?

A PROSPECTIVE JUROR: Haven't heard any evidence.

MR. LEMKE: There's a presumption that is

given to my client, given to Ricardo, the Judge will instruct you over and over again, the People have the burden of proof in this case. Again, I can't go into the instructions on the law, but I don't have to prove or disprove anything. If you haven't reached a verdict because there hasn't been any testimony, you haven't listened to the Judge's instructions on the law as to how it would apply, then you must follow the instructions, they haven't proven their case yet.

Mr. Grasso, do you agree with that principle?

A PROSPECTIVE JUROR: Yes, innocent until proven guilty.

MR. LEMKE: Mr. Shah.

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: Does that bother anyone that there's that presumption that my client benefits from? It's part of the criminal justice system. Does that bother, Mr. Coleman, bother you if you're selected there may be a witness or two, I didn't ask any questions because there's certain issues, if you're selected in this case, you can do that?

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: If you're selected in this case, is it Miss Potenza, I apologize if I mispronounced your name, in a case like this, a young lady takes the stand,

case you're selected in, and goes through an absolutely horrible crime, no question they'll be a number of witnesses regarding that, and as the prosecutor had indicated it's going to be identification, and if you're selected as a juror you have to decide whether or not the lighting conditions, the time element, the fear, whether or not there's been an accurate identification. So, a young lady comes in, testifies, and then at some point the prosecutor asks that witness, do you see the individual you believe did this to you. It's going to be very strong, very compelling moment, she will look around, you don't think she will point to me or the district attorney, she's going to point to Ricardo.

MS. SINGAS: Objection.

THE COURT: Sustained.

MR. LEMKE: If you're selected as a juror, talk about identification, that occurs, my question to you is, will you then still listen to any other evidence, to any other documents or exhibits that may come into evidence, to determine whether that identification is accurate or not.

Do you understand the question?

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: Tough situation. It's a vacuum, that's something we need to, in a few minutes, we speak

to discuss that type of situation, scenario.

A PROSPECTIVE JUROR: I am not sure.

MR. LEMKE: Think about it for a couple of minutes.

Mr. Fergurson, just going through a vacuum, you're selected, there is testimony, I am asking at this point if you're selected as a juror, will you consider all the other evidence or perhaps, shorten the question, is it possible, in fact, for an individual to make a mistake? Anybody ever saw somebody they thought was someone else, potential juror, Mr. Math, every done that?

A PROSPECTIVE JUROR: Sure.

MR. LEMKE: Maybe you have been identified, thinking you're someone else you're not. Mr. Grasso.

A PROSPECTIVE JUROR: I have to listen to all the details before I make a decision.

MR. LEMKE: Miss McCann.

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: Identification may be one thing bright light coming in, you're looking at us, maybe, yeah, you may be able to identify me, see me here, that is the individual, but the question is, with not identifying me or the prosecutor as the individual and if you're selected as a juror based upon testimony,

could you sit and evaluate it all, even if you have a witness coming in, saying, yeah, he is the one that did this. All I am asking you is to keep an open mind and follow the Judge's instructions.

Can you do that, Mr. Burke?

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: Miss Lyle.

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: You can do that if you're selected as a juror?

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: Now, is it Miss Bartolomeo?

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: Your daughter's dating a police officer I believe.

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: And she was a potential juror?

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: She came home and probably discussed a little bit about that day?

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: How much in detail did you talk about the lawyers, did she say, pretty cool, waste of time, here all day or was it a learning experience, didn't get picked.

A PROSPECTIVE JUROR: Told me what the case was about. Didn't get picked.

MR. LEMKE: Anything, I don't think so, but anything in that short discussion or anything else for that matter, would interfere with your ability to be fair if you're selected in a trial such as this?

A PROSPECTIVE JUROR: No, I thought it was ironic, you know.

MR. LEMKE: Very ironic.

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: Yes. Wouldn't be any problems with you going home and telling your daughter, listen, I don't know, but I got picked, you didn't, hold that over her for a little while?

A PROSPECTIVE JUROR: No.

MR. LEMKE: Ready to sit if you're selected?

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: Because of the emotional aspects of it.

A PROSPECTIVE JUROR: I know, yes.

MR. LEMKE: Mr. Math, during your many years of experience, did you ever have to get involved with any experts for trial, all the time?

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: However, it's, although, a fairly

new, field, DNA.

A PROSPECTIVE JUROR: No.

MR. LEMKE: Deal with DNA.

A PROSPECTIVE JUROR: No, couldn't spell it.

MR. LEMKE: Okay. That is why we called it DNA.

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: Anybody else either have any experience, good or bad, with DNA, anyone?

Mr. Coleman, had to give a description what DNA is, what is your opinion or belief of DNA.

A PROSPECTIVE JUROR: Today's technology helping to be able to identify people more clearly than before.

MR. LEMKE: It is, I guess, again, Mr. Burke, pretty much some type of thing, ever watch law enforcement shows.

A PROSPECTIVE JUROR: No, not at all.

MR. LEMKE: Yes.

A PROSPECTIVE JUROR: They discovered I have paracusus through gene study at Sloan Kettering. Saved my life.

MR. LEMKE: Profiling, genetic profiling.

A PROSPECTIVE JUROR: Took blood away to the lab came back with different mutations that contributed

to different diseases, you know.

MR. LEMKE: Discussed a little bit those results and so forth.

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: If you're selected as a juror, if you had, I will ask Miss McCann, if you're selected as a juror, if an individual comes in, may be called as an expert, and he is testifying regarding DNA, whether it's a live semen or anything else, along those lines, if the individual or the expert testifies, yes, we had something but it wasn't a match, are you going to completely, then, okay, ignore the rest of the testimony or visa verse an expert comes in without knowing more about the science, Mr. Coleman, as to one, how the sample was collected, preserved, tested, tested along with certain protocol and determination whether that expert, when that individual, and if that individual, he or she should testify as to what those results would be, whether it helps the case or not, or is it a situation where you feel it's an exact science, not going to listen to the manner in which it was recorded, preserved and prepared, Mr. Coleman.

A PROSPECTIVE JUROR: Not an exact science.

MR. LEMKE: Listen to the testimony, again, in relation to the expert's qualifications, Mr. Burke.

A PROSPECTIVE JUROR: Listen to the evidence.

MR. LEMKE: Mr. Fergurson.

A PROSPECTIVE JUROR: All the evidence.

MR. LEMKE: Police officer testifies or, were to testify, Mrs. Bartolomeo, you kind of had that scenario, whether you give that officer more or less credibility, officer, did he ever say the light was red, a civilian testifies the light was green, haven't seen anything else, there's been no testimony, any record that may have been written to cross-examine one person or the other, be more likely, Miss Lyle indicated she would more than likely believe the police officer opposed to the civilian. Here's a vacuum. Police officer comes in, don't know anything about the case, he says one thing, a civilian says another thing, or can you listen regardless of the professional status the individual has, the occupation that that person has, you will take a look at the testimony, various records, see if they're inconsistent in some sense, then make a determination, following the Judge's law, whether or not the officer's, as the Judge indicated, is either telling the truth, mistaken or in some cases lying.

A PROSPECTIVE JUROR: I think I can listen to everything first only because I have been hearing this for twenty-five years. So --

MR. LEMKE: In the office back and forth.

A PROSPECTIVE JUROR: No, I transcribe transcripts.

MR. LEMKE: Recording, reading it.

A PROSPECTIVE JUROR: I hear it all the time.

MR. LEMKE: Okay. Told you I wasn't going to be that long. Couple of areas I wanted to touch on. Okay. Mr. Shah, you have two daughters.

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: Emotional case. If you're selected as a juror in this case, with women --

A PROSPECTIVE JUROR: No.

MR. LEMKE: -- coming in, certainly going to, something that will affect each one of you. If you're selected as a juror, however, in such a case like this, would you be able to still look at the evidence, would you be able to come back and as emotional as it was where you had young victims, witnesses coming in, women coming in and testifying, it is their belief that someone had done this to them, if you're selected as a juror, would you still be able to come into this courtroom, if the People haven't proven the elements as the Judge will instructs you on, would you be able to, with your other jurors, come into this courtroom, and if the People have proven their case, certainly convict the

individual, Ricardo Walters, but if they haven't proven the elements, would you still be able to come in and say no, not guilty.

Understand that scenario, because it's an emotional time. Could you do that in a case such as this?

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: Mr. Grasso, you think you could.

A PROSPECTIVE JUROR: Yes.

MR. LEMKE: Okay. I have nothing else.

THE COURT: Thank you, Mr. Lemke.

Those of you in the jury box, I'm going to ask you to sit tight while the attorneys consider your answers and make their selections. If everybody in the back also can kind of survey where you are, in the next ten minutes or so, we will be excusing you for lunch then those in the jury box we will be determining, finding out, those who have been selected to serve in this case, everyone who has to use the facility by all the means do so. Remember where you're seated in your box. If you don't have to use the facilities just sit tight for a few minutes. Make it easier for my court staff.

(Whereupon, the following takes place in chambers.)

THE COURT: We have nine?

THE CLERK: Yes.

THE COURT: Go through the first three. That is Mr. Burke through Miss Potenza.

People, you got four challenges left. Defendant one. Any challenge for cause, first three.

MS. SINGAS: No.

THE COURT: Defendant first three.

MR. LEMKE: No.

THE COURT: People, peremptory, first three Burke, Fergurson, Potenza.

MS. SINGAS: No.

THE COURT: Defendant.

MR. LEMKE: Number three, Potenza.

THE COURT: Mr. Burke will be juror number ten, Fergurson number eleven.

Dealing with Miss Bartolomeo. People cause.

MS. SINGAS: No.

THE COURT: Defendant cause.

MR. LEMKE: No.

THE COURT: People perempt.

MS. SINGAS: No.

THE COURT: She is our twelfth juror, Miss Bartolomeo.

Two perempts on each seat. Want to get three

on the alternates.

Going to Mr. Math, People cause.

MS. SINGAS: Yes, I think so. I think he made it pretty clear.

THE COURT: I think so too.

Mr. Ramotar, number six, cause People.

MS. SINGAS: No.

THE COURT: Cause defendant.

MR. LEMKE: No.

THE COURT: People perempt.

MS. SINGAS: No.

THE COURT: Defendant perempt.

MR. LEMKE: No.

THE COURT: Mr. Ramotar is alternate number one.

Mr. Coleman, number seven, People cause.

MS. SINGAS: No.

MR. LEMKE: No.

THE COURT: People perempt.

MS. SINGAS: Yes, People perempt.

THE COURT: Number eight, cause People.

MS. SINGAS: Other than her saying I look like someone's mother which I can, clearly she is nuts, but nothing for cause, Judge.

MR. LEMKE: No.

THE COURT: People perempt.
MS. SINGAS: Alternate two.
THE COURT: Yes.
MS. SINGAS: I am going to perempt her.
THE COURT: People out for the second alternate seat.
Miss Lyle, cause People.
MS. SINGAS: No.
THE COURT: Defendant, cause, Miss Lyle.
MR. LEMKE: Yes. Not for cause.
MS. SINGAS: No perempts.
MR. LEMKE: Perempt, yes.
THE COURT: All right. Number ten, Miss McCann, cause People.
MS. SINGAS: No.
THE COURT: Defendant.
MR. LEMKE: No.
THE COURT: People perempt.
MR. LEMKE: They're out.
THE COURT: Sorry. I will use my last on her.
THE COURT: Mr. Grasso, cause.
MS. SINGAS: No.
MR. LEMKE: No.
THE COURT: Grasso's alternate number two.

Mr. Shah, cause People.
MS. SINGAS: No.
THE COURT: Defendant.
MR. LEMKE: No.
THE COURT: Peremptory People.
MS. SINGAS: Yes.
THE COURT: Number thirteen, Miss Lodge. Already said. Off the record.
Leaves us with Miss Cummings, cause People.
MS. SINGAS: No.
THE COURT: Cause defendant.
MR. LEMKE: No.
THE COURT: People.
MS. SINGAS: No.
THE COURT: Defendant.
MR. LEMKE: Yes.
(Whereupon, there was a discussion held off the record.)
THE COURT: Burke, number ten, Fergurson number eleven, Bartolomeo number twelve, Ramotar alternate number one, Mr. Grasso number two, Michele McCann alternate number three. We have our jury.
(Whereupon, the following takes place in open court.)
THE COURT: All right. Those fourteen

potential jurors in the box, kindly listen to my clerk as the names are read, please.

THE CLERK: The following jurors whose names I call have been selected to be on this jury.

Juror number ten, Michael Burke. Juror number eleven, Peter Fergurson. Juror number twelve Patricia Bartolomeo. Alternate juror number one is Aedile Ramotar. Alternate juror number two, Louis Grasso. Alternate juror number three is Michele McCann.

If your name has been called, remain in your seat. If you name has not been called, you're excused from this case and must return back to central jury.

THE COURT: Those leaving the box, name not called, thank you for participating in our jury selection.

At this point, as my clerk said, you will be asked to report back to central jury. I can't make any representations whether or not you will be called this afternoon. Hopefully you won't and jury service will be concluded, but I don't want to make that representation. Don't know what is happening in central jury. Again, those names not called, please follow my sergeant and step out at this point.

THE CLERK: Are the remaining jurors satisfactory to the People?

MS. SINGAS: They are.

THE CLERK: To the defense.

MR. LEMKE: Yes, Your Honor.

THE CLERK: Will the selected jurors please rise and raise your right hand.

Do you and each of you solemnly swear you will try this action in a just and impartial manner to the best of your judgment and render a verdict according to the law and evidence so help you God.

(Whereupon, the newly selected jurors collectively answered in the affirmative.)

THE COURT: You can have a seat our selected jurors.

Again, welcome. Now that you have been selected as jurors in this case, I want to thank you again. This completes our jury selection in this case. As I indicated we have been picking a jury since approximately the middle of last week. At this point I am going to excuse you for the day. We're not going to be obviously seeing you tomorrow being it's Election Day. I have directed those jurors who did get selected last week to report back here Wednesday. That is going to be the fifth at 9:30. Just step out and my sergeant will tell you where to go. He will give you some further instructions relative to parking. What I

anticipates happening on Wednesday, we will begin with my preliminary instructions I give to the jury before my trial actually starts, immediately followed by opening statements by the parties and the calling of witnesses. So, we expect to put in a full day on Wednesday, starting hoping anywhere as close to 10:30 as I can get everybody together. I ask you to come at 9:30, probably be busy here in Mineola, get a cup of coffee, listen to where my sergeant tells you where to report, and we'll try to have you in the courtroom as soon as possible.

Step out. Take your personal belongings with you. My sergeant will give you further instructions. See you here Wednesday morning at 9:30.

(Whereupon, the trial was adjourned to November 5, 2008.)