STATE OF NEW YORK : NASSAU COUNTY

COUNTY COURT PART 49

- - - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK, SCI/IND. NO. 436N-2008

-against-

JURY TRIAL

RICARDO WALTERS,

Defendant.

- - - - - - - - - - - - - - - - - - - - -X

262 Old Country Road
Mineola, New York
November 5, 2008

B e f o r e:

HON. JAMES P. McCORMACK, Acting Supreme Court Justice

A p p e a r a n c e s:

HON. KATHLEEN M. RICE
District Attorney, Nassau County
By: MADELINE SINGAS, ESQ.
THERESA TEBBETT, ESQ.
Assistant District Attorneys

DENNIS LEMKE, ESQ.
Attorney for Defendant
114 Old Country Road
Mineola, New York 11501

Mary Ocskai
Official Court Reporter

THE COURT OFFICER: Jury entering.

THE CLERK: Case on trial, People of the State of New York against Ricardo Walters, 436N-2008.

Are the People ready?

MS. SINGAS: People are ready.

THE CLERK: Defense counsel ready?

MR. LEMKE: Defense ready, Your Honor.

THE COURT: Good morning, members of the jury.

We are currently in Judge Carter's courtroom. He was kind enough to allow us to use his courtroom here for this morning for the first couple of witnesses. We will be using, the People may be using some projection devices which you see here in front of you.

In a moment we're going to have opening statements and calling of witness. Before I do that, however, I want to first give you some preliminary instructions concerning what's about to take place and your role here as a juror.

As I indicated we're about to begin the trial of this case concerning which you have heard some detail during the process of jury selection. As the trial begins it is appropriate to make a few observations concerning the orderly procedure of the trial. It is hoped that these observations may be helpful

particularly to those of you who are serving as jurors in this court for the first time. The comments and instructions that follow are designed to acquaint you with the separate functions, duties and responsibilities of the Court, counsel and the jury, and to give you a better understanding of how you as jurors should conduct yourselves during the trial.

As you know this is criminal case which has been brought by the People upon an indictment accusing the defendant of various crimes. Please keep in mind this indictment is simply an accusation, a paper writing, and is not in any way evidence of the allegations it contains. It is merely the device used to bring the charges against the defendant.

The defendant has plead not guilty to the indictment. According to the law the People have the burden of proving, beyond a reasonable doubt, each and every element of each of the crimes charged in the indictment. The defendant does not have to prove anything. He is presumed to be innocent of these charges.

When I have completed these preliminary instructions the case will be begin with a statement from the Assistant District Attorney as to what the People intend to prove. This is known as opening to the

jury. The law requires the People to make an opening statement to enable the Court and you, the jury, to better understand the testimony and the evidence that will follow at trial.

On the other hand, the defendant's attorney is not required by law to make an opening statement. It is because the People have the burden of proving the charges beyond a reasonable doubt. Thus defense counsel may, if they choose, not to make an opening statement, but may instead wait to see if the People prove their case. If defense counsel chooses not to make an opening statement you must not draw any inference from this. As I have indicated the defense has the legal right to choose not to open.

Bear in mind, the opening statements of the Assistant District Attorney or defense counsel, if any, are not evidence. The evidence upon which you shall base your verdict will come to you only from the witness box or in the form of documents introduced during the trial. Again, bear in mind, the defendant has no obligation to offer in evidence. The entire burden always remains on the People.

After all the witnesses have testified and all the evidence has been heard and received, each of the attorneys will have the opportunity to argue orally in

support of their case. These closing arguments are known as summations and like the opening statements are not to be considered by you to be evidence. Under our system of law defense counsel will sum up first and the Assistant District Attorney will sum up last.

Following summations I will instruct you on the law which applies to these criminal charges. You, the jury, will then retire to the jury room to deliberate for the purpose of reaching your verdict. This in brief is the general outline of the trial.

Before we begin with the opening statements there are certain legal principles which you should keep in mind throughout the trial. You, the members of the jury, are the sole judges of the facts. You alone will have the responsibility to find and determine the facts. On the other hand, when I instruct you on the law, either during or at the close of the trial, you must follow my instructions on the law exactly as I give them to you without any hesitation or reservation even though you may disagree with them.

After the opening statements witnesses will be called to the stand after being sworn and will be examined and cross examined. The questioning of a witness by the lawyer calling that witness is known as direct examination. The questioning of that particular

witness by the lawyer on the opposite side is known as cross examination.

From time to time during the trial you will hear the lawyers object to the asking of a particular question. That means that the lawyer making the objection claims that the question is not a proper question. The Court must rule as a matter of law as to whether it is or is not a proper question. You must draw no inference from my rulings.

If I find the rules of evidence of the question is a proper one I will say objection overruled and the witness will then answer the question. However, if I find the objection is valid and the question is improper, I shall say objection sustained, and the witness will not be permitted to answer the question.

When I so rule you cannot draw any inference either from my ruling or the question itself. It is only a question without an answer. Questions are never evidence. Only answers constitute evidence. Therefore, no inference can be drawn from the mere asking of a question.

I suspect there will be times when a witness will answer a question before the Court has ruled on an objection. In such event if I sustain the objection, I will direct the answer be stricken. It then becomes

your duty to strike it from your mind and disregard both the question and the premature answer.

Do not resent the fact that the attorneys make objections or motions during the course of the trial. That is their job. You must not hold it against either party when and if I rule against them.

Exhibits such as photographs, documents, or other tangible objects presented by either counsel during the course of the trial will first be marked solely for identification. Such exhibits are not evidence until and unless they are received into evidence by the Court.

When reference is first made during the testimony of a witness to a document, photograph or other physical or tangible object, they will be marked with a number or a letter of the alphabet so we can identify it and refer to it. Subsequently, if I find such exhibit may be received into evidence, it will be so marked into evidence. Then, and only then, does it become evidence which you may consider during your deliberations.

There are specific rules of law which will govern your conduct during the entire trial. Whenever during the course of this trial the Court stands in recess, or whenever during the course of the trial you

are asked to retire to the jury room while the Court and counsel discuss questions of law that do not and must not concern you, you must observe these specific rules of conduct.

In fairness to the People and the defendant, you must keep an open mind throughout the trial. You must reach your conclusions and your ultimate decision only after having heard all the evidence and my instructions to you on the law, only after exchanging views and reasoning together with other members of the jury. During your final deliberations you must not form or express an opinion as to the guilt or innocence of the defendant until the entire case has been submitted to you by the Court. You must not during the course of the trial converse among yourselves or with anyone else upon any subject connected with this trial. This simply means you must not discuss this case with anyone, not even with your fellow jurors, nor permit anyone to speak with you or in your presence about any subject connected with this trial.

While it is a normal human tendency to converse with people whom one is thrown in contact, you must not during the time you are serving on this jury converse whether in or out of the courtroom with any the of parties, their attorneys, any witness or anyone

else. By this I mean you're not only to refrain from conversing about the case, you're not to converse with any of these persons at all even to pass the time of day. In no other way can everyone be assured of absolute impartiality they are entitled to expect from you as jurors.

In the same vain undoubtedly you will notice the attorneys will not converse with you either, not even to say hello in the hallways. Do not take this as rudeness on their part. They're just avoiding any possible appearance of impropriety.

You must not read or listen to any accounts or discussions of this case as reported, if there be any, in the newspapers, magazines, radio, television or by any other news media including the Internet.

You must not visit or view the premises or the places where the offenses charged were allegedly committed, nor are you to visit or view any other premise or places involved or connected with any of the events described in this case.

Prior to your being discharged you must not request, accept, agree to accept or discuss with any persons the receiving or accepting of any payment or benefit in consideration for supplying any information concerning the trial.

During the time you serve on this jury you are not to access the Internet or World Wide Web by any means available to you for the purpose of either learning about this particular case or learn about the law and legal issues concerning this case.

Your verdict must be based solely on the testimony you hear during the trial, the exhibits that are received in evidence during the trial, and my instructions to you on the law.

You are bound to accept the rules of law I give you. You must apply those rules of law to the facts as you find them to be.

You must promptly report to me personally any attempts by any person to converse with you or who in any way improperly attempts to influence you or any other members of the jury concerning this case. You must not, however, discuss with your fellow jurors either the fact a third person has sought to discuss the case in your presence, or the fact you feel it necessary to bring such attempt to the attention of the Court.

After the opening statements by the district attorney, and by defense counsel, if any, the People will call their witnesses and proceed to offer evidence and testimony in direct proof of the People's case. Thus the trial will commence.

The defendant, the attorneys, and myself, all would like to thank you in advance for assuming the important responsibility of serving as jurors in this criminal case.

One final note, all communications or requests for information are to be addressed to the Court and must be in writing, dated with the time of day, signed by the foreperson, and placed in an envelope which will be provided to you, and sealed. You should deliver the sealed envelope to the court officer outside this jury room who will in turn deliver it up to the Court.

At this point, members of the jury, we will hear from the People their opening statement.

Miss Singas, if you would.

MS. SINGAS: Thank you, Judge.

Good morning.

In the early morning hours of September 9, 2007, two law enforcement officials were in the vicinity of Totten and Greenwich Streets in Hempstead, Nassau County. Both men were armed with working operable guns. Both men were wearing uniforms of their respective departments. Both men had the job to maintain safety and the duty to care for the citizens of this county. Both men carried their shields and identifications.

But you will learn throughout this trial, ladies and gentlemen, that only one of those men, Police Officer Eugene Este of the Hempstead Village Police was doing his job that morning. Only he used his weapon legitimately that morning. Only he was maintaining safety on the streets that morning. Only Officer Este brought dignity to the uniform he wore.

The other one is the defendant, Ricardo Walters, who you will learn was a New York City Corrections officer working on Rikers Island at the time. He used his gun that morning as well, but he used it to intimidate, to force, to terrorize. And you will learn throughout this trial that he used weapons legitimately obtained but illegally used against several young, defenseless, women in Hempstead.

Sara Sandoval is an Hispanic woman who was on her way to work on September 9, 2007. She worked at the Dunkin Donuts. She was taking the bus there. Her job was she cleaned the Dunkin Donuts in which she worked. It was a Sunday morning about 5:15 to 5:20 in the morning. Traffic was light, pedestrian traffic was even lighter. She stopped and waited for the bus at the bus shelter at Totten and Greenwich Streets and this defendant approached her, and she looked at him, and she waited for the bus, and she thought he was waiting for

the bus. But the bus was taking a little long to get there, and she was growing nervous. And with good reason, ladies and gentlemen.

Without even knowing what this defendant had done three times earlier to women just like her in places just steps from where she was standing, she was getting nervous. And he walked up to her and he pulled out a gun. A black automatic handgun he used and was registered for use with his job at Rikers Island.

He used that black automatic handgun and demanded her money, and she complied. She gave him everything she had, eleven dollars in singles. Eleven singles. She gave it to him. And inside those singles, you will learn, there was a piece of paper with a name on it. The name Maria Reyes. Because what you will learn, ladies and gentlemen, about Sara Sandoval is, she is not a very educated woman. She's not very sophisticated. She doesn't speak English that well. She needed that name Maria Reyes. She needed to look at it so she can copy it down, because at work that is the name she used. Maria Reyes. And she handed that to him as well. It was intermixed with those singles.

Sara thought that he had what he wanted, but he didn't leave. And now she knows that she has to fight. She's growing more and more nervous because he

won't walk away and she gave him everything and he approaches her and he puts his arm around her and he places the gun to her side and he starts dragging her toward a more secluded place on Totten Street in Hempstead. And this unsophisticated woman who doesn't even know how to write the name Maria knew that she had to fight for her life, and she did, and she swatted the gun away and she was pulling away from him, and he grabbed her by her ponytail and was trying to drag her and she fought.

And, ladies and gentlemen, you will hear she did. She did break free. She saw the upcoming lights of a car and she broke free hoping that the person in that car would stop and render her some assistance and she was able to break free from his grip and she stepped into the street and practically stepped into Police Officer Eugene Este's police car as he was travelling down Greenwich Street as part of his routine patrol that early morning on September 9, 2007.

Now, as Officer Este was driving, he heard a chilling scream and he turned and looked out of his passenger's window and saw Sara Sandoval in the street and she began motioning to him wildly using her fingers to indicate a gun, showing him how he was pulling her hair, and pointing at the defendant.

Now, Officer Este saw the two of them and instinctually knew, this veteran police officer instincturally knew there was something going on here. It's 5:30 in the morning, it's barely daylight out. The street's deserted. He has this woman hysterical in the street motioning wildly towards the defendant.

So, he asked his, unbeknownst to him at that time, his fellow law enforcement officer, he asked him, what's going on here. He says nothing, I was just trying to talk to her. Now, Officer Este knows that this wouldn't be her reaction if he was just trying to talk to her. So, he says, yeah, right, stay right there. As he gets out of his police car and steps into the street the defendant runs.

This corrections officer, this law enforcement officer, ran from a police officer. And Police Officer Este, abandoned his car in the middle of Hempstead and a chased began. And he is trying to radio for help. And he is screaming at him for him to stop and he wouldn't and he doesn't until Officer Este is able to overtake him, standing, stands in front of him, draws his weapon, and tells him to get down. And, finally, he did. All the while saying to Officer Este, I'm on the job, I'm on the job, attempting, ladies and gentlemen, to curry favor, I'm on the job. But Officer Este didn't care and

he cuffed him in the street and left him laying down on the street as his fellow officers came around.

Now, Officer Dale Jones arrived on that scene within minutes of hearing Officer Este's call for help on the radio. And Officer Dale Jones stayed with the defendant while Officer Este went back to his vehicle, went back to Sara Sandoval to make sure she was okay and to assess what it was that was going on that morning. And Spanish speaking officers arrived on the scene to help speak and translate for Sara Sandoval.

Now, there on the ground Police Officer Jones did a preliminary search of the defendant and from his back pocket he took out a black automatic gun. A gun that, you will hear, was working. A gun you will hear was operable. A gun that you will hear was not inside the holster the defendant also wore that morning. And much to his dismay Officer Jones also found his corrections officer shield and his identification.

Now, Police Officer Este made his way back to where the defendant was being held and they noticed a car in the distance, a red Mitsubishi Galant, the defendant's car, parked several feet from where he was laying on the ground. And you will hear that Police Officer Este walked over to that car and the car's engine was engaged. The car was running, idling.

Inside he saw the defendant's blue uniform, correction officer's shirt, hanging on a hanger.

Now, the defendant was brought back to the police station in Hempstead. Now you will hear that Spanish speaking officers took a statement from Sara Sandoval and it confirmed what Police Officer Este already knew. That she had been robbed at gunpoint by the defendant.

Now, back at the station house a more thorough search of the defendant was done, and you will hear there was physical evidence found which again corroborated what Sara Sandoval told the police. Inside one of his pockets was eleven dollar singles, Significantly, that piece of paper with the name Maria Reyes, Sara's piece of paper, Sara's money was inside his pocket. And the police officers were able to see him standing, 5'9" to 5'10" weighing approximately 250 pounds, an African American male with dreadlocks wearing his uniform, navy pants, his hair worn in dreads, a doo rag around his head.

He was given something to eat and he was given something to drink. And from the container from which he drank it was sent to the lab. Experts in this field, you will hear, will take the stand and will tell you from that container a DNA profile was brought out from

his saliva when he was drinking and his DNA was extracted.

Now, soon the Hempstead police station was overrun by law enforcement officials, corrections arrived at the scene. They took his shield, they suspended him. They took his identification. They confiscated his weapons from his home at 32 Martin Avenue just blocks from where that initial crime happened. You will see those weapons, two black handguns and a silver handgun, weapons he registered as he was required to do and weapons that he used to terrorize.

Now, as the police personal at Hempstead began digesting what was going on here, they had a New York City Corrections officer under arrest and as his description made its way first to the Hempstead Police Department, then to the Nassau County Police Department, the pieces of the puzzle were being put together as his world, ladies and gentlemen, were becoming unhinged and unraveled because you will learn, beginning in 2005 the police were looking for an African male, approximately 5'9" to 5'10", stocky, athletic build, wearing a cap, or a hood to cover his hair.

They were looking for that man with facial hair who is carrying either a black or silver gun. They

were looking for that man who was perpetrating robberies, and if uninterrupted those robberies turned into sexual assaults and rapes. They were looking for that man who was perpetrating those crimes in an area no bigger than a mile and-a-half in Hempstead. They were looking for a man that were perpetrating crimes against mostly Hispanic women. And, ladies and gentlemen, on September 9, 2007, as this defendant sat in that police station that search was over.

You will meet Shamika Dottin. On April 17, 2005 she was at a friend's house. She decided to walk home. It was late, three o'clock in the morning. It was deserted. She almost made it home. She was about a block away. She saw a man in a car, bigger than a sedan, smaller than a minivan. He tried to wave her over and she didn't go. She put her head down and she kept walking. She didn't want to make eye contact. She just wanted to get home and as she passes an alleyway between two stores the defendant exited that alleyway just as she was walking in front of him, and he had his gun laid across his chest, and he forced Shamika Dottin into that alleyway and behind that store and he asked her for her money.

Now, ladies and gentlemen, you will hear and the evidence will show these cases aren't really about

the money. The money, I submit to you, is a way to unnerve his victims. It is the beginning, ladies and gentlemen, but it is not the end. When he was dragging Sara Sandoval toward that abandon building he did so, the evidence will show, "for his own sexual gratification." He wanted to bring her to a more secluded place so he could sexually assault her.

Now, Shamika Dottin gave him her money. She handed it to him. She thought it would end there. It was only the beginning. He forced his penis into her mouth at gun point, and he thrust his penis into her mouth until he ejaculated and he told her to swallow and she did. And she stood up and he put his hands in her pants and he put his fingers into her vagina at gunpoint. He put his mouth on her breasts in an alleyway in Hempstead at three o'clock in the morning at gunpoint. All the while holding his gun, a gun that she will describe to you.

She will tell you it was a black gun. She will tell you at the top of the gun she could see there appeared to be these two little lights at the top of the gun. It's almost like an alarm clock that fluoresces light at the top. You will hear that they call those night sights in law enforcement. Officials put those on their weapons so they can take better aim at night. You

will also hear that Ricardo Walters' gun, his black gun, is an automatic gun with night sights on it. That is the gun that he held to Shamika Dottin.

Shamika went home terrified and woke her mother and they called the police. And the police came and she described him as 5'10", dreadlocks, 200 something pounds, stocky, wearing all black, with a black flight jacket with orange lining. And, ladies and gentlemen, there was no need for Shamika Dottin to recognize him later because you will learn when he placed his mouth on her breast he left something behind, his DNA. And when Shamika Dottin went to North Shore Hospital, when Shamika Dottin was examined by nurses, they're called SANE nurses, who are trained specifically to deal with victims of sexual assaults and collect evidence, when they did their examination, they took swabs of her breasts and they sent those over to the lab, and the lab was able to extract a DNA profile from that saliva that was on her breast and, guess what, the DNA matched the DNA that was taken from the orange juice container the defendant drank from at the Hempstead police station.

And just to make sure, ladies and gentlemen, Detective Robert Dunn, took a buccal swab, it's really a big Q-tip, from the inside of the defendant's mouth and

that was sent to the lab and experts will tell you how the DNA profile was extracted from there, and that was matched to what was on Shamika Dottin's breast.

Scientific evidence confirming for the police what this defendant already knew. That it was him who robbed and sexually assaulted Shamika Dottin in April of '05. But it would be two years before he was caught.

On November 28, 205, Delsy Sanchez, a young pregnant Hispanic woman was on her way to work in the early morning hours. She worked at McDonald's as a cashier. She crossed Front Street in Hempstead and made her way towards McDonald's. She was walking through the Pep Boys parking lot and she almost made it. This defendant confronted her and he pulled out a black automatic handgun and he demanded her money, and she complied. She gave him her money.

She thought it would end there. It didn't. The robbery was only the beginning. He put his arm around her, pressed the gun against her stomach and lead her across the street behind a store into a desolate alleyway. There at gunpoint he forced his penis into her mouth, all the while telling her to just shut up. He stood her up, he turned her around, he bent her over, she leaned against a little window sill, that you will see pictures of, and then he raped her from behind. He

forcibly put his penis into her vagina and he touched her breasts. He touched her buttocks. He pulled out and ejaculated on the ground in an alleyway and told her not to call the police and not to move. And she made her way to the McDonald's and her friends saw her and knew there was something terribly wrong and as she cried quietly she brought the knit hat she wore that morning up to her mouth and was constantly wiping the inside of her mouth, trying to erase him from her over and over again.

Her friends gave her water. They tried to calm her down. They called a cab for her, she wanted to go home, and in that cab, ladies and gentlemen, you will hear that Delsy Sanchez found the strength you will see exhibited in this courtroom, and she said, take me to the Hempstead police department, I need to report a crime. And, she walked into that police precinct and told the police what he had done to her. The police took her back to that alleyway and she told them where he ejaculated.

It was still early, ten o'clock in the morning, and they couldn't see anything on the ground, but you will hear, ladies and gentlemen, that crime scene, hours, hours later when it was dark out, and they put up the alternate blue light, what they call an

alternate blue source and it lit up right where she said the semen landed, but by that time they couldn't get a sample. Just like she said. Too much time had past and.

Delsy gave them her hat and said I kept wiping my hat, when I kept drinking water, take it, they did, and they sent that to the lab and you will hear that tested positive for semen. But there wasn't enough there for them to extract the DNA profile, but Delsy Sanchez didn't need a DNA profile to know who had done this to her. She saw him. She saw him even though he tried to hide his appearance, because you will hear when he confronted her in the parking lot of Pep Boys he had a mask over his face, but as they made their way across the street he lifted it up, put his arm around her as if they were two lovers walking away, and she looked at him, and he told her, don't look at me. But Delsy Sanchez needed to see and she kept looking. And when she was forced to kneel in front of him she looked up at him with his mask over his face. She could see his doo rag on his forehead. She saw his face. She saw his chest. She saw Ricardo Walters. She saw his navy blue uniform, his pants, she saw his blue gray button down shirt. She saw his automatic black gun. She described him. 5'10", African American, not fat, athletic,

stocky.

And Delsy Sanchez told the police something else. Two years, two years before this defendant was caught. Delsy Sanchez told the police the man who did this to me is a security guard or a carrier. He wore a uniform. He handled a gun very easily. He is a security guard. And Delsy Sanchez was correct. And two years after he brutally violated her Delsy Sanchez walked into a room where a lineup was being held. The defendant was in that lineup. Also with him were five other men. You will see pictures of that lineup. Five other men with characteristics very similar to his. Caps over their heads, sheets up to their neck. She looked at all their faces. And even though she described him perfectly, she looked into that window and she told the police, it was Ricardo Walters who did that to her two years earlier.

Isla and Delmy Morales were sitting in their car in Hempstead on Fulton Avenue at ten o'clock in the morning on November 9, 2006. Delmy had gone to run an errand and left her sister waiting in the car. Delmy returned and got into the passenger's seat. The window was down and the defendant appeared at their passenger window and leaned in. And they looked at him at ten o'clock in the morning, in Hempstead. He demanded money

and he took his silver gun and he pressed it against Delmy's leg and Isla gave him his money. Several hundred dollars she was planning to send home to Honduras. He took it. That was all the money they had and they told him so.

But that wasn't the end, that was just the beginning. And he reached in and he unlocked the back door and he got into Isla Morales car and sat between them in the back seat as the two sisters sat in front and he said drive.

Now, Isla Morales instinctively knew that she shouldn't drive. Not knowing what he had done to Shamika Dottin, not knowing what he had done to Delsy Sanchez, Isla Morales said I am not moving this car and she tried to get people's attention by putting her hand out the window, but nobody was noticing.

He kept telling them to drive and pointing the gun and Delmy tried to reason with him. She turned around and looked at him and said, don't you have a family. We don't have anything else, please, just get out of the car. Don't you believe in God. And, as she pleaded with him, looking at him, Isla Morales' keys fell to the ground and somehow the alarm set off. The car alarm starting ringing. Now people were starting to notice.

He realized these women wouldn't go so easily and he got out of the car and walked away. He told them not to call the police. They did it anyway. They described him. 6'1" to 6'2", stocky build, facial hair, African American, 35 years old, wearing a hood to cover his hair, holding a silver gun, just like the silver gun you will hear was recovered from his house on September 9, 2007.

And, a year later those two sisters came to the police precinct where the lineup was being held and Delmy walked right in and told the police it was Ricardo Walters that did that to them. She recognized him, instantly. Isla Morales, you will hear, was not sure when she first looked. As she was being lead out of the lineup room and brought somewhere to wait, she turned to the detective and said, I know it was number five, and number five was Ricardo Walters, and she was right.

Now, Ricardo Walters, ladies and gentlemen is guilty of the crimes that he is charged with in that indictment. I am convinced after you listen to the evidence, apply your common sense, and after you see the evidence you will be convinced of the same. The question you will be left with, ladies and gentlemen, is not how did these women, how can these women remember his face, the question you will be left with after what

they went through is how in the world will they ever forget him.

Thank you.

THE COURT: Thank you, Miss Singas.

Mr. Lemke.

MR. LEMKE: Yes, Your Honor.

May it please the Court, Mrs. Tebbett, Mrs. Singas, Ricardo, ladies and gentlemen.

As Judge McCormick has instructed you, I have no burden or obligation to address you at this time. But after listening to the opening of Mrs. Singas I think there's a few things that need to be addressed at this point in time.

As you know these are vicious, horrible, heinous crimes that have been committed against four, five victims, young ladies. There is no dispute regarding that. And it is this time, at this juncture, as you begin to listen to our openings and throughout this trial, you will now need to consider and listen to testimony, listen to and view any documents which may be introduced into evidence, to determine whether or not what Mrs. Singas has said, and what Mrs. Singas says or Mrs. Tebbett or myself is not evidence. It's what you hear, what you listen to and view, that you consider to be credible, that you consider to be evidence, credible

evidence, in determining the factors, determining the issues in this case when it's given to you.

Unfortunately, you don't get the instructions of the law before we start so you'd know what to look at. So you know what things, at the end of this case, you will be asked to really look at and consider. But there is a couple of things now that need to be, as I said, addressed.

That is, in listening to the various evidence or lack of evidence in this case, you heard from Mrs. Singas already, that there will be four complaining witnesses, in one instance, two sisters. What I am asking you now to consider, what I am now asking and submitting to you at this point in time is, for example, when you hear from, and you're now considering testimony from Shamika Dottin, this incident that occurs back on April 17, '05, I will ask you to, I am going to submit, ask you to consider in the People's case what they're going to be asking you to do at the end of this case is now begin to take look at various factors from four different instances.

At the end of this case the Judge will instruct you as to, take a look at each one separately in determining whether the People have proven the identification of the individual that did this to these

young ladies as Mr. Ricardo Walters. I want you to begin to consider when you hear and you consider the incident of April 17, '05, you heard the complaining witness's name, Mrs. Dottin. There is not going to be any dispute there was a vicious act that occurred on that date. But I am asking you to begin to consider what, if anything, did Detective Moran do or not do.

Because I am going to submit to you now that when the assault took place and it was reported, they began their investigation as to who committed this crime, the identification of this individual. You will learn that where this assault took place, this gas station that was involved in sorts, that there was a video that Detective Moran seized that video to review what in this case Miss Dottin had indicated. That there was some van that pulled in.

I am submitting to you now there is no van my client ever owned and registered and had the opportunity to use. Because that's part of the factors in considering who committed this assault back on April 17, '05. Listen to what Detective Moran saw on that video, what wasn't there, and what he did with it. Because what you will learn in a case such as this, where you're now having to decide four separate individual times, it becomes difficult not take something from one case and

apply it to another, much like the People in this case are trying to build a train and they have from the date of April 17, '05, you have an incident, and that particular train you have perhaps four wheels on this train, you have an engine, but you don't have a whistle.

In evaluating that particular case, only when the Judge gives you the elements of the law you're considering that you realize there is no whistle here, they haven't proven to my satisfaction Mr. Walters committed this vicious, heinous act. You can't take a look at November 28, '05 where you have another individual whose assaulted, Delsy Sanchez. You can't take a look at that and they have proven that there's a whistle there and there's an engine, but there is no wheels on that particular train. So, therefore, let's perhaps take a wheel from that train and put it on this train because you have different allegations and different charges.

It doesn't make it stronger whether you have one individual that comes in and makes an identification based on what she observed. It's for you, I submit, to you take a look at what was recorded, what was reduced to writing at that point.

What about this so called DNA and the manner

in which it was, in fact, secured or tested and how it is preserved, if any, what the profile was, because you haven't heard anything yet. You have heard what Mrs. Singas intends to prove, what, in fact, what she will prove, that is for you to consider when you hear it.

You have a third incident, November 9, '06, and again I'm submitting to you to consider what was told to the officers at that time. A description that was made. Whether there's any, at that time to observe, scaring, something about facial hair, whether there's a mustache or not. Those are the factors you need to consider, can be separately, not taking from one or maybe here, maybe here, there's four, four, those are the factors I am asking, as I did during voir dire, as I am during opening, to consider.

And then the date that he was arrested on September 9, '07. There's no question you will hear testimony that Ricardo Walters was arrested that day in the early morning hours. You will hear, I submit to you, at this point the evidence is going to show, that Mr. Ricardo Walter's vehicle was, in fact, parked in that lot. He was on his way to work. No dispute. You will hear evidence regarding that as a corrections officer at Rikers. And he was starting at seven o'clock.

I submit to you, you can, when you consider the evidence regarding the testimony from Mrs. Sandoval as she is waiting, that Ricardo Walters sees her there. There is no question. And, as embarrassing as it is, and as Mr. Ricardo Walters needs to deal with that factor, he resides in Hempstead with his wife and three children. They had been separated at the time.

You will learn at that time he parks his vehicle, he walks over, believing and as insulting, disappointing to himself as it was that she, that being Mrs. Sandoval, was a prostitute. There is no question he was wrong. He approached her trying to talk with her, not in dispute. That she panicked, perhaps even rightfully so at that time. No question she runs into the street.

What is critical, what I am submitting and suggesting to you, again to consider, what did Officer Este see, if anything, and what had occurred during the next encounter regarding how he was placed under arrest and what had occurred and what was said, if anything, regarding it. And as Mrs. Singas had said they wanted an individual. They had somebody they wanted and in Miss Singas' own words I believe they wanted and they were looking for this man, this person and, guess what, now they have somebody, let's go back now, let's build a

case, let's build that train, let's, perhaps, a railroad, without knowing that an individual, without taking each individual case, making a determination whether that, that is Ricardo Walters or not.

Keep an open mind. The trial may last a week and-a-half before you get the case, before you get the charges on the law, what you need to consider with each one of these allegations on each one of these dates. We're confident if you do that from the outset, you will listen, you will evaluate, you will scrutinize the testimony, then at the end I'll come back up to you and during my summation I'll tie in each one of these incidents and what this lacks and that's why you must acquit.

You can't take a piece from one piece and then from the other and say, okay, there must be a conviction on that, but take a look at it separately. I am confident if you do that, you wait until you hear the Judge's instructions on the law, you will realize, yes, these women had been sexually assaulted but they don't have the right man.

Thank you, ladies and gentlemen.

THE COURT: Thank you, Mr. Lemke.

Miss Singas, your first witness.

MS. SINGAS: People call Police Officer Eugene

Este.

EUGENE ESTE, Police officer, called as a witness on behalf of the People, after having been first duly sworn, and having stated his shield number as 147, and his command as the Village of Hempstead Police Department, took the witness stand and testified as follows:

DIRECT EXAMINATION

BY MS. SINGAS:

THE CLERK: Please state your name spelling your last name, shield number and unit of command.

THE WITNESS: My name is Police Officer Eugene Este, E-S-T-E, 147, serial 1147, command, Hempstead Village Police Department.

THE COURT: Bring that microphone a little bit closer to you.

THE WITNESS: Thank you.

THE COURT: Okay. Miss Singas.

MS. SINGAS: Thank you, Judge.

Q Good morning, Officer Este.

A Good morning, ma'am.

Q How are you?

A Okay.

Q Can you tell us where you are employed?

A I work for the Hempstead Village Police Department.

Q What do you do for the Hempstead Village Police Officer?
A Uniform patrol officer, ma'am.
Q What are your duties as a uniform patrol officer?
A Driving around in a marked radio patrol car, in a, Post 2, downtown area of Hemptead.
Q You said marked police car. Can you tell us what that means?
A Standard police car markings on the side, decal that says Hempstead police on it, 911, with the light bar on top, and standard Crown Victoria, 2005 I think.
Q All right. Now, Officer Este, how long have you been working for the Hempstead Village Police Department?
A Going on twelve years, ma'am.
Q And have you always been in Hempstead?
A Yes, ma'am.
Q And, how familiar would you say you are with the Village of Hempstead?
A It's a small village, roughly three by four, an area of three by four miles. Working there twelve years. I am very familiar with it, ma'am, with the roads.
Q On September 9, 2007, were you working?
A Yes, I was.
Q Do you remember what hours?
A It was a midnight tour, ma'am.

Q What hours is that?

A We work a ten hour tour. We get in at nine o'clock and we get relieved by seven o'clock in the morning.

Q I am going to direct your attention to approximately 5:15 to 5:20 in the morning on September 9, 2007.

Were you in the vicinity of Totten and Greenwich Streets?

A Yes, I was.

Q That is in Nassau County?

A Nassau County, Village of Hempstead.

Q Okay. Tell us what you were doing?

A I was just coming back from the pumps, gasoline pumps, refilling my radio patrol car, going back to my area of patrol. Like I said, I patrol the downtown area of Hempstead.

Q Let me ask you, were you alone in the car? Did you have a partner with you?

A I was alone at the time, ma'am.

Q Okay. So, continue.

A Like I said, I was coming back to the downtown area of Hempstead. I passed Dunkin Donuts. I was thinking about getting a cup of coffee. I'm glad I didn't. I was travelling slowly, slower than the speed limit which is --

Q Let me ask you about vehicular traffic. What was

it like that morning?

A Extremely light at that time in the morning. Very light.

Q Do you know what day of the week it was?

A Saturday into Sunday, ma'am. We were in Sunday morning.

Q So, at 5:20, we're talking Sunday?

A Yes, ma'am. Yes, ma'am.

Q What about the pedestrian traffic?

A At that time extremely light pedestrian traffic. There's the usual standard homeless people at the gas station across the street, but I didn't take note of them. They usually hang around there drinking beer there and other stuff.

Q What was the lighting like around that time?

A Ambient light from the streetlights. So, it was well, the roadway was well hit.

Q All right. Now, what road were you travelling on?

A I was on Greenwich Street, going northbound. Greenwich street turns into Main Street. And like I said I was going slower than the posted speed limit. And as soon as I approached Totten I heard a piercing scream, only way I can describe it, as a scream of anguish. I quickly turned over to my right and I saw a female Hispanic that I now know as Sara Sandoval right at my passenger window. She was in an

extreme state of panic. Her black hair was disheveled and she was motioning with her hand in a gesture like someone's pulling at her hair and her other hand was like indexing like this to her chest (indicating.)

Q I am going to stop you for a minute. Let me describe what we're doing for the record.

I believe you, the officer, has his left hand up like his hand is in a sort of C form and with his right hand he has his index finger pointed at his chest with his thumb straight up in the air.

THE COURT: Yes. The record will so reflect.

Q Continue.

A And I noticed there was a male subject standing behind her who I now know as Ricardo Walters.

Q Do you see that person that was standing behind her in the courtroom today?

MR. LEMKE: So stipulated, Your Honor.

THE COURT: All right. You're stipulating to Officer Este's identification of the defendant.

MR. LEMKE: At that time, yes.

MS. SINGAS: Not asking at that time, asking at this time.

THE COURT: Do you see that person in the courtroom.

THE WITNESS: Yes, sir. It's the defendant in

the brown suit sitting next to defense lawyer.

THE COURT: So stipulated. The record will indicate the officer is pointing to the defendant.

Q Thank you.

Now, how far away would you say that the defendant was standing from Sara Sandoval when you first noticed him?

A He was still on the sidewalk. So, about three to four feet, because Sara Sandoval was in the roadway next to my open window.

MS. SINGAS: Okay. I am going to ask that these three pictures be marked as People's 1, 2 and 3.

MR. LEMKE: No objection to them going into evidence.

THE COURT: You have no objection to them going into evidence?

MR. LEMKE: If the People wish them in evidence.

THE COURT: People's 1, 2 and 3 will be marked in evidence.

THE COURT OFFICER: People's 1 through 3 marked and received into evidence.

Q Okay. Officer Este, would you take a look at those pictures, please.

Do those pictures depict the area of Totten and Greenwich Street and the bus shelter?

A Yes ma'am.

Q Okay. I would like you to take a look at People's 1. Okay.

Does that, can you indicate for us, I am going to give you a pen, and if you can indicate with an arrow which way your vehicle was travelling that morning.

If you can put an arrow and show us which way?

A Like I said I was travelling northbound on Greenwich and --

Q I will display it. Don't worry about that.

A It would be directly, going the same direction of travel as the bus and the red SUV that is on this photo.

Q On that photograph do you also see, can you make out where the bus shelter is?

A Yes. In the distant foreground there is a bus shelter.

Q Can you just put a circle around there?

MS. SINGAS: At this time I would just like to display that for the jury, please.

THE COURT: You can just give it to the officer, please.

Q Okay. So, Officer Este, you are travelling the way of the flow of traffic seems to be travelling?

A Yes, ma'am.

Q And the bus shelter is here in the distance?

A Yes, ma'am.

Q Can you take a look at People's number 2, please. What are you looking at?

A That's the picture of the bus shelter.

Q In that photograph, does it show where Sara Sandoval was standing when you first noticed her?

A Yes.

Q Can you put a SS by where she would be standing?

A I am going to use my magic marker. Shows better than the pen.

Q That is fine.

Okay. Does that photograph depict where it was you saw the defendant for the first time?

A Yes.

Q Okay. Can you put a D where that is, please?

A (Witness complies.)

Q Okay. Let me have that so I can display that, please.

Thank you.

Now, you indicate an arrow there, SS and an arrow pointing down. What does that mean?

A Sara Sandoval. She was a little bit more into the roadway passed that white line.

Q Does that photograph show it better? You're looking at People's 3, or no?

A Not really.

Q Okay. Okay. And the defendant was outside of the bus shelter where that D is?

A Yes.

Q Okay. Can I see what that number 3 is. Okay. So, in People's number 3, is that just a wider angle of the bus --

A Yes. Yes.

Q -- shelter?

A Yes.

Q Okay. Can you tell us a little bit about that building that we see on the corner of Totten and Greenwich across the street from the bus shelter?

A That's a new condominium complex that was being built at the time. It's near one hundred percent completion at the time, but there was still construction going on, a green stockade fence, mounds of dirt.

Q At that time was there actually a building there or was it just the base of a building?

A There was a building. The building was there. Like I said, it was only about seventy percent done, and lots of construction machinery and mounds of dirt still surrounding the building.

Q I am going to display that picture as well, please.

We're referring to this building.

A Yes, ma'am.

Q Okay. Now, officer, can you tell us, can you describe for us the defendant's appearance when you saw him? What was he wearing?

A At the time of the initial stop I didn't notice the pants he was wearing, but when I had the opportunity to arrest him I realized he had on police type cargo pants, police uniform cargo pants, like the pants I have on right now.

MS. SINGAS: Judge, I'd ask if the officer can stand up, please, to show his pants to the jury.

MR. LEMKE: If you want to mark them into evidence I have no objection.

MS. SINGAS: I don't think he wants to take them off.

THE COURT: Officer, if you can stand up and step out of the box so the jurors can see the pants you're referring to.

A (Witness complies.)

Q Okay. Other than his clothing, can you describe him physically?

A Wearing the blue dress shirt, wearing a doo rag.

Q What is a doo rag?

A It's a hair covering, like a fabric device that a

majority of African American, well, gentlemen, generally they wear it over their head to tie down their braids or to get what they call waves.

Q What is it made out of?

A Made out of typically nylon or cotton. They tie it around with a piece of string that attaches to the actual fabric itself.

Q And, how tall do you say he was?

A He was roughly my height, a little bit taller, 5'10", 5'11". I say he weighed about 260 pounds.

Q Now, officer, tell us about Sara Sandoval. Can you describe what she looked like?

A Like I said, I've never seen a woman like that, in a state of panic, it was near hysteria. She was like, judging from her pulling at her hair and frantically motioning at her chest with her index finger, put me on a heighten sense of alert, because I knew that she was trying to convey to me that the subject had a gun.

Q Was she speaking softly, was she yelling, what was --

A No. Like I said she was hysterical. The scream I heard drew my attention to her and made me stop my car abruptly at the intersection. She was, like I said, I never seen, I can't recollect the last time I saw a woman in that state of panic.

Q Okay. Do you remember what it was she was wearing?
A What she was wearing?
Q Yes.
A No, I can't.
Q Let me ask you this. In your Hemptead years as an officer, as a patrol officer in Hempstead, have you had occasion to see prostitutes walking around the streets of Hempstead?
A Yes, I have.
Q Did you think at that time that Sara Sandoval was a prostitute?
MR. LEMKE: Objection, Your Honor. Nobody thinks --
THE COURT: Overruled.
MR. LEMKE: Observations.
THE COURT: I will allow it.
A She didn't have what I would consider a typical attire for the lady of, typical ladies of the evening.
Q Now, all right. Approximately, tell us what happens after you notice her motioning to you. What do you do?
A Since she spoke Spanish and my grasp of the Spanish language is limited, I turned my attention to the defendant who was standing behind her, and I said in a loud and clear voice, yo, what is going on here?

Q Was your window up or down?

A My window -- it was a nice autumn early evening. The window was down. And generally I always drive with my window down so you can hear what is going on outside. I directed, like I said I directed my attention to the defendant who was standing behind her. I said, yo, what is going on here? And his reply was, nothing, I was just trying to rap to her, talk to her. And my reaction was, you're just trying to talk to her and she is acting like this? Stay right there.

Q What did you do?

A Like I said before, I was on a heighten sense of alert because of the motions of the victim with her finger.

Q What does that motion of the finger indicate to you?

A That he had a gun.

Q Okay.

A As I am getting out of my, I told him to stay right there. I opened the door of my RMP. I am turning on my portable radio in my car. My portable radio is turned off. If I try to use the car radio with my portable radio on, it would be feedback, interference. So --

Q I am going to stop you for a second. I just hear a phone or a radio.

THE COURT: I don't think -- there may be

music.

Somebody's got a phone that is on? Would you shut it off, please.

Okay. Go ahead.

Q I am sorry. Where were you, Officer Este?

A I was turning on my portable radio because in the car my portable radio is turned off. If I try to use the car radio with my portable radio turned on, there would be interference. All you'd hear is a loud squeal.

I wanted to turn my radio on to call for assistance, to get adequate backup. At the same time I'm getting out of the car, I observe the defendant running instead of staying as he was told by me southbound on Greenwich Street.

Q What did you do?

A I did what I was trained to do which was run after him. I am telling him, police, stop, don't move. And as I am chasing him, he is not running with a full gate of a sprinter. He is like running stiff with his hands going for his back pocket.

At this moment I don't know what is going on. A thousand thoughts are going through my head.

Q Let me stop you there. Let me back up.

You said he is running?

A He is not running. When people run away from me, generally they run like this (indicating.)

MS. SINGAS: The witness is indicating with his fists together pumping his arms up and down.

A But he is not running like that. He is running, if I could --

Q Tell us first and then you can demonstrate.

A Running with his hands going towards his back pocket stiffly. I am quickly able to, I quickly came up to him. Due to his -- normally I would tackle a person. I am running after him but judging -- when I judged his size and mass, I thought it's in my best interest to go around and in front of him.

I have my -- at that time I have my service weapon out, freeze don't move, let me see your hands. Let me see your hands. And he stopped, but his hands are still down. They're not raised up. I am thinking something fretfully wrong is going to happen, and I said, let me see your hands. He put up his hands. I said, get on the ground, get on the ground. And he is looking at me like he has this incredulous look, like me? And he gets, he drops to his knees and gets down on the ground. And like then he said, on my face? And I was, yes, on your -- at that time I let out, excuse me, on your fucken face. He gets on the ground.

Then I see, I have one handcuff on his hand and as I am about to handcuff his other hand I realize at that time what kind of pants he has on which is similar to, like mine. At

that time he is yelling, I'm on the job, I'm on the job.

Q What does that mean to you?

A It's a lingo law enforcement uses to identify themselves that they're part of the law enforcement community working as a police officer. And then I saw my backup driving down, toward, driving down Greenwich. I realize he is driving toward where my car was. He didn't see me. I'm saying stop. That was Officer Dale Jones that came out.

I handcuffed, by that time I handcuffed the defendant. Dale came running over to me. I said Dale, watch him, I got to get to my victim. I have my police car, my shotgun's in the car. The car is running. I have the victim in the middle of the street. I didn't want anything to happen to her, I didn't want her to disappear or anything happen to the car.

So, without me even, I gave Dale the defendant to his custody, I ran back to where I left Sara Sandoval, and there she was still standing in the middle of the street like, there gazing in the head lights like frozen.

Q Okay. Let me go back to when the chase began.

Did you have, was it a full fledge chase? Did you have to run after him?

A I ran after him, but like I said I was able to catch up with him, not only was I able to catch up with him, I was able to get around and in front of him.

Q You mentioned to the jury that he kept taking his hand and reaching towards the back of his pants?

A Yes.

Q Okay. At that time were you able to see if he had anything in his hands?

A I couldn't -- I couldn't see. I couldn't see what was, what he had in his hands.

Q I am going to ask these be marked People's 4, 5 and 6.

THE COURT: Any objection, Mr. Lemke?

MR. LEMKE: I may have a quick voir dire on them.

THE COURT: Before we show these photos, I think at this point we will take a short break, members of the jury, to give you an opportunity to stretch and use the facilities, if necessary. We will have you back here in a few minutes. Follow my officers and step out.

Officer, you can step down.

(Whereupon, there was a brief recess in the proceedings.)

THE COURT: Mr. Lemke, People's exhibits 4 through 6 you have no objection.

MR. LEMKE: No objection.

THE COURT: They will be marked in evidence.

THE COURT OFFICER: Jury entering.

THE COURT: Members of the jury, the exhibits 4 through 6 that were marked for identification before the break have now been marked in evidence at this point.

Miss Singas.

MS. SINGAS: Thank you, Judge.

Q Officer Este, take a look at People's 4, 5 and 6, please.

Let's start with number 4. What does that picture indicate to you?

A That was in the direction of travel I was chasing after the defendant.

Q Okay. And towards what streets are you?

What street are you chasing him on and toward which cross street?

A I am on Greenwich Street. I am going southbound toward the T intersection of Jerusalem Avenue. The next block would be Jerusalem.

Q Just put an arrow then in the direction you and the defendant were running.

A (Witness complies.)

Q I would like to display that, please.

Now, Officer Este, when you were driving minutes earlier toward the bus shelter, where would the bus shelter be when

you're looking at this photograph?

A The bus shelter would be out of the picture.

Q Is it in the same direction the arrow is, or in the opposite direction?

A Opposite direction.

Q The bus shelter would be where my hand is?

A Approximately there, yes, ma'am.

Q Indicating when you're looking at the photograph to the left. Okay.

Take a look at number 5. What does that show?

A That is the sidewalk which I was chasing after the defendant.

Q Okay. Can I see that? Okay. I think that's People's 5.

That's now from the bus stop looking down Greenwich towards Jerusalem; is that correct?

A Yes, ma'am.

Q And that building here in the distance, this white building?

A That building is no longer there. Used to be a Wonder Bread Hostess Bread outlet factory outlet. It has since been torn down and it's an empty lot there.

Q Is that at a corner?

A Yes, ma'am.

Q And, the corner of what and what?

A T intersection of Jerusalem Avenue and Greenwich Street. That is where Jerusalem Avenue actually starts in the Village of Hempstead or ends, depends on the travel.

Q Take a look at that, People's 6?

A Yes.

Q What is that?

A That's the area where I actually stopped the defendant and the defendant ultimately complied to my orders of getting down on the ground.

Q Can you put a D there where you stopped the defendant.

A (Witness complies.)

Q Now, Officer Este, approximately how far then is that one block that you ran from the bus stop to where he was ultimately stopped?

A Approximately a minute.

Q Now, did there come a time -- you said that Police Officer Jones came to the scene. How did you contact Police Officer Jones?

A As I was running, as I was getting out of the car, I was going over the radio calling for assistance, foot pursuit, subject travelling on Greenwich Street toward Henry Street, giving my general area.

Q Okay. I am going to mark for ID, please, this disk as People's 7?

THE COURT: People's 7 for ID.

THE COURT OFFICER: People's 7 marked for identification.

Q Okay. Officer Este, take a look at that disk. Do you know what is on that disk?

A Yes, it's the audio file with my radio transmission copied from the Hempstead Police Station transmission.

Q All right. Did you have occasion to listen to that before today?

A Yes.

Q Did you mark it in any way?

A I put my initials and serial number and shield number.

Q Do you see that on that disk?

A Yes. Right now.

Q Yes. Is that what you listened to? Is that a fair and accurate recording of what you had put over the radio?

A Yes.

MS. SINGAS: Okay. At this time I would like to move it into evidence.

MR. LEMKE: Again, no objection, Your Honor.

THE COURT: Okay. Without objection, People's 7 will be received in evidence.

THE COURT OFFICER: People's 7 received and marked in evidence.

MS. SINGAS: I would like it played for the jury, please.

(Whereupon, People's 7 in evidence was played in open court.)

Q Okay. Officer, did you hear that?

A Yes, I did.

Q Tell us what is going on?

A A hundred things in a split second. I am getting out of my car, like I said, I am trying to turn on my portable radio, telling the defendant to stop, police, don't move, running after him, catching up to him, going over the radio saying foot pursuit, male black, going toward Henry Street.

Q Where are you speaking into when you're running?

A I am running, I am speaking into this portable mike right here.

Q You're indicating on your shoulder?

A My lapel. You press down on this button, you transmit, you release so other units can respond. I am transmitting I am running after him, I am yelling after him. I see another unit drive down Greenwich Street. I am telling them stop. And, like I said, a hundred things in a span of a couple of seconds.

Q Okay. When we were listening to you there, were you running at that time?

A Yes, I was.
Q Again, what is it you said because it's hard to understand?
A Yes, it is. Foot pursuit, male black, going toward Henry street. Then I am saying stop.
Q Okay. Now, from the time that you put out that radio transmission until the time that assistance came, how much time are you talking?
A Like, seemed like an eternity, but it couldn't have been more than twenty, thirty seconds.
Q Who was the first officer you saw on that scene?
A Officer Dale Jones came. He was in a Post 5. He was travelling down Greenwich Street. He knew what sector I was in. So, that's the -- so, that is the quickest way to get to downtown. So I --
Q All right. You said you left at -- you left the defendant with Officer Jones and you went back to your car.
A Yes.
Q Was the victim Sara Sandoval still there?
A She was still standing there where I left her.
Q At that time, did other police officers come who were able to communicate with Sara Sandoval?
A Oh, yes. I asked for a Spanish speaking officer to respond to my location.
Q How much time do you think passed before that

happened?

A Minutes. Two minutes at most. I work in a small department. We back up each other when we go on foot pursuits. We depend on each other and we respond accordingly. This job came very quickly.

Q There came a time when you, where you said you went back to where Officer Jones was holding the defendant?

A Yes. Like I said, like I had stated before, when I handcuffed him, as I was handcuffing him, I noticed his uniform pants and he was stating those words, the phrase on the job, and I knew it in the back, I fear in the back of my mind this guy's a cop, and I spoke to Officer Ancila and --

Q Was Officer Ancila a fellow officer who appeared on the job?

A He and I came back, and Officer Dale Jones who I left the defendant in custody with asked me --

Q I don't want to hear anything about any conversation.

A I am sorry. At that time I realized who he was.

Q All right. Let's just -- did there come a time that you learned his occupation?

A Yes.

Q Was that at the scene?

A Yes.

Q Okay. What is his occupation, or was?

A Correction officer. Correction officer for the City of New York.

Q Now, did you have occasion to seize any property that belonged to him close to where he was when you stopped him?

A Yes. I saw the weapon, a Glock, and the defendant's ID.

Q That would that be his Correction's ID?

A Yes, his shield.

Q Did there come a time that you noticed a vehicle?

A Yes.

Q Tell us about that?

A One of the other responding officers said --

MR. LEMKE: Objection to what was said.

A I am sorry. I looked to my left and I saw a motor vehicle that was, the engine was actually on, parked in the parking lot.

Q Okay. The picture we have up on the easel, I think on the projector, that's People's 5?

THE COURT: 6.

Q In that photograph, can you show us where the car was park?

A It's off the picture to the left.

Q Would you put an arrow with the word car so we know in what area the car was?

A (Witness complies.)
Q Okay. And approximately how far from where the defendant was stopped was his car?
A About forty feet, fifty feet.
Q Did you ascertain what kind of car that was?
A It was a Mitsubishi, red.
Q Did there come a time that you ascertained or it was ascertained who that vehicle was registered to?
A Yes.
Q Who was that?
A The defendant stated that was his vehicle.
Q Okay. Now, did there come a time where a DMV check was done concerning this vehicle?
A Yes.
Q Who is the registered owner?
A It was the defendant.
MS. SINGAS: I am going to ask this be marked People's 8.
MR. LEMKE: No objection to People's 8 being moved into evidence at some point.
THE COURT: Without objection, People's 8 will be received in evidence.
THE COURT OFFICER: People's 8 marked and received into evidence.
MS. SINGAS: If you can show the witness,

please.

Q What is that we're looking at, Officer Este?

A It was the defendant's motor vehicle that was at the scene with the engine running.

Q Okay. And what is the license plate on that vehicle?

A Boston Nancy William 4181.

Q When you say the engine was running, that means the car was actually on?

A The car was on and in park. The engine was engaged.

Q Were there any other cars around it?

A I can't recall. Not that -- the other yard uses it as a spare storage. There may be one or two cars there at the time.

Q Are there any store fronts there like is there a store to get coffee where his vehicle was car?

A No.

Q Any business open and operating?

A Not at that place, no.

Q At that location?

A No.

Q Now, what else did you notice about the car?

A Oh, I walked over to the car, I looked inside and I observed a New York City Correction uniform shirt hanging on

the coat rack, coat hanger device in the back of the car.

Q Were you able to open that car?

A The car door was unlocked, yes. I opened the car.

Q All right. Now, did there come a time that the defendant was brought back to the Hempstead Village Police Department?

A Yes.

Q And, how much time do you think passed from the time that you first saw Sara Sandoval to the time that the defendant was brought back to the Hempstead Police Department?

A About ten, fifteen minutes maybe.

Q Now, at the station house was a more thorough search of the defendant conducted?

A Yes.

Q Were you present for that search?

A Yes.

Q And, can you tell us what was recovered from him concerning this case?

A From what I believe was the left pocket cargo, like I said I have side pockets, was eleven dollars in single bills, plus a white piece of paper with a name written on it.

Q Do you recall the name that was written on there?

A Yes.

Q What was the name?
A The name was Maria Reyes and --
Q And the denominations of the money?
A Was singles.
Q All right. Was there anything else in that pocket where that money was and that sheet of paper?
A No, not that I recall.
Q Now, did you recover the doo rag the defendant was wearing?
A Yes.
Q Underneath his doo rag, describe his hair style?
A His hair was in dread locks.
Q What are dread locks?
A It's braided hair. At that time it was below shoulder length. Thick.
Q Did it appear the way it does today?
A Swept back.
Can I have the defendant turn?
MR. LEMKE: I have no objection.
A Basically. Yeah, basically. Yes, just like that.
Q Now, all right. Let me -- I'd like to have marked for ID, I'd like the officer to look in that manila envelope --
THE COURT: Want it marked first?
MS. SINGAS: Yes, mark it.

THE COURT: People's 9 for ID.

THE COURT OFFICER: People's 9 for ID.

MS. SINGAS: May it be shown to the witness.

Q Would you take a look in there.

Do you recognize what is there, Officer Este?

A Yes, ma'am.

Q What is it?

A It's $11 in single dollar bills with the white piece of paper with the name Maria Reyes. Forgot the M, Maria M. Reyes, written on it, and the police officer's initials on the upper corner on the white piece of paper.

Q Which police officer's initials are on it?

A Dale Jones.

Q Was Dale Jones present when the search was conducted?

A Yes.

Q Was it the same Dale Jones at the scene that held the defendant while you went back to Sara Sandoval?

A Yes.

Q How about the money? Is there any marking on the money?

A Yes.

Q What kind of marking?

A Same initials and his shield number.

Q That would be when you referred to his --

A I am sorry, Dale Jones.
Q You're familiar with his initials and shield number?
A Yes, ma'am.
Q I'd like to move those into evidence.
MR. LEMKE: May I have a voir dire?
THE COURT: Yes.

VOIR DIRE EXAMINATION
BY MR. LEMKE:

MR. LEMKE: May I have those, please.
Good afternoon, Officer Este. I think you know my name is Dennis Lemke. I just have a few questions regarding --
THE WITNESS: Absolutely.
MR. LEMKE: -- what has been marked as People's 9.
The last time you saw this envelope was today, a week ago, two weeks ago, Officer Este?
THE WITNESS: Last time I saw it was in the attorney's office.
MR. LEMKE: Attorney's office being Miss Singas?
THE WITNESS: Yes.
MR. LEMKE: Today?
THE WITNESS: No.

MR. LEMKE: How long ago?

THE WITNESS: When? Say about, this went on so many times. When I first got called in, back in the Grand Jury.

MR. LEMKE: Did you make any notations in your memo book?

THE WITNESS: No, I didn't.

MR. LEMKE: You don't know when since you has last taken it into your custody back on September 9, '07?

THE WITNESS: Did I know, no, sir.

MR. LEMKE: That was Officer Jones?

THE WITNESS: Yes.

MR. LEMKE: Same Officer Jones who will testify at this trial?

THE WITNESS: Yes.

MR. LEMKE: He is available, isn't he?

THE WITNESS: He's standing right outside that door.

MR. LEMKE: He is the one that initially took these and marked them with his initials?

THE WITNESS: Yes.

MR. LEMKE: Then somehow documented perhaps those dollars somewhere else, correct, if they were documented, but you didn't make any recordings?

THE WITNESS: I didn't make any recordings.
MR. LEMKE: That was Officer Jones?
THE WITNESS: Officer Jones, yes, sir.
MR. LEMKE: Do you know what Officer Jones did with the paper with the name Maria Reyes that he initialed back on September 9, '07?
THE WITNESS: What he did with it?
MR. LEMKE: Yes.
THE WITNESS: I don't understand.
MR. LEMKE: After he seized -- you said he took them at some point from my client?
THE WITNESS: Yes.
MR. LEMKE: What did he do with them?
THE WITNESS: He secured them. I am pretty sure he put them -- I may --
MR. LEMKE: Did you see him do that?
THE WITNESS: No.
MR. LEMKE: Okay. You don't know what happened to them from that point on, correct?
THE WITNESS: Right.
MR. LEMKE: I object to the foundation until Officer Jones testifies.
THE COURT: Did you, Officer Este, did you actually see these items retrieved from the defendant?
THE WITNESS: Yes, I did.

THE COURT: The money as well as the paper?

THE WITNESS: Yes, I did.

THE COURT: I will overrule the objection. They will be marked People's 9 in evidence.

THE COURT OFFICER: People's 9 marked and received in evidence.

DIRECT EXAMINATION

BY MS. SINGAS:

Q Officer Este, did the defendant say anything at the time that he was being searched?

A Yes.

Q What was it that he said?

A He says, I am into Spanish chicks.

Q I am into Spanish chicks?

A Yes.

Q Now, I am also going to show you, I will have this marked as People's ten?

THE COURT: 10.

THE COURT OFFICER: People's 10 marked for identification.

Q Would you take a look at what is inside there, please.

What does that look like to you?

A It looks like a doo rag the defendant was wearing at the time of occurrence.

Q Okay. The doo rag recovered, the one he was wearing, who was that given to?
A It was ultimately given to the detectives.
Q Okay. Who was the assigned detective, if you know, on this case?
A Detective Wemberly.
Q Is that Sheila Wemberly?
A Yes.
Q Did she take control of invoicing or vouchering all of the evidence seized in this case?
A Yes, ma'am.
Q Okay. So, does what you're holding in your hand look like the doo rag the defendant was wearing at this time?
A Yes.
Q Okay. We will leave it at this point.
Now, did there come a time that you ascertained where the defendant lived?
A Yes.
Q What address is that?
A The exact numerical I can't recall. I know he lived on Martin in the Village of Hempstead.
Q Would there be something that would refresh your recollection?
A 81, the arrest card.
MR. LEMKE: No objection to the People

refreshing the officer's recollection.

Q Take a look at that and see if it refreshes your memory as to the defendant's address.

A 132 Martin Avenue.

Q You said that is in the Village of Hempstead?

A Yes, ma'am.

Q Approximately how far is 132 Martin from the corner of Totten and Greenwich?

A I would say a half mile.

MS. SINGAS: I am also going to ask this be marked as People's 11.

THE COURT OFFICER: People's 11 marked for identification.

Q Would you take a look at that, please, Officer Este.

What is that? What is that a picture of?

A That is the picture of the defendant's shield and corrections officer's ID card and name tag.

Q Is that what you saw at the scene where you arrested the defendant at some point?

A Yes.

Q Does that photograph fairly and accurately depict the shield and his ID the way you saw it that day on September 9, 2007?

A Yes.

MS. SINGAS: I would like to move that into evidence, please.

MR. LEMKE: No objection, Your Honor.

THE COURT: Received in evidence.

THE COURT OFFICER: People's 11 marked and received into evidence.

MS. SINGAS: Would you just display that, please.

Q Okay. Officer Este, I am going to show you this map.

I will have this marked as People's 12 for identification.

MR. LEMKE: No objection to that being moved into evidence.

MS. SINGAS: Thank you.

THE COURT: People's 12 will be received in evidence without objection.

THE COURT OFFICER: People's 12 marked and received in evidence.

MS. SINGAS: Place that on the easel.

Q Okay. Officer Este, you said you're pretty well familiar with the Village of Hemptead?

A Yes, ma'am.

Q Can you take a look, you might have to step down.

THE COURT: Step down.

Q Can you take a look at that map. I just want you to indicate for the jury where it is that Totten and Greenwich Streets are on that map?

A This is the intersection of Totten and Greenwich Street right here.

Q Okay. Can you also show us where 132 Martin is?

A This is Martin Avenue, and 132 would be approximately right here where, this says 132 Martin Avenue.

Q And, how about the location of 23 South Franklin?

A 23 South Franklin would be, this is South Franklin right here. I am sorry. Says 23 South Franklin right here.

Q You want to step back on the other side so everybody can see. Okay.

How about the location, 118 Fulton.

A Fulton Avenue would be one of those longer streets in Hempstead right here better known as Hemptead Turnpike. While you're in the Village of Hempstead it's called Fulton Avenue.

Q What about 543 Greenwich?

A 543 Greenwich would be right here near the Hempstead/Uniondale border.

Q Okay. All of those locations, approximately what distance are we covering in Hempstead?

A Within a mile and-a-half.

Q Okay. You can take a seat officer.

THE COURT: Miss Singas, do you have much more?

MS. SINGAS: No, Judge. Stop in a second.

That is all I have of this witness. Thank you, Officer Este.

THE COURT: Members of the jury, at this point we're going to take our luncheon recess before we pick up with cross examination.

As I excuse you, you're going to hear these admonitions throughout the course of the trial and any break and any period of time when you go home. I will ask you not to discuss the case among yourselves or with anyone else. Not to form any opinion at this point obviously we just started the case. Don't view or visit any of the areas that have been testified to or described to you.

At this point I am going to excuse you for lunch. We'll try to pick it up between two and 2:15. Come back around two o'clock and hopefully we will get going shortly thereafter. Follow my officer.

THE COURT OFFICER: Step this way.

L U N C H E O N R E C E S S

(Afternoon session.)

THE COURT OFFICER: Jury entering.

THE COURT: All right. Good afternoon,

members of the jury, we're about to begin with the cross examination. I just want to just mention one thing. I don't know if any of you are taking notes, but at this point I am going to direct you not take any notes, for a number of reasons.

One, in this particular case, I don't necessarily think it would be necessary. The other thing to keep in mind is everything that is being said here is obviously being taken down by my court reporter.

One of the things I will tell you at the close of the case is that if there is any testimony you want read back, obviously send me a note and we will do that, and quite frankly, the court stenographer's notes are really the official transcript of the court proceeding. So, obviously, in some instances juries are allowed to take notes.

In this particular case I am going to ask you not to and again if there is any doubt, any confusion, any clarification you want, whether it's testimony, whether it's instructions by me on the law, you can give me a note and I will give you the instructions on the law again if and when that becomes necessary. But certainly with regard to any testimony in this case it's the official transcript you have to rely upon and it's

not uncommon during the course of jury deliberations for jurors to ask for certain portions of testimony read back.

I don't want anybody to be sitting here thinking my God do I have to remember what witness X said two or three weeks ago. You know if there is any doubt about what a witness said you are certainly entitled for that to be read back. I just want you to rest assured that is not going to be an issue.

So, at this point we're ready, I believe, to pick up with cross examination. Mr. Lemke.

MR. LEMKE: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. LEMKE:

Q Again, good afternoon, Officer Este.

A Good afternoon.

Q Few questions I have for you. If you don't either understand the question and want me to rephrase, let me know and I will do so. Okay, officer?

A Absolutely.

Q On September 9, '07, you testified on direct that you were in a marked patrol vehicle?

A Yes.

Q And, you had started your tour of duty early the night before, which would have been Saturday night; isn't

that correct?

A Correct.

Q I believe you indicated you started roughly at about nine o'clock?

A Correct.

Q And, you were working alone in your marked vehicle that night?

A I could have been doubled up earlier on the tour, but at three o'clock the overlap tour goes home. So, if I was working, they would have been long gone.

Q Do you have any independent recollection whether or not you had, in fact, worked, and when I say doubled up, you had someone else in the car earlier, or you don't know?

A No, I can't remember.

Q That would be, if indicated, would be on some documentation back at the Hempstead Police Department, correct?

A Correct.

Q And at about 5:30, 5:40 in the morning, is that when you see this woman you described as hysterical; is that correct?

A Say again.

Q What time did you see this woman that was hysterical?

A The exact time would be on the arrest card, the 81,

if I can see it, I will tell you.

Q Independently you don't recall --

A About 5:30.

Q -- the time?

A Approximately 5:30.

Q Approximately 5:30 given that had been basically when you gave chase, at some point, that's where you had the 911 -- withdrawn.

That is where you had the radio transmission earlier that same morning, correct?

A Correct.

Q And that obviously gives some point earlier or after, gives a time that you then gave chase, correct?

A Yes.

Q And would it also be correct to say that on the Sunday morning hours between perhaps 5:30 approximately to 5:35 and so forth, that when you first saw this woman, that there was a male that you now identify as Ricardo Walters about three feet from her; isn't that correct?

A Yes, correct.

Q As there was, according to your testimony, and as depicted in one of the photographs, I believe 2, actually 1, 2 and 3 in evidence, this individual female was standing and where Mr. Ricardo Walters was standing, correct?

A Correct.

Q When you first observed her, would it be correct to say that, was it the screaming you first heard that directed your attention to her or the fact she was in the street, or both?

A Both I would say.

Q And as you look over you see this male, Ricardo Walters three to four feet away, correct?

A Correct.

Q You don't see them at that time, at that time, in any struggle, correct?

A Correct.

Q You don't see Ricardo Walters grabbing her either by the hair, correct?

A Correct.

Q You don't see a weapon in Mr. Ricardo Walters' hands at all, correct?

A Correct.

Q And, I then simultaneously you stop your marked vehicle, correct?

A Correct.

Q And you then either yell through your window, hey, what's going on?

A To Ricardo Walters, yes.

Q Was Ricardo Walters closest to your driver's window at that time, or were you coming up and you had to go through

your passenger's window basically?

A All conversation was directed through the passenger's front window.

Q Okay. And, so, when you then get out of your vehicle, at some point that is when Mr. Ricardo Walters begins to run, correct?

A Correct.

Q But after he had stated to you in response to your question, what's going on here, he said, I'm just trying to talk with her?

A Talk to her, yes, correct.

Q I think on direct you testified he said I wanted to rap or talk, rap would be your words?

A One of those words. I don't know if he used street slang of raping or, I can't, I knew the gist of the conversation, his response, I was just trying to talk to her, or I was just trying to rap to her. I couldn't --

Q Obviously, you don't know what he was trying to talk to her about, but he indicated, I'm trying to in some way talk to her, rap to her in some way, correct?

A Correct.

Q And at that point in time you responded, you said something to him, correct?

A Yes.

Q Something along the lines, stay there, or what

exactly did you say again?

A I said, you're just trying to talk to her and she is acting like this? Stay right there.

Q You put your car in park and you get out of your vehicle, correct?

A Yes.

Q That is when Mr. Ricardo Walters begins to run?

A Yes.

Q And he is running, initially, towards the back end of your police vehicle, in the direction of your police vehicle, and when I say back --

A Yes.

Q Away? Withdrawn.

When he is running, you now testified in giving chase to Mr. Walters and the -- apparently he is not able to run fully with his arms, as you testified, like pumping, the record reflect my arms are pumping up and down, he --

A Yes.

Q -- appears to have something in his hands?

A Appeared to be going for something in his back, his back pocket, or putting something away in his back pocket.

Q You never see what it is?

A No.

Q You're looking, obviously, to see?

A I am looking.

Q You're a bit scared?
A I am scared.
Q You are watching this individual run and at some point you're able to run passed him?
A Yes.
Q And as you run passed him, you run passed him on your left or right?
A On my left. I run around almost like a semicircle.
Q You loop around him to come now facing him?
A Correct.
Q You're with your gun out?
A With my service weapon out, sir.
Q Now, at that point in time you tell Mr. Ricardo Walters stop?
A Stop.
Q You still don't see any weapon in his hands?
A I don't see his hands, they're down by his sides.
Q You tell him to drop, get on the ground, something along those lines?
A Yes.
Q He doesn't lunge for you, correct?
A Doesn't lunge.
Q Doesn't resist the arrest. He asks, you mean down on my face?
A After several, after numerous commands, he drops

down to his knees.

Q During those commands, he does so, he doesn't in any way wrestle with you, correct?

A Correct.

Q Doesn't lunge at you in any way?

A No, he did not.

Q Doesn't verbally assault you in any way?

A No, he did not.

Q Correct. When you first saw him standing back by this young lady he had a doo rag?

A Yes.

Q As you described his doo rag tied around his dreads as if he had a ponytail?

A Correct.

Q It wasn't down covering his face when you first saw him, correct?

A Correct.

Q It wasn't down over his mouth or eyes, correct?

A Correct.

Q He gives chase, he's running, the doo rag doesn't fly off his head, it's tied in a knot on his hair, correct?

A Correct.

Q He gets down on the ground and at that moment, that is when his hands are behind his back, I take it, at your direction?

A He gets down on the ground, he's being commanded, I command him to get down on the ground face down.

Q And he does so?

A Ultimately, yes.

Q And I take it either you grab one wrist or hand and pull it behind his back?

A I handcuff his right wrist.

Q He didn't resist that, correct?

A No, he did not.

Q You then had both his arms or both his hands in handcuffs behind his back on the ground?

A On the ground.

Q It's about at that time that Officer Jones had either arrived almost simultaneously?

A Correct.

Q At that point you still hadn't seen any gun, correct?

A Correct.

Q Hadn't seen any shield?

A Correct.

Q You didn't at that point determine the identity of this individual, at that moment, correct?

A No.

Q You then go back to secure the area and secure your vehicle as well since your vehicle is running with guns and

shot guns and so forth, correct?

A Correct.

Q And so you go back knowing Mr. Walters is now with Officer Jones?

A Correct.

Q Now, at some time later, maybe ten, fifteen minutes later, Mr. Walters is transported to the Hempstead Police Department; isn't that correct?

A Correct.

Q Before doing that, do you pat down, or does anyone in your presence pat down Ricardo Walters in your presence?

A My presence?

Q Yes?

A No.

Q In fact, the first time -- withdrawn.

You did happened to see a weapon at that location on 9/9/07?

A Correct.

Q That was shown to you by Officer Jones, correct?

A Correct.

Q You didn't observe where he had retrieved that gun from, correct?

A Correct.

Q Did Officer Jones also have an identification with him, that being of the individual Ricardo Walters?

A Yes, he did.
Q You didn't see how that was retrieved either, did you, correct?
A No, I did not.
Q You were the -- at any time did you observe Mr. Walters in possession of two cell phones?
A No, not at that time.
Q Or any other currency, correct?
A Not at that time.
Q You didn't even see $11 at that time?
A Not at that time, sir.
Q He is then transported in your vehicle to Hempstead, correct?
A Negative.
Q I am sorry, in whose vehicle?
A Officer Jones or it could have been Officer Jones or Amazar.
Q You didn't?
A Correct.
Q At some point in time you arrive back at the Hempstead Police Station, correct?
A Correct.
Q I would take it pretty close in time to when Mr. Ricardo Walters was brought back?
A Correct.

Q This may be around ten to six, six o'clock?
A I would hate to put, define a certain time limit, but it was generally around that area, yes.
Q And, where is Mr. Walters when you see him at the Hempstead Police Department?
A In the main holding cell.
Q Was he then taken out of that holding cell to be then further searched?
A Not at that time.
Q At what time and who removed Mr. Walters from that holding cell to then be searched?
A He was searched in the holding cell. There are three arrest rooms. He was in the main arrest room at that time. I was right there by the main arrest room.
Q You were watching him?
A Correct.
Q You didn't partake in it?
A No.
Q That would be Officer Jones?
A Officer Jones and Officer Amazar.
Q Amazar?
A Yes, sir.
Q They were, would you say, inside the holding area?
A They were inside the room.
Q Were you outside the room?

A I was by the doorway.
Q The door was open?
A Yes.
Q You weren't inside the room, but you were kind of standing, maybe leaning up on the door frame perhaps?
A I was by the door.
Q As you were watching, I take it, was it your responsibility to write down what was recovered from Mr. Walters; is that correct?
A My responsibility?
Q Yes.
A I did generate the crime report which is the narrative of incident, what happened.
Q Well, isn't there also a property receipt that is also prepared at the time that property is taken from an individual?
A That property receipt could be done hours after the arrest process.
Q Would there be a time on that?
A Yes.
Q Would you be the individual that would have done so?
A I did that arrest, that property receipt.
MR. LEMKE: Okay. If I can have this marked for defendant's identification at this time, please.

THE COURT: A.

MR. LEMKE: I believe it's A.

THE COURT OFFICER: Defendant's A marked for identification.

MR. LEMKE: May it be shown to the officer, please.

Q I take it, it's a copy, not the best, is that the property receipt you prepared, or in preparation for it?

A Yes.

Q That is kept in the ordinary course of business at the Hempstead Village Police Department?

A Yes.

Q Is that something that you not only generated, you completed?

A Yes.

MR. LEMKE: At this time I offer it into evidence.

THE COURT: People.

MS. SINGAS: I don't object.

THE COURT: Defendant's A will be received in evidence without objection.

THE COURT OFFICER: Defendant's A marked and received into evidence.

MR. LEMKE: Now, may that be shown to the witness.

Q Take a look at it for a second. I don't have any questions, but take a look at it.

A Yes.

Q In preparation of that, that is prepared by you and, in fact, you wrote on there, in the property recovered from Ricardo Walters, cell phone?

A Yes.

Q Did you recover that cell phone from Mr. Ricardo Walters?

A It was inventory of his property.

Q Inventory of his property which was taken by whom?

A Taken from -- taken from the officer who took the contents of his property off his person and placed it on the desk.

Q Who was that?

A Could have been Officer Amazar or Officer Jones.

Q So, the procedure would be that the officer that morning, that Sunday morning, that went into the holding area and removed this property would put it perhaps, either, usually into a big envelope?

A Yes, correct.

Q They would write on the side what was being removed from him, correct?

A No, not necessarily, they wouldn't. They could put it on the desk, they can put it in a bag off to the side

until the arresting officer was able to complete all the necessary paperwork, including this property invoice.

Q On this property invoice, you recorded he had how many cell phones?

A Two cell phones.

Q How much money in cash?

A $176.

Q How much in coins?

A $3.81.

Q What about social security card?

A Actually for some reason there's two social security cards.

Q What about a shield? What else was recovered there?

A Credit card, four store credit cards, health card, and scrunchies for ponytails, like rubber plastic devices.

Q What else does it say there? Watch, belt?

A Yes, sir.

Q What does it say about a watch?

A One watch.

Q Did you record anywhere at all regarding the official document that there was $11 in singles, yes or no?

A No.

Q No. Did you record on this property invoice anything about a piece of paper with the name of Maria Reyes

on it?

A No.

Q No. That is the report that you prepared regarding property recovered from my client correct?

A Yes.

MR. LEMKE: I have nothing else.

THE COURT: Any redirect.

MS. SINGAS: Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. SINGAS:

Q First of all, Officer Este, I am going to let you look at your 81A and ask you the time that you responded to the location of Totten and Greenwich Streets?

A I gave it out, time of offense, which is when I called, 5:33.

Q That is 5:33 a.m.

A Yes, ma'am.

Q All right. You said you were in a marked police car which means it had the police logos as well as the sirens on it?

A It says Village of Hempstead Police Department, Serving to Protect, white with beige stripping.

Q Is it fair to say you were dressed much like you are today in your uniform?

A Exactly the way.

Q Okay. Now, Mr. Lemke asked you when you came around the defendant to overtake him, you yelled out stop; is that true?

A Yes.

Q Was that the first time you yelled stop?

A No, it wasn't the first time.

Q About how many times had you yelled out stop during that chase?

A Numerous times, five, six, police, stop.

Q Okay. How about when you asked him to get down, how many times did you have to ask him to get down?

A More times than it ever took me to stop someone. Five, six times, repeatedly. Ultimately I had to use strong verbal language to convey what I meant.

Q So, is it fair to say that the defendant wasn't exactly cooperative?

A No, he was not.

Q All right. Now, that piece of paper that Mr. Lemke showed you, can you explain the difference between that piece of paper and invoices?

A Well, that is the personal property that is not printed into the case that belongs to the defendant. Everything else we marked as evidence. Guns, money, any other evidence we think the detective might think that may be linked to any crime that has occurred.

Q Is it fair to say that the gun that was recovered from him, that is not on that list, right?
A No, it's not.
Q That would be invoiced, is that correct, as evidence?
A Correct.
Q All right. So, that money, that $11 is evidence, right, it's not his property?
A No.
Q So, the list you have in front of you is his personal property to inventory it so that when he is moved from that location there can be a list of what his personal property was, correct?
A Correct.
Q Let me ask you another question.
That $11 and that piece of paper, was that in a separate pocket or in the same pocket where that other money was found?
A It was in a separate pocket, the left pocket.
Q That was the only money in there, $11 and the piece of paper with the name on it?
A Yes.
MS. SINGAS: I have nothing further.
MR. LEMKE: May I have that?
THE COURT: What do you need.

MR. LEMKE: Defendant's A in evidence, please.

REDIRECT EXAMINATION

BY MR. LEMKE:

Q The document as you just described, it's a property receipt, isn't it?

A Say again.

Q It's a property receipt?

A Property receipt.

Q Property taken from the defendant on 9/9/07; is that correct?

A Yes.

Q And, are you saying there would be another piece of paper that would have, or a list having other things on it?

A Well, the evidence taken from the person that we don't have intentions on giving back to the defendant any time soon.

Q Not giving back, just the property you seized?

A That is the property, yes.

Q You filled it out?

A Yes, sir.

MR. LEMKE: Nothing else.

THE COURT: Okay. Officer Este, thank you very much.

THE WITNESS: You're welcome, Your Honor.

THE COURT: Watch your step as you step off.

(Witness excused.)

THE COURT: Okay. People your next witness.

MS. SINGAS: People call Officer Dale Jones.

(Whereupon, there was a pause in the proceedings.)

THE COURT: Members of the jury, what we will do is take a five or ten minute break a little bit earlier than normally we do at this time in the afternoon and you will be back here shortly. Follow my sergeant and step out.

(Whereupon, there was a recess in the proceedings.)

THE COURT: All right. Members of the jury, I think we're ready for our next witness.

Miss Singas.

MS. SINGAS: People call Police Officer Dale Jones.

DALE JONES, Police Officer, called as a witness on behalf of the People, after having been first duly sworn, and having stated his shield number as 59, and his command as the Village of Hempstead Police Department, took the witness stand and testified as follows:

DIRECT EXAMINATION

BY MS. SINGAS:

THE CLERK: Please state your name, spelling your last name, your shield number and unit of command.

THE WITNESS: Okay. My first name is Dale, D-A-L-E, last name Jones, J-O-N-E-S, shield number 59, Hempstead Police Department.

THE COURT: Officer Jones, I would ask you to move your seat a little bit and keep that microphone close to you.

Miss Singas.

MS. SINGAS: Thank you.

Q Good afternoon, Officer Jones.

A Good afternoon.

Q How are you?

A Fine, thank you.

Q Where are you currently assigned?

A I am assigned to the Hempstead Police Department.

Q What are your duties there?

A Routine patrol.

Q And, how long have you been working at the Hempstead Village Police Department?

A Roughly about seventeen years.

Q Before that were you employed by any police agency other than the Hempstead Police agency?

A I was assigned to the Queens Robbery Task Force, New York City Police Department.

Q For how long?
A Roughly five years.
Q On September 9, 2007, were you working as an officer in the Hempstead Village Police Department?
A Yes, I was.
Q Can you tell us what your duties were that day?
A Routine patrol from five o'clock in the afternoon to roughly three o'clock in the morning in a marked RMP, in uniform.
Q Were you working that morning at approximately 5:30 a.m.?
A Yes, I was.
Q So, that morning, do you remember your tour extending passed 3:30, or does it encompassed it?
A That particular evening it was extended to seven o'clock in the morning.
Q Now, at approximately 5:30 in the morning, did you have occasion to hear a radio transmission?
A Yes, I did.
Q Were you able to ascertain from that transmission who was sending it?
A Yes, I did.
Q Who was that?
A That was Police Officer Eugene Este.
Q Had you worked with Officer Este before at the

Hempstead Village Police Department?

A Yes, many times in the past.

Q Had you heard his voice on the radio before that early morning?

A Yes, thousands of times.

Q All right. Now, had you seen Officer Este during the course of your routine patrol at any time before you got that transmission?

A Yes. I'd say several minutes prior to I saw officer Este down Greenwich Street in a, I would say, in a northerly direction several minutes prior to that transmission. Then, rather, prior to that transmission as well he was going back the other way in a southerly direction down Greenwich.

Q Where were you when you saw that?

A I was parked opposite 350 Greenwich Street which is actually Kennedy Park right out there on Greenwich Street.

Q Now, Officer Jones, what did you do when you heard the radio transmission from Officer Este?

A At that point, once I realized it was Officer Este, I took it upon myself to actually go in that direction he was and hopefully I would come across him because I didn't know where he was.

Q Were you able to make out what he was saying on his transmission?

A It was very inaudible, but I could hear him saying stop. That is why I knew it was his voice.

Q Were you in a marked vehicle?

A Yes, I was in a marked RMP, marked police car.

Q That means sirens, Hempstead Police Department slashed across the sides of it?

A Exactly, yes.

Q Were you in uniform?

A Yes, I was.

Q Were you alone in the car or did you have a passenger?

A I was there alone.

Q A partner?

A I was alone, by myself.

Q All right. Tell us where it is you went?

A I proceeded to pull out and head south, correction, north down Greenwich Street. At that point I saw Officer Este's car parked sideways in the middle of the street. I kind of got tunnel because I am looking in the car and I didn't see anybody in it.

A second later I heard Officer Este call to me. At that point I had turned to my right to see him standing over someone. I immediately got out of my car and ran over to him and he said something to the extent, hold him, I got to catch the victim or find the victim, I don't want them to get away.

Q Let me stop you there.

When you say you saw his vehicle, were you driving in your vehicle when you first saw his vehicle?

A Yes, I was. Yes.

Q All right. Was Officer Este inside his vehicle at that time?

A No, he wasn't.

Q Did you continue then driving?

A Well, at this point when I saw the car I pulled right behind it and stopped and you could see there was no one in the car.

Q Right.

A And, I didn't see where Officer Este was. That is when he called to me at that point.

Q How far was he from you when he called to you?

A Not that far. Probably twenty feet.

Q Did you drive over to him or did you walk?

A I just got out of my car and ran right over to him.

Q You said he was standing over someone?

A Yes, he was.

Q The person he was standing over, do you see that person anywhere in the courtroom today?

A Yes, I do.

Q Can you please point him out?

A The gentleman right there with the dark brown

jacket and, I guess, cream colored shirt.

MS. SINGAS: Indicating the defendant, Your Honor.

THE COURT: Yes.

Q All right. Now, so, you had a conversation with Officer Este, and then did you observe Officer Este leave and head back towards his vehicle?

A Yes. He kind of headed like passed his vehicle down the street. At that point I kind of lost sight of him.

Q Okay. Now, let me show you, I am going to show you People's 6 that is in evidence.

Can you see it if I put it on the projector?

A Yes. Yes. No problem.

Q Okay. Do you recognize that area?

A Yes.

Q Where is that?

A That would be the corner of Greenwich Street and Jerusalem Avenue in the Incorporated Village of Hempstead.

Q Is that where you saw Officer Este holding the defendant?

A Yes.

Q Okay. Now, I am going to display for you People's 5. Okay.

Is that a view of Greenwich Street?

A Yes, it is.

Q All right. Now, is that the way you were travelling when you were heading to Officer Este?

A The direction I was actually travelling is the direction you see that vehicle.

Q Okay. So, you were coming towards us then?

A That is correct, yes.

Q Okay. All right. Now, you get to that scene and the defendant is on the ground?

A Yes.

Q Tell us what you do once Officer Este goes back to find the victim.

A Well, at that particular moment I started to pat the individual down, the outer most garments, while on the ground, and I felt a wallet in his front right pocket. As I proceeded to pat him down some more, in his left rear pocket I felt a handgun.

Q Okay. How did you know it was handgun? Have you felt handguns before?

A I've been a police officer for well over twenty years. I know a handgun when it's a handgun.

Q What did you do at that point?

A At that point I had taken the gun out of his left rear pocket, unloaded it and secured it in my pocket.

Q Do you remember what color the gun was?

A It was black in color.

Q Do you remember what type of gun it was?

A Nine millimeter, I believe a Glock. I'm not really a gun expert, but it was definitely a nine millimeter.

Q You say you pulled out the magazine and unloaded it?

A Yes. I took the magazine out and also took one round out of the chamber.

Q Explain for the jury what that means. If you had to unload it, was that weapon loaded?

A Yes. Once you take a clip out of an automatic handgun there is still one round in the gun. So, you basically have to pull the slide back for that other round to come out or it's still considered loaded, it can still fire one shot.

Q Do you remember or recall how much ammunition was in that gun?

A No, I do not.

Q Okay. I am going to show you People's, I will mark it as People's 13. It's this box.

THE COURT OFFICER: People's 13 marked for identification.

MS. SINGAS: Thank you. May it be shown to the witness, please.

Q Would you take a look inside that box and tell us if you recognize anything?

A Yes, this is the gun.
Q Okay. And is there ammunition in there as well?
A Right now there is no ammunition in the gun.
Q That thing you just pulled out of it, what is that called?
A This is a clip. This is a clip that holds a certain amount of rounds.
MR. LEMKE: No objection since, it's not in evidence, no objection to People's 13 in evidence.
MS. SINGAS: I will move it into evidence.
THE COURT: People's 13 will be received in evidence without objection.
THE COURT OFFICER: People's 13 marked and received in evidence.
Q Go ahead. Take a look at the gun and explain to us again what it is you removed?
A What I did, I actually took the clip out to secure the firearm. At this point there was still one round in the chamber.
So, would you like me to tell, like me to demonstrate that?
Q No, we got that.
A Okay.
Q But inside that box is there ammunition?
A Yes, there is.

Q Would you take that out.
Can you tell us how many rounds of ammunition are there?
A Thirteen rounds of live ammunition and two spent rounds and two casings.
Q Now, when you say ammunition, those are bullets; is that correct?
A That is correct.
Q And those bullets, when you secured the weapon from the defendant, those bullets were inside, thirteen of them were inside the magazine and one was inside the chamber; is that correct?
A Actually since it's a total of thirteen, it would be twelve rounds in the magazine and one round, which is thirteen in the chamber.
Q And you took that out of which pocket again?
A His left rear back pocket.
Q You take the gun out and you unloaded it?
A Yes.
Q Then do you keep it on your person?
A Yes.
Q Eventually, do you give that property over to an assigned detective?
A Yes.
Q Who is the assigned detective in this case?

A That would be detective Wemberly.
Q Ultimately Detective Wemberly takes possession of that gun and that ammunition, correct?
A Correct.
Q Now, do you then continue your search of him at the scene?
A Yes, because several times in the past I have taken --
MR. LEMKE: Objection.
Q Just tell us what you did --
THE COURT: Sustained.
Q -- in this case.
A I continued to pat him down. I went back to the front wallet again because --
Q Don't tell us why. Did you pull it out at some point?
A Yes, I did.
Q Okay. Did you look inside?
A Yes, I did.
Q What did you see?
A There was a shield and an ID card from the New York City Department of Corrections.
Q All right. That ID card, did that have a picture on it?
A Yes, it did.

Q Did that picture match the person who was in custody at that time?

A Yes, it did.

Q I am going to show you People's 11 in evidence. Do you see that, Officer Jones?

A Yes, I do.

Q Is that the wallet and shield case with the ID you pulled out from the defendant's pocket?

A Yes, it was.

Q All right. That was in his front pocket?

A That was in his front right pocket.

Q Now, did you make any other observations of him or any other evidence that he had on him at the scene?

A Yes.

Q What was that?

A It was a holster located on the right side of his hip.

Q Okay.

A With no firearm inside.

Q What was that?

A With no firearm.

Q Okay. When you observed it, did you make the defendant stand up or was he still on the ground?

A No, at that point he was still on the ground. I just pulled his jacket up.

Q When you pulled his jacket up, you saw he had a holster on?

A Correct.

Q But there was no weapon inside?

A No weapon inside.

MS. SINGAS: All right. Bear with me. I am going to mark this as People's --

THE COURT: 14.

THE COURT OFFICER: People's 14 marked for identification.

MS. SINGAS: Can you show that to the witness, please.

Q Officer Jones, what is that a picture of?

A A picture of a holster on a belt.

Q Okay. And, does that picture fairly and accurately depict what the defendant's holster looked like on the day of September 9, 2007?

A Yes, it does.

Q Is that a picture of the holster?

A This is a holster and the belt.

MS. SINGAS: At this time I'd like to move that into evidence, please.

MR. LEMKE: No objection.

MS. SINGAS: People's 14.

THE COURT: People's 14 will be received in

evidence.

THE COURT OFFICER: People's 14 marked and received into evidence.

MS. SINGAS: Thank you. If we can display that.

Q Officer, Jones, did you make any observations of any vehicles at that location where you were with the defendant?

A Yes, I did.

Q And, did you observe the defendant's red Mitsubishi Gallant in the area where he was stopped?

A Yes.

Q Officer Jones, did there come a time that the defendant was transported back to the Hempstead station?

A Yes, he was.

Q And, did you transport him or did somebody else?

A I transported him.

Q Okay. Now, at the Hempstead police precinct, was a more thorough search of the defendant conducted?

A Yes, there was.

Q And who conducted that search?

A I did and another officer I believe.

Q Okay. And, would that have been Officer Este or was Officer Este present?

A I believe Officer Este -- I don't really recall. I

am not sure now.

Q Do you know who the other officer was that was assisting you in doing this search?

A Officer Amazar.

Q Okay. I am going to show you what has been put into evidence as People's number 9.

A Thank you.

Q Do you recognize what is in People's 9?

A Yes, I do.

Q What is it?

A It's the currency and a note that I recovered from Mr. Walter's pocket.

Q Do you remember from which pocket that currency and that note was recovered from?

A I believe it was his front left pocket.

Q Okay. Now, that note, is there anything on the property that you're looking at that distinguishes it for you, any markings made on it that indicates your recovery of those items?

A Yes. On every piece of currency here as well as the note I put my initials DEJ, Dale Eric Jones, and 59 which is my shield number.

Q Is that also on the slip of paper that has the name on it?

A Yes, it is.

Q What is that name?
A The name is Maria M. Reyes.
Q Now, at that time, what happens to that property?
A It's turned over to the detectives.
Q Okay. And, can you explain what invoicing is for the jury, please?
A Invoicing is once you gather the property you have to identify it to show a chain of command which is why I initialed it and then I subsequently turn it over to the county detectives.
Q And again whose the lead detective on this case?
A That would be Detective Wemberly.
Q Where is Detective Wemberly from?
A She is from the Nassau County Police Department, Third Precinct, Detective Squad.
MS. SINGAS: Okay. I have nothing further for this witness.
Thank you, Officer Jones.
THE COURT: Mr. Lemke.
CROSS EXAMINATION
BY MR. LEMKE:
Q Good afternoon, Officer Jones.
A Good afternoon.
Q Officer Jones, regarding the September 9, '07 incident you just testified to, I believe that early morning

hours of Sunday morning, when you had either received or heard a transmission, that you recognized the officer's voice, Officer Este's voice, correct?

A Correct.

Q I take it you work closely with Officer Este over many years?

A Yes.

Q You're familiar with each other from certainly working either together the night shift; isn't that correct?

A That is correct.

Q You socialize with him at all outside the office?

A Yes, I do.

Q You consider him a friend of yours?

A That is correct.

Q Many times, obviously, he's called perhaps back up you and vice verse, correct?

A Correct.

Q So, you have a close relationship both while on the job as well as socially, correct?

A Correct.

Q Back on September 9, '07, you recognized his voice and I will take it within a few moments you then spot his patrol vehicle, correct?

A Yes, sir.

Q And as you approach his patrol vehicle, you

observed that he is not in that vehicle, Officer Este, correct?

A Correct.

Q And at some time you hear Officer Este yelling for you?

A Calling to me, yes.

Q At what point in time that morning, when I say time, in relation to where you were in your vehicle regarding Officer Este's vehicle, did you hear Officer Este yelling for you?

A You mean from the time -- I don't understand the question.

Q You're travelling on Greenwich, correct?

A Correct.

Q And, as you're travelling, you see the vehicle that Este was using to drive?

A Yes.

Q I take it you're very familiar with the number, obviously, that he is assigned, the car he drives?

A Well, he has a different car every time, every night. I recognized the car, but he has a different car ever night.

Q But that is the car he is driving that night, you recognized it?

A Yes.

Q When you first see it, you don't hear anyone yelling to you, correct?

A It was within seconds.

Q Did you see a young woman on the street later known to you as Sara Sandoval?

A No.

Q Did you see Mr. Walters who you identified in court?

A Yes.

Q Where did you see him?

A On the ground.

Q With Officer Este?

A Yes.

Q Prior to Officer Este calling over to you, you hadn't seen Ricardo Walters on the ground that night?

A Say that again.

Q Prior to September 9, '07, driving up Greenwich, prior to hearing Officer Este yelling for you, you hadn't seen Ricardo Walters on the ground that night?

A No, he was on the ground.

Q Well, did you see him prior to Officer Este saying hey, hello, Officer Jones, I'm over here?

A No, not prior to that.

Q No. Once Officer Este yelled out to you, that is when you looked over and you saw Ricardo on the ground?

A That's correct.
Q You park your vehicle and you got out?
A The car was already stopped. I just got out.
Q And then you either, I don't want to say ran, you went over to where you saw Officer Este?
A No, I ran.
Q You run over. At this point when you arrive there, Mr. Walters is on the ground face down, isn't he?
A Yes. Correct.
Q Hands behind his back?
A Handcuffed.
Q Handcuffed already, correct?
A Correct.
Q At this point in time, there's a brief conversation between you and Officer Este, and Officer Este leaves for a second, correct?
A That's correct, sir.
Q At that point in time do you assist Mr. Walters up before you pat him down?
A No.
Q You pat him down on the ground?
A Correct, sir.
Q While you pat him down, it's your testimony that you observed a couple of things as you feel and pat him down?
A Correct.

Q One I believe is a wallet?
A Yes.
Q You reach in and take out the wallet?
A No. Initially I pat down the wallet, then I continue searching him.
Q And you remove that wallet?
A Yes, I did.
Q At that location?
A Yes, I did.
Q Okay. Now, after you pat him down, you feel something and you continue to feel further, correct?
A Correct, sir.
Q Does Mr. Ricardo Walters at that point struggle, roll left to right, or anything like that?
A No.
Q Is he resisting you in any way while you're patting him down?
A No.
Q You feel what you believe to be, I take it, a wallet, and you search further, correct?
A Correct.
Q It's at that point you find a weapon, correct?
A Yes, sir.
Q You remove that weapon?
A Yes, sir.

Q You testified a few moments ago that, of course, for safety reasons, you removed the magazine or the clip from the weapon, correct?

A Correct.

Q You always, if you can, open up the chambers because many times there's a bullet in the chamber of the gun even though you take out the magazine. That weapon obviously is still live and still loaded.

A Correct.

Q In this case you did so?

A Yes.

Q How many bullets did you recover at that time?

A I don't know.

Q You had indicated, however, upon review of what is in evidence as People's 13, there's a gun you had recovered, correct?

A Correct.

Q And you later ascertained through your investigation that Mr. Ricardo Walters has a license for that gun, correct?

A Yes, sir.

Q And, when you removed the magazine from that weapon there was certainly bullets within that magazine, correct?

A Yes, sir.

Q In People's 13 you had indicated that how many

bullets are part of that in evidence?

A Thirteen.

Q Thirteen shells or, withdrawn, thirteen bullets?

A Thirteen bullets.

Q Next there's two spent rounds, correct?

A Yes, sir.

Q For the jury, when you say there's a spent round, you didn't remove a spent round from that gun, correct?

A Correct, sir.

Q They were live rounds, correct?

A Correct. Yes, sir.

Q Then later on the ballistics department or bureau would have tested the weapon, if you know, to see if it works?

A That is correct.

Q By using one of the bullets that you had removed from the gun, correct?

A Not sure how they do that.

Q Not to give a false impression, there were no bullets that had been spent when you_took that gun from Mr. Walters?

A That is correct.

Q Now, you had also indicated that at some point you arrived back to the Hempstead Village PD?

A Say that again, sir.

Q Arrived back fifteen, twenty minutes later in the morning of September 9th of '07 to the Hempstead Village PD, correct?

A Correct.

Q Detective Wemberly is a Nassau County Police Department Third Precinct detective, correct?

A Yes, sir.

Q Would she be considered the carrying detective regarding that particular arrest?

A Yes, sir.

Q And for the jury, a carrying detective would be the detective that this case would be assigned to for further investigation, correct?

A That is correct.

Q You would be the assisting officer, arresting officer or assisting officer, correct?

A Correct.

Q Perhaps Officer Este would be the arresting officer?

A Yes.

Q You get back to the precinct and everything gets reported to Detective Wemberly to assign individual tasks if needed, correct?

A Yes, sir.

Q You get back, when you're there, Detective Wemberly

is not there yet, is she?
A No.
Q Do you recall what time, if at all, she arrived that morning?
A I don't at all.
Q That would be in some type of ledger perhaps or Detective Wemberly, what time she arrived, correct?
A Yes.
Q But now earlier that morning you do a more thorough search at that time, apparently, of Ricardo Walters?
A Yes, sir.
Q That is with another officer, not Officer Este, correct?
A Correct.
Q And that is done within this holding cell area?
A Correct.
Q And at the time you're further searching Mr. Ricardo Walters, you have a note pad with you to write down everything that is recovered?
A No.
Q Do you have anything at all to write down what you recovered?
A No.
Q No. You, in fact, just take things as you pat down Mr. Ricardo Walters, you take things from him?

A That's correct, sir.
Q You take his watch. He has a watch on, correct?
A Yes, sir.
Q Any jewelry. Has any jewelry? Correct?
A Yes, sir.
Q Any if there's any papers in his pocket, you may take them out?
A Are you talking as property or talking evidence?
Q No. As you're doing the search right there that morning?
A Okay.
Q According to your testimony, you went back and did a more thorough search of Mr. Walters?
A Yes.
Q What time was that?
A I don't know.
Q Is there anything that would refresh your recollection as to what time that was?
A No.
Q You didn't make any notes or record on anything as to when you searched Mr. Ricardo Walters?
A That is correct, sir.
Q Yet as you're so called searching him, you wrote nothing as to what time it is you now find certain items?
A Why do I have to know what time it is?

Q I am sorry?
A Why do I have to know what time it is?
Q I am asking, did you make any notations as to what time it is?
A No, sir.
Q You're asking me why should you have to write it down. Is that what you're asking me?
A Yes.
MS. SINGAS: Objection.
THE COURT: Sustained.
Q You don't make any notations at all?
A That is correct.
Q Is it in the morning still?
A Yes, sir.
Q Closer to eight o'clock?
A No, sir.
Q Maybe seven o'clock?
A Don't know, sir.
Q Could be ten o'clock?
A Definitely not ten o'clock.
Q Could be anywhere from six when you arrived to eight o'clock, nine o'clock, you don't know because you didn't write it down?
A It is probably safe to say at least fifteen to twenty minutes once we arrive at the precinct.

Q Did you write anything down regarding that?
A No, I didn't.
Q Didn't think it was important, did you?
A That is correct, sir.
Q While you're patting down Mr. Walters, now you're removing things from Mr. Walter?
A That is correct.
Q Again, you're not writing down where those items were found and what time they were found, are you?
A That is correct.
Q Then you gather a whole bunch of things that you probably put in an envelope?
A All I gathered was evidence.
Q When you say evidence, did you take, for example, any money from him?
A Yes, I did.
Q And that money was eleven bucks, according to you?
A Eleven singles, yes, sir.
Q At that time did you recover from him another $120 from him?
A No.
Q Did you ever see that money?
A No.
Q Well, did you search his pockets?
A Yes.

MR. LEMKE: Could I have defendant's A in evidence.

If that can be shown to the witness, officer, please.

Q Officer, at that point in time you don't know what would be evidence?

A Say that again.

Q When you're searching Mr. Walters, when you're searching Mr. Walters, you don't know what would be evidence, do you?

A No, I didn't.

Q You didn't, did you?

A I don't understand the question.

Q Yes. You're searching Mr. Walters, maybe fifteen minutes, maybe an hour after he is placed under arrest, correct?

A Not two hours, about fifteen, twenty minutes.

Q Did you speak -- do you speak Spanish?

A No, I don't.

Q Did you speak to Sara Sandoval?

A No, I didn't.

Q Now, you're searching Mr. Walters. You say you are searching for evidence, correct?

A Searching his body.

Q For evidence.

A Yes.

Q Okay. When you pat him down, don't you find two cells phones?

A No.

Q Well, isn't there property invoiced, officer?

A This is a property invoice, but I didn't do the property invoice. It's not my name.

Q When you're patting him down, doesn't he have two cell phones on him?

A Well, I don't know, but the thing was I was told --

Q Forget what you were told. I am asking you what you were looking for, what you're doing when you're patting him down. Do you find a watch on him? Yes or no, or you don't remember?

A I only searched for the evidence.

Q You say evidence, you're only searching for one thing?

A That is correct.

Q You're not searching, according to you, for anything else that is on him; is that right?

A That is it.

Q You had to go through his pockets?

A One pocket.

Q So, the first pocket you went into, low and behold you found $11?

A Yes.
Q Then you stopped?
A I was told he should have $15 --
Q Whatever you were told?
A Yes.
Q I said you can't answer what you were told, you were looking for items?
A Yes.
Q The first thing you looked for, low and behold you find it in the first pocket you searched?
A That is correct, sir.
Q Then your search stopped there?
A For me it did.
Q You didn't go anywhere else, didn't check any other pockets, did you?
A No.
Q Do you remember how many pockets Mr. Ricardo Walters had in his pants that night?
A Two in the front, two in the rear. I believe they were cargo pants.
Q That's right. Two on the side, at least two on the sides, right?
A Maybe.
Q At least six, seven pockets?
A Well, that I don't know.

Q It's your testimony you go in without making any notes to find $11 and some name in the first pocket you go into, you just happened to find it there; is that correct?

A That is correct, sir.

Q Then you stop, you don't search anything else?

A That is correct.

Q Did anybody else do that?

Were you able to observe anybody else that did that while you were there?

A No. By then I stepped out of the room to verify to the other officer I found the evidence.

Q Do you know Police Officer Amazar?

A Yes.

Q He is a Hempstead police officer?

A Yes.

Q He was working that morning with you as well?

A Yes, he was.

Q Wasn't he present with you?

A He was.

MR. LEMKE: I have nothing else.

THE COURT: Any redirect?

MS. SINGAS: Yes.

REDIRECT EXAMINATION

BY MS. SINGAS:

Q Officer Jones, does officer Amazar speak Spanish?

A I am not sure.
Q How about Officer Espina?
A Yes, he does.
Q Is Officer Espina a fellow Hempstead police officer?
A Yes, he is.
Q Was Officer Espina involved in talking to Sara Sandoval at the Hempstead police station?
A Yes, he was.
Q And, we're you, don't tell us the conversations you were having, but during that time, were you and Officer Jones speaking with Officer Amazar and Officer Espina?
A Yes, we were.
Q And, were you gathering information about the case you were investigating?
A Yes, we were.
Q Okay. And, is it partly based on some of the information you received that sort of guided how your search was going to proceed?
A Yes, it was.
Q And, is it true that before a prisoner is taken anywhere an inventory is done of all of that prisoner's property which includes jewelry, wallets, health card, cell phones, et cetera?
A That's correct.

Q Who filled that out? Do you know? Do you recognize the handwriting on that, defendant's A?

A I really can't even tell.

Q Is that standard operating procedure that --

A Yes.

Q -- personal property of every defendant is jotted down so that a record is made of it?

A Yes.

Q Okay. And, everything else that, based on your investigation, is deemed as evidence is transported to the detectives to voucher and inventory?

A That is correct.

MS. SINGAS: All right. I have nothing further. Thank you.

MR. LEMKE: Nothing else.

THE COURT: Nothing. Officer Jones, you can step down.

Thank you very much.

THE WITNESS: Thank you.

THE COURT: May I see the lawyers real quick.

(Whereupon, there was a bench conference held off the record.)

THE COURT: All right. Members of the jury, we're going to break a little bit earlier than we normally do for reasons you shouldn't really concern

yourselves with. Tomorrow we're going to be back here again in Judge Carter's courtroom.

So, therefore, I will ask you to get to the courthouse by ten o'clock. You're clearly welcome to come before then and get a cup of coffee. There's a, I'm sure by now they told you there is somewhat of a cafeteria downstairs. The reason I say if you want to come before ten o'clock, usually by ten o'clock, the parking lot starts to get very, very crowded if it's not crowded already.

I am going to try to get going between ten and 10:30 tomorrow morning. I have a couple of calendar matters to get out of the way so they don't hold us up during the day. When you come here tomorrow, report too room 106. If you haven't been acquainted with it by now, the officers will tell you as you step out for the day.

As I let you go, I remind you not to talk among yourselves or with anyone else about the case. Don't form any opinions at this point about the case. Obviously as I indicated earlier, don't view or visit any of the areas or locations described. Should there be any reports of the case in the media please do not view any accounts of this case in the media, be it T.V., newspaper or on the computer.

Have a good night. Beat the Mineola traffic home. See you back here tomorrow.

(Whereupon, the following takes place outside the presence of the jury.)

MR. LEMKE: One other thing for the record, Your Honor. If we can, if the commit slip, I had made mention of it earlier, my client does receive medication. I worked that out regarding doses he will be receiving during the day, but we may need to have on the commitment slip that a kosher lunch be sent over that gives him the nutrients needed so he doesn't have a diabetic shock episode.

Somehow if it can be marked and this way the jail can bring over, they have them there, to avoid any problems.

THE COURT: Mark it and I will ask my secretary to contact the person of transportation and try to deliver that message also.

MR. LEMKE: That would help. Thank you, Your Honor.

* * * *

This is to certify that the foregoing is a true and accurate transcript of the proceedings.

Mary Ocskai
Senior Court Reporter