VOLUME II OF III



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU : PART 49

-------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK

-against- Indictment No. 436N/08

RICARDO WALTERS, JURY TRIAL

DEFENDANT.

-------------------------------------x

Mineola, New York
November 6, 2008

B E F O R E: JAMES P. McCORMACK
Acting Supreme Court Justice

A P P E A R A N C E S:

HON. KATHLEEN M. RICE
District Attorney of Nassau County
BY: MADELINE SINGAS, ESQ.
THERESA TEBBETT, ESQ.
Assistant District Attorneys
For the People

DENNIS LEMKE, ESQ.
114 Old Country Road
Mineola, New York 11501
Attorney for Defendant

ALSO PRESENT: Maria Deysine
Official Spanish Interpreter

Kathi A. Fedden
Kathleen Plaia
Official Court Reporters

THE CLERK: Case on trial, the People of the State of New York against Ricardo Walters, Indictment 436N of 2008.

People ready?

MS. SINGAS: Yes.

THE CLERK: Defense counsel ready?

MR. LEMKE: We're ready, your Honor.

THE COURT: Are we ready to bring in the jury?

MS. SINGAS: Yes.

MR. LEMKE: Yes.

COURT OFFICER: Jury entering.

(Whereupon, the jury entered the courtroom.)

THE COURT: Members of the jury, good morning. I want to apologize for our late start. I had a couple of matters that took longer than I had expected to and, despite my best efforts, I was not able to get them before now -- actually conclude them before now.

The good news is that in the interim, the attorneys were able to hammer out a stipulation which I believe will obviate the need of calling two witnesses. The stipulation we'll deal with a little bit later, so. Although you weren't able to sit for the past hour, we probably saved ourselves, with the stipulation, at least that much in terms of courtroom time and testimony. So, that's the good news. So, in that sense, we have been

able to kind of shorten up the witness list somewhat. At this time we're ready to proceed.

Ms. Singas, if you would.

MS. SINGAS: Yes, thank you, Judge. The People call Detective Sheila Wimberly.

D E T. S H E I L A W I M B E R L Y, Shield #1031, assigned to the Third Squad of the Nassau County Police Department, having been called as a witness on behalf of the People, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: Detective, please state your name, spell your last name, shield number, rank and command.

THE WITNESS: Detective Sheila Wimberly, W-I-M-B-E-R-L-Y. Shield 1031.

THE COURT: At any point in time somebody can't hear any witness, raise your hand and let me know.

Detective, if you can move up.

THE CLERK: Detective, state your command.

THE WITNESS: I work at the Third Squad, Williston Park, Nassau County Police Department.

THE COURT: Ms. Singas.

DIRECT EXAMINATION

BY MS. SINGAS:

Q. Good morning, Detective, how are you?

A. Good morning. Fine.
Q. Where are you currently assigned?
A. I'm assigned to the Third Squad in Williston Park.
Q. What is your rank?
A. Detective.
Q. How long have you been a detective in the Third Squad?
A. Approximately five years.
Q. Where were you before that?
A. I worked in the Commissioner's office. I worked narcotics. I worked legal Bureau, patrol.
Q. How long have you been working for the Nassau County Police Department or in a law enforcement capacity?
A. Twenty-one years.
Q. On September 9, 2007 where were you assigned?
A. I was assigned to the Third Squad.
Q. Were you assigned a case involving a Ricardo Walters?
A. Yes, I was.
Q. Did you have occasion to go to the Hempstead Village Police Department that day?
A. Yes, I did.
Q. Do you remember what time you got there?
A. I got there approximately 7:45 in the morning.
Q. Now, the person that I have just mentioned as

Ricardo Walters, do you see that person anywhere in the courtroom today?

A. Yes, I do.

Q. Could you please indicate him and what he's wearing?

A. He's the gentleman sitting over there in, I believe, either a green dark green suit and white shirt with the dreadlocks.

MS. SINGAS: Indicating the defendant?

THE COURT: Yes.

Q. Now, when you got to the Hempstead Police Department, was the defendant already there?

A. Yes, he was.

Q. Did you have occasion to speak with Officers Este, Jones and Detective Espina, among other police personnel, at Hempstead that morning?

A. Yes, I did.

Q. Now, on that date, were you assigned as the assigned detective for that case which occurred on September 9, 2007?

A. Yes, I was.

Q. Now, did you have occasion to take what we call pedigree information from the defendant?

A. Yes, I did.

Q. And can you tell us what pedigree information is?

A. His name, address, date of birth, employment, if any.
Q. Did you find out what his occupation was?
A. Yes, I did.
Q. What was it?
A. He was employed by the New York City Department of Corrections as a correction officer.
Q. How about his date of birth?
A. Yes.
Q. And what was that?
A. October the 29th, 1965.
Q. And that made him approximately how old on September 9th?
A. At that time, 41 years old.
Q. And how about his address?
A. Yes.
Q. What was that?
A. I believe it was 132 Martin Avenue in the Village of Hempstead.
Q. Did you have occasion to ascertain the type of vehicle that he drove?
A. Yes.
Q. And what kind of car was that?
A. It was a 2001 Mitsubishi.
MS. SINGAS: Can I see People's 8, please?

COURT OFFICER: (Handing.)

Q. Detective Wimberly, is that the vehicle -- is that the defendant's vehicle?

A. Yes, it is. It appears to be the vehicle.

Q. And was that vehicle impounded from where it was on Jerusalem and Totten Streets and brought to an impound area?

A. Yes, it was.

Q. And did you have occasion to run or was the plate run and the owner of that vehicle ascertained, the registered owner?

A. Yes.

Q. And who was that?

A. The defendant, Ricardo Walters.

Q. Now, did you, as part of your duties as the assigned detective, notify any personnel from corrections about the arrest of a corrections officer?

A. Either it was myself or my supervisors notified corrections. I don't recall which one of us, whether it was myself or supervisors, but they were notified.

Q. Did they send corrections personnel to the Hempstead Village Police Department?

A. Yes, they did.

Q. Do you remember who it was that was sent, their names?

A. Their union lawyer, Peter Troxler, Captain Gregory

Navoy, I believe, from the Investigation Unit, and possibly Tom Cavalino, I'm not quite sure, responded to the Hempstead Police Department.

Q. So there were corrections personnel at Hempstead. Did you have occasion to speak with them as well?

A. Yes.

Q. Fill them in about what had happened?

A. Yes.

Q. Now, are part of your duties as the assigned detective to invoice property?

A. Correct, yes.

Q. And where do you typically get that property from?

A. Usually get it from the arresting police officers.

Q. Now, I'm going to show you People's 13 in evidence, please. Take a look at what's in that box. Do you recognize what's in People's 13?

A. Yes.

Q. And what is it?

A. It's the property envelope where I originally sealed the weapon, which is a Glock 26 nine millimeter with serial number and 15 rounds and a magazine.

Q. And do you recognize your handwriting anywhere on that box or inside on that envelope?

A. Yes, I do.

Q. Where do you see it?

A. It's written on the original sealing packet of the gun.

Q. And did you receive that gun and that ammunition from Officer Dale Jones of the Hempstead Village Police Department?

A. Yes, I did.

Q. And what did you do with it once you received it? Explain to us the invoice process.

A. Once the arrest processing was completed, I responded back to the Third Squad with this weapon. I invoiced it, took photographs, noticed the serial number on it, how much ammunition and invoiced it on a property voucher from the Third Squad, forward it to our Property Bureau and our lab for operability.

Q. And for operability of the weapon, is that the -- it goes to the Ballistics Department?

A. Yes.

Q. Do you know which detective conducted the examination for operability on that weapon?

A. Yes, I believe it was Detective Sergeant Robert Nemeth.

Q. Now, I'm going to show you People's, I believe it's, 9. You can take a look inside there, Detective.

A. Okay.

Q. And is that also property that you received from

Dale Jones that morning of September 9, 2007?
A. Yes, it is.
Q. And what is it that you are looking at?
A. I'm looking at 11 single one dollar bills and a piece of torn ripped paper with the name written in capital letters in blue ink, spelled out to be Maria M. Reyes.
Q. And do you recognize your handwriting anywhere on that?
A. My handwriting is on the property invoicing envelope.
Q. And where was that money recovered from?
A. I believe this money was recovered from the defendant's left front pocket.
Q. Now, how about I'm going to show you People's 10 that's marked for ID. Do you recognize that, Detective?
A. Yes.
Q. What is that?
A. It's a black doo-rag that's wrapped around the head like a scarf.
Q. Was that doo-rag given to you by either Officer Este or Jones next with this case?
A. Yes, it was.
Q. And how do you recognize that it comes from this case?
A. I indicate on the envelope, the property envelope,

the case report, arrest number, the invoice voucher number and my name.

Q. And is that doo-rag in the same or substantially the same condition today as it was on September 9th of 2007?

A. Yes, it is.

MS. SINGAS: I would like to move that into evidence. I think it was just marked for identification.

MR. LEMKE: No objection, your Honor.

THE COURT: Without objection, People's 10 will be received in evidence.

(Whereupon, People's Exhibit 10 for identification was received and moved into evidence.)

COURT OFFICER: People's 10 marked and received into evidence.

Q. Now, Detective, we mentioned the Mitsubishi Galant. Did you have occasion to see what was inside that car?

A. Yes. I responded to the scene. The window has tinted windows, so I looked in and I saw that there was a uniform shirt, I believe, in dry-cleaner's plastic and I observed like a police memo-type portfolio book.

Q. Were you able to ascertain from what department that uniform shirt came?

A. Yes, I saw the patch on the uniform shirt.

Q. And from what department would that be?

A. New York City Corrections.

Q. Now, that car and that shirt, what was the done with that car after you made your observations?

A. I impounded it. Requested headquarters impound it.

Q. After the impound process, did the police keep that car or was the car given back?

A. No, the defendant authorized for the car to be released to his wife.

Q. So that car was ultimately released; is that correct?

A. Yes.

Q. Let me show you People's 14. What's that a picture of?

A. It appears to be a belt with a gun holster attached to it.

Q. Does that appear to be the holster that Ricardo Walters was wearing that day, as was told to you by the arresting officers or Officer Jones?

A. Yes.

Q. Now, how about that holster, was that invoiced as evidence or was that given back as personal property?

A. I believe it was returned as personal property.

Q. Can you sort of explain for us how it is that the determination is made what is invoiced as evidence and what is listed as personal property and what is ultimately

returned to the defendant?

A. Once I ascertain, during my investigation, the matters of the incident, I determine what could possibly be evidence and what is property. The property will eventually be returned back to the defendant. Any evidence, any property that can be deemed evidence is retained and forwarded to our Property Bureau.

Q. Do you make that determination as the assigned detective?

A. At times, yes.

Q. Now, what was the defendant's condition when he was at the Hempstead Village Police Department that morning into the afternoon, as far as you could see?

A. As far as I could see, he appeared fine.

Q. Did police personnel and yourself included, give the defendant anything to eat, anything to drink?

A. Yes. During the course of our investigation, I was informed by the arresting officer and possibly by the defendant, that he was a diabetic and he had not taken his insulin shot and I requested to have a medical technician to respond just to make sure he was fine.

Q. And did that, in fact, occur?

A. Yes.

Q. And was he, in fact, fine?

A. Yes.

Q. Now, during the day, was the defendant given something to drink and something to eat?

A. Yes, he was.

Q. And do you remember what it was that he was drinking?

A. He was drinking some orange juice.

Q. And how about what he was eating?

A. Chocolate cookie.

Q. And was he given an opportunity to use the restroom?

A. Yes, he was.

Q. Now, let's talk about the, you said, orange juice?

A. Yes.

Q. What was he drinking it from?

A. He was drinking it from a plastic container.

Q. And did you observe him drinking from that container?

A. Yes, I did.

Q. What was done with that container once the defendant finished drinking from it?

A. I removed it.

Q. What did you do with it?

A. I invoiced it.

Q. And for what reason?

A. During the investigation I was made aware that

there were similar incidents that occurred in the Hempstead area, so as part of my investigative tool, I invoiced the plastic container for DNA evidence.

Q. Okay. I would like to show you what I'll now mark, I think we're up to 15, People's 15 for identification?

THE COURT: 15 for identification.

(Whereupon, People's Exhibit 15 was marked for identification, only.)

COURT OFFICER: People's 15 marked for identification.

MS. SINGAS: Can it be shown to the witness, please.

(Handed to witness.)

Q. Take a look at the outside of the envelope first, Detective Wimberly. Do you recognize anything that's on there?

A. Yes. It has my handwriting indicating the case report number, the item -- description of the item and my name.

Q. What is the description of the item?

A. An orange juice container.

Q. Why don't you open it up, please.

Do you recognize what's inside that envelope?

A. Yes.

Q. And what is that?

A. It's a Tropicana orange juice plastic container.
Q. Is that the same container that the defendant Ricardo Walters was drinking from on September 9, 2007?
A. Yes, it is.
Q. Now, after you take the container and put it into the envelope, do you seal the envelope?
A. Yes.
Q. And where is it sent?
A. It's sent to our forensic evidence lab.
Q. And how is it that you seal the envelope?
A. I sealed it with the red evidence tape.
Q. That's the tape that you put on it that day?
A. Yes, it is.
Q. And I think there is some markings on the other side?
A. Yes, there is.
Q. Are those your markings?
A. No, it's not.
Q. Are you aware of whose markings they are?
A. No, I'm not.
Q. After it leaves your custody in the sealed condition, it's sent to the lab; is that correct?
A. Yes, it is.
MS. SINGAS: I'm going to ask that it be moved into evidence subject to lab connection.

MR. LEMKE: No objection to that, your Honor.

THE COURT: Subject to? I'm sorry, you said subject to?

MS. SINGAS: Connection. The laboratory connection.

THE COURT: Subject to the lab connection, we'll receive it in evidence at this time.

(Whereupon, People's Exhibit 15 for identification was received and moved into evidence.)

COURT OFFICER: People's 15 moved into evidence.

Q. Now, Detective, I'm going to show you People's number 11. What is that, Detective Wimberly?

A. It's a picture of the defendant's correction officer work identification and his shield and his shield holder attached with a key to the shield holder.

Q. What was done with the actual shield and identification of the defendant?

A. This was turned over to the correction officer officials.

Q. That were at the precinct that day?

A. Yes.

MS. SINGAS: I would like to mark for ID, People's number 16.

(Whereupon, People's Exhibit 16 was marked for

identification, only.)

COURT OFFICER: People's 16 marked for identification.

MS. SINGAS: She can look at it, please.

(Handed to witness.)

Q. Can you open that up and look inside, Detective Wimberly?

A. Okay.

Q. What is that that you're looking at?

A. It's a box containing the defendant's shield, number 3990.

Q. And is that shield in the same or substantially the same condition today as it was when you took it on September 9, 2007?

A. It appears to be.

MS. SINGAS: I would like to move that into evidence.

MR. LEMKE: No objection, your Honor.

THE COURT: Without objection, 16 will be received in evidence.

(Whereupon, People's Exhibit 16 for identification was received and moved into evidence.)

COURT OFFICER: People's 16 marked and received into evidence.

Q. Detective, did there come a time when other

detectives from other police units came to the Hempstead Police Department?

A. Yes.

Q. And what units responded and, if you remember, what detectives?

A. Detective Robert Dunn from the Special Victims, and Detective John Lavalle from Robbery Squad, a few detectives from my squad and a supervisor responded.

MS. SINGAS: I just need a moment, your Honor.

THE COURT: Yeah, sure.

(Pause in the proceedings.)

Q. Detective, let me show you again number 15. I just want you to tell us what case number that was vouchered under. First I want the case number and then I want the actual invoice number?

A. The case report number is 207CR75863.

Q. Okay. And does that case number that you assigned to this case involve the defendant and what happened on September 9, 2007?

A. Yes, it is.

Q. Now, was there a separate invoice number generated for the orange juice container?

A. Yes, it is.

Q. And tell us what that number is?

A. The invoice number is 3-964-07.

Q. And are invoice numbers unique to each piece of property?

A. Yes, it is.

Q. So there cannot be another piece of property that has that invoice number; is that correct?

A. Correct.

MS. SINGAS: I have nothing further. Thank you.

THE COURT: Mr. Lemke.

MR. LEMKE: Thank you.

CROSS-EXAMINATION

BY MR. LEMKE:

Q. Good morning, Detective Wimberly.

A. Good morning, Mr. Lemke.

Q. Just a few questions, Detective. On September 9th of '07, would it be correct to say that you either received a call regarding the arrest of Mr. Walters and to then report to the Village of Hempstead Police Department?

A. No. I signed on duty at 7:00 and once arriving at the Third Squad, I was the individual detective being assigned cases. I was assigned by a fellow detective of the incident and then I responded to Hempstead headquarters.

Q. In other words, you hadn't been independently responding to Hempstead, it was as a result of a call, you being the carrying detective and assigned this case, and at

that time you went to the Hempstead Police Department, correct?

A. Yes.

Q. And I think you had arrived at about 7:30 a.m. on September 9th; is that correct?

A. No. I believe I left the Third Squad around 7:30. I arrived at Hempstead headquarters around 7:45.

Q. And the Third Squad being the precinct up on Hillside Avenue?

A. Correct, in Williston Park.

Q. You arrived in Hempstead around 7:45 that morning?

A. Approximately around that time, yes.

Q. I take it when you arrive at that time you are somewhat briefed in speaking with perhaps Officer Este, Police Officer Jones and other officers that may have been involved in the arrest of Mr. Walters?

A. Upon my arrival, I talk with the desk officer first before talking with the arresting officers.

Q. Before speaking with Mr. Walters regarding pedigree information, you had spoken to those other officers, correct?

A. Yes.

Q. And when you went in to speak to Mr. Walters regarding the pedigree -- I'm asking you just regarding the pedigree information -- you took that information yourself?

A. Yes.

Q. And that's a form that you fill out in taking that information, correct?
A. I took it in longhand. It wasn't exactly put on the form yet. It was in my notes.
Q. Did you wind up putting it on a form later on?
A. Hempstead Police Department, on their arrest processing paper, yes.
Q. Was that taken from your notes?
A. Yes.
Q. And I think you indicated, regarding his date of birth, 10/29/65, correct?
A. Yes.
Q. Part of the other pedigree information would be where he was employed, correct?
A. Yes.
Q. And you were speaking to him at that time regarding pedigree information and he was cooperative, wasn't he?
A. I didn't hear you.
Q. He was cooperative?
A. Yes, he was.
Q. You had asked him a question regarding the pedigree information, and he answered you, correct?
A. Yes.
Q. What was his demeanor like at this time? Would this be about 8:00 that morning?

A. It was a little later than that.
Q. What was his demeanor at that time that you were receiving the pedigree information from Mr. Ricardo Walters?
A. He appeared to be fine.
Q. When you say "fine;" cooperative, answering questions, correct?
A. He appeared to be fine, cooperative.
Q. Now, you also determined and found out that he was married, correct, as part of the pedigree information?
A. I believe I asked him if he was married, yes.
Q. That he had three children. Also part of the pedigree information, correct?
A. I believe so.
Q. You asked him, as pedigree information, for his father's name, mother's name, correct?
A. I don't believe I asked him that.
Q. You didn't ask him those questions at that time during the pedigree?
A. I don't believe so.
Q. At that time, regarding pedigree, do you ask him at that time whether he has any medical conditions?
A. That was -- I was informed prior to that and he also confirmed that he was a diabetic.
Q. Now, again, during that time, regarding the pedigree information, had you been aware of, before speaking

to Mr. Walters at that time, that Este or Jones had recovered a weapon from Mr. Walters?
A. Yes.
Q. You didn't know -- you didn't independently see or observe how that was recovered, correct?
A. Correct.
Q. You were also informed that there was $11 and a piece of paper with a name on it that had also been in or handed to you by Officer Jones; isn't that correct?
A. Correct.
Q. You did not observe where he had recovered that from independently, correct?
A. Correct.
Q. And at some time that morning you were also made aware of a -- that you referred to it as a doo-rag, correct?
A. Correct.
Q. That was also provided to you by Officer Jones, I believe, or Este, correct?
A. Correct.
Q. And again, you didn't see the circumstances in which that had been collected from Mr. Walters, if at all, correct?
A. Correct.
Q. You had also indicated the vehicle, itself was, I guess, impounded at some point, correct?

A. Correct.

Q. At your direction, was that vehicle either tested or screened for any type of fingerprints or any other items in that vehicle at all, do you know?

A. At my direction I believe I requested photos and prints.

Q. And also that it be searched for any proceeds, perhaps, or anything else of that matter, correct?

A. I don't believe I instructed them to do that.

Q. Just fingerprints?

A. Prints and photos.

Q. And at some point in time the vehicle was then released, correct?

A. Yes.

Q. Now, you also indicated that while you were at the Hempstead Village Police Department, you had directed that at some point in time either an orange container or I think it was pineapple juice was given to Mr. Walters as well?

A. I believe that was given to him at the hospital.

Q. Okay. When was he taken to the hospital, if you know?

A. He was taken to the hospital after the arrest processing was completed and he was taken to the hospital to get, what we call, a fit for confinement.

Q. And a fit for confinement would be then to transfer

him either for arraignment to bring him before a judge, correct?

A. Correct.

Q. And during the time you gave him the orange juice, which is now at this point subject to connection, I guess, but People's 15, do you know what time that was given to Mr. Walters?

A. The AMT arrived around 9:35. About 15 minutes later he was complete with evaluating him. Between ten and 15 minutes after the AMT left the Hempstead Police Department.

Q. And he had drank from the orange container or was it a cup?

A. It was the container, itself.

Q. And the container, was that thrown in the garbage where you retrieved it?

A. No.

Q. It was left on the table where Mr. Walters was being spoken to, correct?

A. It was left on the bench that he was cuffed to.

Q. Okay. And it's at that point that you then took that container, correct?

A. Yes.

Q. And then inventoried it, to some extent, or made some notations as to that container, correct?

A. Correct.
Q. For the purposes of then sending it out for any DNA evaluation that could be done on that, correct?
A. Correct.
Q. For any saliva that may be on that container, correct?
A. Correct.
Q. Was there any other item that was sent out for examination of Mr. Ricardo Walters at that time?
A. What kind of examination? DNA examination?
Q. Yes.
A. I believe the pineapple can was sent out also.
Q. There was a pineapple container that was seized at the hospital?
A. Correct.
Q. That was also inventoried, correct?
A. Correct.
Q. Do we have that here, that you know, Detective? Where is that?
A. The container?
Q. Yes.
A. I'm not quite sure.
Q. You don't know where that is?
Was that inventoried by you?
A. I believe it was.

Q. Also given a number and so forth, correct?
A. I believe it was.
Q. And that would be sent out also to the same lab to be tested, correct?
A. Yes.
MR. LEMKE: I have nothing else at this time.
THE COURT: Any redirect, Ms. Singas?
MS. SINGAS: Yes.
I'll have this marked as People's 17, please.
MR. LEMKE: No objection if the People wish to move that into evidence.
MS. SINGAS: Let's just take a look at it first.
(Whereupon, People's Exhibit 17 was marked for identification, only.)
COURT OFFICER: People's 17 marked for identification.

REDIRECT EXAMINATION
BY MS. SINGAS:

Q. Do you recognize the outside of that first, Detective Wimberly?
A. Yes.
Q. Is that your handwriting?
A. Yes, it is.
Q. And what is it? Let's open it up.

What is that that you are looking at?
A. A metal container of Dole pineapple juice.
Q. Were you aware of the defendant drinking from that container? Did you see him drink from that container?
A. No.
Q. Do you know under what circumstances -- is that your handwriting on the outside of the bag?
A. Yes, it is.
Q. And do you know from where you received that can so that you could then invoice it?
A. I received it from the Hempstead Police Officer Manny Smith.
Q. And are you certain that it came from the hospital or it could have come from the precinct, itself?
A. From the hospital.
Q. And are you certain of that?
A. Yes.
Q. And was that given to him at the hospital or given to him at Hempstead?
A. I was advised it was given to him at the hospital.
Q. And what's the invoice number on that?
A. I believe it's 964. It's kind of covered with the tape, so it's difficult to read.
Q. Okay. And how about the case report number, is that on there?

A. The case report number is 207CR75863.

Q. Do you have any other paperwork that might refresh your recollection on the invoice number?

A. Yes. There should be a departmental form property invoice.

Q. Now, is that also sent to the lab, as well as the other orange juice container?

A. Yes, it was.

Q. At your direction?

A. Yes.

MS. SINGAS: I am going to move that in subject -- or it can go into evidence, then put it in not subject to anything.

THE COURT: Do you still have no objection, Mr. Lemke?

MR. LEMKE: No objection.

THE COURT: So 17 will be received in evidence.

(Whereupon, People's Exhibit 17 for identification was received and moved into evidence.)

COURT OFFICER: People's 17 marked and received into evidence.

Q. I'm just going to show you this invoice and ask you again for the invoice number that pertains to that pineapple can?

A. The invoice number is 3-964-07.

Q. Is that what appears to be on that envelope in your handwriting?

A. Yes. It describes -- it says, Empty plastic orange juice container.

Q. Does that appear to be on that, that number you were trying to read, is that the number?

A. Yes.

MS. SINGAS: I have nothing else. Thank you.

THE COURT: Mr. Lemke.

MR. LEMKE: Can I have the witness shown People's 15 at this time, please.

THE COURT: You want the witness to be shown?

MR. LEMKE: Yes.

THE COURT: 15 is the --

MR. LEMKE: Orange juice.

THE COURT: -- orange juice container.

(Handed to witness.)

RECROSS EXAMINATION

BY MR. LEMKE:

Q. Detective, what number was that inventoried under?

A. 964.

Q. 964-07?

A. 07.

Q. 3-964-07, correct?

A. Yes.
Q. Isn't that the same number that you put the pineapple under?
A. It appears so.
Q. Did you give it any other distinguishing numbers?
A. I don't believe I did.
Q. And did you put a time as to when each of those items had been inventoried or placed into an envelope by you?
A. Just a date, no time.
Q. Just a date?
A. Yes.
Q. And is it your testimony that the pineapple container was given to Mr. Ricardo Walters at the hospital?
A. Correct.
Q. Is there a time that you had received that, if you know, the pineapple container?
A. Later on in the evening that day by transporting officers.
Q. You think in the evening?
A. Early evening.
Q. And when did you inventory the orange juice container?
A. As soon as I responded back to the Third Squad.
Q. Which was about what time?
A. Early evening.

Q. Early evening as well?
A. Yes.
Q. And there was a Hempstead police officer that brought you the pineapple container?
A. Transporting officer, yes.
Q. That was transporting officer Smith?
A. Yes.
MR. LEMKE: I have nothing else. Thank you.
MS. SINGAS: Judge, I have one follow up.
THE COURT: Yes.

FURTHER REDIRECT EXAMINATION

BY MS. SINGAS:

Q. Detective Wimberly, can you just explain to the jury how it is that -- do you invoice everything at the time you receive it or do you wait to go back to your command and then invoice all of the property that you receive throughout your investigation?
A. After leaving Hempstead headquarters I invoiced the items after responding back to my command.
Q. So at the same time that you were invoicing, for example, the gun, you were invoicing the pineapple can, you were invoicing the orange juice can, you were invoicing the doo-rag, you were invoicing the money, you were invoicing the slip of paper?
A. Correct.

MS. SINGAS: Thank you.

THE COURT: Anything, Mr. Lemke?

MR. LEMKE: Yeah.

Can I have Detective Wimberly shown People's 10 in evidence, please? That's the doo-rag.

THE COURT: Yes.

(Handed to witness.)

FURTHER RECROSS-EXAMINATION

BY MR. LEMKE:

Q. Detective Wimberly, I take it that was also invoiced by you?

A. Yes.

Q. And I take it the same time as the pineapple and the orange juice?

A. Yes.

Q. And what number was given to the doo-rag?

A. 983-980-07.

Q. Could you explain to me how the orange juice and pineapple have the same inventory number, yet the doo-rag has a different number? Isn't each item supposed to be given a separate number, Detective?

A. It depends.

Q. Depends on what?

A. It depends like if the item fit in the same packaging and how we invoice it in the log book.

Q. So then the orange juice and the pineapple should have been put in the same envelope by you, correct?

MS. SINGAS: Objection, Judge, that's not what she said.

A. No.

MR. LEMKE: I'll withdraw that.

THE COURT: Yeah.

Q. If you have brought back to the Third Squad the doo-rag, correct?

A. Correct.

Q. A pineapple can, correct?

A. I didn't bring the pineapple back to the Third Squad. It was given to me.

Q. It was brought to you, correct?

A. Yes.

Q. But you brought back the OJ, correct? The orange juice?

A. Right.

Q. And the doo-rag?

A. Right.

Q. And it's your testimony, Detective, that everything is given a separate number. That's what you testified to ten minutes ago on direct?

A. That's correct.

Q. And I'm asking you if you are inventorying these

items, you give the doo-rag a number, 3-980-07, correct?
A. Correct.
Q. So would I be correct in stating that the orange juice and the pineapple were inventoried prior to the doo-rag because it has a lower sequential number, correct?
A. I would say that they were entered into the log book prior.
Q. They were what?
A. They were entered into the log book prior to the container.
Q. The law book?
A. We have a log book. Property log book.
Q. Gotcha. The log book?
A. Yes.
Q. And yet, just so I'm clear, the OJ and the pineapple were put into the same envelope to be sent out?
A. No, they were not.
Q. They were put in two separate envelopes to be sent out?
A. Correct.
Q. And your testimony was that if they're placed in the same envelope, they would have the same evidence number placed on them, correct?
MS. SINGAS: Objection, Judge, that wasn't her testimony.

THE COURT: Overruled. You can answer that.

Q. Correct, Detective?

If I have two items and I put them in the same envelope, you are to give that one evidence number, correct?

A. Correct.

Q. If you have three envelopes before you, isn't it protocol to give each envelope an evidence number to track; isn't that correct?

A. That's not the protocol.

Q. It's not the protocol?

A. It's not the protocol. The reason the container and can were not invoiced together is because they didn't want them to get contaminated. But they were recorded in the log book under the same number, but it was forwarded to the Evidence Bureau in separate packaging.

Q. In two different envelopes?

A. Yes.

Q. So when that envelope then is received by someone else and they open it up, they are going to open up two separate envelopes under 964-07; is that correct?

A. That's correct.

Q. Without there being anything distinguishing one item from the other, correct?

A. Well, I describe the item on the packaging.

Q. And you give it the same number?

A. Yes.

Q. And your testimony here, just moments ago, is that each item gets its own separate number. Isn't that what you testified to?

A. At times it can.

MR. LEMKE: I have nothing further.

THE COURT: Anything?

FURTHER REDIRECT EXAMINATION

BY MS. SINGAS:

Q. One says orange, one says pineapple?

A. Yes.

MS. SINGAS: Thank you.

THE COURT: Detective Wimberly, thanks very much.

(Whereupon, the witness was excused.)

THE COURT: People, your next witness.

MS. SINGAS: The People call Sara Sandoval.

THE CLERK: Will the Spanish interpreter please place your appearance on the record.

THE INTERPRETER: Maria Deysine.

S A R A S A N D O V A L, residing in Nassau County, having been called as a witness on behalf of the People, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: State your name, spelling your

last name and county in which you live.

THE WITNESS: Sara Sandoval.

THE INTERPRETER: By interpreter, she doesn't know how to spell the last name.

THE COURT: Could she give us the county in which she resides?

THE WITNESS: Hempstead.

THE COURT: Ms. Singas.

DIRECT EXAMINATION

BY MS. SINGAS:

Q. Good afternoon, Ms. Sandoval.

A. Good afternoon.

Q. Are you okay?

A. Yes.

Q. Tell us how old you are.

A. Forty-four years of age.

Q. And do you have a family?

A. Yes.

Q. Do you have children?

A. Yes.

Q. How many?

A. I have four. There were five. I have four kids.

Q. And do they live with you here or do they live somewhere else?

A. Two here and two in El Salvador.

Q. Now, Ms. Sandoval, do you work?
A. Yes.
Q. What kind of work do you do?
A. Cleaning.
Q. Do you clean for a place or do you clean for people's homes or for a business?
A. At Dunkin Donuts.
Q. Now, Ms. Sandoval, I'm going to take you back to September 9th of 2007, okay? On that date at approximately 5:15 in the morning, do you remember where you were?
A. Yes.
Q. Where were you?
A. I was at a bus stop.
Q. Was that in Hempstead?
A. Yes.
Q. Do you know the name of the street that runs in front of that bus stop?
A. I don't know the street, but it's by Our Lady of Loretta church. Angeline. I don't know what is the name of the street.
Q. Is it a main street that the bus goes down?
A. Yes, the line 55 and 54 bus by that bus stop.
Q. Now, from your house, were you able to walk to the bus stop?
A. Yes.

Q. Now, where were you going that morning at about 5:15 or 5:20?
A. I was going to take a bus.
Q. And where were you taking the bus to?
A. I was going to work.
Q. Do you remember what day of the week that was?
A. Sunday.
Q. Now, tell us at that time in the morning were there a lot of people around or not so many people around?
A. I was alone.
Q. How about as far as going up and down the road, what was the traffic like?
A. Yes, cars were going by.
Q. Now, I'm going to show you what's People's 2 and 3 in evidence.
A. This is it.
Q. First let's start with 1, okay. Let me see which one you are looking at. Can I see the number, please?
COURT OFFICER: (Handing.)
Q. People's 3 in evidence. Look at that, Sara. What is that?
A. This is a bus stop.
Q. Is that the bus stop that you were waiting at the morning of September 9, 2007?
A. Well, this one is more like it (indicating).

Q. Okay, let's look at that one. I believe it's People's number 4.

A. Yes, this is the one.

Q. That was People's 3, I'm sorry.

THE COURT: Maria, can you see the number on the back?

COURT OFFICER: 2.

Q. That's People's 2.

Okay, Sara, look at that one. Is that the bus stop that you were waiting at on September 9, 2007?

A. Yes.

Q. And how do you recognize it? What looks familiar there?

A. There is a building here that was being built.

Q. Now, tell us when you got to the bus stop, was there anyone else there?

A. No, I was by myself.

Q. Can you tell us what you were wearing that morning?

A. I had a red shirt and I had a sweater on top.

Q. And how about your pants?

A. I had the red blouse from my uniform.

Q. And what kind of uniform is that?

A. The shirt is red and the pants are beige.

Q. And is that the uniform that you wore to work?

A. Yes.

Q. And where were you working on September 9, 2007?
A. At Dunkin Donuts.
Q. And is that the Dunkin Donuts' uniform that you were wearing?
A. Yes.
Q. Okay. Now did there come a time that someone approached you or approached the bus stop where you were standing?
A. I was at the bus stop and I saw someone here and arrived here (indicating).
Q. Let's stop there, okay. Look at me, Sara. When you go like this (indicating), you can't indicate, you have to speak, okay.
Did you see someone coming to the bus stop?
A. Ten minutes after I arrived there, someone arrived. Someone arrived.
Q. Okay. Can you describe that person who arrived? What did that person look like?
A. He's black, very big, husky type with something on his head, black. Something black on his head, a light blue shirt and a pair of pants, kind of dark blue or black blue.
Q. Now, where did that person come and stand by the bus stop? Can you show us in that picture?
THE COURT: Ms. Singas, she's indicating. You want her to mark that?

MS. SINGAS: I would like her to mark it, but can I see the picture first, please?

COURT OFFICER: (Handing.)

Q. So this is on People's 2. I want you to put an X where you saw -- was that person a man or a woman, by the way?

A. He was a man.

Q. Put an X where you saw the man stop.

A. (Indicating.)

Q. And can you put -- does that picture show where you were standing when the man first came over?

A. He walk out to here.

Q. But does that picture show where you were standing?

A. Right here inside (indicating).

Q. Right there, I want you to put down an S for Sara, okay, were where you were standing.

A. (Indicating.)

MS. SINGAS: Can I have that, please?

COURT OFFICER: (Handing.)

Q. Sara, can you see here (indicating)?

A. Yes.

Q. When you indicate here (indicating)?

A. Yes.

Q. Were you inside the bus shelter?

A. Yes.

Q. Were you standing or sitting?
A. Standing.
Q. And you said the man was standing here (indicating)?
A. Yes. And from there he walked to where I was.
Q. Before we get there, okay. Did you see him driving to this spot or did he walk to you? Do you know where he came from?
A. He was walking.
Q. Was he walking from this direction, which would be the left of the photograph, or was he walking from this direction, which would be the right of the photograph (indicating)?
A. From here, where the car is.
Q. So he was walking from where the car was?
A. Yes.
Q. And so then he passed you first and went and stood over there?
A. He stopped at the corner, yes.
Q. What's that, I'm sorry?
A. He stopped at the corner.
Q. And for how long do you think he was stopped there at the corner?
A. Maybe 15 minutes and then he went to where I was.
Q. And that whole time that he was standing over

there, what was he doing?

A. Like that, looking around (indicating).

Q. You are doing something with your hands. Was he doing that?

A. No, I had my handbag hanging from my shoulder. He was doing something with his hands.

Q. Show me what he was doing.

A. Like that (indicating).

MS. SINGAS: Just wait. I'm indicating her fingers interlaced and moving them back and forth.

THE COURT: Right, interlocked moving back and forth.

Q. And during that time were you able to see him?

A. Yes. I was like this (indicating) and I was looking at him. I thought he was waiting for the bus.

Q. Did any other people come to wait for the bus?

A. No, he was the only one.

Q. Sara, you said at some point he approached you?

A. Yes. He approached me when I got inside of the shelter. The bus shelter. He arrived and told me, Give me your money, but he put the gun on my belly.

Q. So he approached you?

A. Yes.

Q. How far was he standing from you?

A. I was like that (indicating) when he came from

behind and put his arm -- he put his hand around me on my shoulders and the gun on my belly and grabbed me by my hair.

Q. Let's wait, okay. So was that the same man who was standing at the corner? Is that the same man who approached you and got close to you?

A. Yes.

Q. And you say that he had something in his hand. What did he have in his hand?

A. No, he didn't have anything in his hands. He was making that motion with his hands.

Q. Okay. But when he approached you --

A. Then he pulled a gun.

Q. Did you see where he took the gun from?

A. (Indicating.)

Q. You have to tell us.

A. From here he took his gun (indicating).

MS. SINGAS: Indicating the waistband, Judge?

THE COURT: Yes.

Q. And did he say anything?

A. Yes. He told me to give him my money.

Q. Now, was he speaking in Spanish or was he speaking in English?

A. English, not Spanish.

Q. Did you understand what he meant when he said, Give me your money?

A. Yes, I did understand. And I took the money and I gave it to him.
Q. Where did you take the money from, Sara, to give to him?
A. From here (indicating).
Q. Did you have that same pocketbook?
A. The same one, yes. And in the middle of the money I had a little paper.
Q. Now, from the outside pocket of your pocketbook you gave him money?
A. Yes.
Q. And do you know how much money you gave him?
A. I think it was about nine dollars.
Q. Do you know if it was singles or a five?
A. Nine singles.
Q. Now, you also said that there was a piece of paper in there.
A. Yes, there was a paper with the name of my sister, Maria Reyes.
Q. Maria what?
A. Reyes, R-E-Y-E-S.
Q. Was that paper together with the money?
A. Yes, with the money. I had it with the money.
Q. Now, can you tell us, Sara, why it is that you had a piece of paper with the name Maria Reyes on it?

A. Because I work with my sister's papers and with that name I sign the checks.

Q. So do you need that name in order to know how to write her name?

A. Yes, I need it for that reason.

Q. What are you showing us, Sara, what is that?

A. The same name. The same name of my sister.

Q. Do you have that on a piece of paper now?

A. This is another one, but the one that was with the money was another one. A different one.

MS. SINGAS: I'll mark that, Judge.

THE COURT: People's 18 for ID.

(Whereupon, People's Exhibit 18 was marked for identification, only.)

COURT OFFICER: People's 18 marked for identification.

MS. SINGAS: Can it be shown to the witness, please.

(Handed to witness.)

Q. Okay, Sara, what name is on that piece of paper?

A. Maria Reyes.

Q. And do you use that piece of paper for the same thing that you were using the other piece of paper?

A. Yes, to sign the check.

MS. SINGAS: I would like to move that into

evidence as People's 18.

MR. LEMKE: Voir dire, please, your Honor.

THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. LEMKE:

Q. Good afternoon, Ms. Sandoval.

A. Good afternoon.

Q. I have a few questions regarding this piece of paper.

I take it your sister wrote her name on this?

A. No, my son wrote it.

Q. Your son. When did your son write this?

A. Because when the check arrives with my sister's name, I told him to write the name in that piece of paper.

Q. You forge your sister's name?

MS. SINGAS: Objection to this. This is outside the scope of voir dire.

THE COURT: Sustained.

Q. This piece of paper, when did you first get this piece of paper?

A. I have that piece of paper with me since I started working two years. The last two years or for the last two years.

Q. Did you have this piece of paper with you on September 9th of '07 when you were at the bus stop that

morning?

A. Yeah, but the other piece of paper was with the money that I gave to him.

Q. And where was this piece of paper on September 9, '07?

MS. SINGAS: Judge, I'm going to object to this because I don't think it's proper voir dire.

THE COURT: Yeah, sustained.

MR. LEMKE: Your Honor, I'm objecting. You can't bring something in two years later and say I have it in my pocket, I would like to introduce it into evidence.

THE COURT: Can I see everybody up here with Kathi.

(Whereupon, the following discussion was held at the bench:

THE COURT: You are objecting to Maria Reyes on a piece of paper.

Are you still offering this in evidence?

MS. SINGAS: I am, Judge, because I think it is relevant that it wasn't just some random piece of paper. She needed this to write her name at work and the fact that she wrote another one to replace the one that was taken is extremely relevant in this trial.

THE COURT: I mean, it would be relevant to

the extent that was that the piece of paper that was given to the defendant at the time that this happened. This is obviously a piece of paper she said her son has written the name on it for her in order to sign this check. She's testified to that. I mean, I certainly don't see the relevance of a second piece of paper with the name Maria Reyes on it. I think it's pretty clear to us, at this point, this occurred subsequent to this incident. Unless there is some other reason or some other offer for it, I would be inclined to sustain the objection.

MS. SINGAS: Well, Judge, at this time I would say that I don't know where the defense is going. If they claim that he got a number from a woman named Maria Reyes, which is what he claimed during his statements subject to the Huntley hearing, if he gets on the stand and says Maria Reyes gave me her name, which is what the statement was to the police, then clearly this becomes relevant. Because my point is that this Maria Reyes is her sister and she needs this piece of paper. Whatever he writes on here, she writes the same thing because she needs it for work. It might become completely relevant and dispositive.

MR. LEMKE: Because in evidence you already have a piece of paper with Maria Reyes that apparently

was taken from my client's left front pocket with 11 singles.

THE COURT: I think it's pretty clear at this point she testified that the Maria Reyes that she wrote on a piece of paper, that it's a different piece of paper that she had that name written on at the time of the incident that she handed to him.

At this point I don't see the relevance. If at some point it becomes relevant and you want to offer it, I'll certainly hear you then. So, the objection will be sustained.

I thought -- I didn't know how long you were going to be. I don't want to keep the staff here much longer. I assume you will need more time with her.

MS. SINGAS: Yeah.

THE COURT: At this point we'll break. I'll let the jury go until 2:00.)

(Whereupon, the proceedings continued in open court.)

THE COURT: Members of the jury, it's about that time we take our luncheon recess. This looks like a good point to do that. We're going to reconvene at 2:00.

As I let you go, please don't speak amongst yourselves or anyone else about the case.

Don't form any opinions about the case at this point.

Please don't view or visit any of the areas described so far and please don't access any accounts of this case in the media.

We'll see you back here at 2:00. Have a good lunch.

(Whereupon the jury exited the courtroom.)

(A luncheon recess was taken.)

(Whereupon, the afternoon session was recorded by Kathleen Plaia, an official court reporter.)

A F T E R N O O N   S E S S I O N

THE COURT: Ready?

MR. LEMKE: Your Honor, I think there will be one, I guess, just to make a record of it, concern that I would have. Apparently, Ms. Sandoval is employed with Dunkin' Donuts, received a check from Dunkin' Donuts. Apparently, she is not working off the books.

THE COURT: Right.

MR. LEMKE: And is now filing basically a false instrument every time she is signing her sister's name to a check with which there was probably some application filed, recorded with, probably at some point with taxes or with the Dunkin' Donuts Corporation that obviously pays withholding taxes for this individual and social security number that is used for this individual.

Clearly, Ms. Sandoval is committing a crime. Obviously, I think it may require to some extent -- it may be, it may not be the situation where the District Attorney's Office from Nassau County is not seeking to prosecute in any way. However, I think she should have counsel for this, admonish her, or talk to her in some way, about what she's answered questions about; she does file taxes, sign some tax documents, working for Dunkin' Donuts, submitted an application, whether she's

using the social security number of her sister.

I think we're on somewhat thin water as far as, I would say, regarding that question which is relevant to this case, as far as this name Mary Reyes, which is in her pocket. She testified on direct that she used to sign her sister's name for checks from Dunkin' Donuts.

I'm ready to proceed. I think it may be prudent just to have the 18B Attorney of the Day just speak to her for five minutes. Could be she doesn't file tax returns. I think it is something that should be addressed.

THE COURT: You want to be heard, Ms. Singas?

MS. SINGAS: Again, Judge, I don't know to what extent -- she says she uses that name. There hasn't been any further questioning about tax returns or taxes or checks or whether she's filing under what name. So, at this point I think we're fine. I have already indicated that this office would not be prosecuting her for it. I cannot speak, obviously, for the federal government.

THE COURT: Right. I mean, I'm speculating, but I'm assuming that the sister probably has a social security number and she doesn't, which is why she uses her sister's name.

MS. SINGAS: Again, I can't verify or not. I don't know.

THE COURT: All right. Mr. Lemke, do you intend to, in terms of your inquiry, have her -- what extent do you feel you're going to go into it?

MR. LEMKE: I would be asking some questions regarding that.

MS. SINGAS: Then he's bound by the answer, Judge. You know, I mean it's not --

THE COURT: The problem I'm going to have, I may have somebody up here admitting to a tax law violation. Having tried one this past year, I know they're at least a felony, at least as far as some tax law issues.

MS. SINGAS: Do you want to call somebody in from 18B?

THE COURT: Yes.

(Whereupon, there is a brief recess in the proceedings)

MS. SINGAS: Judge, shall we mark those weapons now under the stipulation?

MR. LEMKE: Yes.

THE COURT: We'll mark some of these exhibits, weapons, I should say, with exhibit numbers consistent with what is contained in the stipulation.

(Whereupon, People's Exhibits 19, 20, and 21 are received and marked in evidence outside the presence of the sworn jury and alternates)

THE COURT: Maria, bring in Ms. Sandoval.

(Whereupon, the witness, Ms. Sara Sandoval, having been previously sworn through the aid of the interpreter, resumes the stand to continue sworn testimony)

THE COURT: Ms. Sandoval, come back and take the seat that you were previously in.

All right. Ms. Sandoval, in light of your testimony concerning the use of, I believe, your sister's name at your job for purposes of your employment, there is potential that some of your actions could potentially involve either civil and/or criminal penalties as far as using that name for either tax purposes, employment purposes or any other purposes.

I have asked Mr. Grizopoulos, who is standing next to you, to advise you of your legal rights, insofar as those issues are concerned. And you have had an opportunity to speak with him with the assistance of the interpreter?

THE WITNESS: Yes.

THE COURT: And he's advised you of your

rights, as far as the use of the name Maria Reyes for whatever purposes you may use that for?

THE WITNESS: Your Honor, I used her name with her authorization.

THE COURT: I understand that. But notwithstanding the fact that you used it with her authorization, it may have well been that the use of that name, in whatever capacity you may have used it, may be unlawful to some extent.

THE WITNESS: I know.

THE COURT: And you have spoken to Mr. Grizopoulos and he's advised you of your rights as far as your right against self-incrimination is concerned?

THE WITNESS: Yes.

THE COURT: And you understood what Mr. Grizopoulos said?

THE WITNESS: Yes.

THE COURT: And it's your intention at this time to testify without invoking any of your Fifth Amendment rights or privileges with respect to the use of this name?

THE WITNESS: I'm just going to tell the truth, your Honor.

THE COURT: Okay. You understand what is

taking place here right now, insofar as the fact that a lawyer has been appointed for you at this point?

THE WITNESS: Yes.

THE COURT: And it's your wish to testify at this time and not invoke any type of right or privilege that Mr. Grizopoulos told you, you would be entitled to?

THE WITNESS: I'm only going to tell the truth. I'm not going to say anything that has nothing to do with the truth.

THE COURT: All right. Do you have any questions of Mr. Grizopoulos at this time, or before we continue the trial?

THE WITNESS: No.

THE COURT: All right. Mr. Grizopoulos, I'm going to ask if you can just remain in the courtroom until cross-examination is done.

MR. GRIZOPOULOS: No problem, Judge.

THE COURT: If any issue comes up during the course of that questioning, I would ask you to be here.

Ms. Sandoval, if at any point during the course of your questioning, only as it concerns the issue of the use of the name Maria Reyes, if at any point in time you need or want to speak to Mr. Grizopoulos during your testimony, please indicate

that through the interpreter.

THE WITNESS: Okay.

THE COURT: Thank you, Mr. Grizopoulos.

MR. GRIZOPOULOS: No problem.

(Whereupon, Mr. Grizopoulos is seated in the audience gallery)

THE COURT OFFICER: Ready, Judge?

THE COURT: Yes. Bring them in.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE COURT: All right, members of the jury, welcome back. We're ready to continue with direct examination.

Ms. Singas.

MS. SINGAS: Thank you, Judge.

DIRECT EXAMINATION (CONTINUED)

BY MS. SINGAS:

Q Ms. Sandoval, we got to the point before we broke where you said you were handing the man with the gun some money with a slip of paper with the name of Maria Reyes on it. Do you remember that?

A Yes.

Q Can you describe the gun for us; what color was it?

A Black.
Q Okay. Now, can you describe how the money and the paper was when you handed it over it the man?
A Like this (indicating).
Q Okay, and --
MS. SINGAS: She's indicating a rolled up piece of paper.
THE COURT: Yes.
A No, no. The bills and the little paper with a name in between.
Q Okay. Now, when you handed the man the bills with the piece of paper, did you see what he did with it?
A Put it in his pocket.
Q Okay.
MR. LEMKE: Your Honor, let the record reflect the witness moved with her right hand into her right pocket.
THE COURT: Yes.
MR. LEMKE: Thank you.
Q Do you know which pocket, right or left?
A I didn't notice that.
Q Okay. But did you notice it went into the front pocket, as opposed to the back pocket?
MR. LEMKE: Again, your Honor, may the record reflect, taking the right hand and into the right

front --

A Like this here (indicating). Like this here. He put it in his pocket, but I don't know in which one.

Q Okay. Now, tell us what happened after he put the money in your pocket -- in his pocket; did he leave?

A No. He did not leave. He had the gun pointing at my belly.

Q And tell us what happened.

A When I gave him the money, I was telling him that I didn't have any more. And he would go shhhh with the gun here (indicating).

Q Okay. "Here," Indicating, I'm sorry, the waist area?

A Right here (Indicating).

Q Okay, again, indicating the waist?

THE COURT: Indicating the stomach area, yes.

MR. LEMKE: Your Honor, there has to be a question before there's an interpretation.

THE COURT: I'm sorry?

MR. LEMKE: There's no question before the witness.

THE COURT: Okay. Ask your next question, please.

Q Okay. Sara, so he had the weapon by your waist?

A Yes.

Q And what was happening?
A He wouldn't take the weapon out of my belly or my waist and he was holding me.
Q I'm sorry, I didn't understand the first part.
A He was not going -- he was not taking the weapon out of my waist.
Q Okay. And what happened next?
A No. He put his arms around here (indicating) and grabbed me by the hair.
MS. SINGAS: Indicating by the neck area and indicating her hair.
A He was grabbing me by the hair and he was pushing me.
Q Let me stop you there. Was your hair down loose or was it up in a ponytail or how?
A I had it like this (indicating)
MS. SINGAS: Okay, Judge, indicating a ponytail with the tail end of it up to the top of her head.
THE COURT: Yes.
THE WITNESS: I had this in my hair (indicating).
MS. SINGAS: All right, the witness is demonstrating and she's taking the tail of her ponytail and putting it up with a comb or clip.

THE COURT: Yes.

Q So, how did he grab your hair, Sara?

A Like that (indicating)

MS. SINGAS: Okay, indicating by the neck.

Q And what was he doing?

A He wouldn't let me go. When he was -- when he was holding me, he would go like this (indicating). The weapon was in my waist and he wouldn't let me go.

MS. SINGAS: Okay. She indicating like that, put her index finger by her mouth.

THE WITNESS: Yes. He was going like this, shhhh.

Q What were you doing, Sara, what were you doing?

A I was not understanding what he was saying, but I was asking him to let me go because I didn't have anything.

Q Okay. When you said -- you said earlier he was pulling you or pushing you, is that correct?

A He was doing this to me (indicating).

MS. SINGAS: Okay, indicating --

Q Tell me with your words, Sara, what he was doing.

A I would not understand what he was saying.

Q Tell me what he was doing. How was he pulling you?

A He had me with a gun, the weapon here (indicating).

Q Right, by your waist?

A If a car would be passing by, he would hold me by the shoulders and pretending that he was caressing me.

Q Okay. Now, so you said when a car would pass by sometimes he would let go of your hair and hold you by the shoulders?

A Yes. And he would pretend he was really massaging me.

Q Okay. Then when the car would leave, what would happen?

A And then he would grab me again by the hair and he was pushing me.

Q Okay. Where was he pushing you? Did you actually -- did you actually move because of him pushing you?

A Well, he would be telling me to walk that way.

Q Okay. And did you walk that way, did you walk that way?

A No. I was standing, and then when a car would pass by, I stretched my arm. And then because a car was coming, and thank God it was a police car --

Q Okay. Before we get there. Okay, Sara, look at People's 3 in evidence. Okay.

(Placed on the presenter)

Q Okay. Where were you standing, were you standing

the same place you showed us before?

A Yes.

Q Now, when you say he was trying to pull you, can you tell us, was he trying to pull you to the left or to the right on this photograph?

A Outside.

Q Okay. But outside can be this way, to the right, and outside can be this way, to the left.

A Towards you.

Q Towards me. So, this side (indicating)?

A Yes.

Q You have to say yes or no, you can't nod.

A Yes, that way.

Q Okay. Now, did you actually move steps toward this direction when he was pulling you?

A No. I wanted to get out of there and he wouldn't let me.

Q Okay.

A He wouldn't let me.

Q Were you fighting back?

A No. I was just going like that (indicating).

Q Okay. What does "that" mean? You were pushing him or the gun, or what were you doing?

A Well, when he was pointing at me with the gun, I was putting my hands on top.

Q On top of what?
A The hand that was holding the weapon.
Q Okay. Now, when you said that he was trying to pull you, did you go with him where he was trying to pull you or did you resist him?
A No, I was resisting.
Q Explain that for us. How were you resisting?
A You know, he was holding my hand and I was talking to him in Spanish and I was telling him that I had already given him what I had, to let me go. And he would say, shhhh, shut up.
Q And did he let you go?
A No. He didn't let me -- he wouldn't let me go until he saw the police car.
Q Okay. How much time do you think passed from the time that you gave him your money, until the time that you saw the police car? How much time passed when he was trying to pull you?
A About ten minutes.
Q Okay. So, for ten minutes he was trying to pull you and you were resisting and fighting back?
A Yes.
Q Okay. Now, during that time is that when you said that sometimes cars would pass by and he would stop trying to pull you?

A Yes. When a car would be passing by, then he will let me go.
Q How many times did that happen, that a car passed by and he let you go?
A Several cars, about seven cars.
Q Okay. Were you -- were you still inside that bus shelter or had you come outside on to the sidewalk?
A Oh, I had come out from the shelter and I sat on the sidewalk.
Q At what point did you come out and sit on the sidewalk, when you were with the man or before?
A When I saw him passing by. So, I was very happy, and that's why I sat down, because I thought he was another passenger.
Q Okay. That's at the beginning, right, Sara? That's before he pulled out the gun?
A Please understand me. I'm telling you.
Q Okay.
A When I got up from when I was sitting down and then I went back into the shelter, that's when he came to me and showed the gun.
Q Okay. So, before you -- before you saw him, you were sitting on the sidewalk, waiting for the bus?
A Yes.
Q Okay. And then there came a time when you saw

him. Okay. There came a time when you saw him stand -- This is People's 2.

(Placed on the presenter)

Q At this X, right, Sara?

A Yes.

Q Okay. When he was standing here, were you sitting at the sidewalk or did you go back into the shelter?

A No, I was inside.

Q Okay. So, you had gotten up from the sidewalk and went inside the bus shelter?

A Yes, inside.

Q Okay. Now, once you're inside the shelter and he approaches you, you gave him your money, is that true?

A Yes.

Q And now I want to talk about what happened after you gave him your money.

From the time that you gave him your money, until the time that the police car came, tell us what was happening, tell us what was happening during that time period.

A You know, I told you, he was grabbing me by the hair, had a gun in my stomach. I gave him the money. And I was telling him that I didn't have any more. And I was showing him my bag. And I was asking him, please, let me go. But he still kept pointing me with a gun. And I was

telling him that I didn't have anything.

Q Okay. When he was pulling you by the hair, where was he pulling you towards?

A Where I put the X mark.

Q Yes.

A Straight ahead.

Q Okay. So, he was pulling you in the direction towards where you put the x mark?

A Yes.

Q Okay. Now, did there come a time that you saw the police car?

A I didn't know he was a police car. I saw the car coming and I stretched my arm.

Q Tell us about that. Tell us what you did when you saw the car coming.

A I stretched my arm and I scream, I said, Help me.

Q Did you scream in English or in Spanish?

A Spanish.

Q Where were you when you screamed for help?

A Right there in the bus stop.

Q Were you in the bus shelter or were you in the street?

A In the street. When I saw the car stopping, so I went towards the car, and he run that way.

Q Stop there.

A And I was making a motion to the police that he had a gun.
Q So, when you saw the lights of the car coming, did the man still have his hands on you and you were able to break free or had he let you go?
A Yes. I was able to let him go from my hair. And I really broke away and he got out of there, running.
Q When you say you broke away and went into the street, when did you first notice it was a police car?
A I didn't know it was a police car.
Q Okay.
A I just asked for help.
Q All right. So, when you screamed, when you saw the lights, you didn't know at that point that it was a police car?
A No, I do not know.
Q Now, did there come a time when you realized it was a policeman?
A Yeah. Because he opened the door and -- with a gun, he drew the gun.
Q Now, tell us what you were doing, how you were communicating with that person in the car.
A You know, he called for someone who would speak Spanish to me.
Q Okay. That was after, right, Sara? Another

police car came and someone spoke Spanish and they were able to speak to you?

A Yes.

Q Okay. But at the time that you broke free, you said you indicated with your fingers something to the man in the car.

A Yes. I scream and I made some motions and I went like this (indicating).

MS. SINGAS: Okay, indicating with her index finger pumping it back and forth.

THE WITNESS: I meant to tell him that -- to say that he had a gun.

Q Okay. So, you were showing him a gun with your finger?

A Yes.

Q And were you doing anything else; were you making any other motions?

A No.

Q Okay. Do you think you were yelling loudly, were you calm, were you not calm? Tell us --

A No, I was screaming. I was crying and I was desperate.

Q Okay. Now, you saw that it was a policeman and the policeman got out of his car, is that correct?

A Yes.

Q And where was the man standing, the man that was holding you, when you broke away from him, where was he standing?

A He was inside of the bus -- of the shelter. Because I got loose and I run this way (indicating) and he went there.

Q Okay. So, you were able to break free and run into the street?

A And he run that way when he saw the police.

Q What's that, I'm sorry?

A When he saw the police he ran that way.

Q Okay. Which direction did he run, Sara, towards where the X is or the other way?

A That way.

Q Okay. Listen to me. Was he running toward where the X was or was he running the other way?

See where the X is? Did he run this way, towards the X, or did he run the other way (indicating) ?

A To the other side. And I run this way.

Q Okay. And did you see the police officer run after him?

A Yes. One was after him and -- only one was running after him. And then he call and a lot of policemen arrive.

Q Okay. Did there come a time that that policeman

that speaks Spanish came to speak to you?
A Yes.
Q And then you went back to the Hempstead Police Station and spoke to people there, do you remember?
A Yes.
Q Let me ask you this, Sara, the man who approached you and took your money, do you think you would be able to recognize him again?
A Yes.
Q Do you see him anywhere in this courtroom?
A Yes, yes.
Q Can you show us where you see him, where is he sitting?
A He's there.
Q Can you describe what he's wearing or point to him?
A He had a green thing on top of him.
Q He has it now or he had it then?
A No, he had it on now.
Q Okay. So, he's -- is it a jacket, is it a shirt?
A No, it's a jacket, a suit. A jacket from a suit.
MS. SINGAS: Indicating the defendant, your Honor.
THE COURT: Yes.
Q Sara, I'm going to show you People's 9. Sara,

I'm going to show you this piece of paper, okay.

(Handed to the witness)

Q Do you recognize what that is?

A Yes.

Q What is it?

A That's -- this is my sister's name.

Q Was that the paper or paper like that that you had and you gave to the defendant on September 9th, 2007?

A Yes.

Q And was that piece of paper rolled up in single dollar bills?

A Yes.

Q Okay. I'll take that back.

(Handed to Ms. Singas)

Q Okay, Sara, I have no more questions for you. Okay?

A Okay.

MS. SINGAS: Thank you.

THE COURT: Mr. Lemke.

MR. LEMKE: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. LEMKE:

Q Good afternoon, Ms. Sandoval. I'm going to ask you a few questions. If you need me to repeat them through the interpreter, I will.

On September 9th, 2007 you were on your way to work, correct?

A Yes.

Q And you don't understand English at all, correct?

A No.

Q You don't speak English, correct?

A No.

Q And you don't write English, correct?

A Nothing. Neither in Spanish I don't write either.

Q Well, you can read Spanish, correct?

THE INTERPRETER: By interpreter, sorry?

MR. LEMKE: You can read Spanish, correct?

A No.

Q You do understand Spanish; I take it, you understand Spanish?

A I understand Spanish, but I don't know how to write in Spanish. I never went to school.

Q Or read in Spanish?

A No.

Q On September 9th do you remember what time you arrived at this bus shelter?

A Yes.

Q About what time was it?

A 5:20 I was there.

Q And you were waiting to catch a bus, correct?
A Yes.
Q Because you needed to take the bus to go to the Dunkin' Donuts where you were going to go to work, correct?
A Two buses.
Q Two buses, correct?
A I was taking two buses.
Q When you arrived, you first sat on the curb, correct?
A Yes.
Q With your legs out into the street, correct?
A Yes.
Q And as you were sitting there, cars were passing back and forth, correct?
A Yes, the cars were passing by.
Q And at some point in time you saw Mr. Ricardo Walters walking up to the shelter, correct?
A Yes. He was coming towards me and he stopped there.
Q And when he was walking up, were you still sitting -- were you still sitting down, sitting on the curb --
A Yes.
Q -- correct?
A And I said to myself, thank God, there is

somebody else that is taking the bus with me.
Q And as he walked by, his face wasn't covered in any way, correct?
THE INTERPRETER: Wasn't?
Q He had no mask, his face wasn't covered, was it?
A No. Only a black scarf.
Q To tie his hair up, for his hair?
A Yes.
Q And when he walked by, he walked behind you, didn't he?
A Yes.
Q You were still sitting on the curb?
A Yes.
Q And now he walks a little bit past you, doesn't he?
A Yes. And he stopped there.
Q And this is the busy road, isn't it?
A Yes, it is.
Q And now, he waited about five to ten minutes, isn't that correct?
A Yes.
Q Not fifteen minutes. Between five and ten minutes, correct?
A Yes. He was standing there.
Q Okay. And nothing was said, correct?

A No. He didn't talk to me, nothing.
Q And then at that point you stood up, walked back to the shelter, correct?
A Inside, yes.
Q What bus were you waiting for? What time was that, what time does that bus usually arrive there?
A You know, that is the bus stop for 55, 54. Five buses. So, I went there to see which bus was coming first.
Q Right. What time was the bus supposed to arrive, if you remember?
A I assumed it was passing by at 5:30. But it was a Sunday and the bus didn't come.
Q So, the 5:30 bus did not come, correct?
A No.
Q So, when you first saw Mr. Walters, was it after 5:30?
A Yes. It was about twenty to six.
Q Okay. So when you first see Mr. Walters, it's now about twenty to six in the morning, correct?
A Around.
Q Okay. He waits maybe five, ten minutes, correct?
A Yes.
Q You stand up and you go back to the shelter, correct?
A Yes.

Q And Mr. Walters walks back over inside the shelter as well, doesn't he?

A Yes.

Q And now Mr. Walters says something to you in English, correct?

A Yes. In English he asked me to give him the money.

Q Okay. When you say you understood, what words did he use? Did he say, How much? Did he say --

MS. SINGAS: Objection.

Q -- right?

THE COURT: Overruled.

Q How much money?

A No. He just talk about money. And I gave it to him. But since it was very little, after I gave it to him, I was asking him to let me go.

Q Before you gave him any money, he was asking you about money, you were talking about money, correct?

MS. SINGAS: Objection, to the characterization of that testimony.

THE COURT: Yes.

MR. LEMKE: I'd like her to answer. I asked a question what exactly was said. She doesn't speak English.

THE COURT: Sustained as to the last

question.

You want to rephrase it, Mr. Lemke?

Q When Mr. Walters first asked you a question, you interpreted it to mean he wanted your money, correct?

MS. SINGAS: Objection.

THE COURT: No.

A Yes, since he pointed the gun at me. He was talking about money, and I thought he wanted my money.

Q And you're saying you see a gun in his right hand, is that what you're saying?

A Yes. The other one went into my shoulders.

Q The left hand, I was like that (indicating).

MR. LEMKE: If the record could somehow reflect. I don't --

THE COURT: Indicating putting -- using her left hand in one motion and pointing to her stomach with her right hand.

Q From the time this person, Mr. Walters, first touched you, until you ran to the police, how much time was the contact between you and Mr. Walters?

A I wouldn't know. But it was a couple of minutes.

Q Okay. Not ten minutes. Well, do you know?

A Well, you know, I was so worried, so concerned, I don't know what to tell you.

Q While you were there with this individual

Mr. Walters, you say there's a struggle?

A Yes, from my hair.

Q Did he grab your neck?

A No, no, no. Just the hair.

Q And then you break loose, right? He doesn't grab you anywhere else, correct?

A No.

Q And the hand that grabbed your hair, he's not touching your hair kind of in a stroking manner, he's grabbing you, is that your testimony; yes?

A Yes.

Q At that point you're able to break loose from this person, is that your testimony?

A Yes.

Q And right into the street?

A Yes. I run into the street.

Q But during this time that you're struggling with Mr. Walters, about seven cars pass by, is that your testimony?

A Yes. The cars were passing by but they would continue going since I was not able to get my hand --

Q I'm sorry?

A Since I was not able to stretch my hand, the cars were passing by.

Q Now, you spoke with an officer that took a

statement from you, correct?

A Yes.

Q And he read that back to you, correct?

A Yes.

Q You never told that officer or any other officer that there was six or seven or eight cars passing back and forth, did you?

MS. SINGAS: Objection.

A No, maybe more cars.

THE COURT: Overruled. Overruled.

I'm sorry, Maria, did you get the question?

You want to repeat the question Mr. Lemke?

MR. LEMKE: Yes.

Q You spoke to an officer who spoke Spanish that same morning, correct?

A Yes.

Q Did you ever tell him -- did he ever write down anywhere that during your struggle with Mr. Walters that all these cars kept going back and forth?

A No. I didn't say that to him.

Q You did not. In fact, you told the police officer that you pulled right away from this individual and ran out into the street, correct?

A Yes, because I saw the police car.

Q And you did not even know -- withdrawn.

Did you know it was a police car when it was coming towards you, or did you know it was a police car after you pulled away?

A No, I realized it was a police car when he, you know, put the brakes and got out of the car.

Q That was after you had stepped off the curb, correct?

A Yes. When he let me go from my hair.

Q Just a couple of more questions, Ms. Sandoval.

During this struggle that Mr. Walters has with you, from where you were first grabbed, how far were you dragged, Ms. Sandoval, during these five or ten minutes?

A No, just a little bit. From the shelter to the other side.

Q To the shelter, to the other side of the shelter, three feet, five feet?

A No, just a few steps outside of the shelter.

Q Okay. Now, also, you had indicated -- withdrawn.

You had no bruises or scratches to your neck or to your hair, did you, Ms. Sandoval; none at all, correct?

A No.

Q And when Mr. Walters was speaking to you, you don't understand other things he was saying, correct?

A No, I didn't understand anything.

Q Okay. You don't know if he thought that you're a

lady of the evening, correct?

MS. SINGAS: Objection, Judge, to what the defendant was thinking. How would she know that?

MR. LEMKE: If she understood what -- from what he said.

THE COURT: Repeat the question.

(Whereupon, the requested question was read back by the reporter)

THE COURT: Yes, sustained.

Q You don't understand, Ms. Sandoval, what he was asking you in part, correct, because you don't understand English, correct?

A No.

Q The name Maria Reyes, that's your sister's name?

A Yes.

Q And you told the police you had nine singles, nine dollars, with you. You told this Court that, as well, correct?

A Yes. I haven't counted it.

MR. LEMKE: I have nothing else.

THE COURT: Anything -- any redirect, Ms. Singas?

MS. SINGAS: No. I think we're done. Thank you, Judge.

THE COURT: Ms. Sandoval, thank you very

much.

Maria, as always, thank you.

THE INTERPRETER: Thank you, Judge. Pleasure to see you.

THE COURT: Same here.

(WITNESS EXCUSED)

THE COURT: People, your next witness.

MS. TEBBETT: Judge, the People call Detective-Sergeant Robert Nemeth.

R O B E R T   N E M E T H, Detective-Sergeant, called as a witness by and on behalf of the People, having been first duly sworn, testified as follows:

THE CLERK: Please state your name, spell your last name, your shield number, your unit of command and rank.

THE WITNESS: Detective-Sergeant Robert Nemeth, N-E-M-E-T-H. Shield 137. Nassau County Police Department, Forensic Evidence Bureau, Firearms Identification Section.

THE COURT: Okay, Ms. Tebbett.

MS. TEBBETT: Thank you, Judge.

DIRECT EXAMINATION

BY MS. TEBBETT:

Q Good afternoon, Sergeant Nemeth.

A Good afternoon.

Q Can you just tell us all, please, where you're employed?

A The Nassau County Police Department.

Q And what is your position there?

A I am the supervisor of the Firearms Identification Section, and I am also one of the Examiners.

Q And how long have you had that particular position?

A I have been an Examiner for thirteen years, supervisor for approximately five.

Q And were you employed by the Nassau County Police Department prior to this position that you're holding now?

A Yes.

Q Where were you employed prior to holding this position?

A I was within the Nassau County Police, in patrol.

Q How long, all together, have you worked with the Nassau County Police Department?

A Approximately twenty-one and-a-half years.

Q Now, can you explain for us what the Firearms Identification Section is?

A By definition, firearms identification is a wing of forensic investigations that attempts to identify fired ammunition components to their originating sources.

However, actual case work in firearms

identification encompasses a wide area, which could include, from the simple identification of a firearm from its markings, to the operability testing of a weapon, including repairs, the microscopic examination and comparison of fired ammunition components to determine their originating sources, serial number restorations, muzzle to garment distance determinations and full shooting reconstructions, including trajectory analysis.

Q Can you explain for us what is the responsibilities as an Examiner in that section?

A To deal with whatever happens in a case, depending on the evidence presented.

Q And have you received any specialized training in connection with your position as either an Examiner or a supervisor in the Firearms Identification Section?

A Yes.

Q And can you go through that training for us?

A Sure. I have a degree in mechanical engineering. I have received training from the Federal Bureau of Investigation, as well as the Bureau of Alcohol, Tobacco and Firearms. I have attended schools of various firearms manufacturers, undergone a two-year in-house training program, and have received general training in firearms from the Nassau County Police Academy.

Q And what areas did those training encompass?

A In various aspects of weapons and ballistics.
Q Have you ever testified before in court as an expert in the area of ballistics?
A Yes.
Q Can you approximate for us how many times you have testified before as an expert in the area of ballistics?
A About a hundred and fifteen to a hundred and twenty times.
Q Can you tell us in what courts you have previously testified as an expert?
A Predominantly here in County Court, but also in federal court and in New York City Criminal Court.
MS. TEBBETT: Your Honor, at this time I would offer Sergeant Nemeth as an expert in the area of ballistics.
MR. LEMKE: No objection, whatsoever.
THE COURT: Yes.
Go ahead, Ms. Tebbett.
MS. TEBBETT: Thank you.
Q Sergeant Nemeth, can you explain for us the process by which evidence is received into the Firearms Identification Section to be examined?
A It could be one of several avenues. The firearm could have been directly brought into the laboratory for

some kind of processing, or it could have been brought over from Crime Scene. So, it would be either from the detectives, themselves, in the various squads or from Crime Scene. Somehow it would get introduced into our system. I would be the last one to get it in the chain.

Q Now, once that evidence is received into the Firearms Identification Section, is it marked in any way by the Firearms Identification Section?

A As soon as it comes into the laboratory, wherever it is initiated, it gets invoiced into an inventory control system and labeled.

Q And can you explain for us what the purposes of the inventory control system is?

A To mark the evidence, to give it specific numbers corresponding to the case numbers.

Q And did there come a time back in October of 2007 that the Firearms Identification Section received evidence under case report number 207CR75863?

A Yes.

Q Okay. And what type of evidence was received under that particular case report number?

A A firearm, a loaded magazine, and a manilla police --

(Phone ringing)

A -- police department envelope.

THE WITNESS: I'm sorry, I will shut it off.
THE COURT: That's okay.
Q I'm sorry, Sergeant, could you repeat your answer?
A A firearm, a loaded magazine, and a manilla police department envelope with markings on it.
Q What type of firearm was received under that case number?
A It is a Glock semi-automatic pistol, model 26, with a serial number of CRZ972US. It is chambered for the 9mm Ruger -- 9mm Ruger cartridge.
Q And how is that particular firearm packaged when it was received by your section?
A The entire contents was received in a sealed white box.
Q And was it given any particular evidence number by the Firearms Identification Section?
A Not directly by us, by whomever took it into the laboratory. At the intake portion there is a laboratory number associated with the case report.
Q And do you know what that laboratory number is?
A I believe it was 4369 or 89.
Q Is there something that you can look at to refresh your recollection as to that number?
A Sure. Either the box, itself, or the report.

Q Okay. I'm going to show you what is already in evidence as People's 13. Take a look at that.

(Handed to the witness)

A It's 4389.

Q Now, Sergeant, do you recognize that box that is in front of you?

A Yes.

Q How do you recognize it?

A I recognize it as the packaging that I returned to Property Bureau. And I recognize it, in that it has my blue evidence tape on it and my initials on it.

Q Okay. You were just pointing to that blue evidence tape on the side of the box.

A Here (indicating) and on the top.

Q Do you see your markings and your handwriting on that box?

A Yes.

Q Open up that box and take a look inside, tell us if you recognize the contents of the box.

(Witness complies)

A Yes.

Q What do you recognize the items inside of that box to be?

A This is the Glock pistol that I examined.

Q And how do you recognize it as the Glock pistol

that you examined?

A It has -- it's consistent with the serial number that I just stated, and it also has my markings on it.

Q Can you just tell us where you put your markings?

A On the bottom of the trigger guard.

Q And are there further contents in that box that you recognize?

A Yes.

Q What else?

A This is the magazine that was loaded with fifteen rounds of ammunition.

Q How do you recognize that?

A Also with my markings on it, the laboratory number and my initials.

These are the fifteen rounds that were received in the magazine. They are all 9mm +P Speer, S-P-E-E-R, jacketed hollow-point cartridges, two of which I used to test fire the weapon.

Q How do you recognize that particular ballistics package?

A Also has my initials all over it, and the laboratory number.

Q Okay.

A And lastly, this is the envelope that I believe all of it came in originally before I got to it. And it has

my markings and initials also.
Q Is that case report number that I mentioned marked on that envelope, as well?
A Yes.
Q Now, what condition was that envelope in when it was received by the laboratory to be tested?
A When I received it, it was in this condition. It was opened already.
Q Okay. And was the condition of that noted originally when it was received by the laboratory?
A This envelope? I don't know.
Q Do you see your markings anywhere on that envelope?
A Yes.
Q Do you see seals on that envelope?
A Yes.
Q And did you have to open that envelope or was it opened prior to when it got to you?
A No, I received the box sealed. This was taken in at some other place.
Q But the box, itself, was sealed when it got to you?
A Correct.
Q And how was the box, itself, sealed when it got to you?

A With red evidence tape.

Q Did you have to open that red evidence tape to see what was inside for your testing of those items?

A Yes, I did.

Q Can you explain for us when you first got that box and opened those seals how you proceeded to begin your testing of those items?

A The testing is the same as one would do with any weapon. I took the weapon out, identified any kind of markings on it to determine the manufacturer, the model, the serial number and the cartridge that the weapon is chambered for.

After that I did a mechanical malfunction test to determine whether or not the gun was safe to fire.

Once it was safe to fire, I then tested it with submitted ammunition, two of the fifteen cartridges. The fifteen cartridges were all loaded into this magazine. It is a Glock magazine, capable of holding the 9mm Ruger cartridge, and it holds fifteen rounds.

Q Now, did you have to remove any of the cartridges from that magazine in order to fire it?

A No, not in order to fire it. But I removed them in order to identify the manufacturer from the head stamp.

Q And did you replace any of those in there to fire that?

A Yes, I used two cartridges to test fire the weapon.

Q Are those cartridges contained within the packages that are within that box in front of you?

A Yes, they are. They are marked as tests.

Q Can you tell us what happened when you fired those two cartridges from that firearm?

A The gun went off. The gun is operable.

Q So, once you did your testing, were you able to reach any conclusions regarding that particular firearm?

A Yes. It is, in fact, operable.

Q Now, Sergeant Nemeth, are you familiar with what an extended clip is?

A Extended magazine is a magazine that is longer than is designed for the particular weapon.

Q And is the magazine that came with that firearm an extended magazine?

A Well, it's an extended magazine for this particular weapon. It's a standard magazine for a different Glock pistol.

Q Can you explain for us what the significance of an extended magazine for that particular weapon, what does that mean?

A It just means it's longer -- it sticks out further than the original magazine is designed for.

Q Does it contain any more rounds of ammunition than the original magazine that is designed for that gun?
A Yes.
Q How many more, do you know?
A Five.
Q And are you familiar with what night-sights are?
A Yes.
Q Can you tell us what those are?
A Night-sights are low grade radioactive elements that are put into the sights of the weapon so that you can see your sight in low lighting conditions.
Q And what function, if any, do the night-sights perform when you're in the dark?
A They allow target acquisition in low lighting.
Q And does that particular firearm that you examined have night-sights?
A This has night-sights.
Q Can you hold that up for us and point out for us where they are?
A These two in the back, in the rear sight (indicating). One in the front sight.
Q And in your experience, have you ever seen or analyzed firearms that contain night-sights?
A Yes, many times.
Q And on what types of guns typically have you seen

night-sights?

A Generally, in the better grade weapons. Mostly for someone who is a professional, who has to carry a gun.

Q When you say professional, do you mean law enforcement?

A Could be law enforcement.

Q Now, Sergeant, in your experience have you tested or analyzed guns that have been involved in typical street crimes?

A Yes.

Q And what percentage of those guns involved in typical street crimes have you seen with night-sights on them?

A Very few.

MS. TEBBETT: May I just have one moment?

THE COURT: Yes.

(Pause in the proceedings)

MS. TEBBETT: I have nothing further. Thank you.

THE COURT: Any questions?

MR. LEMKE: No questions at all. Thank you, Sergeant.

THE COURT: Okay, Detective, thank you very much.

(WITNESS EXCUSED)

THE COURT: All right, members of the jury, we're going to take a very brief recess. I'll have you back in here in five minutes. We'll be picking up with our next witness.

Okay, if you can follow the officer.

(Whereupon, the sworn jury and alternates leave the courtroom)

(Whereupon, there is a brief recess taken in the proceedings.)

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE COURT: All right. People, your next witness.

MS. TEBBETT: The People call Investigator Richard Lombardi.

R I C H A R D L O M B A R D I, Investigator, called as a witness by and on behalf of the People, having been first duly sworn, testified as follows:

THE CLERK: Please be seated. Please state your name, spell your last name, your rank, shield number and unit of command.

THE WITNESS: Investigator Richard Lombardi, L-O-M-B-A-R-D-I. Shield number 2056. Assigned to the New York City Department of Corrections, Legal

Division.

THE COURT: Ms. Tebbett.

MS. TEBBETT: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. TEBBETT:

Q Good afternoon, Investigator Lombardi.

A Good afternoon.

Q Can you tell us who you work for, please?

A New York City Department Of Corrections.

Q And what is your position with Corrections?

A I'm an Investigator. I'm assigned to the Legal Division.

Q How long have you been an Investigator assigned to the Legal Division?

A Approximately six years.

Q And were you employed by the Department of Corrections prior to this position?

A Yes, I was.

Q And how long, all together, have you been employed by the Department of Corrections?

A Eight and-a-half years.

Q Can you tell us what other positions you held in Corrections?

A I was a correction officer.

Q How long were you a correction officer?

A Approximately thirteen years, before I got to the Legal Division. And now I'm an investigator since.
Q Can you tell us what your responsibilities are as an Investigator in the Legal Division?
A I act as liaison to the District Attorney's Office. And I answer subpoenas for, both, defense counsel and the AG's Office and US Attorney's Office. I answer subpoenas, all subpoenas, served on the Department of Corrections.
Q As part of your position, are you one of the custodians of the records of the records kept in the Legal Division?
A Yes, I am.
Q Do you also respond to document discovery requests?
A Yes.
Q Are you designated the task of certifying documents pertaining to the Department of Corrections?
A Yes, I do.
Q Now, can you tell us what your duties and responsibilities were when you were a correction officer?
A Care, custody and control of inmate population, primarily.
Q And as a correction officer, is a correction officer allowed to carry a firearm?

A Yes, they are.

Q And are you allowed to apply for a firearm license based on your position as a correction officer?

A I believe as a correction officer you don't need a license. I believe that, that just becoming a correction officer, that is your license, until, of course, you retire.

Q Okay. And is a correction officer required to notify the Department of Corrections or register with them any firearms?

A Yes.

Q Can you explain that for us.

A You first have to request, in writing, to purchase a firearm. And once you're qualified, and with the approval of your commanding officer, you can purchase a firearm through the State of New York.

Q Now, during the years that you, yourself, spent as a correction officer, did you wear a uniform?

A Yes.

Q And are you familiar with the uniform that Correction Officers for New York City wear?

A Yes.

Q And can you tell us what that uniform consists of?

A Basically, it's navy blue pants with a one-inch darker stripe, or navy blue pants, if it's a B-uniform, with

side pockets and navy blue shirt.

Q What do those pants look like?

A Typically, they -- they're the same pants as NYPD wears or -- you know, they're navy blue, darker stripe down the middle, and the shirt differentiates from New York City Police Department just by the color of the patch, which is orange.

Q Okay. Now, which color patch is orange, the Corrections patch?

A The Corrections patch is orange and NYPD is yellow.

Q Where is that patch on the correction officer?

A On the correction officer, they have a patch on both sleeves. It's on the left side and right side, as well.

Q Are there any shoes that are part of that uniform?

A Yes. We have shoes. I mean, regulation shoes would be black. Black, either high-top or low-top loafer kind of shoes.

Q Any jackets that are part of a uniform?

A Yes.

Q What do the jackets look like?

A Duty jacket would be like a reefer coat. A coat -- hard to describe it. Some kind of a para-military

kind of coat. It would also have two patches, left side and right side, a series of pockets. Something that is florescent at nighttime, to take out, in case you're working at night.

Q And what color is that duty jacket?

A Navy blue, as well.

Q Now, are there any other articles of clothing that are, what you would consider, off duty for correction officers?

A Off-duty clothing, you could wear anything you want over your uniform; I mean, if you choose to wear something over your uniform. That is your choice.

Q Are there any other articles of clothing that would have either insignia or markings identifying Department of Corrections that are not duty issue or department issue?

A With insignia on it, no. The majority of officers might go out and buy some kind of a jacket that they would also buy at the uniform store where they buy the uniforms.

Q What type of jacket would that be?

A Maybe like a silk lining jacket. Some kind of a flight jacket. Some kind of a jacket that is also sold at the store where they sell uniforms.

Q Are you familiar with that flight jacket style of

jacket?

A I have worn a jacket like that previously.

Q Okay. Can you tell us about that, what color is it, what does it look like?

A It's black, a little darker than navy blue. But the navy blue is so dark, it almost looks black. It's kind of puffy. It is the kind of a jacket that a lot of people wear.

Q Is there any color on the inside lining of that style of jacket?

A I have worn it with a white inside. Also made one with an orange inside.

Q Okay. All right. Now, Investigator Lombardi, in your position that you have now with the Legal Department, are you familiar with the New York City Department of Corrections document known as a time card?

A Yes.

Q Can you explain for us what that is and what its purpose is?

A Time card is a time card which each staff member has, not only uniform but also civilian staff. It's a list of all your time. Basically tells you if you were at work, if you weren't at work, and if you have done overtime. It's what timekeepers use to calculate your salary.

Q Are you familiar with an employee employed by the

New York City Department of Corrections by the name of Ricardo Walters?

A Yes, I am.

Q Are you familiar with any time cards that the New York City Department of Corrections maintains with respect to Ricardo Walters?

A Yes.

Q And were those documents, those time cards, pertaining to Ricardo Walters' employment with the New York City Department of Corrections, were those maintained in the regular course of business of the New York City Department of Corrections?

A Yes, they were.

Q Is it in the regular course of business of the New York City Department of Corrections to make or generate those time cards?

A Yes.

Q And are those time cards made at or about the time or the shifts that person was designated to work?

A Yes.

Q And are those reports made by a person who has a duty to make those reports based on either their actual knowledge of those events or based on information from someone at the Department of Corrections that has actual knowledge about those events?

A Yes.
Q And are you familiar with the personnel file pertaining to the correction officer by the name of Ricardo Walters?
A Yes, I am.
Q Are you familiar with the time card pertaining to his employment with Corrections for the years of 2005, 2006, and 2007?
A Yes, I am.
Q And just, generally, what information is contained in those time cards for those three years?
A For Mr. Walters?
Q Yes.
A It would be the days he worked, the days he took off. Also indicates if he did overtime. It would also indicate if he did a mutual or did a mutual pay back.
When I say a mutual, exchange of tours with two officers, to guarantee the other one that, you know, they will work each other's tour.
It would also say if he was sick or AWOL.
Q And what is AWOL?
A AWOL, absent without leave. Not calling your command and not showing up for your scheduled tour of duty.
MS. TEBBETT: Judge, I'm going to ask these documents be marked People's 22, 23 and 24 for

identification.

MR. LEMKE: I have seen them. If the People wish to move them into evidence, no objection.

MS. TEBBETT: I do.

THE COURT: All right, I'm sorry, 22 through 24?

MS. TEBBETT: Yes.

THE COURT: Mr. Lemke, you have no objection?

MR. LEMKE: No objection.

THE COURT: So, it will be received in evidence.

(Whereupon, People's Exhibits 22, 23 and 24 are marked in evidence)

THE COURT OFFICER: People's 22, 23 and 24 marked and received in evidence.

MS. TEBBETT: Can I have them shown to Investigator Lombardi, please.

(Handed to the witness)

Q Investigator Lombardi, take a look at these three documents. Are you familiar with those?

A Yes.

Q And are those time cards that are kept as business records by the Department of Corrections pertaining to Ricardo Walters?

A Yes, they are.

Q Are those for the years of 2005, 2006, and 2007?
A Yes.
Q Let's start with the one that is for the year 2005. I believe that should be People's number 22.
A Uh-huh.
Q Okay?
A Yes.
Q Now, can you tell us, in the year 2005, where Ricardo Walters was assigned as a correction officer during that time?
A NIC, or North Infirmary Command.
Q Where is that?
A Rikers Island.
Q And can you tell us what his duties and responsibilities were as a correction officer assigned there, just generally?
A I'm looking at the time cards. Obviously, I know he's a correction officer because it's civil service title, CO. It gives me a shield number. And it also basically tells me that he's on a four and two rotation.
Q What does that mean?
A It means that he works basically four days a week and he's off two, and then he's -- his rotation will start again.
Q Now, is he off the same two days every work week,

or does he work the same four days?

A Rotate pass days. So, pass days, meaning, days off are rotating.

Q Now, specifically, let me ask you about the date of April 17th of 2005. Based on those records, was Ricardo Walters scheduled to work that day?

A April 17th, 2005 is scheduled pass day for him. One of his rotating pass days, his second of his pass days.

Q So, would he have been scheduled to come into work that day?

A No.

Q And let me ask you now specifically about the date of November 28th of 2005. Was he scheduled to work on that day?

A I'm sorry, give me the date again.

Q Sure. November 28th, 2005.

A November 28th, 2005 he is scheduled to work, yes.

Q What tour, what hours, would he have been scheduled to work on that day?

A According to his time card, looks like he would be working a seven to three tour. Had he worked that day, he would be seven o'clock in the morning until three o'clock in the afternoon.

Q And according to his time card, did he actually work that day?

A No, he did not.

Q And did he give a reason or can you tell from those time cards the reason why he didn't work that day?

A Yeah, he called in sick. He used a code 3 as his sick reason.

Q What is that?

A Gastrointestinal problem. Something wrong with his stomach. He called in sick. It was his third day to work, though.

Q When a correction officer calls in sick, giving that reason, do they have to provide any documentation as to that illness?

A Unless he's chronic sick, and chronic sick is not indicated on his time card, they don't have to bring in any documentation until the third day. Basically, he can call in sick for two days without documentation.

Q What were the two days he called in sick in November of 2005?

A Would be his third and fourth day.

Q And would that be the 28th, and which other?

A And the 29th.

Q And what day did he come back to work after November 29th, 2005?

A So, if I read directly from the time card, the 30th is scheduled pass day. He obviously didn't work that

day. He also took off December 1st, that was a scheduled pass day. Continuing, on December 2nd and 3rd he did scheduled mutuals, which is exchange in tours with other officers.

Q Did he work those days?

A No, he did not. He does come back to work on December 4th. It's a seven to three tour, which is putting him back in his regular rotation.

Q Now, let's talk about the year of 2006. The time card for 2006, which is People's Exhibit 23. Can you tell from that time card where Ricardo Walters was assigned to work as a correction officer during that year?

A Same facility, North Infirmary Command. It's on Rikers Island.

Q And according to that time card, did he actually come to work at all during the year of 2006?

A No, he did not.

Q Can you tell from that time card why not?

A He's out sick from January 1st, out sick, stays all the way up until December 31st of that same year. So, he's out sick the entire year.

Q Let me direct you specifically to the date of November 9th of 2006. According to his time card, was he scheduled to work that day?

A You said November 9th?

Q November 9th.
A November 9th, had he not been out sick, and I'm assuming this is a continued sick, would have been a first day of work. He is scheduled to work. He's out sick from January.
Q So, according to that time card, did he work on that day?
A No, he did not work.
Q All right. Now, let's talk about the year 2007, the time card which is People's 24. Did he have the same assignment at Rikers Island during the year of 2007, according to that time card?
A Yes. Still works at North Infirmary Command or NIC.
Q Now, according to that time card, can you tell when he came back to work after having been out sick in 2006?
A Looks like he came back January 1st for seven to three tour.
Q January 1st of '07?
A Correct.
Q Okay. Now, let me direct you specifically to the date of September 7th, 2007. According to his time card, was he scheduled to work on that day?
A September 7th?

Q Right.
A No. That's the second pass day. His second rotating day off.
Q I'm sorry, September 9th of 2007.
A September 9th, 2007 is his first day back from the rotating pass day. He is scheduled to work.
Q What hours was he scheduled to work that day?
A Seven to three.
Q Now, according to the time card, did he actually show up for work that day?
A No, he did not.
Q Now, was any administrative action taken against him by the Department of Corrections on that day?
A The time card indicates an X, which is also what we put on time cards, indicates that he was suspended.
Q And does the time card indicate what day he was suspended?
A September 9th. And looks like it's to the end of the year.
Q And do you know what the reason was for his suspension on September 9th of 2007?
A No, I don't.
MS. TEBBETT: Thank you. I have -- just one second.
(Pause in the proceedings)

Q Investigator Lombardi, let me ask you, back in the year of 2005, again, according to that time card --

A Yes.

Q Take a look at April 16th of 2005. Was he scheduled to work on that day?

A April 16th, 2005 is his first pass day or his first rotate day, he did not work on that day.

MS. TEBBETT: Thank you. Nothing further.

THE COURT: Mr. Lemke.

CROSS-EXAMINATION

BY MR. LEMKE:

Q Investigator Lombardi, in your approximation, perhaps maybe you have an exact number, how many New York City Correction Officers are there?

A Approximately eight thousand and change.

Q And that includes the five boroughs, doesn't it?

A Yes.

Q Okay. And those eight thousand are scattered obviously throughout the five boroughs, right?

A We don't have -- we don't currently have a jail in Queens. We have Court Division. We don't currently have a jail in the Bronx, there's only the Court Division. Richmond County or Staten Island has no jail.

Predominantly all of our officers work in Rikers Island.

Q Is there a Queens House of Detention?
A Yes, there is. It's currently closed.
Q When was it closed?
A It's been closed for about four to five years. We currently have a Queens Court Division. I do believe that we have a Fire Watch inside of the Queens House of Detention. It's not staffed with inmates, just staffed with maybe medically monitored officers or officers that have been modified.
Q And out of those eight thousand plus, most of them are required to wear uniforms?
A While at the Queens House?
Q No, Rikers.
A Rikers Island, yes.
Q And that uniform would be very similar to what you described here, correct?
A Correct, navy blue.
Q So, it would be at least eight thousand. Very similar to police officers' trousers, as well, correct?
A Correct. It's the same exact uniform, with the exception of the patch.
Q And I take it, you don't know how many Nassau County Police Officers there are, do you?
A No, I don't. I'm sorry.
Q You testified regarding time sheets for Ricardo

Walters, correct?

A Yes.

Q You also testified that if a CO is to miss three consecutive days, that there needs to be an explanation, correct?

A On the third day they're required to let -- let the Health Management Division know the reason for their sickness. They have to bring documentation.

Q That should be attached to the records, correct?

A It wouldn't necessarily be attached to the time card. It would be another piece of paper. This is the time card at the facility. It's not a time card from the Health Management Division.

Q Did you check out the Health Management Division regarding Mr. Walters?

A Yeah. There was a printout for Mr. Walters.

Q Okay. And, in fact, Mr. Walters, you indicated, based on the time sheet as well, that for the year 2006 he was out on sick leave, isn't that correct?

A Correct.

Q And that was as a result of a serious heart condition, isn't that correct?

A It was a hospitalization. And there was a heart condition. That is the reason why he was out more than three days.

Q And can you tell this jury what days he was actually hospitalized in the hospital he was at?

A No, I could not tell you that.

Q You don't know, in fact, if he was in the hospital on any of the days you were asked by Ms. Singas or Ms. Tebbett, correct?

A The days that I previously testified to he was not out sick. You said 2006. During the year of 2006 he is off the entire year. But during the year of 2005 and 2007, there is no indication that he's hospitalized.

Q Well, if he was hospitalized, say, for two days for the days he was off, that wouldn't indicate because he would come back to work, correct?

A Are you saying, like, every time he's sick, he's hospitalized?

Q No. I'm saying, if somebody is working four days on and two days off, that if they miss, say, a third day, a doctor's note is required, correct?

A Correct.

Q But if somebody is having a heart condition or a heart problem, and they're in, say, the hospital -- whether it's Winthrop, for example, or another hospital, St. Francis, perhaps -- and they're in for three days, two days in which they're off, and then that third day where they call in sick, you're not going to have that documented,

correct?

A I only have to document when they call in sick.

Q That's where you put an S in the little chart?

A S is the sickness, yes. They document it, being a three-day sickness. Had he been in the hospital for those days, he would have called the Health Management Division. He's obligated to let the department know he's been hospitalized. We have to know he's hospitalized, for the simple reason that we need to come get his weapon, safeguard it, and we need to come get his shield.

Q If he misses three days of work?

A No, if he's hospitalized. If he misses three days of work, there is no need for us to do that. If he calls in sick with a reason, there are certain codes, there are printouts, there is no reason for us to come and get his stuff.

Q And if Mr. Walters is off on a Monday and Tuesday, Monday morning he goes to the hospital and he's in the hospital for testing Monday and Tuesday, which are his days off, there is no requirement, of course, except if it's a psych reason, perhaps, that the Department of Corrections, would say, be notified?

A Correct.

Q If he's off Monday and Tuesday, in the hospital Monday and Tuesday, and Wednesday was his first day back,

but he called in sick, it still wouldn't be a need for medical -- medical department, right, to receive any notification because it's not three consecutive days, correct?

A Correct.

Q Now, you unfortunately didn't bring any file regarding the reasons or days that he would have missed, correct?

A I do have a Health Management file that I had in my paperwork. I mean, I don't have it on me right now, no.

Q Did you review that prior to testifying?

A I did review the Health Management printout.

Q Okay, do you have it with you today?

A Like I said, I don't have it on me, with my files, ready. I did bring it with me.

Q Is it upstairs, in the D.A.'s Office, where?

A Yeah, it's upstairs.

Q Okay.

MR. LEMKE: Perhaps -- let me ask a couple of more questions, perhaps it may not be required.

A Like I said, I would only have a copy of what he actually called in to us. I would not have if he did not call in. If he goes sick for two days and he's off two days, if he does not call the Health Management Division, there is no printout.

Q You wouldn't have that?

A Correct.

Q But you may have something. I realize you're saying things may be missing from it, but you have something?

A I have his Health Management printout, correct.

MR. LEMKE: I have nothing else. Thank you. Subject to --

MS. SINGAS: Can we approach, please?

THE COURT: Yes, come up.

(Whereupon, there is a discussion held at the Bench, off the record, between the court and counsel)

THE COURT: You can stay right there, Investigator.

All right, members of the jury, at this point we're going to break for the day.

We're going to pick it up tomorrow. I'm going to try to get going around the same time. I realize today we got going a bit later than obviously I normally do, both in the morning and in the afternoon.

Again, to the extent we were late, I apologize. You know, sometimes things will come up that are totally unexpected, which happened today, both in the morning and the afternoon. I'm trying to do my best not to have you sit around, wasting time. That's

why this morning I kind of told my officers to let you go and come back forty-five minutes later, when I felt pretty sure we would be able to get going as soon as possible.

Again, we try to do our best to kind of keep the train rolling, if you will, and keep you not sitting in the room and wasting time. Sometimes -- I'm usually pretty good at it, sometimes. I'm not going to be perfect.

At this point we'll let you go for the evening. Be back here tomorrow, same courtroom. Come back tomorrow at ten o'clock, room 106.

As you're just going for the evening, don't talk among yourselves. Don't talk with anyone else about the case.

Don't view or visit any of the areas described.

Don't form any opinion about the case.

Don't access any accounts of this case in the media, should there be any.

You should be home, beat the Mineola traffic at this point.

Follow my officer. See you back here tomorrow morning at ten o'clock.

(Whereupon, the sworn jury and alternates

leave the courtroom)

THE COURT: Investigator, we'll need you back tomorrow. We will look at some records.

Mr. Lemke --

THE WITNESS: Are there things you want me to bring?

THE COURT: The DA will have it.

Do you have any objection, even though you're in the middle of cross-examination, do you have any objection to Ms. Singas talking to the witness --

MR. LEMKE: No.

THE COURT: -- in light of what we discussed here at the bench?

MR. LEMKE: No.

(Whereupon, court stands in recess. The trial is adjourned to November 7th, 2008 at 10:00 a.m.)

STATE OF NEW YORK : NASSAU COUNTY

SUPREME COURT PART 49

-----------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK TRIAL

- against - IND. 436N-08

RICARDO WALTERS

Defendant.

-----------------------------------------X

November 7, 2008
262 Old Country Road
Mineola, New York

B E F O R E :

HON. JAMES MCCORMACK
Acting Supreme Court Justice

A P P E A R A N C E S:

(Same as previously noted)

KATHLEEN PLAIA
KATHI FEDDEN
OFFICIAL COURT REPORTER

*** *** ***

(Whereupon, People's Exhibits 25 through 38 are marked into evidence outside the presence of the sworn jury and alternates)

R I C H A R D L O M B A R D I, Investigator, recalled as a witness, having been previously duly sworn, resumed the stand to continue sworn testimony as follows:

THE CLERK: This is People versus Ricardo Walters, trial continued.

People, ready?

MS. SINGAS: Yes. The People are ready.

THE CLERK: Defense counsel, ready?

MR. LEMKE: The Defense is ready, your Honor.

THE COURT: Bring them in.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE CLERK: Let the record reflect the jury is seated in the jury box at this time.

THE COURT: All right. Good morning, members of the jury. While you were waiting we have been actually premarking thirteen different exhibits that have been stipulated and agreed to by the attorneys and have been received in evidence. Obviously, that will expedite matters as the trial progresses.

At this time, we're ready to proceed with further examination of Investigator Lombardi.

People.

MS. TEBBETT: Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. TEBBETT:

Q Good morning, again, Investigator Lombardi.

A Good morning.

Q You were talking yesterday about the time card relating to Ricardo Walters for the year 2006.
A Correct.
Q And did the reasons for Ricardo Walters being out that year remain constant or did they change at all during 2006?
A It changed.
Q Okay. Now, the date of November 9th of 2006, what was the reason given for him being out at that time?
A November 9th of 2006?
Q Yes.
A It was a particular code that would be dictated on the Health Management form.
Q Are you familiar with the codes that are used?
A I'm familiar with them, but I would have to see them to know what they were verbatim.
MS. TEBBETT: Okay, I'll show you these two documents and see if it refreshes your recollection as to the code.
(Handed to the witness)
A Okay.
Q Is the code identified with a number?
A What was the date that you said?
Q For November 9th of 2006.
A Yes. He's out for code 4.

Q And can you just tell us what a code 4 means?

A A code 4 is when an officer calls in and tells the Health Management Division there having palpitations, chest pains, shortness of breath or profusive sweating.

Q Now, do you recall yesterday on cross-examination when Mr. Lemke was asking you some questions regarding whether or not the defendant had a serious heart condition during that time period?

A Yes.

Q Okay. And is that the code that you just read to us that was being used at that time?

A The code I just read is what he called the Health Management Division for. It doesn't dictate any serious heart conditions. It just dictates that he called in with the problem of having either palpitations, chest pains, shortness of breath or profuse sweating.

Q Do you recall Mr. Lemke asking you some questions yesterday on cross-examination regarding the defendant's hospitalization?

A Yes.

Q Is there a code for hospitalization that is used?

A Yes, there is.

Q What is that code?

A The hospitalization code is code 12.

Q And did the defendant ever use that code during

2006?

A No, he did not.

Q Okay. And can you tell us when he returned to work?

A He -- during the year of 2006 he did have two return of duty dates. And that was two dates he should have returned to work, but he did not.

Q When did he actually return to work?

A January 1st, 2007.

Q And how did he return to work at that time, was he on full duty, modified duty?

A January 1st, 2007 he returned to work full duty.

Q And did he, in fact, work during the beginning of January and into 2007?

A Yes, he did.

Q Okay. And can you tell us how he worked during that time?

A Basically, January 1st, 2007 --

Q The shifts.

A -- to July 2007 he had been put in chronic sick status, which meant that he just could not call in sick anymore without reporting back to the Health Management Division. But during that time he worked as a full duty corrections officer and did doubles and worked his four and two rotation.

Q You said the word doubles, what does that mean?
A He did scheduled overtime, volunteered overtime, and he also did mutuals.
Q Investigator Lombardi, can you tell us what kind of documentation is required by Corrections when an officer calls in sick to Health Management?
A When they call in sick to the Health Management Division they don't have to give any documentation until they would have been out the third day, then they have to bring in documentation to the Health Management Division. It would basically be a doctor's note.
Q And are there any steps taken by Health Management Division or the Corrections Department to investigate the doctor's note or whatever documentation is brought in?
A There are no steps, unless there is a reason for it. But I don't think in this case there was ever a reason for us to investigate his sickness.

MS. TEBBETT: Okay. Thank you.

MR. LEMKE: May I, your Honor?

THE COURT: Yes.

RECROSS-EXAMINATION

BY MR. LEMKE:

Q Investigator, it's a pretty good gig, I can call in for a period of a year and never have to provide any

documentation and I get paid all that time?
A You can basically take off for a year and get paid, that's correct. As for not providing documentation, you are ordered by the Health Management Division to bring in doctors' notes.
Q And if you don't, then obviously you will wind up being suspended or called out for it, wouldn't you?
A You will face charges when we -- when you came back to full duty status.
Q There was certainly none against my client regarding this?
A On January 1st, 2007, when he returned to work, he was put on chronic sick leave absence.
Q In fact, you're familiar with Coumadin, Investigator?
A Yes, I am.
Q Coumadin is a blood thinner, isn't it?
A That's about my extent of knowledge of Coumadin.
Q In fact, your department, Department of Corrections, wouldn't permit you to work if you have Coumadin as one of the medications because it's a blood thinner, isn't it, Investigator?
A That is not entirely correct.
Q Not entirely correct?
A There are officers that are working on Coumadin

present day as a full duty corrections officer.

Q Assigned to different locations that may not have direct contact with inmates because if they're cut, and excessive bleeding, for lawsuit purposes, isn't that true, Investigator?

A That also is not true. Every case is a different case. I, for a fact, work in the Legal Division. I handle cases.

Q Are you a lawyer, by the way, Investigator?

A Say again.

Q Are you a lawyer?

A No, I'm not. I am an investigator assigned to the Legal Division. I do know specific cases where there are full duty officers that currently take Coumadin and there are cases where officers came work full duty when they take Coumadin.

Q And that was the case with Ricardo Walters?

A I do not know.

Q You do not know?

A I'm not a doctor.

MR. LEMKE: That's all, thank you.

REDIRECT EXAMINATION CONTINUED

BY MS. TEBBETT:

Q Let me ask you again. You mentioned earlier that when Ricardo Walters came back to work, he came back as

chronic sick, what does that mean?

A When he came back to work January 1st, 2007, he came back full duty. Because he had been out for an excessive two hundred and something days for the calendar year of 2006, we placed him in chronic sickness.

Q Was any action, administrative action, taken at that point?

A We -- Officer Walters chose to appeal his chronic sick absence by submitting documentation to us.

Q And can you explain what it means when someone appeals that status?

A With the proper documentation of hospitalization, and what I previously said of getting paid for the year, with the proper hospitalization proof, we would not have taken action against him for chronic sickness. He would have been able to then call in sick from the year of January 1st, 2007 to July, you know, 1st, 2007, which Mr. Walters could not.

Q And what happened to his appeal?

A It was denied.

Q What does that mean?

A It was denied. It was -- it was approved by two of the four people, but it was denied by the assistant chief and the chief of the department. It was denied, basically, on his documentation.

Q So, when someone's appeal is denied, does that mean they remain in that status?

A He currently -- yes, he had to remain in that chronic sick status.

Q That status means they can't call in sick for a certain period of time?

A Correct.

Q What would happen?

A He would have to report immediately back to the Health Management Division with proof on that day, as opposed to the three days, which you would do when you're normally sick.

MS. TEBBETT: Okay, thank you.

RECROSS-EXAMINATION CONTINUED

BY MR. LEMKE:

Q Aren't you placed on chronic sick after missing thirteen days?

A You're placed on chronic sick for numerous reasons, forty days --

Q Isn't it policy after missing thirteen work days, the Department of Corrections after thirteen consecutive work days, you're placed on chronic sick?

A It all depends on the scenario. If you're in the hospital and you are hospitalized, we do not place you on chronic sickness.

Q If you are not, after thirteen days, you're placed on chronic sick, not a year later, six months later, at the time, within thirteen days?

A No, within a twelve month period.

Q Thirteen days --

A Yes.

Q -- correct.

MR. LEMKE: Thank you. Nothing further.

THE COURT: All right, Investigator. Thank you very much. You can step down.

(WITNESS EXCUSED)

THE COURT: Okay, People, your next witness.

MS. SINGAS: The People call Rosa Portillo.

THE COURT: Rosa Portillo.

Mr. Interpreter, if you would please step up.

THE CLERK: Let the record reflect the Spanish interpreter is required and present.

R O S A I M E L D A P O R T I L L O, Called as a witness by and on behalf of the People, having been first duly sworn, testified through the aid of the Spanish interpreter as follows:

THE CLERK: Please be seated. State your name, spelling your last name, give your County of residence, please.

THE WITNESS: Rosa Imelda Portillo,

P-O-R-T-I-L-L-O. 87 Union Place, Hempstead, Nassau County.

THE COURT: All right.

Mr. Interpreter, can you give your name for the record, please.

THE INTERPRETER: First name Patricio, P-A-T-R-I-C-I-O. Last name Aguirre, A-G-U-I-R-R-E.

THE COURT: Mr. Interpreter, what I ask you to do, move that microphone closer to you.

THE INTERPRETER: Is that all right?

THE COURT: Ms. Singas.

MS. SINGAS: Thank you, Judge.

DIRECT EXAMINATION

BY MS. SINGAS:

Q Good morning, Ms. Portillo. How are you?
A Fine, thank you.
Q Ms. Portillo, do you work?
A Yes.
Q What kind of work do you do?
A I work at the pasta factory.
Q Ms. Portillo, in November of 2005, were you working?
A Yes.
Q Where were you working?
A McDonald's.

Q Where was that McDonald's located?
A Peninsula Boulevard. Always in Hempstead.
Q Now, I am going to direct your attention to November 28th of 2005, the early morning hours, approximately around 6:45 a.m. Were you working on that day at that McDonald's?
A Yes.
Q And what was your job that morning?
A My work was to receive orders through the drive-thru.
Q Now, in the early morning hours of November 28, did you have occasion to see Delsy Sanchez?
A Before I started working, or what?
Q No. While you were working.
A No.
Q Did Delsy Sanchez come to work that day -- I'm going to withdraw that.
Do you know Delsy Sanchez?
A Yes.
Q Okay. And how do you know her; did she work with you?
A Yes, we worked together.
Q And as of November 2005, how long had the two of you been working together at that McDonald's?
A She was working, like, a little over a year.

Q Okay. Now, on November 28th, was Delsy scheduled to work that morning?

A No.

Q Did she work that morning?

A No. She had the day off. But when they needed people, they asked her to come to work as a favor.

Q Okay. On that day was she coming to work as a favor?

A Yes, yes.

Q Do you remember what day of the week that was?

A Monday.

Q Okay. Can you tell us at what point, what time did you see Delsy that morning?

A Exactly the time, I don't remember.

Q Approximately.

A I think about seven something. Because I was busy, I couldn't give you an exact time.

Q What time was she schedule to work?

A At seven.

Q Okay. Can you tell us, can you tell the jury, did you see Delsy Sanchez that morning?

A Yes.

Q Can you explain to us how she appeared to you?

A When I saw her, somebody told me that she --

MR. LEMKE: Objection to what somebody else

said.

THE COURT: Yes. Don't tell us what somebody may have said to you, just what you observed.

A When I saw her, I saw her nervous, upset. She was crying. She couldn't stop crying. She was cleaning her tongue with the thing we use, a cap. Many times she couldn't tell me anything, she could only clean her tongue.

Q Okay. What was her condition like?

A She was very nervous. For me, she was, like, in shock, nervous.

Q Okay. You said she was crying?

A A lot. A lot.

Q And did there come a time that you asked her what happened to her?

A Yes. I did ask her many times.

Q Was she able to speak to you?

A She only told me that somebody had placed something orally.

Q Did she tell you what someone had placed orally?

A Only that a man had attacked her.

Q Okay. And you mentioned the word oral, I think. Can you just explain to us what it is that Delsy said to you?

A I don't know how I could say that to you. She was cleaning her tongue a lot. The man had told her that

the penis.

Q Did Delsy tell you that a man attacked her and put his penis into her mouth?

MR. LEMKE: Your Honor, I take it, hearsay is coming in as a recent outcry.

MS. SINGAS: Correct.

MR. LEMKE: No objection.

THE COURT: Overruled.

She can answer that, Mr. Interpreter.

MR. LEMKE: No objection.

A At that time that someone had asked her to do that orally.

Q Did you give her anything to drink?

A A little water, because I saw her too upset.

Q Okay. Now, did there come a time that Delsy left the McDonald's that morning?

A Yes.

Q And how was it that she left?

A She called a cab.

Q Okay. Did she actually work at all that morning?

A No.

Q About how much time passed, do you think, from the time that you saw her until the time that she left the McDonald's?

A That day I didn't see her again until she called

me.

Q Okay. Do you know how much time you spent with her at McDonald's that morning, if you know, approximately?

A About ten minutes.

Q Okay.

MS. SINGAS: I have nothing further. Thank you, Ms. Portillo.

MR. LEMKE: No questions. Thank you.

THE COURT: Okay, Ms. Portillo, thank you very much. Please watch your step as you step off the witness stand.

THE WITNESS: Okay. Thank you.

(WITNESS EXCUSED)

THE COURT: People, you need the interpreter for the next witness?

MS. SINGAS: No.

THE COURT: Mr. Interpreter, thank you very much.

THE INTERPRETER: I'll stay here, if you'd like.

THE COURT: Thank you.

MS. TEBBETT: The People call Detective Robert Dunn.