R O B E R T D U N N, Detective, called as a witness by and on behalf of the People, having been first duly sworn, testified as follows:

THE CLERK: Please be seated. State for the record your name, spelling your last name, give your rank, shield number and command.

THE WITNESS: Detective Robert Dunn, D-U-N-N. Shield 552, Special Victims' Squad, Nassau County Police.

THE COURT: Ms. Tebbett.

MS. TEBBETT: Thank you, Judge.

DIRECT EXAMINATION

BY MS. TEBBETT:

Q Good morning, Detective Dunn.

A Good morning.

Q Can you tell us who you work for?

A I work for the Special Victims' Squad.

Q Is that with the Nassau County Police Department?

A Yes, it is.

Q Can you tell us what the Special Victims' Squad is?

A Special Victims' Squad is assigned to investigate sex crimes.

Q And what is your position there?

A I'm a Detective.

Q And how long have you been a Detective with the Special Victims' Squad?
A Five years.
Q Where were you employed prior to that?
A I was assigned to the Third Squad prior to that.
Q And how long were you assigned to the Third Squad?
A Approximately, seven years.
Q And can you tell us how long all together you worked with the Nassau County Police Department?
A Thirty-seven years.
Q And can you explain to us what your duties and responsibilities are as a detective now in the Special Victims' Squad?
A We are assigned to all felony sex crimes that are investigated by the Special Victims' Squad.
Q Were you working as a Detective in the Special Victims' Squad back on September 9th of 2007?
A Yes, I was.
Q And were you notified on that day of an arrest made by the Hempstead Police Department of an individual by the name of Ricardo Walters?
A Yes, I was.
Q And can you explain to us how you became notified of that arrest?

A Approximately 11:30 in the morning I was called at home by a Sergeant Dorsey from the Third Squad.
Q And what was the purpose of him notifying you of that arrest?
A He notified me because they felt they knew there was an existing pattern of sex crimes in the Hempstead area, they thought this defendant was possibly a subject involved in the patterns.
Q Let me ask you about that pattern. When was that pattern established?
A The pattern was established in November of '06.
Q And who were the detectives assigned to the investigation of that pattern?
A Pattern involved rapes and robberies. I was assigned for the sexual crime part of it. And Detective Lavelle consider from the Robbery Squad was assigned for the robbery pattern.
Q Was there a particular geographic area that was involved in the incidents in the pattern?
A Yes, Hempstead.
Q And was there a similar description of the perpetrator of the incidents in that pattern?
A Yes, there was.
Q Were you familiar with what that was?
A Yes.

Q What was it, just generally?
A Male black, dreads, stocky build.
Q And was there anything similar about the victims that were involved in the incidents that were part of that pattern?
A Yes. The victims in the case were all female Hispanics.
Q Now, did you learn anything when you were notified the morning of September 9th of 2007 about the nature of the incident that that individual was arrested for?
A Yes. I learned that he was arrested for a robbery occurring within the Village of Hempstead.
Q Did you learn when that had occurred?
A On September 9th, I'm sorry, approximately 5:30 in the morning.
Q Did you learn where he was arrested?
A Yes. Greenwich Street and Totten Street within the Village of Hempstead.
Q Are you familiar with that area in Hempstead?
A Yes.
Q And do you know whether there is a church that is located in that vicinity by the name of St. Loretto?
A I think it's our Lady of Loretto. It's just north of the location.

Q Approximately, how far from that location of Totten Street and Greenwich Street is that church located?
A Approximately a block.
Q Now, can you tell us what you did after you were notified of this arrest?
A I responded to Hempstead Police Department.
Q And what was your purpose in going to Hempstead Police Department that morning?
A To assist in the investigation.
Q Do you know about what time you got there?
A Approximately 12:30, one o'clock in the afternoon.
Q And can you tell us who else was present at Hempstead Police Department when you got there?
A Well, there were a number of Hempstead Police Officers, Sergeant Dorsey from the Third Squad, Detective Wimberly from the Third Squad, and Detective Lavelle from robbery squad.
Q Can you just tell us what was happening in the Hempstead Police Department at the time when you got there?
A There was a lot happening, but mostly the defendant was being processed. They were waiting for people to respond from Rikers Island, a lot of paperwork being processed.
Q Did you have an opportunity to observe the

individual that had been arrested?
A Yes.
Q Okay. And can you tell us what you observed him?
A He was in a holding room in the basement of Hempstead Police Department.
Q And can you describe for us what he looked like when you observed him?
A Male black, dreads, stocky build, approximately in his 30's.
Q Okay. And did you learn his name to be Ricardo Walters?
A Yes, I did.
Q And do you see that individual sitting anywhere in the courtroom today?
A Yes, I do.
Q Can you just point out where you see him sitting and identify him by an article of clothing?
A Rear table, wearing, looks like -- hard to see the color -- brown jacket.
MS. TEBBETT: Your Honor, indicating the defendant.
THE COURT: Yes.
MS. TEBBETT: Your Honor, could I also have this marked as People's 39 for identification.
THE COURT: People's 39 for ID.

(Whereupon, the referred to item is received and marked People's Exhibit 39 for identification)

THE COURT OFFICER: People's 39 marked for identification.

MS. TEBBETT: Can I have it shown to the witness, please.

(Handed to the Witness)

A Thank you.

Q Detective Dunn, take a look at that. Do you recognize the individual depicted in that photograph?

A Yes.

Q Who is that?

A That's the defendant.

Q And does that photograph fairly and accurately depict how he looked when you observed in Hempstead Police Department on September 9th of '07?

A Yes, it does.

MS. TEBBETT: Your Honor, I offer that into evidence.

MR. LEMKE: No objection, your Honor.

THE COURT: Without objection, People's 39 will be received in evidence.

(Whereupon, the referred to item previously marked for identification is received and marked People's 39 in evidence)

THE COURT OFFICER: People's 39 marked and received into evidence.

(Handed to the witness)

Q Detective Dunn, during the time you're at the Hempstead Police Department that morning, did you learn any pedigree information about the defendant?

A Yes.

Q And did you learn where he lived?

A Yes.

Q Where was that?

A Marvin Avenue in Hempstead.

Q Did you learn whether or not he was employed at that time?

A Yes.

Q Was he employed?

A Yes.

Q Where was he employed?

A New York City Corrections Department.

Q And did there come a time during the time that you were in the Hempstead Police Department that employees or personnel from the New York City Department of Corrections arrived?

A Yes.

Q Do you recall who those individuals were?

A There was a Captain Navoy; a long Italian name, I

forget it, I don't want to repeat it, I'm not positive; an attorney for the defendant came from the union for the Corrections Officers.

Q Were those individuals present in the Hempstead Police Department during the time you were there that afternoon?

A Yes.

Q Now, did you learn during the time you were at the Hempstead Police Department whether or not the defendant had any weapons registered to him?

A Yes, I did.

Q Okay. What did you learn about him?

A I learned he had four handguns registered to him.

Q And did you learn the whereabouts of those handguns?

A Yes.

Q Where were they?

A One was on his person when he was arrested, three other handguns were in his home.

Q And did you learn what happened to those weapons on that particular day, the ones that were at the home?

A Yes. On that date people from the Corrections Department recovered one of the weapons from his house. Two other weapons were in a safe. They were subsequently recovered from them once they got the combination to the

safe.

Q Subsequent to that date, did you make any arrangements to retrieve those weapons from Corrections?

A Yes, I did.

Q Can you explain for us what arrangements you made to do that?

A We received subpoenas that were served on the Corrections Department to recover the weapons.

Q Do you know approximately when that was?

A First weapon I recovered in September 25th of '07. The last ones were in October of this year -- the other two, I'm sorry, were October of this year.

MS. TEBBETT: Your Honor, at this time we do have a stipulation I ask be entered into evidence so that I can read it at this time.

THE COURT: Yes.

MS. TEBBETT: I guess, as People's 40.

THE COURT: People's 40 in evidence.

MS. TEBBETT: Should we make it a Court Exhibit?

THE COURT: No. We'll leave it as People's 40 in evidence.

Mr. Lemke, I take it, you reviewed the stipulation and agree to it?

MR. LEMKE: We entered into it, yes. It's

agreed upon, your Honor.

THE COURT: Okay. Do you want to read it at this time?

MS. TEBBETT: If I can.

(Whereupon, the to referred item is received and marked People's Exhibit 40 in evidence)

THE COURT OFFICER: People's 40 marked and received into evidence.

MS. TEBBETT: Thank you.

THE COURT: All right. Members of the jury, Ms. Tebbett is about to read a stipulation that has been agreed to by both the prosecution and the defense. What that means is, that stipulation which she is about to read is to be treated as evidence, as though the witness -- the people she will be referring to had testified to those matters that are contained in that stipulation. So, it's to be treated by you as evidence -- as testimony, as if you heard it from the witness stand.

Go ahead, Ms. Tebbett.

MS. TEBBETT: Thank you, Judge.

If called to testify, Captain Gregory Navoy of the New York City Corrections Department would testify to the following facts:

One, he has been employed by the New York

City Corrections Department for nineteen years and on September 9th of 2007 he was a Captain in the Investigations Division of the New York City Corrections Department.

Two, Ricardo Walters, a New York City Corrections Officer, was arrested on September 9th, 2007, and was being held at the Hempstead Village Police Department.

Three, according to New York City Corrections Department Regulations and Procedures, all members of service must register all personal firearms with the Corrections Department.

Four, on September 9th, 2007 Ricardo Walters had registered four weapons with the Corrections Department: A 9mm black Glock that he possessed at his arrest, a stainless steel Smith and Wesson handgun, model 6946, serial number VJC 9532, a black Sig Sauer firearm, model P226, serial number U488980, and a black Glock handgun, model 19, serial number BCR580US.

Five, according to New York City Corrections Department Rules and Regulations, once a member of service is arrested or suspended, all firearms registered with the department to that member of service must be confiscated by Corrections personnel.

Six, that on September 9th, 2007, Captain

Gregory Navoy responded to the Hempstead Police Department and effectuated a suspension of Ricardo Walters and pursuant to policy and procedure, effectuated the paperwork pertaining to the surrender of Ricardo Walters' firearms.

Seven, that on September 9th, 2007, Captain Gregory Navoy responded to Walters' residence at 132 Martin Avenue, Hempstead, and recovered a stainless steel Smith and Wesson handgun, model 6946, serial number VJC 9532, which was retained by the Department of Corrections. That on September 25th, 2007 the New York City Corrections Department released that stainless steel Smith and Wesson handgun, model 6946, serial number VJC 9532, registered to the defendant, to Detective Robert Dunn, pursuant to a subpoena.

And number nine, that weapon is People's 19 in evidence.

If called to testify, Investigator Thomas Lynch would testify to the following facts:

One, he has been employed by the New York City Corrections Department for twenty years and that in September of 2007 he was an investigator assigned to the Investigations Division of the Corrections Department.

Two, that on September 21st, 2007,

Investigator Thomas Lynch responded to Walters' residence at 132 Martin Avenue in Hempstead, and pursuant to New York City Corrections Department Rules and Regulations, recovered one black Sig Sauer firearm, model P226, serial number U488980, with a magazine, registered to Ricardo Walters, as well as one black Glock handgun, model 19, serial number BCR580US, registered to Ricardo Walters. And both of these handguns were retained by the Department of Corrections.

Three, that on October 8th, 2008, the New York City Corrections Department released the black Sig Sauer firearm, model P226, serial number U488980, with a magazine registered to Ricardo Walters, as well as a black Glock handgun, model 19, serial number BCR580US, registered to Ricardo Walters, to Detective Robert Dunn, pursuant to a subpoena.

Four, the black Sig Sauer firearm, serial number U488980, is People's Exhibit 20 in evidence. And the Glock model 19, serial number BCR580US, is People's Exhibit 21 in evidence.

THE COURT: All right. Members of the jury, that stipulation that has been marked in evidence will be available to you during jury deliberations, as I indicated, the same with any other piece of evidence or

testimony here in the case.

Go ahead, Ms. Tebbett.

MS. TEBBETT: Thank you.

DIRECT EXAMINATION (CONTINUED)

BY MS. TEBBETT:

Q Now, Detective Dunn, at some point you received each of those firearms from the Corrections Department?

A Yes.

Q And can you tell us what you did with them?

A The first firearm I gave for forensic evidence purely, and it was test-fired to be examined.

Q That was the one that was on him when he was arrested?

A No. That's the second one, the one I got on the 25th, the stainless steel. The other two firearms I put into the property bureau.

Q And were they invoiced in the Property Bureau?

A Yes.

Q Can you just explain for us what it means for something to be invoiced?

A It's kept in a secure -- in the Property Bureau of the Police Department in a secure facility so when I want it, I can get it and nobody else can get it.

Q And did there come a time that you retrieved those three firearms from the Property Bureau?

A Yes.
Q I'm going to show you what is now in evidence as People's 19, 20 and 21.
(Handed to the witness)
Q Detective, take a look at those items.
A Okay. Which one do we want to do first?
Q We can start with 19. Do you recognize the one that has the marking 19?
A Yes, I do.
Q Do you recognize that particular item?
A Yes, I do.
Q Is that one of the firearms that you retrieved from Corrections Department pursuant to the subpoena?
A Yes, it is.
Q And take a look at 20.
A As soon as I get this one back in. Yes, I have it.
Q Do you recognize that one?
A Yes, I do.
Q And is that, also, one of the firearms that you retrieved from the Corrections Department pursuant to subpoena?
A Yes, it is.
Q And now just take a look at 21.
A I have it.

Q Do you recognize that one?
A Yes, I do.
Q Is that also one of the firearms registered to the defendant that you had retrieved from the Corrections Department?
A Yes, it is.
Q Now, Detective Dunn, let me bring your attention to February of 2008. Were you still working as a detective in the Special Victims' Squad in February of 2008?
A Yes, I was.
Q And specifically, the date of February 29th of 2008, were you working on that day?
A Yes, I was.
Q And on that day, were you called upon to assist in the preparation of a lineup to be conducted that day at the offices of the Robbery Squad?
A Yes.
Q And can you tell who was the subject of the lineup that was going to be conducted on that day?
A The defendant, Ricardo Walters.
Q And who were the viewers going to be of the lineup that was going to be conducted on that day?
A Victims in the various cases.
Q Were you familiar with who those women were?
A Yes.

Q And were there other members of the Nassau County Police Department that were involved in the arrangements to set up that lineup on that particular day?

A Yes.

Q Can you tell us who that -- who they were?

A Detective Lavelle, Lieutenant -- my supervisor, Lieutenant Zito, Detective Perez, Detective Morales, both Spanish speaking officers, we needed their assistance, Detective Bartels and Detective Finn.

Q Can you just explain to us Detective Dunn how a lineup is composed?

A A lineup is composed of the defendant, plus five, what is called, fillers, five people similar looking in appearance to the defendant. They are kept in a viewing room. On the other side of the viewing room is a one-way glass that the victim can look through and see the defendant and the defendant cannot see her.

Q What is the purpose of a lineup?

A The purpose of a lineup is for the victims to be able to see if the victims can identify the defendant as the subject.

Q And can you just explain for us how the arrangements were made for this particular lineup?

A For this particular lineup we got fillers -- we got fillers from a homeless shelter in Brooklyn, brought

them in. I don't know if you want me to get into that, how we brought them in.

The fillers were picked up in Brooklyn.

Q Okay. And can you explain for us how the fillers for this lineup were selected?

A Fillers were selected, Detective Bartels and Detective Finn went to Brooklyn and picked out five what they felt were the best candidates to be part of the lineup.

Q Were they looking for any particular physical characteristics in selecting who the fillers were going to be?

A Yes. We wanted male blacks. We wanted people with facial hair. And we wanted people approximately the same age as the defendant.

Q And how many fillers were selected and brought to the Robbery Squad?

A Five.

Q And what were the characteristics of those five fillers that were selected and brought to the Robbery Squad?

A They were all male blacks, all within a range of the same age as the defendant, and they all had facial hair.

Q Do you know who brought them to the Robbery Squad?

A Detective Bartels and Detective Finn.

Q Where were those individuals brought once they

were brought to the Robbery Squad?

A Brought directly into the viewing room.

Q And where is that located within the building that houses the Robbery Squad?

A The viewing room is in approximately the middle of the building on the -- if I get my directions -- on the north side of the building.

Q And did they use any particular entrance when they arrived at the Robbery Squad?

A Yes. There's an entrance door right next to where the viewing room is. They entered through the side door.

Q And did there come a time when the defendant arrived at the Robbery Squad?

A Yes.

Q And where was he brought in the Robbery Squad?

A He was brought in through an interview room in the Robbery Squad.

Q Was anyone with him in that interview room?

A He was brought there by myself and Detective Lavelle. But he was left in the interview room, which is a closed room, there is no windows, only one door in or out.

Q Was anyone else in the room with him during that time?

A On and off, yes.

Q Who was with him?
A Mr. Lemke and Mr. Schaeffer, another attorney at the time, and I was in and out.
Q And anyone else besides those individuals that you mentioned and yourself?
A Not that I recall.
Q And did there come a time that the victims of the incidents that were involved in this particular pattern were brought to the Robbery Squad, as well?
A Yes.
Q And how were those arrangements made to bring them there?
A They were brought in by Detective Perez and Detective Morales with the assistance of other detectives, once again, because they spoke Spanish. All the victims spoke Spanish. They were brought into the building from the front door, which is on the west side of the building.
Q And where were they brought once they were brought in the front door?
A They were brought into a conference room, which is in the front of the building.
Q And who was with them in that conference room?
A Detective Morales, Detective Perez and Detective McCauley.
Q From where that conference room is located in

that building, how would you get to where the lineup room is located in that building?

A I'm sorry, say that again.

Q From where that conference room is located in the building, how do you get from there to where the lineup room is located?

A There's an interior hallway.

Q From the conference room, can you see the lineup room?

A No, you can't.

Q Do you have to go through any doors or how do you work there?

A You have to go through an interior hallway through two sets of doors to get to where the viewing room is.

Q Did there come a time that individuals were brought into the lineup room, itself?

A What do you mean by individuals; you mean fillers or the viewers?

Q Not talking about the viewers, yet. Were the fillers brought into the lineup room?

A Yes.

Q Did there come a time that the defendant was brought into the lineup room?

A Yes.

Q Okay. What happened once the fillers and the defendant were brought into that room?

A At that point the defendant was given the option to -- there are six -- I should explain how the lineup room is set up.

There are six chairs against the curtain that the defendant and the fillers sit in. And the defendant is given the option to pick a number from one to six and which chair he wishes to sit in.

Q And was this defendant afforded that opportunity?

A Yes.

Q And did he select a number?

A Yes.

Q What number did he select initially?

A Number 4.

Q And were the other five individuals that were the fillers given numbers?

A Yes. They were asked to pick at random where they wished to sit? When they sat, they were given numbers to correspond to where the seat was.

Q Did there come a time then that those five individuals and the defendant each had numbers and were seated in the chairs in that room?

A Yes.

Q And were they seated in sequential order based on

the numbers that they had?

A Yes.

Q What are the numbers on?

A The numbers are on pieces of cardboard that are held up for the viewing.

Q So, if you were looking at that from left to right, how do the numbers read?

A One to six.

Q Which number was the defendant in that line?

A 4.

Q Now, Detective Dunn, prior to everyone being given their numbers and seated in the chairs in that lineup room, were any safeguards utilized by yourself and the other detectives to ensure that the defendant and the fillers looked similar or that nothing stood out between the defendant and the fillers?

A Yes. They are given knit caps to wear because not all the fillers had the same hair type as the defendant. And they are given a sheet that they hold up, only viewed from, basically, from the neck down, and the sheet is held up against the chin.

Q And was the lineup, once it was arranged with those items, with the numbers, with everyone seated in the chairs, was it memorialized?

A Yes.

Q How was that done?

A We have a Crime Scene detective photograph it.

Q And was a photograph taken of that lineup?

A Yes.

MS. TEBBETT: Your Honor, I ask this be marked People's Exhibit 41.

(Whereupon, the referred to item is received and marked People's Exhibit 41 for identification)

THE COURT: People's 41 for identification.

THE COURT OFFICER: People's 41 marked for identification.

MS. TEBBETT: Could I have it shown to the witness?

(Handed to the witness)

THE WITNESS: Thank you.

Q Detective Dunn, take a look at that. Do you recognize what that is?

A Yes, I do.

Q What is that?

A That is a picture of the lineup that was done that day, in the viewing room, in the Robbery Squad.

Q And how do you recognize that picture?

A I recognize it because I was there when it was taken.

Q Okay. And does that picture fairly and

accurately depict how the lineup looked when it was first arranged on that day?

A Yes, it does.

MS. TEBBETT: Your Honor, I offer that into evidence.

MR. LEMKE: No objection, your Honor.

THE COURT: All right. People's 41 will be received in evidence.

(Whereupon, the referred to item previously marked for identification is received and marked People's Exhibit 41 in evidence)

THE COURT OFFICER: People's 41 marked and received into evidence.

(Placed on the presenter)

Q Detective Dunn, can you see that from where you're sitting?

A Yes.

Q Okay. Is there a number 4, an individual with a card with number 4 on it?

A Yes.

Q And who is that?

A That's the defendant.

Q Is that him here, where I'm pointing, to the card with the number 4, sort of in the middle of this photo?

A Yes.

Q Is this what the lineup looked like when the first woman was brought in to view it?
A Yes.
Q So let me ask you about that. Were you familiar with a woman by the name of Delmy Morales?
A Yes.
Q And were you familiar with her particular case and the incident that had occurred to her?
A Yes.
Q Were you the detective assigned to that case?
A No, I wasn't.
Q Were you familiar with it in connection with the pattern that you and Detective Lavelle were working on?
A Yes.
Q Okay. And do you know when and where her incident occurred?
A Her incident occurred in November -- November of '06.
Q And do you know what area?
A Hempstead.
Q And did there come a time that Delmy Morales was brought in to the viewing room for the lineup?
A Yes.
Q Can you describe for us the viewing room?
A Okay. I mean, as you can see in the picture, the

far side of that, what you're looking at, is the wall. In that wall is a small window with one-way glass. And to the left of the people that are looking at you is where the door is to come in and out of the room.

Q Were there any individuals present in the viewing room?

A Yes, Detective Bartels.

Q And the room where the women were going to be brought to look at the lineup, who was present there?

A I was in the room, Detective Lavelle, Lieutenant Zito, yourself, Mr. Lemke, and part of it changed, depending on which Spanish speaking detective brought which victim in, it was either Perez or Detective Morales.

Q Were you present in that room when Delmy Morales was brought in?

A Yes.

Q And who brought her?

A I'm sorry, I don't recall whether it was Perez or Morales.

Q Are you familiar with Officer Rafael Morales?

A Yes.

Q Is there anything I could show you that would refresh your recollection as to who brought in Delmy Morales?

A Yes.

Q Just take a look at this, Detective Dunn.
(Handed to the witness)
Q And tell us if that refreshes your recollection as to who assisted Delmy.
A Bear with me one moment please. Yes, it does.
Q Who is that?
A Detective Perez.
Q And is there a section in the piece of paper I just handed you, on the right side, which it says, Assisted by?
A Yes.
Q And who -- take a look at that and tell us if it refreshes your recollection as to who assisted Delmy Morales.
A Yes. It says Detective Morales.
Q Is that now Officer Morales, Rafael Morales?
A Yes.
Q He was a detective at that time?
A Yes, he was.
Q Now he's an officer?
A Yes, he is.
Q Did there come a time that he brought Delmy into the room to view the lineup?
A Yes.
Q Did he assist her in that room?

A Yes.
Q He speaks Spanish?
A Yes, he does.
Q And so does she?
A Yes.
Q And did you observe Delmy Morales look through that window with the one-way glass that you described to us?
A Yes, I did.
Q And did she speak in Spanish while she was in that room?
A Yes.
Q Did you understand what she was saying?
A I -- well, no, not really.
Q You don't speak Spanish?
A No, I don't speak Spanish.
Q All right. Where was she taken after she viewed that lineup through the one-way glass?
A She -- she was taken by Detective Morales to another room in the building, separated from everything else.
Q Was the room she was taken by then Detective Morales the same conference room where she was brought in initially?
A No. A private room, just her and Detective Morales.

Q Now, after Delmy viewed the lineup, did there come a time that a woman by the name of Delsy Sanchez came in to view that lineup?

A Yes.

Q Are you familiar with that particular woman, Delsy Sanchez?

A Yes.

Q Are you familiar with the incident that had occurred to her, when it occurred or where it occurred?

A It occurred in 2005. I'm sorry, I forget the exact date. I believe it was also November of 2005.

Q What area did that occur?

A In Hempstead, on South Franklin, in Hempstead.

Q And was that also one of the incidents in the pattern that you and Detective Lavelle were working?

A Yes, it is.

Q Now, what number was the defendant when Delsy Sanchez came in to view the lineup?

A Number 4.

Q And was that his number also when Delmy Morales viewed the lineup?

A Yes.

Q Did anything change from the time that Delmy and Delsy came in to view the lineup?

A No.

Q Okay. Now, tell us what happened, who brought Delsy Sanchez in to the room to view the lineup?
A Detective Perez.
Q And who is Detective Perez?
A She's another detective assigned to the Special Victims' Unit.
Q Does she speak Spanish, if you know?
A Yes, she does.
Q Did Detective Perez assist Delsy Sanchez in the viewing room to look through that window of the one-way glass?
A Yes, she did.
Q Did Delsy Sanchez speak Spanish when she was in that room?
A Yes.
Q Was that with Detective Perez?
A Yes.
Q And were there other individuals present when Delsy Sanchez viewed the lineup?
A Yes.
Q Who was present?
A Myself, Detective Lavelle, yourself, Mr. Lemke. I don't remember -- Mr. Schaeffer left at some point. I don't remember exactly at which point he left.
Q How much time did Delsy Sanchez spend in that

room, viewing the lineup?

A It was a matter of seconds. I don't know exactly -- on the lineup sheet it would say how long they were there. I don't know how long she was there.

Q A matter of seconds?

A Yes.

Q How about Delmy Morales, the first woman who viewed the lineup, how much time did she spend viewing it?

A Seven seconds.

Q What happened once Delsy Sanchez looked through the window and viewed the lineup?

A She conversed with Detective Perez.

Q Was she taken somewhere with Detective Perez?

A Yes.

Q Do you know where she was taken?

A Another room within the building, separated from everybody else.

Q All right. Now, did there come a time, Detective Dunn, that same afternoon, that a woman named Ilsa Morales came in to view the lineup?

A Yes.

Q Now, did something change in the composition of the lineup prior to Ilsa Morales viewing the lineup?

A Yes.

Q And can you explain for us what happened?

A The defendant requested to change seats.
Q And what happened when the defendant requested to change seats?
A I was notified, I don't remember exactly by who, that he wished to change seats. I said, fine, he can pick whatever seat he wants. He changed his seat to number 5.
Q Did he pick which seat he wished to change to?
A Yes.
Q Which seat did he choose?
A Five.
Q Was he allowed to change to seat number 5?
A Yes.
Q What happened to the individual who had been in seat number 5?
A He switched to number 4.
Q After the defendant switched to seat number 5, was that composition of the lineup memorialized?
A Yes.
Q How was that?
A Crime Scene detective took another photograph.
MS. TEBBETT: Your Honor, I ask to have this marked as People's 42.
THE COURT: Okay, 42.
(Whereupon, People's Exhibit 42 is marked for identification)

THE COURT OFFICER: People's 42 is marked for identification.

MS. TEBBETT: Could I have that shown to the witness.

(Handed to the witness)

Q Detective Dunn, take a look at that. Do you recognize what is marked People's 42 for identification?

A Yes, I do.

Q What is it?

A A Crime Scene photograph of the rearranged lineup.

Q Does that photograph fairly and accurately depict how the lineup looked once the defendant changed his seat to number 5?

A Yes, it does.

MS. TEBBETT: Your Honor, I offer that into evidence.

MR. LEMKE: No objection, your Honor.

THE COURT: All right, without objection, People's 42 will be received in evidence.

(Whereupon, the referred to item previously marked for identification is received and marked People's 42 in evidence)

THE COURT OFFICER: People's 42 marked and received into evidence.

(Placed on the presenter)

Q Detective Dunn, take a look at this photograph up here on the screen. Do you see a number 5 sitting in this photograph?

A Yes, I do.

Q Who is the individual that is seated in number 5 in this photograph?

A The defendant, Ricardo Walters.

Q And this is him over here towards the right side of the photograph?

A Yes.

Q Okay. And the individual who is now in number 4, is that the individual who had been in number 5 in the earlier photograph I showed you, People's 41?

A Yes, it is.

Q How about numbers 1, 2, 3 and 6, were they the same or did they change?

A They remained the same.

Q All right. Is this how the lineup looked when Ilsa Morales came in to view the lineup that afternoon?

A Yes, it is.

Q Okay. And do you recall who brought her in to view the lineup, was that Detective now officer Morales, as well?

A Yes, it was.

Q Okay. And do you know which incident Ilsa Morales was involved in?

A The robbery in November of '05.

Q Was that the same incident as Delmy Morales?

A Yes.

Q And who else was present in the room when Ilsa Morales was brought in by then Detective Morales -- no relation, right?

A No.

Q Who else was present when he brought Ilsa Morales in to view the lineup?

A I was present, Detective Lavelle, Lieutenant Zito, yourself, Mr. Lemke.

Q What language did Ilsa Morales speak?

A Spanish.

Q And did Detective Morales assist her in the lineup room?

A Yes, he did.

Q And did you see her look through that window with the one-way glass?

A Yes, I did.

Q How much time did she spend looking through that window?

A A matter of seconds.

Q Did she have any conversation with Detective

Morales in that room in Spanish?

A Yes.

Q And then was she taken out of that room by him, as well?

A Yes.

Q Do you know where she was brought?

A Another room within the building.

Q Okay. All right. Now, Detective Dunn, also on that same date of February 29th of 2008, did you have occasion to collect some evidence from the defendant, himself, on that day?

A Yes, I did.

Q And can you explain for us what evidence you collected from the defendant?

A I completed a buccal swab collection kit, which is a collection kit for DNA.

Shall I explain how it's done?

Q Yes. Please explain that for us.

A Basically, it's a kit, comes with two long Q-tips that are one for each side of -- of somebody's mouth. You rub the Q-tip on the cheek of their mouth and it collects cells an saliva for DNA analysis.

Q And where did that take place?

A Within the interview room in the Robbery Squad.

Q Was anyone else present with you and the

defendant when that took place?

A Yes. Mr. Lemke and Mr. Schaeffer.

Q And can you explain for us physically what you had to do and what you used to collect that evidence?

A It's a kit. It comes in an envelope which is sealed. You have to open the seal, and within that is a sealed -- another sealed package with the Q-tips in there, a pair of Latex gloves and some forms you have to fill out and a collection envelope. Once it's done, is sealed up within the collection envelope for when it's sent to the lab.

Q Tell us exactly what you did.

A The seal is opened up. The card is filled out. The defendant has to thumbprint, his thumbprinting is on the card for identification purposes. Then I put on the Latex gloves. I have to open up the seal for the Q-tips, rub one on each side of the defendant's mouth. Then those Q-tips have to sit and air-dry for five minutes. Then they're sealed up within the kit.

Q Is that what you did on this particular day?

A Yes.

Q To collect that evidence from the defendant?

A Yes.

Q Tell us what you did with the envelope once you sealed it back up with those Q-tips, as you described, inside?

A The envelope is invoiced and forwarded to the Forensic Evidence Bureau. From there it's forwarded to the DNA lab.
Q What happened to that envelope while you were in the offices of the Robbery Squad in the afternoon?
A It was in my possession.
Q Did you bring it with you somewhere after you left Robbery Squad that day?
A Yes.
Q Where did you bring it?
A Police Headquarters.
Q Tell us what you did with it there?
A In Police Headquarters it goes in a locker where it is then subsequently retrieved by the Forensic Evidence Bureau.
Q Did that --
A Not a locker, a refrigerator. A locked refrigerator in the main office.
Q Did that envelope remain with you during that day, February 29th of 2008, until you received it, brought it back to that locked refrigerator in Headquarters?
A Yes.
Q What condition was the envelope in during the time it remained with you?
A Sealed.

Q And what condition was it in when you brought it to that locked refrigerator in Headquarters?
A Sealed.
Q And who has access to that locked refrigerator?
A The Forensic Evidence Bureau.
Q And was that particular envelope assigned an invoice number?
A Yes.
Q Do you recall what that was?
A I believe, 55.
Q And was any other items of evidence assigned that same number of 55?
A No.
Q Did you make any requests with respect to that buccal swab kit for any analysis to be performed?
A Yes. When you invoice something, property invoice sheet, that is also a lab analysis request -- it's called a Police Department Form 301 -- telling the lab what you want done with it. And I requested it be analyzed for DNA evidence.
Q Are you familiar with the process of how evidence that's entered into that locked refrigerator arrives at the DNA Lab?
A Yes.
Q How does that work?

A It's taken by somebody who works in the Forensic Evidence Bureau. It's transported to the DNA Lab. The Lab is in East Meadow or the office of the morgue at the Nassau University Medical Center.

Q What condition is the envelope in when it's in that locked refrigerator and during the time when it's being transported over to the DNA Lab?

A It's sealed.

MS. TEBBETT: May I have one moment?

(Pause in the proceedings)

Q And that particular invoice number, Detective Dunn, would be 55 of this year, of '08?

A Yes.

MS. TEBBETT: Thank you. I have nothing further.

(Continued on next page)

THE COURT: Members of the jury, this looks like a good time to take our morning break. We'll be back here in about five or ten minutes. Just follow my officer out. We'll be right back, okay.

(A recess was taken.)

COURT OFFICER: Jury entering.

(Whereupon, the jury entered the courtroom.)

THE COURT: Mr. Lemke, any questions?

MR. LEMKE: Yes, your Honor, thank you.

CROSS-EXAMINATION

BY MS. LEMKE:

Q. Good afternoon, Detective Dunn.

A. Good afternoon.

Q. Detective Dunn, directing your attention to February 29th of this year --

A. Yes, sir.

Q. -- regarding the lineup procedures and so forth. The lineup was conducted in, I call it, the Bellmore office?

A. Yes.

Q. And it was conducted certainly with notice to myself, I guess the district attorney's office, that we were certainly going to have a lineup on that day?

A. Yes.

Q. And there came a point in time in the afternoon on February 29th of '08 that I had arrived, we had a

conversation, perhaps brief at that point, if you recall?
A. Yes.
Q. And we, at some point, waited for, as we refer to them as, fillers to arrive in order then to arrange for the lineup, correct?
A. Yes.
Q. And there came a point in time, obviously, that the fillers had arrived, they were placed into the room as depicted within this photograph and there was an opportunity to pick a number, meaning myself on behalf of my client, or if my client had a lucky number, to pick a number, correct?
A. Yes.
Q. And that afternoon, it may have been more like -- I think the first one, was it about 4:00?
A. I'm sorry?
Q. Do you recall the time that the lineup was finally put together?
A. The first viewing was approximately 4:30.
Q. And prior to bringing in the first individual who I believe was Ms. Morales I believe, right?
A. One of the two, yes.
Q. Delmy Morales. There are two sisters, Morales sisters, correct?
A. Yes.
Q. And they were from an incident, a robbery that had

occurred a few years earlier, correct?

A. Yes.

Q. And I think you had testified that those two sisters were, something about the case, as you recall, that they had been together regarding the robbery, correct?

A. I'm sorry, say that again.

Q. I think November 9, '06 I believe was their date, if you recall?

A. I believe so, yes.

Q. When they were in the other room and I say "they," Delmy Morales was also in the other room with Delsy Sanchez, correct?

A. I believe they were both in the conference room, yes.

Q. The other Morales, Ilsa Morales, if you know, was back at the store that the two sisters ran, correct?

A. Yes.

Q. And so at about 4:00 or 4:30 when Delmy Morales was brought in, her sister, Ilsa Morales was at the store, was not present, correct?

A. Yes.

Q. Ms. Delmy Morales is brought in and the viewing area, looking into where the lineup was, was a number of detectives and, of course, myself and I believe you, as well I think the prosecutor was there as well, correct?

A. Yes.
Q. And when she's brought in, Ms. Delmy Morales is brought in, I think by Detective Morales and there was another individual, another detective that brought in Delsy?
A. I didn't get the question, I'm sorry.
Q. Delmy Morales was brought in to view the lineup by whom?
A. I believe Detective Morales.
Q. He's now Officer Morales?
A. Yes.
Q. When did he become officer?
A. Fairly recently.
Q. Now, Delmy comes in, she views the lineup with Detective Morales present and then she speaks to the detective in Spanish, correct?
A. Yes.
Q. And she walks out, correct?
A. Yes.
Q. And then whatever --
A. Well, she's escorted out.
Q. She's escorted out by, at that point, what you recall, from Detective Morales, correct?
A. Yes.
Q. Then they are brought to a separate area, correct?
A. Correct.

Q. And whatever may be discussed is then perhaps reduced to writing or recorded by Detective or now Officer Morales?

A. Yes.

Q. And you aren't present during that conversation, correct?

A. No, sir.

Q. A few minutes go by, and at that point the second individual that's brought in is Delsy Sanchez, correct?

A. Yes.

Q. Delsy Sanchez is now brought in by Detective Perez, correct?

A. Yes.

Q. Very similar circumstances, inside our little viewing area would be myself, the prosecutor, yourself, maybe perhaps another detective or two and then that is when Delsy Sanchez is brought in. She has a brief conversation with Detective Perez in Spanish, correct?

A. Yes.

Q. And they walk out, correct?

A. Yes.

Q. And they go to perhaps another area, they have a conversation among themselves, correct?

A. Yes.

Q. There may be some notes or some type of statement

that was recorded, but that would be between Delsy Sanchez and, at that point, Detective Perez, correct?
A. Yes.
Q. You are not present during that conversation, correct?
A. No, sir.
Q. You are not present during any interpretation or interpreting between what Ms. Sanchez is discussing with Detective Perez and so forth, correct?
A. No, sir.
Q. Now, at this time there is, as you recall, there is a break for maybe about a half hour, correct?
A. I think it was probably closer to an hour, but yes.
Q. Because there needed to be an individual, maybe another detective, to take Delmy Morales back to her store so her sister can now be brought in to look at the lineup, correct?
A. Yes.
Q. Because both sisters weren't together in that area waiting to come in to view the lineup, correct?
A. Correct.
Q. And at some time, it might have been about an hour later, that is when Ilsa Morales is brought in to view the lineup, correct?
A. Yes, sir.

Q. Now, the lineup changes during that time, correct?
A. Yes, sir.
Q. At his request, Mr. Ricardo Walters is now in a different seat, correct?
A. Yes.
Q. That's again depicted in People's evidence as, I believe the second lineup as depicted in People's 42 in evidence, correct?
A. Yes.
Q. She's brought in. When I say "she," that's Ilsa or Elsa Morales. Do you recall who brought her in?
A. I believe Detective Morales.
Q. The same Officer Morales, right?
A. Yes.
Q. And he's the same one that brought the other sister in, correct?
A. Yes.
Q. And they have some conversation at that point, correct?
A. Yes.
Q. In Spanish?
A. Yes.
Q. They leave, correct?
A. Yes.
Q. To maybe have a conversation somewhere else,

correct?

A. Yes.

Q. You are not present during that conversation, correct?

A. No, sir.

Q. Now, you're somewhat, I take it, familiar with this case, Detective, correct?

A. Yes.

Q. There was not at all during the lineup, or, for that matter, at any time, a discussion about Sara Sandoval coming in to view this lineup, correct?

A. I'm sorry, what was the question?

Q. Sara Sandoval was not ever brought to any lineup, correct?

A. No.

Q. Nor was Shamika Dottin.

Do you know who Shamika Dottin is?

A. Yes, I do.

Q. She was not brought to the lineup either, was she?

A. No.

Q. Finally, there was, during the time that we were either waiting, you were waiting -- not to make myself a witness, but as you were waiting, there was a buccal swab taken, correct?

A. At some point, except I don't remember if it was

before we started or in the middle, but at some point it was done.

Q. Of course, that was taken in a small room with myself present with Mr. Walters, correct?

A. And Mr. Schaeffer too.

Q. Mr. Schaeffer as well.

Kind of a long Q-tip swabbed the inside of Mr. Walters' mouth, correct?

A. Two of them, yes.

Q. And now that then is placed into an evidence -- perhaps an envelope, to protect the integrity of that, correct?

A. Yes, sir.

Q. And then it's placed into the freezer at that point or refrigerator?

A. Refrigerator, yes.

Q. And you have -- you make a notation on that envelope. Was it yourself that, I think, initialed it?

A. Yes.

Q. And at what point in time did that envelope with the buccal swab in it leave, I would say -- did it remain in Bellmore? It doesn't remain in Bellmore in evidence, does it?

A. My office is in police headquarters. When I left Bellmore, I went to police headquarters. The envelope went

with me.

Q. It gets taken over there. Of course, there is a chain of custody. It's either signed out for and then there's a notation made at police headquarters, correct?

A. Yes.

Q. At what point in time was that then sent to be tested, do you know?

A. I don't know.

Q. You didn't take it?

A. It goes to the Forensic Evidence Bureau. They take it. I don't know exactly what day they took it.

Q. You didn't have any further dealings with that buccal swab, with that piece of evidence? I think it was 55-08, I believe. Was that the number?

A. Yes.

Q. You didn't have anything further to do with that, did you?

A. No. Once I secure it in the refrigerator, it's the property of the Forensic Evidence Bureau.

Q. Okay. Thank you, Detective Dunn.

THE COURT: Anything, Ms. Tebbett?

MS. TEBBETT: No, your Honor.

THE COURT: Okay, Detective, thank you very much.

(Whereupon, the witness was excused.)

THE COURT: People, your next witness.

MS. SINGAS: Judge, we need a few minutes because they are upstairs in the holding area.

THE COURT: Yes. Is it going to be more than that?

MS. SINGAS: No, five minutes.

THE COURT: Member of the jury, rather than have you sit there, why don't you step out. We'll have you back here in about five minutes, okay.

(Whereupon, the jury exited the courtroom.)

COURT OFFICER: Jury entering.

(Whereupon, the jury entered the courtroom.)

THE COURT: People, your next witness.

MS. TEBBETT: People call Detective John Lavelle.

THE COURT: John Lavelle, detective.

D E T. J O H N L A V E L L E, Shield #601, assigned to the Robbery Squad of the Nassau County Police Department, having been called as a witness on behalf of the People, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: State your name for the record, spelling your last name. Give your rank, shield number and command, please.

THE WITNESS: Detective John B. Lavelle,

L-A-V-E-L-L-E, shield 601, Nassau County Police Department Robbery Squad.

THE COURT: Ms. Tebbett.

MS. TEBBETT: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. TEBBETT:

Q. Good afternoon, Detective Lavelle.

A. Good afternoon.

Q. Could you just tell us, please, who you work for?

A. I work for the Nassau County Police Department.

Q. And where are you currently assigned as a detective?

A. To the Robbery Squad.

Q. And can you explain for us what the Robbery Squad is?

A. The Robbery Squad investigates bank robberies, jewelry store, precious metal store robberies, the robberies of armored cars. We also investigate pattern robberies.

Q. And how long have you been a detective in the Robbery Squad?

A. Approximately four-and-a-half years.

Q. And what was your assignment prior to that?

A. I spent ten years in the Third Squad and, prior to that, seven years in the Fourth Squad.

Q. And how long altogether have you worked for the

Nassau County Police Department?

A. Total of 29-and-a-half years.

Q. Now, were you working as a detective assigned to the Robbery Squad back on September 9th of 2007?

A. Yes, I was.

Q. And were you scheduled to work on that day?

A. That was my day off.

Q. And were you notified on that day of an arrest made by the Hempstead Police Department of an individual by the name of Ricardo Walters?

A. Yes, I was.

Q. And can you tell us who notified you of that?

A. Detective John Espina from the Third Squad called me at home.

Q. And did he request you to come to the Hempstead Police Department on that day?

A. Yes. He said that --

MR. LEMKE: Objection to what he said, your Honor.

THE COURT: Yeah, sustained as to anything he said. You want to rephrase that.

Q. Without telling us what he said, did he request you to come in in connection with the investigation of the arrest of that individual?

A. He suggested that I come in, yes.

Q. Did there come a point that you did, in fact, go into the Hempstead Police Department on that day?

A. Yes.

Q. Now, prior to that day, in connection with your assignment as a detective in the Robbery Squad, had you been working on a series of cases of incidents that occurred in Hempstead involving crimes of a similar nature with a similar description of a perpetrator of those incidents?

A. Yes, ma'am.

Q. And were you working on that series of cases with Detective Robert Dunn of the Special Victims Squad?

A. Yes, I was.

Q. And did you respond then to the Hempstead Police Department on that day also in furtherance of your investigation of those cases?

A. Yes, I did.

Q. And was one of those cases an incident that had occurred on November 9th of 2006?

A. Yes, ma'am.

Q. And did you become the assigned detective to that particular incident?

A. Yes, I was assigned the case when it went pattern.

Q. And can you tell us the location where that incident had taken place back on November 9th of 2006?

A. It happened on Fulton Avenue in Hempstead in front

of 116 and 118 Fulton Avenue.

Q. And can you tell us just generally what was the nature of that incident that had occurred there on that date?

A. Two female Hispanic victims had reported that while sitting in their vehicle they were approached by a male black armed with a silver handgun who had then proceeded to rob them.

Q. Can you tell us the names of those two Spanish females involved in that incident?

A. Ilsa Morales and Delmy Morales.

Q. Were they related to each other in some way?

A. They are sisters.

Q. And what language did Delmy Morales and Ilsa Morales speak?

A. Spanish.

Q. Now, can you tell us when you first became involved in the investigation of the incident that had occurred to them?

A. On December 6th of 2006 I was assigned the case by my commanding officer.

Q. And were you the detective that was investigating that particular incident?

A. From that point on, yes. The initial investigation was conducted by a detective from the Third Squad.

Q. Now, let me ask you about the area where this

incident took place, this area on Fulton Avenue. Can you describe for us what that area is comprised of on Fulton Avenue in Hempstead?

A. It's a business area of Fulton Avenue that comprises mostly retail stores with some office buildings and also a shopping center in that vicinity.

Q. And can you tell us what specifically is located at 118 and 116 Fulton Avenue?

A. They're part of a series of one-story retail stores.

Q. What type of stores, do you know?

A. 116A is a Western Union store. 118 is an empty store. I believe to the west of that there was, I believe, a pharmacy. To the east of that is another store. I think it's like a 99 cents store.

Q. Can you describe for us the layout of Fulton Avenue, itself in that particular stretch?

A. Fulton Avenue is a four-lane roadway running in an east-west direction. It's the part of Hempstead Turnpike, the Route 24. It's designated Fulton Avenue in Hempstead.

Q. How would you describe that area? Is it a busy area, a light traffic area?

A. It's busy during the day. At night it's quiet.

Q. Did you have occasion subsequent to the day that that incident occurred to visit that location on Fulton

Avenue?

A. Yes, I did.

Q. And did you have occasion to take some photographs of the area where this incident had occurred?

A. Yes.

MS. TEBBETT: Your Honor, can I have these marked for identification as People's 43, 44 and 45?

MR. LEMKE: Your Honor, I have seen them. I have no objection.

THE COURT: So 43 through 45 will be received in evidence without objection.

(Whereupon, People's Exhibits 43 through 45 were marked and received in evidence.)

COURT OFFICER: People's 43, 44 and 45 are marked and received into evidence.

MS. TEBBETT: Thank you. If they can be shown to the witness.

(Handed to witness.)

Q. Detective Lavelle, take a look at those three photographs. Can you tell us what those are photographs of? Start with 43.

A. 43 is a view looking in a southwesterly direction from Fulton Avenue towards the front of the stores at the place of occurrence.

Q. And the one that's marked 44?

A. 44 is pretty much a southward view of the same stores.
Q. And People's 45?
A. 45 is a south southeasterly view of the stores.
MS. TEBBETT: Can I just have those back so I can display them on the screen?
COURT OFFICER: (Handing.)
Q. Detective, can you see this from where you are sitting?
A. Yes, I can.
Q. Can you just point out for us what's in this photograph? What is the street that is running from left to right in the photograph?
A. The street that is visible is Fulton Avenue.
Q. And the two lanes that we can see in this photograph, does the traffic go in opposite directions or the same direction?
A. That view is of the eastbound lanes. There is two eastbound lanes and there is two westbound lanes. I took that photograph from the center of the street.
Q. And can you describe for us what's along the edge of the street here in the photograph (indicating)?
A. That's a parking area along the side of the road that's controlled by meters.
Q. And can you tell us what's on the other side of the

parking area with the parking meters? What are these here on top of the photograph (indicating)?

A. That's the stores that I described earlier that are located at the place of occurrence.

Q. Can you see in here the Western Union or the check cashing store that's located on Fulton Avenue?

A. Yes, I do.

Q. And where is that?

A. It's to the left center of the photograph directly behind the end of the car that's on the left end of the photograph.

Q. Is that where we see the storefront sign that says, Checks cashed?

A. Yes, ma'am.

Q. Let me put up for you People's 44. What is this view in this photograph?

A. That's the same view, just from a point going in a southeasterly direction. I moved to west of my prior photograph. I have also changed my position to the north side of Fulton Avenue.

Q. And what would be the cross street that would be towards the right-hand side of this photograph? What would be the cross street there with Fulton Avenue?

A. The north half of the intersection is Cathedral Avenue. The south half of the intersection is President

Street.

Q. Now, let me put up People's 45. What is the view in this photograph?

A. That's a view from the northeast corner of Fulton Avenue and Cathedral Avenue.

Q. And how many lanes of traffic are visible in this photograph on Fulton Avenue?

A. There is two eastbound lanes of traffic. There is two westbound lanes of traffic and there is also a westbound turn lane.

Q. And can you see that check cashing store in the background of this photograph?

A. Yes. It's directly behind the end of the white vehicle that is traversing during the time I was taking the photograph.

Q. And is that where the incident had occurred involving these women back on November 9th of 2006 in that vicinity of Fulton Avenue?

A. Yes.

Q. Now, was there a description given by Ilsa Morales and Delmy Morales of the individual who committed that incident against them back on November 9th of 2006?

A. Yes, there was.

Q. And what was the description that was given by Ilsa and Delmy Morales?

MR. LEMKE: Objection; hearsay, your Honor.

THE COURT: Yeah, sustained.

Q. Well, did they give you physical characteristics of the individual who committed the crimes against them that were reported to the police?

A. Yes, they did.

Q. And did they give you a description of that individual's height?

A. They described him as either six foot or six foot two.

MR. LEMKE: Objection, your Honor.

THE COURT: Sustained as to anything they said.

Q. Just yes or no, did they give you a description of his height?

A. Yes, they did.

Q. And did they give you a description as to whether or not that individual was male or female?

A. They actually gave a description to the Hempstead police officers that were taking the report at that time, but they did give descriptions to the Hempstead police officers.

Q. And was part of that description the gender of the individual?

A. Yes.

Q. And was part of the description that they gave the

race that of individual?
A. Yes, it was.
Q. And was part of that description the color of that individual's skin?
A. Yes, it was.
Q. And was part of that description the individual's build or sort of bode type or body size?
A. Yes, it was.
Q. And was part of the description that they gave the clothing that that individual was wearing?
A. Yes, it was.
Q. And was part of that description the approximate age of that individual?
A. Yes, it was.
Q. And was part of that description whether or not that individual committed this crime with any weapons?
A. Yes.
Q. And did they give a description of a particular color or describe the firearm that was used?
A. Yes, they did.
Q. And did they give a description that included anything regarding the individual's hair or whether or not that was covered?
MR. LEMKE: Your Honor, I'm going to object because it's leading. I have let some go, but.

THE COURT: I know. Overruled. You can answer that.

A. Yes.

Q. Now, when you went to the Hempstead Police Department on September 9th of 2007, did you have an opportunity to observe the individual that they had under arrest there by the name of Ricardo Walters?

A. Yes, I did.

Q. Can you describe what he looked like when you observed him there that day?

A. He was a male black, approximately five foot ten, approximately 250 pounds. He had a mustache and a beard, Fu Manchu type. He also had an unshaven look on both of his cheeks. He had short hair on the top that was tied into dreads. The dreads extended down past his shoulder. He was wearing a light blue dress shirt, a white T-shirt, blue uniform pants commonly worn by police officers or corrections officers, and he also had on black shoes.

Q. And do you see that individual sitting anywhere in the courtroom today?

A. Yes, I do.

Q. Could you please point out where you see him and describe an article of clothing that he's wearing today?

A. He's the male black sitting at the second table back from the railing. He's wearing a yellow shirt and a

brown suit.

MS. TEBBETT: Your Honor, indicating the defendant?

THE COURT: Yes.

Q. Now, Detective Lavelle, were you assigned as a detective back in the Robbery Squad back in February 29, 2008?

A. Yes, I was.

Q. Were you working on that day?

A. Yes, I was.

Q. On that day were you assisting in the preparation of a lineup to be conducted that day in the Robbery Squad?

A. Yes, I was.

Q. And who was the target of the lineup that was going to be conducted that day?

A. Ricardo Walters.

Q. And were there individuals that were going to come and view that particular lineup in connection with the series of cases that you had been investigating?

A. Yes.

Q. And were Ilsa and Delmy Morales two of the individuals that were going to come in and view that lineup?

A. Yes, they were.

Q. And can you explain for us what arrangements you made to have them brought to the offices of the Robbery Squad

on that day?

A. I had arranged for Officer Rafael Morales to pick them up one at a time from their store and bring them to the squad sequentially, one sister, who would then do the viewing. When she was done, she would then be brought back to the store and then the second sister was then picked up and transported to the Robbery Squad.

Q. Had Officer Morales been involved at all in your investigation of the incidents that involved Ilsa and Delmy Morales prior to the day of this lineup?

A. Officer Morales, who was a detective at that time, had been temporarily assigned to the Robbery Squad from the Gang Investigation Squad subsequent to my investigation into this case and was not involved in the investigation.

Q. And can you explain the reason why you requested his assistance on this particular day?

A. He's a Spanish interpreter who's fluent in Spanish.

Q. And can you just explain for us what his role was in the lineup preparations and the conducting of the lineup that day?

A. His only role was to pick up the two sisters, bring them to the building that we were using and then to stay with them while they viewed the lineup to interpret what their response was to viewing the lineup.

Q. And did you make arrangements with him to transport

Delmy Morales to the Robbery Squad that day?
A. Yes, I did.
Q. And did that, in fact, occur?
A. Yes, it did.
Q. And was she brought into the viewing area to view that lineup?
A. Yes, she was.
Q. And were you present for that?
A. Yes, I was.
Q. And were there any other members of either your squad or the Nassau County Police Department present when that occurred?
A. Yes.
Q. And who assisted Delmy Morales into the viewing room?
A. Officer Morales.
Q. And did you observe whether or not she looked into the viewing window to view that lineup?
A. Yes, she did.
Q. And did you observe whether or not she had any conversation in Spanish with Officer Rafael Morales?
A. Yes, she did.
Q. Now, at the time that Delmy Morales came in to view the lineup, can you tell us which number in the lineup was the target of the lineup?

A. Number four.
Q. And who was the individual that was number four when Delmy Morales came in to view the lineup?
A. Ricardo Walters.
Q. Now, had Officer Rafael Morales been involved at all in setting up the individuals and their numbers in the lineup?
A. No.
Q. Prior to him bringing in Delmy Morales to view the lineup, had you communicated to him who the target was of the lineup or what number the target was of the lineup?
A. No.
Q. And did there come a time that he escorted Delmy Morales out of the viewing room after she had viewed the lineup?
A. Yes.
Q. And did you make arrangements with him to bring her back to her place of business?
A. Yes, I did.
Q. And did he bring another woman to view the lineup after he brought Delmy back?
A. He brought her sister Ilsa back.
Q. And can you explain for us, was there any change in the composition of the lineup during the time that Rafael Morales was bringing Delmy back and bringing Ilsa there?

A. Ricardo Walters had moved his seat to seat number five.

Q. And did you communicate at all with Officer Rafael Morales about the fact that the defendant had changed his seat number?

MR. LEMKE: Your Honor, again, I don't mind what, if anything, was said. They're all leading questions. I'm objecting to the leading questions.

THE COURT: Yeah, sustained.

Q. What, if any, communications did you have with him during the time that he was transporting one woman back and bringing the other woman to your office?

A. None.

Q. And did you have any conversations with him once he arrived back at your office with Ilsa Morales?

A. No.

Q. And can you tell us what he did once he brought Ilsa Morales back to your offices where the lineup was being conducted?

A. She was down at the conference room at the opposite end of the building. When I signalled to bring her down, he walked her the length of the hall down into a separate hall which led to the lineup room. He walked her into the lineup room. They went to the window and viewed the lineup at that time. After several seconds, they then exited the room.

Q. And did they have any conversation in Spanish in the room?

A. They had a short conversation in the room. Then, as I was walking them down a short hallway which leads to the main hallway, they had a further conversation in Spanish.

Q. And, Detective Lavelle, can you explain for us what your role was in the setting up of and the conducting of the lineup on that day?

A. I was, more or less, managing the lineup, ensuring there was no contact between witnesses and victims that had seen the lineup with any witnesses or victims who had not seen the lineup. We make sure that there is no cross contamination or no contact between pre-viewing and post-viewing.

THE COURT: Ms. Tebbett, are you finished?

MS. TEBBETT: Yes, your Honor.

THE COURT: Members of the jury, we're going to take our luncheon break at this time. When you leave, please don't speak amongst yourselves or anyone else about the case.

Don't form any opinions about the case.

Don't view or visit any of the areas described.

Please don't read any accounts in the media, should there be any.

Follow my officers. We'll see you back here at 2:00.

(Whereupon, the jury exited the courtroom.)

(A luncheon recess was taken.)

A F T E R N O O N S E S S I O N

(Whereupon, the following takes place in open court, outside the presence of the sworn jury and alternates, all parties being present)

THE COURT: I wanted to ask if Detective Lavelle can join us from outside.

J O H N L A V E L L E, Detective, recalled as a witness, having been previously duly sworn, resumed the stand to continue sworn testimony as follows:

THE COURT OFFICER: Ready?

THE COURT: Yes, bring them in.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE COURT: All right, members of the jury. We're ready to proceed with the cross-examination.

Mr. Lemke.

MR. LEMKE: Thank you, your Honor.

CROSS EXAMINATION

BY MR. LEMKE:

Q Good afternoon, Detective.

A Good afternoon.

Q Detective, on December 6th of '06, would it be correct to state that at that time you were then made aware of an incident which had occurred on November 9th of '06

regarding two sisters, Delmy and Ilsa?

A Yes, sir.

Q And I take it, at that point, would you be then assigned as the carrying detective on that file?

A Yes, sir.

Q And as such, you would review any documents, review any evidence that would have been collected up to that point from the incident of November 9th of '06?

A Yes, sir.

Q And you had testified on direct that in doing so there was a description that you testified to in response to Ms. Tebbett's questioning as to the individual that they had described, meaning, the Morales sisters, correct?

A Yes, sir.

Q And part of your investigation on December 6th and in reviewing various documents, would you have reviewed a 32 from the Morales sisters?

A 32Bs, yes, sir.

Q 32B. A 32B is basically a statement that either an officer wrote for them based upon conversations that each one of them may have had with an officer, correct?

A Yes, sir.

Q And whether or not it was initially written in Spanish and then translated to English, that would be for the officer that was involved at that time, correct?

A Yes, sir.

Q And you testified that during your review of the file, that you had a profile of a male black, am I correct?

A Yes, sir.

Q Somewhat stocky build?

A Yes, sir.

Q And part of that would be from your reviewing the 32Bs of the Morales sisters, correct?

A Yes, sir.

Q And isn't it true that -- they did give a height, as you had been asked by Ms. Tebbett, correct?

A That's correct.

Q And isn't it true that from a review of Ilsa Morales's 32B, that the height she gave was six foot two inches tall?

A Can I refresh my memory by looking at the 32B?

Q Would anything refresh your recollection, such as a 32B of Ilsa Morales?

A Yes, sir.

MR. LEMKE: Okay. If I could have this marked for identification purposes, please.

THE COURT: Defendant's B.

(Whereupon, the referred to item is received and marked Defendant's Exhibit B for identification)

THE COURT OFFICER: So marked Defendant's B

for identification.

Q Detective, I ask you to take a look at that. Perhaps, read it to yourself, in part, and I'll ask you questions if that in fact refreshes your recollection as to their description at that time.

(Handed to the witness)

(Pause in the proceedings)

A Okay.

Q In reviewing Ilsa Morales's 32B, you are now, as the carrying detective, are going to put together basically a profile of the individual you would be looking for, correct?

A Yes, sir.

Q And at that point you have to take the descriptions from both sisters, to be fair, correct?

A Yes, sir.

Q Ilsa's description is somebody about six-two?

A Yes, sir.

Q And at what time of day or night was this incident?

A I believe it was approximately ten a.m.

Q Ten a.m., in the morning?

A Yes, sir.

Q Offhand, do you recall what the weather was like at that time?

A No, sir.
Q Whether it was clear or whether it was rainy or so forth; you don't know at this point?
A No, sir.
Q But it was in the morning?
A Yes, sir.
Q And in looking at and refreshing your recollection from this document, they also gave you a description of the clothes or the clothing that this individual was wearing, correct?
A Yes, sir.
Q And, in fact, the individual is described as wearing blue jeans, correct?
A Yes, sir.
Q Not a prison uniform or not something that looks like official pants or trousers, correct?
A That's correct.
Q But jeans?
A Jeans.
Q You also had a description of the shoes that the individual was wearing from the incident of November 9th of '06, and that would be sneakers, correct?
A Yes, sir. White sneakers.
Q So now, you're again looking, trying to put together, here's an individual with jeans, sneakers, about

six foot two, male black, right?
A Yes, sir.
Q What about the shirt that this individual or sweat shirt; what was he wearing?
A Dark hooded sweat shirt.
Q Dark hooded sweat shirt. And anything -- a blue baseball cap?
A Yes, sir. A baseball cap.
Q So, again, on November 9th, as you have this file before you, the description you're now getting is of a male black -- what about facial hair; mustache, right?
A Yes, sir.
Q Okay. In either of the supporting depositions from the Morales sisters, they don't describe at all this individual having dreads, do they?
A No, sir.
Q So, the profile of the individual that assaulted these -- robbed these two women from November 9th when you -- withdrawn.
When you reviewed the file and began to put this together on December 6th, was in -- in fact, again, to be fair, the sister Delmy Morales indicated the individual was six foot tall, correct?
A Yes, sir.
Q So, we've got somebody between six foot and

six-two, black, stocky, neither of them describe anyone with dreads, whatsoever, correct?
A Yes, sir.
Q No beard, correct?
A A mustache.
Q A mustache. Wearing jeans and sneakers, correct?
A That's correct.
Q Now, on November 9th of '07, when you're called to the Hempstead Police Squad, is that when you first see Mr. Ricardo Walters?
A That's the first time I met him, yes.
Q And he -- he had dreads, much like he has now, correct?
A Yes, sir.
Q Wasn't wearing blue jeans, correct?
A He wasn't.
Q Wasn't correct?
A That's correct.
Q Let me withdraw the question.
Do you recall what he was wearing at that time on September 9th of '07?
A Blue uniform pants.
Q Certainly not blue jeans?
A No, sir.
Q Not white sneakers?

A No, sir.
Q Not a baseball cap?
A No, sir.
Q Not a sweat shirt?
A No, sir.
Q And he had dreads, much like I said?
A Yes, sir.
Q Had a mustache, though, right?
A Yes, he did.
Q Now, in 2008 you participated in the lineup in this case, correct?
A Yes, sir.
Q And as part of that lineup there were a number of detectives that were there, including Detective Dunn and so forth, correct?
A Yes, sir.
Q An each of the detectives at that point had various assignments regarding complaining witnesses, the victims, to be brought into the Bellmore Robbery Squad, correct?
A Yes, sir.
Q Because you had a number of carrying detectives that were assigned to each number of these cases, correct?
A It was -- at that point it was just Detective Dunn and myself.

Q And in putting together the lineup, there was a point in time regarding the Moraleses, that one sister was first brought to the Robbery Squad, correct?
A Yes, sir.
Q And was that -- did you go at that time to bring her?
A No, sir.
Q That was Officer or detective -- Officer Morales, correct?
A Yes, sir.
Q You don't know what was discussed in the car at that time, nor what was said to that Morales sisters, correct?
A No, sir.
Q Now, and later that afternoon he, Officer Morales, then brought -- I'm sorry, Detective, brought back one of the Morales sisters back to the shop to pick up the other one, correct?
A That's correct.
Q You weren't with him at that time, either?
A No, sir.
Q You don't know what the conversation was, correct?
A That's correct.
Q And when the other sister was then brought back

to the Robbery Squad, she was then brought in by Detective Morales to view the lineup, correct?

A That's correct.

Q Okay. Both sisters, Morales sisters, were you present when they met with Detective Morales after viewing the lineup to prepare any notations regarding the lineup?

A No, sir.

Q Okay.

MR. LEMKE: Nothing else. Thank you.

THE COURT: Okay. Any redirect, Ms. Tebbett?

MS. TEBBETT: Just one moment, Judge.

THE COURT: Yes.

(Pause in the proceedings)

MS. TEBBETT: No, I don't have anything further.

THE COURT: Okay, Detective. Thank you very much. You may step down. Watch your step.

(WITNESS EXCUSED)

THE COURT: People, your next witness.

MS. TEBBETT: Your Honor, the People call Police Officer Rafael Morales.

R A F A E L M O R A L E S, Police Officer, called as a witness by and on behalf of the People, having been first duly sworn, testified as follows:

THE CLERK: Please be seated. State your

name for the record, spell your last name, give your rank, shield number and command.

THE WITNESS: Police Officer Rafael R-A-F-A-E-L, Morales, M-O-R-A-L-E-S. Shield number 1032, assigned to the Bureau of Special Operations.

THE COURT: Ms. Tebbett.

MS. TEBBETT: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. TEBBETT:

Q Good afternoon, Officer Morales.

A Good afternoon.

Q Can you tell us where you currently work?

A Bureau of Special Operations.

Q Is that part of the Nassau County Police Department?

A Yes, it is.

Q And can you tell us what is the Bureau of Special operations?

A It's basically a SWAT team and we're Street Anticrime.

Q What is your position there?

A Police officer on the SWAT team.

Q How long have you been assigned to the Bureau of special Operations, currently?

A About a month and-a-half now. And then

previously seven and-a-half years.

Q And how long, all together, have you worked for the Nassau County Police Department?

A I'm in my 16th year.

Q What was your assignment prior to this most recent assignment with the Bureau of Special Operations?

A Assigned to the Special Investigations Squad, Gang Section.

Q What was your position there?

A I was a Detective in the Gang Squad in investigating gang crimes.

Q And how long did you have that assignment?

A Three years.

Q And can you explain for us how you changed from that assignment back to the Bureau of Special Operations?

A It was a request. I wanted to go back to the SWAT Unit, so I just went back.

Q Okay.

A You have to be a police officer. So, I gave my gold shield in and became a police officer again.

Q All right. Thank you.

Now, Officer Morales, do you speak Spanish?

A Yes, I do.

Q And how well do you speak Spanish?

A My whole life, fluent.

Q And have you been called upon to speak Spanish and translate for the Nassau County Police Department?
A Yes.
Q And how long have you been called upon to translate either English to Spanish or Spanish to English for the Nassau County Police Department?
A My entire career.
Q Now, Officer Morales, let me bring you back to February of this year, specifically, the date of February 29th of 2008. What was your assignment on that particular day?
A I was assigned, temporarily assigned, to the Robbery Squad for a gang robbery case, working out of the Robbery Squad.
Q And is that in Bellmore?
A Yes, it is.
Q Now, on that particular day, February 29th of 2008, were you given a specific assignment for that day?
A Yes. I was requested to assist the Robbery Squad guys in a case they were doing. They needed a couple of females who didn't speak English to be picked up and brought to the facility.
Q And what was your role in connection with what the Robbery Squad Detectives were arranging that day?
A They were setting up a lineup.

Q And what were you asked to do?
A Basically, pick them up, transport them there. When they were asked to come into the office, I was supposed to bring them into the lineup. Take a statement if need be, and return them back to their place of business or wherever their home was or wherever they came from.
Q Is that because those individuals spoke Spanish and you spoke Spanish?
A Yes.
Q Now, prior to that date, had you had any involvement during your assignment at the Robbery Squad with the investigation of any of the incidents that were involved in that line?
A No.
Q Did you have any knowledge as to who the subject or target was of the lineup that those detectives were arranging that day?
A No.
Q Did you know the name of the individual at that time?
A No.
Q Were you involved in any of the arrangements that were happening at the Robbery Squad, in terms of physically setting up the individuals for the lineup?
A No.

Q Now, did there come a time that you went to pick up a woman by the name of Delmy Morales?

A Yes.

Q And where did you pick her up from?

A At her place of business in Hempstead.

Q Can you tell us what you did after you picked up [Delmy] Morales at her place of business?

A Transported her to Bellmore facility. We arrived there, signed her in to a conference room. She went into the conference room. Basically, I waited outside. I was told to wait outside until they requested her to come into the lineup.

Q Did there come a time that the other detectives requested her to come view the lineup?

A Yes.

Q Did you assist her with that?

A Yes. Brought her from the conference room, to the lineup room.

Q Tell us what you did in the lineup room?

A Well, on the way there, I told her, Be calm. She was nervous. I told her that she would be going into a room. When she walked in, there was going to be a glass, look through the glass. There would be gentlemen in there with numbers on their chests. And she was supposed to look through the glass, see if she recognized anyone. If she

did, you know, say whatever number. And that was it.
Q And at the time that you brought Delmy Morales into that lineup room, did you know which number in the lineup was the target of the lineup?
A No, I didn't.
Q Without telling us anything that was said, did you speak with her in Spanish?
A Yes.
Q And did she view the lineup in your presence?
A Yes.
Q And what did you do with her after that?
A Once she saw, you know, said a number, I told her, okay. We walked out and I brought her into a coffee room which is about fifty, sixty feet away from the lineup room.
Q Was anyone else present in that coffee room when you brought Delmy in there?
A No, it was just her and I.
Q What did you do with her after you brought her into that coffee room; did you take her anywhere?
A After that room?
Q After that.
A No. I took her home, back to her place of business after we're done. I took a statement from her.
Q Okay. Can you tell us what you did when you

brought her back to her place of business?

A Well, on the way there, I explained to her that I was going to bring her sister back. She wasn't -- when I brought her in there, she wasn't supposed to speak to her sister at all. She was supposed to go in, and I'm bringing her sister out and they're not to speak to each other.

Q Did you observe whether or not they did speak to each other?

A No, they didn't speak to each other.

Q Did you bring her sister, transport her from the place of business?

A Yes.

Q And was that Ilsa Morales?

A Yes.

Q And at that time did you have any knowledge as to which number in the lineup the target was?

A No, I had no idea.

Q Where did you bring Ilsa?

A Same place, Bellmore facility, in the conference room.

Q Did you wait with her there?

A No. Again, I was directed to wait outside until they called for her.

Q Did there come a time that you brought her somewhere?

A Into the lineup room, yes.
Q Okay. Can you tell us what you did when you brought her from the conference room, to the lineup room?
A Did exactly what I did with her sister. I explained into her, you know, she was going to walk into a room. She's going to look through the glass. There were going to be gentlemen, again, with numbers on them. If she recognized anyone, say the number. And that would be it. If she didn't recognize anyone, then she didn't recognize anyone.
Q Were you present with her in that viewing room before the lineup?
A Yes.
Q Without telling us anything that was said, did you speak with her in Spanish?
A Besides telling her to look through the window, that was about it.
Q I'm sorry, I didn't hear the end of what you said.
A That was about it.
Q Okay. At the time that you brought Ilsa Morales in to view the lineup, were you aware at that time which number the target was in the lineup?
A No, I did not.
Q Were you aware whether any changes had been made

in the composition of the lineup between the time that you brought Delmy in and the time you brought Ilsa in?

A At that time, no. I didn't know anything.

Q Can you tell us what you did after Ilsa Morales viewed the lineup?

A Same exact thing. Left the lineup room and walked into the coffee room.

Q Did you have any conversation with her? Without telling us what was said, did you have any conversation with her in the coffee room?

A Yes.

Q Did you speak -- after you brought her back into the coffee room, did you speak to any of the other detectives that were involved in the lineup that was being conducted that day?

A After we went into the coffee room? Yes, I spoke to Sergeant Giambrone after.

Q Who is Sergeant Giambrone?

A He's the commanding officer of the Robbery Squad.

Q Did you bring Ilsa Morales anywhere after you had brought her into the coffee room and after you had spoken to Sergeant Giambrone?

A Yes. I brought her back to her place of business.

Q And did there come a time that you learned who

the individual was that was the target of the lineup?
A At the end, yes. When it was all done.
Q When, do you know at what point you learned that?
A After everybody was brought back and we were just there in the room back at Robbery Squad.
MS. TEBBETT: Thank you. I have nothing further.
THE COURT: Anything, Mr. Lemke?
MR. LEMKE: Yes.
CROSS-EXAMINATION
BY MR. LEMKE:
Q Officer Morales, on February 29th of '08 you were asked to respond to a location to pick up Ms. Morales or one of the Morales sisters, correct?
A Yes.
Q And the first one you were going to bring back to the Robbery Squad to view the lineup was Delmy, correct?
A I believe it's Delmy, yes.
Q You went to their place of business in Hempstead, correct?
A Yes.
Q You were by yourself, correct?
A No. There was another detective with me from the Robbery Squad.
Q What was the name of the detective?

A Manny Nash.

Q I'm sorry?

A Detective Nash.

Q Nash, N-A-S-H, right?

A Yes.

Q When you go with Detective Nash, you had not, nor had Detective Nash, called earlier to inform the Morales sisters that they would be required to come back to Bellmore to view a lineup, correct?

A They were called and told that they were being picked up to view a lineup, yes.

Q Was that by you?

A I believe it was me, yes. Could have been me.

Q So, you called them up and you explained to them that, obviously, it was regarding an incident that they were involved in, correct?

A I didn't talk to them about the incident. I told them they will be picked up for the lineup.

Q Did they at some point tell you -- well, in fact, they told you, we have two of us here. We can't both leave. So one will come with you, and then you -- then come back and pick up the other one, so they didn't have to close their shop, correct?

A Correct. It was a Friday night, they were busy. They didn't want to close their shop.

Q So, you drive there with Detective Nash. At that point, Delmy gets in your vehicle to come back and view the lineup, correct?
A Correct.
Q It's your understanding that the lineup they're viewing is to see if she can identify who she believes had robbed them previously, correct?
A She's viewing someone for something, yes.
Q Well, for something. You went with Detective Nash, right?
A Right.
Q This wasn't a situation where you were unaware of the incident, correct?
A Some incident. I didn't get into any details.
Q But you knew it was for a robbery that had occurred?
A For a robbery, yes. It's the Robbery Squad.
Q And the sisters -- if the sisters had asked you, what am I going to view, what's in front of me? It's not like somebody breaks into the store. They would know it is for a robbery that they were involved with, when they were robbed early in November, correct?
A I didn't get into any conversation about their incident.
Q What about Detective Nash?

A He can't speak to them.
Q Because he can't speak Spanish, correct?
A That's correct.
Q Only you can, correct?
A That's correct.
Q So now, you drive back with the one sister, Delmy. And when you bring Delmy back to the Robbery Squad, you place her into an area where there are other women at that point in time, correct?
A In the conference room. There were other witnesses there, yes.
Q And there may have been other detectives coming in and out, correct?
A There were a few detectives in there, yes.
Q And at some point in time, perhaps, at about maybe 4:35 p.m., you brought Delmy into an area to view through a window, to view a lineup, correct?
A Yes.
Q You brought Delmy into that area, correct?
A Yes.
Q And there were a number of individuals in that room, including myself and the prosecutors, correct?
A Yes.
Q And at that point in time you told Delmy in Spanish, in sum and substance, to look --

(Phone ringing)

THE WITNESS: Sorry, I had that off, too.

Q -- to look through the window and see if they can identify anyone, correct?

A Yes. We brought them in, told her to identify someone there, yes.

Q Of course, that's in Spanish?

A Correct.

Q And at that point she says something to you in Spanish, correct?

A Yes.

Q And you bring her back out, correct?

A Yes.

Q You take her to a separate area, not to be in any way mixed with the other witnesses, correct?

A Coffee room.

Q I'm sorry?

A It's a coffee room. It's a coffee room.

Q Into a coffee room. And at that time you sit down with Delmy and you take a statement from her, a supporting deposition, don't you?

A For a positive identification, yes.

Q For a positive identification. But you just told this jury on direct you didn't know who the target was.

A I didn't know who the target was.

Q Right. She picked out a number?
A Yes, she did.
Q You don't know what that number -- who that number was associated with, according to your testimony, correct?
A That's right.
Q But subject -- subject to police procedure, if somebody comes in to view a lineup, when you then bring that person back out, you take a supporting deposition, regardless of who they pick out or if they viewed someone and they're unsure, correct?
A Usually, if it's a positive identification, you take the statement.
Q Right, if they identify anyone.
A If they identify anyone.
Q And if they don't identify somebody, anybody, isn't it procedure to take a statement and write down, again, I viewed on such and such a date, such and such a lineup, I did not identify anyone, correct?
A I don't think I have ever done one for a negative.
Q I'm sorry?
A I don't think I've ever down one for a negative.
Q How many negatives have you had?
A Probably done about six or seven lineups. I

don't recall doing any negatives.

Q Were there any negatives in those six or seven?

A I don't think so, no.

Q So, everyone you brought in had identified somebody, right?

A Yes.

Q Never had one, and I guess you didn't know what to do if somebody didn't pick out anybody, correct?

A That's probably so, yes.

Q So now, in this case, you bring out Delmy and you write down in Spanish and read to her basically what she had observed and the number she picked out, correct?

A Correct.

Q And it's at that point now that you then drive her back, maybe only takes ten minutes or so, to the store so that you can bring her sister now to the lineup, correct?

A That's correct.

Q And did you go back with Detective Nash?

A No. This time it was Detective Finn.

Q And when you go back, I take it one detective went in to bring back one sister before you brought in the other sister so they wouldn't have any conversation?

A Actually, Detective Finn stayed with her, the first one.

Q Right.

A On the way I told her, when we get out of the car, I'm going to go in first. I'm going to tell your sister not to speak to you, and you're not to speak to your sister either.

So, I walked into the store first.

Q This is all in Spanish, correct?

A Correct.

Q And you had already known that she had picked out somebody, correct?

A She picked out a number.

Q Now, when you bring back -- this is Ilsa, correct?

A Yes.

Q You now bring Ilsa back on February 29th. You bring her back in. Do you put her at that point in that same room to wait to make sure that the individuals are ready to bring her in to view it?

A Yes.

Q And she's there probably only about five minutes or so, right?

A Yeah.

Q Correct?

A I would say so.

Q You bring her in, much like you did her sister; you give her instructions in Spanish, correct?

A Yes.
Q And now she looks through a window, correct?
A Correct.
Q And she looks -- do you know how long she was looking for?
A Ten seconds, maybe.
Q Okay. And, in fact, she says something to you in Spanish, correct?
A Yes, she does.
Q That she is not sure, correct?
A I'm not sure, (speaking in Spanish).
Q No identification, at all?
A I'm sorry?
Q No identification?
A She's not sure.
Q She didn't pick out a number, correct?
A At that point, no.
Q Now, that's with everybody around at that time, correct?
A Correct.
Q You now leave, you take her outside that room, correct?
A Yes.
Q To take her to the coffee room, correct?
A Yes.

Q It's at that time that she has a conversation with you, correct?

A Yes.

Q Okay. It's at that time that she tells you a number, correct?

A What she says is that she is very sorry, she was nervous.

Q Right.

A And she wasn't sure.

Q Right.

A She thought it was a number.

Q She thought it was a number?

A Yes.

Q So, of course, now you, because of your experience in this, you know you have -- she picks out a number, doesn't she?

A Yes, she does.

Q So, you sit down with her and you get a statement from her, much like you did with her sister Delmy. Only an hour before that Delmy had signed what she just observed, right?

A No. What I did --

Q Yes or no?

A No, I didn't make a statement like her sister.

Q You did not?

A No, I don't think I did. No.
Q In fact, at that point in time, even though she gives you some number, you don't bother taking a 32B, a deposition, do you?
A I don't do a 32B, no.
Q That would be somebody else, is that correct?
A I think I made a statement.
Q Did you sign a statement that Delmy had made?
A You have to show me that.
MR. LEMKE: Yes. Perhaps this can be marked for identification purposes.
THE COURT: C.
(Whereupon, the referred to item is received and marked Defendant's Exhibit C for identification)
THE COURT OFFICER: Defense C marked for identification.
MR. LEMKE: If that can be shown to the officer, please.
(Handed to the witness)
THE WITNESS: Thank you.
Q That's a statement in Spanish, correct, Officer?
A I would like to read it first, please.
Q Is it in Spanish?
A I'm sorry?
Q It's in Spanish?

A Yes, it's in Spanish.
Q Thank you, Officer.
A This is the first statement from the first girl.
Q Okay. so there's no confusion, the first girl is Delmy?
A Yes.
Q That is a statement that she gives to an officer in Spanish after she looked at this lineup, correct?
A Yes.
Q After you had brought her in to look at this lineup?
A Correct.
Q When you bring her back out, that is signed by Delmy Morales, correct?
A Yes, it is.
Q Is that not your signature?
A No, that is my signature.
Q It is your signature. So, you did take a statement from her?
A Yes. I thought you meant the second girl, I'm sorry.
Q We'll get there.
A I'm sorry?
Q So here Delmy gives you a number. Delmy signs it and you sign it, correct?

A Yes.
Q You take her back. You bring back the other sister. The other sister goes in and in front of everybody says, I'm not sure, correct?
A Yes.
Q And then when you're alone with her, it's your testimony she tells you, now she picks out a number?
A She says I'm not sure, I think it's number so and so.
Q Okay. So, there's a number she picks out?
A Correct.
Q So, much like you did with the other sister, you sit down with her, you write a statement that she viewed the lineup, came out, picked out a number that she identifies, you asked her to sign it, and you signed it; did you do that?
A No, I did not.
Q You did not. In fact, you take her back, you drop her home, correct?
A No.
Q What do you do with her?
A I told her to wait. I went and spoke to Sergeant Giambrone first.
Q Okay. You spoke to Giambrone and you come back and then she gives a statement?

A No. I wrote a statement. I was directed by the Sergeant, because it was not positive at the window, just to write what she stated to me; and that's what I wrote.

Q So, here she picks out a person, you don't ask her to write a statement, like her sister did, but you make a note to yourself, that you sign yourself, about something she said to you, correct?

A Correct.

Q That's at that time?

A Yes.

Q Was Ilsa there?

A That's right.

Q And Ilsa was available to sign the statement, as well, wasn't she?

A That's right.

Q And you didn't ask her to, did you?

A No, I didn't.

Q But now you take her -- is it at that time you take her?

A Yes. After I took her back to her business.

Q When you took her back to her place of business before dropping her off, did you get a statement from her about who she picked out?

A No, we didn't.

Q Did you ever?

A No, I didn't. No.
MR. LEMKE: I have nothing further.
THE COURT: Anything, Ms. Tebbett.
MS. TEBBETT: Just briefly, if I could, Judge.

REDIRECT EXAMINATION

BY MS. TEBBETT:

Q Officer Morales, after Ilsa Morales viewed the lineup and you went in and had that conversation with your Sergeant, Sergeant Giambrone, were you following his directions or was it your call to decide how to proceed at that point?
A His direction.
Q Okay. Did you do what he instructed you to do?
A Yes, I did.
Q Now, was it a note that you made to yourself or was it something that he directed you to write down and give to the case detective?
A He directed me to write what she said and give it to the case detective; and that's what I did.
Q At that time that you were having that conversation with Ilsa Morales in the coffee room, where she indicated to you, I think it's a number whatever, did you know at that time who the individual was that was associated with that number?

A No, I don't.

Q And did you know at that time which number out of all the numbers in the lineup was the subject of the lineup?

A No, I did not.

MS. TEBBETT: Okay. Thank you.

THE COURT: Anything, Mr. Lemke?

MR. LEMKE: Nothing else.

THE COURT: All right, Officer Morales. Thanks very much.

THE WITNESS: Thank you, sir.

THE COURT: Watch your step as you step off.

THE WITNESS: Yes, sir.

THE COURT: People, your next witness.

MS. SINGAS: Yes. The People call Delsy Sanchez.

THE COURT: Does she need the interpreter?

MS. SINGAS: Yes, she does.

THE COURT: All right, members of the jury. We're just waiting. We're told the interpreter will be here momentarily.

(Pause in the proceedings)

THE COURT: You know if I excuse you, when the last one of you walks out the door, that's when the interpreter will come through the door.

(Pause in the proceedings)

THE COURT: Come up, Mr. Interpreter.

If you can bring Delsy Sanchez, please.

The record reflect the Spanish interpreter is required and present for this witness.

D E L S Y S A N C H E Z, Called as a witness by and on behalf of the People, having been first duly sworn through the aid of the Spanish interpreter, testified through the aid of the interpreter as follows:

THE CLERK: Be seated. State your name for the record, spell your last name, give your County of residence.

THE WITNESS: My name is Delsy Sanchez. I live in the town of Hempstead. Sanchez is S-A-N-C-H-E-Z.

THE COURT: Ms. Singas.

MS. SINGAS: Thank you, judge.

DIRECT EXAMINATION

BY MS. SINGAS:

Q Good afternoon, Ms. Sanchez.

A Good afternoon.

Q How are you?

A So-so.

Q Okay. Ms. Sanchez, are you married?

A Yes.

Q And do you have any children?

A Yes.
Q How many children do you have?
A Three.
Q How old are they?
A The oldest one is twelve. The second is almost five. The youngest one is two and-a-half years old.
Q And do they all live with you in Hempstead?
A My husband and my two youngest children. However, the older one is in my country.
Q What country is that?
A Honduras.
Q And do you work Ms. Sanchez?
A Yes.
Q And what kind of work do you do?
A I work as an assistant with the inventory department in -- at a factory in Mineola.
Q In November of 2005 were you working, Ms. Sanchez?
A Yes.
Q Where were you working?
A I was working in McDonald's that's located in Peninsula, in the town of Hempstead.
Q Is that Peninsula Boulevard?
A Yes, boulevard.
Q And what kind of work did you do for McDonald's

at that time?

A I was working as a cashier, sometimes in the kitchen, or whenever I was needed.

Q Did you have regular hours that you were working at that time or did your hours change?

A It's -- regular hours, in the morning.

Q All right. Now, I'm going to direct your attention to November 28th of 2005. Were you working or were you scheduled to work that day at McDonald's?

A Yes.

Q Tell us how would you get to McDonald's from your home?

A I used to live on California Avenue in Hempstead. Normally, I would go with my husband to the bus terminal in Hempstead. Then, he would take the bus. He used to work in Elmont. And I would -- would go walk to McDonald's. First I would take Jackson and then Franklin.

Q And on the morning of November 28th, 2005, is that what you did?

A Yes.

Q So, were you with your husband the morning of November 28th, 2005?

A Yes. I left with my husband. We went together to the terminal. Then he took the bus that was going to Jamaica and then I walked, normally, from Jackson to

Franklin Street.

Q Okay. At that time, Ms. Sanchez, on November 28th, 2005, how many children did you have?

A Two. I was pregnant with my third child.

Q Okay. I'm going to ask you to look at this photograph. I will put it on the projector. This is People's 25 in evidence.

(Placed on the presenter)

THE INTERPRETER: Counsel, that apparatus, that lamp, if you can move it a bit. That one on your left, that one.

MS. SINGAS: This one?

THE INTERPRETER: I think she can see it now.

MS. SINGAS: Is that better or not? We have to have everybody see.

THE INTERPRETER: Towards your left. That's fine; perfect.

MS. SINGAS: Is that fine, Mr. Lemke?

MR. LEMKE: That's fine, thank you.

Q Okay. Ms. Sanchez, do you recognize what is depicted in this photograph?

A Yes.

(continued on next page)

Q. And what is that?
A. This is a parking lot. That is the Pep Boys parking lot and at the end of the photograph, by the van, is Franklin.
Q. This way (indicating)?
A. Yeah.
Q. I want to show you a better picture of Franklin. What is this street across this (indicating)?
A. That's Front Street.
Q. And I'm just going to ask you to put, with a pen, the direction that you were traveling when you were walking towards your job that morning on November 28th, okay. Show us with an arrow the way you were walking?
A. Okay. I was coming from the bottom here of the picture. There is a light here. I was walking towards this way. McDonald's is towards this way (indicating).
Q. Okay, let me see.
Okay, Ms. Sanchez, so you were walking from this street through the parking lot; is that correct?
A. Yes.
Q. I'm going to show you now People's 26 in evidence. Do you see the McDonald's where you were working in November of 2005 in that photograph and, if you do, circle it for me.
THE INTERPRETER: She already did, Counsel.
Q. So, Ms. Sanchez, this is the same parking lot that

I had showed you before?
A. Yes.
Q. And would it be that Pep Boys is here on the left of the photograph (indicating)?
A. Yes.
Q. And this is the McDonald's where you were working?
A. On the other side is Franklin Street. And beyond McDonald's is Peninsula Boulevard.
Q. Okay. I'm going to show you People's 27 in evidence. This is the McDonald's, correct?
A. Yes.
Q. And this street here, what is that street (indicating)?
A. North Franklin Street. I don't know which way is north or south, but that's Franklin Street.
Q. I'm going to show you another picture, People's 28. Is that a better picture of Franklin?
A. Yes, that's the one.
Q. So basically you were walking along Franklin, except you were walking in the parking lot of Pep Boys; is that correct?
A. I didn't hear that very well.
Q. Okay. The street that was running in the same direction that you were walking was Franklin, but you weren't walking on the sidewalk, you were walking in the parking lot?

A. Exactly.

Q. Now, what time of morning was it that you were walking through this parking lot getting to work?

A. About 6:30 in the morning I was walking. That was my regular schedule that I had.

Q. Now, can you tell us a little bit about what the lighting was like at that hour?

A. The sun was rising then and there were still some lights, you know, the lights that the town has.

Q. So the lights on the street, the street lamps were lit?

A. Exactly.

Q. And the sun was coming up?

A. Yes.

Q. Okay. Now tell us what happened as you were walking through the parking lot?

A. When I got to the crossing between Franklin Street and Front Street, I stopped there for the light to change so I could cross the street. While I was waiting for the light, meanwhile I saw a lady walking in the parking lot as well and I realized that she was an older lady because she was walking slowly.

Q. Other than that lady that you saw when you were waiting for the light to change, were there a lot of people out on the street at that hour of the morning?

A. No.
Q. Continue, please.
A. When I was waiting for the light to change, the lady also got to the light on the other side. When the light changed, I crossed over to the side where McDonald's was and she crossed the other way.
Q. So basically you crossed each other as you were crossing the street?
A. Exactly. Then when I crossed, I didn't take the sidewalk and the lady had just passed -- had crossed the parking lot and I just went my way.
Q. And your way, does that mean that you went through that parking lot that we saw on the picture by Pep Boys?
A. Yes, sir.
THE INTERPRETER: She's talking to me.
Q. Thank you. Thank you, Delsy.
Go ahead. What happened, Delsy?
A. When I was walking through the parking lot, on the side there were some containers that the trailers use. Then far ahead there was a white van parked. And peacefully, I kept on walking. When I was getting near the van, on one side of the van --
Q. Let me just stop you one second and show you People's 31.
Delsy, what is this picture that we're looking at?

A. That's the van that was parked that day there.

Q. That's the van that you were referring to that you were walking close to?

A. Exactly.

Q. So what happened as you approached the van?

A. Then when I was near the van, a man came, jumped from the back and as he was coming down, he pulled out something and he was pointing at me.

Q. Let me stop you. When you say a man came out from the back, did the man come from inside the van or did you see him outside the van?

A. I didn't see the man. When I was near the van, I saw the man. I really don't know where he came out from. I only saw that he came behind the van and then all of a sudden he point at me with a gun.

Q. Delsy, show us in this picture, was it on which side of the van? Was it on the right-hand side or the left-hand side that he first confronted you?

A. The side where you are closer to.

Q. Take a look at People's 29 in evidence and can you put an X by the spot where the man confronted you?

A. He came out of this area, but you cannot see the place where he confronted me (indicating).

Q. Was it further -- was it closer to McDonald's where he confronted you?

A. I almost got to McDonald's. I only had what was left of the parking lot to get there. McDonald's is part of that shopping complex.
Q. So let me show you People's 27. In this photograph, does it indicate the area where you were standing when he confronted you?
A. Yes.
Q. Then in People's 27, can you put an X?
A. The van was parked more or less around here, so it was here (indicating).
Q. Okay, Delsy, you said a man came up to you. How close did he come and stand to you?
A. Very close. I had no opportunity to run, nothing.
Q. Tell us what happened. What did he do?
A. When he came out, immediately he put his hand towards his waist and pulled out a gun and he came over me and he grabbed me by the clothes, by the neck and he was pointing at me with a gun. And he was telling me, Shut up, shut up.
Q. Now, can you describe at that point, can you tell us what the man looked like or what he was wearing?
A. He had a mask.
Q. What kind of a mask?
A. Like the ones they use, the skiers. It has like a window like in the area of the eyes.

Q. So were you able to see his eyes?
A. Yes, I could see perfectly his eyes.
Q. Can you describe his eyes for us?
A. His eyes were like sad. Eyes that I don't forget.
Q. Tell us about what else he was wearing at that point?
A. He was wearing blue pants, navy blue like they use for uniforms, a black jacket with elastic here and in the waist (indicating).
MS. SINGAS: "Here" indicating by the wrist, Judge?
THE COURT: Yes.
Q. Go ahead, Delsy.
A. He was black. I could see his skin. His shirt was like blue or grayish. It wasn't a defined color, but it was between gray and blue.
Q. Could you tell approximately how tall he was?
A. He was a little taller than I. I'm five-seven. Perhaps five-nine. But he was a lot stronger and big. Since he grabbed me by the neck, I just panicked.
Q. Now, did you get a look at the gun that he was holding at that time?
A. Yes. He put it right in front of me.
Q. What color was it?
A. Black and one of those automatics with a charger.

It wasn't a revolver, it was an automatic.

Q. Now, was he saying anything to you?

A. Shut up, shut up. I could only put my hands together and said, Please, please don't kill me.

Q. Did you say that in English or did you say that in Spanish?

A. In English. He was only talking to me in English.

Q. So when he said shut up to you, that was in English?

A. Yes. He was telling me, Shut up.

Q. Did he say anything else?

A. First he asked me, Do you have money?

And I responded, Only $10.

Q. And did you respond again in English or in Spanish?

A. I responded in English. At that moment, you see, I cannot speak English, but I understood what he was saying. He asked me if I had money and I responded only $10 and I took the money out of my jacket -- out of my pocket and I gave it to him. And he asked me again if I had money and I said, No more, no more. Then I opened my purse and I showed him so he could search it, but he didn't bother doing that.

Q. Did you see what he did with the money that he did take?

A. He put it away.

Q. Do you know where?

A. In his jacket that he had.
Q. And the whole time is he still holding the gun?
A. Yes, pointing it right in front of me.
Q. Now, Delsy, at that time, at that moment, tell us what the lighting conditions were like there in the parking lot?
A. It was clearing up already. I could see clearly his eyes, the clothes that he was wearing. It was between dark and light. The sun was coming out.
Q. Okay. Now, Delsy, what happened after you showed him your purse and told him that you had no more money?
A. I was telling him, Please don't kill me, I'm pregnant, I'm pregnant. Those were my words.
Q. And when you said those words, Don't kill me, I'm pregnant, did you say that in Spanish or did you say that in English?
A. In English.
Q. Continue, Delsy.
A. Then he started pulling me towards the front to the side where I had been coming from.
Q. Do you mean towards Front Street?
A. Towards Front Street.
Q. How was he doing that?
A. He was pulling my arm so for me to walk. And I said -- and I was saying, No, no, I go to work, I go to work.

And then he asked me, Where do you work?
Q. And, again, that was in English and you understood that?
A. Yes. I wasn't going to tell him where I was working and I just pointed and said over there towards the Peninsula side.
Q. What happened?
A. Then he turned around and grabbed me towards Franklin Street. Then he was saying to me, Do you love your baby?
And I answered, Yes.
Then he said, Okay, you love your baby, shut up, shut up. Then he went from the parking lot towards the sidewalk.
Q. Where were his hands when he was walking from the parking lot toward the sidewalk?
A. Him?
Q. His hands, yes.
A. He was grabbing my arm and he had the gun pointed at me. He was pulling me towards Franklin Street.
Q. How was he pulling you?
A. Like this (indicating).
MS. SINGAS: Indicating her hand on the upper arm of the interpreter.
THE COURT: Yes.

Q. And where was the gun, Delsy?
A. In his hand pointing at me.
Q. Continue. What happened next?
A. When he was coming down to the sidewalk, there is like an unlevel portion in the sidewalk. He told me, Don't look at me. Don't look at me or I'll kill you.
Q. And was that, again, in Spanish or in English?
A. In English.
Q. What happened?
A. And then when that was happening, he pulled his mask up.
Q. Up to where?
A. Up to here (indicating).
MS. SINGAS: Indicating the top of her forehead, Judge?
THE COURT: Yes.
Q. Okay. So what part of his face, if any, were you able to see?
A. His whole face.
Q. So did you look, even though he said to you don't look?
A. Yes, because besides the fear, I wanted to see who he was.
Q. Where were you at that point when he picked the mask up over his head?

A. He was grabbing me by the arm and pointing me and he was going down on the unlevel part before going on the sidewalk because there were cars crossing.
Q. I'm going to stop you right there. I'm going to show you People's 29 in evidence.
Delsy, what street is this here (indicating)?
A. That's Franklin Street.
Q. Is this the direction that he was pulling you towards?
A. Exactly, towards that street he was pulling me.
Q. And that uneven part of the sidewalk, where is that?
A. Right there where those little bushes are, the parking lot is raised above the street. There is an area like for a garden.
Q. Okay. I'm going to show you this picture. This is People's 30 in evidence. Is this the area that you are referring to here where these bushes are?
A. That's the one.
Q. Okay. So when he pulled up his mask, had you crossed through the bushes yet or were you still on the side by the parking lot?
A. We were in that area, but on the other side of the van.
Q. So when he first confronted you, you stated that

you were where this X was, correct?

A. Yes.

Q. And then did there come a time that you moved back around the van again and then crossed over the street?

A. No. Everything happened on this side where the van was.

Q. Okay. So, again, I'm going to show you People's 29 in evidence. And are you saying that everything happened on the side closest to where I'm standing, on the left-hand side of the photograph?

A. On the opposite side.

Q. On the opposite side?

A. Yes.

Q. Okay. So when he pulled up his mask, had you made it through those bushes or were you still in the parking lot?

A. As he was crossing through the bushes, he pulled up his mask, but he kept on saying, Don't look at me, don't look at me.

Q. Why was he saying that, do you know?

A. Because he was going to pull up his mask and he didn't want me to look at him.

Q. Were you looking at him?

A. I looked at him.

Q. Now, tell me at that point in that area that you were when he pulled up his mask, tell me how close he was to

you?

A. Like this, like now (indicating).

MS. SINGAS: So, a foot-and-a-half? I don't know, Judge.

THE COURT: Yeah, anywhere from a foot to two feet.

Q. At that time, at that moment when he picked up his mask, tell us what the lighting was like.

A. It was already early morning and there was the street lights.

Q. At that moment when you looked at him, did he have anything covering his face?

A. He had a cap. And besides that, he had like, like a nylon piece of cloth that they use to hold the hair and they make a knot over here (indicating).

Q. And were you able to see that nylon when he pulled the mask up over his head?

A. Yes.

Q. Were you able to see anything about his hair?

A. No.

Q. What color was that nylon that you saw on his forehead?

A. Black.

Q. Now, tell us what happened after he pulled the mask up and you were standing by the bushes?

A. He kept on telling me, Don't look at me, don't look at me. He grabbed me on this position (indicating) from my hold.

MS. SINGAS: Your Honor, let me indicate what that is. She's putting her arm around the interpreter's shoulders.

Q. Where was his other hand, Delsy?

A. Pointing me with his gun on my ribs here (indicating).

MS. SINGAS: "Here," indicating on her right-hand side?

THE COURT: Yes.

THE WITNESS: On this side (indicating).

Q. Could you feel the gun pressing against you?

A. Yes.

Q. Continue. What happened next?

A. He was then standing on the sidewalk near Franklin Street waiting for the cars to cross. And at that moment he continued saying, Shut up. You love your baby, shut up, shut up. Don't look at me.

Q. And all those words were said in English?

A. Everything in English.

Q. And you understood?

A. Yes.

Q. Continue.

A. Then we crossed Franklin Street and he continued taking me by the shoulder and with a gun like this (indicating). Then we walked through a parking lot behind a store or a discotheque or something and then the parking lot was there. He took me to the rear part behind a shop where they fix televisions and electronic appliances.

Q. Delsy, I'm going to ask you, from the time that he picked up his mask until the time you got across Franklin Street, how many times do you think you looked at his face?

A. At the moment he pulled it up, I think I saw him at that moment. Then when he was saying not to look at him, I tried to maintain my sight towards the street. I was trying to do what he was telling me to do, but at the same time I was trying to see who he was. And he just kept on telling me not to look at him. And then when we had crossed the street already by the parking lot area, he again pulled down his mask.

Q. Okay. So, at the point that you had crossed the street and gotten to the other side, he pulled his mask back down?

A. Yes.

Q. And was that then covering his face again?

A. Yes, and only the eyes were uncovered.

Q. Okay. Let me just show you this picture. This is People's 28. I don't know if you can see it from here,

Delsy, or if you want to look at it up close, but does this indicate where you traveled, which alleyway you went into?

A. The parking lot is up there, then we crossed from the lighting post a little far ahead.

Q. I'm going to give you the pen again and ask you to draw an arrow the way that you walked on People's 28.

A. (Indicating.)

Q. Okay, Delsy, these markings indicate how you crossed the street, the location where you crossed the street?

A. Yes.

Q. Okay. Now do you know how many lanes of traffic this is to cross?

A. Two; one towards Hempstead and the other one towards the south of Hempstead going down.

Q. So it's a two-way street, correct?

A. Yes.

Q. Do you know how many lanes there are altogether?

A. Two.

Q. Now, did you make it across the street in one time or did you have to stop and wait for cars to pass before you could make it to the other side?

A. At once.

Q. I'm going to show you People's 31. And does People's 31 also indicate where you ended up on the other

side of the street?

A. Yes.

Q. I'm going to ask you to put an X where you ended up.

A. (Indicating.)

Q. You put an X here, Delsy, by where this police car is?

A. Yes. That's the parking lot and in the rear part of the police car there is some businesses and a discotheque.

Q. Okay. Let me show you People's 32 in evidence. Do you recognize what this is, Delsy?

A. Yes.

Q. What is this?

A. That's the place where he took me after we crossed the street. He took me to a repair shop. You can only see a small piece of it.

Q. But is this the alleyway that you had to walk through?

A. That's the entrance where he entered. There is no other way out. The only entrance is through that way and you have to get out the same way.

Q. Let me show you People's 35 in evidence. What are we looking at here, Delsy?

A. That's a repair shop. The television repair shop.

Q. And in the distance behind this television repair

shop, is this the Pep Boys where you started out your morning?

A. Yes.

Q. Now, you said that he put the mask back down on his face when you got to the other side of the street?

A. Yes.

Q. Tell us what happened next.

A. Then he took me through that entrance towards the rear of that shop. Then near that door there is an unlevel part, like a step. Then there is cement and also dirt.

Q. Let me show you People's 33 in evidence.

A. That's the one.

Q. Is this what you are indicating, this concrete (indicating)?

A. That's the step.

Q. Okay. Tell us what happened.

A. He took me to that place over there. And right next to the door he took me there. Then he stopped me against the wall near the door. When he pushed me against the wall, I felt like a hole on my back and I think there was a window that was sealed there and he put me against that and he kept on saying to shut up, shut up. Then he grabbed me by the arm.

Q. Would you like some water?

THE INTERPRETER: She has water.

A. He grabbed me by the shoulder and he pushed me down. But before that he was touching me. He touched my breasts and my stomach and then he went back to my chest on top of my clothes. Then he, at that moment, he grabbed my ass.

Q. Now, where was the gun when he was doing that?

A. Always with the gun in his hand pointing towards me.

Q. What happened after he touched you outside of your clothes?

A. Then he pushed me down with his hand and he lowered me. Then he pulled down his zipper and he pulled out his penis.

Q. Now, were you sitting, were you kneeling, what was your position?

A. No, I was bending over. Then he grabbed me by the head and he said, Open the mouth.

Q. He said that in English?

A. In English. And then he put his penis in my mouth.

Q. Now, at this time, Delsy, did he still have the mask on or had he lifted the mask?

A. When I was bending over and he put his penis in my mouth, he lifted his mask, but he was preoccupied with keeping my head down.

Q. How was he keeping your head down?

A. Because since he took his penis out and asked me to put it in my mouth, he was already without his mask and I went like this (indicating). When he saw that I was looking at him, he pushed my head down and he said, Don't look at me and he put the gun on my forehead. Then he continued pushing his penis in and out of my mouth.

Q. Okay. Delsy, when he was doing that, what position were you in?

A. Bending over.

Q. So you were bending over and where was the gun?

A. On my forehead.

Q. Did you feel the gun on your forehead?

A. Yes.

Q. All right. Now, you said that at one point you looked at him and you noticed that his mask was back up. Did you notice when it was that he lifted his mask back up?

A. I don't know at what point he pulled it up, but when I saw him again, he had his mask up. He was wide around here and like he has not shaven (indicating).

Q. When you said "wide around here," where are you showing us?

A. This area, over here (indicating).

MS. SINGAS: Indicating beneath the eyes to the neck and the upper chest.

A. His neck big and also the mandible like rounded and

wide.

Q. Did you notice either at that time or when you were walking across the street, did he have any facial hair?

A. Yes, it was a person with a beard, like that day he did not shave. You could see that.

Q. Now, describe the shape of his face.

A. Round.

Q. Now, Delsy --

A. And very big.

Q. How many times do you think he pushed his penis into your mouth back and forth? How many times?

A. I don't know how many times, but to me it was an eternity. I only felt that he was pushing in and out and the only thing that I wanted was to vomit.

Q. And what happened next, Delsy?

A. Then there was a point he was going in and out and he pulled out his penis and he continued masturbating and then he threw semen on the ground.

Q. And did you see where it was that his semen went on the ground?

A. On the ground.

Q. Now, did there come a time that you were able to stand up again, to sit up tall again?

A. At that moment I continue bending over with my hands like this (indicating).

MS. SINGAS: Crossed in front of her.

A. Yes, crossed together.

MS. SINGAS: Fingers interlaced.

Q. Go ahead.

A. And then the point came when he grabbed me and pulled me up but then at that point he had his face covered again.

Q. Did you see him at that point put his mask back down or did you just notice when you stood up that his mask was back down?

A. I didn't see it when he pulled his mask down because I had my face down. But when he pulled me up again, he was already covered.

Q. Okay. Now, Delsy, before you stood up, were you able to see his face when he had his penis in your mouth?

A. Yes.

Q. And were you able to see it clearly?

Tell me at that point what was the lighting like?

A. It was clear already and I could see him.

Q. So, Delsy, now you stand up, you straighten up and what happened?

A. He grabbed me again and pulled me up. Then he pulled up my sweater and he wanted to undue my belt.

Q. What was he doing? Tell us what he was doing.

A. He wanted to loosen up my belt with one hand,

always with the gun in his hand. And he could not loosen my belt and for one second he attempted to do that with both hands and he always kept his gun like this (indicating).

Q. "Like this," indicating close to your face, close to your body, where?

A. At the moment he wanted to loosen my belt with both hands, he put his hands closer to me, but at the same moment he put his hand back because he wasn't able to and he forced me to push my hands so I could loosen it. Then I loosen my belt. I open my pants and I lowered down my legs.

Q. What happened?

A. And then he turned me around with my face against the wall and then he was pushing me so I could kneel down and then I supported myself against a little edge on the window and I was holding onto that, but he was pushing me towards the front so I could bend down. And then he continued and I felt that he was penetrating me.

Q. Okay. Delsy, at that moment you weren't facing him; is that correct?

A. No, he had me against the wall.

Q. And you were bent over and you said he penetrated you?

A. Yes.

Q. What did he penetrate you with?

A. He put his penis in my vagina.

Q. Did you feel his penis in your vagina?

A. Yes.

Q. Tell us what happened then?

A. He was in and out and at that moment I got to see the hat that had dropped -- I had dropped right next to me and I had my mouth full of saliva and what was left inside my mouth.

Q. Stop a minute, Delsy. When you say what he had left inside your mouth, had he ejaculated inside your mouth when his penis was inside your mouth?

A. Yes. I felt that he left semen in my mouth, but then he moved away and he dropped it on the ground. But I felt it in my mouth. I had that in my mouth and then I got to see the cap that I was wearing that had fallen and I reached it. With that I was cleaning my mouth.

Q. What was he doing?

A. He was penetrating me inside and out. And then at one moment he moved away from me and ejaculated on the ground.

Q. Now, was that a second time he ejaculated on the ground, Delsy?

A. Yes.

Q. All right. At the time that he moved away from you, were you able to stand up straight?

A. At the moment he pulled away from me, I

straightened out and I pulled up my pants and I closed my pants again. I didn't want him to get near me again. That's why I pulled my clothes on again and with my face away. I didn't want to see him. And at that moment he kept on moving away from me. And then he got up on that step. Towards the end there is the dirt and he was standing there and he told me again to shut up, stay here. And he said, Stay here, don't move. If you come, I'll kill you.

Q. That was in English, Delsy?

A. In English. And he said it again, Stay here, stay here. And he was standing there before he went out to the street. He went and pulled up his mask and he left and I stayed there.

Q. Delsy, when he was standing on the step, you were still standing at the bottom of the step?

A. I was there below.

Q. And when he masturbated, was he standing up here or was he down here where you were (indicating)?

A. When I was bending over, he was in front of me on the edge, between the dirt and the cement.

Q. I'm just showing you between the wall and where the grass starts (indicating).

A. Yes.

Q. Okay. Now, when you stood up and were getting dressed, what was he doing?

A. He was putting back his penis into his pants and moving away from that area.

Q. And you were able to see him then?

A. When he was going away and he said, Stay here, he again pulled up his mask and it was daylight, everything was clear.

Q. So when he pulled up his mask before he left the alleyway, were you able to see his face then?

A. For a moment I saw it again.

Q. Now, Delsy, let's talk about the person who did this to you. Describe his body.

A. He was taller than I. He had an athletic body, wide, wide chest. This part here, very big (indicating).

MS. SINGAS: Indicating the shoulders.

A. Yes, the shoulders. And this here, the back of his neck. You could see that he was an athletic person, that he did not neglect his body. He wasn't fat, but he wasn't thin either. What he was is that he was muscular physique.

Q. Could you see the kind of shape he was in, his stomach, his legs?

A. You could see that the legs -- he wasn't fat. I didn't see his legs, but what you could see from his pants, he was an athletic person.

Q. Now, tell us about what he was wearing. What were your impressions about what he was wearing?

A. From the very first moment that I saw him, I felt his strength. He was not the type of person that he did not know what he was doing. The whole time he had his gun raised, he knew very well how to handle it. He felt at ease with it. The impression that I had was that he must have been a security person. And at that moment maybe I thought that he could be a mechanic because of his uniform as well, but I had that impression that he must be a security person or something like that because of the position, how he handled his gun and the way he was treating me.

Q. Tell us about the clothing again, describe for us how the clothing looked.

A. The pants were navy blue. The shirt was between gray and blue and the jacket was black with elastic by the wrists and the waist. He had black shoes and the belt was black as well. And the mask was black and that Lycra thing was black as well.

Q. That Lycra thing, is that the thing that he was wearing across his forehead?

A. That nylon thing that he was wearing here (indicating).

Q. "Here" indicating the forehead?

A. Yes, in the forehead, covering his hair.

Q. Let me ask you, Delsy, could you smell him?

A. Yes.