Q. Tell us about that.
A. It was a pleasant smell. He smelled cologne. He was a clean person.
Q. So you didn't think it was a homeless person that was doing this to you?
A. No, never.
MS. SINGAS: I'm going to ask to mark this People's 46, please.
THE COURT: People's 46 for ID.
(Whereupon, People's Exhibit 46 was marked for identification, only.)
COURT OFFICER: People's 46 for identification.
MS. SINGAS: If it can be shown to the witness, please.
(Handed to witness.)
Q. Delsy, I want you to look inside. Take out what's in there and tell us what it is?
A. This is my cap. This is the one that I picked up from the ground and I was cleaning my mouth with.
Q. Were you wearing that cap the morning of November 28, 2005?
A. Yes.
Q. I know that it's cut in some places, but other than that, is that cap in the same or substantially the same

condition as it was when you wore it on November 28, 2005?

A. Yes.

MS. SINGAS: I would like to move it into evidence, Judge.

MR. LEMKE: No objection, your Honor.

THE COURT: So without objection, People's 46 will be received in evidence.

(Whereupon, People's Exhibit 46 for identification was received and moved into evidence.)

COURT OFFICER: People's 46 marked into evidence.

Q. Now, Delsy, when the man left the alleyway, what did you do?

A. I stood there waiting for him to leave because he told me if I leave, he would kill me. And I was there, I don't know how long, and I started to leave slowly to see if he was around. And I started seeing and I went up the step and I remained standing looking towards the street and I began to walk slowly through the entrance towards Franklin Street. When I was coming out, at that moment I saw a police patrol was crossing by. At that moment I wanted to, I don't know, scream, but I couldn't.

Q. So what happened, Delsy?

A. Then I got to the street and I waited to cross over to the other side. And I crossed the street and I walked on

the sidewalk and I entered through the parking lot through the shopping center and I went towards McDonald's. When I entered, Rosa was there.

Q. And who is Rosa?

A. She was the manager and she was in charge that day.

Q. Do you know her last name?

A. Portillo.

Q. And what happened? What was your condition?

A. I could only cry and cry and I went to the lobby and they asked me, What happened, what happened? And I didn't answer and I just entered and I went to a small room that they had in McDonald's where the employees use to eat. An area where we can leave our things and eat. I went there and there was a chair and a table. I got there, I sat down. The only thing that I wanted to do was to clean what I had inside my mouth. With that cap I kept on cleaning myself.

And then she kept on asking me, What happened? What's wrong with you? And I couldn't talk. I wanted to talk, but I couldn't. I could only cry and cry. Then again, she had to take care of the customers. She was taking orders through a walkie-talkie in the drive-thru area in McDonald's.

Q. Delsy, did there come a time when you told Rosa what happened or someone what happened?

A. When she came back, she brought me water and I drank some water and I could tell her that I was assaulted.

But then she said, What's wrong? Are you okay?

And then I said to her that man had put his penis in my mouth.

And then she asked me, Did he rape you? Did he rape you?

And I couldn't tell her that he had raped me. I only told her that he put his penis in my mouth and I kept on cleaning myself.

Q. Delsy, did there come a time that someone called a cab for you?

A. Yes. At that moment I was only crying and the store manager arrived at that moment. He asked me if I was all right. He said, Are you okay?

I couldn't even respond to that and just nodded with my head.

And he told me, If you don't feel well, go home.

Q. And did they call a cab for you?

A. Yes.

Q. And did you get inside that cab?

A. I came out and I was waiting for the cab. The cab had not arrived yet and I stood in the lobby, the McDonald's where the tables are.

Q. Did the cab eventually come?

A. While I was waiting there, Rosa was there. A person entered the place and he asked me if I was all right

and Rosa said to him, No.

And he said, If you need help, I can help you. I am a policeman.

I looked at him and I asked him, Are you a policeman?

And he said, Yes. You need help?

And I looked back at him again and I didn't have the courage that I did need help because at that moment, I don't know what impression -- I didn't have the trust in this person that had just walked in and said I am a policeman. He had no badge or no ID. He was dressed like a normal person. And the person that had just attacked me, I felt, the impression, I just didn't trust him to tell him that I did indeed need help.

Q. Okay. After you had that conversation, did you get into the cab that was called for you to take you home?

A. Yes. The man went to buy something and then the man arrived and I got inside the cab. I gave him the address to the lady that was driving the cab, my home address.

Q. And did you go home, Delsy, or did you go somewhere else?

A. When she was headed towards my home in Peninsula, I told her, No, take me to the police station.

Q. And at that time did you go to the Hempstead police station?

A. Yes, I did go there.

Q. And did you have an occasion then to speak to police officers at the Hempstead police station?

A. When I walked in, there were two policemen in the front desk and I only told them I need help. Please, somebody help me.

Q. Were you speaking in English, Delsy, or in Spanish?

A. In English. They came over and they asked me, What happened? What happened?

Q. Did you have an occasion -- were you able to tell them what happened? Did they speak Spanish?

A. No, I couldn't explain to them what had happened to me. I could only cry and I could only say, Please help me.

Q. Did there come a time, Delsy, that you spoke to a woman who spoke Spanish at the Hempstead police station?

A. Yes. Then they came over, they opened the door and they put me inside the police station and they took me to a room downstairs. They asked me to go to the basement, I think. Then they left me there and asked me what happened. I couldn't explain to them. I didn't know how to tell them what had happened to me. I only pointed to the gun that they carry and I said, A black man, and I pointed to the gun, that he had a gun, and I pointed to them with my hand that he had placed it on my head. And then they found someone who spoke Spanish. Then a woman arrived, her name was Claudia.

Q. Were you able to speak with Claudia in Spanish?
A. Yes.
Q. And were you then able to tell Claudia what had just happened to you?
A. Yes, I was able to tell her and Claudia was able to translate everything.
Q. Now, Delsy, how much time do you think passed from the time the man first confronted you in the parking lot of Pep Boys until you were talking with Claudia?
A. I really don't know, maybe an hour, two hours. I don't know. For me, it was an eternity.
Q. Was it less than three or four hours?
A. Yes, less.
Q. Now, did you give Claudia -- did you tell Claudia, did you describe for her the man who did this to you?
A. Yes.
Q. Do you remember what you told Claudia about him?
A. That he was a black man, taller than I. I gave them the same description, an athletic body. He wasn't fat, nor was he thin. He was wide in the shoulders, his chest. He had a beard, like unshaven and the eyes.
Q. Tell us about the eyes.
A. Some sad eyes. Sad like this (indicating).
MS. SINGAS: Indicating pulling down her eyes?
THE COURT: Yes.

A. Droopy.
Q. Did you describe for Claudia what it was that he was wearing?
A. Yes.
Q. What did you tell her?
A. That he was wearing some dark blue pants like a uniform, the shirt between blue and gray, the black jacket with elastic in his wrists and his waist, the black shoes, the belt, black, the cap that he was using as a mask.
Q. Delsy, did there also come a time that you went with the police back to that location?
A. Yes.
Q. And did you show the police everywhere you were standing, everywhere the man was standing?
A. Yes, I did show them.
Q. Did you show the police where it was that you were leaning against?
A. Yes, I showed them where I was leaning against.
Q. I'm going to show you People's 34 in evidence. Do you recognize that, Delsy?
A. Yes.
Q. What is that?
A. That's the window that was sealed that was like a wall. That's the hole that I felt when he pushed me against the wall. And that little edge, that brick edge is when I

supported myself when he was penetrating my vagina, that was the wall that I was supporting myself against.

Q. Did you also show them, Delsy, where it was that his semen landed behind that store?

A. Yes.

Q. Do you remember what time of day it was that you went with the police? Was it in the afternoon or later, do you know?

A. It was that very same day, like in the afternoon when I returned from the hospital. We went there because they told me they had not found anything there, that if I could show them where the area where he had ejaculated. And I showed them more or less the area where it was.

Q. Delsy, did you also at that time give a police officer or a detective that hat that you were wearing that you were using to wipe your mouth?

A. No, the cap I gave them when Claudia was there in the morning when I was making my statement at the police station.

Q. So in the Hempstead Police Department you gave it to Claudia?

A. The policeman took the cap and put it inside a plastic bag. Because I told them I had cleansed my mouth with that cap and what was left in the cap from my mouth.

Q. Now, Delsy, you also mentioned the hospital. Did

you go to the hospital that day as well?
A. Yes, they took me to the hospital.
Q. Did you go with detectives?
Do you remember what hospital you went to?
A. North Shore.
Q. And do you remember being examined by a nurse at North Shore Hospital?
THE INTERPRETER: I'm sorry, Counselor, what was that?
Q. Do you remember being examined by a nurse at North Shore Hospital?
A. Yes.
Q. And did you tell the nurse what had happened to you?
A. Yes.
Q. And do you remember what parts of your body she examined?
A. My vagina. She took samples of my vagina.
Q. Now, Delsy, when the man was penetrating you when you were bent over and his penis was inside your vagina, did you feel him ejaculate inside your vagina?
A. No, I felt that he was going in and out of me, but immediately he pulled out and he ejaculated on the ground.
Q. All right. Delsy, we're going to go now to 2008, okay, February of 2008?

THE COURT: Ms. Singas, before we go there, can I see you at the bench, please.

(Whereupon, a discussion was held off the record.)

THE COURT: Members of the jury, obviously we've put in a long day. It looks like an appropriate time to break for the weekend. We are -- just a couple of scheduling matters, if you will. Monday we're just going to be sitting, if you will, in the morning. I'm going to ask everybody to come back. We're going to be back here in this courtroom on Monday. I'm asking you to report back to room 106. We will not be sitting in the afternoon on Monday, just so you can adjust your schedules and plan accordingly.

Also, please keep in mind Tuesday is a court holiday. It's Veteran's Day, so we will not be sitting on Tuesday.

At this point, looking at the witness list, we're kind of almost at the halfway point, so we're kind of on schedule, which is good news. And, you know, at this point we seem to be working according to what both myself and the attorneys kind of anticipated the length of the trial will be. So the good news is we're not behind and we seem, if anything, to be a little bit ahead.

At this point, as I let you go for the weekend, we're in the middle of the case, don't form any opinions about the case.

Please don't speak to anybody or amongst yourselves about the case.

Don't view or visit any of the areas you either heard described, pictures of any of the exhibits you have seen in reference during the course of the trial.

Please don't read any accounts of the case in the media, should there be any.

Have a very pleasant and safe weekend. We'll see you back here Monday, 10:00, okay.

(Whereupon, the jury exited the courtroom.)

(Whereupon, the trial was adjourned to November 10, 2008.)

* * *

STATE OF NEW YORK : NASSAU COUNTY
SUPREME COURT PART 49

---------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK — TRIAL

- against - — IND. 436N-08

RICARDO WALTERS

Defendant.

---------------------------------------X

November 10, 2008
262 Old Country Road
Mineola, New York

B E F O R E :

HON. JAMES MCCORMACK
Acting Supreme Court Justice

A P P E A R A N C E S:

(Same as previously noted)

KATHLEEN PLAIA
KATHI FEDDEN
OFFICIAL COURT REPORTER

*** *** ***

D E L S Y S A N C H E Z, Recalled as a witness, having been previously duly sworn through the aid of the interpreter, testified through the aid of the interpreter as follows:

THE COURT OFFICER: Ready, Judge?

THE COURT: Ready.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE CLERK: Case on trial continued, The People of the State of New York against Ricardo Walters, Indictment 436N of 2008.

People, ready?

MS. SINGAS: Yes.

THE CLERK: Defense, ready?

MR. LEMKE: Ready, your Honor.

THE COURT: Good morning, members of the jury. Welcome back. We are ready to continue the examination of Ms. Sanchez.

Ms. Singas, if you would.

MS. SINGAS: Thank you, your Honor.

THE CLERK: Ms. Sanchez, you're reminded you're still under oath.

THE WITNESS: Okay.

DIRECT EXAMINATION (CONTINUED)

BY MS. SINGAS:

Q Good morning, Ms. Sanchez.

A Good morning.

Q I'm going to show you what has been marked as People's 35 in evidence.

(Handed to the witness)

Q Okay. Is that the back of the repair shop where you were attacked?
A Yes, that's it.
Q And can you circle -- there appears to be two windows in that picture. Can you circle the window that first you were leaned up against, and then later on that you used for support as you bent over.
A This one right here (indicating).
(Placed on the presenter)
Q Ms. Sanchez, when you were standing for this time period with the man, were you standing by this cement part or were you standing by the part that has grass and dirt?
A In the cement part, but that had a little dirt that was coming off at the edge.
Q Okay. But for the entire time, you were stationed between the building and the extent of where the cement was?
A Yes.
Q Okay. Now, you stated on Friday that the man had -- when you -- when he first encountered you and brought you to the back of the building, that he pushed you down by the shoulders, is that correct?
A Yes.
Q And which part of your body bent; was it your waist or your knees?

A The first time, the part of my knees, when he pushed on my shoulder.

Q Do you think you can demonstrate that for the jury? Can you show us, please, how it was that you were positioned first?

A He pushed me here, bending my knees and lowering myself down (indicating).

Q And where did he have the gun, at that point?

A Right here (indicating), my forehead.

Q Is it at that point that he put his penis into your mouth?

You can sit down, I'm sorry.

A Yes.

Q And how is it that you were able to look up at him; what would you do just to look up at him?

A I raised my head upwards.

Q Now, the second time you said you were also bent. Can you demonstrate for us the second time when you were leaning against the window what your position was?

A He made me turn around. I put my hands on that edge that the window has, like this (indicating.) And he bend me over like this (indicating).

Q At that point where was the gun?

A Behind my head (indicating).

MS. SINGAS: Indicating with her finger,

Judge.

THE COURT: Yes.

Q Ms. Sanchez, the person that did this to you, do you see him anywhere in this courtroom today?

A Yes.

Q Can you please point him out and tell us what he's wearing or describe him.

A It's that man that is over there. He has like a green olive jacket, a white shirt and a neck tie, like grayish and white.

MS. SINGAS: Indicating the defendant, your Honor.

THE COURT: Yes.

Q Now, Ms. Sanchez, in 2008, in February, on February 29th, 2008, did you go to a police station to view a lineup?

A Yes.

Q Can you describe what you saw when you went into the room to look at that lineup?

A It was a room with a window and I could see other persons that were behind that.

Q And were they sitting or standing?

A They were sitting.

Q And were they holding anything in front of them?

A They had, like, a white robe covering themselves

from here down, (indicating). And you could see their heads.

MS. SINGAS: Indicating from the neck down.

THE COURT: Yes.

Q I will show you what is in evidence as People's 41.

(Handed to the witness)

Q Is that a picture of the lineup that you saw that day in February of 2008?

A Yes, that's it.

Q And when you looked at that lineup, did you recognize the number of the person who did this to you back in November of 2005?

A Yes.

Q And what number did you recognize?

A The number 4.

Q And is number 4 the person who took your money and then raped you in November of 2005?

A Yes, that's him.

MS. SINGAS: I have nothing further.

Thank you, Ms. Sanchez.

THE COURT: Mr. Lemke.

MR. LEMKE: Thank you, your Honor.

CROSS EXAMINATION

BY MR. LEMKE:

Q Good morning, Ms. Sanchez.

A Good morning.

Q I have a few questions for you. If you want me to repeat them, I will. Okay, Ms. Sanchez?

A Okay.

Q On November 28th of 05, it was about 6:30 in the morning when you were first confronted by this individual, correct?

A Yes.

Q And you were on your way to work, correct?

A Exactly. I was going to my job.

Q And that is when this man came up to you, correct?

A Yes, before arriving to my work in the Pep Boy parking lot.

Q After the incident where this individual had sexually assaulted you, you then proceeded to work, correct?

A I arrived at my place of work, but I did not work.

Q What time did you arrive at the McDonald's?

A I don't know. I lost notion of the time at that time.

Q And that is where you saw one of your friends

that was working there, correct?

A Could you repeat that?

Q Yes. When you went to McDonald's, there was a friend that you had met, Ms. Rosa?

A When I entered there Rosa was there.

Q But you don't actually know what time you had gotten there, correct?

A I lost notion of the time.

Q So, the incident, itself, five minutes, ten minutes, or you don't know?

A I don't know how long it passed since he assaulted me and did what he did. As far as I'm concerned, for myself, it was an endless time that I would not like to repeat it again.

Q And I'm not going to ask you to repeat it now. But I have some questions as to what you did afterwards, okay. After you left McDonald's, you went into a taxi cab?

A Yes.

Q And then at some point you were speaking to a police officer, a detective, correct?

A That was before taking the taxi -- I'm sorry, before boarding the taxi, but I did not speak with him. He asked me if he could help me, but I did not talk to him. I only spoke with the policeman when I got to the police station.

Q On that November, November 28th, you did arrive at the police station, correct?

A Yes.

Q And do you recall speaking with a Detective Birdsall, Wayne Birdsall?

A I don't remember his name.

Q Do you remember speaking to an advocate by the name of Claudia Serrano?

A Yes.

Q Okay. And Claudia Serrano helped interpreter what had just happened, correct?

A Yes.

Q And there was also a detective that was present, as well, correct?

A Yes.

Q And during the conversation you had, they would take notes of your conversation with what had just happened, correct?

A Yes, they were taking notes. But they asked me to do a statement when I was in the hospital.

Q Okay. And when you were at the hospital -- withdrawn.

They spoke to you first at the police station, correct?

A Yes.

Q And you discussed with them what happened, correct?
A Yes.
Q And they asked you what this person looked like, correct?
A Yes.
Q They told you to think very hard, it's very important, to what this personal looked like, correct?
A Yes.
Q And you told them what this individual looked like, correct?
A Yes, I did.
Q Okay. And then you were taken to the hospital, correct?
A Yes.
Q And at the hospital, again, you were asked about what happened and what this person looked like, correct?
A Yes.
Q They wanted to know everything that this person looked like, his clothes he was wearing, his size, his height, correct?
A Yes.
Q His weight, correct?
A Yes, but I could not estimate that.
Q Okay. But you were asked all of these factors to

consider, correct?

A Yes.

Q And you had given a written statement that Claudia wrote down, correct?

A Yes.

Q In Spanish, correct?

A In Spanish.

Q And you then read the statement while you were at the hospital, correct?

A Yes.

Q And then you signed it, correct?

A Yes.

Q And it was a lengthy statement, about four pages, correct?

A Yes, I think there were, like, four pages.

Q And it was very detailed as to what had happened and the description of this individual, correct?

MS. SINGAS: I object to the word detailed.

THE COURT: Yes, sustained.

Q You told the Detective and Claudia that you didn't have any idea of how much this person weighed, correct?

A No. But I was told them it was a big person, a stocky person. He was no thin individual.

Q Your wording was, he was medium build, correct?

A I told them he was no fat, no skinny. But he was strong, athletic, with muscular mass, a developed man.

Q And you told them he was medium in build, correct?

A Medium built, I don't know if I used that word.

Q Well --

MR. LEMKE: Could I have these marked both at this point please for identification purposes.

THE COURT: Yes.

MR. LEMKE: Let's go with one. If we could have that four pages, if that could be marked first.

(Whereupon, the referred to item is received and marked Defendant's Exhibit D for identification)

THE COURT OFFICER: Defendant's D marked for identification.

MR. LEMKE: If that could be shown to the witness a moment, please.

(Handed to the witness)

Q Delsy, do you recognize that?

A Yes.

Q Do you want to take a moment to just to read that to yourself.

THE COURT: Is there a particular page, Mr. Lemke, you want her attention drawn to?

MR. LEMKE: I can ask the question first and

it will be a matter of, instead of wasting time, if she reads it once for a minute or two, maybe it would be better.

(Pause in proceedings)

Q Ms. Delsy, in giving and having a conversation with the officer and Claudia, you described, in part, what this person looked like, correct?

A Yes.

Q You never told them that this individual had dreads, correct?

THE INTERPRETER: I'm sorry? I didn't --

MR. LEMKE: Dreads. Hair, braids.

A I never saw his hair. He had something covering his hair here (indicating).

Q Did you tell the police that, Ms. Sanchez?

A No.

Q No, you did not. You spoke to the police back on November 28th when this happened, you explained in great detail everything that happened, correct; correct?

A At that moment I wanted to tell the police what had happened to me. I was looking for someone to help me.

Q And you -- and you at the hospital spoke to them regarding a description of this person, correct?

A Yes.

Q You told them that the person was a male black,

correct?
A Yes.
Q Told them what hand he held the gun in, correct?
A Yes.
Q Told them what he was wearing, clothes, correct?
A Yes.
Q They asked about his face, you said it was round, correct?
A Yes.
Q They asked you about any scars, you said you didn't see any, correct? You didn't see any scars, did you?
A No, I didn't see any scars. What I saw was marks from his beard.
Q Okay. When you say beard, you never told them you saw a mustache, correct?
MS. SINGAS: Objection to that, Judge.
THE COURT: No, overruled.
A No, I didn't see any mustache. I said it was like a person that had not shaven.
Q Correct. Unshaven for a day was your words, correct?
A Yes. He had signals that he had a beards.
Q What about his hat, did he have a hat on?
A He had a mask, he had a cap, and something made out of Nylon to hold his hair.

Q And, in fact, you told the police that this individual had a mask on, didn't you?

A Yes. A cap that he used as a mask.

Q But, yet, you never told them anything about a Nylon cloth for his hair, did you?

A Yes, I told them.

Q Is it in your statement?

MS. SINGAS: Objection, Judge, what's in her statement.

THE COURT: No, overruled.

Q Is it in your statement; yes or no?

A It says here about the cap. I don't remember --

Q Would you like to read your statement, Ms. Sanchez?

A -- if they wrote it here. They did not write down all the details.

Q Did -- they didn't write down all the details?

A I told them, at that moment I wanted to describe that person. I don't see here everything. I was nervous at that moment, I don't know.

Q What else about the person's description is not in the statement that you read and that you signed, Ms. Delsy -- Ms. Sanchez?

MS. SINGAS: I object to that, Judge.

THE COURT: Yes. Sustained as to form.

Q You were asked by the officers to give a description. Did you not give them the weight of the person; yes or no?

MS. SINGAS: Objection to that question.

Q Weight, a hundred fifty pounds, hundred and eighty pounds.

MR. LEMKE: It's weight.

THE COURT: Overruled.

Q Did you give them a weight of this individual?

A No, I don't know how to describe. If I see him, I don't know what he weighs. I told them the description how he was, how he --

Q Ms. Sanchez -- Ms. Sanchez.

THE COURT: Let her finish, Mr. Lemke.

A That he's athletic person, that I saw.

Q But you didn't give a weight; just answer yes or no.

A I don't know what he can weigh.

Q And when you described the type of hat, what type of hat was he wearing?

A A black cap that covered him.

Q Like a ski mask, right?

A Yes.

Q Did you see any bun to the back of his head or his hair, that his hair would be under, no?

A I don't -- I don't know about that. I only have his face engraved in my mind, and I remember it every day.

Q Ms. Sanchez, I don't mean to upset you. I just have a few more questions, that's all.

The advocate, Claudia, do you remember speaking to her, as well, Ms. Sanchez?

A Yes.

Q And part of your discussions with her, also, was regarding a description of this person, correct?

A I told them that his face was big. His had -- his eyes were sad, and this part (indicating) of his face, over here, that he had -- I remember him now that I see him.

Q Now that you see him in court, right?

A Yes.

Q But you were also taken to a lineup, correct?

A Yes.

Q And when you walked into that lineup, you were brought there by a detective, correct?

A Yes. They took me to that room and he was behind it.

Q Okay. And that was this year, in 2008, February 29th, correct?

A Yes.

Q Close to almost two and-a-half years after the incident, correct?

A Yes.
Q And you looked through a window correct?
A Yes.
Q And do you remember how long you looked for?
A No. As soon as I saw him, I had him in front of me, I saw his eyes. I felt again the same fear that I felt that day.
Q And that was after looking after two and-a-half years through a window for about five seconds, correct?
A That's a face that I have engraved here (indicating), that I do not forget and I will never forget.
Q And the question is, after two and-a-half years you looked through a window for five seconds and then picked out this person; that's all I'm asking, yes or no, Ms. Sanchez?
A Yes.
MR. LEMKE: I have nothing further.
MS. SINGAS: I would like to approach, please, Judge.
THE COURT: Yes.
(Whereupon, there is a discussion held at the Bench, off the record, between the Court and Counsel)

REDIRECT EXAMINATION
BY MS. SINGAS:

Q Ms. Sanchez, Mr. Lemke asked you if you told the

police in November 2005 what this man looked like, correct?

A Yes, I told them.

Q And told them, didn't you, that he was a male black, approximately five-nine, with an athletic build. He was not overweight or skinny. He appeared not to have shaven in about a day. He had on dark blue pants, a dark bluish gray shirt, a black belt, and a waist-length black jacket. You told them that, correct?

A Yes.

Q And in the grand jury -- remember testifying in the grand jury, Ms. Sanchez?

A Yes.

Q You were asked this question:

"Did you notice, did he have anything else on his face?

"Answer" --

MS. SINGAS: That's line 11.

-- "his eyes were sad. This area here was very big, and the beard area looked like he hadn't shaved but you could tell he had a beard, he hadn't shaved."

Q Do you remember giving that answer to that question?

A Yes, I said that.

Q And do you remember being asked this question, at

the end of the page?

MR. LEMKE: I'm objecting, unless there --

THE COURT: No. Overruled. Let me hear the question first.

Q "Did he have anything else covering his face or near his face?

"Answer: Yes. He had something here (indicating).

"QUESTION: What was that?

"ANSWER: I don't know, it is some sort, some sort of material that some people wear around their head to cover their hair. And he also had the hat. When he pulled the hat, you could see this thing here. At no moment did I see his hair."

Were you asked those questions and gave those answers at the grand jury, Ms. Sanchez?

A Yes, I said that.

Q And at any time when Claudia sat with you, did she ever ask you if he had anything covering his hair?

A They didn't ask me that.

Q Okay. Let me ask you this, when you were talking to Claudia and they were taking that statement, were you waiting to be examined by a nurse at the hospital?

A I don't remember whether at that moment they had already examined me. I think I was waiting for the results,

the blood tests, I don't know what other things, so they could give me some medicine to prevent certain illnesses. Because I was pregnant and I had to protect my baby.

Q Ms. Sanchez, will you ever forget his face?

A Never.

Q Is it the same person that attacked you in November of 2005 that you saw in this lineup, that you see in this courtroom today?

A He is. Those eyes, that face, I don't forget since November of 2005.

MS. SINGAS: I have nothing further.

THE COURT: Mr. Lemke.

RECROSS-EXAMINATION

BY MR. LEMKE:

Q Ms. Sanchez, when you spoke to the police on November 28th of '05, there was no district attorney there, was there?

A I don't know who was at, the persecutor or the police. I only knew I was with the police.

Q And you were just asked a question about testifying in the grand jury and asked about this nylon cloth. Do you remember when you testified in the grand jury?

A Yes.

Q February 14th of this year, of '08, correct?

A Yes.
Q And that was after speaking and meeting with the district attorney, Ms. Singas and Ms. Tebbett, and others, correct?
A I didn't understand the question.
Q Before you testified at the grand jury, you had spoken with other assistant district attorneys about your case, correct?
A They spoke with me, they introduced themselves, because I didn't know them.
Q Right. And they talked about what questions they were going to ask you and about what occurred, that is what they were going to ask you in the grand jury, correct?
A No. They told me just to tell what I had lived.
Q You didn't speak to anybody before you testified at the grand jury Ms. Sanchez --
MS. SINGAS: I don't think that's what she said, Judge.
Q -- about your case?
THE COURT: Yes, overruled.
A If I spoke with someone, what?
Q About your case before testifying at the grand jury?
A I spoke with the people from the district attorney's office.

Q That's all I was asking. Thank you.

THE COURT: Ms. Sanchez, thank you very much. Please be careful when you step off the stand.

(WITNESS EXCUSED)

THE COURT: Thank you, Mr. Interpreter.

THE INTERPRETER: My pleasure, your Honor.

THE COURT: People, you need a moment before your next witness?

MS. SINGAS: Yes, please.

THE COURT: Members of the jury, we will take a short recess before we have our next witness testifying. If you would kindly follow the officer.

THE COURT OFFICER: Jurors, follow me.

(Whereupon, the sworn jurors and alternates leave the courtroom)

(Whereupon, there is a brief recess taken in the proceedings)

COURT OFFICER: Jury entering.

(Whereupon, the jury entered the courtroom.)

THE COURT: People, your next witness.

MS. TEBBETT: Your Honor, the People call Shamika Dottin.

THE COURT: Shamika Dottin.

S H A M I K A D O T T I N, residing in Nassau County, having been called as a witness on behalf of the People, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: Please state and spell your name and give your county of residence.

THE WITNESS: Shamika Dottin, S-H-A-M-I-K-A D-O-T-T-I-N. Nassau County.

THE COURT: Ms. Tebbett.

MS. TEBBETT: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. TEBBETT:

Q. Good morning, Ms. Dottin.

A. Good morning.

Q. Can you just tell everybody how old you are?

A. I'm 26.

Q. Do you work?

A. Yes.

Q. Just tell us what type of work you do?

A. I'm a school bus driver.
Q. Now, Ms. Dottin, I'm going to bring you back to the date of the night of April 16th of 2005 into the morning of April 17th of 2005?
A. Okay.
Q. Do you recall that time?
A. Yes.
Q. And can you just tell us where you were just after midnight of April 17th of 2005?
A. I was at Alicia and Jennifer Lombardo's house.
Q. Who are those people?
A. They are my friends.
Q. Can you just tell us generally what area or what neighborhood they live in?
A. Uniondale.
Q. And were you at their house in Uniondale?
A. Yes.
Q. And can you just tell us what neighborhood you live in?
A. In Hempstead.
Q. And did there come a time in the early morning of April 17th of 2005 that you left their house?
A. Yes.
Q. And do you know about what time that was?
A. 2:00 or 3:00 in the morning.

Q. And that would be on April 17th of 2005?
A. Yes.
Q. And when you left their house at around that time, where were you going?
A. Home.
Q. And can you tell us how you were getting home when you left their house at about 2:00 or 3:00 in the morning?
A. I was walking.
Q. And can you explain for us how you had to walk to get from their house in Uniondale to where you lived?
A. I had to walk down Nassau Road.
Q. And are you familiar with that area of Nassau Road from Uniondale into Hempstead?
A. Yes.
Q. Now, can you describe that area for us of Nassau Road from Uniondale into Hempstead? What is that street like in that area?
A. It's busy in the daytime. At night it's quiet.
Q. Do you know how many lanes of traffic are on Nassau Road in the stretch where you were walking?
A. It's two on each side.
Q. Two lanes of traffic on each side?
A. Yes.
Q. And what's located on the street? Is it residential, is it commercial?

A. It's both. There is houses and commercial and there's a cemetery on Nassau Road too.
Q. And are the houses and the commercial places mixed in together?
A. Yes.
Q. Or there are certain portions of each?
A. Mixed in.
Q. And at the time that you were walking down Nassau Road that morning, are any of those commercial places open at that time?
A. No.
Q. So what was that area of Nassau Road like at the time that you were walking home in those early morning hours?
A. It was quiet. Only a few cars were driving.
Q. And are there any lights that light that stretch of Nassau Road?
A. Yeah, there is lights.
Q. What type of lights?
A. There is traffic lights and there is street lights.
Q. And are there lights from any of those commercial places along that road?
A. No.
Q. Now, you mentioned there is a cemetery on a portion of Nassau Road?
A. Yes.

Q. Do you know where that is?
A. It's on Nassau Road. It's like the beginning -- it's in the middle I would say.
Q. In the middle between Uniondale and Hempstead?
A. No, its in Uniondale. It's not in Hempstead, it's in Uniondale.
Q. So it's before you get to Hempstead?
A. Yes.
Q. And do you know how long the cemetery goes for, how many blocks?
A. No, I don't.
Q. Would it be more than one block?
A. Yeah, because it's one big block and there is blocks on the other side.
Q. And are there any lights in that area of Nassau Road?
A. Yeah, there are. There are, yeah.
Q. Tell us about those lights. What type of lights are they?
A. They are street lights.
Q. Now, how far would it be, in distance, to get from your friend's house in Uniondale to where you lived in Hempstead? Can you approximate that for us?
A. I really couldn't tell you.
Q. Is it a few blocks, a few miles, do you know?

A. No. It's probably about a mile, that's all.
Q. Have you ever walked that distance from your friend's house to your house before this particular morning of April 17, 2005?
A. Yeah.
Q. And how long would it take you to get from your friend's house to your house?
A. Well, I walked, and I walk slow, so it takes me a long time.
Q. Okay. Can you approximate for us how long it would take?
A. About a half hour, because I walk real slow.
Q. About a half hour you said?
A. Yeah.
Q. Now, can you tell us, as you were walking along this stretch of Nassau Road, when you reach Hempstead, does the name of the street change?
A. Yeah, it changes to Greenwich.
Q. And is that Greenwich Street?
A. Yes.
Q. And can you describe for us what Greenwich Street is like once you enter into the Village of Hempstead? What type of street is it then?
A. It's busy in the daytime, but it's quiet at night.
Q. Now, can you tell us, as you were walking down

Nassau Road from Uniondale into Hempstead and then when it changed names to Greenwich Street in the Village of Hempstead, tell us the first thing that happened?

A. Could you repeat the question, please?

Q. Sure. As you were walking down that stretch of Nassau Road from Uniondale into Hempstead when it turns into Greenwich Street?

A. Yeah.

Q. Tell us what was the first thing that happened?

A. Well, I was walking down Nassau Road and when I hit Argyle I seen a red van following me. It turned onto Argyle and I proceeded down Greenwich because it changes to Greenwich from Argyle. It made a U-turn and it made a right back onto Greenwich. And as I was passing the Amoco gas station, the red van pulled up into the gas station like it was going to get gas and the driver motioned me to come over and I motioned back no and I kept going. And then --

Q. Ms. Dottin, let me stop you there for a second. How long had you been walking down Nassau Road into Greenwich Street by the time you had hit Argyle?

A. It was more than ten minutes. Say about 15.

Q. And does Argyle cross Greenwich Street, does it run next to Greenwich Street?

A. It crosses over.

Q. I'm going to show you what's already in evidence as

People's 12. Just take a look at that map and tell us if on that map you can find Greenwich Street after it changes names from Nassau Road?

A. Right there by Argyle (indicating).

Q. You are pointing in the lower right-hand corner of the map?

A. Yes.

Q. And point to us which one of those streets is Greenwich?

A. (Indicating.)

Q. You are pointing to the yellow line?

A. Yes.

Q. And can you see where Argyle hits Greenwich on that map?

A. Yes.

Q. Can you point that out for us?

A. (Indicating.)

Q. And --

MR. LEMKE: Your Honor, just so we have to make a record of that, maybe we should make a notation there is a couple of yellow lines. If it's read back you won't know what she's pointing to.

THE COURT: You can tell us what you are pointing to.

THE WITNESS: The thick yellow line right

here, this is Argyle. This thick yellow line right next to Argyle is Greenwich (indicating).

Q. That's the yellow line that starts off the right-hand bottom corner of that map?

A. Yes.

Q. And is there a mark on there or a notation on there for where Argyle hits Greenwich?

A. No, just the name.

Q. Does it have the name Argyle on there?

A. Yes, right here, Argyle (indicating).

Q. So can you point for us on that map which direction you were coming from, from the right side or the left side?

A. I was coming from the right side, so I was walking towards Argyle.

Q. So you are pointing towards the bottom right-hand corner of the map where the yellow line starts on the map?

A. Yes.

Q. Do you know what direction that was, north, south, east, west?

A. It's north. Going north.

Q. So can you tell us when you first saw this vehicle that you mentioned, where did you first see it?

A. When I was crossing over Argyle.

Q. On Greenwich?

A. Yes.

Q. And what street was the vehicle traveling on?
A. The same street as me.
Q. And can you tell us what direction was it going? Was it going the same direction as you or the opposite direction coming towards you?
A. The same direction.
Q. So when you first saw it, was it in front of you or behind you?
A. I didn't see it because it was behind me. Not until it turned onto Argyle.
Q. When it turned onto Argyle, had it come from behind you on Greenwich?
A. Yes.
Q. And did you notice anything about what it looked like?
A. It was just a red van. Regular van.
Q. Can you describe for us how big it was?
A. It wasn't a fifteen passenger, it was just a -- not one of those construction vans, just a little van.
Q. Was it like a minivan or SUV-type of truck?
A. No, just a square van.
Q. And did you notice anything else about it?
A. No.
Q. Did you notice the license plate or anything like that?

A. No.
Q. Could you see if there was anybody inside the van?
A. Just the person driving.
Q. And were you able to see the person inside the van who was driving?
A. See the person, but not physically.
Q. Were you able to tell at that point if it was a male or a female?
A. Yes.
Q. What did it look like?
A. It was just a big built body. That's it, that's all I can tell you.
Q. Did it look like male or female?
A. It looked like a male.
Q. Could you see that person's face or anything about how they looked at that point?
A. No.
Q. Now, when you first saw that vehicle turn from Greenwich onto Argyle, are there any lights in that area?
A. Yeah, there are.
Q. What kind of lights are there?
A. Street lights.
Q. And how well were you able to see with those street lights?
A. Not really well. I wasn't really paying any

attention.
Q. Was it dark out at that time of the morning?
A. Yeah, it was nighttime.
Q. And when the van came from behind you to turn onto Argyle, how close did it get to you?
A. It crossed in front of me as I was crossing the street. It was like slowing down.
Q. Can you estimate the distance between you and that vehicle?
A. No, I can't.
Q. Was it a few feet, several feet?
A. I can't really tell.
Q. How about the distance between you and me, was it bigger than that?
A. No, it was smaller than that.
Q. How about the distance between you and where this rail is that separates from where you are sitting to this part of the courtroom, was it bigger than that distance?
A. No. It was maybe between me and this lady, because it crossed in front of me, so it wasn't that far.
Q. You are referring to the court reporter that is typing in front of you?
A. Yes.
MS. TEBBETT: Judge, is that a distance of approximately --

THE COURT: Yeah, it's anywhere from six to ten feet.

Q. Were there any other cars that were on the road at that time when you saw that vehicle turn onto Argyle?

A. Yes.

Q. Can you tell us what the traffic was like at that time?

A. It was slow.

Q. Were there a lot of other cars or a few other cars?

A. No, there was a few.

Q. Now, tell us what happened after you saw that vehicle turn onto Argyle. Did there come a time that you saw it again?

A. Yeah, it made a U-turn on Argyle and then it made a right onto Greenwich. As I was walking past the Amoco gas station on Greenwich, it came into the gas station like it was going to get gas. And the person motioned me to come here and I motioned back no, and I kept going. And then the gas station -- I mean, sorry, excuse me, the van proceeded out of the gas station and made a right onto Argyle -- I mean onto Greenwich. And as I was proceeding, it kept going and it made a right onto Elmwood.

Q. Let me stop you there for one second. After the vehicle had turned onto Argyle, did you lose sight of it at all?

A. Well, yeah, because it was behind me. I kept walking.

Q. And when you saw it turn back onto Greenwich, did it turn in the direction that you were walking or did it go back in the opposite direction where you had come?

A. The same direction as I was walking.

Q. Now, at what street is the gas station that you mentioned?

A. It's on Greenwich.

Q. And Greenwich and the intersection of what?

A. Greenwich and Robinwood. It's on the corner.

Q. The corner of Greenwich and Robinwood?

A. Yes.

Q. How far from Argyle is Robinwood?

A. A block.

Q. So Robinwood is the next block after Argyle?

A. No, there is another block. I don't know the name of it. And the next block would Robinwood.

Q. So Argyle, another block and then Robinwood?

A. Yes.

Q. When you saw the van turn into that gas station, were you on Greenwich?

A. When it turned onto what, the gas station? I was walking past the gas station.

Q. You were already at the gas station?

A. Yeah.
Q. Were you able to see the person who was inside of the van at that point?
A. Yes, I saw the person.
Q. Can you describe for us what that person looked like?
A. Just a guy, kind of big. That was it.
Q. Were you able to tell that it was a male?
A. Yes.
Q. Were you able to see that person's face?
A. No.
Q. Were you able to see the color of that person's skin?
A. No.
Q. Were you able to see anything else about the inside of the van?
A. No.
Q. And can you just explain for us what happened again when you saw that van pull into the gas station?
A. Just the person motioned me to come here and I motioned it no, and I kept walking.
Q. Can you show us how that person motioned towards you?
A. Like come here with his hands (indicating).
Q. You have your hand in front of you motioning your

hand towards yourself repeatedly?

A. Yes.

Q. How did you indicate no?

A. I said no with my finger, no (indicating).

Q. You are holding up your index finger and waving it back and forth in a side-to-side motion?

A. Yes.

Q. So can you tell us how you proceeded at that point?

A. I kept walking up Greenwich. The van came out of the gas station and made a right onto Greenwich and then he made another right onto Elmwood Avenue.

Q. Now, when you say that the vehicle made a right onto Greenwich, did that put it in the same direction that you were walking or the opposite direction?

A. Same direction.

Q. And were you able to see anything else about the van at that point?

A. No.

Q. And are there any lights in the area of the gas station?

A. Yes. There are lights in the gas station.

Q. What type of lights?

A. Bright lights.

Q. And then what was the next street that you saw the car turn on to?

A. Elmwood Avenue.
Q. And how far from the gas station is Elmwood?
A. A block.
Q. And are there any lights in that area?
A. Yes, there is street lights across the street.
Q. And are there any businesses or are there residences in that stretch of Greenwich by the gas station and Elmwood?
A. Both. There is residence across the street and businesses on the same side as I was walking.
Q. Were any of those businesses open at this time of the morning?
A. No, just the gas station.
Q. And do you know what any of the businesses are on that stretch of Greenwich between the gas station and Elmwood?
A. One is a beauty salon.
Q. Do you know the name of that beauty salon?
A. Yole's.
Q. Was Yole's open at that time?
A. No.
Q. So can you tell us how you proceeded after you walked past the gas station?
A. Well, I proceeded to walk up Greenwich and the van turned onto Elmwood and as I was walking past Yole's and I

got to the parking lot, the beginning of the parking lot --

Q. Where is the parking lot by Yole's?

A. It's next to it. It's right next to it. The gate was open. And this man came out of the parking lot.

Q. And can you describe for us what this man looked like?

A. He was about maybe five-ten, five-eleven, weighed 200 something pounds, had on a black flight jacket, a nylon jacket with an orange lining inside. He had on some black sweatpants and some black boots.

Q. Now, were you able to tell the person's race, this man's race?

A. Yes.

Q. What was it?

A. African American.

Q. Can you describe the color of his skin?

A. It was like medium brown skin.

Q. And can you tell us -- let me just ask you about the clothing he was wearing. Where did you see the orange lining?

A. Inside the jacket.

Q. Can you tell us where inside the jacket you saw that orange lining?

A. Inside of it. The inside. Because you could see it from the bottom of the jacket.

Q. And were you able to see this man's face?
A. Yeah, for a quick second, but.
Q. Tell us what happened.
A. He had a gun and he told me, Shh, to be quiet and as we were -- as he pulled my jacket, he pulled the stocking over his face.
Q. Let me ask you about that for a second. When you first saw this man by the parking lot, did he have anything covering his face?
A. No.
Q. And what was the lighting like in that area?
A. There was no lights on that side.
Q. Were there any lights?
A. No.
Q. So were you able to see his face at that point?
A. Well, I was close enough, yeah, but I don't remember.
Q. Now, did he cover his face after you first saw him by the parking lot?
A. Yes.
Q. What did he use to cover his face?
A. It was a stocking.
Q. Can you describe what that stocking was like for us?
A. Just a regular stocking. He just pulled it over

his face.

Q. Where did he pull it from?

A. His head.

Q. Did you see it on his head?

A. Yes.

Q. Can you point to us where you saw it on his head, what part of his head?

A. The top of my head (indicating).

Q. Pointing to the top?

A. Uh-huh.

Q. Was it covering any part of his face when you first saw him?

A. No.

Q. Then tell us when he pulled it down, what did it cover?

A. His face.

Q. Did it cover his entire face?

A. Yes.

Q. Do you know what color it was?

A. Like -- no, I couldn't.

Q. Was it skin colored, dark colored, light colored?

A. No.

Q. You weren't able to tell?

A. I don't remember.

Q. Now, were you able to see the top of his head or

the back of his head or his hair at that point?

A. He had a bulge in the back, so I figured it was dreads. So he had the stocking like it was covering his dreads and he pulled the stocking over his face.

Q. Did the stocking extend beyond just the top of his head to cover the back of his head?

A. Yes.

Q. Were you able to see his hair at all under the stocking?

A. No.

Q. Did he have anything else covering his head at that point?

A. No.

Q. Now, you mentioned you saw that he had a gun?

A. Yeah.

Q. Where did you see the gun the first time?

A. He had it against his chest holding it in his hand (indicating).

Q. You are pointing to the middle of your chest?

A. Yes.

Q. How was he holding the gun against his chest?

A. Just like this (indicating).

Q. Was it flat against his chest?

A. Yes.

Q. And can you describe for us what the gun looked

like?

A. It was black and it had two clear light blue lights on it.

Q. Now, where did you see these two clear light blue lights?

A. On top of the gun.

Q. Do you know on what part of the gun?

A. No.

Q. Was it on the handle or the part that fires?

A. It was on top, so it wasn't by the handle.

Q. And do you know what type of gun it was?

A. No.

Q. Do you know anything about guns?

A. No.

Q. Can you tell us what was the first thing that happened then after you saw this man with a gun at the entrance to the parking lot?

A. Well, he grabbed my jacket and said, Shh and he pulled me in front of him and we walked to the back of the parking lot and he asked me if I had any money and I said yes. I told him I had $30 and I gave him a twenty and I gave him a ten.

And then he pushed me on the ground and he took out his penis and he told me that I was going to suck him off and I began to suck him off. And he was talking to me telling me

he came out here to find somebody in Long Island, to find a girl in Long Island to do this to him.

Q. Shamika, let me stop you for one second.

MS. TEBBETT: Judge, I am going to ask to have these marked People's 47, 48, 49, 50 and 51 first for identification.

THE COURT: People's 47 through 51 for ID.

MR. LEMKE: Your Honor, no objection if the People wish to move them into evidence.

THE COURT: Kathi, if you would, 47 through 51 without objection will be received in evidence.

(Whereupon, People's Exhibits 47 through 51 were received and marked in evidence.)

COURT OFFICER: People's 47 through 51 marked and received in evidence.

Q. Shamika, just take a look at those photographs, okay.

A. Uh-huh. Okay.

Q. Do you recognize the areas that are depicted in those photographs?

A. Yes.

Q. Let's start with the first one that's marked as 47.

A. Okay.

Q. Can you tell us what is depicted in that photograph?

A. It's a picture of Yole's Beauty Salon.
Q. And then can you just look at the next one, which is 48. What's depicted in that photograph?
A. It's a picture of the parking lot.
Q. And can you see in that photograph the area where you first saw this man?
A. Yes.
Q. I'm going to hand you this marker and just ask you to put an X on the spot where it was that you first saw him?
A. Okay.
(Indicating.)
Q. If I can have the one that you marked.
So you made an X towards the bottom of this photograph just to the right of this center of the photograph?
A. Yes.
Q. And can you tell us where Yole's Beauty Salon is in this photograph? Can you see it in this?
A. Yes.
Q. Where do you see it?
A. It's on the right corner.
Q. Would that be over here to the right-hand side of the photograph?
A. Yes.
Q. And is this the sign that says Yole's Beauty Salon

where I'm pointing towards the right side of the photograph?

A. Yes.

Q. And where -- in this photograph do you see the parking lot that you mentioned?

A. Yes.

Q. And where would that be, which part of the photograph?

A. In the center.

Q. Would that be this middle part here (indicating)?

A. Yes, that's the parking lot.

Q. So where you put this X, is that at the entrance to the parking lot?

A. Yes.

Q. Now, can you see in this photograph where you ended up in the parking lot?

A. Yes.

Q. Where in the photograph is that?

A. It's in the corner in the back to the left.

Q. And what else is in that area in the corner to the back to the left where you ended up in the parking lot?

A. On the other side of the gate is an abandoned building.

Q. Is there a gate in that part of the parking lot where you ended up?

A. Yes, it separates the abandoned building from the

parking lot.

Q. Can you see that gate in that photograph?

A. Yes.

Q. Where is that, which side of the photograph?

A. On the left side.

Q. Would that be this part over here towards the center left (indicating)?

A. Yes.

Q. And where is the abandoned building that you mentioned in this photograph?

A. On the left side.

Q. Would that be this building over here (indicating)?

A. Yes.

Q. Starting at the left-hand side going towards the middle of the photograph?

A. Yes.

Q. Now, just take a look at the next photograph that you have there. Do you recognize the area that's depicted in that photograph?

A. Yes. It's a picture of inside of the parking lot.

Q. And can you see in that photograph where you ended up in the parking lot with that man?

A. Yes.

Q. Can you just mark on there an X as to the spot where you ended up?

A. (Indicating.)
Q. If I can just have that photograph.
So now you have an X towards the left-hand side towards the bottom, just left of center of this photograph; is that right?
A. Yes.
Q. What is in this area over here on the left side of the parking lot by this fence, this gate?
A. Parking spaces.
Q. And can you see where Yole's is in this photograph?
A. Yes.
Q. Where is it?
A. It's on the right side.
Q. Would that be this building that's over here on the furthest right-hand side of the photograph?
A. Yes.
Q. Is that the back of Yole's?
A. Yes, it's the side of the building.
Q. The side, okay.
A. Yes.
Q. And are there any lights off of Yole's on that part of the photograph?
A. No.
Q. Are there any other lights in this part of the parking lot where you ended up?

A. No.
Q. How about from where the side where the abandoned building is?
A. No.
Q. Can you just take a look then at the next photograph that you have?
A. Yes.
Q. Do you recognize the area that's depicted in that photograph?
A. Yes, it's the corner over where we were of the parking lot.
Q. Can you see in that photograph where you had ended up towards the back of this parking lot?
A. Yes.
Q. Can you just mark that with an X as well?
A. (Indicating.)
Q. Now, is this photograph a closer-up view of the last photograph that I just showed you?
A. Yes.
Q. And you put an X at the bottom of the photograph just about in the center?
A. Yes.
Q. And these are the parking spaces (indicating)?
A. Yes.
Q. Now, can you just describe for us how you got from

that front of the parking lot to this spot here where you have the X?

A. I walked.

Q. And where was the man?

A. Behind me.

Q. And how did you walk with the man behind you to get to that spot? What was he doing?

A. He was walking behind me.

Q. Was he doing anything to you physically?

A. No, he just had a hold on to my jacket.

Q. Was he holding you from the front or from the back?

A. He was holding me on my arm. In the back of my arm with his hand.

Q. And could you see where he had the gun at that point?

A. No, because he was behind me, no.

Q. Now, tell us what was the first thing that happened when you got back to that spot towards the back of the parking lot?

A. He asked me if I had any money and I told him yes, $30. And I gave him a twenty and I gave him a ten and he put it in his pocket.

Q. Where did you have the money?

A. In my purse.

Q. And did you take it out of your purse?

A. Yes. I went inside my purse and took it out.
Q. Did he take the money?
A. Yes.
Q. Did you see what he did with it?
A. He put it in his pocket.
Q. Could you see where the gun was at the time that you were giving him your money?
A. It was in his hand.
Q. How was he holding it?
A. Just holding it. It wasn't pointed at me, he was just holding it.
Q. Was he holding it the same way he was holding it before, against his chest?
A. No.
Q. Did he have it pointed up or pointed down?
A. He had it down.
Q. Were you able to see it?
A. Yes.
Q. Now, after you gave him the money and you saw him take it, what was the next thing that he did?
A. He pushed me on my knees and told me I was going to suck him off and he exposed himself to me and I began to suck him off.
Q. Can you explain for us what positioning you were in?

A. I was on my knees facing him.

Q. And was he in front of you, to the side of you?

A. Yes, he was in front of me.

Q. Were you able to see him at that point?

A. What, see his face?

Q. Were you able to see his face?

A. No.

Q. Did he have anything --

A. He had the scarf on. He had the stocking on his face.

Q. Were you able to see his body or his build?

A. Yes. Like I could tell through the jacket, yes.

Q. Could you describe for us his build as you were able to see him at that point when you were kneeling on the ground in front of him?

A. Just it looked like he weighed about two something and he was kind of big. Taller than me.

Q. How tall are you?

A. I'm five-seven.

Q. And was he a lot taller than you or a little taller than you?

A. A couple of inches.

Q. When you say two something, what do you mean by that?

A. Two something. I can't be exact.

Q. Do you mean two hundred something pounds?
A. Yes, two hundred something pounds.
Q. How would you describe his build; small, medium large? How would you describe it?
A. At the time I would say about medium build.
Q. And can you describe his body?
A. That's what I was describing.
Q. Can you describe the shape of his body, what kind of shape he was in?
A. No, not really. I couldn't tell you if he had muscles or anything like that.
Q. Now, just tell us again the words that he said to you when you were kneeling on the ground?
A. Well, before, you know, he said I was going to suck him off, so he pushed me on my knees.
Q. Let me ask you about that. Did you understand what he meant by that?
A. Yes.
Q. What did you understand that to mean?
A. It meant I was going to suck his penis.
Q. Tell us what was the next thing that happened?
A. He pushed me on my knees and he exposed himself to me, meaning he pulled his penis out and I started to suck him off. And he told me that he came out here to Long Island to find somebody to do this to him.

Q. Now, when you said the words, you started to suck him off, did he put his penis into your mouth?
A. No.
Q. Tell us what you did.
A. I put the penis in my mouth and I just started to suck him off.
Q. And do you know about how long you did that for?
A. Probably about two, three minutes.
Q. And was he doing anything physically during that time?
A. He was touching my breasts.
Q. Can you explain for us how he was doing that?
A. Well, with his free hand he was touching my breast outside of my shirt.
Q. And what was he doing with his other hand?
A. He had the gun in his other hand.
Q. Could you see the gun in his other hand?
A. Yes.
Q. Where was it?
A. On the side.
Q. And can you tell us how close the gun was to you?
A. It was close.
Q. Can you approximate for us inches, feet, how close?
A. A couple of inches.
Q. Was it near your body or near your face?

A. Yeah. Well, it was near my body, near my face.
Q. Near which part of your body?
A. Like my shoulder.
Q. Do you remember which side it was on?
A. Well, for me, it was on the left side.
Q. So that would be which hand that he was holding it with?
A. He was holding it with his right hand.
Q. Can you tell us what was the next thing that he did?
A. He told me to get up and I got up. He tried to unbuckle my pants, but he couldn't because you need two hands, so I unbuckled them.
Q. Can you explain that for us. Tell us what he tried to do?
A. He tried to unbutton my pants with his free hand.
Q. What was he doing with his other hand?
A. He was holding the gun and I unbuckled it because he couldn't do it and he stuck his fingers inside my vagina.
Q. When he was trying to unbuckle your pants, was he saying anything to you?
A. No, not at that point, no.
Q. Did he ever tell you to unbuckle your pants?
A. Yes, when he couldn't unbuckle them.
Q. What did he say?

A. He said, Unbuckle your pants.
Q. Were you able to see the gun at that point when he told you to unbuckle your pants?
A. Yes.
Q. Where did you see it?
A. It was in his hand on the side.
Q. And can you just explain for us how you were positioned when he directed you to unbuckle your pants?
A. I was standing in front of him.
Q. And then what did you do to your pants after you had unbuckled them?
A. Nothing. I just unbuckled it and he stuck his fingers in my vagina.
Q. Did he have to pull your pants down to do that or was he able to do it with your pants still up?
A. He was able to do it with my pants up.
Q. Can you describe for us what you could feel in the area of your vagina when he put his hands inside your pants?
A. Somebody's finger inside of me.
Q. Were you able to feel that?
A. Yes.
Q. Did you feel the fingers on the inside or the outside of your vagina?
A. The inside.
Q. And how long did he do that for?

A. Not long. Not even a minute.
Q. What did he do next after he put his fingers inside of your vagina?
A. He took my breasts out. He made me lift my shirt up and he took my breast out of my bra and he sucked on my breasts.
Q. Can you explain for us how he did that?
A. He took his hand and he sucked on my breast with his mouth.
Q. Were you able to feel his mouth on your breasts?
A. Yes.
Q. Do you know which breast you were able to feel his mouth on?
A. Both. He did both. He did one and then he did the other.
Q. Can you just describe for us what you were able to feel?
A. What do you mean what I was able to feel? He was sucking on my breast.
Q. Were you able to feel his mouth on your breasts?
A. Yes.
Q. And how long did he do that for?
A. He didn't do it long. That was about -- the whole episode was probably about a minute.
Q. Were you able to see where the gun was during the

time that he was putting his mouth on your breasts?
A. Yes. He still had the gun in his hand.
Q. Did he move it at all to position it differently at all?
A. No.
Q. And did he say anything to you during the time, first, that he was putting his fingers in your vagina? Was he saying anything to you?
A. No, not at that moment, no.
Q. How about before he put his mouth on your breasts, did he say anything to you at that point?
A. No.
Q. Can you tell us what he did after he had his mouth on your breasts?
A. He told me -- after he told me I'm going to finish sucking him off, so I got back down on my knees and I proceeded to suck him off. And he said have I ever done it before?
And I told him, No.
And he said, Well, it sure doesn't feel like you have never done it before.
Q. Can you explain for us how you were positioned when that happened?
A. I was on my knees.
Q. How did you get from standing up to on your knees?

A. I got on my knees.
Q. And when he said to you to finish sucking him off, at that point what did you understand that to mean?
A. That I was going to finish sucking his penis.
Q. And was his penis still exposed from the time before or did he do it again?
A. Yes, it was still exposed.
Q. And did he put his penis into your mouth at that point?
A. No.
Q. Tell us what happened?
A. I got on my knees and I proceeded to suck him off and he told me that I was going to swallow and he ejaculated and I swallowed.
Q. Now, when you said you proceeded to suck him off, just tell us what you meant?
A. I was going to finish sucking his penis.
Q. And was his penis in your mouth at that point?
A. Yes. Well, no, no. I was on my knees and that's what he said.
Q. Did there come a point after you got down on your knees that he put his penis in your mouth?
A. Yes, but he didn't do it, I did it.
Q. Just explain for us how that happened?
A. I got back on my knees and took his penis and put

it in my mouth and I continued to suck him off and he ejaculated and I swallowed and I got back up. And he told me not to make any sudden moves because he wasn't afraid to shoot me or somebody else. And he put his penis away and he told me to sit down and wait five or ten minutes and he proceeded out of the parking lot and he made a right onto Greenwich.

Q. Let me just stop you for one second. The second time he put his penis into your mouth, were you able to see where the gun was at that point?

A. Yes, it was still in his hand.

Q. And how long was his penis in your mouth for that second time?

A. Not long. Maybe about a minute or two.

Q. Can you tell us if you did anything after he ejaculated in your mouth?

A. Swallowed.

Q. Did you do anything after that?

A. No, I just got up.

Q. And were you able to see where the gun was after you got up?

A. Yes, in his hand. Still in his hand.

Q. And just tell us again the words that he said to you?

A. That I'm going to sit and wait five, ten minutes

and that he's not afraid to shoot me or somebody else if I'm trying to get somebody's attention.

Q. And were you able to see the gun when he said that to you?

A. Yes, it was still in his hand.

Q. Now, during the time that you were in this back corner of the parking lot with him, did you see if there were any other cars going back and forth in that area?

A. No, there were no cars going back and forth.

Q. Were there any people walking down that part of Greenwich Street during that time?

A. No.

Q. Did you see anyone in that area?

A. No.

Q. So tell us what happened after he said those things to you?

A. I sat down and as he proceeded to walk out of Greenwich he made a right. While I was sitting there, I noticed the same red van proceeding in the opposite direction going back towards Nassau Road and that's when I got up.

Q. Now, from where you were sitting in that parking lot when he made the right, which direction was he going towards?

A. He was going north.

Q. And do you know which street he was going towards?

A. Elmwood Avenue.
Q. And if I can just ask you to take a look at that map again that's People's 12.
From looking at that map, are you able to tell us first where the location of this parking lot where Yole's Beauty Salon is?
A. Yes.
Q. Point out where that is for us.
A. It's right here, pointing to the red dot (indicating).
Q. And is there any other marking in that area of the map that you are pointing to?
A. No, just a red dot.
Q. Does it indicate what the location is?
A. Just an address.
Q. Are you familiar with that address?
A. Yes.
Q. What's the address where the Yole's Beauty Salon is?
A. 543 Greenwich.
Q. Is that marked on that map?
A. Yes.
Q. You are pointing again towards the bottom right-hand portion of the map where it almost looks like the image of a pushpin?

A. Yes.
Q. And the address of 543 Greenwich Street is listed on there?
A. Yes.
Q. Are you able to see on that Mapp where Elmwood is?
A. Yes.
Q. Can you show us where that is?
A. It's right here.
Q. And you are pointing to the next street after where that pushpin marker is located?
A. Yes.
Q. So is Elmwood the next street after you pass this stretch where Yole's Beauty Salon is located?
A. Yes.
Q. You can put that down, thank you.
Now, when you saw the man get to the entrance to the parking lot, were you able to see him after he turned right?
A. No, because of the gate. You can't really tell. He just made the right.
Q. From where you were sitting in the back of that parking lot, how far can you see out onto Greenwich?
A. Well, with the opening of the parking lot you can see across the street, but I'm looking towards the gate. I can't see because it's dark and the gate is brown, so you

really can't see.

Q. Can you see towards the left or the right of that gate from where you were sitting in the back of the parking lot?

A. Yeah, but not on the opposite side, no.

Q. Now, how long did you sit there for in the back of the parking lot?

A. About five minutes.

Q. And did you see anything during that time that you were sitting there?

A. Just the red van going in the opposite direction.

Q. And can you tell us what that van looked like?

A. Just a red little van.

Q. Were you able to tell for certain whether or not that was the same vehicle that you had seen earlier when you were walking down Greenwich Street?

A. Yes, it was the same color, same body shape.

Q. And were you able to see whether or not there were people inside of that vehicle?

A. Just the driver, that's all I could see.

Q. Were you able to actually see what the driver looked like?

A. No.

Q. Were you able to tell whether or not it was the same person driving that you had seen when you first saw the

vehicle?
A. I knew it was a male.
Q. Were you able to tell if it was the same person?
A. No.
Q. And were you able to tell whether or not the person who was driving that vehicle was the same man who had attacked you in the parking lot?
A. Well, I guessed it was, yes.
Q. Were you able to tell based on what you could see or you weren't sure?
A. No, I wasn't sure.
Q. So can you tell us what you did after you sat in the back of that parking lot for about five minutes?
A. I got up and I made a right and I went home.
Q. Now, can you tell us what you did once you got home?
A. I went and woke up my mom.
Q. Did she live with you at that time?
A. Yes.
Q. Now, do you know about what time it was when you got home?
A. No.
Q. Would it be after 3:00 in the morning?
A. Yeah. Yeah, it could have been 3:00, yeah, because when I got to the hospital it was after 3:00.

Q. Now, can you tell us how much time you spent in this back area of the parking lot while this man was attacking you?

A. I would say a good 15, 20 minutes.

Q. And do you know about how long you had been walking home from your friend's house before you ended up in the parking lot?

A. No.

Q. Do you know how much time passed by the time you got home and woke up your mother from when you had left your friend's house?

A. No.

Q. Can you tell us what happened when you woke up your mother?

A. She was panicking and she called 911 and they came to my house and I told them the story and they took me to the hospital.

Q. Now, Ms. Dottin, can you describe for us at the point when you got home when you woke up your mother, what was your condition like at that time?

A. I was crying.

Q. And emotionally, what was your demeanor?

A. All over the place.

Q. What do you mean by that?

A. I wasn't myself.

Q. In what way?
A. In a scared, drastic way.
Q. And can you describe for us what your condition was like during the time that you were with the man in the back of the parking lot?
A. Scared, nervous, didn't know what to expect.
Q. And can you describe for us what your reaction was to what was happening to you when you were in the parking lot?
A. Shocked.
Q. Okay.
Now, did you tell your mother about anything that had happened to you in the parking lot?
A. No. She doesn't know the details.
Q. Did you tell her anything about what happened to you?
A. Yeah, I told her I got sexually assaulted.
Q. And did she call the police to come to your house?
A. Yes, she did.
Q. And would that be the Hempstead Police Department?
A. Yes.
Q. And did they take a statement from you at that point when they first came to your house?
A. No.
Q. Can you tell us where you went after the police had

come to your house?

A. To the hospital, but I'm not really sure which one. I don't remember.

Q. Was it a hospital in Nassau County?

A. Yes.

Q. And can you explain for us what happened to you once you got to the hospital?

A. They took a statement and they gave me a rape kit to examine me.

Q. Who went with you to the hospital?

A. My mom.

Q. And did any of the officers accompany you to the hospital?

A. Yeah, the one that drove me.

Q. And did you meet any other officers or detectives once you were at the hospital?

A. Yes.

Q. Do you recall who they were?

A. Detective Moran.

Q. Do you know when you first met him?

A. I don't know what time it was.

Q. Was it after you were already at the hospital?

A. Yeah. I already -- after I had the exam.

Q. Now, let me ask you some questions about that exam. Were you brought to the SANE Unit of that hospital?

A. The what unit?

Q. Do you remember them telling you you were at the SANE Unit, the Sexual Assault Nurse Examiner Unit?

A. I don't know.

Q. Tell us about the examination that they did on you at the hospital.

A. She took swabbings of my vagina and swabs off my breasts and my mouth.

Q. And did she examine parts of your body?

A. Yeah.

Q. Which parts?

A. My breasts, my mouth, and my vagina.

Q. Was that a nurse at the hospital that did that?

A. No, I believe -- I believe so, yeah. She had came from home to give me the exam.

Q. And how long did that exam last at the hospital?

A. About ten minutes. It wasn't that long.

Q. Now, when you spoke to the detective, did you speak to him in the hospital?

A. Yes.

Q. And did you explain to him at that point what had happened?

A. Yes.

Q. And did he take a statement from you that day at the hospital?

A. Yes.
Q. And were you able to give Detective Moran a description of the man who had done this to you?
A. Yes.
Q. Were you able to give a description of what the man looked like?
A. No, not his face features, no. I couldn't tell him what he looked like.
Q. Why not?
A. Because it was for a split second I only saw his face and he had it covered with a stocking, so.
Q. And did the police take any of your clothing while you were at the hospital?
A. They took my jacket.
Q. Let me ask you about the jacket. Had something happened with your jacket during this incident in the parking lot?
A. Yes. While I was walking home, I threw up and I wiped my mouth with my jacket. The sleeve of my jacket, I wiped it with my mouth.
Q. Where were you when you threw up?
A. Walking home.
Q. Was that after you had exited the parking lot?
A. Yes.
Q. And can you tell us what type of jacket that was

that you were wearing?
A. It was a blue jean jacket.
Q. And you had wiped your mouth with the sleeve of it?
A. Yes.
Q. And did you have that jacket with you at the hospital?
A. Yes.
Q. And do you remember who you gave it to?
A. Some -- I don't know if it was a detective or cops. I gave it to them the next day. They didn't take it that night, no.
Q. Can you tell us what you did with your jacket from the time that you were at the hospital until the time that you gave it to the detectives?
A. Yeah. It was in my room.
Q. Did you wash it at all during that time?
A. No.
Q. And did you tell them anything about the jacket when you gave it to them? Did you tell them what you had done with the jacket after you threw up?
A. Yes.
Q. Now, let me ask you, from the time that you left that parking lot through the time that you got home and told your mother about what happened, did you wash your body at all?

A. No.
Q. How about the time that you were at home waiting for the police to arrive?
A. No.
Q. Did you wash your body at all during that time?
A. No.
Q. And how about up until the time that you were examined by the nurse at the hospital, did you wash your mouth out, wash your body, do anything at all during that time?
A. No.
Q. Now, after you left the hospital, did you go somewhere with the police?
A. No, I went home.
Q. Did there come a time that you went back to this parking lot area with the detectives?
A. Yeah, the next day.
Q. And do you remember who you were with at that time?
A. No, I don't remember.
Q. Was it the same detective at the hospital or a different detective?
A. I don't remember.
Q. Can you tell us what you did with the police when you went back to this area the next day?
A. I showed them where it happened and they took

pictures and I told them about the incident and they took my jacket in for evidence.

Q. When you say the next day, would it be the 18th or just later in the morning after this had happened?

A. Later in the morning.

Q. Do you know about what time it was?

A. No.

Q. Was it after the hospital?

A. Yeah, of course, it was after the hospital.

Q. Did you go home at all during that time?

A. Yeah, I went home with my mom.

Q. And how long were you at home before you went back with them?

A. A couple of hours. Maybe two hours, three hours.

Q. Now, when you were speaking to Detective Moran at the hospital and telling him about the man who had done this to you, was that someone that you had ever seen before?

A. No.

Q. Was it someone that you ever saw since?

A. No.

MS. TEBBETT: Judge, can I have one moment?

THE COURT: Yes.

(Pause in the proceedings.)

Q. Ms. Dottin, let me ask you a few more questions, okay?

A. Okay.

Q. Now, when you were in the back of this parking lot next to the Yole's Beauty Salon, did you ever see that red van that you described earlier --

A. No.

Q. -- in that parking lot?

A. No.

Q. And did you ever see the person who was driving that van exit the van and come over to you by that parking lot?

A. No, I didn't see nobody exit the van because I didn't see the van.

Q. Now, when the man who attacked you left that parking lot, from what you could see of where he went, did you see whether or not he went towards a vehicle?

A. No, he just made a right on Elmwood -- I mean Greenwich, excuse me.

Q. Could you see any vehicles in that area where he turned towards?

A. No.

Q. During the time, those five minutes that you said you stayed in the back of that parking lot, did you hear a car drive by at all?

A. Yeah. I saw the car drive in the opposite direction.

Q. After the man left the parking lot, did you hear any cars driving back and forth?

A. No.

Q. Now, during the time that you spent with this man in the back of that parking lot, did he ever lift the stocking up?

A. Yes.

Q. Let's talk about that. When did that happen?

A. When he went to suck on my breasts, that's when he lifted the stocking up above his mouth (indicating).

Q. And you were just pointing to the area between your upper lip and your nose?

A. Yes.

Q. So what part of his face was exposed when he lifted the stocking up to that point?

A. His mouth.

Q. And were you able to see that area of his face?

A. Yes.

Q. And did you notice anything about that area of his face?

A. No, just the mouth.

Q. Were you able to see his chin, his neck, any --

A. I saw his chin, but that's about it. Chin, mouth, that was all exposed.

Q. Did you get a good look at that area?

A. No. I wasn't looking.
Q. Why not?
A. I don't know. I don't know why I wasn't looking. I can't really tell you why.
Q. Was there any light in that area that would have helped you see his face?
A. No.
Q. Now, during the whole time that you spent with him in the back of that parking lot, did you ever get a good enough look at his face that you would be able to identify him again if you saw him?
A. No.
Q. Now, can you say for sure whether or not the man that you saw driving the van was the same man that had attacked you in the parking lot?
A. No.
Q. Now, Shamika, the first time that you got down on your knees in the back of that parking lot, can you explain for us how you said he pushed you down to your knees?
A. From my shoulder with his hand, he pushed me down.
Q. Can you just demonstrate that for us?
A. My shoulder, he just pushed me down like that (indicating).
Q. And you have an open palm with your fingers facing downward, moving down in a downward motion?

A. Yes.
Q. Was his hand around your shoulder or on top of your shoulder?
A. On top of my shoulder.
Q. Can you show us where on your shoulder?
A. (Indicating.)
Q. And you have your hand across the top of your shoulder?
A. Yes.
Q. Did he do that with one hand or both hands?
A. One.
Q. Did he push you down using his hand?
A. Yes.
Q. And can you explain for us how your body got positioned when he pushed you down?
A. I got on my knees when he pushed me down. I bent my knees to get on my knees.
Q. Were your knees the only part of your body that bent at that point?
A. Yes.
Q. And during the time -- during the second time that he had his penis in your mouth, what was he saying to you during that time?
A. Have I ever done it before?
I told him, No.

He said, It sure doesn't feel like it.

Q. And after he ejaculated in your mouth during that time, did he say anything to you regarding that ejaculate, that semen?

A. That I was going to swallow. Swallow it.

Q. Now, at the time, Ms. Dottin, that you were at the hospital when they were doing the examination of you, can you just explain for us how they took those swabs of those areas of your body? What were they using?

A. I don't know what they used for my coochie -- my vagina, but for my breasts they used Q-tips and wiped around my areola, my nipple part.

Q. Was that the same area on your breast where the man had put his mouth and was sucking on your breast?

A. Yes.

MS. TEBBETT: May I just have one moment, Judge?

THE COURT: Yeah.

(Pause in the proceedings.)

MS. TEBBETT: Thank you. I have no further questions.

THE COURT: Mr. Lemke -- can I see the lawyers real quick?

MR. LEMKE: Your Honor, I have no questions at all.

THE COURT: Thank you, Ms. Dottin.
That answers my question.
MR. LEMKE: I thought so.
THE COURT: Ms. Dottin, thank you very much. Just watch your step as you step off.
THE WITNESS: Thank you.
(Whereupon, the witness was excused.)
THE COURT: Members of the jury, as I told you on Friday that we would just be sitting this morning. We're not going to be reconvening this afternoon. Tomorrow is obviously a Court holiday. The Court will be closed, so we will be coming back Wednesday morning. I'm not quite sure if we'll be back in this courtroom at this point.
What I'm going to do is ask all of you to come back Wednesday at 10:00 to the same place. I believe it's room 106 you have been coming to the last couple of days.
As I let you go for the next day-and-a-half, please don't form any opinions.
Don't speak about the case amongst yourselves or with anyone else.
Please don't view or visit any of the areas described, and please don't access any accounts of this case either in the past or should there be any more

recently in the media about the case.

So, enjoy the next day-and-a-half.

I know we had a short morning, but we'll be back, ready for a full day on Wednesday. See you then.

(Whereupon, the jury exited the courtroom.)

(Whereupon, the trial was adjourned to November 12, 2008.)

STATE OF NEW YORK : NASSAU COUNTY

SUPREME COURT PART 49

----------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK TRIAL

- against - IND. 436N-08

RICARDO WALTERS

Defendant.

----------------------------------------X

November 12, 2008
262 Old Country Road
Mineola, New York

B E F O R E :

HON. JAMES MCCORMACK
Acting Supreme Court Justice

A P P E A R A N C E S:

(Same as previously noted)

KATHLEEN PLAIA
KATHI FEDDEN
OFFICIAL COURT REPORTER

*** *** ***

THE COURT: Bring them in.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE CLERK: Case on trial, The People of the State of New York against Ricardo Walters, Indictment

436N of 2008.

People, ready?

MS. SINGAS: The People are ready.

THE CLERK: Defense, ready?

MR. LEMKE: Defendant is ready, your Honor.

THE COURT: Good morning, members of the jury. Welcome back. We're ready to continue.

Ms. Singas or Ms. Tebbett, your next witness.

MS. TEBBETT: The People call Ilsa Morales.

THE COURT: Dave, Ilsa Morales.

I L S A M O R A L E S, Called as a witness by and on behalf of the People, having been first duly sworn through the aid of the Spanish Interpreter, testified through the aid of the interpreter as follows:

THE CLERK: Please be seated.

THE COURT: Good morning.

THE CLERK: Please estate your name, spell your last name, give your County of residence.

THE WITNESS: Ilsa Morales. I live in Brentwood.

THE CLERK: We have the Spanish interpreter.

Your fame for the record.

THE INTERPRETER: Charlene Perez DeKlein.

THE COURT: All right, Ms. Tebbett.

MS. TEBBETT: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. TEBBETT:

Q Good morning, Ms. Morales?

A Good morning.

Q Good mornings. Can you tell us how old you are?

A Thirty-five.

Q Do you work?

A Yes.

Q Tell us what type of work you do.

A I work in a beauty salon.

Q And who else works with you there?

A Delmy.

Q Who is Delmy?

A My sister.

Q And is her name Delmy Morales?

A Yes.

Q And how long have you and your sister worked in the beauty salon?

A Six years.

Q Now, let me bring you back to November of 2006. Specifically, the date of November 9th of 2006, in the morning. Okay?

A Yes.

Q At about ten or 10:30 that morning, can you tell us what you were doing?

A We were going to work, but we went to the cashier because we were going to change some money.

Q Who were you with?

A With my sister, Delmy Morales.

Q Now, can you tell us where you went to go to the cashier?

A Delmy got off and she went to the cashier.

Q How did you get with your sister to the cashier?

A In my car.

Q Who was driving?

A I was.

Q And can you tell us what neighborhood or area the cashier was in?

A Fulton.

Q Is that the street?

A Yes.

Q And is it called Fulton Avenue?

A Yes.

Q Are you familiar with that street where the cashier is located?

A No. I rarely go around there.

Q Do you know that neighborhood in Hempstead?

A Yes.

Q Now, did you drive with Delmy in your car to Fulton Avenue in Hempstead that morning?

A Yes.
Q And do you know about what time it was when you got there?
A It was more or less around 10:30.
Q In the morning?
A Yes.
Q And when you got to the cashier on Fulton Avenue, what did you do with the car?
A I parked at the meter.
Q Do you know what street it was on that you parked at the meter?
A Yes. It was Fulton.
Q And was it near where the cashier place was?
A Yes.
Q Where was your parking spot by the cashier?
A It was in front, almost like this (indicating).
Q When you say almost like this, what do you mean?
A It was almost in front of the cashier.
Q And did you park the car there?
A Yes.
Q Tell us what seat you were sitting in when you parked the car there on Fulton Avenue in front of the cashier.
A I was in the driver's seat.
Q Okay. When you first parked the car there, where

was Delmy in the car?

A Delmy was on the left side. She had already left the cashier.

Q Before she got out of the car, was she in the passenger seat or in the back seat?

A In the passenger seat.

Q Okay. Did she get out of the car to go get in to the cashier?

A Yes.

Q And tell us what it was like on the street, on Fulton Avenue, that morning. Were there people around, cars around, or was it quiet, what was it like?

A There was people going by.

Q A lot of people, a few people? Tell us what it was like.

A Few people.

Q And besides the cashier, are there other stores around there?

A Yes.

Q And what was the traffic like, a lot of cars driving by, not a lot of cars driving by?

A There were cars going by.

Q Okay. So when Delmy got out of the car to go into the cashier, what did you do?

A I stayed sitting in there.

Q Okay. How long did you stay sitting in there while she was in the cashier?

A More or less, like, fifteen minutes.

Q And was the car running or did you turn the car off while you were waiting for her?

A I don't remember.

Q Okay. Now, did you see Delmy come back from the cashier after you had been waiting?

A Yes.

Q Where did you first see Delmy when she came back from the cashier?

A Sitting -- when she entered?

Q When she entered the car.

A Yes.

Q Where did she enter the car from, which side?

A The side where the one that rides with you.

Q The passenger side?

A Yes.

Q And which side of the car was parked at the curb, the passenger side or the driver's side, do you remember?

A Passenger side.

Q And did Delmy get back into the car?

A Yes.

Q Now, tell us, what was the next thing that happened after your sister, Delmy, got back into the car?

Tell us what happened.

A The window was down and we saw that the man was with a weapon inside.

Q When you say the window was down, which window are you talking about?

A The passenger side.

Q Okay. And did you see a man come to that window?

A Yes.

Q Okay. Let's talk about the man that you saw come to the window. Where did you first see him?

A We were getting ready to leave, and he spoke and he told us to open the door. And I understood when he said, Give me the money. And I just handed my wallet. I opened it like this (indicating).

Q Let me stop you for one second. Did you see the man first or did you hear the man first speaking, which happened first?

A Well, he was talking. And I just gave him the wallet and then I saw him.

Q Now, what language was he speaking when you heard him talking?

A English.

Q Okay, do you speak any English?

A No.

Q Do you understand any English?

A I understand a little.
Q How much -- I'm sorry, I didn't hear you.
A A little.
Q A little. Okay. When you first heard him talking in English, were you able to understand what he was saying?
A Yes.
Q Tell us what you heard, what you understood him saying.
A The first thing -- the first thing I heard him say was, Give me the money.
Q When you heard him say, Give me the money, did you look at him?
A Yes. And I handed him my wallet.
Q Okay. When you looked at him, where did you see him?
A On the window, like this (indicating), and with his other hand he was like this (indicating).
Q When you say, "like this," show us again what you just did when you saw him in the window.
A He had his hand like this (indicating).
Q Okay. You're bending -- your hunching your shoulders down to bend forward?
A Yes.
Q You're motioning forward with your hands?

A Yes. Because he had a weapon there.
Q What type of weapon did he have?
A It was a silver color.
Q What was it?
A It was, like, a gun.
Q Now, when the man was bending over by the window, what part of his body could you see through the window of the car?
A The face.
Q Could you see his whole face?
A Yes. I could see them in the front.
Q Could you see any of his body, the upper part of his body?
A No, only the face.
Q Could you see his neck or his shoulders?
A No, because they were covered.
Q Covered by what?
A Like, with a jacket and a hat.
Q Okay. So you could see that part of his body covered with some type of clothing?
A Yes, it was covered.
Q Let's talk about the man's face. Okay. Can you tell us what the shape of his face was?
A Like, round, like fat. Had a mustache.
Q And could you see the color of his skin?

You have to answer out loud. You can't just shake your head.

A Yes.

Q Tell us what color it was like.

A Black.

Q Okay. Were you able to see his hair?

You have to answer out loud.

A No.

Q How come you couldn't see his hair?

A Because he had it covered.

Q What was it covered with, could you tell us about that?

A The same thing from the jacket.

Q Was it part of the jacket that was covering his hair?

A Yes.

Q Was it like a hood?

A Yes.

Q Was the hood covering any part of his face, or was it just covering his hair?

A You could see the face, only the hair

Q At this part of the morning, when you saw this man, what was the weather like outside?

A It was clear, there was sun.

Q Were you able to see his face clearly?

A Yes.
Q Was the window opened or closed when you were able to see this man's face in the window?
A It was open.
Q How much of the window was open?
A It was like this (indicating).
Q When you say like this, what do you mean, half-way, all the way, a little bit?
A It was very low.
Q Okay. Now, were you able to see how tall the man was?
A No. Because I was sitting down.
Q Okay. Can you tell us how old he looked?
A Like, around thirty-six.
Q Okay. Now, the clothing that he was wearing, what could you see about the clothing?
A What I could see was blue.
Q What was blue?
A A dark blue.
Q A dark blue, what?
A The jacket.
Q Okay. Could you see if he had anything on under the jacket?
A No.
Q Could you see if he had anything else on his head

under the hood of the jacket?
A No.
Q Were you able to see what he was wearing, what type of pants?
A No.
Q Now, how long were you looking at the man through the window when you first saw him at your car?
A I saw him quickly, and I was very nervous.
Q Did you look at his face when you heard him saying, Give me the money?
A Yes. I did like this, and I passed him my wallet.
Q What do you mean you did like this?
A I saw him like this and I took the wallet and I just opened it. I gave it to him.
Q When you say I did like this, do you mean you looked at him with your eyes?
A Yes. I turned to look at him.
Q And did you give him your pocketbook?
A I opened it.
Q And what did you do?
A And he put his hand in.
Q And what did he do when he put his hand inside of your pocketbook?
A Well, he -- well, he went in with his hand and

took -- took something, and he had the weapon with the other hand and he opened the door.

Q When you say he took something, did he take something from your pocketbook?

A Yes.

Q Tell us what he took.

A Money.

Q Do you know how much money you had in your pocketbook that morning?

A I had some money there. I told the police it was about two hundred dollars.

Q And how much money did you have all together in your pocketbook that morning?

A Like, six hundred.

Q Okay. How did you have the money in your pocketbook? Was it in a wallet, was it loose, how was it?

A It was just loose, like this.

Q When you say like this, what do you mean?

A Well, just like the wallets have, just in there.

Q Did it have pockets inside your pocketbook?

A Well, it's open and you have places to put it in.

Q Okay. Is that where you had the money?

A Uh-huh.

Q You have to say yes or no.

A Yes.

Q Okay. Did you see him take that money out of your pocketbook?
A Yes.
Q Okay. Now, where did you see the gun when he took the money from your pocketbook?
A In his hand.
Q And where was he holding the gun?
A He was pointing it at my sister.
Q How close was the gun to your sister?
A He was pointing it like this, very close.
Q Was it touching her or not touching her?
A No. In the beginning, no.
Q And then what?
A And when he came -- got into the car, yes.
Q Let me ask you, how did he get into the car, what did he do?
A He opened the back door.
Q How was he able to open the back door, can you explain that for us?
A He had the weapon here (indicating). And with the other hand he touched the knob, and he took the lock off and took the hand and opened it.
Q When you say he had the weapon here, show us how you had your arm there.
A Had it like this.

Q You motioned with your arm bent at the elbow, with your hand -- with your fingers together with your hands?

A Yes, yes. Because he was like this, and (indicating) he was pointing it.

MS. TEBBETT: Indicating with her arm bent at the elbow, pointing forward with her hand.

Q Was the gun inside the window when he was pointing like that or outside?

A Inside.

Q And he was able to open up the door for the back seat?

A Yes.

Q And did he get into the car at that point?

A Yes.

Q Were you looking at him when he was opening the door and getting into the back seat?

A Yes, yes. And he sat in the middle.

Q Were you able to see his face during that time when you were looking at him?

A No.

Q Were you able to see his face before he got into the back seat?

A Yes.

Q Okay. Now, when he got into the back seat, did

you turn around to look at him?

A No, because he had -- he wouldn't let us, he had the weapon here.

Q When you say here, what do you mean?

A He had the weapon on my sister and he said not to move, otherwise he was going to shoot my sister.

Q Where did he have the gun to Delmy?

A Here (indicating).

Q You're indicating on the back of her neck?

A Yes, here.

Q The back of her head, by her neck?

A Yes.

Q And did he say that in English or in another language?

A In English.

Q Were you able to understand him when he said that?

A Yes.

Q So, tell us what happened at that point, after he got in the back seat.

A He wanted us to leave from there, because he was saying, I got to go.

Q Was he speaking in English or in Spanish?

A English.

Q What did you hear him say in English?

A We have to leave, otherwise he was going to shoot. And when I put my hand out the window, he said for me to bring it in, because, otherwise, he was going to kill us.

Q And were you able to understand him when he was saying those things?

A I understood him.

Q Tell us what you did with your hand?

A I was taking it out so that someone could help.

Q Were you able to see if there were any people on the street?

A Yes. There were people going by.

Q And did you try to get their attention?

A Yes. And because I was crying, and people would just go by, look at us, and they would just laugh.

Q Did anybody come to help you at that point?

A No.

Q Do you remember at that point if the car was running or if it was off?

A I don't remember.

Q Now, tell us what you and your sister were doing when the man was telling you to leave.

A My sister was begging him to leave us alone, that, if he didn't have a family, if he didn't have children, if he didn't have a mother, if he didn't believe

in God.

Q Was she speaking to him in English or in Spanish?

A In English.

Q And what was he saying to you and your sister?

A He said he didn't believe in God. And he said that he didn't believe in God and he wanted us to give him more money. And we told him that we didn't have any more.

Q What did he do after you told him you didn't have any more money?

A And then he was putting the gun on me here (indicating) so we would leave.

Q When you say here, you're indicating to the back of your neck?

A Yes.

Q And how long did he point the gun to the back of your neck when he was telling you to leave?

A It felt like a long time because I was very nervous.

Q Do you know how long it actually was?

A No.

Q Was it seconds, minutes, hours, what would you say?

A To me it was like minutes, a lot.

Q Okay. Now, tell us what happened next, after that?

A The keys to the car, they fell on the floor. And he was telling me I had to start the car, I couldn't. And then the car started -- the horn started to go off. And he was saying to turn it off. And then he said finally he was going to let us go, but to not call the police. And that if we call the police, that he already knew us and he was going to kill us.

Q So, let me ask you about what happened to the car. Okay. Do you know how the keys fell?

A No.

Q And do you know what caused the horn of the car to sound off?

A No.

Q Was it like an alarm or were you pressing on the horn?

A No.

Q Which one, was it like an alarm or were you pressing on it?

A No, I don't know.

Q Okay. Were you able to turn that sound off?

A No.

Q So, what did he do after you weren't able to turn that sound off on the car?

A Since I couldn't turn it off, then it went off and he opened the car door and he said that God had saved

us, and he left.
Q Did you see him when he got out of the car?
A Yes.
Q And did you look at his face again when he got out of the car?
A No, because I was very nervous.
Q But were you able to see him when he got out of the car?
A Yes.
Q And did you see where he went when he got out of the car?
A Yes. And he got out and he went towards, like, Home Depot.
Q Where is Home Depot from where you were in the car by the cashier on Fulton?
A It's at the next block, like.
Q What do you mean by like, this is like a block away?
A It's very close, like, on the corner.
Q Now, during this time that this man was sitting in the back seat of your car, did you ever turn around to look at him?
A No. He wouldn't let us.
Q Now, do you have a rear view mirror in that car?
A Yes, but I wasn't looking. I was actually

looking to see if people were going by.

Q Did you ever look to see him in the rear view mirror of the car?

A No.

Q How long was this man in the back seat of the car?

A I would say, like, about ten minutes.

Q And how long were you looking at him before he got out of the back seat, when you saw him at the window of the car?

A He stayed, I would say, like, three minutes outside, looking in.

Q Okay.

MS. TEBBETT: Your Honor, could can I have these exhibits marked People's 52, 53 and 54 for identification.

MR. LEMKE: I have no objection if the People wish to have them marked into evidence, your Honor.

THE COURT: All right.

MS. TEBBETT: I do.

THE COURT: So, without objection, 52, 53 and 54 in evidence.

(Whereupon, the referred to items are received and marked People's Exhibit 52, 53 and 54 in evidence)

MS. TEBBETT: If they can be shown to the witness, please.

(Handed to the witness)

Q Ilsa, just take a look at those photographs. Do you recognize those?

A Yes.

Q Look at each one of them and tell us what those are photographs of?

A My car.

Q And when were those photographs taken, do you know?

A No.

Q Is that where your car was the day that this happened to you?

A Yes.

Q Do those pictures show the same spot where your car was where this happened?

A Yes.

Q And in those photographs can you see the cashier that Delmy went into the morning that this happened?

A No.

Q Is that where the car was parked, on the street where the cashier was?

A Yes.

Q Take a look at the first photograph, the one of

your car, that has the number 52 on the back. Do you have that one?

A Yes.

Q And can you see in that photograph the window of your car where you first saw the man?

A Yes, here (indicating).

Q Can you see in that photograph how far the window is down?

A Yes.

MS. TEBBETT: Can I have that one.

(Handed to Ms. Tebbett)

MS. TEBBETT: Actually, I'll take all of them for a second.

(Placed on the presenter)

Q Ilsa, let's look at this one. Is this your car?

A Yes.

Q And is this the curb where your car was parked, down here at the bottom from the center, towards the right hand side of the photograph.

A Yes.

Q Okay. And do you see here the window where you first saw the man approach your car?

A Yes.

Q Which side of the photograph is it on, the left side or the right side?

The side where I'm standing or the opposite side?
A On this side.
Q The side opposite from me you're pointing to, towards the right side?
A Side.
Q Is this the window here?
A Yes.
Q And can you see here how far the window is down?
A Yes.
Q And is this it, right here?
A Yes.
Q Where I'm pointing, below the middle of that window?
A Yes.
Q Which is the right passenger side, front door window of that car?
A Yes.
Q Is that where you first saw the man?
A Yes.
Q Could you see where he was standing? Was he in the street or on the curb, were you able to tell?
A I think on the sidewalk.
Q Okay. All right, let me show you the next one. I will show you People's 54.
(Placed on the presenter)

Q Can you see the two pictures that are on the --
A Yes.
Q Do you see the top picture?
A Yes.
Q Do you recognize the sign of the store in the top picture?
A That's a cashier.
Q Is that the cashier Delmy went into on the morning, this morning?
A Yes.
Q Let's look at the bottom picture. What is in that picture?
A It's where I'm parked.
Q Let me just focus you in on that picture for a second. Can you see in this picture the spot where you first saw the man when he came to the window of your car?
A On the side of the passenger.
Q I'm going to give you back this photograph. I'm going to hand you a marker. I'm going to ask you to put an X in the spot where you first saw him at the window of your car, okay?

(Handed to the witness)

(Witness complies)

MS. TEBBETT: If I could have that back when she's done.

(Handed to Ms. Tebbett)

MS. TEBBETT: Thank you.

(Placed on the presenter)

Q Is this the mark that you made, right here (indicating)?

A Yes.

Q Now, you have an X on the door portion, where the window meets the door, on the front right side passenger door of your car?

A Yes. Around there is where he put his hand in.

Q Okay. And was he close to your car or a distance from your car when you saw him?

A It was very close to the car.

Q Let take a look at the last one, which is People's 53.

(Placed on the presenter)

Q Do you recognize what is in these two photographs?

A That's my car.

Q The one on the bomb?

A Yes.

Q Okay. The one on the top?

A That's my car, behind the police.

Q Is that the same spot where your car was parked on the morning of November 9th of 2006 when this happened?

A Yes.
Q Okay. Is this the street where the cashier is located.
A Yes.
Q Now, after this man got out of your car, what did you and Delmy do?
A Then we called the police.
Q Did the police come to where you were on that street, on Fulton in Hempstead?
A Yes.
Q And were you able to speak to them about what had just happened to you?
A Yes.
Q And were you able to describe to the police the man who had robbed you with the gun in your car?
A Yes.
Q Were you able to describe for the police his face?
A Yes.
Q How did you describe his face?
A Like, very robust.
Q You're talking about his face?
A Yes. Because that's what I could see, was his face.
Q Were you able to describe his build, his body

size?

A You could see he was robust.

Q Did he look muscular, skinny, how did he look?

A Not thin, he looked strong.

Q And were you able to describe for the police the clothes that the man was wearing?

A I told them only the top part.

Q And were you able to describe for the police the color of his skin?

A Yes. And he was black.

Q Okay. And did you tell the police how much money the man had taken from you that morning?

A Yes, two hundred.

Q Now, after you told the police initially that he took two hundred, what did you realize about the money that you -- the rest of the money that you had in your pocketbook?

A When I was home and I checked.

Q What did you realize when you checked once you were home?

A That the other money was missing, I had six hundred.

Q What was that money that you had in your purse that day?

A From my job and to send to my children.

Q Do you have children, Ms. Morales?
A Yes.
Q How many do you have?
A Four.
Q And where do they live, with you or somewhere else?
A Honduras.
Q Okay. All right. Now, Ms. Morales, after this day when you spoke with the police to report what had happened, did you speak further with the police and the detectives in connection with what had happened to you?
A No.
Q Did there come a time in October of last year, on October 11th of 2007, that you testified in the grand jury about what had happened to you?
A Yes.
Q Okay. And did there come a time this year, in February of this year, that you were contacted by the police to come in and view a lineup?
A Yes.
Q And did you come on February 29th of 2008 to a police station to view a lineup?
A Yes.
Q How did you go to the police station on that day?
A Someone took me.

Q And was that a police officer or a detective?
A Detective.
Q Do you remember his name?
A No.
Q Did he speak Spanish?
A Yes.
Q Okay. Did he bring you to the police station that day?
A Yes.
Q Once you got to the police station that day, did you view a lineup?
A Yes.
Q And was the detective who spoke Spanish with you when they brought you to the room to view the lineup?
A Yes.
Q And did they bring you to a room to look through a window?
A Yes.
Q And did you look through that window?
A Yes.
Q I'm going to show you what is already in evidence as People's 42?
(Handed to the witness)
Q Take a look at that photograph, Ms. Morales. Is this a photograph of the lineup that you looked at that day?

A Number 5.
Q Okay. Is that the photo -- is that a photo of what you saw when you looked through that window?
A Yes.
Q When you first looked through the window, tell us what happened.
A I got very nervous. I asked them to take me out of there. And I told the detective that it was number 5.
Q When did you tell that to the detective, when you were in the room with the window or after you left that room?
A When I went out.
Q Did you tell the detective anything before you went out, when you were still in that room looking through the window?
A I told them I was nervous because I was afraid.
Q Okay. And what happened right after you walked out of the room with that detective?
A I went to sit down.
Q And what happened?
A I told them it was 5.
Q When you told him it was 5, how did you know that person who was holding the number 5?
A Because I remembered his face.
Q Was that the man who had robbed you back on

November 9th of 2006?

A Yes.

Q Now, do you think you would recognize that man if you saw him again?

A Yes.

Q Okay. I'm going to ask you to take a look around this courtroom and tell us if you see that man and recognize him?

A The one that is sitting over there.

Q Can you point to where you see him sitting in this courtroom?

A Over there.

Q Can you describe for us what he's wearing or where you see him sitting, exactly?

A The one that is sitting over there behind her.

Q When you say behind her, who are you referring to, Ms. Singas who you know over here?

A Yes.

Q Okay. What is he wearing?

A He has braids and a brown jacket.

MS. TEBBETT: Your Honor, indicating the defendant.

THE COURT: Yes.

MS. TEBBETT: Just one moment.

(Pause in the proceedings)

MS. TEBBETT: I have nothing further. Thank you.

THE COURT: Mr. Lemke.

MR. LEMKE: Thank you.

CROSS-EXAMINATION

BY MR. LEMKE:

Q Good morning, Ms. Morales.

A Good morning.

Q Ms. Morales, back on November 9th of '06, you were driving your Ford Explorer, correct?

A Yes.

Q And your sister was in the car, as well, correct?

A Yes.

Q Your sister was in the passenger seat, correct?

A Yes.

Q And where were you coming from at that time on the morning of November 9th, 2006?

A We were going to our job, and we stopped at the cashier to change money.

(Continued on next page)

Q. And when you say change money, that would be your sister, to cash a check?

A. Which we were going to deposit, but we didn't send it to Honduras.

Q. So your sister got out of the car. That's Delmy, correct?

A. Yes.

Q. And Delmy went into the Western Union to send a money order to Honduras, correct?

A. Yes.

Q. And how much money was she going to send to Honduras?

A. Two hundred.

Q. And then she came back to the car, correct?

A. Yes.

Q. How long was she inside the Western Union before she came back out.

A. Inside Western Union, like 15 minutes.

Q. And was there a problem that she couldn't send the $200?

A. I don't know, because it was going to be sent to my mother and my grandmother.

Q. But your sister came out still with the $200, correct?

A. Yes.

Q. And while you were waiting in the car, you were there for about 15 minutes, correct?

A. Yes.

Q. And when did you put down the passenger window?

A. I lowered it because it was warm. It wasn't too hot, but I lowered it.

Q. Before your sister came back to the car, correct?

A. Yes.

Q. And while you were waiting, you didn't see this man, before your sister came out, you didn't see this man walking around, correct?

A. No.

Q. Your sister comes out about 10:30 in the morning or -- I'm sorry, do you remember what time your sister came out?

A. No.

Q. And when she came out, she got back into the car, correct?

A. Yes.

Q. And did she tell you that she couldn't send the money?

MS. SINGAS: Objection, your Honor.

THE COURT: Overruled. You can answer that. Go ahead.

A. When she just came in and sat down and we didn't

speak. She was closing the door and sitting down and when we turned around, the man was already there.

Q. Your sister comes out, gets in the car and just before the door actually is closed, this man is at the door, correct?

A. The door was closed already. What was open was the window.

Q. This man appears and he surprises you, doesn't he?

A. Yes.

Q. You're not expecting a man to be standing there with a gun, do you?

A. No.

Q. You become very nervous, don't you?

A. Yes.

Q. And this man puts the gun a little bit leaning into the window, correct?

A. Yes.

Q. Now, what is the first thing that is said at that time?

A. He said, Give me the money.

Q. Now, you speak some English, I believe, correct?

A. No, but I do understand some.

Q. Did you understand that, Give me the money?

A. Yes.

Q. What, if anything, did you or your sister say back

to this man?

A. I didn't speak.

Q. What did your sister say?

A. My sister told him we didn't have money, that that's all we had.

Q. Now, when your sister got back in the car, did she give you the $200?

A. He didn't take them from her.

Q. When your sister got back in the car, did she -- the $200 that was being sent, was that your money or your sister's money?

A. That was my mother's that had given it to my sister to send.

Q. But your sister, when she got back in the car, she didn't give you the $200, correct?

A. No, because she had them in her pocket.

Q. After the man gets to the window and says, Give me your money, your sister says to him, I have no money, correct?

A. Well, he had already taken the money from the wallet.

Q. I just want to slow down.

The man comes to the window and says, Give me your money, right? That takes three seconds, correct?

A. Yes.

Q. You are very nervous during this time, correct?
A. Yes.
Q. You then hand your pocketbook to this man?
A. Yes, I opened it.
Q. You open it and who takes the money out?
A. He did, with his hand.
Q. So he's able to reach in, you opened up your pocketbook, and he took $200, correct?
A. Yes. He took the money, everything. I didn't notice because I was very nervous.
Q. And that lasted maybe about another five to ten seconds, correct?
MS. TEBBETT: Objection.
THE COURT: Overruled.
Q. Correct?
A. Well, from there he opened the door and got in.
Q. So before he opens the door, what had occurred was your sister got into the car, closes the door, correct?
A. Yes.
Q. Then a man appears at the window, correct?
A. Yes.
Q. Says, Give me your money, which lasts about three seconds, correct?
MS. TEBBETT: Objection, your Honor, to that characterization.

THE COURT: No, overruled.

Q. Correct?

A. Yes.

Q. You then open your pocketbook, lean towards the window. The man with the gun takes out the money, $200, right? Correct?

A. Well, he was pointing towards my sister, so I put my bag like this and he just the put his hand in. I don't know how much he took out.

Q. And that lasted about ten seconds, correct?

A. I don't know.

Q. It was very quick.

You were very nervous, correct?

A. Yes.

Q. He then hops into the back of the car, correct?

A. Yes.

Q. And he hops into the -- he opens up the back passenger door behind your sister, correct?

A. Yes.

Q. He slides over to the middle of that back seat, doesn't he?

A. Yes.

Q. And you testified on direct that you never looked into the rearview mirror to look at him at that time, correct?

A. I didn't see him, but I saw him when he was right on the window.

Q. But now we're in the back of the car. You don't look at him when he's in the back seat of the car, correct?

A. No, because he's pointing with a weapon.

Q. And you're very scared, very nervous and you are looking at this gun, correct?

A. Yes.

Q. You don't know if he's going to kill you or not, correct?

A. No, because he was saying that he was going to kill us.

Q. And both you and, I'm sure, your sister, were very scared, correct?

A. Yes.

Q. Now, there is now more conversation, correct? He's telling you to start the car, to move, correct?

A. Yes.

Q. And you're able to hear this voice, correct?

A. Yes.

Q. Now, did this voice have an accent in any way?

A. I don't remember.

Q. And now how long is this person in the back seat before he then gets out of the car?

A. What person?

Q. The person in the back seat that gets in to take your money.
A. It felt like a long time.
Q. I'm sure it felt like a long time.
When he's in the back seat, he tells you to start the car and drive off, correct?
A. Yes.
Q. And he says that pretty much right away when he gets in the car, correct?
A. He was telling us to start moving.
Q. And as soon as he got into the back seat, within seconds he told you to move the car, correct?
A. Yes.
Q. You dropped your keys to the ground, correct?
A. Yeah, the keys fell.
Q. And the alarm in the car goes off?
A. Yes, it started to sound.
Q. This person told you to shut it off, correct?
A. Yes.
Q. You couldn't shut it off, correct?
A. No.
Q. And then this person got out of the car and left, correct?
A. Yes.
Q. Okay. And that was the sequence and that was the

timing, correct?
A. When he got out, he said that God had saved us, but to not call the police because he would kill us.
Q. And, again, you heard his voice quite clearly, correct?
A. Yes.
Q. Now, that morning you spoke with a police officer -- a number of police officers, correct?
A. Yes.
Q. One of which interpreted Spanish, correct?
A. Yes.
Q. And you testified here moments ago that the individual that robbed you on November 9th of '06 was 36 years of age, correct?
A. Yes.
Q. What makes you say 36 today, Ms. Morales?
A. Because he didn't look old.
Q. Well, didn't you tell the police how old this person was back on November 9th of 2006?
A. I don't remember.
Q. Do you remember signing a statement with the police that day?
A. I don't remember.
MR. LEMKE: If I can have this marked, please, for identification purposes at this point.

THE COURT: Yes.

MR. LEMKE: I believe I'm at -- I'm not sure.

THE COURT: I think it's E. Defendant's E for ID.

MR. LEMKE: Your Honor, perhaps this should be marked also.

THE COURT: E will be the English version, F will be the Spanish version.

(Whereupon, Defendant's Exhibits E and F were marked for identification, only.)

COURT OFFICER: Defendant's E and F marked for identification.

MR. LEMKE: If that can be shown to the witness and I would ask the witness to either read them to herself or to review them.

MS. TEBBETT: Judge, I would object to that.

THE COURT: Do you want her to look at the Spanish version, Mr. Lemke, F?

MR. LEMKE: Well, probably the Spanish version, F.

THE COURT: Madam interpreter, she can look at Defendant's F for ID.

Mr. Lemke, there is no Spanish version.

MR. LEMKE: I believe that's all part of one. If she can then, perhaps, review the English

version -- withdrawn.

Have her take a look at those.

Q. Is that your signature at the bottom of one of those?

A. Yes.

Q. It is, okay.

You signed it after it was translated to you by an interpreter?

A. Yes.

Q. And that was at the time of the incident back on November 9th of '06, correct, Ms. Morales?

A. Yes.

Q. And at that time you were asked, if you can, to be very specific with what you could give regarding the description of this individual, correct?

A. Yes.

Q. And, in fact, when they asked you to give an age, if you could, you said the individual was 35 years of age, correct?

A. I said that.

Q. But today you said 36. I'm just asking why the change?

MS. TEBBETT: Objection.

Q. Is there anything?

A. I don't remember. I was nervous.

Q. Okay. So you remember telling the police that he was 35 at that time, correct?
A. I don't remember well.
Q. No, but that's your statement, correct?
You don't remember well, Ms. Morales, is that your testimony?
A. Certain things I remember, but I was nervous. I don't remember everything.
Q. Okay. But reviewing that statement, does that refresh your memory that you told the police that he was 35?
A. Yes.
Q. Did you also give a height of this individual to the police back on November 9th of 2006?
A. No, I didn't say the height.
Q. You didn't tell them six foot two?
A. No.
Q. Would you -- would anything refresh your recollection as to what you told the police?
A. The only thing I said was that he was strong and robust, but not height.
MR. LEMKE: May I have those two documents back, please.
COURT OFFICER: (Handing.)
MR. LEMKE: Could I have madam interpreter, please read that then to the witness.

THE INTERPRETER: Read this whole page?

THE COURT: Is there a particular section?

MR. LEMKE: Yes, the first two lines where it says, Six foot two.

THE COURT: The first two lines of the statement?

MR. LEMKE: Yes.

THE COURT: Okay, Ms. Interpreter.

(Pause in the proceedings.)

THE INTERPRETER: I read the two lines.

THE COURT: Is there a question?

Q. You are Ilsa Morales, correct?

A. Yes.

Q. And does that refresh your recollection that you told the police that this individual was six foot two?

A. I don't remember saying six feet. I couldn't have said numbers.

Q. You could have, but you don't remember?

A. I do not remember having said numbers.

Q. Well, that's a document -- you remember talking to the police, correct?

A. Yes.

Q. And they wrote things down that you spoke to them about, correct?

A. They were writing, yes.