Q. Do you remember telling them that this person was wearing a baseball cap?

A. No. He had a hat from the jacket.

Q. And not a baseball cap?

A. No.

MR. LEMKE: So could I have that shown, please, to the witness again.

Madam interpreter, if you can go down to the next line regarding the description, please.

(Handed to witness.)

(Pause in the proceedings.)

A. No.

Q. So the police officer would be wrong who wrote that down, Ms. Morales?

A. No, because I did not say a baseball cap.

Q. You never said a baseball cap and you never said six foot two?

A. No.

Q. So then the officer who wrote that down in speaking to you and you signed it is wrong?

MS. TEBBETT: Objection, your Honor.

THE COURT: Sustained.

Q. Now, after you spoke to the officers that day and they took notes from you, you were then asked to come to view a lineup; isn't that true, Ms. Morales?

A. Yes.

Q. And before you came to see, in fact, the lineup and -- going back to November 9th a second. The person that you saw, you never saw any dreads or any braids, correct, on this individual, correct?

A. I couldn't see his hair.

Q. So the answer is you never saw any braids or dreads, correct?

A. No.

Q. And the pants he was wearing were blue jeans, correct?

A. I didn't see that. I only saw his face.

Q. Well, when he got out and walked away, didn't you say he was walking towards the Home Depot?

A. Yes.

Q. How did you know that's where he was walking?

A. That's where he turned.

Q. And you saw him?

A. Yeah, I saw him, but I wasn't looking at his pants.

Q. Didn't you tell the police officers on November 9th who took a statement from you that you signed that he was wearing blue jeans?

A. No.

Q. And, again, if it's in the statement, that statement is wrong?

MS. TEBBETT: Objection, your Honor.

THE COURT: Overruled.

A. I saw him turn, but I wasn't looking at what pants he was wearing.

Q. The question, Ms. Morales, is the statement that you gave to the police says blue jeans. I'm asking you is that incorrect? Are you saying you never said that to the police?

A. When I saw him, I was very nervous and I didn't see.

Q. Okay. Now, on the 29th when you were picked up to come to a lineup, do you recall receiving a call from one of the detectives that they were going to come pick you up to bring you to the Robbery Squad?

A. Yes.

Q. And you don't recall the name of that detective, correct?

A. No.

Q. And that detective told you to come with him, he was going to pick you up so you can look at a lineup to see if you identify anyone regarding the robbery from 11/9 of '06, correct?

A. Yes.

Q. And he wanted to bring your sister as well, but both of you run a store and it would be easier if you came

first and then you could come back and she could then go, correct?

A. Yes.

Q. And at that time the detective picked you up and he was with somebody else, wasn't he?

THE INTERPRETER: I'm sorry?

Q. The detective that picked you up, was there somebody else in the car on February 29 of '08?

A. There was two of them.

Q. Right. And then they brought you to someplace in Bellmore, correct?

A. Yes.

Q. Now, the person on November 9th that came to your window, you had never seen him before, correct?

A. No.

Q. And now on February 29th you are brought to the Bellmore station, the Robbery Squad and you are brought and you are asked to sit with a couple of other women, correct?

A. Yes.

Q. And there are, I think, one or two other police officers that may have been coming in and out, correct?

A. Yes, I think so. I don't remember.

Q. And at some time you were then asked to walk with the same detective that picked you up to go look into a window, correct?

A. Yes.
Q. And that detective speaks Spanish, correct?
A. Yes.
Q. And you could understand him and he could understand you, correct?
A. Yes.
Q. And when you come into the room, there is a number of people there, correct?
A. Yes.
Q. Now, you look through that window, don't you?
A. Yes.
Q. And don't you say in Spanish to him, I'm not sure? Isn't that what you told the detective at that time?
A. Yes, but I remembered then and when I went out I told them, I know it's number five.
Q. Well, when we're inside -- we'll get to what you said on the outside.
When you are inside that room, you don't say to him I'm afraid, I'm nervous. You don't say that to him when you're in that room with the other people, correct?
A. When I went in, I was afraid because I thought they were looking at me. And he told me to be at ease and then I went outside.
Q. And you looked into that window and you said, I'm not sure, isn't that what you said?

A. I don't remember.

Q. Well, the detective was with you there, correct, in that room, correct?

A. Yes.

Q. There were others that heard what you said; isn't that correct?

MS. TEBBETT: Objection.

MR. LEMKE: Withdrawn.

Q. You said it out loud in Spanish, something, correct?

A. I was quiet. It wasn't until I went outside that I told him.

Q. Well, when you walk outside, do you then -- he brings you to another room, correct?

A. Yes, and I sat down.

Q. And then he takes out a piece of paper for you to sign saying I recognize so and so, isn't that what he did?

A. I told him I recognize number five.

Q. And did you sign anything? Did he write that down for you to sign?

A. No, I don't remember.

Q. Now, when you were taken back to your store, okay, your sister then came, correct?

A. Yes.

Q. Your sister gets brought back by the same detective

that had picked you up to bring you there, correct?

A. Yes.

Q. The same detective that you told him what number this person was; is that correct?

A. Yes.

Q. And now when your sister is brought, you don't know what happens when your sister is brought back to the Robbery Squad, correct?

A. No.

Q. But when she's brought back to you later that day, you have a conversation as to what happened, don't you, regarding the lineup --

A. No.

Q. -- when she comes back that night?

A. No.

Q. You don't talk about what you looked at, if you picked out anybody?

A. She didn't tell me anything.

Q. Did you tell her anything?

A. No.

Q. So it's your testimony to this jury that later that night, after both of you were brought home and dropped off by the detectives, that neither of you discussed what had happened earlier that day?

A. No. Afterwards, later, I said to her what I had

recognized was number five. But she didn't say anything to me.

Q. And then the next day who called the detective?

MS. TEBBETT: Objection, your Honor.

THE COURT: Sustained.

Q. Did you speak to the detective the next day?

MS. TEBBETT: Objection.

THE COURT: I'll allow that.

Q. Ms. Morales?

THE COURT: Can you repeat the question, Mr. Lemke?

MR. LEMKE: Yes.

Q. The next day, which would have been March 1st, after the lineup, didn't the detective that brought you there call you again?

A. No.

Q. What about March 2nd?

A. March 2nd, I don't remember.

Q. Well, do you recall having this detective come see you again within those first couple of days, if you recall?

MS. TEBBETT: Objection, your Honor.

THE COURT: Overruled.

A. No, because it's never the same ones.

Q. The same detective?

A. No.

Q. Oh, it was a different one?
A. I don't remember who it was. I don't know if it was the same one.
Q. But was it the next day that another officer came to see you, correct?
MS. TEBBETT: Objection.
THE COURT: Could you clear up, Mr. Lemke, are you talking about the day after the lineup?
Q. March 1st, the day after the lineup, you go home that night to your store, correct?
A. Yes.
Q. Your sister says to you, I picked out somebody, correct?
MS. TEBBETT: Objection, your Honor.
THE COURT: Sustained.
Q. Didn't you testify moments ago on my questioning that your sister discussed with you about the lineup?
A. No, I was the one. I told her.
Q. I'm sorry, you told her?
A. I told her; she didn't.
Q. Now, the next day, which would be March 1st or March 2nd, was there a detective or another officer that came to speak to you regarding the lineup?
A. No.
Q. Was it a different officer that came to see you?

MS. TEBBETT: Objection, your Honor.
THE COURT: Overruled.
A. No one came.
Q. And when you were at the lineup, you don't recall ever signing anything, correct?
A. I don't remember.
Q. Okay.
MR. LEMKE: I have nothing else.
THE COURT: Redirect?
MS. TEBBETT: Yes, please, Judge.

REDIRECT EXAMINATION

BY MS. TEBBETT:

Q. Ms. Morales, you remember Mr. Lemke asking you some questions about the statement that the police took from you back on the day that this happened?
A. Yes.
Q. And did they write that statement in English?
A. Yes.
Q. And were you able to read it in English that day?
A. No.
Q. But when you spoke to the police on that day, did you tell them the description of the man that you testified to here in Court today?
A. Yes. I told them that what I could see is the hat, the hood.

Q. And you told them that that was a dark colored hooded sweatshirt?
A. There was a jacket.
Q. And did you tell them about the hood?
A. Of what, the hat?
Q. Did you tell them that the jacket or the sweatshirt had a hood that was covering the top of his head?
A. Yes.
Q. And did you tell them it was dark colored?
A. Yes.
Q. And did you tell them that this person was a male black?
A. Yes.
Q. And did you tell them that he had --
MR. LEMKE: Your Honor, I'm going to object to the leading. If you want to ask what was said. Even though it's redirect, it's still not direct. The leading questions.
THE COURT: I understand. Overruled. Go ahead.
Q. Did you tell them that he had a stocky build?
A. Yes.
Q. And did you tell them that he had the silver handgun that you told us about today?
A. Yes.

Q. Now, do you know how tall you are, Ms. Morales?
A. I'm like five-two.
Q. Do you know exactly how tall you are?
A. No.
Q. And were you able to tell the police whether the man was taller than you or shorter than you or the same as you?
A. I didn't say anything like that.
Q. Now, do you recall Mr. Lemke asking you some questions about the day in February of this year that you went to view the lineup?
A. Yes.
Q. And had you been working that day?
A. Yes.
Q. And was Delmy working that day?
A. Yes.
Q. And did you stay behind at the store when Delmy went with the detectives to look at the lineup?
A. Yes.
Q. And did she go first with them?
A. I think so, but -- I don't remember if it was her or me.
Q. Do you remember staying back at the store and being there when Delmy came back?
A. Yes.

Q. And do you remember any -- if any of the detectives came into the store before Delmy came back in?

A. No.

Q. Did you speak to Delmy at all before you went with the police?

A. No. They wouldn't let us speak.

Q. Now, when you looked through the window at the lineup, were you sure at that time which number was the man who had robbed you back in November of 2006?

A. When I looked, I saw it was number five.

Q. Did you tell that to the detective before you left the room or after you left?

A. After I left.

Q. When were you sure that it was number five, before you left the room or after?

A. I told him outside.

MS. TEBBETT: Thank you. I have nothing further.

THE COURT: Anything, Mr. Lemke?

MR. LEMKE: Nothing else.

THE COURT: Thank you, Ms. Morales. Thank you very much. Thank you, madam interpreter. Watch your step.

(Whereupon, the witness was excused.)

THE COURT: Members of the jury, it looks like

it's about that time we take our luncheon break. It doesn't make sense to go to the next witness at this point. I'm going to let you go for lunch. We'll pick it up at two sharp.

Please, as you step out, don't talk amongst yourselves or anyone else about the case.

Don't view or visit any of the areas described.

Don't come to any opinions.

Don't view any of the accounts of this case in the media. We'll see you back here at 2:00.

(Whereupon, the jury exited the courtroom.)

(A luncheon recess was taken.)

A F T E R N O O N S E S S I O N

(Whereupon, the following takes place in open court, outside the presence of the sworn jury and alternates:)

THE COURT: Put the stipulation on the record.

MS. SINGAS: The stipulation is that Ilsa Morales made a statement to the police in Spanish. It was translated into English, and she signed the English statement after it was read to her in Spanish. There is no Spanish written statement concerning the incident involving Ilsa Morales.

THE COURT: You agree to that, Mr. Lemke?

MR. LEMKE: Yes, so stipulated.

THE COURT: Do you have any objection if I read that?

MR. LEMKE: No.

THE COURT: You read it.

We'll have Kathy read it.

Okay.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE COURT: All right. Members of the jury, good afternoon. We were working on a stipulation

between the parties with respect to our last witness, Ms. Morales.

Our reporter, Kathy, is going to put that stipulation on the record.

(Whereupon, the stipulation is read by the reporter)

THE COURT: Okay. That's agreed to by both parties?

MS. SINGAS: Yes.

MR. LEMKE: Yes, your Honor.

THE COURT: Again, members of the jury, that is to considered by you as direct evidence, as you would any piece of evidence you hear or see during the course of the case.

Ms. Tebbett, I think you will be conducting the direct of the next witness.

MS. TEBBETT: Yes. The People call Allyson Davilar.

A L L Y S O N D A V I L A R, Called as a witness by and on behalf of the People, having been first duly sworn, testified as follows:

THE CLERK: Please be seated.

Please state your name, spell your last name, your County of residence.

THE WITNESS: Allyson Davilar, D-A-V-I-L-A-R.

THE COURT: County of residence, Ms. Davilar, the County in which you live?

THE WITNESS: New York.

THE COURT: If you could kindly move yourself a little bit closer. There you go. Put that microphone down a little bit.

Ms. Tebbett.

MS. TEBBETT: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. TEBBETT:

Q Good afternoon, Ms. Davilar.

A Good afternoon.

Q Can you tell everyone please where you work.

A I work at North Shore University Hospital in Manhasset.

Q And what is your there position?

A I'm a supervisor there, but I also work as a sexual assault nurse examiner.

Q Are you, yourself, a nurse?

A Yes.

Q How long have you worked as a sexual assault nurse examiner at North Shore University Hospital?

A Approximately ten years.

Q Can you tell us if you worked as a nurse prior to working as a sexual assault nurse examiner there?

A Yes, I did.
Q How long did you work as a nurse prior to that?
A Eleven years.
Q And were you working in any particular department?
A Emergency.
Q And can you tell us a little bit about your education?
A I am a bachelor-trained, studying for a masters. I trained at Manhattan Community College and Downstate Medical Center in Brooklyn.
Q And is there a continuing area that you have your degree in?
A In nursing, just a bachelor of science in nursing.
Q What area are you pursuing your masters in?
A In clinical nurse specialist; nursing, still.
Q Now, during the time that you have been a sexual assault nurse examiner at North Shore Manhasset, can you tell us about the type of training you received to become a nurse in that particular department?
A It's a -- at the time when I did the program it was a three-day training session, followed by three to six months of practice in the obstetrics clinic, gynecology clinic.

Q What areas did you receive training in during initially that three-day course?
A It's -- areas of obtaining evidence, documentation, and, basically, that's it.
Q And what areas were you being trained on during those months that followed?
A Those months that followed, you were being trained on how to adequately perform and document the pelvic exam.
Q And where did you undergo that particular training?
A At the North Shore Hospital, they have a clinic on 875 Northern Boulevard.
Q And during the ten years that you have been a nurse, sexual assault nurse examiner, have you had to undergo any continual training or continual education?
A Yes. There is the annual continued education to maintain your skills.
Q And what is covered in that annual training?
A Usually they go over the -- the changes in forensics, if there's any. They go over basically the basic exam, how it's done. It's mostly updates on what is new in the field.
Q Is that to keep yourself up to date?
A To keep up to date, yes.

Q Is there a particular unit in North Shore Manhasset Hospital that performs these examinations?

A Yes. There is a SANE Unit. As part of the emergency department, which is at -- our victims do not have to wait in a regular emergency unit, they are directed to the SANE Unit.

Q Does SANE stand for something?

A Stands for sexual assault nurse examiner.

Q And during the ten years that you have been a nurse in the SANE Unit, can you tell us just approximately how many sexual assault examinations you personally have performed?

A I would say, somewhere in the range of about sixty to eighty exams in the last -- in my last ten years.

Q Are there any additional exams that you observed, as well?

A Yes, I have.

Q Can you approximate for us about how many you observed, as well?

A Like, over a hundred exams.

Q And can you explain for us, Ms. Davilar, there's a certain manner in which a sexual assault examiner is to be conducted?

A A sexual assault examination should be conducted according to -- there is a kit that is provided; which each

case that comes in, you open a new kit, and it tells you the directions to follow. But those directions can be followed based on what is the presenting victim's complaining situation.

Q Can you explain what you mean by that?

A By that I mean, if I have -- I'm sorry. If I have a victim that is coming directly from a scene, it -- some of that will change. If I have a victim that is coming in days after an assault and has showered and all that --

(Phone ringing)

A Please, forgive me. Sorry.

Q That's okay.

A If I have a victim that is coming to me days after an assault, then it also changes what steps will be done. So, although that kit is labeled step one through step twelve, you don't necessarily follow. Some of those steps are eliminated based on the presentation of the victim.

Q Okay. And is there also a protocol in place that dictates the manner in which the examination is to be conducted?

A Yes.

Q Are you familiar with what that protocol dictates how to perform the examination?

A Yes.

Q Now, can you explain for us, when a patient presents to you in the SANE Unit, what is the first step, according to that protocol, that you do?

A The first step in that protocol would depend, again, if the victim is coming from the crime scene.

If the victim is coming directly from a crime scene and is wearing clothing and all of that, that evidence is collected and put aside, like clothing and stuff like that, going over the body with a Woods lamp. All that is done prior to actually starting that kit and collecting that evidence.

Q And prior to collecting the evidence and starting the steps in that kit, do you take a history or a health history from the patient?

A Yes.

Q Can you explain when in the course of the examination you do that?

A Immediately on seeing a patient you begin taking what happened. You get the history of what happened before you proceed to anything else.

Q And who do you get that history from?

A The victim.

Q Can you explain for us the significance to you in terms of what you do in your exam that follows, what the significance is of what you get from the patient about what

happened.

A Okay. If I'm told, I don't know what happened, then in my head I already know what steps I need to perform. If I'm told step by step, I was aware, this is what happened to me, this is where I was, this is where I was taken, this is the clothing I was wearing, all of that, that prepares me for the next step, where do I go next with the exam.

Q Is that why you obtained this information at the beginning of the exam?

A Yes, yes. So you know all the tools and equipment that needs to be gathered to do that exam.

Q Does what a patient tells you assist you in performing the exam and in making any diagnoses or administering any medication or taking any further steps in the examination?

A Yes.

Q Do you document the history that you obtain from the patient?

A Yes, I do.

Q How do you document that?

A I document it as male or female, their age, claims this is what happened, where they were. I go down -- there is a questionnaire that is part of my examination that guides me, as well, just in case anything is forgotten. So that even though I listen to what the victim had to say, I

still use this questionnaire as a guide, so that she, him or I don't forget any information that might be pertinent.

Q And does that form become part of the medical records maintained by the hospital for that particular patient?

A Yes, it does.

Q Now, after you obtain the history from a patient of what happened to them, the incident that brought them to the hospital, do you get any other further information from the patient, themselves?

A Then I go on to take a medical history.

Q What is the significance of taking a medical history?

A Well, the significance of taking a medical history tells me basically what could have happened, what could happen as a result of being injured this way, or that way, you know, whatever might have happened, what else can happen, what medication they might be on that might affect the medications I might have to give them. And it just tells me in terms of -- for example, last period, any kind of surgeries, any kind of previous injuries that can be reinjured during an assault. You know, basic information.

Q So, is the nature of that information sort of a general past health history or medical history of the person?

A Yes.
Q Can you tell us what is the next thing that you do after you obtain the medical history from the patient?
A Once I obtain the medical history from the patient, I tell him or her what services we are able to offer.
For example, I let them know that based on what you said to me, this is what I can do for you. And I layout that I can do a physical exam to obtain evidence. That you can choose to call the police, if you haven't already done that. That you will be treated for sexually transmitted diseases. You can be treated for HIV. You can be treated for pregnancy. Then I explain what medications would be used, the possible side effects and give the victim a chance to choose whether they want to be part of that process, yes or no.
Q Do those services or choices that you explain and offer to the patients vary based on what they told you actually happened to them?
A Yes, it does.
Q Okay. And what do you do next after you offer that information to the patient?
A Once the victim agrees that they want to be part of this process, then if there is any -- if the victim is wearing the clothing that comes from the scene, I make sure

that I said, okay, let's collect that clothing. Let's bag it. Let's put it away for the detectives.

Q Can you explain for us how you do that?

A In our SANE Unit there is an anti room that include a bathroom and a locked cabinet with all our supplies. So, we would go into that bathroom, spread a sheet on the floor, have the victim step out of his or her shoes, on to that sheet, disrobe on to that sheet and step off so I can fold all that material and put it aside.

From there I would conduct a Woods lamp of the body, which means, I turn the lights off in the room and I take the light and go down every inch of the body, searching for any evidence of dried secretions or anything that might be on the body that is foreign.

Q Can you explain to us what a Woods lamp is?

A A Woods lamp is a lamp, it's basically about yea big (indicating). It has a handle. It has an ultraviolet light. What it does is, in the dark it illuminates the body, and every bit of lint, anything on the body, any dried secretion, anything that is on the body is highlighted with this magnet -- with this ultraviolet light. And certain things glow and certain things just become brighter with this light.

Q What type of things would glow or become brighter?

A Semen would glow. If there is semen on the body, it gives you a greenish kind of glow on the body.

Q Can you tell us what the next step is in your examination as dictated based on the unit?

A If I observe any dried secretions on the body, I immediately take a sample of it.

Q And can you explain for us how you do that?

A With the taking of that sample, I would take a cotton swab, moisten it with distilled water and then rub it on the -- on to that, whatever area it is, to obtain the specimen, whatever I found.

Q And where do you obtain that swab from that you used?

A That swab comes in the kit. And if I needed more, I can always use some from outside of it, because it only comes with two.

Q And what do you do with those swabs after you use them?

A My SANE Unit has a specific air-drying system. There is -- that they purchased. It's a -- it's a box and on top of the box it has little holes. And each hole is labeled, for example, oral, rectal, vaginal, that kind of stuff.

So, any swab you took, you can put it into that little chamber, place it back into this little container

once you're finished. There's an air drying system that goes on inside of it for about an hour. And when you finish, it's dry.

Q Do those designations you just mentioned for the swabs on that box, do they correspond with some of the steps in the kit?

A Yes. Everything that needs to be air-dried in that kit corresponds with that -- the chambers on that little system.

Q How does your examination continue after that is done?

A Well, my examination after that will go from head to toe after that. You will take the oral swabs, you will take the DNA swabs, and you will come down the body.

Q What are you looking for at that point?

A At that point I am -- I'm looking for injuries. I'm looking for areas of pain. I'm looking for any evidence of, like, anyone else's hair on that victim by combing through their hair, and all the different steps.

Q Is that examination of the patient's body guided at all from what you learned from the patient during the history portion of the exam?

A Yes, it is.

Q In what way?

A Well, if there was -- if there was oral contact,

then oral swabs are important. If there was rectal contact, then rectal swabs are done. If there was vaginal penetration, then vaginal swabs are done. If there is no contact with either areas, then it wasn't done, that won't be done.

If my victim is saying I wasn't touched in that manner, then there is no need for me to do that. If my victim is saying, I woke up here, I don't know what happened, then it doesn't matter, it goes all the way through.

Q And what do you do after you do that visual examination of the patient's body?

A After I do that visual examination, if I need to take pictures, then I do. If there is no need for pictures, because I can't see any physical injuries, then I just go on and make sure the evidence is collected from all the areas that need to be swabbed.

Q Do you do any internal examinations of the patient?

A Yes, if it's necessary.

Q And what would make it necessary for you to do that?

A If there was penetration of an anal or a vaginal orifice, then it would be necessary for me to do an internal exam.

Q Can you explain for us how you do an internal examination?

A Internal examination is done with a speculum.

Q Can you tell us what that is?

A A speculum is kind of like a duck's bill kind of instrument that you insert and you -- it clicks and it opens up the vaginal canal and allows you to obtain specimens or in some cases we may need to use an analscope, if there was anal penetration. An analscope is basically, it's like -- basically, it's like a tubular instrument that allows you to go in. It expands the anal area so you can get the swabs out. The only thing, that one doesn't expand like the speculum does.

Q Can you tell us what you do after you do an internal examination, if that was necessary in a particular exam?

A Swabs are collected for sexually transmitted diseases. Pictures can be taken, if there is any injury that is noted, because you can always use a -- there's a high powered -- it just ran out of my head. There's a high power machine we use, as well. I haven't used it in so long. That allows you to take pictures. You just -- it's just a great magnification a bit that allows you to take pictures of any area of the body.

Q What things do you take pictures of?

A I take pictures of injuries. It's called a colposcope. And it allows you to take pictures. And I take pictures of injuries, lacerations, bruises, discolorations.

Q Now, would it be fair to say, if you don't see any injuries, you don't take any pictures of that patient?

A Right. If I don't see any injuries, because under that kind of magnification, you can see. If you don't see any injuries, no, I don't take any pictures.

Q Generally speaking, do you see injuries in every patient who comes into the SANE Unit for this examination?

A No, I don't.

Q Are there any other steps as dictated by the protocol to the examination?

A Well, at the end of the examination, once you have gotten all your specimens, you lock it. There's a lock system to that air-drying. And that takes about an hour, to make sure they're properly dried. So, that's locked so no one can breach it. You lock that. At the end of the hour those swabs are taken out, they're replaced into their individual containers and put back in to their envelopes, put into the kit, sealed and given to the detective who is waiting for it.

Q And can you tell us who has access to this locked drying system that you just described for us?

A The only persons that have access to that drying

system would be the person using it at that time.

Q So, would that be yourself if you were doing the exam?

A Yes, yes.

Q And do you do more than one exam at a time?

A No.

Q So, when you're using that locked drying system, how many patient's swabs or samples are there in there at a time?

A One.

Q Now, Ms. Davilar, were you working as a nurse assigned to the SANE Unit back on April 17th of 2005 at North Shore Manhasset Hospital?

A Yes.

Q And on that date did you have occasion to conduct a sexual assault examination on a patient by the name of Shamika Dottin?

A Yes, I did.

Q And was your examination of her in the SANE Unit documented?

A Yes, it is.

Q And did that becomes part of the medical records maintained by the hospital for that patient Shamika Dottin?

A Yes.

Q Are you familiar with those medical records for

her from that particular date?

A Yes, I am.

MS. TEBBETT: Judge, at this time I offer into evidence as People's 55 a certified copy of those medical records pursuant to CPLR Section 4518.

MR. LEMKE: No objection. I have seen them and I have a copy.

THE COURT: People's 55 will be received in evidence without objection.

(Whereupon, the referred to item is received and marked People's Exhibit 55 in evidence)

THE COURT OFFICER: People's 55 marked and received into evidence.

MS. TEBBETT: If you could give them to the witness, please.

THE WITNESS: Thank you.

(Handed to the witness)

Q Ms. Davilar, take a look at those. Are you familiar with the records pertaining to Shamika Dottin from April 17th of 2005?

A Yes, I am.

Q Do you see there any of the forms that you used when you did your examination of her?

A Yes, I do.

Q Okay. New, where did you first meet Ms. Dottin

in the hospital on that particular day?

A I met her in the SANE Unit. I think when I arrived she was already there.

Q Were you working that day or were you called in that day?

A No, I was called in that day.

Q Okay. Do you know about what time it was when you arrived at the hospital that day?

A I would say, sometime around five in the morning, maybe.

Q And was anyone else with Ms. Dottin in the hospital that morning?

A I don't recall.

Q And do you recall if there were any detectives at the hospital who were associated with the incident that had happened to her?

A I know the detectives were there. But I don't remember if they were there before I got there or after I got there.

Q And was one of those detectives, Detective Moran from the Special Victims' Squad?

A Yes.

Q Are you familiar with him in your capacity as a SANE nurse?

A Yes, yes.

Q Now, can you tell us, when you first began your examination of Ms. Dottin that morning, what is the first thing that you did?

A If my memory serves me right, I would have spoken to her. That would have been the first thing I did with her, was to have a conversation with her.

Q And when you spoke with Ms. Dottin, did you obtain a history from her of what had brought her into the hospital that morning?

A Yes, I did.

Q And how did you obtain that history from her?

A Well, we spoke. I asked her what had happened, and she told me.

Q Did you utilize the forms and the questionnaires that you told us about earlier?

A Yes, I did.

Q And what information were you looking to get from Ms. Dottin when you were obtaining that history from her?

A Well, I was basically looking at, to see what transpired between her and her assailant, so this way I can gauge what type of equipment I needed and how much and what type of exams I would need to perform.

Q Did the information that you got from her when you were speaking to her to get that history from her, in fact, guide the examination that you conducted on her after

that?

A Yes, it did.

Q Can you tell us what information you got from her that guided your examination?

A Well, from what I can recall, she said that -- she said that she was in Hempstead, and that she was assaulted by someone who was driving a van. And that he had forced her to have oral sex with him. That he fondled her breasts, and that he ejaculated in her mouth, then told her to swallow. Then she said that she had vomited on the street and that the assailant had sucked on her breast.

Q Did you document that information in your forms?

A Yes, I did.

Q And did you also utilize a questionnaire?

A Yes, I did.

Q Can you just explain what that questionnaire consists of?

A The questionnaire consists of specific questions, from asking the time of assault to -- so that I can gauge the time that it took her to get to me from the assault.

Q Were you able to gauge that? I'm sorry to interrupt you, were you able to gauge the time?

A Yes. She said approximately 2:30 to three a.m. on Sunday morning. So, it had been about two hours since the assault when I saw her.

Q Can you explain to us why it's important for you to know how much time has passed from the incident to when you're seeing the patient?

A Timing determines injuries, what I will see, what I probably wouldn't see. It also determines how evidence can be broken down. So, the earlier I see the victim, the more evidence there is to collect.

Q What do you mean by evidence being broken down, can you explain that part?

A For example, somebody who is sexually assaulted, semen breaks down after three days, it begins to lose the ability to pick it up. That was the initial teaching. They have now extended it to five days.

So, if my victim tells me she's been hurt between or he has been hurt between those time frames, I know that I can possibly still pick up trace evidence there.

Q Do you know about saliva, what you know what impact timing has on whether it is still present at the time you see the patient?

A I do not know how long. But I do know, as long as my victim hasn't eaten or hasn't drank anything, the chances of me still being able to collect specimens in the mouth is still very good.

Q What about saliva that you're looking to collect from any other parts of the body, besides the mouth. Do you

know what impact timing has on your ability to collect that?

A Just that I know that the sooner she gets to me or he gets to me, if they haven't had a shower or anything like that, it's the likelihood it will still be there.

Q When you were speaking with Ms. Dottin the morning you were examining her and obtaining that history from her, did you ask her those type of questions, whether or not she had eaten anything, drank anything and bathed?

A Yes.

Q Did you document those pieces of information in the medical record?

A Yes, I did.

Q What can you tell us about that?

A On the question of whether she had taken a shower, the answer was no. If she had brushed her teeth, the answer was no. Whether she had eaten or drank anything, the answer was no. Whether she had douched, changed a sanitary napkin, changed her clothing, rinsed her mouth, moved her bowels, she had said no. And urinated, she said, yes, she had.

Q Going back to that questionnaire, what other types of information did you gather from her using that questionnaire?

A Using this questionnaire, I was able to gather from her whether she -- how she was assaulted.

And if you will give me one second.

Okay. I asked Ms. Dottin whether there had been contact with her vagina at any time by a penis. She said no. By fingers, she said no. By any foreign objects -- I'm sorry, correction. Penis, she said no. Fingers, she said yes. A foreign object, she said no.

And that is for contact with her vagina by her assailant.

Q And is that of any significance to you in the examination?

A Yes.

Q In what way?

A It means that I can examine the vagina for physical injury, not necessarily for any secretions.

Q What do you mean by secretions?

A Any sperm.

Q And would you expect to necessarily see physical injury to her vagina based on having -- there having been contact between the assailant's finger and her vagina?

A No, not necessarily.

Q Why not?

A Because it's not possible. There have been assaults where I haven't found anything at all with penile penetration, with digital penetration, highly unlikely, as well. And there is also the possibility it could be, but I

don't necessarily expect or not expect to find it.

A It all depends.

Q Can you continue with what other information you were asking her about from that questionnaire during the history portion?

A I asked her if there was any contact with her rectum by the assailant and by penis, finger or foreign objects. All three she said no.

Q And what significance was this information to you in performing the steps of the kit upon examination?

A That would eliminate me doing an anal examination on her.

Q Okay. And can you continue then with the questionnaire, what other information?

A Yes. I asked her if there was any oral touching have genitals on her by the assailant. She said no. I asked her if she was asked to perform any oral -- any touching of genitals on the -- any oral touching of genitals on her by the assailant, she said no. On the assailant by her, she said yes.

Q And when you say oral touching of genitals, what parts are encompassed by the term genitals, what body parts?

A The penis.

Q Was that of any significance to you in performing the steps of the kit in the examination?

A Yes. It told me that since she said that she hadn't brushed her teeth, she hadn't rinsed her mouth, she hadn't done anything, that the chances of me picking up any semen in her mouth, since she did say he did ejaculate in her mouth, the chances are very good since I had only seen her within two hours of the assault.

Q Other than you asking her whether she brushed her teeth or drank anything, did you ask her whether or not she had vomited?

A No. She volunteered that information in the initial interview.

Q Did she tell you whether or not she had?

A Yes. She said she did.

Q Would that have any significance on your ability to collect any evidence from the swabbing her mouth?

A No.

Q And can you tell us what other information you gathered to use for your examination?

A I asked her if there was any oral touching of her anal area by the assailant. And said she no. I asked her if he had performed any acts on the victim's anal area, and she said no as well.

My next question was, did ejaculation occur. And she said yes, and to oral, but there was no vaginal or anal ejaculation.

Q Was there any other information that you gathered from her to use for your examination?
A Yes. It said, outside of the body only, and she said yes. And ejaculated in her mouth, I think she said, on her.
Q Is there any other information that you used this questionnaire to gather from her, to guide your examination?
A Yes.
Q What is that?
A Did any of the following occur, if there was a use of foam, jelly, or any lubricant. And this is in terms of protecting her. And she said none of those three that I just mentioned were used. I asked if there was a condom used. She said no. I asked if there was any sucking, kissing or biting, and she said yes.
Q What information did you gather from her response of yes to the last question?
A That -- that the assailant put his mouth on her breast.
Q What was the significance of that information to you in doing your examination and performing the steps in that kit?
A Because that told me that I had to do the dry secretions part of the kit.
Q Can you tell us what dried secretions means?

A It means that if someone touched an area with their saliva, there still can be traces of that saliva on that area. So, what you need to do is swab that area with a moistened cotton swab, let it dry and be collected into evidence.

Q And did you gather any other information from her about how this incident occurred that you used in the course of your examination?

A My next set of questions went to the methods used by the assailant.

I asked, was a weapon used to inflict injuries. She said no, there was no injuries, but he held a gun, but did not inflict any injuries on her.

I asked, did he use any physical blows. She said no. Any grabbing, any restraints, any threats, any choking, blindfold, any burn injuries or -- and she said no to all the others, except the gun that was held.

Q Okay.

A My next question I asked was, what position was she in. And she said she was in a kneeling position.

Q Was that of any significance to you for your examination?

A For my examination it would mean that there can be bruising on her knees, to help corroborate what she is saying to me.

Q Did you observe that, at all?
A No. There wasn't any.
Q Okay. Now, after you obtained this history from her about the incident, itself, did you make any observations of her, physically?
A She was very quiet, as I documented. She wasn't crying. She -- she was very quiet. She just sat there, twisting her fingers, basically was her demeanor.
Q Now, after you obtained this history from her and made the observations of her demeanor, what's the next step that you took in the course of your examination of her?
A The next step was to actually perform the physical examination.
Q Can you explain to us how you did that?
A Yes. My first -- once I had already done the lamp, taken the clothing and put all of that aside, my first thing was to get an oral swab from her.
Q Can you explain for us how you do that?
A The oral swab, there is no -- nothing needs to be moistened. It's an envelope, you open it. You remove the swabs. You swab her mouth, up, lower, all around, under the tongue and everywhere. Replace it. You let it dry. And you write the time that it was done, you write your name, and the date that it was done. And you also check the box yes or no, whether you did or not.

Q What is the purpose of collecting an oral swab from her?
A Collecting an oral swab from her was to yield any evidence of semen in her mouth.
Q Can you tell us what was the next step you did after doing the oral swab?
A The next step on her was to do the dry secretion swab on her breast.
Q Can you explain for us how you did that?
A For that test I needed the swab comes again in the little envelope. Open it up. Use distilled water, moisten it and then swab around the breast with one swab, and around the other breast with the next swab.
Q What did you do with those swabs after you used them to swab both of her breasts?
A Those are placed on the -- the heading marked "other."
Q In that box that you mentioned?
A In the box, yes, to dry. Once they were dried, they were replaced into a little box that it goes into.
Q And do those two dried secretion swabs that you used on each of her breasts come into contact with any of the other swabs in that drying box?
A No, no.
Q Can you tell us what you did next?

A For her, I did a pelvic examination. And there was no documented injuries on her. So, where I just did the swabs for basic gonorrhea, chlamydia, that type of stuff. Because that is standard operating procedure in this case.

Q And did you do any other examinations of her?

A I did a pregnancy test on her, which is standard procedure. I took blood work from her, which is also standard procedure. I don't think -- that's it.

Q The parts of the examination that correspond with the steps of the kit, can you explain for us what you do with each of those items at the end of your examination?

A At the end of my examination -- I'm sorry, need to go back. I did do one other thing with her, I scraped her fingernails.

Q Can you explain for us how you do that?

A Those -- in the package comes two separate sheets. And you place her hands on it. And there are two separate little, like, little sticks was a beveled edge. You go under each nail and you clear -- you scrape. You close that one up, and you label it left or right. And then you go over to the next side, you do the same thing and label it left or right.

Q And each of those pieces that are in connection with that kit do you package them up again at the end of the examination?

A Things that don't need to be dried are immediately packaged, sealed and placed back into that kit. The only things I left outside of the kit are the things that need to be dried before they are put away.

Q Do you make any marks on those envelopes or on that kit to identify the patient or the examination on the box?

A Each envelope has the patient's name, medical record number, date of birth, it has my signature, it has -- the time I did that particular exam, and the date I did that exam, and the box is checked that says, yes, I did it.

MS. TEBBETT: Judge, I ask to have this item marked People's 56 first for identification.

THE COURT: 56 for ID.

(Whereupon, the referred to item is received and marked People's Exhibit 56 for identification)

THE COURT OFFICER: People's 56 marked for identification.

MS. TEBBETT: If I could have it shown to the witness, please.

(Handed to the witness)

Q Mr. Davilar, take a look at that item. Do you recognize what that is?

A Yes.

Q Can you tell us what that is?

A It's the sexual assault kit that was filled out for Ms. Dottin.

Q How do you recognize it's the sexual assault kit that pertains to Ms. Dottin?

A It's my handwriting, it's her name, where I work, the date I did it, and the detective I handed it over to.

Q Can you just look inside of that box and tell us if you recognize anything inside?

(Witness complies)

A These four swabs -- these four envelopes were collected by me.

Q How do you recognize that?

A They have my signature and -- and the date, and everything that I placed on them.

Q And do you recognize any of the remaining items that are in that box?

A Yes.

Q What are those?

A One is for vaginal swab and smear. One is for anal swab and smear. One is for pubic area combing. And one is for debride collection.

Q Did you collect -- of the ones you just mentioned, did you collect any of those from Ms. Dottin?

A No.

Q Can you tell us why you didn't?

A Because Ms. Dottin was not vaginally assaulted.

Q Was that based on the information you obtained?

A Based on the information, yes.

Q And the other envelopes, can you tell us what condition you put those envelopes in after you were done with your examination of Ms. Dottin?

A Once I was finished with them, I sealed the envelopes, I placed them back in here, I sealed this, and I applied this orange sticker, here, with my initial over it.

Q You're pointing on the side of the box, in the middle, where there's an orange square.

A It goes here, and my initials are at the bottom of the yellow tape. I can see it through there.

Q Can you tell us, when you sealed up the kit, did you obtain the dried secretion swabs that you swabbed of Ms. Dottin's breasts?

A Yes.

Q Do you see those in there, at this point?

A No, it's not.

Q Can you tell us, before you put those swabs into that kit, what did you do with them after you removed them to swab her breasts?

A When I was finished using them to swab her breasts, I placed them into the drying tray. I put the drying tray back into the holder, turned the air on, and

locked it.

Q Did anyone, you or anyone else, access those swabs while they were locked in there to dry?

A No.

Q How long does it take for them to dry, do you know?

A About an hour.

Q And during that time, was anything done with them by anyone?

A No.

Q Can you tell us what you did after that time period, after they dried, what did you do?

A After they were dried, I break the seal on the kit -- on the drying machine. I remove them. I get each envelope and their little boxes. Then I take the swabs out and put them back into each individual box. Put them back into the envelope, seal that one, and then get the next one, until I'm all through.

Q And the envelope that you put the dried secretion swabs into, did you put it into that kit prior to sealing it?

A Yes, I did.

Q Are you aware whether or not the items that you take from the patients that you put into that kit, are tested by a laboratory?

A Well, I suppose they will be.

Q Are you aware of the process of what happens to that kit after you complete collecting the evidence that you put in there?

A I sign it off to Detective Moran and it goes to a lab.

Q And you don't have anything to do with it after that?

A No.

Q Okay. Can you tell us, the items that you collected that you put into that kit, what condition were they in when you put them into that box?

A They were dry. And each envelope was sealed. And this box was sealed.

Q Okay. And did you see that box prior to coming into the courtroom this afternoon to testify?

A Yes, I did.

Q When did you see it?

A I saw it in the D.A.'s office.

Q Was that earlier today?

A Yes.

Q And can you tell us what condition that box was in when you saw it earlier today, prior to coming in to testify this afternoon?

A It looked almost like this. When I initially saw

it, this yellow tape was sealed. Then Detective Moran came in and he took a scissor and he went around the edge of it and opened it.

Q Was that in front of you this morning?

A Yes.

Q Were you able to look at the contents of the box after that?

A Yes, I was.

Q Other than that seal being different at this point in time, are the contents of that box and the markings that you made on that box in the same or substantially the same condition today as they were when you did your examination of Ms. Dottin back on April 17th of 2005?

A With the exception of that one envelope, everything else is as I put them in there.

MS. TEBBETT: Your Honor, I offer that into evidence.

MR. LEMKE: Voir dire, your Honor, please.

THE COURT: Yes.

MR. LEMKE: In fact, may I have the box?

VOIR DIRE EXAMINATION

BY MR. LEMKE:

Q Good afternoon, Ms. Davilar.

A Good afternoon.

Q You know, I'm Mr. Lemke. How are you?

A Good, thank you, sir.
Q Regarding the kit you're now testifying to. Back on April 17th of '05, is that when that was collected?
A Yes.
Q And you testified that there are a number of items inside that box, is that correct?
A Yes.
Q And you indicated that after April 17th of '05 you had given that to Detective Moran, correct?
A Yes.
Q And you don't know what happened to it between the 17th of April until today, correct?
A Yes.
Q But, yet, when you were shown that box today, that being People's for ID purposes number 56, it was sealed?
A Say that again.
Q It was sealed?
A Yes, it was.
Q It was sealed with yellow tape?
A Yes.

(Continued on next page)

Q. It was sealed with yellow tape?
A. Yes.
Q. Did you put that yellow tape on that?
A. No, sir.
Q. You don't know who did, do you?
A. No, sir.
Q. And so when you saw it this morning for the first time, it was different from when you gave it to Detective Moran back in April of 2005, correct?
A. Yes, sir.
Q. And Detective Moran is the one that now opened that up, correct?
A. Yes, sir.
Q. And could you explain again what's now inside that box? What are the items that are inside that box?
A. The items that are in this box right now?
Q. Yes.
A. Are the fingernail swab.
Q. That's in an envelope?
A. Uh-huh.
Q. Is that envelope open?
A. The fingernail scraping.
Q. Were they open?
A. It's sealed differently.
Q. So sealed differently from when you first turned it

over back in April, right?
A. Yes.
Q. What else is in there?
A. There is a buccal specimen.
Q. Again, that's in an envelope that -- is that open, do you know?
A. Yeah.
Q. So it appears --
A. Sorry, can I back up?
Q. Yes.
A. The fingernail swab is not changed. The buccal swab is changed.
Q. Buccal swab?
A. Yes.
Q. Now, that's a buccal swab of who?
A. The victim's.
Q. Back on April 17th. So that's different than it was on April 17th, correct?
A. Uh-huh.
Q. You didn't do that, correct?
A. No. There is a red tape on it, yes.
Q. So it's in a different condition than it was from April 17th, correct?
A. Yeah.
Q. What else is in that box that is different?

A. There is one that's marked pulled pubic hair is different.

Q. That's different as well from when you turned it over to somebody back then, right?

A. No, that one is not different, that one is the same.

And pulled hairs, it's the same.

Q. Meaning they were never open?

A. It doesn't look that way.

Q. Okay. What else is in that box?

A. There is underwear.

Q. Not open?

A. Not collected.

Q. Okay.

A. Vaginal swab and smear, not collected. Anal swab and smear, not collected. Pubic hair combings and debris collection, nothing in there.

Q. Was there an envelope that you said was open but there was nothing in it? Was there a swab of a breast?

A. No. There's the one that says, Dried secretions that is not here.

Q. That's not there?

A. No.

Q. But it was there on April 17th, right?

A. Yes.

Q. So that's all different from when you turned it over to somebody back on April 17th, correct?

A. Uh-huh.

MR. LEMKE: Your Honor, I object to all this.

THE COURT: Come on up, all of you.

(Whereupon, the following discussion was held at the bench:

THE COURT: Mr. Lemke, you want to elaborate on your objection?

MR. LEMKE: Yes. I would think it's going to be subject to connection, that being, perhaps, the individuals who tested it. However, at this point, until there is that foundation laid, I'm objecting. Obviously, there are items that are missing that apparently were there back on April 17th when she turned it over to Detective Moran. I believe Detective Moran may be testifying as well that he may have received this box. So, I would expect --

THE COURT: We're going to take a break.

Members of the jury, while we're discussing this on the record, why don't we take a break. All of you can step out at this point. Follow Dave. My lieutenant will have you back here in a minute.

(Whereupon, the jury exited the courtroom.)

MR. LEMKE: So I'm sure it's going to be

subject to connection. I mean, I object at this period of time. There is also yellow evidence tape that is placed on it which was not there when she turned it over to Detective Moran on April 17th. Som it's not the same as it had been when she collected this.

She's laid a foundation preliminarily that she collected it and made the markings on it and I'm not at this time consenting, I'm objecting based on that there is no foundation as of yet.

THE COURT: Ms. Tebbett.

MS. TEBBETT: I mean, I can offer it subject to connection. She needs to be able to authenticate her part of it and Detective Moran can say what he did with it and the lab will say what they retained and what they put back in the kit and resealed and put it back.

THE COURT: Right, which I assume is going to happen.

MS. TEBBETT: Right.

THE COURT: Do you want to offer it through Detective Moran or you want --

MS. TEBBETT: Judge, I'm going to show it to him either today, if we get to him, or, if not today, tomorrow. But he doesn't open it once he gets it from her, he just puts an additional seal on it and forwards it to the lab. So, I can offer it at this point subject

to connection and ultimately when the lab person comes in --

THE COURT: So in other words, Moran gets it from her, it's sealed.

MS. TEBBETT: Yes, with this orange.

THE COURT: Moran doesn't open it.

MS. TEBBETT: Right. He adds this red that's on either corner. You see where it says, Evidence?

THE COURT: Right.

MS. TEBBETT: And sends it to the lab and then the lab person will testify they opened it, test whatever they test, retain one where they get the profile, the DNA off of it, and reseal it with the yellow evidence tape that you see around the edges.

THE COURT: Who puts the yellow evidence on it, the lab?

MS. TEBBETT: The lab.

THE COURT: And send it back to Moran?

MS. TEBBETT: Right.

THE COURT: And Moran now opens it the first time in front of our witness, Ms. Davilar, which is today.

MS. TEBBETT: Right.

THE COURT: Over objection, Mr. Lemke, subject to these witnesses providing the remaining evidentiary

foundation.

Let me ask the People, I trust someone from the lab is going to come in here and say that they got this?

MS. TEBBETT: Yeah.

THE COURT: Okay. Let me finish that thought. That they got it sealed?

MS. TEBBETT: Yes.

THE COURT: And the seals that you have indicated from this witness and Detective Moran?

MS. TEBBETT: Yes, and they document all that in their paperwork, which they will testify to.

THE COURT: Subject to connection, I will overrule the objection.

MS. SINGAS: Should we take the opportunity now to get our other witness or should we wait?

THE COURT: Yeah. This is as good a time as any to go find the next witness.

(A recess was taken.)

COURT OFFICER: Jury entering.

(Whereupon, the jury entered the courtroom.)

THE COURT: The objection to People's 56 is overruled at this time subject to connection.

People, do you have -- that item has been marked People's 56 in evidence. People, any further

questions of this witness?

MS. TEBBETT: Just a couple, Judge, thank you.

(Whereupon, People's Exhibit 56 for identification was received and moved into evidence.)

CONTINUED DIRECT EXAMINATION

BY MS. TEBBETT:

Q. Ms. Davilar, just so that we're clear, do you recognize on each of the envelopes inside of that box, your markings, your handwriting?

A. Yes, I do.

Q. And are they still sealed in the spots where you had sealed them back on April 17th of 2005?

A. Yes, they are.

Q. And you recognize your markings on the outside of the box also?

A. Yes, I do.

Q. And can you tell us what you did with that box after you put all of those items inside on that morning?

A. On that morning, after I finished with it, I -- the victim had signed over a consent to give it to Detective Moran. So, I signed that consent along with her and I gave Detective Moran this box and he signed off for it and he signed the papers as well and he gave me my copy. I gave the young lady her copy and that was the last I saw it.

Q. And what condition was the box in when you gave it

to Detective Moran?

A. Pretty much the same condition it's in, except for the red and yellow tape that's on it now.

Q. Was it sealed or -- had you sealed it when you gave it to him?

A. Oh, absolutely, yes.

Q. Thank you. I have no further questions.

THE COURT: Mr. Lemke, any questions?

MR. LEMKE: Yes, your Honor.

CROSS-EXAMINATION

BY MR. LEMKE:

Q. Good afternoon, Ms. Davilar. Now, Ms. Davilar, on April 17th of '05, you received a call to come in as a result of a young lady that came through the hospital with allegations, complaint that she had been sexually assaulted, correct?

A. Yes.

Q. You were off that day?

A. Yes.

Q. And when you arrived, it was back at North Shore or University Medical Center?

A. University Hospital Manhasset.

Q. University Medical Hospital, correct?

A. Uh-huh.

Q. When you had arrived, I take it you then went into

a room where you then met this young lady?

A. Yes.

Q. And you learned that her name was Ms. Dottin, correct?

A. Yes.

Q. And the initial, I guess, conversation with Ms. Dottin, was for her to explain to you what had occurred, correct?

A. Yes.

Q. And you asked her some of the questions in order for you to make a determination into what type of exam you might give her, correct?

A. Well, she told me what had happened. Then I asked the questions on the questionnaire to find out.

Q. And those questionnaires were some of the questions that the People had asked you just moments ago, correct?

A. Yes.

Q. Because at that time, it's not for you to make a determination as to whether somebody is actually a victim as opposed to whether somebody is making it up, but based upon what that individual tells you, to collect evidence, correct?

A. Yes.

Q. Because there will be those that come in that are telling the truth regarding a sexual assault and there will be those that come in that are not telling the truth,

correct?

A. It could be, yes.

Q. In this case you speak to Mrs. Dottin and she indicates to you regarding what had occurred and you get some information from her, correct?

A. Yes.

Q. And at some time is there a Dr. DaMore that was present also?

A. Yes, there was.

Q. Dr. DaMore, do you know whether it's a male or female? Is it a he or she?

A. Male.

Q. Do you know whether he, himself had reviewed your results or your collection of evidence?

A. No, he does not.

Q. Does he speak to her in any way?

A. Yes, he does.

Q. And had he spoken to her prior to you speaking to her?

A. I don't recall who spoke with her first.

Q. Well, do you recall who called you in?

A. It would have been the nurse in charge that would have called me in.

Q. And is that in your records, perhaps, the medical records, as to who called you in?

A. It usually isn't, but on triage it might tell me who did the triage. One second.

(Pause in the proceedings.)

A. It looks like the triage nurse was Kelly Ambrosio, but I'm not sure who called me.

Q. But there was, in fact, someone that called you, that's why you arrived to the hospital?

A. Yes.

Q. And, again, also as protocol would require, to some extent, in speaking to this young lady, there is a question as to whether or not she would like to have an advocate present, correct?

A. Yes.

Q. And in this case she refused?

A. She refused.

Q. Correct?

A. Advocate refused, yes.

Q. And there is also, during this initial discussion, regarding whether a psychiatrist would also be someone she would like to talk to and she refused as well, correct?

A. Yes.

Q. And but this is something you are asking her before you conduct the exam to make her feel as comfortable as you can, correct?

A. Yes.

Q. Now, the next step, after you receive some information from her, is now to protect the integrity and collect as much evidence as you can, to determine and to assist in an investigation as to who did this, correct?

A. Yes.

Q. And would it be correct to say that shortly after speaking to Ms. Dottin, you then have her step into a basically a -- I don't want to call it a blanket -- a sheet?

A. Yes.

Q. That has certainly been sanitized, correct?

A. No, I wouldn't say -- I wouldn't go as far as to say those words.

Q. Certainly it's a clean sheet?

A. Yes.

Q. So it's a clean sheet that she would step into and then undress completely, correct?

A. Yes.

Q. And, again, the purpose for that is if there is any loose, perhaps, hair follicles, there is some evidence in any way that that could be collected on the sheet, correct?

A. Yes.

Q. And she completely takes off all her clothes?

A. Yes, she does.

Q. And she does that, correct?

A. Yes.

Q. And prior to doing that, you had asked her had she showered at home, correct?
A. Uh-huh.
Q. Had she -- you can't go uh-huh, you have to answer.
A. Yes.
Q. Is that a yes?
A. Yes.
Q. And you asked her whether she had showered at home, correct?
A. Yes.
Q. Because those are things that are important in trying to determine what evidence you would need to collect, correct?
A. Yes.
Q. And once Ms. Dottin then removed her clothing, I take it she's given, basically, some type of garment to put on, correct?
A. Yes.
Q. And she did so, correct?
A. Yes.
Q. And then she is then brought either to another area, an examination area, correct?
A. Yes.
Q. And you are present because you are going to conduct that examination, correct?

A. Yes.
Q. And in doing so, one of the first things that you do is, I would take it, you make observations with your eyes, correct?
A. Yes.
Q. To determine whether there is any type of bruising, correct?
A. Right.
Q. To see if there is any type of other evidence that you might see, such as dried secretions, correct?
A. Yes.
Q. Blood, correct?
A. Yes.
Q. Pubic hairs, correct?
A. Yes.
Q. Or anything else that may be relevant to the investigation later on, correct?
A. Yes.
Q. Because that's what you have training in, specifically as a SANE nurse, correct?
A. Yes.
Q. And in doing so, you examined Ms. Dottin, correct?
A. Yes.
Q. Regarding any type of physical injuries?
A. Yes.

Q. And she had none, correct?
A. No.
Q. But, again, that depends on what the individual's complaining of, correct?
A. Yes.
Q. So in this case, you are conducting your examination and as part of your conversation with Ms. Dottin, she had indicated that this individual had ejaculated in her mouth, correct?
A. Yes.
Q. So it's going to be important for you, at some point, to take a buccal swab of the mouth inside, correct?
A. Yes.
Q. And that's why you asked her, did she have anything to eat since the attack and she said no, correct?
A. Yes.
Q. You asked her if she had anything to drink, correct?
A. Yes.
Q. She said no?
A. Yes.
Q. You asked if she brushed her teeth or did anything to perhaps alter the chemicals in her mouth, correct?
A. Yes.
Q. Now, would it be correct to say that once she's

disrobed, that you observe, again with your eyes, and then the next step, because your eyes can only see so much, would be to use any instruments?
A. Yes.
Q. Or in this case the Wood's lamp?
A. Yes.
Q. The Wood's lamp, I think, as you had indicated, is an ultraviolet light, correct?
A. Yes.
Q. That will indicate or pick up any secretions, correct?
A. Yes.
Q. In this case, you had used such a lamp, correct?
A. Yes.
Q. And in doing so, you go basically from the tip of the patient's head down to the toes, correct?
A. Yes.
Q. And you did so in this case on April 17th of '05, correct?
A. Yes, I did.
Q. And with all negative results, correct?
A. Yes.
Q. And when you say negative, they're recorded in the records as indicating it did not detect any secretions, whether it's blood, semen, saliva or anything else, correct?

A. Well, I can't say correct, because it wouldn't pick up saliva.
Q. Saliva is not picked up by the Wood's lamp, correct?
A. No.
Q. The Wood's lamp has to pick up some type of enzyme, correct?
A. Yes.
Q. Such as semen, correct?
A. It would pick up semen, correct.
Q. Blood, correct?
A. It would show any blood, yes.
Q. And in this case, as you did the entire body, it didn't pick up any type of saliva, correct?
A. No.
Q. Because it wouldn't?
A. No.
Q. It didn't pick up any type of blood or other secretions, correct?
A. No.
Q. And then you move on to the next part of the examination, which may be, as you had indicated, internal to some extent, correct?
A. Yes.
Q. And moving past that and, more importantly, you

then now are going to take evidence through a rape kit which you now testified in part to, correct?

A. Yes.

Q. And regarding the rape kit and Ms. Dottin, what was the first thing that you did regarding the rape kit? You had a number of envelopes in that rape kit, correct?

A. Yes.

Q. For example, one of the envelopes would be to select undergarments or underwear, correct?

A. Yes.

Q. But that had already been collected in the sheet?

A. Yes, in the pile of clothes.

Q. Now, those pile of clothes, where did they go?

A. I don't recall.

Q. You didn't make any notes as to where those clothes went?

A. The only thing I documented that I collected from her was the evidence kit.

Q. Well, is it your testimony then that she didn't take down all her clothes and put them on a sheet that were collected or she did?

A. I don't remember saying that I made her take off all her clothes. I said that would be the procedure if the patient was coming from the scene and based on what they said.

Q. Well, in this case I'm asking you, she comes in, she says she's been sexually assaulted?

A. Right. I don't remember because I don't have any clothing here from her --

Q. So --

A. -- as being given to the detectives.

Q. So does that mean that you don't know what happened to her clothes?

A. I don't recall.

Q. You don't know, do you?

A. No.

Q. Protocol would have been to make some notations, wouldn't it, as to whether the clothes would have been gathered, such as her underwear, her bra would be important, wouldn't it?

A. Uh-huh.

Q. Because saliva can be, if you know, extracted from the bra, couldn't it?

A. Yes.

Q. Clothing, dried secretions could be removed from the clothing if there was an individual that had ejaculated on those clothing, correct?

A. Yes.

Q. That's important in a case such as this where there is allegations of sexual abuse, correct?

A. Yes.
Q. And yet you don't have any indication whatsoever as to what happened to her underwear, bra or her clothes, do you?
A. No, I don't.
Q. Now, regarding some of the questions that you were asking Ms. Dottin, it then led you to take swabs, correct?
A. Yes.
Q. The kit that you have before you that is, at this point, subject to connection in evidence, could you take out each one of the envelopes, please, that are in that kit. There is a number of them there, correct?
A. Yes.
Q. Let's go to the ones that haven't been opened. Well, withdrawn.
Let's to go the ones that are empty. Would that be, for example, you have one there that is marked the patient's underwear, correct?
A. Uh-huh.
Q. That's empty?
A. Yes.
Q. So, obviously, it's empty because you didn't collect underwear, correct?
A. Right.
Q. Or her bra, correct?

A. Right.

Q. So let's put that envelope to the side. That was not utilized, correct?

A. Yes.

Q. What other envelopes are there that are not utilized? Vaginal swab?

A. Yes.

Q. We didn't do a vaginal swab because she didn't say she had been penetrated with a penis or leaving some kind of ejaculate, correct?

A. Yes.

Q. So we can put that to the side, correct?

A. Yes.

Q. What other evidence do you have there in the rape kit?

A. Anal swabs and smears.

Q. So you put that to the side.

What else?

A. Pubic hair combing.

Q. Now, pubic hair combing is significant in some part because if the allegations are placing a penis into one's mouth or so forth, there may be, obviously, pubic hair, correct, that may come off one's body?

A. Uh-huh.

Q. In this case is there any combing of the clothing

or looking for any type of pubic hairs regarding Ms. Dottin?

A. If there was no vaginal contact, I couldn't look for pubic hairs vaginally. There was no vaginal penetration. There was no contact between her assailant and her vaginal area, according to her, so why would I look for --

Q. For pubic hair.

Is it your testimony then if there is not vaginal penetration --

A. But this is the victim's pubic hair.

Q. So that pubic hair combing would only be then for the vaginal area --

A. Distinguishing.

THE COURT: Ms. Davilar, you can't both speak at the same time.

You want to rephrase the question.

MR. LEMKE: Yes. Perhaps I'm mistaken.

Q. Pubic hair combing or looking for pubic hairs on clothes would be certainly different than pubic hair combing in the vaginal area; is that correct?

A. No.

Q. Okay. That's why we don't have one now, correct? That's why we don't have any pubic combing, because there wasn't any penis to vagina, correct?

A. Yes.

Q. So we can get rid of that one.

What's the other one you have there?
A. Debris collection.
Q. The what?
A. Debris.
Q. What kind of collection is that?
A. That would be like gravel, leaves, stuff like that.
Q. That would be on either her body --
A. Or on her clothing.
Q. -- or on her clothing.
The clothing would be important, but you don't know what happened to the clothing?
A. No.
Q. So the ones that are left -- what do you have left?
A. Pulled head hair.
Q. Okay. Let's go to that one. Is that empty or did you do something with that?
A. That one I did.
Q. What's that?
A. Pulled head hairs.
Q. So tell the jury exactly what that type of evidence collection is?
A. That is just getting a sample of her hair so that you have a sample of her DNA and what her hair sample is like compared to someone else's.
Q. So you can make a DNA profile of her so you know if

there is something else as to where it came from, right?
A. Yes.
Q. That was done, correct?
A. Yes.
Q. And, in fact, that is opened up I take it, right?
A. It is not at this moment.
Q. That's not open?
A. No.
Q. Well, maybe there is something else. Is there something else to get a DNA from Ms. Dottin from in that kit?
A. The next one is pulled pubic hairs.
Q. Pulled pubic hair. Would that also be to get a DNA of her?
A. Yes.
Q. And did you do that?
A. Yes.
Q. And I take it that's open?
A. It doesn't look that way.
Q. So that's not open either.
Ms. Dottin's pubic hair or hair from her head to test for DNA is not open.
What else did you take from Ms. Dottin for any DNA?
A. Her buccal specimen.
Q. Buccal swab?
A. Yes.

Q. That's been open, correct?
A. Yes, it looks that way.
Q. That was to test, obviously, for a number of things; her DNA, correct?
A. Uh-huh.
Q. And as well as to determine whether there is any DNA from another individual, correct?
A. Yes.
Q. Because she had indicated that the individual placed his penis in her mouth, correct?
A. Yes.
Q. And that there was ejaculation, correct?
A. Yes.
Q. And that's why you asked whether there has been any eating or any drinking, correct?
A. Yes.
Q. Anything else in that kit?
A. Fingernail scrapings.
Q. Fingernail scrapings. They were done, right?
A. Yes.
Q. Is that unopened also?
A. It looks that way.
Q. So that hasn't been tested, as far as you know?
A. As far as I know.
Q. No?

A. No.
Q. Anything else in there that you did that they didn't bother to test?
A. There is nothing else that is in here at the moment.
Q. There is nothing else in there?
A. No.
Q. What else would you have collected that's not in that kit that you turned over to Detective Moran?
A. The dried secretions.
Q. And those would be swabs, cotton swabs, correct?
A. Yes.
Q. Four of them were taken, correct?
A. Yes.
Q. And you had marked them A-1 I believe, A-2 -- withdrawn.
You don't mark them, do you?
A. No.
Q. You take them, they are dried in a drying box, as I call it, correct?
A. Yes.
Q. Then put in an envelope and put in the kit and who knows where they are, correct?
A. Yes.
Q. You haven't seen them, have you?

A. No.
Q. You didn't see them this morning either, correct?
A. No, sir.
MR. LEMKE: I have nothing else. Thank you.
THE COURT: Any redirect?
MS. TEBBETT: Just briefly, Judge, please.

REDIRECT EXAMINATION
BY MS. TEBBETT:

Q. Ms. Davilar, you recall Mr. Lemke asking you some questions regarding Ms. Dottin's clothing?
A. Yes.
Q. Now, was there anything in the information that you had obtained from her during that history portion of the examination that would lead you to conclude that there would be any evidence that you would find on any of those clothes?
A. Not that I recall.
Q. For example, did she tell you whether or not he ejaculated on her underwear?
A. No.
Q. She didn't tell you or that didn't happen?
A. She didn't tell me that.
Q. Did she tell you whether or not he had ejaculated on pants, shirt, any other article of clothing that she was wearing?
A. No, she did not.

Q. So, based on the information that you got from her, did you make a determination whether or not there was anything of evidentiary value in those clothes or were you able to make that determination?

A. To be totally honest, I don't recall.

Q. From the notes or the notations and the things that you documented in the medical records, was there anything in there that would help you or that would have led you to make a determination as to whether or not to collect those clothes and forward them to the police?

A. On my documentation of her presentation, I remember my documentation said that clothing were intact.

Q. What does that mean?

A. Meaning that they weren't torn, they weren't disheveled or anything. That's what intact, in my terminology, meant.

The fact that I did not give them to the police, there must have been a reason behind it, but I am not going to sit here and speculate what they were. The fact that I didn't give them to them means that maybe I didn't see a reason for it, but I'm not going to say that because I don't remember.

Q. Okay, thank you.

Now, just to make sure that we all are clear, when Mr. Lemke was asking you regarding pubic hair combings, what

does that mean? What does that refer to?

A. Between a victim and assailant, if there had been pubic hair, the pubic area contact, the possibility of pubic hairs becoming dislodged between these two individuals is very high. So, combing through her pubic hair would separate hers from anyone. I can pick up samplings of both hers, as well as anyone else's pubic hairs.

Q. So the envelope for pubic hairs refers to combing the victim's pubic hairs?

A. Yes.

Q. Not looking for someone else's pubic hairs somewhere on her?

A. No.

Q. Now, the dried secretion swabs that you took from her breasts, can you tell us how many Q-tips you used to do that?

A. There are four Q-tips and two boxes. One swabs right, one swabs left and whichever one you do first, but they're put in separately.

Q. Are each of those -- how are each of the four packaged?

A. They come two in a package and there are two boxes in there and you open, you swab with two, you put them in the dryer. You open the next one, you swab the next one with two and you put them in the dryer.

Q. And how do you package them up again after they have dried?

A. Each go into an individual box and go into the one envelope.

Q. Okay. And was that envelope sealed when you put it into that kit the day you did the exam?

A. Yes, it was.

MS. TEBBETT: That's it. I have nothing further.

THE COURT: Anything, Mr. Lemke?

MR. LEMKE: Nothing else, your Honor.

THE COURT: Ms. Davilar, thank you very much.

(Whereupon, the witness was excused.)

THE COURT: Can I see counsel at the bench.

(Whereupon, a discussion was held off the record.)

THE COURT: People, your next witness.

MS. TEBBETT: The People call Sandra Dottin.

S A N D R A D O T T I N M C C A I N, residing in Nassau County, having been called as a witness on behalf of the People, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: Please state your name, spelling your last name and your county of residence, please.

THE WITNESS: Sandra Dottin-McCain,

D-O-T-T-I-N - M-C-C-A-I-N. Nassau County.

THE COURT: Ms. Dottin, if you can just move up a little bit closer to that microphone so we can all hear you.

Ms. Tebbett.

MS. TEBBETT: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. TEBBETT:

Q. Good afternoon, Mrs. Dottin.

A. Hi.

Q. Do you work, Mrs. Dottin?

A. Yes.

Q. What type of work do you do?

A. I'm a bus operator.

Q. Do you have any children?

A. Yes.

Q. How many children do you have?

A. Two.

Q. And do you have a daughter?

A. Yes.

Q. And can you tell us her name?

A. Shamika Dottin.

Q. Now, Mrs. Dottin, I want to direct your attention back to the date in 2005 of April 17th of 2005?

A. Okay.

Q. Do you remember that day?
A. Yes.
Q. At about 4:00 or so in the morning of that day, can you tell everyone where you were and what you were doing?
A. I was asleep.
Q. Were you at home at that time?
A. Yes, I was at home asleep, I'm sorry.
Q. And did your daughter Shamika live with you at that time?
A. Yes.
Q. And did there come a time somewhere around 4:00 in the morning of April 17TH of 2005 that something woke you up?
A. Shamika's scream.
Q. Can you tell us about that? How did you come to wake up that morning?
A. I woke up to her screaming, screaming, running up the stairs. So, I jumped out of my sleep and I ran. I met her. I have a hallway outside and I met her in the hallway and she was screaming hysterically and shaking. She fell into my arms and I kept asking her what was wrong.
And she said, Mommy, mommy, heeee. . . .
So I'm saying, What, Shamika, he what?
And she said -- sorry -- but she said, He made me suck his dick.
And I'm like, Who? What? Who?

I don't know. I don't know. He had dreads. He had dreads. And she was screaming.

I asked her, What happened? Who was it? Where was she? We were both hysterical at that time, just crazy.

Q. Can you describe for us what her screaming sounded like when you first heard it?

A. Your stomach just drops in your gut. Because I was sound asleep. I had been asleep for hours. That scream, I didn't get up and sit up, I just ran. I just got up out of my bed and I ran to her because I knew she was in trouble.

Q. Had you ever heard her scream like that about anything before?

A. No, never.

Q. And when you encountered her in the house --

A. Right.

Q. -- can you explain how she was able to talk to you or was she able to talk to you?

A. At first she was speaking, but she was crying too, so I couldn't make it out. Everything had to be repeated twice. We had to -- I had to keep asking her so I could make out her words, because I couldn't make out her words with the screaming. Her crying, actually.

Q. Can you describe how her demeanor appeared to you that morning in the house?

A. She was just really, really upset and shaky.

Q. Had you ever --

A. Crying. She was just upset, completely upset. Distraught.

Q. Had you ever seen your daughter Shamika like that before?

A. No, not in that state.

Q. Can you describe for us usually what her temperament or her disposition is like?

A. She's cool. She hides her emotions.

Q. And did she appear that way to you as she usually did this morning of April 17th of 2005?

A. Yes.

Q. Did she appear, as you described, as cool or hiding her emotions?

A. What, that morning? No, I'm sorry. I'm thinking this morning. I'm hearing you, but not listening, sorry.

Q. That's okay.

Now, can you tell us what you did when you saw your daughter in such a state the morning of April 17th of 2005?

A. I was in the same state as she was. From the moment I saw her, we ran up the stairs and she just fell into my arms. We were both screaming and crying. I'm trying to dial 911. The lady is on the phone telling us you have to calm down, we can't understand you. You have to calm down. And we just weren't together.

Q. Did there come a time that the police arrived at your home that morning?

A. Yes.

Q. And did you go anywhere with your daughter that morning after the police had arrived?

A. We went to the hospital.

Q. Can you tell us what her demeanor was like after you got to the hospital?

A. She was okay. She was calm. Calmer, let's put it that way. She was, you know, but then she had to tell her story and, you know, she got upset to repeat it again. And the exam, of course, upset her again.

Q. Okay. Now, after this date in April of 2005, did a period of time pass by before you were contacted by the police again in connection with the incident that happened to your daughter?

A. Yes, it was a long time. About two years.

Q. About how long?

A. Two years. It was a long time.

Q. Was that sometime in 2007?

A. No, this year. This year, wasn't it?

Q. 2008?

A. I think it was this year, 2008.

Q. All right. Thank you, Ms. Dottin. I have no other questions for you.

THE COURT: Anything, Mr. Lemke?

MR. LEMKE: Not at all.

THE COURT: Ms. Dottin, thank you very much You can step down.

(Whereupon, the witness was excused.)

THE COURT: All right, members of the jury, think that's going to be about all for today. We're going to pick it up tomorrow. I'm going to ask you t come back the same time 10:00. We'll be back here in the same courtroom. I believe you have been reportin I think, to room 106, so I'm going to ask you to come back.

As I let you go for the evening, please don speak amongst yourselves or anyone else about the cas

Don't form any opinions.

Don't view or visit any of the areas described.

Please don't access any accounts of the cas in the media, should there be any.

Have a good night. See you back here tomor morning 10:00.

(Whereupon, the jury exited the courtroom.)

(Whereupon, the trial was adjourned to November 13, 2008.)

* * *