STATE OF NEW YORK : NASSAU COUNTY

SUPREME COURT PART 49

-----------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK — TRIAL

- against - — IND. 436N-08

RICARDO WALTERS

Defendant.

-----------------------------------------X

November 13, 2008
262 Old Country Road
Mineola, New York

B E F O R E :

HON. JAMES MCCORMACK
Acting Supreme Court Justice

A P P E A R A N C E S:

(Same as previously noted)

KATHLEEN PLAIA
KATHI FEDDEN
OFFICIAL COURT REPORTER

***  ***  ***

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE COURT: Good morning, members of the jury. Welcome back. I had a couple of calendar matters I needed to address before we started with the

trial; but we're now ready to proceed.

People, your next witness.

MS. SINGAS: The People call Detective Chris Ferro.

C H R I S T O P H E R F E R R O, Detective, called as a witness by and on behalf of the People, having been first duly sworn, testified as follows:

THE CLERK: Please be seated. Please state your name, spell your last name, rank, shield number and command.

THE WITNESS: Sure. Detective Christopher Ferro, F, as in Frank, E-R-R-O. Shield number is 994. I'm with the Third Squad, Nassau County Police Department.

Good morning.

THE COURT: Okay, Ms. Singas.

MS. SINGAS: Thank you, Judge.

DIRECT EXAMINATION

BY MS. SINGAS:

Q Good morning, Detective.

A Good morning.

Q Where are you employed?

A Nassau County Police Department.

Q What precinct are you assigned to?

A Third Squad.

Q In what capacity are you employed with the Third Squad?
A As a detective.
Q What are your duties as a detective for the Third Squad?
A We investigate crimes within the Third Precinct and the neighboring villages which encompass the Third Squad, which include Hempstead, Garden City, Old Westbury and Floral Park.
Q How long have you been a detective with the Third Police Precinct?
A Just under five years.
Q How long have you been a police officer, in total?
A Twenty-two and-a-half years.
Q All right. Now, are you familiar with the Village of Hempstead?
A Yes.
Q And are you familiar with the area around Pep Boys which is on Franklin Avenue in Hempstead?
A Yes.
Q Okay. I'm going to just ask you to -- I will put this on the screen and ask you to take a look a it.
MS. SINGAS: 27 in evidence, please.
(Placed on the presenter)

Q Do you recognize that area?
A Yes, I do.
Q And what is that?
A That's the western portion of Pep Boys, facing from South Franklin.
Q So, the street right in front, that runs right in front of it, is what street?
A South Franklin.
Q Okay. Where does South Franklin run into, what street?
A Eventually goes, the next intersection would be Peninsula Boulevard.
Q All right. There's a McDonald's located at Peninsula Boulevard where it intersects with Franklin?
A Yes. It's actually in the furthest most portion of that parking lot, if you went straight.
Q So, right here (indicating)?
A Yes.
Q Okay. All right. Can you tell us a little bit about that area, that roadway, Franklin Avenue there? How many lanes of traffic are there?
A It's four lanes.
Q Okay. And how many go in each direction?
A Two go south, two go north.
Q Have you had occasion to be there during the

evening hours?

A Yes.

Q And can you tell us about what the lighting conditions is like?

A It's well lit. There are street lights just north of that location which is Front Street. And along the main street which is South Franklin there are street lights.

Q All right. Is South Franklin the main thoroughfare in Hempstead?

A It's one of them, yes.

Q Now, how about vehicular traffic, during the day what is it like?

A Very busy during the day.

Q How about in the evening?

A It's also -- still well traveled during the evening.

Q How about pedestrian traffic?

A Well traveled.

Q Both morning and evening?

A Yes.

Q Okay. Now, can you tell us where you were working on November 28th of 2005?

A I was working at the Third Squad.

Q Do you remember what tour of duty you had or what hours you began that morning?

A Yes.
Q What was that?
A Seven in the morning until five at night.
Q Now, did you get called and did you help in the investigation of a case that happened at 23 South Franklin?
A Yes.
Q Okay. Let me put this up on the screen for you, 30 in evidence.
(Placed on the presenter)
Q Okay. And what are we looking at in that photograph?
A You are looking in a western direction. It's the bottom portion of the picture, looks like the curb to Pep Boys parking lot. The street with the yellow line is South Franklin. And the store and parking lot in the further portion of that picture is the scene that I eventually went to. The building to the left of that picture with the white side and the brick face is 23 South Franklin.
Q Okay. I'm just going to point to it and tell me if I'm accurate. Is it this one?
(Indicating)
A Yes.
Q This is 23 South Franklin?
A Yes.
Q Did you have occasion to go there the morning of

11/28/2005?

A Yes.

Q Already. Can you tell us a little bit about what you did there?

A I investigated a scene, which I was called by Hempstead Police Sergeant that an assaulted occurred at that location.

Q Did you have occasion that morning to speak with a Delsy Sanchez?

A Yes.

Q And how is it that you were able to speak to her?

A I spoke through an interpreter from Domestic Violence Coalition.

Q Do you know what language she was speaking?

A Yes.

Q What was that?

A Spanish.

Q Okay. When you spoke to her that morning, do you remember if you spoke to her at the Hempstead Police Station or if you spoke to her on the scene?

A First at the Hempstead Police Station.

Q Okay. And was your purpose there to get a general idea of what happened and a general description of the person that had attacked her?

A Yes.

Q Did there come a time that you went with her back to this scene at 23 South Franklin?
A Yes, there was.
Q And what was the reason for that?
A To clarify and to point out the actual locations of the assault.
Q Okay. Did she do that with you, with the help of an interpreter?
A Yes, she did.
Q At that scene?
A Yes.
Q Do you remember about what time of day that was when you went back there with her?
A It was approximately between, I would say, probably, ten o'clock in the morning.
Q Okay. Do you know if that was before or after she went to the hospital, if you know?
A Before.
Q Now, and did you have a conversation with her at the rear of that location, 23 South Franklin?
A Yes.
Q I'm going to show you 35 in evidence.
(Placed on the presenter)
Q Is that the way that the rear of 23 South Franklin looked on the morning of 11/28/2005?

A Yes.
Q Okay. Now, did there come a time when Crime Scene was called to this scene?
A Yes.
Q And what's the reason for that?
A To photograph and document the scene.
Q Okay. Did you have a conversation with the people from Crime Scene?
A Yes, I did.
Q And do you remember who the detective from Crime Scene was that you were speaking with?
A It was first Detective Tobias, and then Detective Hutchinson later on.
Q When you say later on, did there come a time when Crime Scene left and then came back?
A Yes.
Q Can you explain to the jury why that is?
A The first Crime Scene detective gathered evidence at the scene, including measurements, photographs, and gathered evidence at that seen. However, the second detective brought with him a light, a fluorescent-type light, to illuminate the ground area of that scene.
Q Okay. And are you familiar with that blue light; is that called an alternate light source?
A Yes, it is.

Q Does Crime Scene utilize that light source, have you seen it utilized in your presence in your career as a detective and as a police officer?
A Yes, I have.
Q Do you know what the purpose of that alternate light source is?
A It illuminates body fluids.
Q Okay. Now, at what point was that light source brought to this scene?
A It was brought just prior to -- at dusk. Dusk would be the best description. It was getting dark out. It was approximately around six, 6:30 when Detective Hutchinson came to that scene.
Q Okay. Is there a reason why you had to wait until dusk for that light source?
A Yes.
Q Why is that?
A It only -- pretty much only works when it's dark out, dark out. That's when the light's utilized, in a dark condition.
Q I'm sorry, were you present when Detective Hutchinson came become with that light source?
A Yes, I was.
Q And can you tell us what happened?
A In that area, in front of that window and door

area you're looking at --
Q Yes.
A -- there were several spots that were illuminated from the light.
Q All right. And are those marked in any way by Crime Scene?
A Yes.
Q How are they marked?
A Detective Hutchinson placed two cones and in two locations over there.
Q Okay. Is that then photographed?
A Yes, it was.
Q Was that in your presence?
A Yes, it was.
Q And were you able to see the area that had lit up?
A Yes.
Q And can you describe what it looked like?
A It looked like white -- it stood out from the ground. Stood out like it was -- almost, if you can describe a color, it would be a white color.
Q I'm going to show you People's 36 in evidence. What are we looking at here, Detective?
(Placed on the presenter)
A That's a close-up shot. Those are the two cones

that Detective Hutchinson placed down after he utilized the light.

Q Okay. Is this area now being lit or is this lit naturally, do you know?

A It's lit naturally.

Q And these two cones, 1 and 2, were placed there by Detective Hutchinson, is this after he placed the blue light on this area?

A Yes.

Q All right. I'm going to show you People's 38 in evidence.

(Placed on the presenter)

Q What are we looking at here?

A That's the first illumination that Detective Hutchinson found with the light.

Q Okay. I would like to show you People's 37?

(Placed on the presenter)

Q What are we looking at there?

A That's the second spot that Detective Hutchinson found with the blue light.

Q If there had been any other spots that had lit up, would you -- would Hutchinson had put down cones in those areas, as well?

A Yes.

Q Were any other cones placed in any other spots?

A No. He checked the whole back portion of that building area and the whole sidewalk.

Q Okay. What is done in your presence in those areas by Detective Hutchinson?

A He eventually gathered some of the specimens into a container.

Q And do you know where those specimens are sent to?

A They are sent to Forensic Evidence Bureau.

Q Is that to see if they can do an analysis of that?

A Yes.

Q Was that, again, done in your presence?

A No.

Q Not the analysis but the gathering of the specimens?

A Yes. I apologize. Yes, it was.

Q Now, I'm going to show you People's 46. This is in evidence. If you can take a look in there and tell us what is there.

(Handed to the witness)

THE WITNESS: Can I remove it?

MS. SINGAS: You can remove it, if you'd like.

Q What is that, that we're looking at, Detective?

A That is the hat that the victim was wearing at the time of the assault.

Q Were you given that hat?

A Yes.

Q That morning of 11/28/2005?

A Yes, I was.

Q And did you have a conversation with Delsy Sanchez through an interpreter regarding that hat?

A Yes.

Q Okay. Now, do you recognize any markings or anything that would identify it as you having taken it for evidence?

A Yes. The envelope that I secured on the day of the incident is this specific envelope, with my rank, name and shield signed on the back, which I signed.

Q Okay, you recognize your signature and your markings on that?

A Yes. I also placed the detective division number on the front.

Q All right. And do you seal that envelope after you place the hat inside of it?

A Yes. Evidence tape is on the back.

Q Okay. That red tape, that is evidence tape you placed along the seal?

A Yes.

Q What did you do with that hat and envelope?
A I sent it to Forensic Evidence Bureau for analysis.
Q And you sent it on or around the time of November 28th, 2005?
A Yes.
Q Okay. Now, did you eventually ascertain where Delsy Sanchez worked?
A Yes.
Q And where was that?
A The McDonald's which was adjacent to Pep Boys.
Q Did you ascertain if, in fact, she was scheduled to work that day?
A Yes, I did.
Q Was she?
A Yes, she was.
Q Detective Ferro, would this be a case that you would keep assigned to you for the complete investigation or do you hand this case over?
A It's handed over.
Q Who is it handed over to?
A Special Victims' Squad.
Q Okay. And did you, in fact, do that with this case?
A Yes.

Q And was the special victims' detectives on the scene at some point that day, as well?

A Yes.

Q And who was that?

A Detective Wayne Birdsall.

Q And from that point on then, would it become Detective Birdsall and the Special Victims' Unit case?

A Yes.

Q Is that because of the sexual nature of the charges?

A Exactly, yes.

MS. SINGAS: I have nothing further for him. Thank you very much, Detective.

MR. LEMKE: Just one or two.

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. LEMKE:

Q Good morning, Detective.

A Good morning.

Q Detective, on November 28th, '05, there was a determination made in particular to the hat to which you testified to, that that would be a significant part, article of clothing, based on your conversation with the victim, to then seize it, to be tested for the possibility of any type of DNA evaluation, correct?

A Yes.
Q That is, based on your conversation, clothing would be important to any kind of sexual assault. And back on November 28th you seized that hat, properly protected, and placed it in an envelope and signed for it, correct?
A Yes.
Q At that point it was then turned over to Detective Birdsall, Special Victims', right?
A No.
Q Where was it turned over?
A I forwarded it to Forensic Evidence Bureau.
Q Yourself?
A Yes.
Q Again, that would be for further testing, correct?
A Yes.
MR. LEMKE: I have nothing else. Thank you.
THE COURT: Ms. Singas.
REDIRECT EXAMINATION
BY MS. SINGAS:
Q You didn't take her underwear, did you?
A No.
THE COURT: Thank you, Detective. Thank you very much.
THE WITNESS: Your welcome.

(WITNESS EXCUSED)

THE COURT: Okay. People, your next witness.

MS. SINGAS: Yes. The People call Delmy Morales.

THE INTERPRETER: Good morning, your Honor.

THE COURT: Good morning.

THE CLERK: Spanish interpreter, give your name.

THE INTERPRETER: Charlene Perez DeKlein.

D E L M Y M O R A L E S, Called as a witness by and on behalf of the People, having been first duly sworn through the aid of the Spanish Interpreter, testified through the aid of the interpreter as follows:

THE CLERK: Please be seated.

Please state your name, spell your last name, and give your County of residence.

THE WITNESS: Delmy Morales. The county?

THE CLERK: Yes.

THE COURT: Yes.

THE WITNESS: Suffolk County.

THE COURT: Ms. Singas.

MS. SINGAS: Thank you.

DIRECT EXAMINATION

BY MS. SINGAS:

Q Good morning, Ms. Morales.

A Good morning.

Q How are you?

A Fine.

Q All right. Ms. Morales, how old are you?

A 28.

Q And do you work?

A Yes.

Q What kind of work do you do?

A I'm a stylist in a beauty salon.

Q Do you work with your sister?

A Yes.

Q And what is your sister's name?

A Ilsa Morales.

Q And is she an older sister or younger sister?

A Older.

Q Okay. Ms. Morales, do you speak English?

A A little, not very much.

Q Do you feel comfortable conversing in English?

A Yes. But sometimes I can't explain very well.

Q And what language do you prefer to speak in?

A Spanish.

Q Ms. Morales, I'm going to direct your attention to November 6th, 2006, okay, approximately ten o'clock in

the morning. Were you with your sister, Ilsa Morales, that morning?

A Yes.

Q Where were you going?

A To a cashier, Western Union.

Q What was the reason that you were going there?

A I was going to send some money to my country.

Q What country is that?

A Honduras.

Q Now, how did you get to the Western Union where you were going?

A With my sister.

Q Did you drive or did you walk?

A By car.

Q Now, who was driving, you or your sister?

A My sister.

Q And whose car was she driving?

A A Ford Explorer.

Q Was that her car?

A Yes.

Q Okay. Now, when -- did you eventually get to the Western Union where you were heading?

A Yes.

Q And what area was that located in?

A Hempstead.

Q Do you know the name of the street that the cashier place is located on?
A Fulton.
Q Is that Fulton Avenue?
A Yes, Fulton Avenue.
Q All right. Now, when you got there, did your sister park the car?
A Yes.
Q And did -- do you know where you parked relative to the store?
A In front of -- almost in front of the place.
Q Okay. Now, was it just you and your sister in the car at that time?
A Yes.
Q Okay. Were you -- where were you seated.
A In the passenger seat.
Q Did there come a time that you left the passenger seat and went inside the store?
A Yes.
Q How much time did you spend inside that store?
A Like, ten minutes, perhaps.
Q Were you able to complete the transaction that you went there to do?
A No.
Q When you came outside, did you have any money on

you?

A Yes. But I had it in my pants pocket.

Q Did you have it, if you remember, in your front pants pocket or your rear pants pocket?

A In the back pocket.

Q Okay. When you came back outside the store, did you go back into the car?

A Yes.

Q And what seat did you take in the car?

A Passenger seat.

Q And who was sitting in the driver's seat?

A My sister.

Q Can you tell us what happened at that point after you got into the car?

A The window in the car was down and this person came up to the window and put the hand inside, with a weapon, inside the window.

Q Let me ask you, you said a person came to the car, is that true?

A Yes.

Q Where, what part of the car did the person come up to?

A Where I was on the passenger side.

Q Was that person standing by the window?

A Yes.

Q Approximately, how far away from you was that person?

A Very close, because he was over the window.

Q Okay. When you say over the window, what do you mean? Describe that.

A He had the hand inside the car, but he was very close to the car.

Q Okay. Now, you said he, was that person a man?

A Yes.

Q Can you describe the person that you saw by the window?

A Yes.

Q Please do it.

A It was a black man. What I could see was his face and how he was dressed.

Q Okay. How was he dressed?

A The pants were blue jeans, and a sweat shirt, blue, dark blue. And he had a hat. And over the hat he had the sweater's hood.

Q Can you describe what kind of hat?

A No.

Q Okay. Did it have -- did it have something that came out in front; was it like a cap, or was it -- do you know?

A No.

Q Okay. And then you said on top of the hat was the hood?

A Yes.

Q So, what part of the person's face were you able to see?

A His eyes, from the front.

Q And were you only able to see his eyes or were you able to see his entire face?

A His whole face.

Q Okay. Now, you also said that he had a weapon and he placed it inside the car?

A Yes.

Q Can you describe what kind of weapon that was?

A Silver.

Q Silver what?

A It's a small weapon.

Q Can you describe what kind of weapon?

A It was a gun, a pistol.

Q Where did he place the gun when he put his hand through the window?

A On my leg.

Q And did the person speak?

A Yes.

Q Can you tell us what he said?

A To give him the money.

Q And what happened after that?

A I told him that I didn't have money. And my sister did open her wallet and he took the money that she had in the wallet.

Q Okay. When he took the money that she had in the wallet, was he standing outside of the car or was he inside the car?

A Outside of the car.

Q And did he have to reach across you to get the money?

A Yes. Because my sister put her bag on top of me.

Q And did you see him reach in and take money?

A Yes.

Q And at that time, Ms. Morales, were you able to see this person's face?

A Yes.

Q At that time can you tell us what the lighting conditions were like?

A It was clear.

Q Was it daylight or was it nighttime, what are we talking about?

A It was day.

Q At that time do you think he was closer to you than the interpreter is or further?

A It was like this close.

Q As close as to the interpreter is to you right now?

A Yes.

Q And when the person looked -- when the person was by the window, did he have to bend over to put his face in the window or was he standing back?

A He was standing, but he had his face on the window.

Q And at that time did he have anything covering his face?

A No.

Q Okay. Now, tell us what happened after your sister opened her wallet and he took the money; did he leave?

A No.

Q What happened?

A He took the lock from the door and opened the other door. I don't know how he did it, but he entered the car.

Q What part of the car did he enter?

A Behind me.

Q So, did he go into the rear seats?

A Yes.

Q And did you see him when he sat down in those rear seats?

A I saw him when he sat down in the back.

Q Okay. Can you tell us where he sat down in the back, behind you, behind your sister?

A He was in the middle.

Q And tell us what happened at that time.

A He put the pistol on me so that I would give him the money.

Q Where did he put the pistol?

A In this part here (indicating).

MS. SINGAS: Indicating the back of the, neck your Honor.

THE COURT: Yes.

THE WITNESS: Behind my neck.

Q Okay. And what was he saying?

A To give him money.

Q Was he speaking in English or in Spanish?

A English.

Q Were you able to understand what he was saying?

A Yes.

Q At that time were you speaking?

A Yes.

Q What were you saying?

A That I didn't have money.

Q And continue, what happened next?

A He wanted my money, because perhaps he knows I

had money that I had changed there.

Q Did you give him any money?

A No.

Q How many times do you think he asked for money while he was inside the car?

A Many times.

Q And what were you saying and what was Ilsa saying that you could hear?

A My sister was scared and crying and I was scared. But when he put the gun on her, I got more scared. And I put my head back and I started talking to him. And I started telling him to think about his family. If he didn't believe in God. And he said no. And I told him to think about his family. And that, he would like someone to do to his family what he was doing.

Q When you were speaking to him, Ms. Morales, where were you looking?

A His face.

Q Now, other than him asking for money, was he saying anything else to you at that time, before you started that conversation with him?

A Only to start the car and to leave.

Q Okay. How many times do you think he asked you to start the car and drive away?

A Many times.

Q More than three times?
A Yes.
Q More than five times?
A He was saying constantly, start the car, start the car.
Q Okay, did your sister at any point start the car?
A No.
Q All right. Now, I use the word asked, how many times did he ask you to start the car? Can you describe what his tone of voice was?
A Mad.
Q Was he asking you?
A Like, upset.
Q Was he asking or was he ordering you?
A Ordering us.
Q All right. Now, at that time when he was in the back seat, did he have anything covering his face?
A No.
Q Okay. Now, you said that he told you to start the car. And did he say, drive away?
A Yes.
Q Do you remember what it was exactly that he said?
A He said, start the car. Only, to start the car and to leave.
Q Now, you said that you started speaking to him,

is that true?

A Yes.

Q And you said that you started talking to him about his family?

A Yes.

Q And was he answering you back?

A He said that he didn't believe in anything.

Q At the time that you were having that conversation, were you looking at him?

A Yes.

Q Now, why were you asking him those questions, Ms. Morales?

A Because I wanted him to let us go.

(Continued on next page)

Q. And how long do you think he spent inside the car; how much time?

A. I don't know. It felt like a lot of hours.

Q. How much time do you think he spent at the window by the passenger's side before he got into the car?

A. Like a few minutes.

Q. Now, when he was inside the car and you were asking him about God, was that the end of that conversation or was there more to it? Do you remember what else you may have said?

A. No. He was telling me to shut up.

Q. And is he saying that in Spanish or in English?

A. English.

Q. Now, did there come a time that he eventually left the car?

A. Yes.

Q. Tell us about that. What happened?

A. He saw that I didn't have money. Perhaps God did something, because he said that because we believed in God, that God had saved us.

Q. Had something happened to the car, itself?

A. Yes. My sister didn't have the keys and the car alarm started going off.

Q. And was that -- what did the alarm sound like?

A. Very strong. Like when someone wants to open a

D. Morales - People - Direct 1089

door or something and it's locked.

Q. And did he say anything about the alarm while he was still inside the car?

A. Yes, to turn it off.

Q. And were you or was Ilsa able to turn that car alarm off?

A. No.

Q. And at that time did he leave the car?

A. Yes.

Q. Now, the person that was in the car and the person that stood by your window, can you describe him for us?

A. Yes.

Q. Can you please do that?

A. If he's here?

Q. Well, do you see that person that took your sister's money and held you in the car that morning in November, do you see him in this courtroom, Ms. Morales?

A. Yes.

Q. Can you point him out, please?

A. That's him (indicating).

Q. Can you tell us something that he's wearing or describe something about him?

A. Brown jacket.

MS. SINGAS: Indicating the defendant, your Honor?

THE COURT: Yes.

Q. Now, Ms. Morales, what happened when the defendant got out of the car? What did he say to you?

A. To not call the police and, if we did, he was going to come back looking for us and kill us.

Q. And then did you see him leave the car?

A. Yes.

Q. Did you see where he went?

A. I don't know the name of the street, but he was going towards Home Depot.

Q. And did you see him get into a car or was he walking?

A. He was walking.

Q. And at that time did you, in fact, call the police?

A. Yes.

Q. And did the police come?

A. Yes.

Q. And did you tell the police what had just happened to you?

A. Yes.

Q. And did you speak to the police through an interpreter or did you speak to them using your English?

A. I spoke with my English.

Q. Now, how did you describe the defendant to the police, do you remember?

A. No.
Q. Did you tell them what color he was?
A. Yes.
Q. And did you tell them what he was wearing?
A. Yes.
Q. Did you tell them how tall he was?
A. I didn't say how tall he was. I don't remember.
Q. Did you tell them about his body type?
A. Yes.
Q. What did you say?
A. That he wasn't fat, but he wasn't thin. That he wasn't fat.
Q. Did you tell them anything about any facial hair?
A. Yes.
Q. What did you say?
A. That he had like the beard around his mouth.
Q. Did you tell them approximately how old you thought he was?
A. Yes, like around 35 or 40.
Q. Now, at that time, can you tell us was someone else speaking to your sister Ilsa from the police?
A. No.
Q. I'm going to direct your attention now to February 29th of 2008. Do you remember going to a police station to view a lineup on that day?

A. Yes.
Q. Now, do you remember if your sister Ilsa also went to see the lineup?
A. Yes.
Q. Now, do you remember who went first to view the lineup, you or your sister?
A. I did.
Q. And how did you get -- where were you? Did the police come and pick you up from somewhere?
A. Yes. Yeah, they picked me up.
Q. And did they pick you up from work?
A. Yes.
Q. And was your sister also at work?
A. Yes.
Q. And did a police officer bring you to the police station so that you could view that lineup?
A. Yes.
Q. I'm going to show you what's in evidence as People's 41, please. Do you recognize what that's a picture of, Ms. Morales?
A. Yes.
Q. And is that the lineup that you saw that day in February?
A. Yes.
Q. And did you walk into the viewing room and see

those people there holding numbers in front of them?
A. Yes.
Q. What did you tell the police regarding any particular person in that lineup?
A. That it was number four.
Q. And where did you recognize number four from?
A. From the time that he entered our car.
Q. And is number four the person who robbed you and your sister that morning in November of 2006?
A. Yes.
Q. And you told that to the police that were there?
A. Yes.
Q. Now, Ms. Morales, at that time did you go back to the store where you were working?
A. Yes.
Q. At that time did you have a conversation with your sister about that lineup before she came to view the lineup?
A. No.
Q. Now, did you speak to your sister yesterday about what happened in Court when she came to testify?
A. No.
Q. Now, Ms. Morales, is it this man that was standing by your window and came into your car demanding that you drive away (indicating)?
A. Yes.

MS. SINGAS: I have nothing further.

THE COURT: Mr. Lemke.

MR. LEMKE: Yeah, your Honor, thank you.

CROSS-EXAMINATION

BY MR. LEMKE:

Q. Good morning, Ms. Morales.

A. Good morning.

Q. Ms. Morales, on November 9th of 2006 you were in a car with your sister correct, Ilsa?

A. Yes.

Q. And you were driving or she was driving a Ford Explorer, correct?

A. Yes.

Q. And at about 10:00 in the morning, you were going to go to the Western Union to wire money to your family in Honduras, correct?

A. Yes.

Q. And you arrived at the Western Union, your sister parked the car but remained in the car, correct?

A. Yes.

Q. And you got out of the car, correct?

A. Yes.

Q. And you went into the Western Union, correct?

A. Yes.

Q. During the time that you got out of your car to go

into the Western Union, you had not seen this individual that later robbed you, correct?

A. No.

Q. You went into Western Union to wire money, about $200, correct?

A. No.

Q. How much money were you going to wire?

A. I don't remember how much I was sending.

Q. You don't remember how much?

A. No.

Q. Did there become a problem inside the Western Union while you were trying to send that money?

A. I couldn't send it.

Q. Had you sent money from there before?

A. No, it was the first time.

Q. And why couldn't you send it?

A. I don't know.

Q. You don't remember?

A. I don't remember.

Q. And you don't remember how much money you had on you, correct?

A. No.

Q. Now, you then leave to go back into your sister's car, correct?

A. Yes.

Q. And when you get back into your sister's car, before going into the car and closing the door, you don't see this person that had robbed you, correct?

A. No, I didn't see him.

Q. And when you get into the car, the window is up, isn't it?

A. No.

Q. The window is down?

A. Yes.

Q. How far down is the window?

A. Very low.

Q. Well, do you recall giving a statement to the police on November 9, 2006, shortly after this incident occurred?

A. Can you repeat the question?

Q. Yes. You spoke to the police after this individual left your sister's car, correct?

A. Yes.

Q. And they wrote it down in a statement for you, correct?

A. Yes.

Q. And you read it and signed it, correct?

A. I signed it.

Q. So you remember signing a statement, correct?

A. Yes.

Q. And that was a statement regarding what had occurred, correct?

A. Yes.

Q. Do you recall telling police officer -- the police officer that this individual knocked on the window with his left hand? Do you remember telling the police officer that?

A. No.

Q. Is there anything that would refresh your recollection as to what you told the police officer?

A. I don't know.

Q. What about your statement?

MR. LEMKE: Could I have this marked for identification purposes, please?

THE COURT: Defendant's G.

(Whereupon, Defendant's Exhibit G was marked for identification, only.)

COURT OFFICER: Defendant's G marked for identification.

MR. LEMKE: If that can be shown to the witness, please.

(Handed to witness.

MR. LEMKE: I would ask that the witness take a moment to look at the signature that's on that.

Q. Delmy, that's your signature, isn't it?

A. Yes.

Q. And do you recall signing that?
A. Yes.
Q. And that was signed back on November 9th of '06 at about 11:30 in the morning, correct?
A. Yes.
Q. And you can read that. You saw the time and the date, correct?
A. I can't read English very well.
Q. Well, can you speak English?
A. I understand it more than I can speak it.
Q. But you spoke to an officer in English that morning, didn't you?
A. Yes.
Q. The individual that you saw was wearing white sneakers, correct?
A. Yes.
Q. And that's in your statement, correct?
A. I don't know where it is.
Q. How about the fourth line down.
A. Yes, I did say that he had white sneakers.
Q. So he had white sneakers, this person, correct?
A. Yes.
Q. You told the police officer that he was wearing a blue baseball cap, correct?
A. No.

Q. Directing your attention to the third line, do you see where it says, Wearing a blue baseball cap?
A. Yes.
Q. And this is -- and you see that there, correct?
A. (No verbal response.)
Q. Correct?
A. Yes.
Q. And you told the officer that the individual was wearing blue jeans, correct?
A. Yes.
Q. Wearing a blue sweatshirt, correct?
A. Yes.
Q. And that's written down in the statement that you had signed, correct?
A. Yes.
Q. You also indicated the person was six feet tall, do you see that there?
A. I didn't say that he was six foot.
Q. Is that in your statement, Ms. Morales?
A. It's in the testimony, but I didn't say that.
Q. So the detective who wrote that down was mistaken?
A. Yes.
Q. What about where it says 35 years old, did you tell the detective that?
A. I said from 35 to 40.

Q. Do you see 40 at all there, Ms. Morales?

A. No.

Q. And do you also see that you told the officer that this person knocked on the window with his left hand, he told me to put the window down and I did? Is it your testimony that the detective is lying?

MS. SINGAS: Objection, Judge.

THE COURT: Sustained as to the form.

Q. Is it your testimony you never said that to the detective who happened to write this down and you signed it?

A. I signed it, but perhaps he didn't understand me.

Q. So perhaps we should call the detective in to find out what you said?

MS. SINGAS: Objection, Judge.

THE COURT: Yeah, sustained.

Q. Well, Ms. Morales, are you saying that he misunderstood you telling him the individual was six feet tall? You never said that?

A. No.

Q. And he never knocked on your window to say put the window down?

A. No.

Q. This is a statement that you had signed, correct?

A. Yes.

Q. And is it my understanding that you signed this

without knowing what was in it, Ms. Morales?
A. Yes.
Q. So now it's your testimony -- and it was the detective that wrote this down and said sign here, Ms. Morales, correct?
MS. SINGAS: Objection, Judge, it's not a detective.
Q. It was an officer, if you know?
A. It was an officer.
Q. And he told you to sign and you signed it, correct?
A. Yes.
Q. The individual that you saw there, you never saw any dreads or braids on that individual on November 9th of 2006, correct?
A. No.
Q. When you're in the car and now this person is right at your window, he says, Give me your money, correct?
A. Yes.
Q. And he says that about the same time that you first see him at your window, correct?
A. Yes.
Q. That lasts about three seconds to four seconds, correct?
A. I don't know.
Q. Are you good with time, Ms. Morales?

A. I don't know, because when someone is nervous.
Q. You were extremely nervous because you have a gun that is pointed right at your face, correct, Ms. Morales?
A. Exactly.
Q. And very scared, correct?
A. Sure, in the beginning, yes.
Q. That you might even be killed, correct?
A. Yes.
Q. And all these thoughts were running through your mind as you are looking at this gun that is pointed at your face, correct?
A. I don't know what I was thinking, but I was very nervous.
Q. And your sister hands over or opens up her pocketbook for this person to take money out of, correct?
A. She had the pocketbook and he took the money from there.
Q. And then he then opens up the back door, correct?
A. Yes.
Q. Now, did he reach in to pull up the knob or did he just reach and open up the door handle?
A. I don't know.
Q. So you never saw him reaching in to pull up the doorknob, correct?
A. No.

Q. Did you ever tell the police officer that he reached inside the car window and unlocked the back door?
A. I told him I didn't know how he entered, how he took the lock off.
Q. So that would be another mistake in your statement, correct, Ms. Morales?
A. I don't know.
Q. Well, did you see this individual reach into the car and unlock the back door and then get inside the car? That's in your statement.
A. He had his hand inside the car.
Q. So I'm asking you, did he then pull up the button in the car or didn't he?
A. He would have had to do it.
Q. So that would be correct in your statement, correct?
A. Well, we didn't take the lock off, he did.
Q. Okay. And that's what you told the police, because that's in your statement, correct?
A. Sure.
Q. And then he sits into the back, gets into the back seat and puts the gun to the back of your head, the back of your neck, correct?
A. Yes.
Q. Because you're looking forward at that point,

correct?

A. Yes.

Q. And then after your sister cannot start the car, he then gets out of the car and starts to walk away, correct?

A. No.

Q. Doesn't he get out of the car and walk away?

A. Could you repeat the question?

Q. Yes. He then gets out of the car, at some point, to begin to walk away, correct?

A. Yes, but after he had us there for a while.

Q. Inside the back seat, he puts the gun to the back of your head, asks for more money, correct?

A. Yes.

Q. You're still very scared, very nervous, correct?

A. Yes.

Q. You are not looking at him at that point, correct?

A. No.

Q. And you say, I have no money, correct?

A. Yes.

Q. And he keeps saying, Start the car, start the car, correct?

A. Yes.

Q. And you're able to understand his voice, correct?

A. Yes.

Q. Your sister drops the keys, correct?

A. Yes.
Q. The alarm goes off in the car, correct?
A. Yes.
Q. And then he then gets out of the car and leaves, correct?
A. Yes, but after having us in the car for awhile.
Q. When you say "awhile," you had told him, in part, Please don't kill us. And at some point he gets out of the car and says, You're lucky you believe in God or you would be dead, right?
A. Yes.
Q. You told the police that and that's in your statement, correct?
A. Yes.
Q. And as he walks away, that's when you were able to see, I take it, his sneakers, correct?
A. Yes.
Q. Now, there is a point in time that when -- you don't move the car. The police come to the car, correct?
A. Yes, I called the police.
Q. And they arrived there, correct?
A. Yes.
Q. Did they, in front of you, if you know, take fingerprints of the car, of the car door or the back in any way?

A. No.
Q. Did they take your car in any way to do any tests regarding fingerprints?
A. No.
Q. Now, on roughly about February 29th of this year, you receive a phone call from a detective, Detective Morales, if you remember, correct?
A. Yes.
Q. Because he wants you to come down to the Robbery Squad to take a look at a lineup, correct?
A. Yes.
Q. Regarding the incident that had occurred back in November, correct?
A. Yes.
Q. And so when you went there, you knew what the purpose of you going there was, correct?
A. Yes.
Q. And the detective, when he picked you up, Detective Morales is with another detective, wasn't he?
A. Yes.
Q. And both detectives left with you to go back to the Robbery Squad, correct?
A. Could you repeat that?
Q. Yes. They came to your store to pick you up to bring you back to the Robbery Squad. Your sister Ilsa

remained behind, correct?

A. Yes.

Q. And when you were brought to the Robbery Squad, you were placed in a room with other individuals, other women, correct?

A. Yes.

Q. And then, if you know, one at a time you were taken out of that room, correct?

A. I didn't understand.

Q. Were you the first one to leave that room of the other women that were there? Do you understand the question?

A. Yes.

Q. You were the first one, right?

A. From the ones that were there, yes.

Q. And then after you left that room, you were not brought back into that room, correct?

A. No.

Q. Because Detective Morales then brought you into the lineup area, correct?

A. Yes.

Q. You were brought in with Detective Morales, correct?

A. Yes.

Q. And then he asked you to look into a window, correct?

A. Yes.

Q. And then after you looked into that window, you were then brought out of that room, correct?

A. Yes.

Q. And with Detective Morales, you sat down in another area where he wrote down a statement for you, correct?

A. Yes.

Q. And then from there, he took you back to your place of business and then brought back your sister, correct?

A. Yes.

MR. LEMKE: I have nothing else.

THE COURT: Ms. Singas.

MS. SINGAS: Yes.

REDIRECT EXAMINATION

BY MS. SINGAS:

Q. Ms. Morales, remember when Mr. Lemke asked you if the defendant had his hair in braids that morning in November? Do you remember that question?

A. Yes.

Q. Were you able to see his hair that morning?

A. No.

Q. And why is that?

A. It was covered.

Q. And was it covered by the hat and then the hood, the way you described it earlier?

A. Yes.
Q. Now, also remember when Mr. Lemke asked you when the defendant came up and put the gun to your face and you were scared and nervous, do you remember those questions?
A. Yes.
Q. But when he first came up to the window, where was the gun?
A. When he first came to the window, he put it on my leg.
Q. So it wasn't by your face?
A. No.
Q. And then when he got inside the car, you said that first he placed the gun to the back of your neck, correct?
A. Yes.
Q. And did there come a time that he placed the gun to your sister?
A. And my sister, yes.
Q. And you told the police that, right?
A. Yes.
Q. And at the time that he placed the gun to your sister, were you able to turn around and look at him?
A. Yes.
Q. And is it at that time that you were having a conversation trying to appeal to him to let the both of you go?

A. Yes.
Q. And let me ask you another question. When you get nervous and when you get scared and when you get really frightened, does anything happen to your eyesight?
Are you still able to see even though --
MR. LEMKE: Your Honor, I didn't get an answer on that.
THE COURT: Is there an answer, Madam interpreter?
A. Yes.
Q. Are you able to see or does something happen to your eyesight and suddenly you can no longer see?
A. No.
MS. SINGAS: I have nothing further.
THE COURT: Anything, Mr. Lemke?

RECROSS EXAMINATION

BY MR. LEMKE:

Q. When you were speaking to this individual in the car, did you ever see either a lump to the back of his head or anything that would indicate the person had his hair up or tied back?
A. No.
MR. LEMKE: Thank you.
THE COURT: Ms. Morales, thank you very much. Watch your step as you step off.

Madam interpreter, thank you again.

THE INTERPRETER: You're welcome, your Honor.

(Whereupon, the witness was excused.)

THE COURT: Members of the jury, this looks like a good time to take our morning break. I'll have you back here in a few minutes. Follow Tom, my officer. We'll have you back here in about five or ten minutes.

(Whereupon the jury exited the courtroom.)

(A recess was taken.)

COURT OFFICER: Jury entering.

(Whereupon, the jury entered the courtroom.)

THE COURT: People, your next witness.

MS. TEBBETT: The People call Detective Edmund Moran.

D E T. E D M U N D M O R A N, Shield #827, assigned to the Special Victim's Squad of the Nassau County Police Department, having been called as a witness on behalf of the People, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: Please state your name, spell your last name, shield number, rank and command.

THE WITNESS: Edmund Moran, M-O-R-A-N. Shield number 827, Nassau County Police Department, detective, Special Victim's Squad.

THE COURT: Ms. Tebbett.

MS. TEBBETT: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. TEBBETT:

Q. Good afternoon, Detective Moran.

A. Good afternoon.

Q. Can you tell us where you are employed?

A. Nassau County Police Department Special Victim's Squad.

Q. And what is your position in the Special Victim's Squad?

A. I'm a detective in the squad and I investigate sex crimes, rapes, and criminal sexual acts and sexual abuses and such against women, men, children, any age.

Q. And how long have you been a detective in the Special Victim's Squad?

A. I have been in Special Victim's Squad 11 years.

Q. And how long have you been employed by the Nassau County Police Department in total?

A. About 22-and-a-half years.

Q. Now, Detective Moran, were you working as a detective assigned to the Special Victim's Squad back on April 17th of 2005?

A. Yes, I was.

Q. And were you scheduled to be working on that day?

A. That was a Sunday, that was my day off.

Q. Now, did you receive a call to come in to work that day?

A. I did.

Q. And were you assigned on that day to investigate an incident that had occurred that morning in the vicinity of 543 Greenwich Street in Hempstead?

A. Yes, I did.

Q. How did you come to be notified of that incident to be assigned to that case?

A. About 5:45 in the morning I was called by main office detectives that we had a criminal sexual act, a forcible sodomy in Hempstead and they asked if I would come out to take the case and I did.

Q. And are you familiar with the area that's in the vicinity of 543 Greenwich Street in Hempstead?

A. Yes.

Q. Can you describe that area for us?

A. Yes. Greenwich Street is a main road, two lanes of traffic in each direction running basically north and south; commercial properties, gas stations, businesses, thing likes that.

Q. And are you familiar with the property that's located at 543 Greenwich Street?

A. Yes.

Q. And what is that?

A. There is a building at 543 Greenwich Street. It's a hair salon attached to another small business and next to the hair salon is a driveway to the parking lot for that building.

Q. Now, Detective Moran, were you assigned to be the lead detective on this incident that had occurred in that location on the morning of April 17th of 2005?

A. Yes.

Q. And what does that mean for you to be the lead detective?

A. This case is my case and I get to make all the decisions on the case. I get to investigate the case to its completion.

Q. Now, can you tell us what you did when you were notified of this incident that early morning of April 17th of 2005?

A. Yes. First from my home I respond to Special Victim's Squad, and at the time we were located in Bellmore on Newbridge Road, to gather up what I need, paperwork and case report numbers and things like that. And then from there I get an unmarked police car, travel up to North Shore Hospital where I interview any police officers that may be there that would have information for me and eventually interview the nurse who did the sexual offense evidence collection kit and also the victim.

Q. And did there come a time that morning that you arrived at North Shore University Hospital in Manhasset?

A. Yes.

Q. And do you know about what time it was when you arrived there?

A. Yes, it was approximately 7:45 in the morning.

Q. And did you go to a particular unit within that hospital once you had gotten there?

A. Yeah. The unit in the hospital is called the SANE unit. It's called Sexual Assault Nurse Examiner. The nurses are specifically trained to examine victims of sex crimes.

Q. And who did you meet once you went to the SANE unit of that hospital that morning?

A. First I met a detective from the Third Squad who came out on the case earlier than me. And then also the SANE nurse and then Shamika Dottin, the victim.

Q. And when you first met the detective at the hospital, did you have a conversation with him about the general nature of the incident that you were there to investigate?

A. Yes, I did.

Q. And do you recall which nurse it was that you spoke to there?

A. Yes, RN Allyson Delivar [sic], I believe. I don't know how to pronounce it.

Q. Did you meet the woman who was the victim of the incident that you were investigating?
A. I did.
Q. And can you tell us her name again?
A. Her name is Shamika Dottin.
Q. And can you tell us where you first saw Shamika Dottin in the hospital that morning?
A. Yes. By the time I arrived at the hospital the examination was completed. And next to the examination room there is an interview room where we conduct the interviews of our victims.
Q. And did you have a conversation with Ms. Dottin in the hospital that morning?
A. I did.
Q. And can you describe for us how she appeared to you and her demeanor or her condition when you met her and you were speaking to her?
A. Ms. Dottin was clearly visibly upset and glassy eyed, but she was composed. She was in control of her emotions. I can speak to her and ask her questions. She answered the questions clearly, but not hysterical.
Q. And did you take a statement from her about the details of the incident that had occurred to her that morning?
A. I did.

Q. And was she able to provide you a description of the person who had assaulted her that morning?

A. Yes, she did.

Q. And can you just tell us, generally, what information you got from her regarding that description?

A. She described the person that forced her at gunpoint to do a criminal sexual act as a male black, medium complexion. He had dreadlocks tied back or pulled back and he was wearing black clothing. She said a black nylon jacket, black sweatpants and black boots.

Q. Now, was she able to provide you with any details of what he looked like, like his face or anything like that?

A. Not specific details about the face, no.

Q. She was not?

A. Not about the face, no.

Q. And based on your conversation with her and the information that you were able to get from her about the individual who had committed this incident against her, were you able to make any determination whether or not she would be able to identify someone or identify the face of the person who had committed the incident against her?

A. At that moment I wasn't certain, so in the course of my investigation, I had her meet with a police department sketch artist to do a composite. And when they met, she was not able to give an accurate, full description of the face

for a sketch artist to complete.

Q. Was she able to give any description of the face?

A. I don't think so.

Q. Now, when you were speaking to her, did she provide you details of the incident, itself?

A. She did.

Q. And as part of that, did she describe any weapons that were involved in the incident that happened against her?

A. Yes, she did.

Q. What information were you able to get from her about that?

A. She said that he was holding a handgun in his hand by his chest and she described the handgun as being black and it had -- she called it three lights on the gun; two lights in the back and one light in the front of the gun.

Q. And did that have any significance for you, Detective, those details about the lights?

A. Yes.

Q. Tell us about that.

A. They're called night sights on the gun and they glow. There are two in the back of the gun at the rear sight, one in the front of the gun at the front sight and these sights glow constantly. It's for low light conditions. So, if you were to point a gun at somebody, you know where the muzzle is pointing.

Q. And have you seen weapons that have those night sights on them, Detective?

A. Yes.

Q. What type of weapons have you seen with those night sights on them?

A. Mostly semiautomatic handguns, normally used by law enforcement or military.

Q. Now, can you tell us what else you did while you were at the hospital that particular morning?

A. Yes. While at the hospital and interviewing and taking a statement from Shamika, the nurse, the RN, Allyson, gave me the completed sexual offense evidence collection kit in a sealed box, which I took.

Q. Let me ask you about that, Detective. Are you familiar with those evidence collections kit that are used by the nurses at the SANE Unit?

A. Yes.

Q. And can you describe for us the packaging of those kits?

A. Yes. When they get the kit, the kit is sealed. The nurse will unseal the kit. And inside the kit there are different items for examining victims, maybe victims of vaginal intercourse or anal intercourse, oral sex, swabs to swab different parts of the body, things like that. Everything is individually wrapped and secured.

Q. And what are each of those envelopes contained in by the time that you receive the kit?
A. The envelopes are then placed in a box called the rape kit for short and it's sealed by the nurse and then turned over to me.
Q. And while you were at the hospital that morning, did you receive such a box, such a rape kit from Allyson Davilar as evidence in the case that you were assigned to investigate regarding Shamika Dottin?
A. I did.
Q. And can you describe for us what condition that box was in when you received it from the nurse at the hospital that morning?
A. Yes. When I received it from Allyson at the hospital, she fills out the top with the patient's name, Allyson's name, date, time. There is an orange seal which the nurse seals the box shut and also initials it.
When she gives me the box, I then sign it, date it and I also put other numbers on it; case report number, sex crimes case number, things like that.
Q. And when you received the box from the nurse that morning, was it sealed with the orange seal that you just described?
A. Yes, it was.
Q. And did it have any markings on it from

Ms. Davilar?

A. Yes.

Q. And did you, yourself, make any markings on it after you received that box from the nurse?

A. I did.

Q. And what markings did you make on it?

A. I put my name on it, the date and the time.

Q. And can you tell us what you did with that box after it was handed over to you by the nurse?

A. Yes. That box stays with me until I get back to the squad and I invoice it and then bring it to the main office in the police headquarters to secure it in a locked refrigerator for Forensic Evidence Bureau to proceed.

Q. And did you do that with this particular box later that morning?

A. I did.

Q. Can you tell us exactly what you did to the box?

A. Yes. At the squad, the kit gets invoiced and it gets a number attached to it so that that number only goes with that particular piece of evidence. I put two pieces of tape on the box, evidence tape. I initial it and I put the date on that evidence tape. So, if the box is open, not only is Allyson's tape disturbed, but my tape is also disturbed.

Then, after everything is logged and I print out an invoice sheet, eventually I bring it personally to main

office and secure it in the locked refrigerator.

Q. And did you do that with this particular box?

A. I did.

Q. And did you request anything be done with that box once you brought it over to the main office?

A. Yes.

Q. And what did you request?

A. There is also paperwork that goes along with the invoice requesting Forensic Evidence Bureau and the lab to check for -- they want to know what we want to check for. We fill out the form that's going to check for semen, hair, blood, any kind of DNA material that might be recovered from the kit.

Q. And can you explain for us how you secured that evidence, that box containing that kit when you brought it to the main office?

A. Yes. At main office in police headquarters there is a key for the refrigerator. I have access to the key. There is a detective stationed at that location. I get the key from him. I go back to the refrigerator and I secure it myself; unlock it, put it in, lock it and then return the key.

Q. Is that what you did with this particular piece of evidence?

A. Yes.

Q. Can you tell us who has access to that particular piece of evidence once you had locked it in that refrigerator?

A. Nobody has access to that piece of evidence. It will go to Forensic Evidence Bureau the next working morning.

Q. And are you familiar with the process of how the evidence that you have secured in that refrigerator goes from Forensic Evidence Bureau and then onto the lab to do the analysis that you requested be done on it?

A. Somewhat.

Q. Can you explain that for us?

A. Yeah. The next working morning the lab will send a person over to the refrigerator. And after a weekend, it could be quite a bit of evidence in there that they have to look at. And that person will then remove all the evidence and then bring it to the lab.

Q. Detective, I'm going to show you this item that's already marked as People's number 56. Just take a look at that, please. Do you recognize that item that's in front of you?

A. Yes, I do.

Q. Can you tell us what it is?

A. This is the sexual offense evidence collection kit that RN Allyson prepared at North Shore Hospital.

Q. And how do you recognize that particular box?

A. It has Shamika Dottin's name on it. It has Allyson's name on it, a date and time. It also has my name on it, date and time.

On the side of the box I write Detective Moran, that's me, with my serial number. The sex crimes number -- the sexual Special Victim's Squad case number and then also the county case report number also on the box and also the invoice number is on the box, all in my handwriting.

Q. And what was that county case report number that was associated with that box?

A. The county case report number is 205CR29969.

Q. And do you recognize on there any other markings or any other items put on there by you?

A. Yes, the red evidence tape is mine sealing the box here (indicating). And I put my initials and the date on that also.

Q. Can you just point out for us again where you saw your red evidence tape?

A. The tape on the top of the box here and on the bottom of the box here sealing the box (indicating).

Q. And you are pointing first to the top right-hand corner of the box if you were looking at it from where the writing is on the front of the box?

A. Yes.

Q. And also the bottom right corner?

A. Correct.

Q. Are you familiar with the other tape or stickers or markings that are on that box?

A. Yes.

Q. Could you tell us about those?

A. The orange seal in the center of the box is the one the SANE nurse who prepared the kit would seal and initial it. The yellow tape would be from the lab or the Forensic Evidence Bureau and that was done after I have already submitted the box.

Q. What condition was the box in when you put it in that locked refrigerator and submitted it to be tested?

A. It was just like this without the yellow tape on this red here (indicating). It had the SANE nurse seal and my seal.

Q. And was your seal and the nurse's seal intact at that time?

A. Yes.

Q. Now, Detective Moran, did there come a time yesterday that you saw that box again?

A. Yes.

Q. And can you tell us where it was that you saw that box again?

A. Yeah, yesterday was the next time I saw the box since 2005 and it was at the district attorney's office.

Q. And can you tell us what the condition was of the box when you saw it yesterday, first in the DA's office?

A. Yes. The box was in the same condition you see here. The yellow tape was not cut. It was sealed. I cut it. I opened the tape at the district attorney's office.

Q. So when you first saw it in the office yesterday, what was the condition of it?

A. It was a sealed kit.

Q. And did you see your seals and your markings on it that you have pointed out for us today?

A. Yes.

Q. And can you tell us how you opened it?

A. Yes. I just took a scissors and cut across the box, the opening of the box to unseal it.

Q. Now, other than the yellow tape that you pointed out for us from the lab, when you saw the box yesterday before you opened it, were your markings and your tape and the rest of the box in the same or substantially the same condition when you saw it yesterday as it was when you saw it back in April of 2005?

A. Yes.

Q. Now, back on that date of April 17th of 2005 when you were at the hospital, did you receive any other items of evidence in connection with the case you were investigating involving Shamika Dottin?

A. Yes, I did.
Q. Tell us what you received.
A. I received from Shamika Dottin a blue jacket that she had on at the time of the sexual assault.
Q. And when you were speaking to her about the details of the incident, did you learn any information relative to that jacket?
A. Yes.
Q. What did you learn?
A. While talking to Shamika about what happened to her, she told me that after she performed oral sex on the person, she took her arm and wiped her mouth with the shoulder and arm part of the jacket.
Me, thinking that that may contain evidence now, we took that to submit it to the lab.
Q. Can you tell us what you did with that jacket when you got it from Ms. Dottin at the hospital that morning?
A. At the hospital I placed that jacket into a brown paper bag. I kept that with me until I went back to the office where I sealed it and then also invoiced it like I did with the sexual offense evidence collection kit, and then transported it at the same time with the kit to main office and placed it in the refrigerator.
Q. And can you explain for us how you sealed it and what markings you made on it?

A. Yes. This is a normal paper bag, just roll up the opening of the bag, staple it shut and also use the same red evidence tape, put it on the bag and I initial the tape and date the tape.

Q. And did you secure that in the evidence locker in main office after you had done that?

A. I did.

Q. And did you make any requests about that jacket?

A. I requested that it be examined for any DNA or semen. Any recovered from that jacket.

Q. And after that date in April, 2005, did there come a time recently that you saw that item again?

A. Yes.

Q. And can you tell us about when that was and where you saw it?

A. Yeah. I think it was Monday at the district attorney's office again.

MS. TEBBETT: Your Honor, at this time I would ask this item be marked People's 57, first for identification.

THE COURT: People's 57.

(Whereupon, People's Exhibit 57 was marked for identification, only.)

COURT OFFICER: People's 57 marked for identification.

MS. TEBBETT: May I have it shown to the witness, please.

(Handed to witness.)

Q. Detective, take a look inside that outer packaging and tell us if you recognize any of the items inside?

A. Yes. It's the bag that I used to seal the jacket and also the jacket.

Q. And how do you recognize those items?

A. This bag here the jacket was placed in has the red evidence tape. It has the date and my initials on both sides and also the back. On the front of the bag, in my handwriting, has, Blue jacket, Detective Moran. It has the squad case number, the case number, invoice number. So this is the same bag that I used.

Q. Are your seals and your markings in the same or substantially the same condition today as it was when you made those back on April of 2005?

A. Yes.

Q. And do you recognize the other item in that packaging?

A. Yes. Also in the bag is the blue jacket.

Q. And do you recognize the outer packaging that contained your bag and that jacket?

A. This bag here, I don't recognize it. I believe it came from the lab, the Forensic Evidence Bureau after they

got done processing it.

Q. Now, the two items inside and the jacket, do you recognize that as the jacket that Ms. Dottin gave you at the hospital that morning?

A. Yes.

Q. And does the jacket appear to you to be in the same or substantially the same condition today as it was when she gave it to you back in 2005?

A. Yes.

MS. TEBBETT: Your Honor, at this time I would offer that item into evidence.

MR. LEMKE: No objection, your Honor.

THE COURT: So without objection, People's 57 will be received in evidence.

(Whereupon, People's Exhibit 57 for identification was received and moved into evidence.)

THE COURT: Ms. Tebbett, I take it you still have more questions.

MS. TEBBETT: I do.

THE COURT: Members of the jury, this looks like a good time to take our luncheon break. We're going to reconvene at 2:00.

Again, my admonitions, please don't talk amongst yourselves or with anyone else about the case.

Don't form any opinions about the case at this

point.

Don't view or visit any of the areas described and don't access any accounts in the media, should there be any.

See you back at 2:00.

(Whereupon, the jury exited the courtroom.)

(A luncheon recess was taken.)

A F T E R N O O N   S E S S I O N

E D M U N D   M O R A N, Detective, recalled as a witness, having been previously duly sworn, resumed the stand to continue sworn testimony as follows:

THE COURT OFFICER: Ready for the jury, Judge?

THE COURT: Ready.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE COURT: All right, members of the jury, welcome back. I'm sure, like myself, you smell a distinct smell in the air. We are trying to decide whether that's popcorn somebody is cooking somewhere. But believe me, if there's a fire or we see smoke, we will get out of here real quick. I want you to be assured of that.

I think we're ready to continue with the direct, Ms. Tebbett, of Detective Moran.

MS. TEBBETT: Thank you, your Honor.

DIRECT EXAMINATION (CONTINUED)

BY MS. TEBBETT:

Q Now, Detective Moran, let me go back for a second. When you were speaking with Ms. Dottin at the hospital, when she was providing you some information and a

description about the individual who had assaulted her, did she provide you with a height or weight at all for that individual?

A Yes, she did.

Q Can you tell us about that?

A She estimated him at five foot eleven, two hundred ten pounds.

Q Now, I had asked you some questions earlier before the lunch break regarding the weapon that Ms. Dottin described for you was involved in the incident. During your tenure as a police officer and as a detective in Nassau County, have you ever occasion to recover guns from perpetrators during your career?

A Yes.

Q And can you just tell us, approximately what percentage of the guns that you have recovered had those night-sights like you described for us?

A None, that I recovered.

Q Okay. Now, when you were at the hospital with Ms. Dottin, were you present when Ms. Davilar conducted the actual examination of Ms. Dottin?

A No, I was not there.

Q Okay. So, were you able to see then the items that were put into that box that I showed you earlier prior to being sealed by Ms. Davilar?

A When the examination is done, it's done, of course, in a closed room. It's a GYN exam, basically. For most cases, anyway, it's behind closed doors. Everything is sealed up before the nurse gives them to the detective.

Q You're never able to see the actual items inside the box?

A That is correct.

Q Now, the other day or yesterday when you testified earlier that you had broken the seal of that box in the district attorney's office, was Ms. Davilar present there with you?

A Yes, she was.

Q And when you had occasion to look inside of that box, did she do that, as well?

A Yes, she did.

Q All right. Now, Detective Moran, did you have occasion on April 17th of 2005 to go to the location in the vicinity of 543 Greenwich Street in Hempstead?

A Yes.

Q Can you tell us what you did when you responded to that scene?

A I went to the parking lot of the 543 Greenwich. I notified Crime Scene to come down and process the scene in case there was any evidence to be gathered and photograph the scene.

Q And did Crime Scene respond and do that?
A They did.
Q Were you present when that was done?
A Yes, I was.
Q Were you present for any photographs that Crime Scene took of that location?
A Yes.
Q I'm going to show you, first, what is already in evidence as People's 47 through 51. Just take a look at those.
(Handed to the witness)
Q Did you have a chance to look at those, Detective?
A Yes.
Q Do you recognize what is depicted in those photographs?
A Yes, I do.
Q What is that?
A This is the parking lot on the north side of -- of Yoles, the hair salon, at 543 Greenwich Street in Hempstead.
Q Detective, did you have an opportunity to make observations of the area surrounding that parking lot, as well, when you were at the scene?
A Yes.

MS. TEBBETT: Judge, I ask these first be marked for identification as People's 58 and 59.

THE COURT: 58 and 59 marked.

(Whereupon, the referred to items are received and marked People's Exhibit 58 and 59 for identification)

THE COURT OFFICER: People's 58 and 59 marked for identification.

MS. TEBBETT: Could I have them shown to the witness, please.

(Handed to the witness)

Q Take a look at those two, Detective Moran, and tell us if you recognize those two.

A I do.

Q What are those?

A These are photographs of the rear left-hand-side of the parking lot, as you are looking at it from the roadway, where the sexual assault took place.

Q And do those fairly and accurately depict what those areas looked like back on April 17th of 2005?

A They do.

MS. TEBBETT: Your Honor, I offer those into evidence.

MR. LEMKE: May I see them a moment?

THE COURT: Yes.

MR. LEMKE: A brief voir dire.

THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. LEMKE:

Q Detective Moran, regarding the two photographs which you have just been asked to review as People's 59 and 58. Do you know when these were taken?

A Those were taken on April 17th by Crime Scene.

Q Of '05, correct?

A Of '05, yes. I'm sorry.

MR. LEMKE: No objection.

THE COURT: All right. Without objection, 58 and 59 marked in.

(Whereupon, the referred to items previously marked for identification are received and marked People's Exhibits 58 and 59 in evidence)

THE COURT OFFICER: People's 58 and 59 marked and received into evidence.

DIRECT EXAMINATION (CONTINUED)

BY MS. TEBBETT:

Q Detective Moran, I'm going to put up what is People's 58. Can you describe for us where this area is with respect to the parking lot?

(Placed on the presenter)

A That picture is next to the parking lot. As you

enter the parking lot, on the left-and-side is an abandoned building. And that is behind -- that's -- what you see on the right there, that is the side of the abandoned building, with a four foot chain link fence. On the other side of that fence is the parking lot where the crime took place.

Q Okay. Now, I'm going to show you People's 59. What area are we looking at here, Detective Moran?

(Placed on the presenter)

A That is looking also from the abandoned building toward the parking lot area. The abandoned building is on the right. And there's the same chain link fence at the end of the photograph.

Q Now, Detective Moran, I'm going to put up People's 48. Is this the parking lot area behind or next to 543 Greenwich?

(Placed on the presenter)

A Yes, it is.

Q Now, the areas that were depicted in the two photographs I just showed you prior to that, where are they relative to what we see in this photo here?

A As you see the entrance to the parking lot, on the left-hand-side there, that brown -- I mean, that white building there is an abandoned building.

Q This one over here (indicating)?

A That's correct. In the back of the parking lot

is some type of garage that is fenced off, possibly somebody else owns that.

Q Right here in the middle of the photo (indicating)?

A Correct. The corner, where the chain link fence meets that garage, is the view that we looked at from the abandoned building side. Back there is where the crime took place.

Q You're referring to, the chain link fence is sort of to the left of the middle of this photograph, where the parking spaces are in this photo (indicating)?

A Correct.

Q Can you approximate the height of that fence for us?

A Approximately, a four foot fence.

Q Now, Detective Moran, if we look at this photograph again, towards the right-hand-side, this brick building with the sign with the red and blue lettering on it --

A Yes.

Q What is that establishment?

A That's the hair salon called Yoles, Y-O-L-E-S, Salon.

Q Did you have any contact with the proprietors of that business?

A Yes, I did.

Q Can you tell us what you learned from them?

A When I went back to the scene ~~after leaving the~~ hospital later on that morning, I went to that location. Noticed there's a camera on the top left-hand-side of that building, right near the sign, above the Y. The camera points down at the sidewalk, at the entrance to that store. I contacted the owner to see if we could view the tape, just in case it picked up something, my victim or a subject in view of that camera.

The owner got back to me, because the camera kind of looks right at the front door, sidewalk area. It doesn't cover the whole sidewalk. Nothing was observed.

Q How wide is that sidewalk in front of that business?

A Just an estimate, I'd say about fifteen feet wide.

Q And in this photograph, can you see that camera that you referred to?

A Yes, you can.

Q Where do you see it?

A Top left-hand-side, above the Y on the blue and red sign. You can see it pointing towards the door. The front door to that establishment is not in that picture. But it's right where it would be cut off.

Q Would that be over here, towards the top right (indicating)?

A That's the camera. That's pointing down toward the entrance to the store.

Q Okay. Detective Moran, did you visit any other locations in that area of Greenwich Street on that particular day?

A Yes, I did.

Q Can you tell us where else you went?

A About a hundred and fifty feet or so before the hair salon, where the parking lot is, there's a gas station there. I believe it's a BP Gas Station. I also went to the gas station to check to see if they had cameras over there. And I was told, yes, they did have a camera.

Q What did you learn about the angle that that camera captured?

A That camera also is located by the front door. It catches one pump near the front door and sort of the walkway to the entrance to that establishment.

Q Can you tell us where the sidewalk is located with respect to where the entrance to the gas station, I guess, building or office building is located?

A Yeah. From the doorway or the entrance to that gas station, to the sidewalk where the curb is, and I didn't measure it, I would estimate about sixty feet.

Q Okay. Now, Detective, when you were in this vicinity at the scene, can you tell us if there is any lighting that you observed, any lights in the area of the back of that parking lot where the incident had occurred?

A No, not that I can remember.

Q Did you see whether or not there were any lights on either the Yoles building or that garage or that abandoned building?

A No, nothing other than lights left on in the store that may filter out into the sidewalk area.

Q But anything that you saw in the back of that parking lot?

A No.

Q Now, Detective, did you continue an investigation in this case?

A I did.

Q Can you tell us just generally what you did?

A Yes. I went to the gas station to ask for the videotape, and it wasn't available to me that day. But the following day I think it was, it was available to me.

I also called Hempstead Police Department and asked them to intensify patrols of that area because of the seriousness of this crime.

I contacted Queens Special Victims' Squad and asked -- I told them what kind of crime I had. Gave them

some details. I asked them if they had any similar cases any patterns or anything that would stand out. They said no.

I contacted Brooklyn Special Victims' Squad, also. I got the same response. I asked them if they had any patterns or any outstanding cases that were similar to mine. They also said no.

On the, I believe, the 19th -- the crime occurred on April 17th. On the 19th I did receive a tape from that gas station owner. I brought that tape to our Electronics Squad, where we viewed the tape. And from about an hour before to an hour after the crime we viewed the tape. And other than looking at, I believe it was one pump, and the walkway right to the entrance of the gas station, there was no information on that tape to aid me in this case.

Q Now, Detective Moran, at that point did you have any other leads or any information you can follow up on in terms of ascertaining, ascertaining who had committed this crime against Shamika Dottin?

A At that time I didn't know who committed the crime.

Q Now, was your investigation still continuing on May 3rd of 2005?

A Yes.

Q And tell us what happened with respect to your

investigation on that date?

A May -- May 2005, I believe, that was the date I was contacted by Forensic Evidence Bureau, and they advised me that --

MR. LEMKE: Objection to what they advised, your Honor. Hearsay.

THE COURT: Yes. Sustained.

Q Well, Detective Moran, did they provide you any information with respect to any possible leads in your investigation?

A They did.

Q And did they provide you information with respect to the evidence that you had submitted to Forensic Evidence Bureau and requested be analyzed for DNA?

A Yes.

Q Now, did you have any individuals to investigate at that point?

A No, no individuals to investigate.

Q Can you tell us what happened with your investigation at that point in time?

A At that point, when I was notified, then the case remained open, and just waiting for any leads that might come up in the future.

Q What type of information were you waiting for?

A I was waiting for maybe a DNA match to any DNA

that may have been found through the examination of the materials.

Q Now, Detective Moran, when is the next time you picked up this case file to recommence your investigation?

A I believe it was October 26th of 2007.

Q Can you tell us what happened on that day?

A On that date I was advised that --

MR. LEMKE: Objection what he was advised, your Honor.

THE COURT: Yes. If you could, just not tell us what anybody may have said to you, just tell us what you did.

Q Did you receive information that day?

A I did receive information.

Q Who did you receive information from?

A From Forensic Evidence Bureau.

Q What type of information did you receive?

A Information that there was --

MR. LEMKE: Objection, your Honor.

THE COURT: Yes, sustained.

Q Well, did you receive information with respect to the evidence that you had submitted and requested be analyzed for DNA?

A I did.

Q And without telling us any specifics, did you

receive information as to whether or not there had been a match to any of the evidence that you had submitted two years earlier in 2005?

A Yes.

Q And did you take any action with respect to your investigation of this case after you received that notification from the lab?

A Yes.

Q Tell us what you did.

A Well, the case was then looked at again. And then it was, you know, proceeded through the course of the investigation, just proceeded.

Q How did you proceed with the case at that point?

A Detective Dunn working on other cases also was -- I don't know how to put this.

MR. LEMKE: Your Honor, may we approach a second.

THE COURT: Yes, come up.

Just have a seat over there.

(Whereupon, the witness leaves the witness stand)

(Whereupon, the following takes place at the Bench between the Court and Counsel)

MR. LEMKE: We have come too far, I don't want to have a mistrial. This Detective looks like

he's struggling. I'm sure there was photo-packs put together.

MR. SINGAS: I think the fact that there was a match is not hearsay offered for the truth. It's hearsay offered for what it is, how he continued the investigation. We're not going to ask him about any photos.

MR. LEMKE: No. You're asking him about the investigation.

THE COURT: What do you need to go down this road for, anyway, at this point? It's going to become apparent through the next couple of witnesses.

MS. TEBBETT: Yes. All he's going to say, he re-contacted the victim. The case moved forward. His case was closed. At that point he was able to process an arrest. He's not involved at all in the photo-packs or anything like that. None were done in this case.

MS. SINGAS: So, what if we just say to him:

After you received communication, did you contact Shamika Dottin, did she testify in the grand jury, and was your case closed?

MR. LEMKE: I mean, that seems to be fine. Although, I would have to ask, what does testifying in the grand jury have to do with anything?

MS. SINGAS: Re-contacted the complainant.

MR. LEMKE: Yes. Because the grand jury --

MS. TEBBETT: That's it.

MS. SINGAS: Okay.

MR. LEMKE: I don't mind that leading question.

(Whereupon, the witness resumes the witness stand)

(Whereupon, the following takes place in open court:)

DIRECT EXAMINATION (CONTINUED)

BY MS. TEBBETT:

Q Detective Moran, after you had received that communication at the end of October of 2007, did you re-contact the victim in your case, Ms. Dottin?

A I did.

Q Did there come a time that your case was closed?

A Yes.

Q And when was that?

A That was, I believe it was February of 2008.

Q Okay. Now, Detective Moran, let me just ask you one question I forgot regarding the area of the gas station. You mentioned the camera angle captured one pump and the walkway to the door.

A Yes.

Q Are there other pumps besides that one in the gas

station?

A Yes, there are.

Q How many others?

A I believe there are four pumps on two islands.

Q And were any of those other pumps captured in the angle of that camera?

A No, not that I can remember.

MS. TEBBETT: Thank you. I have no further questions.

THE COURT: Mr. Lemke.

MR. LEMKE: Thank you.

CROSS-EXAMINATION

BY MR. LEMKE:

Q Good afternoon, Detective Moran.

A Good afternoon.

Q I think you stated, regarding Ms. Dottin, you're the carrying detective in this matter?

A Yes.

Q That you had been contacted on April 17th of '05 regarding the allegations that were made by Ms. Dottin, correct?

A Yes.

Q And is it correct to state that on that morning you met with Ms. Dottin?

A Yes.

Q And you spoke to her regarding what had occurred, correct?

A I did.

Q And I think you testified that after speaking with her, that at some point in time you had asked her for her jacket?

A Yes.

Q And would it be correct to say that that was given to you?

A Yes.

Q Do you recall where the jacket was given to you?

A I believe it was at North Shore Hospital.

Q Wasn't given to her -- wasn't given to you by her at her house the next morning?

A Not that I can recall, no.

Q Anything that would refresh your recollection as to how and when you received the jacket?

A I can look at the invoice.

Q Do you have that invoice present with you?

A I do.

Q Could that be used to refresh your recollection as to that?

A The jacket was invoiced on 4/17 of '05, which is the same date as the occurrence. So, I didn't receive it the next day, no.

Q Do you recall what time?
A That I received it?
Q Yes.
A I believe I received it at the hospital.
Q That was after conference with or discussions not only with Ms. Dottin but with Ms. Davilar as well?
A Yes.
Q And it became important that because of what you discussed with Ms. Dottin there may be evidence on one of the sleeves, correct?
A Yes.
Q Were you present also regarding any conversation that Ms. Dottin had relayed regarding that her breasts had been kissed by the individual that had assaulted her?
A Yes, sir.
Q And as a result of your, I guess, training and expertise, you at that point had asked for various items of clothing?
A I asked for the jacket, yes.
Q You didn't ask for her bra?
A No, I didn't ask for the bra.
Q Yet, you were aware at that time that she had indicated that the bra had been moved and that her breasts had been kissed by this individual, correct?
A Yes.

Q The conversation that you also had with Ms. Dottin then lead you to go back to the scene, correct, that this had occurred?

A Yes.

Q At that point in time you had been, I guess, informed by Ms. Dottin that she couldn't pick out this person, is that correct?

A Yes.

Q And so, you went back to the scene. And at some point in time you went in and spoke to the owner of the salon, isn't that correct?

A Yes. I spoke to a person at the salon. I'm not sure if it was the owner.

Q Okay. Do you remember his name?

A Not offhand.

Q Ricky Littles, would that sound familiar?

A I do recognize Littles, yes.

Q And, in fact, this is about two days later, on the 19th, that you went back to speak to Ricky Littles, correct?

A Yes.

Q As a carrying detective, when you had gone to speak to him, you asked him about the camera that was depicted right outside the store, correct?

A Yes.

Q Because you were aware that Ms. Dottin had walked past that location in front of Yoles when she had been apprehended by some male, right by the opening between the two stores, correct?

A Yes.

Q And the camera, itself, was angled right by the sidewalk, within maybe fifteen feet or so from the street to the front door, is that correct?

A I don't know how much area it covered. But it was angled toward the front door and walkway to the front door.

Q You don't know how much area it covered because you never looked at it, did you?

A That's correct.

Q In fact, as a carrying detective, in an assault such as this, you saw a camera which clearly could contain some type of evidence, correct?

A Possibly.

Q You go in and speak to the owner. Did he have any problem giving it to you?

A Yes. He didn't --

Q What was the problem?

A He didn't have -- I believe he didn't have the equipment on scene. I think the camera was -- the film or the DVD, whatever it used, was at another location.

Q You were too busy to go to that other location to view it, Detective?

A I don't think it was available to me.

Q Well, he viewed it, didn't he?

A I asked him to view it for me.

Q Yes, which means it was recording, correct?

A It was recorded somewhere, yes.

Q It wasn't a live, as you say, footage, where nothing is recorded. Like you have your live traffic cams on the parkways, those are live, nothing is recorded from those. Once the incident happened, there's nothing to record. In this case, you had something, correct?

A Yes.

Q You didn't have anybody under arrest, correct?

A Correct.

Q You didn't have a suspect at all, correct?

A Correct.

Q And you have an individual that has available to you a camera that would show exactly where this individual walked, correct?

A Which individual?

Q Ms. Dottin.

A Yes.

Q And perhaps whether she was followed or not, correct?

A Yes.

Q But you chose to, even though you could, not to go view it, correct?

A I asked the owner to view it for me, and he did.

Q Is he in law enforcement?

A No.

Q No. Does he have the expertise or training as to what to look for?

MS. TEBBETT: Objection, your Honor.

THE COURT: Yes, sustained.

Q Did you ask him whether he had any qualifications? Did you ask him how many cars passed by or anything at all?

MS. TEBBETT: Objection, your Honor.

MR. LEMKE: I withdrawn the question.

THE COURT: Okay.

Q You didn't do any of that, did you, Detective Moran?

MS. TEBBETT: Objection.

THE COURT: Yes, sustained.

Q Yet, you now go to a gas station, a gas station that had also been discussed with you by Ms. Dottin, correct?

A Yes.

Q Because she had indicated to you on a number of

occasions that there was a van that she observed that seemed to be somewhat suspect, correct?

A Yes.

Q That this van had pulled into this gas station, correct?

A Yes.

Q And, in fact, did you go back to that location with Ms. Dottin?

A With Ms. Dottin?

Q Yes.

A I don't recall doing that.

Q Do you recall discussing with her the gas station that the van pulled into?

A Yes.

Q And exactly where that van pulled up to?

A I don't recall the exact conversation.

Q Well, you go now to the gas station, the BP Gas Station, correct?

A Yes.

Q At that point you asked for the tape, correct?

A Yes.

Q And he gives it to you, correct?

A I think he gave it to me the following day. It wasn't available the day I was looking for it.

Q You received it along with Detective Ed Goehler,

correct?

A I received it, Detective Ed Goehler works at the Electronics Squad. So I received the tape and I brought it to the Electronics Squad.

Q Did you watch it with Detective Goehler?

A Yes.

Q And that tape, itself, did you take notes as to when you watched that tape?

A Did I take notes, no.

Q Yes. You didn't take any notes?

A About the tape?

Q Right.

A No.

Q Because you don't need to take notes because you preserved the tape, right?

A No.

Q Withdrawn.

You go to the gas station, you get a tape, correct?

A Correct.

Q The tape in which Ms. Dottin had indicated this van pulled into, correct?

A Yes.

Q And so, you asked the owner for that tape, correct?

A Yes.
Q And it's not a CD in any way or -- it's a tape, correct?
A A VHS tape.
Q You pop it into the machine and watch it?
A Yes.
Q And he gives that to you, it's part of your investigation, and is this a video that is a live in-time or is it every three to five seconds?
A I did need the assistance of Electronics Squad. So, it wasn't a video you could put in and watch on your home VHS player. The Electronics Squad had to speed it up or slow it down somehow so I could watch it.
Q It would be a number of seconds in different locations, correct?
A I think it was just one location, pointing at the front of the door area.
Q And how long did you watch this video?
A I don't recall how long it took; but about an hour before the incident until an hour after the incident.
Q Did you record any activity?
A No, it didn't record any activity.
Q Did you record, yourself, again, how long you watched it?
A No, not the length of time I watched it.

Q So, what you did then, at the end of watching it, you then preserved this tape by putting it in your case jacket with all this other evidence that we have here, correct?

A No.

Q You didn't give it back to him, did you?

A Yes, I did.

Q You took a piece of evidence that you didn't know what value it would have, and you gave it back to the owner?

MS. TEBBETT: Objection, your Honor.

THE COURT: Yes, sustained.

MR. LEMKE: Withdrawn.

Q You give it back to the owner, correct?

A I gave the tape back to the owner, yes.

Q Was there any special tape he needed?

A No.

Q Your Electronics could have certainly made a copy of it, correct?

A Copy of what?

Q The tape.

A There was nothing on the tape.

Q Well, you certainly saw then an area with a gas pump?

A Yes.

Q You certainly saw maybe the front door, correct?

A Yes.
Q It wasn't that it was completely blank, correct?
A Right.
Q Did you show that to Ms. Dottin and ask her about where this car would have come up?
A No.
Q Did you discuss it with her, at all, the tape?
A No.
Q It goes back to my question, did you make a copy of it?
A No, I did not.
Q No. Now, in your investigation now you also indicated that you made a number of arrests or, perhaps, seized a number of guns, is that correct?
A Over the years, yes.
Q How many guns would you say you have confiscated?
A Maybe five or six guns.
Q I'm sorry?
A Maybe five or six guns.
Q Five or six guns?
A Me, personally, yes.
Q Not five or six hundred? Five or six guns?
A Yes.
Q On those vast five or six guns, in what, how many years, twenty-one years?

A Right.

Q It's your testimony that none of them had a night scope?

A Night-sights.

Q So, your testimony here earlier about all these guns that you confiscated --

A I didn't say all the guns.

MS. TEBBETT: Objection.

MR. LEMKE: I withdraw it.

Q But the guns, that you had never saw these night scopes, correct?

A Correct.

Q You don't need a special permit to obtain or purchase a night scope, do you?

A It's not a night scope. It's not a scope. It's a sight.

Q Night-sight.

A It's not something that lights up, it just glows.

Q You can buy that at any gun store location, right?

A It's made with the gun, not an accessory.

Q You can order one, can't you?

A I don't know. Night-sights, I don't know.

Q You don't know how you can purchase them, the manner in which they're purchased or if they're only issued

to law enforcement, so forth; you don't know any of that, do you?

A I don't -- when the gun is manufactured, the sights are -- the night-sights are installed on the gun during manufacturing. I don't know if there is any after-market type night-sights.

Q So, if there are, for example, five hundred thousand guns that are manufactured, it comes with the gun?

A Yes, part of the gun.

Q One or two other questions, Detective. I take it back, I have no questions.

MR. LEMKE: Thank you.

THE COURT: Ms. Tebbett, anything?

MS. TEBBETT: Briefly, Judge. Thank you.

REDIRECT EXAMINATION

BY MS. TEBBETT:

Q Now, Detective Moran, when you were speaking with Mr. Littles regarding the surveillance cameras at his location, was there any evidence to suggest to you that he couldn't be trusted to view that tape and report back the information to you?

A No, there wasn't.

Q Okay. And when you testified that you had observed the camera by the Yoles Salon on Greenwich Street, was that camera angled toward the back of the parking lot

where you learned that this incident actually had taken place?

A It was not.

Q Were there any cameras back there?

A No, there weren't.

Q Did you see any cameras on that abandoned building that was towards the back of that parking lot?

A No, I did not.

Q And can you tell us just what street that abandoned building is located on?

A I believe it was Fernwood. Can I check my notes? Let me see.

Q If you need to look at your notes to refresh your recollection about that --

A If I can.

MR. LEMKE: No objection.

THE WITNESS: Excuse me?

MR. LEMKE: No objection if you need to refresh your recollection.

A Elmwood.

Q So, if you hopped over that fence that was in the back corner of the parking lot, what street would you be on?

A Elmwood.

Q Were there any surveillance cameras in that area?

A Not that I had seen.

Q When you were interviewing Ms. Dottin, she gave you information about the van that had pulled into the parking lot of the gas station. Did you have any information that the van had actually pulled into the area that was covered by that camera?

A No, I did not.

Q Were you sure that the man who was driving that van was even the same man who had attacked Ms. Dottin that day?

A No, I didn't know.

MS. TEBBETT: Thank you. I have nothing further.

THE COURT: Mr. Lemke.

MR. LEMKE: Yes, I do.

RECROSS-EXAMINATION

BY MR. LEMKE:

Q In speaking to Ms. Dottin, she had told you there was a van that pulled into the gas station and motioned her to come over, correct?

A Right.

Q And after she had been assaulted, moments after she sees that same van passing by, isn't that correct?

A Yes.

MR. LEMKE: I have nothing else, either.

THE COURT: All right. Thank you, Detective.

THE WITNESS: Thank you.

(WITNESS EXCUSED)

THE COURT: People, your next witness.

MS. TEBBETT: The People call Anna Fernandez.

A N N A F E R N A N D E Z, Called as a witness by and on behalf of the People, having been first duly sworn, testified as follows:

THE CLERK: Please be seated. State your name, spell your last name, County of residence.

THE WITNESS: Anna Fernandez, F-E-R-N-A-N-D-E-Z.

THE COURT: Okay, County of residence.

THE WITNESS: Queens County.

THE COURT: Okay, Ms. Tebbett.

MS. TEBBETT: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. TEBBETT:

Q Good afternoon, Ms. Fernandez?

A Good afternoon.

Q Can you tell us where you're employed?

A Employed at the Nassau County Medical Examiner's Office, Department of Forensic Genetics.

Q What is your position there?

A I'm a Forensic Geneticist I.

Q Can you explain for us what that means?

A As a Forensic Geneticist I, I'm responsible for the examination of physical evidence for the presence of biological fluids, such as blood, semen or saliva, perform DNA analysis, write reports based on my results and occasionally testify in court.

Q And can you tell us how long you have held that position?

A For about three and-a-half years.

THE COURT: Ms. Fernandez, if you can move that microphone a little bit closer and lower it. There you go. Keep your voice up loud so all my jurors can hear you.

Go ahead, Ms. Tebbett.

MS. TEBBETT: Thank you.

Q Can you tell us where you were employed prior to the position that you hold currently?

A I was employed at the New York City Office of the Chief Medical Examiner for about five years.

Q And what was your position in the City?

A I was Criminalist II.

Q And can you tell us what that position entailed?

A As a Criminalist II, I performed the same type of duties as I do now as a Forensic Geneticist I.

Q Can you tell us also your educational background?

A I have a Bachelor of Science from John Jay

College of Criminal Justice in Forensic Science. I'm currently attending a Master's program in Adelphi University.

Q And in the course of your employment, Ms. Fernandez, have you received training in the areas of forensic evidence examination and DNA analysis?

A Yes, I have.

Q Can you tell us what type of training you have received in those areas?

A I received an intensive six-month training at the New York City Office of the Chief Medical Examiner, and I received further training here at the Nassau County Medical Examiner, aside from continuing education, conferences I attend every year.

Q And can you tell us what areas or topics those trainings covered?

A The topics that it covered was evidence examination, DNA analysis, and court testimony.

Q Now, in your experience with those employment positions that you told us about, can you approximate for us how many cases you have handled performing forensic evidence examinations?

A Hundreds of cases.

Q And have you ever testified before in court as an expert in the field of forensic science and forensic

evidence examination?

A Yes.

Q Can you tell us about how many times you have testified before as an expert in those areas?

A I have testified over twenty times.

Q And can you tell us where you have testified?

A I have testified once in the Bronx, Bronx County, and the rest of the time here in Nassau County.

MS. TEBBETT: Your Honor, at this time I would offer Ms. Fernandez as an expert in the area of forensic science and forensic examination.

MR. LEMKE: No objection, your Honor.

THE COURT: Okay, she will be so qualified.

Q Now, Ms. Fernandez, were you employed in the position you have now back in December of 2005?

A Yes.

Q At that time did you your laboratory receive evidence from the Nassau County Police Department relating to a Delsy Sanchez under -- that was given a lab number FGO5-0289?

A Yes.

Q And can you tell us, were there numerous items that were received in connection with this case?

A Excuse me. Would you like to know the items?

Q Were there a number of items that were received?

A Yes.

Q Just generally, what did those items consist of?

A They consisted of a sexual assault kit, clothing from the victim and clothing from the crime scene area.

Q And amongst the clothing from Ms. Sanchez that was received by the laboratory, was one of those items a hat from Ms. Sanchez?

A Yes,

Q Let me ask you some questions about that. Can you tell us when that piece of evidence, that hat, was received by the laboratory?

A It was received December 13th of 2005.

Q And can you explain for us how that was received by the lab?

A It was received in a sealed packaging.

Q And was that item examined by the laboratory?

A Yes, it was.

Q Does -- is the receipt of that item documented in the lab paperwork once it's received by the lab?

A Yes, it is.

Q Is any examination of that item also documented in the paperwork generated by the laboratory?

A Yes, it is.

Q Now, can you explain for us what type of examination was done on that hat, initially?

A Yes. The hat was examined for biological fluids. It was visually examined for any stains. After visually examining the hat, we then visualize it under an alternate light source for any fluorescence. Fluorescents was seen on the hat.

Q You mentioned the term biological fluids, what is that?

A Any biological fluids, could be semen, saliva, blood.

Q And when the item was visually examined, how was it visually examined?

A With a naked eye.

Q And then can you explain for us what that light source is that you mentioned that was also used to examine that item?

A Yes. That light source is under a certain wavelength that when viewed in a dark room, I'm sorry, if there is any fluorescence seen, you can see this under this light.

Q And what does it mean if an area fluoresces when you are using that light?

A It gives you -- it's a presumptive test for biological fluid.

Q Was this particular hat examined using that alternate light source?

A Yes, it was.
Q And what happened when it was examined using that light source?
A Two areas fluoresced on the hat.
Q Can you explain for us what the significance was from the laboratory's perspective from those two areas fluorescing?
A This is an indication for us that it's possible that there is biological fluids on the hat, and we continue further testing on the hat.
Q Was further testing done on that hat?
A Yes.
Q Can you explain for us what further testing was done?
A The next test we performed, we take a cutting of the areas that fluoresced and we perform what is called a color test, which is presumptive for the presence of semen.
Q And what happened when the color test was done on that hat?
A We -- it was a positive result for the color test for semen.
Q What does it mean when you have a positive result?
A When we have a positive result, it is also an indication that there may be semen present, so we then move

on to the next test.

Q What is the next test?

A The next test is a confirmatory test for semen.

Q And was that done on this hat?

A Yes.

Q Can you explain for us the confirmatory test?

A Yes. The confirmatory test actually tests for a protein found in semen in very high levels.

Q And was that done on this hat?

A Yes.

Q And can you explain for us what the result was of that test?

A The stains that we tested were positive for that confirmatory test.

Q What does it mean to have a positive result from this test?

A It means that there is semen present on the hat.

Q And what does the laboratory do with that item once you got a positive result from this particular test?

A At this point, once we get a positive for the confirmatory test, we take another cutting and submit it for DNA extraction or DNA analysis.

Q Was that done with respect to this particular item?

A Yes.

Q And can you tell us what happened when DNA analysis was attempted on this item?

A No DNA foreign to Delsy Sanchez was seen. No male DNA was seen.

Q Can you explain for us why it would be that you would have a positive result from the test, that test for semen, and not find any male DNA on that particular item?

A There could be a number of reasons. One may be there is not -- you need sperm cells in order to get a DNA profile. The protein may be present, but the sperm cells are not present in a high amount. Therefore, you would not get a DNA profile.

Q And is it possible to have semen present without having any sperm present?

A Yes, it is.

Q Which part of the semen contains the DNA?

A The sperm cells.

Q Okay. I'm going to show you this item which is already in evidence as People's 46. Can you just take a look at that.

(Handed to the witness)

Q Do you recognize any of the markings on that item, Ms. Fernandez?

A Yes, I do.

Q Tell us what you recognize and how you recognize

it?

A I recognize the initials of the supervisor that accepted the evidence into our laboratory.

Q And is that on the front of the packaging?

A Yes, it is.

Q Do you recognize any other markings on the other side of the packaging?

A I recognize the initials of the analyst that examined the hat.

Q Can you just take a look at the item that is inside of that packaging and tell us if you recognize that?

A It's a white knit hat.

Q Is that the hat that was examined in connection with this particular case?

A Yes.

Q Do you recognize that hat?

A Yes.

Q Is that the same one that was tested that you just testified to?

A Yes.

Q With the results that you had just testified to for us?

A Yes.

Q And were you aware of any other swabs from the scene of this incident being submitted or attempted to be

submitted for DNA analysis?

A Yes, there was other evidence submitted.

Q And were you aware of any evidence that was rejected by the laboratory?

A Yes.

Q That was not tested?

A Yes.

Q And do you know what those items were?

A I do not have paperwork with me of what they were exactly.

Q But were you aware there were two items that were not accepted by the laboratory for testing?

A Yes.

MS. TEBBETT: Just one moment.

THE COURT: All right.

MS. TEBBETT: Thank you. I have no further questions.

THE COURT: Mr. Lemke.

MR. LEMKE: No questions, your Honor.

THE COURT: No questions?

MR. LEMKE: None, at all.

THE COURT: Ms. Fernandez, thank you very much.

THE WITNESS: Thank you.

(WITNESS EXCUSED)

THE COURT: Can I see the lawyers a moment.

(Whereupon, there is a discussion held at the Bench, off the record, between the Court and Counsel)

THE COURT: Members of the jury, we're -- before we call our next witness, we're going to take a break. I think this is probably a good time. The next witness will be a little lengthy. So, why don't we take our break now. And when we come back, we'll probably work for the duration of the day.

See you back here in a few minutes. Just follow the court officer.

(Whereupon, the sworn jury and alternates leave the courtroom)

(Whereupon, there is a brief recess taken in the proceedings)

COURT OFFICER: Jury entering.

(Whereupon, the jury entered the courtroom.)

THE COURT: People, your next witness.

MS. TEBBETT: The People call Sandra Hayn.

S A N D R A H A Y N, residing in Nassau County, having been called as a witness on behalf of the People, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: Please state your name, spell your last name and county of residence.

THE WITNESS: Sandra Hayn, H-A-Y-N, Nassau County.

THE COURT: Ms. Hayn, if you can keep your voice nice and loud for us.

Ms. Tebbett.

DIRECT EXAMINATION

BY MS. TEBBETT:

Q. Good afternoon, Ms. Hayn.

A. Good afternoon.

Q. Can you tell us where you are employed?

A. I'm employed at the Nassau County Medical Examiner's Office in the Department of Forensic Genetics.

Q. And is that also commonly referred to as the DNA lab?

A. Yes.

Q. And what is your position there?

A. I'm a Forensic Geneticist Level II.

Q. Can you explain for us what that position entails?

A. It's a supervisory position. I act as a lab supervisor. I'm also a lab CODIS manager. Meaning, I manage the CODIS, which is our DNA databank system and I also manage staff scientists.

Q. And how long have you held this particular position at the DNA lab?

A. Supervisory position?

Q. Yes.

A. Approximately four years.

Q. And did you hold a position at that lab prior to becoming a supervisor?

A. Yes. For a year I was a Forensic Geneticist Level I.

Q. What does that position mean?

A. That position means I'm a lab analyst. I examine physical evidence, perform DNA testing on evidence and write reports and submit them to my supervisors.

Q. Were you employed prior to holding that position?

A. Yes.

Q. Where were you employed and in what position?

A. I was employed at the Office of the Chief Medical Examiner in New York City and I was a forensic -- excuse me,

a Criminalist Level II.

Q. What did that position entail?

A. That position entailed the same thing pretty much as my first position in Nassau County. I examined physical evidence on rape kits, homicide cases and I wrote reports and submitted them to my supervisor for review.

Q. And can you tell us your education?

A. I have a Bachelor's of Science Degree in biology from Rensselaer Polytechnic Institute and I also have a Master's of Science in Forensic Science from John Jay College of Criminal Justice.

Q. Now, is the DNA laboratory accredited?

A. Yes.

Q. Who is it accredited by?

A. We're currently accredited by ASCLAD lab, which is the American Society of Crime Lab Directors Lab Accreditation Board and also by New York State.

Q. What does it mean to be accredited?

A. Being accredited means that we have manuals and protocols in place. There is a multitude of criteria that are set by ASCLAD Lab and by the DNA audit document which is put out by the FBI. We basically have to go through an audit every year which checks that our manuals have certain protocols and that we follow those protocols. And it also means our analysts, our DNA analysts have to undergo two

proficiency tests a year.

Q. Does accreditation also involve quality control and quality assurance?

A. Yes.

Q. Can you tell us what those two terms mean?

A. Quality control and quality assurance are pretty much those checks in our protocol to ensure that what we're saying we're doing, we're actually doing. And we have a quality assurance manager. And the proficiency test are an essential part of our quality assurance program.

The proficiency tests are where we get samples from an outside vendor. We process the samples in-house. We submit those results to that vendor to learn whether or not those tests have been passed or failed. Every interpreting analyst at our laboratory has to undergo two rounds of that testing per year.

Q. And have you taken and passed those proficiency tests yourself?

A. Yes.

Q. Now, can you tell us what type of training you have received in DNA analysis?

A. I have received training in all aspects of DNA analysis from evidence examination to screening of evidence for biological material such as semen, blood, saliva, all the way through DNA extraction and testing. And also

interpreting DNA profiles and mixtures of DNA.

Q. And did your training include forensic evidence examination as well?

A. Yes.

Q. And can you tell us in your experience both here in Nassau County, as well as in New York City, how many cases you have handled performing forensic evidence examination and DNA analysis?

A. I would say in the hundreds.

Q. And in your position as a supervisor here in Nassau County, can you approximate for us how many cases you have reviewed and supervised?

A. I would say also probably in the hundreds. Definitely in the hundreds, yes.

Q. And have you testified before in a court of law as an expert in the field of forensic evidence examination, as well as DNA analysis?

A. Yes.

Q. And can you approximate for us how many times you have testified before?

A. Approximately 15 times.

Q. And can you tell us where you have testified before?

A. I have testified here in Nassau County, also in Kings County and in Queens County.

MS. TEBBETT: Your Honor, at this time I would offer Ms. Hayn as an expert in the area of forensic evidence examination and DNA analysis.

MR. LEMKE: No objection, your Honor.

THE COURT: All right, she'll be so qualified.

Q. Ms. Hayn, can you tell us what is DNA?

A. DNA stands for deoxyribonucleic acid. It's our genetic material that makes us who we are. We inherit half from our mother and half from our father.

Q. Where is DNA found?

A. DNA can be found in almost all cells in the human body. It can be found in such things as blood, semen, saliva in skin cells, epithelial skin cells.

Q. Are there tests and technology available that can test a person's DNA?

A. Yes.

Q. And can you tell us what is a DNA profile?

A. DNA profile basically is like a long string of numbers. Ninety-nine percent of our DNA is the same. That's what makes us all human. However, there is about one percent of our DNA that is highly variable amongst individuals and that is the DNA that we test specifically.

We test in our laboratory 13 different locations, plus the amelogenin location, which is a sex determination location. So, we're basically testing the different forms of

a person's DNA at those different locations. And in the end, the DNA profile basically reads the string of numbers across those various locations.

Q. And can you explain for us how each of those 13 locations are identified or named?

A. They are identified and named by the various chromosomes that they are found on.

Q. And is every person's DNA unique?

A. Yes, barring identical twins.

Q. And does a person's DNA profile ever change over the course of time?

A. No.

Q. Now, can you tell us how long the laboratory in Nassau County has had the capability of performing DNA analysis?

A. Since 2003.

Q. And are there procedures and controls established to ensure that a reliable and accurate result is achieved by the laboratory?

A. Yes.

Q. And can you explain for us what those procedures and controls entail?

A. They are basically the part of the quality control and quality assurance program that we have which ensures or mandates that we run various controls along with our testing.

So, we have positive controls and we also have negative controls which act as reagent blanks that run along with every sample we perform in-house.

Q. And is it the regular course of business of the DNA laboratory here in Nassau County to conduct DNA testing?

A. Yes.

Q. And are reports prepared by the analysts with the results of that DNA testing?

A. Yes.

Q. And are there protocols in place that establish every step of that DNA testing?

A. Yes.

Q. Do each of the employees and the analysts at the laboratory have a business duty to follow each of those steps in the protocol?

A. Yes.

Q. Now, can you explain for us, starting with the receipt of evidence into the laboratory, how evidence is received by the lab and how it proceeds?

A. Evidence is received by the laboratory from the Forensic Evidence Bureau. It comes into our laboratory. We itemize what items are delivered. We always make a notation on that piece of evidence. We note whether or not it's sealed or not. That case is then assigned to a particular analyst within our laboratory and that's when the analysis is

begun or is performed.

Q. And is the receipt of evidence documented in the laboratory paperwork?

A. Yes. We maintain chain of custody on every piece of evidence that comes through our laboratory.

Q. And is the condition of a particular piece of item that's received by the laboratory also documented in the lab paperwork?

A. Yes. Every analyst uses a detailed evidence packaging worksheet which details the actual appearance of the package, whether or not its sealed, what it's labeled with.

Q. And are each of the examinations or tests that are done on pieces of evidence that are received into the laboratory documented in the lab paperwork as well?

A. Yes.

Q. And is there a business duty by each of the analysts or employees of the lab that handle or test or examine a piece of evidence to document what they do in the lab paperwork for each case?

A. Yes.

Q. Now, can you explain for us what happens to the pieces of evidence after the testing is completed by your laboratory?

A. After the testing is completed, the analysts will

retain in-house any items that, number one, may require further testing or a positive for any type of biological material or is an exemplary material which serves as -- when I say exemplar, it serves as a control sample for that person. So, it could be an oral swab. We call them buccal specimens because you are scraping the buccal cells of a person's inner cheek on cases where there is one submitted.

Q. What happens to the rest of the evidence that is not retained by the laboratory?

A. The rest of the evidence is packaged up, sealed and then submitted back to the Forensic Evidence Bureau.

Q. And is that documented in the lab paperwork as well?

A. Yes.

Q. And are there occasions when your laboratory rejects evidence that will not be tested for DNA or any other forensic evidence examination?

A. Yes.

Q. And can you explain for us when that happens?

A. Basically, a supervisor who is on the evidence intake rotation goes through the paperwork that is submitted through FEB, determines through conversations with the case detective the probative nature of the different pieces of evidence. They make a decision on what items are to be prioritized in testing. Because oftentimes it's just not

possible for us to test every item within a certain case. So, items are given a level of priority. And there are also items that are deemed to have no probative value or little probative value and those items would be rejected and held over in Property.

Q. And are you familiar with the case where the analysts was Anna Fernandez and you, yourself, performed the technical review under FG05-0289 back from the end of 2005 into the beginning of 2006?

A. Yes.

Q. And are you familiar with pieces of evidence that were rejected by your laboratory in connection with that case?

A. Yes.

Q. And can you tell us about those?

A. There were two crime scene swabs that were rejected by our laboratory back at the time when the case was initially presented to us.

Q. And can you explain for us why the laboratory would not be able to do DNA testing on those type of items?

A. I'm not sure if we wouldn't be able to do DNA testing on those type of items. It was, they were not deemed to be of a higher probative value at that point in time.

Q. Okay. Now, when evidence is received by the laboratory and the testing process is done on each piece of

evidence, does the same person from the laboratory perform each of the steps?

A. Not always.

Q. Can you explain why that wouldn't be?

A. We work in a rotation system, so if you inherit a case, you would be the person performing the initial evidence examination on a case. And then the case would be passed on and batched together where all the DNA extractions, quantitations, the running on instruments to generate the DNA profiles, all of that would be done in a batch system. It's a much more efficient process.

So, even though you are the case analyst, you might not be performing every step along the way in the process. However, you are also managing that case and are dictating where the samples are going and how they are flowing through our laboratory.

Q. And which one of those individuals is called into Court to testify with respect to the testing and the results, if any, that was reached?

A. It would be the final interpreting analyst on the case.

Q. Now, did there come a time, Ms. Hayn, in April of 2005 that the laboratory received evidence from the Nassau County Police Department relating to a Shamika Dottin that was under police case number 205CR29969 that was given a lab

number of FG05-0066?

A. Yes.

Q. And can you tell us who was the analyst that was assigned to that case?

A. I was the analyst.

Q. And what was your position in the laboratory back in April of 2005?

A. In April of 2005 I was in the same position that I am in currently.

Q. And was a report ultimately generated with respect to the evidence that was submitted that was associated with that lab number?

A. Yes.

Q. And were the entries in that report made in the regular course of business of the laboratory?

A. Yes.

Q. And was that particular report made and kept in the regular course of business in the laboratory?

A. Yes.

Q. And was it made at or about the time that the testing was completed?

A. Yes.

Q. Now, can you tell us what type of evidence was received in connection with that lab number?

A. We had received a sexual assault kit and also a

jacket.

Q. Now, let me ask you first about the jacket. Can you tell us when that was received by the laboratory?

A. That was received in April, April 21st of 2005.

Q. And was that documented in the lab paperwork?

A. Yes.

Q. And can you tell us how the jacket was received by the laboratory?

MR. LEMKE: Your Honor, if the witness wishes to refresh her recollection, I have no objection to that.

THE COURT: Ms. Hayn, could you just tell us what documents you are referring to?

THE WITNESS: I'm referring to my case notes for this case.

THE COURT: Would those case notes refresh your recollection about the questions Ms. Tebbett is asking you?

THE WITNESS: Yes.

THE COURT: Go ahead.

A. That jacket was received in a medium sized brown paper bag that was sealed.

Q. And was that jacket examined by analysts in the laboratory?

A. That was examined by me.

Q. Can you explain for us what you did?

A. Sure. I basically would open the packaging. First document what's on the outside of the packaging. Open up the packaging, examine the jacket visually for any signs of, in this case, we were looking for possible semen. I would be looking for any type of, if I didn't see any staining visually, I would then go to a tactile examination and use an alternate light source on that jacket.

Q. And now did you visually examine that jacket?

A. Yes.

Q. Did you observe anything?

MR. LEMKE: Again, no objection if she wishes to refresh her recollection.

A. There was no semen like staining seen upon visual examination of the examination.

Q. You used the phrase tactile examination, what does that mean?

A. That would be a field test for semen. Oftentimes, if we're looking for semen, its aged. It would be fairly crusty, so you would be looking for some type of crust-like material or stiffening of the fabric.

Q. Were you able to feel anything during your tactile examination?

A. No.

Q. And then how did you proceed to examine the jacket

at that point?

A. I then proceeded to examine it using a UV light source, which is an alternate light source. We use various wavelengths of fluorescence and the one we typically use in the laboratory is a wavelength of 495 which helps to illuminate or screen for a possible presence of biological material.

Q. And can you explain for us when you use an alternate light source, what determines how bright something would light up?

A. There is really no quantitative way to state specifically how different things will light up. We're looking for any type of fluorescence, whether it be dull or bright. Being an experienced examiner, you become a little more familiar with what things might be, but there is no positive way of saying any specific determination of just looking at something fluorescence you would be able to say specifically what that fluorescence might be from. It might be from urine or any type of biological material.

Q. Do different types of biological material look different when you use that alternate light source?

A. Yes, things do fluoresce at different dullness or different brightness.

Q. And does any particular type of biological material always fluoresce the same way?

A. No.

Q. What would affect that?

A. It could be affected by -- the number one thing that would probably affect it or -- sorry, would affect it, would be the type of substrate. If it's a type of dark substrate, that might be quenching some of the fluorescence. Or also the quantity of deposit that is on that particular item comprises that particular biological stain would affect the way it would fluoresce.

Q. You used the word substrate. What does that mean?

A. Substrate means the actual material you are examining.

Q. The actual composition of the item that you are looking at?

A. Yes, the type of material, the type of fabric in a jacket, per se, or something like that we call a substrate.

Q. And it would be affected by how much biological material is on that particular item or how little?

A. Yes. You would expect it to fluoresce at different ways, depending on how much is there. Also, the age of the stain would also affect how bright it would be.

Q. And what did you observe when you used the alternate light source to examine the jacket?

A. I observed stains on the jacket.

Q. And just by looking at it with that alternate light

source, were you able to tell conclusively at that point what those stains were composed of?
A. No.
Q. Can you explain for us what the fluorescent light is used for at this point in the examination process?
A. Specifically just a screening tool to screen for biological material. Any possible presence of biological material.
Q. And when an item has an area that fluoresces when you are using that light, what is the next step that would be taken in the examination of that item?
A. In this case, since we were looking for semen specifically. I then went on to perform an acid phosphatase test, which would test for the presence of AP or acid phosphatase in materials.
Seminal acid phosphatase is present in high quantities in semen, so that's why that is the next presumptive test that we do when we're screening for semen, after we visualize fluorescing stains.
Q. And did you perform that test on this particular item?
A. Yes.
Q. And what was the result?
A. All the stains that were tested were negative.
Q. And what does it mean to get a negative result in

it with this particular item?

A. It means that there is no semen present.

Q. Now, can you explain how you would get a negative result from the acid phosphatase test when you had seen fluorescence using the alternate light?

A. It could have been any other type of biological material other than semen. Or it could have been a non-biological material that could have been some type of staining that was creating a level of fluorescence which would cause me to test it.

Q. Could it have been semen that fluoresced despite the fact you got a negative result from the acid phosphatase test?

A. Could you repeat that?

Q. Could it have been a small quantity of semen that fluoresced, even though you got the result that you reached from the acid phosphatase test?

A. No.

Q. Now, let me show you this item which is marked People's 57 in evidence.

Do you recognize that item, Ms. Hayn?

A. Yes.

Q. And is that the jacket that you examined in connection with this case?

A. Yes.

Q. And do you recognize markings made by the laboratory on the packaging of that item?

A. Yes. Our laboratory number, FG05-0066 is on the outer packaging, as well as our item number and my initials and date.

Q. You can put that aside.

Now, did you also receive what's commonly referred to as a rape kit in connection with the evidence that was submitted under this case number?

A. Yes.

Q. And was that item examined?

A. Yes.

Q. Can you tell us when it was received by the laboratory. And if you need to look at your notes to refresh your recollection, you can do that.

THE COURT: Yes.

A. Also on April 21st of 2005.

Q. And can you tell us how it was received by the laboratory?

A. It was also received in a sealed condition with notations on the outside with what it was labeled, which is a white box.

Q. And was the receipt of that piece of evidence and its condition when it was received documented in the lab paperwork?

A. Yes.

Q. And once that sealed box was received by the laboratory, was it opened?

A. Yes.

Q. And were the contents of that box documented and examined?

A. Yes. The first thing that we do when we receive a sexual assault kit is perform a kit inventory where we basically take an inventory of exactly what was submitted within the sexual assault kit.

From that step, markings are put on every packaging or every piece of inner packaging that is inside the sexual assault kit. We start to perform DNA analysis or screening of those items.

Q. Can you tell us what was contained in this particular kit that was received by the lab?

A. We received dried secretion swabs, four of them, which were noted to be on the packaging from both breasts. We received fingernail scrapings, oral swabs and smears, which is smears basically like a slide which, when the sexual assault kit is taken, the swab is used to create a slide which is used for microscopic examination.

We received the buccal specimen, which, like I said before, is like an inner cheek swab or scraping to use as a control.