We received pulled head hair and we received pulled pubic hair.

Q. And were each of those items that you mentioned contained in separate packages within that box?

A. Yes.

Q. And was that documented in the lab paperwork as well?

A. Yes.

Q. Can you tell us the condition of the packaging of each of those items within the box?

A. All of those items were sealed within that inner packaging of the box.

Q. Was that documented in the lab paperwork as well?

A. Yes.

Q. Now, can you explain for us what was done with those pieces of evidence?

A. Basically when we get a sexual assault kit, we test the items that we are meant to test. So, in this case, we tested the oral swabs for semen and we also tested the dried secretion swabs for semen and amylase.

Q. Now, Ms. Hayn, I'm going to show you this item which is marked People's 56. Can you take a look at that item and tell us if you recognize that?

A. Yes.

Q. Tell us what that is?

A. This is the sexual assault kit.
Q. How do you recognize that particular item?
A. I recognize it by my initials and date on the outer packaging, as well as our case number and our item number.
Q. Are there any other markings from your laboratory on that box?
A. Yes.
Q. What else do you recognize from your laboratory?
A. There is my initials across the seal when I resealed the case and there is also initials of the person who took the case in from FEB.
Q. And do you know who that was?
A. Karen Dooling.
Q. And is she employed by the DNA lab as well?
A. She is the assistant director at the DNA laboratory.
Q. And on the front of that box, can you see on there the seals that were intact when the item was received by the lab?
A. Yes. The seal that was here would have been the seal that would have been intact.
Q. It's no longer intact, correct?
A. No.
Q. But was it intact when the lab received it?
A. Yes, it was received into our laboratory in a

sealed condition.

Q. Just hold it up and point out which seal you are referring to?

A. This seal (indicating).

Q. That would be the orange seal in the middle of the box?

A. Uh-huh.

Q. Can you also see on there red evidence tape from the police department?

A. Yes.

Q. Where do you see that?

A. This is a sticker that FEB or the Property Bureau will put on, but this would, I believe, be put on subsequent to us getting this kit into the laboratory.

Q. Now, when that kit was received by the laboratory, were there any other seals on it besides that orange sticker?

A. I am not certain if this red sticker was on there prior. This red evidence tape. I basically have that it was sealed. I don't have exactly what was sealing the box.

Q. But it was in a sealed condition when it was received by the laboratory?

A. Yes.

Q. Now, let me just ask you, when the testing was completed of the items that were contained in that kit, what was done with each of those items and the box, itself, by

your laboratory?

A. There are certain items within this kit that were retained in our laboratory and were removed from the sexual assault kit and repackaged and are currently held in our laboratory. And there were other items that were -- I'm sorry, the remainder of the items were put back into the sexual assault kit, resealed and forwarded back over to FEB.

Q. And now which items were retained by the laboratory?

A. The buccal specimen was retained, the oral swabs and smears were retained and all four dried secretion swabs were retained.

Q. And after the remaining items were put back into that kit, what condition was the box put back in by the laboratory at the end of the testing?

A. It was sealed.

Q. And can you tell us what happened to that piece -- that box after the testing was completed and it was then sealed by the laboratory?

A. From my chain of custody, all I can see is that it was returned to a custodian at FEB -- not a custodian, a person who sends evidence back and forth over between our bureau and their bureau.

Q. And what condition is the box sent to FEB in after the testing was completed?

A. In a sealed condition.

Q. Can you see on there the seals that were put on it by your laboratory after the testing was completed?

A. Yes.

Q. Can you point those out for us?

A. These are my initials and date across the yellow evidence tape across the top and side of the box (indicating).

Q. And does the yellow evidence tape that you use go around three out of four sides of the top of that box?

A. Yes.

Q. And were they sealed by you before you sent it back to the Forensic Evidence Bureau?

A. Yes.

MS. TEBBETT: Your Honor, at this time I would offer that kit into evidence.

MR. LEMKE: No objection at this point, your Honor.

THE COURT: Without objection, it will be marked 56 in evidence. It will be in now.

(Whereupon, People's 56 in evidence subject to connection is received in evidence.)

COURT OFFICER: 56 in evidence received.

Q. Ms. Hayn, let's talk about the testing that was done on certain items inside that box. Did that box contain

buccal swabs from Shamika Dottin?
A. It was a buccal specimen.
Q. And was testing done on those to generate a DNA profile for her?
A. Yes.
Q. And can you explain for us how that was done, just generally?
A. Basically a DNA extraction is performed on that buccal specimen. We perform a quantitation amplification which basically are the steps in the process that we use to generate a DNA profile, and we generate a DNA profile for Shamika Dottin from that buccal specimen.
Q. And is that profile considered a known sample for her?
A. Yes.
Q. And now were there also oral swabs that were contained within that kit from Shamika Dottin?
A. Yes.
Q. And were they tested as well?
A. Yes.
Q. Now, what were they tested for?
A. They were tested for the presence of semen.
Q. And can you explain how they were tested for the presence of semen?
A. Sure. They, at the first step along the process,

when I said that there was a slide that was submitted in that box is when the sexual assault kit is being examined. We first look at that slide to check for the presence of sperm, and there were no sperm seen. So, the next step is what we call a seratec P-30 test, and that tests for the positive -- that is our final test for semen. It's not a presumptive test.

Q. Is that a conclusive test or a confirmatory test?

A. Yes.

Q. And was the P-30 test performed on the oral swabs?

A. Yes.

Q. And what was the result of that?

A. They were positive.

Q. And can you explain for us what the significance is of that test result being positive?

A. That since the P-30 test was positive, that means that there was semen found on those oral swabs.

Q. Now, can you explain for us what are the components of semen?

A. Semen is basically broken down between seminal plasma and spermatozoa or sperm. The seminal plasma is what we are testing for specifically with the P-30 test because we are testing for the presence of a specific protein called the P-30 protein which is found in seminal fluid.

Q. And now can you tell us which part of semen

contains the male DNA?
A. In the sperm. In the spermatozoa themselves.
Q. So is it possible then to have sperm -- to have semen present without having sperm present?
A. Yes.
Q. Can you explain how that is possible?
A. There are men who are azospermatic, meaning, they do not have spermatozoa. If you had had a vasectomy, you can have levels of P-30 protein and not see sperm. And also if there are a -- oftentimes what we'll see in the laboratory is the P-30 test might be positive, but there are no sperm seen, which just is a level of degradation.
The P-30 test is highly sensitive and will detect levels of semen, wherein those cases you might not see full intact or any sort of sperm because they tend to break down over time.
Q. Now, you used the term degradation. Can you explain what that means?
A. Sure. When sperm or semen is in any kind of cavity, it's going to degrade over time. So that sperm head is a pretty strong cell. It has disulfate bonds that keep it pretty much intact. But when it's attacked over time by various enzymes or bodily fluids, it tends to break down.
Q. Now, oral swabs would be taken from the mouth; is that correct?

A. Yes.

Q. And is there anything about the mouth in particular that affects degradation of sperm?

A. It's not so much the degradation of sperm, it's the constant flushing of that cavity, which, if you had had semen in the mouth, you would be constantly flushing that cavity out. So, the likelihood of getting a positive P-30 test would be decreased just by the nature of the cavity, itself.

Q. And would the nature of the cavity, being the mouth, itself, also affect whether or not sperm were present in the semen?

A. Yes.

Q. How would it affect that?

A. Again, it's in the cavity that is not friendly to sperm, so it would be breaking down that sperm. And combined with the constant flushing in that cavity, there is only a really, you know, it's only a real short period of time that you would expect to get a positive result on a P-30 test. And even in sperm heads, there is even a less likely shot and a much more compromised time period where you would expect to see sperm.

Q. So now after you did the P-30 test on these oral swabs, was any further testing done on the oral swabs at that point?

A. Yes.

Q. Tell us what was done.

A. There was a DNA extraction performed, which is called a differential extraction in which, since we saw the presence of semen, we attempt to isolate the male DNA that is there from the female DNA that is there. So, it's a specialized extraction procedure.

Q. And can you tell us what the results of that procedure was?

A. The result of that procedure was that we only were able to detect DNA that was consistent with the victim. There was no male DNA detected during that step of the procedure.

Q. Can you explain for us how that result could be reached?

A. There were no sperm seen. When I said before how we look at the slide as the first step from the sexual assault kit, there was no sperm seen at that step. Again, when we do the differential extraction, we do two more sets of slides from the material from that DNA extraction. At both of those steps, again, there was no sperm seen, or sperm head seen, whether it be intact or not intact or partially intact. There was no sperm seen whatsoever. So, that would explain or be part of a reason why to explain why there was no male DNA detected.

Q. So was there any further examination done on those?

A. No.

Q. Now, did that kit also contain dried secretion swabs from the breast of Shamika Dottin?

A. Yes.

Q. And can you explain for us what dried secretion swabs are?

A. Dried secretion swabs are basically like a larger Q-tip that are swabs of a person's body. So various areas of the person's body could be swabbed which is what we term dried secretion swabs.

Q. And what was the condition of the dried secretion swabs when they were received in that kit?

A. They were within the kit in a sealed package.

Q. And were they analyzed?

A. Yes.

Q. And can you explain for us what they were tested for first?

A. First they were tested like the oral swabs. They were tested for the presence of semen. There were four swabs that were within that packaging. They all tested semen negative.

At that point we then do an amylase test, which amylase indicates the possible presence of saliva. It is not a confirmatory test for the presence of saliva, but it is a highly indicative test that is very indicative of a possible

presence of saliva. So that amylase test was then performed on those four dried secretion swabs.

Q. Can you tell us what was the result of the amylase test on those dried secretion swabs?

A. All four dried secretion swabs came back amylase positive.

Q. Can you explain for us what is the significance of testing positive for amylase?

A. When a sample tests positive for amylase, there is an indication that there was possible presence of saliva present.

Q. So can you tell us then once those swabs tested positive, what was done with them next?

A. Two of those swabs were selected. Since all four swabs were from the same area on the body as indicated on the sexual assault kit, two of those swabs were selected for DNA testing and DNA extraction.

Q. And was DNA analysis performed on those swabs?

A. Yes.

Q. And was there DNA found on those dried secretion swabs?

A. Yes.

Q. And was a DNA profile generated for the material that was found on those swabs?

A. Yes.

Q. Now, can you explain for us what was found?

A. There was a mixture of DNA found on those swabs. There was a male DNA profile that was found to be the dominant or what we call the major component to that DNA mixture.

Q. Now, can you explain for us what is the significance of finding a mixture on swabs like that?

A. If it's a dried secretion swab in particular, you are swabbing a person's body, so it's not uncommon to get a mixture of DNA. In one of the dried secretion swabs there was a very, very low level presence of a mixture. So you basically had a male profile with a slight indication that there may be a mixture present.

The other dried secretion swabs came back where there were two DNA alleles. When I said before we test various locations, there were two locations where there were two alleles that were consistent with the victim's profile, but were different from the male major component of that dried secretion swab.

Q. Now, what is the maximum number of alleles that one person can have at a particular location?

A. Two. When I said before you inherit half of your DNA from your mother and half from your father, you are going to have a maximum of two DNA alleles at any one location, barring some type of trisomy or some type of genetic

abnormality. But you have the maximum number of two DNA alleles at any one location. Sometimes you may have the presence of only one DNA allele. If you inherited the same DNA allele from your mother and from your father, you will only have one DNA allele at that location.

But when we see the presence of three or more alleles at one location, that has a definite indication that there is a mixture of DNA present.

Q. And that would be a mixture from at least two people?

A. Yes. If you saw a maximum of three DNA alleles at one location, that would be a minimum of two contributors.

Q. And how are the alleles identified, by numbers?

A. Yes.

Q. And are there any significance attached to the numbers that identify the alleles?

A. No, it's basically what we look at are STR results, which are short tandem repeat results. It's basically the number of different repeats that you have at the various location.

Q. So now when testing was done on these dried secretion swabs, you said there was a mixture of DNA found, correct?

A. Yes.

Q. And was there both a minor contributor and a major

contributor to the mixture?

A. We were able to determine a major contributor to the mixture. The minor contributor we weren't able to deduce out because it was such a small contribution to that sample.

Q. And can you tell us was the source of the major contributor to the mixture male or female?

A. Male.

Q. And were you able to deduce out of that mixture a male DNA profile for the individual who had left his DNA behind on Shamika Dottin's breast?

A. Yes.

Q. And were you able to deduce any DNA profile for the minor contributor?

A. No.

Q. Were you able to reach any conclusions about the minor contributor?

A. From one of the dried secretion swabs. Dried secretion swab one --

THE WITNESS: Your Honor, may I?

THE COURT: Yes.

A. For dried secretion swab 1A-1 we were able to determine the victim could not be excluded from that major, which is basically the weakest statement that we make. It's saying that the victim cannot be excluded. She can't be included because there is such a small presence of that minor

contributor there.

Q. Do you reach that conclusion by looking at the DNA profile that you generated for Shamika Dottin that was the known sample for her?

A. Yes.

Q. Now, would you expect to find some of the victim's DNA in that mixture when it comes from dried secretion swabs that are taken from her breasts?

A. It wouldn't be uncommon.

Q. Why not?

A. Because you are swabbing that person's skin directly, so it wouldn't be something that would jump out at you as some kind of abnormality to see a DNA profile from that person that you are swabbing or a minor contributor, especially.

Q. Now, the male DNA profile that you were able to deduce out from the mixture from this dried secretion swabs of her breasts, did you perform any statistical analysis on that?

A. Yes.

Q. And can you explain for us what that means to do a statistical analysis?

A. We basically have population databases that we are able to use to generate the likelihood of finding that DNA profile so that that DNA profile that we were able to deduce

from that major contributor from dried secretion swab 1A-1 was likely to be found in greater than one in one trillion individuals.

Q. So within a reasonable degree of scientific certainty, were you able to calculate the statistical frequency of that evidence in the world's population? In other words, to determine how rare or how common that particular male DNA profile would be?

A. Yes.

Q. And can you explain what that result was?

A. Well, basically the earth has approximately six billion people on it. So you would expect to have to look over more than one hundred sixty earths in order to find that DNA profile again.

Q. Now, from the testing that you did with respect to the dried secretion swabs, as well as the known DNA profile that you generated for Shamika Dottin, was that DNA analysis memorialized in your report?

A. Yes.

Q. And did you memorialize that DNA analysis in a particular chart?

A. Yes.

Q. And is that chart a part of your report?

A. Yes.

Q. And is it made in the regular course of business?

A. Yes.
Q. And is it in the regular course of business to make that chart as part of your report?
A. Yes.
Q. And was it made at or about the time that the testing was done?
A. Yes.
Q. And would that chart aid you in testifying and explaining your analysis to the jury?
A. Yes.
MS. TEBBETT: Judge, at this time I would ask to have this chart marked People's 60.
(Whereupon, People's Exhibit 60 was marked for identification, only.)
COURT OFFICER: People's 60 marked for ID.
MS. TEBBETT: Can I have it shown to Ms. Hayn, please?
(Handed to witness.)
Q. Do you recognize that, Ms. Hayn?
A. Yes.
Q. Is that a large version of the chart that was part of your report?
A. Yes.
MS. TEBBETT: Your Honor, I would offer that into evidence at this time.

MR. LEMKE: May I have a brief voir dire, please?

THE COURT: Yes.

Do you need the chart, Mr. Lemke.

MR. LEMKE: No, I believe I have a copy of that.

VOIR DIRE EXAMINATION

BY MR. LEMKE:

Q. Good afternoon, Ms. Hayn.

A. Good afternoon.

Q. Regarding the item that you are now looking at, my understanding is that is a blow-up that has been prepared by the district attorney's office; is that correct?

A. Yes.

Q. And that is reflective of some numbers and part of a report, one of the pages, in fact, of the report that you had prepared regarding FG05-0066; is that correct?

A. Yes.

Q. And part of this report that you prepared yourself; is that correct?

A. Excuse me?

Q. You prepared it yourself?

A. Yes.

Q. And this chart with the numbers you had typed up at some point; is that correct?

A. This chart in particular?
Q. Yes.
A. No, I did not prepare this, this actual chart, but the actual report, the chart and the report, yes.
Q. Obviously that was by the DA, the assistant district attorney, correct?
A. Yes.
Q. And in your report, however, 2005, again, that's reflective of the testing that you had done, correct?
A. Yes.
Q. Some of the results that you had apparently found, correct?
A. Yes.
MR. LEMKE: I have no objection at this time, subject to cross-examination, your Honor.
THE COURT: So it will be marked 60 in evidence.
(Whereupon, People's Exhibit 60 for identification was received and moved into evidence.)
COURT OFFICER: People's 60 received in evidence.
DIRECT EXAMINATION (Cont'd)
BY MS. TEBBETT:
Q. Ms. Hayn, other than that chart being enlarged, is it the same exact page from your report?

A. Yes.

Q. Was it altered in any way other than being made bigger from what you had in your report?

A. No.

Q. And can you see on that chart the results of the testing that you did from the items that were contained in the rape kit from Shamika Dottin?

A. Yes.

MS. TEBBETT: Judge, would she been able to turn it around?

THE COURT: Yes, you want her to move it in front of the jury?

MS. TEBBETT: Sure.

THE COURT: Ms. Hayn, if you can just step down.

MR. LEMKE: Your Honor, the problem is I won't be able to see it, nor will my client.

THE COURT: Can you see it now, Mr. Lemke, because I can't?

Okay, Mr. Lemke?

MR. LEMKE: That's fine for me.

THE COURT: Your client can see that.

Members of the jury, I know it's a little small, but.

MR. LEMKE: Your Honor, I have no objection if

you wanted to run off maybe 16 copies, this way the jury can also have, as an aid, a copy.

THE COURT: I don't know if I will get that done that quickly at this time. Go ahead.

BY MS. TEBBETT:

Q. Ms. Hayn, you can explain for us what's in the chart. Does that chart contain the DNA profile that you generated for Shamika Dottin?

A. Yes, that would be contained. This lists the items that were tested or that are on this particular chart. When I mentioned before we have locations that we test, these were the various different locations that we do DNA testing on. And these are the different forms of the person's DNA. The DNA alleles, as we call them, that were found when we did testing. Like I said before, it's basically like a string of numbers. This top line is the DNA profile that was generated from Shamika Dottin.

Q. And the locations, are they just identified by a series of combinations of numbers and letters across the top?

A. Yes.

Q. Do they signify anything?

A. They signify the various different chromosome locations for the ones that are followed by a D and then a number. That signifies the different chromosome locations of that particular segment of DNA that we are looking at. The

other ones that are signified by letters are just named that way.

The amelogenin location which stands here for AMEL, is the sex determination location that we look at. Your X is what you are seeing when it's strictly female profile and XY is what you are seeing when there is a male presence.

Q. And does that chart contain the DNA profile from the dried secretion swabs?

A. Yes.

Q. Let's start with the one that was identified as 1A-1. Just show us where that's listed on the chart.

A. Dried secretion swab 1A-1 from both breasts. This is the DNA profile that was generated. When I said before that when you have more than three or more alleles seen at one particular location, that indicates the presence of a mixture. If you can see at this one location here, FGA, there are three DNA alleles present. There would be other signs that there would be a mixture also, because what you are looking at is a DNA data and there are different effects and different peak heights or peak height imbalance that would indicate a mixture being present. But this is definitely indicative of a mixture of DNA being present. And in bold you can see the major component of that mixture.

Q. Now, Ms. Hayn it's a little hard for us to see what's in bold, so I'm going to hand you this marker and ask

you if you can circle at each of the locations where the DNA profile is for the major contributor.

A. (Indicating.)

Q. And that would be the male DNA profile that you extracted from the mixture?

A. Yes.

Q. Associated with the male whose DNA was left on Shamika Dottin's breasts?

A. Yes.

Q. Now, for the second swab, second dried secretion swab.

A. Dried secretion swab 1A-4.

Q. And is the result of the DNA analysis for that swab on that chart as well?

A. Yes.

Q. Could you point that out for us?

A. That swab is located here (indicating).

Q. And was there a male profile generated that's contained in that chart?

A. Yes.

Q. And is there any mixture in that profile for that second swab?

A. When I said before that in certain instances where you don't have three DNA alleles present, you still are able to see that there might be a possible mixture of DNA there

because of peak height and balances. What these numbers represent when you are looking at a DNA profile is basically peak heights. If you see one very, very large peak and one tiny peak, that is indicative of two different contributors. Because, like I said before, you have indications where you only inherit the same DNA allele from both your mother and father if you are going to only have one DNA allele at that location.

So, there are indications within this DNA profile, even though there aren't three or more alleles at one location, there is an indication that there was a DNA mixture as well in this profile. There are no minor alleles that we can attribute to that minor profile. Whereas, in this case, we can attribute both of these alleles to the minor contributor.

Q. Which would be Ms. Dottin's?

A. They are consistent with the DNA profile, yes.

Q. Go ahead.

A. But since there are not more than three alleles at one location within this DNA profile, we were still able to say that there is a possible presence of a DNA mixture in this profile. However, all of the DNA alleles that you are seeing here are attributable to that male contributor.

Q. The same male contributor as the profile above it?

A. Yes.

Q. So all of those alleles or numbers which are identified in that string, are the same as the numbers you circled in the line above it?

A. Yes.

Q. So are you able to say whether or not that's the same individual?

A. Yes.

Q. You can take your seat again.

Now, was that male profile put into your report and generated back in April, 2005?

A. I'm not sure in April, 2005. The report was generated in May of 2005.

Q. So, May of 2005?

A. Yes.

Q. And now, in the course of your employment at the DNA lab, are you familiar with what the DNA databank is?

A. Yes.

Q. And can you explain for us what that is?

A. DNA databank is basically a computer generated -- a computer system that we input DNA profiles in and make comparisons of known samples against unknown samples.

Q. Now, after you generated the male DNA profile that you just testified to in connection with the items that you tested, were you able to determine if there was a male DNA profile to be entered into that DNA database?

A. Yes.

Q. And can you explain for us what is the purpose or the significance of entering a DNA profile into the database?

A. You enter a DNA profile into the database in order to possibly generate a match. At different levels, profiles are searched monthly, profiles are searched bi-weekly at various levels of CODIS, which stands for the Combined DNA Indexing System.

Q. Was this male DNA profile entered into the databank in 2005?

A. Yes.

Q. And at that time were there any results when you entered that male DNA profile into the database in 2005?

A. No.

Q. And did the laboratory at that time have any other items of evidence to compare that male DNA profile to?

A. No.

Q. Now, did there come a time in September of 2007, now two years later, when the laboratory received evidence from the Nassau County Police Department from Detective Wimberly relating to a Ricardo Walters?

A. Yes.

Q. And can you tell us what evidence you received forwarded from Detective Wimberly relating to Ricardo Walters?

A. Yes. There were two items of evidence received. There was an empty plastic orange juice container and an empty pineapple juice can.
Q. And can you tell us when those items were received by the lab?
A. On September 12th of 2007.
Q. And was that documented in the lab paperwork?
A. Yes.
Q. And can you tell us how those items were received by the lab?
A. Those items were both received in a sealed condition.
Q. And was that documented in the lab paperwork as well?
A. Yes.
Q. And were those items opened and examined at the lab?
A. Yes.
Q. I'm going to show you People's 15 and 17. Can you just take a look at those items?
Are those the orange juice container and pineapple juice can that were received by the laboratory?
A. Yes.
Q. And if you look at the one that is marked 15, do you see any markings on there that you recognize from the

laboratory?

A. Yes. I see our case number FG07-S018, the item number and initials, date and time of intake into our laboratory and also the time the analyst received the evidence.

Q. Can you see on there the seal that was sealing that item when it was first received by the laboratory?

A. I really can't say. I would believe it would have been this red seal, because this seal is our seal (indicating).

Q. Which one is yours?

A. This yellow seal is our seal that we would put on because I recognize the analyst's initials and date. And that would be put on as we're preparing to return the evidence back over to FEB.

Q. Was that packaging sealed when it was received by the laboratory?

A. Yes.

Q. And was testing done on the item that was contained within that packaging?

A. Yes.

Q. And do you recognize the item that's inside of that envelope as the item that was tested by the laboratory?

A. Yes.

Q. How do you recognize it?

A. It has the case number and the analyst who examined it, the initials and date of the examination.

Q. And can you tell us what condition that item was put in when the testing was completed at the laboratory?

A. When the testing was completed, it was returned to the packaging, sealed and returned over to FEB and swabs that were taken of the item were retained in-house.

Q. So was that package sealed when it was returned to FEB after the laboratory was done testing it?

A. Yes.

Q. And can you see that seal on the package?

A. Yes. That seal is this yellow seal with the analyst's initials and date.

Q. And is that in the same or substantially the same condition as it was when it was done at that time?

A. Yes.

MS. TEBBETT: Your Honor, I offer that into evidence at this time.

MR. LEMKE: Can I just have a very brief voir dire, please?

THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. LEMKE:

Q. Ms. Hayn, you have, I think, documentation as to when you had received this, correct?

A. Yes.

Q. And what was the date that you had received this item?

A. September 12th of '07.

Q. And it was in an envelope by itself or was there something else in this envelope as well?

A. It would have been both of these envelopes and it was -- we received both items and it was in a Manila envelope fourteen and one quarter inches by eight inches, which I believe is approximately the size of that envelope.

Q. And there is two other envelopes inside this one; is that correct?

A. Two other envelopes inside that packaging right now?

Q. Yes.

A. If that is in there.

Q. Well, do you remember what was in here?

A. I was not the one who performed the examination. The examination was performed by an analyst in our laboratory Sidney Espana and she did not document whether or not there was any envelopes inside of that packaging.

Q. So you, yourself, didn't receive this, nor open it?

A. No.

Q. And that is a lab tech that is still working with the medical examiner?

A. She's not a lab tech, she's a Forensic Geneticist Level I, but she is currently with our laboratory, yes.

Q. You, yourself, hadn't received this, correct?

A. No.

Q. Nor did you open this?

A. No.

MR. LEMKE: I'm objecting, your Honor.

THE COURT: Come on up here.

(Whereupon, the following discussion was held at the bench:

THE COURT: What's the basis of your objection to People's 15?

MR. LEMKE: There is going to be a chain of custody. If she's receiving it, she didn't open it. She doesn't identify it. Then you can't introduce it into evidence.

MS. TEBBETT: Judge, she can identify it from what's documented in the lab paperwork. The case law says we don't have to call in every analyst along every step of the way that tested it. She's the analyst assigned to the case. She's the one who takes all that documentation. She's the one that reviews it and does the analysis and she can testify to it based on that.

THE COURT: Yeah, I don't see why she couldn't.

MR. LEMKE: I just made my objection, your Honor.

MS. TEBBETT: That's the state of the law.

THE COURT: Is there anything else?

MR. LEMKE: No.

THE COURT: So over objection it will be received in evidence.)

(Whereupon, the proceedings continued in open court.)

THE COURT: Over objection, 15 will be marked and received in evidence.

MS. TEBBETT: Judge, I think it was subject to connection before.

THE COURT: At this time 15, if it wasn't already received in evidence, is now received in evidence.

(Whereupon, People's Exhibit 15 subject to connection, was received and moved into evidence.)

THE COURT: Members of the jury, it looks like this is an appropriate time for us to take our break. We've kind of put in a long day. Just in terms of the next day, and if I look into my crystal ball, if you will, tomorrow I expect you to be sitting only in the morning. You will probably be out of here before the lunch hour. And I anticipate at this moment that on

Monday we're going to have summations, my charge to you on the law and you will get the case on Monday. That's the 17th, I believe.

So, again, tomorrow we will probably just be sitting in the morning and then hopefully we'll be done by the morning and be free in the afternoon and be back on Monday with summations and charge.

As I let you go for the evening, please don't talk among yourselves or anyone else about the case.

Don't form any opinions about the case at this time.

Please don't view or visit any of the areas described and don't read accounts in the media, should there be any.

Have a good night. Get home safe. See you tomorrow 10:00, same time.

(Whereupon, the jury exited the courtroom.)

(Whereupon, the trial was adjourned to November 14, 2008.)

* * *

STATE OF NEW YORK : NASSAU COUNTY

SUPREME COURT PART 49

-------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK TRIAL

- against - IND. 436N-08

RICARDO WALTERS

Defendant.

-------------------------------------------X

November 14, 2008
262 Old Country Road
Mineola, New York

B E F O R E :

HON. JAMES MCCORMACK
Acting Supreme Court Justice

A P P E A R A N C E S:

(Same as previously noted)

KATHLEEN PLAIA
KATHI FEDDEN
OFFICIAL COURT REPORTER

*** *** ***

S A N D R A H A Y N, Recalled as a witness, having been previously duly sworn, resumed the stand to continue sworn testimony as follows:

THE COURT: Okay, Tom.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates

enter the courtroom)

THE CLERK: Case on trial, The People of the State of New York against Ricardo Walters, Indictment 436N of 2008.

People, ready?

MS. SINGAS: Yes.

THE CLERK: Defense, ready?

THE COURT: Mr. Lemke, ready to proceed?

MR. LEMKE: Ready to proceed, your Honor. Thank you.

THE COURT: Good morning, members of the jury.

Ms. Hayn, you're reminded you're still under oath.

Ms. Tebbett.

MS. TEBBETT: Thank you.

DIRECT EXAMINATION (CONTINUED)

BY MS. TEBBETT:

Q Good morning, Ms. Hayn.

A Good morning.

Q When we left off yesterday we were talking about two items that were forwarded to the lab from Detective Wimberly relating to Ricardo Walters.

I ask these be handed to you again.

(Handed to the witness)

Q One is People's 15 in evidence, which is an orange juice container, the other is People's 17 in evidence, which is a pineapple juice can.
Now, when those two items were received by the laboratory, were they each in their own envelope?
A Yes.
Q The packaging in which appears in front of you now?
A Yes.
Q And was there only one item in each of those envelopes?
A Yes.
Q So, would it be fair to say that the one relating to the orange juice plastic container only contains the plastic orange juice container?
A Only that container was inside that envelope, yes.
Q And the other envelope which was marked as the pineapple juice can only contained the pineapple juice can inside of it, would that be correct?
A Yes.
Q Were each of those envelopes sealed when they were received by the laboratory?
A Yes.
Q And would it be fair to say that when the testing

process is begun on each of those items, obviously, the envelopes have to be opened --

A Yes.

Q -- to take the item from inside?

A Yes.

Q Is that fair to say?

A Yes.

Q And is this that documented, the condition of the envelopes, in the lab paperwork, how it's received by the lab?

A Yes.

Q And is the item, itself, documented as well in the paperwork?

A Yes. The item, when the envelope is open, the item is, in most cases, photographed, as well as documented, the condition of the item, as it is received.

Q And were each of those items sealed with evidence tape when they were received by the laboratory?

A Yes.

Q Would that have been done by the police department prior to it being received at the laboratory?

A Yes.

Q Okay. All right. So, let's talk now -- first, let's just talk briefly about the pineapple juice can.

Was testing done on that item?

A Yes.

Q And were any results reached from the testing that was done on the pineapple juice can?

A The pineapple juice can was swabbed. Basically, a large cotton tip swab was used, moistened with distilled water, sterile water, and the rim of the can where if someone would most likely drink out of it was scraped. DNA extraction was performed. Then we quantitate it, meaning, we try to find out how much DNA is there. There is insufficient amount of DNA present to continue testing on that item.

Q So, were you able to or was the laboratory able to generate any DNA profile relating to Ricardo Walters off of the pineapple juice can?

A No.

Q By the way, Ms. Hayn, I had asked you yesterday some questions regarding a separate case that you reviewed, where Anna Fernandez was the analyst, under FG05-0289. And you testified yesterday about some items that were rejected by the laboratory for testing relating to that case number.

Are you able to tell us what exactly those items were that were rejected?

A There were two swabs that Crime Scene, our Crime Scene Unit, Nassau County Police Department Crime Scene Unit, had collected from the scene.

Q And can you tell us generally the reasons why evidence is rejected by the laboratory?

A Evidence is screened, and if the probative nature of the -- the nature of the evidence is determined. If the evidence does not meet a certain criteria, if at that time it is not necessary, we will reject those items.

Q So, let me ask you this, if there was semen or what was thought to be semen on the ground, on concrete, that the crime scene detectives swabbed the area and submitted those swabs in an attempt to get DNA testing done on them, and that semen or what they thought was semen on the ground had been outdoors, outside for approximately twelve hours, would it be likely that there would be any DNA evidence that the lab would be able to obtain off of swabs such as those?

A Well, it would be potentially possible. The nature of the concrete is very porous substrate, very porous material. So, with the time elapse, between the time of incident to the time of collection, those items were rejected by our laboratory at that point in time. Testing could always be revisited at a later point. But we felt at that point, initially, we would reject those items.

Q Would it be likely that there would be any DNA testing that would be able to be done on those items based on those conditions?

A In my experience, no.

Q Tell us why not.

A Because of the very nature of that -- of that material that you're trying to swab, use a cotton swab to swab. There was some type of material that was there over a period of time, obviously, had dried during that period of time on dry concrete. It's very difficult to remove that material from a substrate such as concrete.

Q So, let me ask you now about the orange juice container that was tested by the laboratory relating to Ricardo Walters.

Can you tell us what type of testing, what is done on that orange juice container which you have in front of you there?

A Like the pineapple juice container, the orange juice container, the rim of it, was swabbed and DNA testing was done. DNA extraction, all the way through DNA typing was performed on that orange juice container.

Q As a result of the testing that was done on the orange juice container, did you generate a report under lab report FG7-S108?

A Yes.

Q Okay. And were the entries made in that report made in the regular course of business of the laboratory?

A Yes.

Q And was that particular report made and kept in the regular course of business of the laboratory?
A Yes.
Q And was the report made at or about the time that the testing was done on that particular item?
A Yes.
Q Okay. Now, can you tell us, as a result of the DNA testing that was done on the orange juice container from Ricardo Walters, were you able to generate a male DNA profile for him?
A Yes.
Q Okay. Can you explain for us what was done with the profile that was generated for Ricardo Walters from the orange juice container?
A That DNA profile was considered to be a known DNA profile. It was entered into our database. It was searched routinely through other forensic unknown profiles that were in our database at that point in time.
Q When you refer to it as a known DNA profile, that would be a known DNA profile for Ricardo Walters, correct?
A From the orange juice container, yes.
Q Now, can you explain for us the searching that you just referred to in the database, explain for us how that works?
A It's basically a level of CODIS, Combined DNA

Indexing System. There are various levels. There's a local DNA indexing system, there's a state DNA indexing system, a national DNA indexing system. All levels of DNA database. That profile was put into our local database at that point in time and searched.

Q Can you it tell us, are there numerous profiles that are in the local CODIS databank?

A Yes, there are forensic unknown profiles and known profiles in that databank.

Q What are forensic unknown profiles?

A Forensic unknown profiles are typically crime scene evidence and various other materials that would be found in a crime scene.

Q And with that -- an example of that would be the unknown male profile that was entered into the database from the dried secretion swabs from Shamika Dottin that you had testified about earlier?

A Yes.

Q The testing that was done on those?

A Yes.

Q Can you explain for us what the known profiles are that are in that CODIS, the local CODIS bank?

A A known profile is a profile either from a buccal swab from somebody, or from an actual templar container that that person had drank out of or had used at some point in

time.

Q Such as the profile from this particular orange juice container?

A Yes.

Q Okay. And can you explain for us, just generally, what happens with the profiles that are in the local CODIS databank, whether they be the known samples that you just mentioned from a buccal swab or a particular piece of evidence, or those unknown samples that come from case evidence or crime scene evidence that is submitted?

A An auto search is biweekly of all of those profiles. In addition, each analyst, when they enter a new profile into that system, they are to search that profile prior to entering it against all the other profiles in our local database in order to possibly generate a match, if there happens to be a matching profile.

Q And is that the purpose of doing those searches?

A Yes.

Q Now, once a profile, be it either a known or unknown, is enter into that local CODIS databank, is the profile ever altered at all while any of these routine searches are going?

A Oh, no, unless -- unless there is new testing that is performed on a particular piece of evidence or item and there is more information gained from that testing,

there might be a profile modification or we might add locations to that profile. But, generally speaking, the profiles are not -- are not altered, other than unless there is some other DNA testing performed.

Q So, the unknown male profile that was generated from the dried secretion swabs form Shamika Dottin's breasts, that was entered into the local CODIS databank back in 2005?

A Yes. That was entered into our local DNA database, also uploaded into this state DNA database, and also the national DNA databank.

Q Was that profile contained within the CODIS databank from 2005 up until 2007?

A Yes.

Q And was it searched amongst the other profiles in the routine searches that you just explained for us?

A Yes.

Q And was it altered in any way during that time period, from 2005 until 2007?

A No.

Q So now, when you were able to obtain a DNA profile for Ricardo Walters from the orange juice container, was that entered into the CODIS databank?

A Yes.

Q And can you explain for us what happened when you

entered that profile for Ricardo Walters from the orange juice container into the databank?

A There is a match generated.

Q And can you tell us about that.

A That DNA profile was found to match the DNA profile, the forensic unknown profile, that was entered from that amalayse swab taken from the breasts.

Q What does it mean when you have a match?

A When we have a match it means that the genetic profiles are identical to each other.

Q Can you explain for us the process that is involved in determining that there is a match?

A Basically, when you perform a search in CODIS, and in this case it was the local DNA indexing system, you receive a match message, the profiles are printed out, all of the data from both cases are reviewed in order to confirm that that is indeed a match.

Q And so then, were you able to compare the DNA profile from Ricardo Walters from the orange juice container to the male DNA profile that you extracted from the amalayse from the dried secretion swabs from Shamika Dottin's breasts?

A Yes.

Q And what did you find when you compared those two DNA profiles?

A The DNA profile from that major male donor is consistent with the DNA profile that was determined from the orange juice container.
Q And what does it mean to be consistent with?
A It means that they are identical.
Q And did they match on every single location of those thirteen loci locations you explained for us yesterday?
A At this point in time, I believe the orange juice container we yielded twelve locations. There is one location that we did not receive information on at that point in time. However, the other locations that all were present, all matched.
Q And can you tell us then what action the laboratory took at this point in time when you determined that you had a match?
A At that point in time, after the match confirmation process is performed, a notification will be made.
Q And who would that notification be made to?
A To the case detective and the district attorney's office.
Q And was the case detective for this particular case Detective Moran of the Special Victims' Squad?
A Yes.

Q And was he notified by the laboratory?
A Yes.
Q And can you tell us when he was notified?
THE WITNESS: Your Honor, may I?
THE COURT: Yes.
A The match letter was dated October 26th of 2007. And the fax of that was made the same day, October 26th of 2007.
Q And at the time that you made that notification, did the laboratory recommend that any further action be taken by the police department or the district attorney's office?
A Yes. Whenever we have a sample that is from a cup or a bottle or container, we always recommend getting a confirmation sample, a buccal swab sample.
Q Can you explain why you make that recommendation?
A Basically, when we issue a report for the orange juice container, it would be worded the orange juice container from whoever had drank it. When we have a known sample, that are buccal swabs that are taken, we can make a direct correlation between that individual and that sample because it is a known controlled sample taken directly from the inside of that person's cheek.
Q So, in a sense, would that be considered a confirmatory match?

A Yes, yes. We call that a confirmation sample.

Q Okay. Now, when you made the comparison between the DNA profile that was generated from Ricardo Walters from the orange juice container to the male DNA profile on the amalayse found on Ms. Dottin's breasts, did you memorialize that comparison in your report in a chart?

A Yes.

Q And is that chart a part of the report that was made for this case?

A Yes.

Q And was that chart made in the regular course of business?

A Yes.

Q And was it in the regular course of business of the laboratory to make that chart in connection with that report?

A Yes.

Q And was it made at or about the time of the testing?

A Yes.

Q Okay. Would that chart aid you in testifying and explaining your results of that comparison to the jury today?

A Yes.

MS. TEBBETT: Your Honor, I ask that this be

marked People's 61 and I would offer it into evidence.

THE COURT: Mr. Lemke, do you want to take a look at it?

MR. LEMKE: I have seen it, your Honor. No objection based on the case law, your Honor.

THE COURT: People's 61 will be received in evidence.

(Whereupon, the referred to item is received and marked People's Exhibit 61 in evidence)

THE COURT OFFICER: People's 61 marked and received in evidence.

MS. TEBBETT: If you could show that to the witness, please.

(Handed to the witness)

Q Ms. Hayn, is that an enlarged version of the page of your report?

A Yes. Page 3 of the report.

Q Other than it being bigger, is it the exact same information that is contained on the page in your report?

A Yes.

Q Okay. So, Ms. Hayn, I'm going to ask you then, using that chart, to explain for us the comparison that was made between the DNA profile for Ricardo Walters generated from the orange juice container, to the male DNA profile from the amalayse on Ms. Dottin's breasts.

MS. TEBBETT: Judge, could we have her come in the same position she was yesterday?

THE COURT: Yes. Put that right in front of me.

Ms. Hayn, you can step over there.

(Whereupon, the witness leaves the witness stand and stands in front of the Judge's bench)

Q Ms. Hayn, I know, even though it's bigger, the print is a little small for some of us to see from back here. Can you explain for us what is contained in that chart?

A Sure. This profile that is here is the profile that was generated from that orange juice container. It's a single source male DNA profile.

This was the pineapple container that was insufficient for DNA. That's why the INS is there.

And this is the DNA profile from the breasts. And in bold, again, you can see the deduced male profile.

And this was the other swab that was taken, which is the -- also the same deduced male DNA donor from that breast swab.

And when you look at the DNA profile from the orange juice container, at every location you have a 16, 16, 16, 19, 16, 19, all the way down across the chart.

The DNA from that male donor from the breast

swabs is identical to the DNA profile from that orange juice container.

Q Ms. Hayn, again, I'm going to hand you this marker. It's hard to see what is in bold. If you can circle for us what is in bold which constitutes the male DNA profile from the dried secretion swabs from the breasts.

(Witness complies)

Q And are you able to see then on that chart, that each of those numbers that you just circled match up to the numbers from the first line of numbers which relate to the orange juice container from Ricardo Walters?

A Yes.

Q And do they match at the first twelve of the thirteen locations?

A Yes. All twelve of the first of the thirteen locations. CFS, this location right here, we have an allele drop out, which means the alleles drop below the threshold.

When I talked yesterday about peak heights and alleles, occasionally, if you have a sample, you might not get all thirteen locations. And in this case we didn't, we got twelve out of those thirteen locations.

Q So, does that mean then that at the thirteen locations, there just wasn't enough there to register a result at that particular location?

A Yes.

Q Okay. Thank you. You can take your seat.

(Whereupon, the witness resumes her seat on the witness stand)

Q Okay, Ms. Hayn, so then, after you made that notification to the police department, to Detective Moran, at the end of October of 2007, with the recommendation that a buccal swab sample be obtained from Ricardo Walters, did there come a time in March of 2008 when the laboratory received buccal swab samples forward from the Nassau County Police Department from Ricardo Walters?

A Yes.

Q And can you just explain for us again what buccal swabs are?

A Buccal swabs are basically a large cotton swab that the interior of the mouth is swabbed. The epithelial and buccal cells from the interior of the mouth are scraped off on to that swab.

Q And can you tell us when the laboratory received the buccal swabs from Ricardo Walters?

A Sure.

THE WITNESS: Your Honor?

THE COURT: Yes.

A Buccal swab kit was received on March 12th of 2008.

Q And can you tell us how the laboratory received

those buccal swabs?
A They were in a sealed container, sealed envelope.
Q Is that documented in the lab paperwork?
A Yes.
Q And had they been forwarded by the Nassau County Police Department?
A Yes.
Q And were they sealed when the lab first received them?
A Yes.
Q And then can you explain for us, was testing done on those buccal swabs?
A Yes.
Q And in order to do that testing, did they have to break the seal on that envelope?
A Yes.
Q Can you explain for us what was contained inside of the envelope when it was opened at the laboratory to begin the testing?
A Inside of the envelope contained buccal swabs.
Q And was that documented in the lab paperwork, as well?
A Yes.
Q And were they identified in any way as to who they came from and where they came from?

A There was a buccal swab card that is contained within the buccal swab kit; which buccal swab card collection kit indicated the subject's name, Ricardo Walters, which was written on the buccal swab card which is contained within the buccal swab kit.

Q Okay. Now, was DNA testing done on those buccal swabs from Ricardo Walters?

A Yes.

Q And can you explain for us how that testing was done?

A One of the swabs is cut. DNA extraction is performed. We get our first round of DNA testing based on that one cutting.

In this case, since there -- there was a match generated, a duplicate cutting is also taken, and taken through the same process and extracted. So there were two cuts taken from those buccal swabs, and a full DNA typing was performed on both of those cuttings.

Q Can you explain for us what was the purpose of taking that second one?

A As a check, as a confirmation, we have a stringent duplication policy in our laboratory.

Q Was a second report generated then under the same lab number of FG7-S108 containing the results of the DNA testing on the buccal swabs?

A Yes.
Q Was that report made in the regular course of business of the laboratory?
A Yes.
Q And was it in the regular course of the business of the laboratory to make that report?
A Yes.
Q And was the report made at or about the time that the testing was done?
A Yes.
Q Okay. Now, as a result of the DNA tests that were done now on the buccal swabs, were you able to generate a known DNA profile for Ricardo Walters?
A Yes.
Q And what was done with that profile?
A That DNA profile was -- at that point in time we already have the DNA profile from the orange juice container which is in our DNA databank. However, when we did testing of the buccal swabs, we receive the additional location, that thirteen location. So, the profile was modified to add that additional information to the profile.
But that profile was then prepared in a report and compared to the profiles generated prior from the amalayse swab of the breasts, and also the other orange juice container, just to maintain, see if there was

consistency between all profiles.

Q Did you, in fact, compare the DNA profile from the buccal swabs from Ricardo Walters to the DNA profile from the orange juice container from him?

A Yes.

Q And what did you find when you compared those two profiles?

A They were the same.

Q Okay. And did you then compare the DNA profile of Ricardo Walters from the buccal swabs to the male DNA profile from the amalayse left on Shamika Dottin's breasts?

A Yes.

Q What did you find when you compared those two profiles?

A They were identical.

Q Okay. And did they match at each of the locations?

A Yes.

Q Now, to a reasonable degree of scientific certainty, are you able to state whether this particular DNA profile that was found from the swabs taken from Ricardo Walters' mouth on those buccal swabs, matched the DNA -- the male DNA profile taken from Shamika Dottin's breasts?

A Yes.

Q And are you able to state to a reasonable degree

of scientific certainty whether the male DNA profile that was found on the swabs taken from Shamika Dottin's breasts could come from anyone other than Ricardo Walters?

A No. Yes, based on the statistical analysis of the dried secretion swabs, DNA profile.

Q Could it have come from anyone other than him?

A No.

Q And now, when you made the comparisons between the buccal swabs from Ricardo Walters and the DNA profile from the orange juice container from him and the male DNA profile from the amalayse on Shamika Dottin's breasts, did you record all of those comparisons in a chart in that report?

A Yes.

Q And was the chart made in the regular course of business?

A Yes.

Q And was it the regular course of business to make such a chart containing those comparisons?

A Yes.

Q And was that chart containing the comparisons made at or about the time the testing was done?

A Yes.

Q Would that chart aid you in testifying here today and explaining all of those comparisons to the jury?

A Yes.

MS. TEBBETT: Your Honor, at this time I ask this be marked as People's now 62 and offer it into evidence.

MR. LEMKE: No objection, your Honor.

THE COURT: Okay. Without objection, People's 62 will be received in evidence.

(Whereupon, People's Exhibit 62 is received and marked into evidence)

THE COURT OFFICER: People's 62 marked and received in evidence.

MS. TEBBETT: Could you show that to the witness, please.

(Handed to the witness)

Q Now, Ms. Hayn, is that chart an enlarged version of a page contained in your report?

A Yes.

Q And other than it being larger, does it contain the exact same information as the page in your report?

A It is. It's the exact same page, yes.

MS. TEBBETT: Judge, I ask to bring that down to the front so she can point some things out.

THE COURT: Yes.

(Whereupon, the witness leaves the witness stand and stand in front of the Judge's Bench)

Q Ms. Hayn, can you point out for us what is contained in that chart?

A This is the DNA profile that was generated from those buccal swabs from Ricardo Walters. This is the full single source male DNA profile across all thirteen locations, plus the sex determination location.

And then you have the dried secretion swab samples here, with the major male profile, again, in bold.

And we also included the DNA profile from Shamika Dottin here.

Q Now, using that chart, can you show us a comparison between the DNA profile generated from Ricardo Walters from the buccal swabs, and the male DNA profile from the swabs from the breasts of Shamika Dottin?

A Across all thirteen locations they are identical. Each location, the major male profile deduced from that mixture on swab 1A-1 and the major profile on swab 1A-4 are the same across all thirteen locations, or nine locations for 1A-4.

So, they are identical across all locations that testing was performed.

Q And what is the significance of those numbers being identical at all of those thirteen locations?

A That those DNA profiles match each other. And across all thirteen locations taken, with a statistical

weight of that evidence profile, that they are from the same donor.

Q And, again, can you take that marker and circle for us the numbers that are in bold from the DNA profile of the dried secretion swabs so we can see it better.

(Witness complies)

Q And do those numbers that you circled match at each of the locations for the first line of numbers, which is the known profile for Ricardo Walters?

A Yes.

Q Okay. Thank you. You can take a seat.

(Whereupon, the witness resumes her seat on the witness stand)

Q Now, Ms. Hayn, let me just ask you, within the laboratory are there protocols in place to prevent cross-contamination of samples, be they suspect samples, known samples or case work samples?

A Yes. Our quality control program is extensive. We run reagent blanks with every step along the way in our process. And we have strict controls also tied into every lab procedure that is performed in our laboratory.

Q What is the purpose of those strict controls?

A To prevent any type of possible contamination or sample mix up. To catch any events like that that might happen along, and stop it right along that first step in the

procedure.

Q Now, you mentioned yesterday that the dried secretion samples which contain that male DNA profile were retained in the laboratory after the testing was done in 2005?

A Yes.

Q Were they brought out at all or re-examined at all during either the testing that was done from the orange juice container or the testing that was done in the buccal swabs from Ricardo Walters two or three years later?

A No, no.

Q And would that be done under any circumstances in the laboratory?

A No. Unless there was a need to re-test a sample, that is the only time a sample would be taken out of our retained storage.

Q Was that done at all in this case?

A No.

Q And can you tell us, Ms. Hayn, if there had been some sort of cross-contamination between the defendant's buccal swabs, for example, and the swabs that came from the victim in this case, Ms. Dottin, what would you expect to find when you got the results of the testing?

A It would be obvious from the preliminary rounds of testing that there was some type of issue or some type of

sample mix up.

Q How would that be obvious to you or one of the analysts in the laboratory?

A Along -- like I said before, along every step of the way we have reagent blanks. You would see something in that blank. We duplicate all our results.

So that the dried secretion swabs, when they were orally tested, they run in two different systems, with overlapping locations.

If you see the first test that is run against the second test that is run, if you don't see those overlapping locations matching each other, then that is a strong indication there is some type of issue that needs to be investigated. We also have corrective action protocols in place, if there is even any type of mix up to correct that, action through remediation.

Q And did you see anything here that would indicate to you that there was any issue such as the ones you just described?

A No.

Q What does that signify to you?

A That signifies that quality control was fine with this testing, there was no sample mix ups at all.

MS. TEBBETT: Can I just have one moment, Judge.

THE COURT: Yes.

(Pause in the proceedings)

MS. TEBBETT: Thank you, your Honor. I have nothing further.

THE COURT: Okay, Mr. Lemke.

MR. LEMKE: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. LEMKE:

Q Good morning, is it Ms. Hayn?

A Good morning. Yes.

Q Ms. Hayn, do you know Doctor Kobilinski?

A Yes.

Q Who is Doctor Kobilinski?

A He was actually one of the professors when I went to graduate school. He's a profession at John Jay College. I'm not sure if he still is a professor there.

Q Did you ever have any dealings was Doctor Kobilinski in the field of genetics?

A Not directly.

Q And it's your testimony that in 2005 that you were employed with the Nassau County Medical Examiner's Office?

A Yes.

Q And the position that you have in 2005, was that, I think, Director, as well?

A No. Forensic Geneticist II, Level II.
Q Level II, though?
A Yes.
Q Obviously, there are numbers associated with the qualifications someone has, whether it's a I or II, is that correct?
A Yes.
Q And back in 2005, you were asked at some point to analyze a number of items, correct?
A Yes.
Q And you were asked, in particular, a number of items not only related to this case but others, as well, correct?
A Correct.
Q In regards to this case, in particular, your testimony here regarding a sample of items that you had received, that you have associated them with a name Shamika Dottin, correct?
A Yes.
Q And in 2005 you received what is known as a rape kit, correct?
A Correct.
Q And you testified in part yesterday regarding what was received in that particular rape kit, correct?
A Yes.

Q And do you recall what was received in that rape kit when you had received it?

If you need to refresh to any reports, that's fine, as well.

A Sure.

(Pause in the proceedings)

A There were dried secretion swabs from both breasts, fingernail scrapings, oral swabs and smears, a buccal specimen, pulled head hair, and pulled pubic hair were all contained within that sexual assault kit.

Q In particular, there were four dried secretions from both breasts, correct?

A Yes.

Q And would that be in Q-tip form?

A Yes, elongated Q-tip.

Q The same that would perhaps be used for a buccal swab?

A Yes, yes. Generally.

Q So, in 2005 -- withdrawn.

By the way, the charts that you now testified to that are in evidence, I take it you never met Ms. Shamika Dottin, correct?

A Correct.

Q You don't know who Ricardo Walters is, correct?

A Correct.

Q So, when you see the names on these charts that are in evidence, their names that were provided to you by the Nassau County Police Department, correct?

A Correct. On the paperwork that is submitted with the evidence.

Q So, if the paperwork, and in fact the results that you have looked at, regardless of whether it was a Mrs. Jones, and you compared it to a Joe smith, that wouldn't change your examination of the DNA profile, correct?

A Absolutely not.

Q So, the fact that the names are there is only because they were provided to you by the police department in this case, correct?

A Correct.

Q And your position -- withdrawn.

The lab that you're with, you referred to it as "our" crime lab. You're independent, aren't you, from the Nassau County District Attorney's Office?

A Yes.

Q In 2003 you received, I believe, certification, correct?

A Accreditation, yes.

Q Accreditation.

A Correct.

Q And in 2005, when you received this rape kit, given a particular number, as well, did you test fingernail scrapings?
A No.
Q And, in fact, would they still then be in the rape kit now?
A Yes.
Q Okay, which is here in evidence now?
A Correct.
Q Okay. If you could take a look at that, please, I believe it's marked as People's 56.
(Handed to the witness)
A Fingernail scrapings.
Q If you could -- did you need gloves?
A No, everything is sealed.
Q Within that rape kit, again, those are the fingernail scrapings, correct?
A Correct.
Q They were not tested?
A No.
Q There is oral swabs and smears, correct?
A Correct.
Q They were not tested?
A They were tested.
Q And they were negative?

A No, they were semen positive.
Q Sorry?
A The oral swabs were found to be positive for semen.
Q Not enough to get any DNA, correct?
A There was no male DNA profile generated, yes.
Q Did you get a profile?
A We got a profile consistent with the victim only in that case on those oral swabs.
Q So, based on your qualifications as an expert and in your evaluation of trying to extract a DNA profile for the male in 2005, you're unable to do so regarding the oral swabs?
A Regarding the oral swabs, yes.
Q There is also now a buccal specimen, correct?
A Correct.
Q That is of whom?
A Of Shamika Dottin.
Q And that would be different from the oral swab?
A Yes.
Q In what way?
A The buccal specimen is a comb-type item.
Q I'm sorry?
A It's generally a comb-type item. I'm not sure exactly what this buccal swab looked like. I can't recall

that. But it's a different type of swab. It's not a swab, per se. Typically, in the rape kits today, there is like a comb-type item to scrape the cheek cells off.

Q Is that present in that rape kit?

A That is retained in our laboratory.

Q And do you know what that was that you tested?

A It was a buccal specimen.

Q My point is, of what?

A Of the cheek swab inside the mouth, yes.

Q What is the difference between a victim that has a rape kit in which a buccal swab is taken from inside of the mouth, where she said that there was ejaculation and, perhaps, in her mouth, and then you have an oral swab? You follow my question?

A No.

Q You have an oral swab, what was the oral swab?

A Inside of her mouth.

Q And the buccal swab is also from inside of her mouth?

A Yes.

Q At the same time?

A At the same time. I wasn't the nurse who took the kit. I believe, probably at the same time, yes.

Q So, why would you have oral swab and smears defined, and, yet, you have a buccal specimen, when it

basically is the same thing, isn't it?
A The buccal specimen is used as a control sample. And the oral swab and smears are used to generate the slide that is then looked at for sperm.
Q But it's for the same surface, correct?
A Yes.
Q And yet, it's your testimony as an expert in this field that in evaluating the oral swabs, you determined some type of male presence, correct, the DNA profile which was insufficient?
A No, no male process was detected on those swabs. They were semen positive only.
Q Semen positive?
A Yes.
Q And again, as a result of that, you're unable to, based on your testimony, to determine a male profile, correct?
A Correct.
Q In part because you needed sperm to do so?
A Yes.
Q Okay. I know I'm talking in the simplest terms, for me to understand, right.
So, because you have in that case no sperm, you couldn't get a profile of a male, an unknown male, correct?
A No sperm or not enough sperm, yes. Correct.

Q So then, you decided, well, we might as well go to a buccal specimen since that was from the mouth, as well, maybe that would have enough to give us a profile, correct?
A No. That was used to be extracted to get a victim sample. Just the victim profile was the only testing that was performed on that buccal specimen.
Q And you didn't do one on that?
A No. We generated the DNA profile from the victim.
Q Without there being any DNA for a male, correct?
A Yes.
Q Pulled head hair, that is still in the rape kit?
A That is still in the rape kit.
Q And pulled pubic hair, again, I take it, would still be in the rape kit?
A Yes.
Q Now, regarding the dried secretions from both breasts, do you recall how many swabs there were?
A Four.
Q And there are none in that kit there are there?
A No.
Q Because they would be tested?
A Yes, they are retained in the laboratory.
Q In fact, prior to testifying here today, had you gone to examine the evidence that was left in your office?

A Prior to me retaining them back in 2005, no.
Q So, you haven't looked at it to determine whether they're in fact still there under this case, correct?
A No. Correct.
Q Did you in 2007, the later part of 2007, test other samples that were provided to you regarding this particular case, such as the orange juice container?
A Yes.
Q And you tested that yourself, correct?
A The containers themselves were not examined by me, but testing was performed in the laboratory?
Q By you?
A Testing was performed by analysts inside the laboratory based on our rotation system.
Q Not by you?
A No.
Q And, in fact, I think you testified yesterday that when you received the orange juice and the pineapple containers, that you did not open them yourself, either, correct?
A Correct.
Q That somebody else did, correct?
A Correct.
Q Do you recall who the analyst was that tested that back at that time?

A It was Sidney Espana.
Q She's still with your office?
A Yes.
Q Still available to testify?
A Yes.
Q Okay. And she is the one that performed the test on these cans, correct?
A She performed the evidence examination at that time. There are multiple other analysts who are involved in the DNA testing throughout the entire process.
Q Were you present when a swab was taken then from either of the cans?
A No.
Q You don't know how they were taken, either of those cans?
A I know based on my evidence notes and documentation that are contained within my case file, they were swabbed.
Q You did not do them?
A I did not do them.
Q Nor did you see them performed?
A Correct.
Q And at that point, the analyst begins to develop a profile, correct?
A Correct.

Q And in part, in trying to keep it simple, the testing of the chromosome strip, that's what you're looking at, correct?
A Chromosome strip?
Q DNA.
A DNA, yes.
Q Trying to look into a location because ninety-nine plus percent of all humans have the same DNA, correct?
A Correct.
Q So, you try to single in on a particular area of a chromosome?
A Multiple areas on multiple chromosomes, yes.
Q How is that done?
A Throughout the entire DNA process, we perform a DNA extraction, where we crack open those cells, whether it be blood, semen, saliva. We extract that DNA out of those cells. Then we determine how much DNA we have to work with. Then we perform an amplification of what we have there, targeted to those specifics locations we're going after. Then they are run on instruments in order to generate a DNA profile.
Q There are things such as peaks you take a look at, correct?
A Yes.

Q Explain exactly what peak is.

A A peak is exactly at the last step in the procedure, the procedure where we generate electropherograms. The -- which, basically, we're looking at short tandem repeat regions, which based on the -- based on peak heights, electropherogram is a series of peaks and their size according to how many repeats are present within that particular allele or that particular segment of the DNA that you're going after.

Q And in some cases, in alleles, if the peaks is not significant or it doesn't -- it's not strong enough, then they're not reported, correct?

A We have a peak threshold that is set in the laboratory based on validation studies. If the peak does not meet that threshold, it is not called.

Q And if it does reach a threshold, is it given a number?

A Yes. Yes. It's sized and given a number.

Q In this case, for example, in your chart that you put together in 2005? For example, if I could show just to the witness 60 in evidence, actually.

(Handed to the witness)

Q There are notations regarding some of your findings, correct?

A Correct.

Q If there is one asterisk, was not attempted, correct?

A Correct.

Q And that was done for one of the swabs from the breasts that was provided to you, correct?

A Correct.

Q And in particular, some of the other notations were two asterisks, indicating that peaks were detected, correct?

A Correct. Peaks -- peaks were detected that did not meet our criteria for calling; meaning, they were below threshold.

(Continued on next page)

Q. Because if they're above some type of threshold, then it's given a number, correct?

A. Correct.

Q. In fact, they were significant enough to mention on a number of locations that you were testing back in 2005, correct?

A. Correct.

Q. And that was recorded as such in this chart which is in evidence as People's 60, correct?

A. Correct.

Q. You also indicated that, at one particular time, there had -- withdrawn.

There is a significance, isn't there, between having an evaluation done of 13 locations as opposed to nine or as opposed to six or as opposed to 15, correct?

A. It depends on the rareness of that DNA profile. In some cases a DNA profile with nine locations will give you a statistic in the trillions. In all circumstances, a profile with 13 locations will give you statistics in the trillions. It's really dependent on the generic rarity or the rareness of that DNA profile.

Q. Again, that's all regarding the chromosomes and the makeup of that chromosome, correct?

A. That are regarding the specific alleles and rareness in population databases.

Q. And in this case, when you then receive a further item, that being another buccal swab that you identified as Ricardo Walters, but you don't know where that particular buccal swab was from, correct?

A. From the documentation.

Q. The confirmation?

A. That was confirmation samples submitted taken directly from Ricardo Walters.

Q. Were you there when it was taken?

A. No.

Q. You don't know where that was actually taken from, correct?

A. No.

Q. So, again, that man could be Joe Smith, correct?

A. Whatever name is on the paperwork that is submitted and written on the buccal swab kit is the paperwork that is the name that is carried throughout with that sample.

Q. Which was provided to you by the police department, correct?

A. Correct.

Q. And I think -- just one last question. As you sit here now, the other two swabs that were part of the initial kit that were provided to you in 2005 are not in this evidence kit here, correct?

A. Correct.

Q. And you had indicated that those you haven't seen since 2005, correct?

A. Correct.

Q. And again, that rape kit, the buccal swab envelope, is that still in the rape kit?

A. The buccal specimen envelope is in the kit, however, the actual buccal specimen is retained inside our laboratory.

Q. So you have the envelope that's there?

A. The envelope here? This is empty packaging.

Q. And you have the empty package also of the four swabs that were taken of the breast area, correct?

A. No. When we retain evidence, the actual entire package, sealed package is retained into another sealed envelope and then put into retained storage.

Q. Didn't you just say there is an empty buccal swab there?

A. Yes. This is for buccal specimens. This is a control sample, so it's housed separately from our evidence samples.

Q. In that, was there ever a buccal swab that was actually in that envelope?

A. A buccal specimen was inside this envelope. It was taken out at the time of examination, put into another Manila coin-type envelope and stored in a box in our retained

storage and sealed.

Q. When you received the four swabs in 2005 with the dried secretions from the individual's breast, weren't they packaged in an envelope just like the buccal swabs right there that you just testified to?

A. Yes. It's simply our lab protocol for items like this, a controlled sample, we retain them in a smaller size envelope for storage purposes. And for evidence, vaginal swabs, anal swabs, oral swabbings, any type of evidence sample, they all get package inside a Manila envelope in their sealed packaging. It's just a storage issue.

Q. Which is the last time you saw it was in 2005?

A. Correct.

MR. LEMKE: I have nothing else.

THE COURT: Ms. Tebbett.

MS. TEBBETT: Thank you, Judge.

REDIRECT EXAMINATION

BY MS. TEBBETT:

Q. Ms. Hayn, do you recall Mr. Lemke asking you a number of questions about the information or the names that are either on the evidence or the paperwork when you receive it from the police department?

A. Yes.

Q. Do you rely on that documentation in labeling a sample as coming from a particular person and carrying that

name throughout your report?
A. Yes. That is the information that is used throughout the entire testing process.
Q. And is it the accepted practice of the accredited labs all across the country to rely on that information that's provided by the police department?
A. Yes.
Q. And is there anything improper about that or against protocol about that or is that what all the labs do, they rely on the information that's provided to them from the police department or the submitting agency?
A. That is correct.
Q. And that's accepted practice?
A. Yes. Some labs operate directly under the police department. We are at the Medical Examiner's Office, which is a separate office from the police department and the district attorney's office, but when we accept evidence from the police department, we rely on the paperwork that's submitted and the names that are on the outer packaging of the particular item of evidence and we rely on all of that to carry it through our testing process.
Q. And you document all of that as well in the lab paperwork?
A. Yes. Extensive documentation is made of all labeling and packaging and all paperwork is retained within

case files.

Q. And the rotational system that you mentioned that's in place in your laboratory, just explain for us what that means again, please?

A. It's basically when evidence comes in, it's assigned to a particular analyst. That analyst is responsible for the evidence examination portion of that case, typically, and then also is responsible for sending those samples out for further DNA testing and quantitation and DNA testing.

That analyst is also responsible for reviewing reports -- I'm sorry, reviewing results, interpreting those results and preparing a report and submitting that report for review. And basically each analyst is on a particular rotation on a certain week. One week one analyst might be on DNA extraction. One week one analyst might be on DNA quantitation. That way is an efficient way to batch together work and push through the laboratory in a much more efficient fashion.

Q. So for each particular case, various employees of the laboratory could perform testing at the different stages, but then it's ultimately assigned to one analyst to review at the end?

A. Correct.

Q. And is that system and that procedure also the

standard and the accepted practice of all the accredited labs across the country?

A. Not all the accredited labs, but a large number of accredited laboratories work in a rotational system and it's fully accredited -- it's fully acceptable within the parameters that are set forth through our accrediting agencies.

Q. Are there protocols in place to make sure each person, so to speak, along the way follows the proper procedures for the testing steps?

A. Yes. The only way a rotational system would actually work is if there is one set of protocols that every analyst is mandated to use.

Q. Now, based on your review of the notes and the documentation in these particular cases, both the lab work for the testing that was done on the evidence submitted associated with Shamika Dottin, as well as the evidence that was submitted associated with Ricardo Walters, can you tell from your review of those if each of the analysts or lab employees along the way followed the proper procedures and protocols for each of the steps of the testing?

A. Yes. All of the case work and the testing that was done was properly documented and we have a witness system in our laboratory. Everything is properly documented within the case file.

Q. Now, can you just explain for us the different purposes of the testing of the buccal swabs that come from the victim in the rape kit versus the oral swabs that come in as evidence in the rape kit?

A. Although they're from the same cavity, we use the oral swabs as a sample to test for the presence of semen in this case. However, the buccal specimen we use as a control sample for that individual. A control known sample.

Q. And can you explain for us why it is that you need that control known sample, that profile for the victim?

A. We need it to compare to other evidence that comes in from that sexual assault kit, such as other swabs that are taken from her body.

Q. And why do you need her profile to compare to the other items of evidence that come in with that kit?

A. It's used as a check in the procedure. Once you have DNA results from one certain swab, you are going to look at that victim profile and compare that profile and see if you see the same profile or if you see a minor contributor from that profile. It's definitely useful in comparing, especially in terms of a rape kit.

Q. And when you generated what you termed a known profile for Shamika Dottin from those buccal swabs that were submitted in her kit, was there any male DNA detected in that?

A. No.

Q. So, for your purposes, that's a known sample for Ms. Dottin?

A. Yes.

Q. Now, do you recall Mr. Lemke asking you some questions about the statistics when you either have 13 locations or nine locations or the varying number of locations?

A. Yes.

Q. And can you just explain that for us?

A. Sure. Based on the population statistics of a DNA profile is always based on the evidence sample. And in the laboratory, if we have two samples that match each other at nine locations, one sample is then taken out to 13 locations and duplicated, because those two samples that match each other at nine locations are internally duplicated within that case. When a sample is taken out to 13 locations, statistics can then be generated based on those 13 locations.

Q. And the 13 locations that you were able to get for the male DNA profile that you generated back in 2005 from the saliva that was left on Ms. Dottin's breasts, can you explain the statistical analysis that was done on that profile?

A. Yes. Those -- the DNA alleles from that DNA profile were put into a population statistics program and the population statistics are generated based on the rarity of

those alleles within that population database.

Q. And what was the statistical analysis result?

A. We break it down between races and each racial group across for all four races that we test. Because the population database are based on racial groups. In every group the statistics were greater than one in a trillion.

Q. What does that mean?

A. That means that that profile is expected to be found in one in one trillion individuals.

Q. And that same male DNA profile that was generated back in 2005 that you would expect to find in only one person out of a trillion that existed back in 2005, is that the same male DNA profile that you determined to be Ricardo Walters in 2007 that you then confirmed again in 2008?

A. Yes.

MS. TEBBETT: Thank you. I have nothing further.

RECROSS-EXAMINATION

BY MR. LEMKE:

Q. You can't say it's Ricardo Walters. You don't know who Ricardo Walters is, correct?

A. It's standard practice to use that paperwork that the sample is submitted under to make that correlation between that sample being taken from the cheek swab of that individual to generate the DNA profile for that individual.

Q. The question is, it's in your opinion the same person, but you can't say whether it's Ricardo Walters, correct?

A. I can say that that buccal swab that came in under that name matches, yes.

Q. That's all I want to know, thank you.

THE COURT: Ms. Hayn, thank you very much. You can step down.

(Whereupon, the witness was excused.)

THE COURT: People.

MS. SINGAS: At this time, your Honor, the People rest. Thank you.

THE COURT: Mr. Lemke, does the defendant have any witnesses?

MR. LEMKE: No, the defense rests, your Honor.

THE COURT: As I told you yesterday, ladies and gentlemen, you will be getting out of here a little bit early today, as I anticipated. Myself and the attorneys have some legal issues that we're going to address.

As I indicated to you yesterday, Monday morning we're going to have summations by both the attorneys, as well as my charge to you on the law. I'm going to you ask to come back. I'm not quite sure if we will be back here in this courtroom on Monday.

Just for consistency purposes, when you come back on Monday, come back to room 106 where you have been reporting the last couple of days. On Monday, there will be a lunch order taken from you, so you can anticipate having lunch on the Nassau County Court system come Monday. I can't vouch for how good it will be, but it certainly won't cost you anything.

Also, as I let you go for the weekend, even though both sides have now rested, all the evidence, if you will, you have heard it, you have seen it at this point, but it's particularly important, even at this late stage, you haven't heard the attorneys' summations. You haven't heard my instructions to you on the law. So even though you are going to be away from the courthouse for the next couple of days, it's particularly important, even at this late stage, that you not form any opinions at this point about the case. That you not speak amongst yourselves or anyone else about the case.

Please don't view or visit any of the areas that you have heard testified to or described.

Don't access any of the accounts that you have heard about the case in the media.

Don't do any type of independent DNA research on the computer or anything like that.

Please, it's very important at this point. So

I'm going to let you go. Have a very good weekend. See you back here Monday morning, 10:00. Follow Tom and we'll see you here Monday morning.

(Whereupon, the jury exited the courtroom.)

THE COURT: Mr. Lemke.

MR. LEMKE: Your Honor, if I may, before I make an application regarding the trial order of dismissal, we have rested. I just want to place on the record that although it has been now a matter of law for the case that the indictment has been consolidated, part of my application in denying and opposing the People's application to consolidate the indictment was, in part, and as I specified in my opposition, was that I expected then in a case such as this, that my client would be able to defend himself and to testify regarding three of the separate dates of incidences other than the September 9th of '07 robbery and attempted kidnapping or kidnapping as it stands now. That the dates that had been recorded as November 9th, November 28th of '05 and I believe 4/17/05, my client would have testified or would have intended to testify had they been severed from the September 9th of '07. And, in particular, the allegations of the September 9th of '07 matter, there was testimony regarding a weapon that my client may have either been possessing in his back pocket or not

holstered, which would be pursuant to protocol as a result of the investigation that had been conducted by the Nassau County District Attorney's Office regarding the shooting and death of an individual. And that shooting and death occurring at I believe it's 132 Martin Avenue in Hempstead. That obviously having my client testify and explaining that situation would have opened up the door for cross-examination regarding that.

And so I just want to place on the record, for further appellate review down the road, that again, what I allege and argued in my application to oppose I think became very clear during the consolidation of these counts and for this trial here today and that was the basis for my client not testifying here today, your Honor.

THE COURT: People, do you want to be heard on that?

MS. SINGAS: Well, Judge, I think we had extensive motion practice concerning consolidation. Case law was provided to your Honor that consolidation in this case, under these facts, under these circumstances was entirely proper and not prejudicial to the defendant. And I'm not really sure what the unholstered weapon has to do -- what kind of protocol Mr. Lemke suggests that why that's proper. I don't

know. But clearly, the weapon, DNA evidence, all of those factors which were laid out extensively in my motion practice and the case law supports a consolidation and was entirely proper in this case.

THE COURT: And I think at this juncture the decision I believe this Court rendered on July 16th was appropriate based upon the facts and information that was available to the Court at that particular time. So I don't know what relief you are asking for, Mr. Lemke, other than to indicate why you feel your client couldn't testify. I'm assuming the same arguments you are making today were made in the motion back in July or June.

MR. LEMKE: Your Honor, I'm not looking -- obviously, there is no remedy. It's merely a matter of placing on the record, based upon the situation, there has been a decision. I respect that decision. However, just to make the record clear, that's why I merely am placing it on the record regarding that situation.

THE COURT: All right.

MR. LEMKE: If I may proceed to the trial order of dismissal?

THE COURT: Yes.

MR. LEMKE: At this point, your Honor, and not to have it in a confusing fashion, since we have had a number of indictments consolidated and we have now what

we believe to be a renumbering of the counts from the various indictments, so I'm referring to my trial order of dismissal.

THE COURT: Just, Mr. Lemke, if I can interrupt you for a moment before we get to that.

People, I'm looking at what I refer to as the mock-up, if you will, of the consolidated indictments number 436N of '08. It appears in the mock-up that you have 14 counts, however, when I look at the list of the counts of the indictment that you provided to me at the beginning of the trial --

MS. SINGAS: There are 16 counts, Judge, so we may be misting two in that. I'll have to review that. But there are 16 counts based on all the indictments that were consolidated.

THE COURT: The answer to my question is I was missing a page. I now see 16.

Go ahead, Mr. Lemke, I'm sorry.

MR. LEMKE: Yes, your Honor. In making my argument for the trial order of dismissal at this point regarding that situation, I'll be relying and will provide the Court the various cases that would apply, including but not limited to People versus Cassidy, cited at 40 NY2d 763, People versus McFadden, 261 AD2d 417, and a number of other cases that they will refer to

as well.

And in light of what my research has, I think, uncovered to some extent for me, is that in cases where you have, in count two of this indictment, kidnapping in the second degree as a sexually motivated felony, there is a merger doctrine in which if there is to be, as in this case, was a robbery in that instance, that that count should be in the alternative to be dismissed. And in the alternative with kidnapping in the second degree, which would be count three, that that should be an attempted kidnapping based on the evidence in the light most favorable to the People.

So, regarding the incident of September 9th, Sara Sandoval, my argument would be that count two, kidnapping in the second degree as a sexually motivated felony should be dismissed under those grounds. And count three, in that situation, should be an attempted kidnapping under those circumstances as well.

The situation also regarding the other kidnappings, if I refer to the ones that should be, I think, dismissed outright, would be count 11, kidnapping in the second degree regarding Delsy Sanchez should be dismissed outright based upon my trial order of dismissal and based upon -- under that division and based on the cases that I have cited. And that the

other kidnappings, as a result of what my interpretation of the statutory and the case law would be, that they should be reduced to attempted kidnapping in each of those other two cases which would be still within the indictment I believe.

I believe I covered each one of those regarding kidnapping. Obviously, regarding robberies and regarding any sexual abuse, whether it's in the first degree, criminal sexual act in the first degree, the sexual abuse, obviously, my arguments rely on the record. But regarding kidnapping specifically as I believe the merged doctrine would, in fact, preclude that to go to the jury.

THE COURT: And I would assume you would be making the same argument with respect to count five as it pertains to Shamika Dottin?

MR. LEMKE: That is correct, your Honor.

THE COURT: Insofar as those kidnapping charges would merge with the other substantive offenses.

MR. LEMKE: That's correct, your Honor, they don't remain alone. I would be making that argument.

THE COURT: Anything else with respect to your trial order of dismissal?

MR. LEMKE: No, your Honor.

THE COURT: People.

MS. SINGAS: Yes, Judge. I think under the kidnapping and the way I understand the merger doctrine is that if there is crimes subsequent to and that are so interrelated with the kidnapping, then courts have held under cases like Cassidy that the kidnapping should be dismissed. However, in this case, and there is case law and I have supplied some of it to you, I believe it's People v. Gonzalez and I'm not sure of the other one, but I can put it on the record after I take a look at what I handed up to you, that if the facts are easily separated and if, for example, one crime has distinctly ended before the other one has begun, then those counts can remain as kidnapping counts. So, that would be my argument as to count five, which is the kidnapping regarding Shamika Dottin.

And as to count 11, which would be the kidnapping as to Delsy Sanchez, that, in fact, those kidnappings are distinct acts and that they do not merge into the crime that happened after, namely, in these cases, the sexual crimes that follow the kidnapping. So, I think they should stand.

As to counts two, three and 16, the argument is really of a factual argument based on the facts elicited at trial and the People's position is that in those cases, using the definition of kidnapping in the

Penal Law, which is to prevent someone's liberation at gunpoint, that the People have met their burden with the facts elicited from the various victims and that kidnapping is sustained in those counts based on the facts as the witnesses testified to them.

In the alternative, those should be attempted kidnappings rather than dismissed outright, because, again, there is no crime that follows afterwards. Clearly, the robberies in those cases -- and it's been the People's theory all along -- that the robberies ended and a new and separate crime begun as he attempted to drag and force the victims away to more remote locations. So, that's my analysis of counts two, three and 16.

As to count two and three, I think that count two should be submitted, kidnapping as a sexually motivated felony. Once they deliberate on that and reach a decision, if it is guilty, then they should just skip over count three, which is the regular kidnapping in the second degree and go right to count four. Because, as you know, the kidnapping in the second degree has to be proven first and then it has to be proven that it was done so as a sexually motivated felony. So, if at count two they find him guilty, then they should go to count four. If they find him not

guilty of kidnap two as a sexually motivated felony, then they should just go to plain old kidnapping in the second degree.

THE COURT: The question that I have insofar as the kidnapping or attempted kidnapping as a sexually motivated felony, in looking at section 130.91, the question I have is whether an attempt of certain specified offenses which apply to sexually motivated felony qualify.

MS. SINGAS: Right. I'll have -- I don't know the answer to that off the top of my head, Judge. I'll have to look into that. It's clearly, I think, at the bottom of the list it says or an attempt of any of the enumerated crimes, but I would have to look at it.

THE COURT: Well, in looking at 130.91(2), it does say or any felony attempt or conspiracy to commit any of the foregoing offenses.

MS. SINGAS: Yeah, I believe it covers attempted.

THE COURT: It's just a question that I have.

MS. SINGAS: But again, the People's position is that those should remain as kidnappings.

THE COURT: Right, I understand.

I'm going to reserve decision, Mr. Lemke, on your application. However, in fairness, since both of

you are going to be preparing for your summations for Monday, in terms of addressing those specific counts, I think it's likely that count five and count 11 will not survive. Meaning, that Mr. Lemke's application may be granted. In all likelihood will be granted with respect to those two counts. And that the remaining kidnapping counts will be submitted to the jury as an attempt. Either attempted kidnapping second degree or attempted kidnapping as a sexually motivated felony. So just to prepare yourselves accordingly.

If, for some reason, I change my mind in thinking about it over the weekend, my law secretary will contact both of you just to let you know.

MS. SINGAS: Thank you, Judge.

MR. LEMKE: Thank you, your Honor.

THE COURT: Let me just have all of you up here. I want a brief charge conference before you go.

(A discussion was held off the record.)

THE COURT: The record should reflect that we've had a pre-charge conference. Mr. Lemke, I take it you will be asking me to charge, as I did in my preliminary charge, about the defendant not testifying and the jury should not draw any adverse inference because of that?

MR. LEMKE: That's correct, your Honor, and

the other should be the standard CJI instructions police officer's testimony.

THE COURT: I intend to charge a police officer testimony, that they are not to be given any greater or lesser weight than any other witness.

I assume, Mr. Lemke, in light of some of your cross-examination, you want inconsistent statement charge?

MR. LEMKE: That's correct, as well as identification as well. One witness, as well as multiple witnesses.

THE COURT: People, you will be asking for a consistency charge?

MS. SINGAS: Correct, Judge, and also I think there is a charge in there for the stipulation. Because we do have a stipulation.

THE COURT: Yeah, I will do that as well.

MS. SINGAS: Prompt outcry and the expanded ID charge.

THE COURT: Anything else, People or defense?

MS. SINGAS: No, Judge.

MR. LEMKE: No, your Honor, thank you.

THE COURT: So, as I said to the jury, I'm not sure where we're going to be on Monday. I would ask you contact my chambers sometime before 10:00 and hopefully

we will be ready to get going by 10:30.

There may be a likelihood, since I'll be working on the charge with my law secretary over the weekend, more likely than not on Sunday, don't be surprised if we give you a phone call if there is any questions. I would ask whatever cell phones you have, just have them on on Sunday.

MS. SINGAS: Okay.

THE COURT: We'll see you Monday.

MR. LEMKE: Thank you, your Honor.

(Whereupon, the trial was adjourned to November 17, 2008.)

STATE OF NEW YORK : NASSAU COUNTY

SUPREME COURT PART 49

-------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK TRIAL

- against - IND. 436N-08

RICARDO WALTERS

Defendant.

-------------------------------------------X

November 17, 2008
262 Old Country Road
Mineola, New York

B E F O R E :

HON. JAMES MCCORMACK
Acting Supreme Court Justice

A P P E A R A N C E S:

(Same as previously noted)

KATHLEEN PLAIA
OFFICIAL COURT REPORTER

*** *** ***

THE CLERK: Case on trial, The People of the State of New York against Ricardo Walters, Indictment 436N of 2008.

Are the People ready?

MS. SINGAS: Yes.

THE CLERK: Defense counsel ready?

MR. LEMKE: The defense is ready, your Honor.

THE COURT: Does anybody have any applications before we bring the jury in for summations?

MS. SINGAS: I think, Judge, there has to be an amendment to the indictment for, I think, the second count, sexually motivated felony -- kidnapping as a sexually motivated felony. At the time the statute was not in the Criminal Procedure Law, Penal Law 130.91. So, the indictment should be amended to read that.

THE COURT: Mr. Lemke, you want to be heard on that?

MR. LEMKE: Not technically to the change. Certainly I'm aware of it. There is no prejudice to my client as a result of that.

However, there would be a further application regarding that particular charge in the indictment. And that is, it stands alone as far as count one, being robbery, regarding Ms. Sara Sandoval and count three, being kidnapping, if they were not defined, that there was a sexually motivated element to that charge.

So, you have three charges against Mr. Ricardo Walters. The concerns that I have -- and I know we're kind of on a new ground regarding this particular statute and criminal charge, I believe. And

I'm going to request, if I hadn't, I thought it would be part of the CJI charges you will be charging to the jury, within each count within an indictment, and perhaps within each count for a crime charged within an indictment, and in particular for each particular date of incident, that there is a charge that the jury receives that each one of those are to be considered separately from each other, in order to avoid any type of spillover effect. That they are to consider the charges, each of the elements, and the People have the burden of proving each of those elements beyond a reasonable doubt.

In this case, of course, if that was standing alone, meaning that counts one, two and three which occurred on September 9th of '07 were separate and were not consolidated with any other counts, there needs to be more than just a blanket sexually motivated act. And certainly, in a light most favorable to the People you have Ms. Sandoval.

Her testimony is, obviously, she's at the bus shelter. This individual comes up to her, Mr. Ricardo Walters. That there is a brief exchange of conversation. She then sees a weapon. My client grabs her, she pulls away, without there being any conversation about taking off her clothes or about

performing some type of sexual act or in that exchange or during that discussion he grabs her, tries to undue her blouse.

So in this situation you don't have any of that. It's a blanket charge, without there being any specific act that the prosecutor could allege my client committed on that date, other than asking or at some point asking or having an inference made that this jury take a look at the other three dates, that there was an incident that occurred. If they find that was Ricardo Walters, they may consider that in establishing what his motive was on September 9th.

I believe that is an inappropriate assumption. I believe that the charge that should be made to the jury is that they are to be considered distinct.

There was no Molineux application, which again, as this particular charge is tried more and more I believe there will be some I think case law to establish what would be needed and the burden applied on the prosecutor.

But for purposes of this trial we have a blanket allegation, that being kidnapping with the purpose of a sexually motivated act. It's bare on its face. And I would renew my trial order of dismissal,

that that should not stand, not remain, as a result of my understanding of the brief cases in particular to 130.91 of the Penal Law, your Honor.

MS. SINGAS: Judge, could I respond to that?

THE COURT: Yes.

MS. SINGAS: In every indictment jurors are forced to grapple with the issue of intent. This crime is no different. And the Legislature asks that the People gather their evidence toward proving their intent, the defendant's intent, on committing this crime as a sexually motivated felony in just the same way we prove intent, given the surrounding circumstances, and if appropriate, using prior convictions, using Molineux evidence. It's no different here.

In this case we have it all consolidated, consolidated properly in this indictment. And I can comment on that consolidation to gear the jury towards resolving this issue of what his intent was. I don't think it's that different from any other crime that we deal with on a regular basis in these courtrooms.

The issue again will be intent. We can prove intent in a number of ways. And in this case we have consolidated crimes. It's true that the jury is to consider each separately and individually, each count.

I think that always remains true. But they can certainly draw on evidence from cases that were properly consolidated to reach a conclusion concerning the defendant's intent.

THE COURT: All right, all right.

Insofar as the People's application to amend what is now the second count of the indictment, insofar as the Penal Law section is concerned, I'm going to grant that pursuant to 200.70 of the CPL, to amend that to be Section 130.91, sexually motivated felony, to conform the pleadings, if you will, with the proof.

I don't see any prejudice to the defendant. The defendant has been on notice as to what the sum and substance and contents of that charge will be.

I am going to deny, Mr. Lemke, your application to dismiss that charge for failing to specify what particular acts or facts as contained in the indictment form the basis of that charge.

I think as pleaded in the indictment, although it's in a very general sense, I think that for purposes of the requirement of 200.50 of the CPL, that the pleadings in this particular case are sufficient.

I did reserve decision with respect to a number of other counts, actually. I had reserved decision on the entirety of, Mr. Lemke, your trial

order of dismissal motion. That motion with respect to the sixteen counts is denied, with the exception, however, of the following:

I am going to grant your application with respect to count five, which charges kidnapping in the second degree, as well as count eleven, which charges also kidnapping in the second degree -- the first incident being April 17, 2005, as it pertains to Shamika Dottin, as well as count eleven, which was the date of incident of November 28th, 2005, as it pertains to Delsy Sanchez -- for reasons primarily having to do with the merger doctrine under the case law of People versus Cassidy, inasmuch as these particular counts of these -- as pertain to each of these indictments really were incidental.

These charges, I should say, were incidental to the substance of the crime, which, in the first instance dealt with a robbery and criminal sexual act, criminal sexual act as pertained to Shamika Dottin.

With respect to Delsy Sanchez, the kidnapping, in this Court's view, was incidental to the robbery plea, rape and criminal sexual act, sexual abuse as well as pertained to Delsy Sanchez.

So, those two counts will not be submitted to the jury. They will be dismissed at this particular

time.

Finally, count sixteen is going to be amended to the lesser included offense of attempted kidnapping in the second degree. That's the incident of November 9th, 2006, as it pertains to Ilsa Morales.

In this Court's view of the evidence, even viewing it in the light most favorable to the People, would not in this Court's view make out a completed kidnapping. However, I do believe there is sufficient evidence for the jury's consideration, insofar as an attempted kidnapping is concerned, and that will be submitted to the jury.

Is there anything else we need to take up before we bring in the jury?

MS. SINGAS: No.

MR. LEMKE: Nothing else, your Honor. Thank you.

THE COURT: All right. So, Dave, you can bring in the jury.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE COURT: Okay, good morning, members of the jury. You can figure out, we're obviously at a different courtroom here. I see everybody getting

their seating arrangements straight.

Now, at this time we're going to, in a few moments, begin the attorneys summations. The defense attorney will go first, followed by the People. More than likely at that point we will take a break and then I will begin my instructions to you on the law.

As I indicated, under our law the defense counsel must sum up first and the prosecutor must follow. The lawyers may not speak to you after that.

Summations, members of the jury, provide each lawyer an opportunity to review the evidence and submit for your consideration the facts, inferences and conclusions they contend may be properly drawn from the evidence.

If you find that a lawyer has accurately summarized and analyzed the evidence, if you find that the inferences and conclusions the lawyer asks you to draw from that evidence are reasonable, logical and consistent with the evidence, then you may adopt those inferences and conclusions.

Members of the jury, however, bear in mind the following points:

First, you are the finders of fact. It is for you and you alone to determine the facts from the evidence that you find to be truthful and accurate.

Plus, whatever the lawyers say, however they say it, should you remember that, what the lawyers say is simply argument and submitted for your consideration.

Second, remember that lawyers are not witnesses in this case. So, if a lawyer asserts as fact something that is not based on the evidence, you must disregard it.

Remember, nothing the lawyers say at any time is evidence. So nothing the lawyers say in their summation is evidence. You have heard the evidence and must decide the case on the evidence as you find it and the law as I will explain it in a short while.

Third, during the summations one lawyer's recollection of the evidence may in good faith may differ from the recollection of the other lawyer's or from your own recollection, and the lawyers will undoubtedly differ with each other on the conclusions to be drawn from the evidence. It is your recollection and understanding and evaluation of the evidence, however, that controls, regardless of what the lawyers say or will say about the evidence.

You and you alone are the judges of the facts in this case. If during your deliberations you need to have your recollection of the testimony refreshed, you may have any or all or any portion of the testimony

read back to you.

Fourth, remember, under our law I am responsible for explaining the law, not the lawyers.

Now, prior to the summations the lawyers were permitted to read the instructions on the law I will deliver to you after their summations. The lawyers are permitted to refer briefly to those instructions in their summations if they wish. However, even though a lawyer may refer to portions of those instructions, you must listen carefully to all the instructions I will give you after the summations.

If you think there is any difference between what the lawyers may have said or what I say the law is, your sworn duty as jurors is to follow my instructions on the law as you have promised me you would.

Fifth, if during the summations I sustain an objection to a comment of a lawyer, that comment will be stricken from the record and you must disregard it as if it were never said. If I overrule an objection, the comment will stand.

Whether I sustain or overrule an objection or on my own indicate a comment must be disregarded, my ruling indicates only that the comment does or does not violate one of the rules of law set down for lawyers to

follow during the summations. It is not an attempt to indicate that I have an opinion of what is said or the facts of the case or whether the defendant is guilty or not guilty.

Remember, under our law, you and you alone judge what facts, if any are proven, and whether the defendant is guilty or not guilty, not I and not the lawyers.

At this time we will turn to the summations.

Mr. Lemke, if you would, please.

MR. LEMKE: Thank you, your Honor.

And in fact, may it please the Court, Ms. Tebbett, Ms. Singas, Mr. Ricardo, ladies and gentlemen of the jury, good morning.

Before I comment to you on the evidence in this case or more importantly the lack of evidence to each of the dates in question, on behalf of Ricardo, his family, myself, we would like to thank you for being such attentive jurors in this matter.

I think now if you were asked how significant and how important it is to be a juror, I think now you see how important it is, what your role is in playing a juror who can sit, listen to the evidence in a case and evaluate it fairly and listen to the Judge's instructions and reach a verdict that is fair to all

parties concerned.

Now for the first time in this case I get to go first. I don't know if it's an advantage or disadvantage. But I know when I'm done and I get to sit down -- you know, I'm not very long-winded. I would like to get to the issues that you have to consider, those things that you need to have as you listen to Judge McCormack's instructions on the law, to apply to that to what you feel is credible evidence in this case.

As I said, for the first time I get to go first. When I'm done and I sit down, I believe Ms. Singas will give her summation. As much as I'd like to get back up here at the end and say, Wait a second, don't you remember the detective talking about when he went and set up for the Moraleses, that he picked up one first and not the other?

I don't get the chance to get back up here. I ask each of you to play devil's advocate; what would Mr. Lemke have said to that argument?

Ask yourselves, Well, what would Mr. Lemke have said to rebut something that is said by Ms. Singas?

I don't get a chance to get back up here.

Additionally, it's been somewhat of a long

trial, over the course of a couple of weeks, with a couple of Tuesdays off. The fact that I don't mention something now, the fact that I may not mention, when Ms. Dottin's was walking down the street in Hempstead, that a van pulled up, if there's something else I don't go into regarding that, that doesn't mean that you are not to consider it.

As the Judge has instructed you, what Ms. Singas and what I say is not evidence. It's merely suggesting, submitting to you the way you should view what has been testified to here, the way you should view it in light of the Judge's instructions on the law and apply that. And if there is anything that I say that you feel may not be accurate, have it read back.

I do have some transcripts I will refer to in reading to you, it makes it a little easier as to those points that you should consider.

So, keep in mind, if I don't mention it, it still may be something that you consider for the reasonable doubts in each one of these situations.

Additionally, you said you would keep an open mind, that you would still have the open mind, not only when I'm done, but when Ms. Singas is done. You know, listen to the Judge's instructions. It's at that point that you then discuss, to deliberate.

You also promised during voir dire you would not expect me as a defense attorney for Ricardo to either prove or disprove anything. That if there are questions that were asked, or a witness may have testified that I didn't ask any questions of, you would keep that open mind, discuss what that witness testified to and see does it show identification, to see does it show that a crime was committed.

We're asking you to keep those promises. To keep those promises.

That a decision was made that Ricardo need not testify because it doesn't change the burden on the prosecutor.

Finally, I think the most important part of the charges you will receive in a case like this, which is different in part because you have four different dates that you need to consider, each one of those dates, as Judge McCormack will instruct you, is to be considered separately from each other. We're asking you to listen to that instruction on the law so that there is no spillover effect, as I refer to it.

Let's take a look at the first date. You can pick any one of the four. I prefer at this point to kind of, it makes some sense, to take a look at what occurred back on April 1st of 2005.

Back on that date you heard testimony from a Shamika Dottin. Shamika Dottin is the young woman who testified that she is employed. She is employed as a bus driver. I submit to you that that is somewhat significant because she refers to a van that had approached her in some way. And as I read some of her testimony -- and keep in mind, if you want it read back, that the district attorney's office, through Ms. Singas and Ms. Tebbett try to distinguish, try to say, you know what, that van is not in issue.

It may be coincidence that that person tried to address you when he was in the gas station. Might be just coincidental, after she was sexually assaulted, that same van moments later after the person left had happened to drive by the way she was going.

Why is that important? Because in part you know that, had Ricardo ever owned a van you would have heard testimony to that; you don't. That's a consideration in establishing --

MS. SINGAS: Objection.

MR. LEMKE: -- who the driver was.

THE COURT: Overruled.

MR. LEMKE: You have from Ms. Dottin, we know as she's walking up the road -- again, this is through transcripts. I have the advantage right now to read

through this for two reasons. One, so that there's not anything that I either forget, or that is not accurate from my memory. So this way you can always have it read back in part.

Again, she's asked about how long it took to walk up the road.

"QUESTION: Can you approximate for us how long it would take?"

"About a half hour, because I walk real slow."

You heard her testimony, about a half hour.

"QUESTION: Tell us what happened."

Again, it's now to establish identification of who this person is. It's on April 17th, 2005, a date that you now have to consider whether that identification is accurate. And Judge McCormack, among many charges you're going to receive, will instruct you on the considerations to give to a one-witness ID, a multiple witness ID, where there's two, three or four. Listen to that instruction regarding the weight to give an identification.

But Ms. Dottin testifies, as she's walking down Nassau Road, "When I hit Argyle, I see a red van following me. It made a U-turn, made a right back on to Greenwich."

She's aware of this van. A van, not a car. And I'm going to submit to you now that when we talk about Ms. Sanchez, when she's abducted, it's by somebody coming out of a van or by a van, I should say. Something to begin to consider who this person is as to whether or not you have an individual somewhat fitting the description of Ricardo Walters, as I will show in the lineup photograph in a few moments.

But she says, as she's walking up she notices this van. "And as I was passing the Amico Gas Station, the red van pulled up into the gas station like it was going to get gas. The driver motioned me to come over. I motioned back and I kept going."

Finger going back and forth.

She observe this van, observing it's a male black in it.

"It was a big built body, that's all I can tell you at this point."

That's what she says about the male black.

Regarding the van, she goes further to say, as she's walking up, that the van comes from behind her and then pulls into a street off of Argyle.

She's asked how far away did she get from the driver of this car. She says, anywhere from six to ten feet.

Remember, this young lady never made any identification in court here. Didn't come in here and say, that's him.

She also goes on to say further -- and in fact, even with an in-court identification, as I will address that regarding the other, regarding the problem with that, regarding what weight to be given to that, because there's no question, as I said in my opening, the individual that is committing these crimes I submit to you is not Ricardo, someone with a similar physique, someone that is similar in looks, otherwise we wouldn't be here.

So what do you have? You have her testifying that the van, "As I was walking past the Amico Gas Station on Greenwich, it came into the gas station."

Which when I get to Detective Moran's testimony you've got to start thinking, she must have went back to the gas station with the detective to see where it went into the gas station so we can take a look at the video to see how this plays into it.

"The person motioned for me to come here and I motioned back, no. I kept going. Then the gas station -- I mean, the van proceeded out of the gas station, made a right on to Argyle -- I mean, to Greenwich. As I was proceeding, it kept going and made

a right on to Elmwood."

Again, paying attention to the van.

Again, when we talk about Detective Moran's testimony in a case where somebody alleges they were sexually assaulted. When that first complaint is made there has to be the determination, as you heard from the SANE Nurse, Davilar, as to whether or not there actually was a sexual assault. In this case it's not an issue before you.

But when the carrying detectives get that and that complaint first comes in, if this is a case where there's a video, no van ever pulls in there, that might be an issue as to whether she's sexually assaulted or not. But the detective doesn't know that. We will talk about that in a moment.

She knows the van. She goes in, she's explaining what happened. The person tried to talk to me. No voice exemplar. If they heard the individual speaking, could they identify the voice in any way?

I asked her, "Could you understand it clearly, there was no problem with that, any accents?

She kept walking, walking up. Gas station, the van. She talked about the Yole's. You have the camera out front. Proceeded up and then inside. That is when she was assaulted.

Then she is asked after that very point, again trying to describe him, the face, not really. She couldn't in any way give a composite.

And she testifies also that when she's there and she's told not to leave, what happens? "I sat down and he walked out. While I was sitting there I noticed the same van proceeding the opposite direction going back towards Nassau."

When I got up, same van, individual? No connection whatsoever between that and Ricardo.

Now, she goes home. Wakes up her mom. As far as her mom said, her screaming. An issue regarding the jacket. She says in her testimony she held the jacket. She then went to the hospital, met with the SANE nurse, met with the detective, then went back to her house to get the jacket. It wasn't collected at the hospital.

Not an overly big issue, significant in the fact that there may be DNA on that in distinguishing who that is.

Now, let's talk about that little DNA. You have Detective Moran -- before we get to the DNA.

Now, Detective Moran is the carrying detective. He gets involved with the case. And in part he was aware that this individual had kissed her

breasts and that now there's a bra. That certainly can become significant and important, because, obviously, as I asked Ms. Hayn regarding that bra, that obviously you could excrete from that, take from that, any saliva or any other fluids as well to be tested; but that wasn't done.

We will talk about the four Q-tips and where they actually wind up.

Detective Moran is aware of that.

"Detective Moran, you were aware at the time she indicated the bra had been removed and her breasts kissed by this individual, correct?"

"Yes."

"At that point you had been informed by Ms. Dottin she couldn't pick out this person, is that also correct?"

"Yes."

"Then you went back to the scene at some point in time, you spoke to the owner of the salon, isn't that correct?"

"Yes. I spoke to a person at the salon. I'm not sure if it was the owner."

I submit, and I suggested to him, "How about Rickie Littles, is that the name?"

The first thing you've got to consider before

you can sit there and say identification, before you can convict somebody on such serious charges such as these, well, you have a detective. He's investigating a serious allegation. There's a camera. And yet the detective doesn't go to see it.

The detective says to the owner, do me a favor, when you have some time, maybe tonight, maybe tomorrow, why don't you look at it and let me know what you see.

Incompetent. You get a copy of it. You keep it in the file. You don't know what it may show later on. You don't know what it shows then. To rely on somebody like that --

And what else do they do to compound matters? Detective Moran goes back to the gas station, talks about the gas station. He testifies, he then asks for a tape. He receives it. He goes back to the Electronics Unit. Again, there's no suspect when I ask him, no name of a suspect.

But you know, this occurred within this area, something about a van. And he says, he asked to view it. He did with the other detective, Detective Ed Goeller.

He goes back in. I said, "Did you take any notes?"

Took no notes.

He wasn't too sure how long it was, maybe an hour before or hour after.

"Did you go back with Ms. Dottin to review exactly where that van may have been?"

She said the van pulled up to the front door. That's where the camera was. You're investigating a case, whether it occurred or it didn't. At some point later on you may be in a court of law, close to two years later, two and-a-half years later, you don't preserve this, you don't protect it in any way.

He says he gives it back. I asked him, "Any problem with it? Can you make a copy, anything so unique?"

"No."

He does absolutely nothing with it. It goes to show, when you have officers who do a good job and detectives who do a good job.

You know what, you know they play judge and jury. How do you know that? The question is asked about the little blue lights on the weapon. He said, in all his, I believe, twenty-one years, all of the guns he's ever confiscated over the years, he said none of them had this. And you are left with the impression he had five or six hundred guns.

I got up and I crossed. I say, Wait a second, how many guns? Maybe five, maybe six.

Goes to show obviously the importance of a question and importance of cross, not to mislead in any way.

He says, at some point in time this is part of the weapon. And the question was: "

"If there are over five hundred guns that are manufactured, they all come with this?"

And the answer is, "Yes."

So again, it's a matter of, his testimony is more importantly what he didn't do.

And you also have in connection with the April 17th of '05 matter, you have also some testimony from when Ricardo is arrested from Detective Wimberly, because Detective Wimberly testifies in part that there was an orange juice container as well as pineapple juice container.

There was some questions, she said on direct they will have their own number. I asked about that at some point, the questions regarding the AMT that arrived at 9:35. He drank from the orange juice container. It may have been a cup container. It was left there next to the bench where he was handcuffed. She took it.

What about the pineapple container? The purposes for sending it, each gets it's own number.

In this case it wasn't the only number. Because when it gets sent to the lab, out of all the items that had been taken by Ms. Davilar, there's a question regarding the clothes and about the bra. She wasn't too sure what she did with some of the clothes, whether she took them off on a sheet in case there was any other debris that may be recovered or anything else.

She says there are four swabs along with fingerprint scrapings, nail scrapings, some other items she had taken. At that point she says she tries to put together a profile. That she, herself, had tested it back then. She puts together a chart which is in evidence. Okay. And I asked her, does the name Ricardo Walters, where did that name come from? It could have been Joe Smith, that's the name given by the detectives.

It's important when you take a look at the chart. I asked her if there is any additional peaks regarding the testing. She didn't testify much about the testing coming out. You noticed there were two swabs, A-1 and swab A-4. The only explanation is to where a 2 and a 3 were. We do know at some point in

time she hadn't seen where these other swabs are.

She didn't test buccal swabs from my client as well as the orange juice. I asked her who was the analyst that tested that, she's still there.

Have you seen the swabs themselves that had apparently this on that? And you're talking about not having enough peaks to make a determination.Those are questions.

As much as you're going to be asked to believe that DNA is infallible, I think you see it is not. It matters the integrity of it, how it is kept and how it's tested regarding that.

Those are the issues that you need to consider regarding April 17th of 2005, the manner in which it was taken, the manner in which it was tested. That becomes an issue as well.

Now, the Judge will instruct you on the law, that certainly is one area that you need to consider. When I say consider, because then once those issues are considered and those are charges in the indictment regarding Mrs. Dottin -- well, you will have it in part to kind of follow through.

But counts four, six, seven, and eight regarding the charges of, through, that robbery, criminal sexual act in the first degree, which will be

defined for you, sexual abuse in the first degree, as well as sexual abuse in the first degree, two different methods, that's for you to consider.

And I think from what I now submitted to you to consider and regarding the Judge's instructions on the law, you find that regarding the date of April 17th of '05, that the People have failed to prove Ricardo guilty of being that individual. Not to sit here and say, let's throw in four or five different days and try to argue them together.

So, you take that date, you consider it, you evaluate it, now you put it to the side.

The next date to follow through is November 28th of 2005, that's regarding Ms. Sanchez. And in part with Mrs. Sanchez now, again you have to analyze what is there, just as you would with the April 17th date, as well as the November 9th date, it doesn't change, doesn't get any easier. You still have to consider each of those charges on each one of those dates.

Ms. Sanchez. She testifies in part as to what had occurred. It's important not to go through, nor would I even submit that the sexual assault did not occur. As I said in the opening, it's the identification.

She identified in part giving a description. And it's in the testimony from her regarding that the individual -- did not notice any mustache on this individual, did not notice any dreads. You can play back and forth regarding whether it's covered or not. The fact of the matter is, she did not identify any dreads. Did not see any mustache. In fact she gives no weight, other than saying, going back and forth, medium or not. She couldn't give an age.

Have her testimony read back and you will hear there was no, again, no composite drawing regarding that situation. But she testifies that it was an individual hiding near a van. You heard my mention the van situation moments ago, because it goes towards the identification. As well, she merely describes it.

When I say that, describing an individual with a gun hiding near the van, athletic build, no age. They all say not skinny, not fat. You heard that. Those are situations I'm looking at now.

Okay, what else is there? She testifies that when she gets -- when she leaves that assault, she goes to work for a moment, the outcry, and then goes to the police and to the hospital in a little while.

Now, you have to take a look at, regarding

her testimony, regarding the description of the individual. As I have just said, what occurred when she went to the hospital.

They asked her, please, it's important, give us a description as best you can because that's what you will focus in on. They asked her about an age, she couldn't give one. Or something about this statement that was written down for her, four pages, in detail.

I asked her about ever saying anything about dreads, no mustache, but a round face, but a round face. In fact, she also goes on to say in part that time goes on before she is then contacted once again. And again there's no voice exemplar. But now the People rely on a lineup.

Now, if I could, round face. Look at the suggestiveness of the lineup. You take a look. You take a look. You will have these in here. It's not blown up like the DNA chart. Take a look. Looking through a small window, trying to look at a lineup to see whether it's adequate, whether in any way it's suggestive. Look at these guys. Could this face be any skinnier and this face skinnier? Look who has the fullest, roundest face here.

I'm not disputing he has a round face. Look through that window to say, Ms. Sanchez, who looks

familiar, for five or seven seconds after two years.

That's the first thing you will see is the round face.

The description that she gave at the time, the fear each woman had with the gun being pointed at them, what they're focusing in on, thinking they're going to be killed. It's a vicious, vicious crime. Just as vicious to convict an innocent man. That's why you're here, to take a look at what identifications were made.

On each one of these, take it back and take a long look. All male blacks. No question they all have hats on. Take a look who stands out immediately. Because that's what you need to look at before you put any significance as to whether or not an in-court identification is made.

She talked about the description in part regarding clothes as well. Take a look at what she says she saw, what she didn't see. Nothing about, as I had said, the particular age. Nothing about, in particular, about any do-rag. I'm told, all of a sudden it's two years later she's asked about that. One is a misidentification, comes in, no admissions here from my client admitting he committed any of this.

So you have an incident, young lady, ability

to observe, fear, and comes in here for November 28th, the lineup was February 29th. Two years later. Have part of that read back when you evaluate the November 28th, Ms. Sanchez, incident.

And as you are doing so, then you take that, if you evaluate that, listen to the Judge's instructions on the law on that, you will find that the People have failed to meet their burden; failed, if you follow the Judge's instructions regarding the incident.

And those will be within counts nine, ten and twelve, thirteen and fourteen as well. You will have those in considering, as you evaluate, that it's separate, it's distinct from the others. You put that to the side.

And you go to the incident of November 9th of '06. On November 9th of '06, you have, as you recall, Ilsa Morales and her sister. About 10:30 in the morning their testimony is that they go to Western Union, again all in Hempstead. And in fact in this case, as well as the others, not only is there some verbal conversation back and forth, but there is also again the situation where some fear for their life.

In this case you have two sisters, 10:30 in the morning. One sister gets out, goes into the Western Union, between ten to fifteen minutes. Because

you have a difference now of how did he actually get in the car, whether he reached in and pulled up the button or not.

Not that that is overly critical or not, but the issue that the individual comes to him with a gun, to the window. The window is up or down, because in Delmy Morales's statement it's, knock on the window with his hand. Asked her to put down the window. It was the sister that then handed over the money from her pocketbook, if you recall, to this individual. And there will be a lot maybe regarding, well, look at the description, it's light out, how long could they see.

If you have the testimony read back when I was discussing it with them, clearly, it was a matter between, you're sitting there, all of a sudden the gun gets placed in your face. You're not too sure if you will die or not. You're nervous. You are worried. That's what you're looking at. That's what you're focusing in on.

Now, the individual gets in the back seat. When the officer arrives there -- remember, he's in the back seat. There's a brief conversation. I broke it down. There is not ten, fifteen, twenty minutes. It's the situation where, at the side of the car there is a conversation, give me your money, opens up the

pocketbook. I think I broke it down from five seconds to seven seconds by the window.

He's now in the back of the car. Let's go, anymore money? No. Start the car. She tries to start it. The keys fall to the ground. She has to bend down and at least pick up the keys. Alarm goes off. This person gets out. Thirty seconds, forty-five seconds. It will seem like an eternity, no question. But it's still the identification you have to consider.

What descriptions do they give? In this case the description is, wears a blue baseball cap, again, blue jeans, no dreads, white sneakers.

Again, considering what description they're trying to give, as to one, whether he's six foot tall, and she said, I wasn't too sure of six foot. At one point she says, thirty-five years of age.

Again, all part for you to consider an identification. Because this goes back to November 9th of '06. No dreads, very scared, thought she might be killed.

No voice exemplar once again. Not going to the lineup and asking him to say something along these lines: Shut up. Ask him to say: Give me your money.

Something else to try to make the identification with. Not only doesn't describe this,

no beard as well. Doesn't notice or identify with any of those things.

Then you have again, now it's another two years, November 9th of '06 to February 29th of '08. There's a lineup. Again, the same lineup they're viewing again.

Take a look at these. As you're looking at it, it's going to be a fair lineup. Take a look at what is described. If they're describing a round face, you don't put one person in with a around face and the rest thin faces.

So, they bring in -- as you hear, there was a detective at the time. And then within months after that there is no longer a detective, Police Officer Morales. He testifies as to how he picks up the one sister first. Brings her into a room separately, where the other individuals are waiting to look into the lineup. And then it goes on in part, because now you have a question, not only does one sister then go in and he says makes a positive identification, but then at some point when he brings back the other sister. He's the only Spanish officer that is speaking to both of them.

He then says he only takes positive identifications, to make a notation or statement for

them to sign.

He acknowledges she comes in and says -- Ilsa -- "I'm not too sure." Walks back out. It's his testimony, he says, "But I think it's so and so."

He takes no statement from her. Doesn't do what's protocol with all the others, as far as taking some kind of statement for identification.

Once again, you have her coming in and then coming back, whether it's the next day or that day, saying, this is the identification. But you know what, what is very important is, and again, part of what you need to consider regarding reasonable doubt, is that Mr. Walters is now in a different seat. He's in a different seat now. And so when the sister comes in after the first sister had made an identification, when the sister comes back, there's a different number. The detective says in part, which is significant, I don't know -- Officer Morales, she picked out a number? Yes, she did.

"Question: You don't know what that number -- who that number was associated with, according to your testimony, correct?"

"That's right."

So, if he is saying, I don't know who the

target is but yet I'm going to take a statement when they pick out somebody or misidentify someone, then it's not credible to say, when the other one came out two seconds later and made an identification, that he doesn't take a statement from her. Because he doesn't know who is who, it wouldn't matter what number they picked out. You would still have a statement that had to be reduced to writing and you'd ask him to sign it.

Because that's the significance of looking at the manner in which an identification is made; how many individuals were there, whether the individuals, of course, are sitting and look at the other individuals that are around in making an identification, in making a decision as to whether that identification is accurate or not. And the Judge will instruct you once again on the date it occurred, on November 9th of 2006. Based upon their descriptions, based upon walking away, the size, the sneakers, the pants, the sweat shirt, all of that, because when evaluating that, you then will find the People haven't proven each and every element of those crimes. And you take that and you put that to the side.

And then you get to September 9th, September 9th of '07. We know -- and you hear from Ms. Sandoval. Ms. Sandoval is on her way to Dunkin' Donuts where