she's working. She's going to wait for the bus, 5:30 in the morning. She's at the bus shelter. The 5:30 bus didn't come.

I tried to at least ask her regarding roughly what time this was. Through some questioning on cross it came out that, yes, she had in fact missed it or the 5:30 bus never came.

It was Sunday morning. She is sitting down, legs out into the street, in part. The People had asked the Officer, I believe, Este whether or not there are prostitutes in that area. He said, yes, they are there.

Regarding the situation when Mr. Walters, Ricardo, now approaches her. Ms. Sandoval does testify that she doesn't understand English at all, correct?

"No."

"Question: You don't speak English, correct?"

"No."

"You don't write English either, correct?"

"Nothing."

Doesn't write Spanish. Doesn't write Spanish either.

When she's sitting there on the curb, many cars are going back and forth. While she's still

sitting there, that's when she sees the individual walking back.

And the question, "You're still sitting when this individual comes behind you?"

"Answer: I said to myself, thank God somebody else is taking the bus with me."

No fear, no threat.

"Did he have a mask on?"

"No, only a tie up his hair."

"Question: When he walks behind you -- he walked behind you?"

"Yes."

"You're still on the -- it's a busy road?"

"Yes, it is."

At that point she stares up. I ask her roughly at what point -- she's there. At that point I ask her, there's a conversation, conversation regarding money. She doesn't quite understand English. Doesn't know if it's a question regarding how much for her, what is happening. Clearly, a situation where she then panics. She is now panicking. There is a situation where, when Este is driving down, she says it's only a matter of seconds for when the officer came down.

Regarding Este.

"Question: You didn't see them at that time

in any struggle, correct?"

"Answer: Correct."

Now, you have Ricardo the size of this. Again, you saw Ms. Sandoval regarding -- saying she's struggling for five or ten minutes. Yet, they only walked four or five -- they're struggling. I think she says he might have pulled her, I think it was two feet, which I think was her testimony.

During all this struggle, there is a struggle without any injuries, without any scratches, without any tearing of any clothing.

And so, there's no question she panics. There's an interpretation there between -- somebody there is either talking to her. How do we know he's talking to her?

There's no question Ricardo panics when Officer Este pulls up, regardless of the embarrassing situation for Ricardo.

"You don't see Ricardo Walters grabbing her by the hair, correct?"

"Correct."

"You don't see a weapon in Ricardo Walters' hand, do you?"

"No."

"And you yell through your window to say,

hey, what is going on."

She's there in the street. It's maybe ten to six. Ricardo is there. Ms. Sandoval is maybe three or four feet in the roadway. And then Este says, what's going on there? And he says:

"Question: But Este says to you in response to your question what is going on there, I'm just trying to talk to her."

"Question: Talk to her?"

"Answer: Yes."

I'm asking Este, "I think on direct you said rap or talk. Rap would be your word."

"I don't know if he used street slang or rapping with her. I knew the gist of the conversation."

His response, "I was just trying to talk to her, just trying to rap to her, I couldn't."

And obviously now you have Ricardo there saying, What is going on? He says, I'm trying to talk to her.

And Este turns around and says, "You're trying to talk to her? Look at the way she's acting. Stay right there."

Ricardo should have stayed there, he panics. He goes to run.

Do you take out a gun to shoot or -- I asked Este, "You tell him to get down? You don't see any gun in his hand?"

"Absolutely not."

Sandoval said when the individual came up, he had a nylon on his head, no mask over on the individual's face. No comment to her regarding any act, regarding any sexual act. And why is that important? Because you are going to be asked to consider count two, kidnapping with the purpose of a sexually motivated act.

Now, the Judge will instruct you on that. I can't give you the law on that.

In dealing now with the September 9th incident, we have a robbery that is alleged, as well as a situation with the kidnapping in count three, kidnapping and sexually motivated felony, count three, and straight kidnapping.

The Judge will instruct you in evaluating each one of these dates of incident. When you take a look at the '99 date, you're to consider the evidence at that point in time, and whether there is any evidence whatsoever that he was grappling at her, grabbed for her clothes and said, come with me, I want oral sex like he said to the others. There's none of

that. You need to consider that apart from whether or not there was a robbery committed.

What's interesting is, Ricardo is taken back to the precinct. And now he's either searched by either Este and Jones, where you have the other detective Wimberly saying, I don't know how they received the gun.

But you have Jones saying the gun was in his back left pocket, which wouldn't make sense if it's in his right hand and he's running as well.

Because those are the things that you need to consider regarding the September 9th incident.

And there's three charges from September 9th, the robbery, kidnapping with motive, sexually motivated, as well as straight kidnapping. You need to consider each one of those all separately.

And if you do that regarding the September 9th date, as well, we're confident if you listen to the testimony from either Este -- Officer Este, Officer Jones, as well, regarding what had occurred to Ms. Sandoval, if you do that and you follow the Judge's instructions on the law to each one of those matters, that you will find that they failed to prove Ricardo guilty of those charges as well.

And I told you, I'm not very long-winded.

There are those dates that you need to consider. You still haven't heard from, of course, the prosecutor nor have you heard from Judge McCormack on the law in this case. And as difficult as it may be to not have one intermingled with the other, the Judge will instruct you on what is to be considered, that that is not to be done.

And as I said, my job is about over. I will sit down in a moment with Ricardo.

This is a case that lasted a couple of weeks. There was questioning of some witnesses. Some witnesses I didn't question. What they testified to was not relevant to the issues of the identification that you need to consider beyond a reasonable doubt.

At some point in time when this case is over and the Judge will instruct you, you will have the opportunity to speak to loved ones, family, friends about this case. And you will have doubts regarding this particular witness who testified a certain way.

Now is the time to have those doubts. Now is the time to evaluate the evidence. If you do so in a manner that Judge McCormack instructs you to do, we're confident, as tough as it is in doing so, knowing these women have been sexually assaulted, it is a heinous crime against them, but it's for you to take a look,

take a look and make sure the right individual is convicted.

Thank you.

THE COURT: Thank you.

Ms. Singas.

MS. SINGAS: Thank you, Judge.

Good morning, members of the jury. Shamika Dottin, Ilsa Morales, Delsy Sanchez, Delmy Morales, Sara Sandoval, five women in Hempstead turned into victims by the actions of one man, this man, Ricardo Walters.

You will have to decide many things when you go back into the deliberation room. You will have to decide, did the prosecution meet it's burden? Was every crime proved beyond a reasonable doubt? Were these women who came into these courtrooms truthful when they told you what happened to them,

Most significantly and most importantly, as Mr. Lemke conceded, the most important issue you have to decide is, was their identification of Ricardo Walters correct? Is that identification from that lineup where he sat with five other men with similar characteristics in a line, in this courtroom with people who look like him, when they picked him out, can that identification, those identifications, be relied

upon?

Can the DNA evidence, the DNA evidence that said one man, one man in this entire earth, in fact, one man in a hundred and sixty earths, one man left DNA on Shamika Dottin's breast, that one man who sits before you, Ricardo Walters, can that DNA evidence, scientific, proof can you rely on that beyond a reasonable doubt?

The answer, ladies and gentlemen, is yes. A resounding yes that bounced off every wall in every courtroom that we sat in.

A yes that these women knew what happened to them and more importantly who did it to them.

A yes with every witness who took the stand, every fact they gave you from that stand. Each woman strengthening her own case. Each one laying the foundation which built the wall of cases that you are to consider in a few moments. Yes.

You are sitting here as jurors, as opposed to all the other people we spoke to, because you made certain promises. You promised that you would let your common sense rule.

You promised that you would discard that which you know can't possibly be true.

You promised that you would take the evidence

as it came from the witness stand and from nowhere else.

I'm calling in those promises now. I'm asking you to focus on the issues in this case. To put aside that which you know makes no sense. To discard that which is unrealistic. To focus on the issues that you have, and let common sense be your guide as you listen to the evidence.

Now, how do we know first that these crimes happened? Okay. Mr. Lemke conceded on, most of them they did happened.

That on April 17th of '05, Shamika Dottin was brutally sodomized and robbed on her way home.

That on November 28th of 2005, that Delsy Sanchez was robbed and brutally raped.

That on November 9th of 2006, two sisters sat in their car and were robbed at gunpoint.

That on September 9th, 2007, no matter how you want to spin it, a man was caught in the act of robbing a woman in Hempstead. We know because police officers arrived on the scene within moments.

We know because those police officers told you how brutalized and terrorized those women were minutes after the crimes happened.

We know these crimes happened because of

physical evidence, because of money that was missing, because of hats that tested positive for semen, mouths that tested positive for semen, man's saliva on a woman's breast.

We know because of anguished outcries to co-workers like Rosa Portillo.

We know because of anguished screams to mothers like Sandra Dottin who told you she didn't just sit up in bed, she had to run to her daughter because she knew something was terribly wrong. Her cool, calm, composed daughter was screaming out to her. And she had to run to her and hold her and try to keep her together as she figured out what happened.

That's how we know these crimes happened. We know because of screams and frantic motions on a quiet Sunday morning in September in Hempstead.

Now, there can be no doubt that these women were victimized. The issue, the main issue you have to decide is who did it.

Ricardo Walters tried to be careful. He hid what he thought was his most distinctive features, his dreadlocks.

Every woman in this courtroom never saw his dreadlocks because they never saw his hair because his hair was always covered.

Despite his attempts to hide his appearance, despite his training as a law enforcement officer, despite him knowing the streets of Hempstead like the back of his hand, despite the fact that he tried to get rid of the evidence by making them swallow or making him deposit his semen on the side of the road, despite that, he made mistakes, mistakes which will lead you to only one conclusion, that Ricardo Walters is the man who committed these crimes.

He underestimated these women. And who are these women? Hard-working women, working long hours just to try to make some money to send it back home. Cleaning toilets at Dunkin' Donuts, making hamburgers at McDonalds, driving buses. That is who he terrorized.

Maybe they appear vulnerable. Maybe walking home alone or walking to work at odd hours, maybe they look vulnerable. Maybe they look like easy prey for a man of his strength, carrying one of his guns. Maybe he thought that they would listen to him when he said, don't call the police. But he underestimated them.

They had eyes and they had a voice and they had courage and they told the police with all the words they could muster exactly who did this to them. They came in these courtrooms and they told you under no

uncertain terms who attacked them, who robbed them, who sexually abused them; Ricardo Walters.

He didn't count -- he didn't count on the women recognizing the clothes he wore was a uniform. He didn't count on that.

He didn't count on the fact that his eyes and his face would sear themselves into the minds of Delsy and Ilsa and Delmy and Sara. He didn't count on that.

He didn't count on Shamika remembering the two little lights on top of the gun that he held. He didn't count on that little detail. That gun which separated him and his gun from a common street thug's gun.

He didn't count on the fact that these women would call the police.

He didn't count on the fact that they would easily recognize the man who sat or stood closer than I am to any of you in broad daylight. He didn't count on that.

He didn't count on the fact that he is a distinctive looking man.

He is. He is.

And not only did these women describe him perfectly, sometimes years before he was caught, described him perfectly, but they were able to

recognize him again.

He certainly didn't count on Sandra Sandoval fighting back that morning.

And he couldn't imagine that Eugene Este would be driving his patrol car down Greenwich Street.

All the things that he didn't count on lead you to him. All of those roads point to him and verify for you that the women were correct when they identified him at the lineup and in this courtroom and that the DNA is correct.

Let's start, as Ricardo Walters did, with Shamika Dottin.

Now, each count in the indictment, as you will see it, will have the dates next to it and the victim's name so it's easier for you to follow.

Shamika Dottin. When Shamika Dottin went to North Shore Hospital hours after she was brutally attacked, she had no idea that the swab of her breast would yield a DNA profile. She had no idea that these little numbers at these spots all across these alleles would identify her attacker. And not identify him a little bit.

Sandy Hayn, an expert, came in here and told you this configuration of numbers in this pattern happens one in a trillion. And there's not even a

trillion people on earth. So you don't get this at all except from one person.

In 2005, in 2005, and that is so significant, in 2005 this person identified her attacker. In 2005 there was one man whose stain was on her breast, and only one man. And they put that profile into the DNA databank in 2005. And they didn't know his name. And they didn't know anything about him yet.

Shamika knew that she couldn't identify him. It was dark. He had a mask, the nylon stocking pulled over his face so that he could hide his appearance. He took her money but he didn't leave. He forced her at gunpoint to the back of an alleyway and he sexually assaulted her. He pushed her down by her shoulders and forced her to her knees at gunpoint. He forced her to put his penis down her throat at gunpoint. He stood her up and he tried to unbuckle her pants but he couldn't do it. So he made her unbuckle her pants and he sexually assaulted her some more.

He was careful because he told her to swallow, and she did. And he was careful because he just inserted his fingers in her vagina, knowing that is not going to leave any evidence behind. But he faltered. He pushed aside her bra and he put his lips and his mouth on her breasts. He pushed aside her bra,

he didn't touch her bra with his mouth. The only part of her that made contact with him was her breasts at that time.

We don't need the bra. We need that secretion, that dried secretion from her breast. The direct evidence of where he put his mouth.

And when she told Detective Moran moments later at the hospital where she sat with her mother and underwent all these tests what happened, she told him she couldn't identify him. And Detective Moran knew that all he could do is wait.

And even when Detective Moran knew that this profile identified the person who did this to her, all he knew he had to do is wait, because there were no matches in 2005 for the person of who did this to her.

And every two weeks, as you heard Sandy explain it to you, the DNA lab gets profiles. They retrieve evidence from crime scenes. From that crime scene they analyze that evidence, they extract DNA profiles. When they get those profiles, they put them into the computer and they run those matches, hoping, hoping, that there will be a match. But there wasn't.

Ricardo Walters didn't count on his DNA being in that computer since 2005.

And it makes sense that his DNA wasn't in

that computer. He's not a career criminal. He's a corrections officer, a person in law enforcement. His DNA wouldn't just be in the bank. The fact that it took three years for that match to come corroborates, I submit to you, the fact that this is Ricardo Walters who did this.

Now, let's see what Shamika Dottin told the detectives about her attacker even before, even before, the DNA came back. What did Shamika say? He was five eleven. That he weighed two hundred something pounds. That he wore his hair in dreadlocks. She didn't see the dreadlocks but she knows based on the stocking he wore and based on the bulge behind his neck, and based on who she is, she knows he was hiding his dreads. He carried a gun. He carried a gun that had lights on it.

And this is so significant, ladies and gentlemen. Three years before he was caught with his gun in his pocket, three years before Shamika Dottin said the man had a gun and it had lights on it. I could see the lights when he had the gun next to me. They were glowing because it was dark there. And we know what these lights are called, they're called night sights.

And when Detective Moran got that little piece of information from her, he knew that the person

who he was looking for was no ordinary street thug. He knew that the people who carry weapons like that are people in law enforcement or people in the military. And lucky for him he hasn't lifted many guns from many perpetrators.

Who told you that law enforcement officials carry that gun? How about another expert, how about Sergeant Nemeth, whose job it is to only analyze guns, who has looked at thousands upon thousands of weapons over a twenty year career. And when asked, How many guns do you see that have night sights? He said, it's rare, very few.

So, he can mock Detective Moran all you want. But the fact of the matter is, the expert, the man who knows guns, told you that only law enforcement officers carry that gun. You don't get guns like that off the street. And we knew that. The Nassau County Police Department knew that in 2005.

She told them he wore a flight jacket, black nylon with an orange lining. All that information and she couldn't make an identification.

And more than two years later, two and-a-half years later, when Sandy Hayn and her team of analysts at the independent laboratory here in Nassau County received from Detective Wimberly an orange juice

container, separately sealed and apart from all the other evidence that was received, and when they analyzed that orange juice container that he drank from, they were able to obtain a DNA profile. And they put that profile into the same computer system, more than two and-a-half years later, and suddenly a match; the DNA jackpot.

The top line came from the plastic orange juice container. The bottom line, the bold numbers, again because the bold numbers are the contributor, the male contributor to her breast.

Remember, these numbers not in bold here indicate Shamika's DNA. The bold numbers from the dried secretions and the swab from the orange juice container (indicating), and they matched at every point, at every allel. One person in a hundred and fifty earths. One person, this person, who drank from that orange juice container and unbeknownst to him left his saliva behind on Shamika Dottin.

DNA evidence, scientific proof. How do we know that that is reliable? Because let's compare him to the person that Shamika Dottin said did this to her. We would have a problem, wouldn't you agree, if Shamika Dottin said the person who attacked me was five-five, he was a white guy, and the DNA came back to him.

But what did Shamika tell us? And what do we know about Ricardo Walters?

That's he's forty-two years old. He stands at five-eleven, just like Shamika said her attacker stood. He weighs two hundred forty pounds, just like Shamika said, two hundred something pounds.

He wore a dread -- he wore dreadlocks and he wore a do-rag on the day he was arrested, just like Shamika said her attacker did, just like she told him in 2005.

He is a New York City -- or, he was a New York City Corrections Officer who carried a nine millimeter gun outfitted for him with night sights, just like Shamika said he was carrying in 2005.

He wore a jacket like Investigator Lombardi told you corrections officers wear, with the orange lining and the black nylon. All of that Shamika was able to tell us two and-a-half years before this, two and-a-half years before this is verified for us in no uncertain terms.

This DNA was just icing on the cake, ladies and gentlemen.

Now, let's recap a little bit about Shamika's case and how we know this DNA can be relied on.

Her description matched Ricardo Walters. The

DNA profile matches, in terms of the chart, the constants, we can't comprehend them, trillions. What that means for us, one in a trillion the gun matched.

We know that on that day he wasn't working. Investigator Lombardi told us that 4/17/05, that is significant. It shows the he had the opportunity to commit this crime, he wasn't at work. He lives only three blocks away. All these facts taken together let you know that this scientific evidence is reliable. You can trust it.

Now, we spoke at great length during jury selection about identification and what kinds of factors make for a more accurate identification, okay. We talked about things like lighting, how far people are standing away from each other, the nature of the attack. Listen for those factors when the Judge reads you instructions on identification and let's apply those factors to what we know about Delsy Sanchez's case.

She was walking to work to start her shift at seven, in the early morning hours, in Hempstead, on November 28th, 2005. The sun was coming up. The sun was coming up. You saw the area. You have pictures of it. It's well-lit anyway. That's a busy thoroughfare, with lots of overhead lights and street lamps. You can

see them in the pictures.

But in any event, the sun was coming up. By the time he accosted her in that parking lot and took her across the street and sexual assaulted her and raped her behind that t.v. repair shop, she said by that time it was clear, I could see. I could see and I did see.

Now, initially he wore a mask, but he lifted it up and he put his arm around her. He didn't want to appear suspicious. He put his arm around her and walked her across the street so somebody seeing them couldn't see the gun that he had pressed against her ribs, the gun that was pressed on her stomach when she was telling him, please, I'm pregnant. Nobody could see that gun, but Delsy could feel that gun. And he walked her across the street. And they spent a significant amount of time together.

We talked in jury selection, remember we said about how a crime that happens, you're walking down a dark alleyway, somebody comes out of somewhere, grabs your purse and runs. You think an ID might be difficult in that case? Most of us agreed, probably.

That's not what we have here. He confronted her at the parking lot. They walked across the street together. She kept looking up at him. He took her to

the back. He lifted up his mask and she could see. And there's nothing wrong with Delsy Sanchez's eyesight. She was forced to place his penis into her mouth. She saw him approaching her. She saw him walking away from her. She saw the sides of him. She saw him in every imaginable angle. He raped her. His penis was in her mouth. There can be no closer contact between two people.

Now, I want you to think about Delsy's testimony. I want you to think about the details as she was able to give, her attention to detail. How she says that when she crossed over one part, the sidewalk was uneven. She had to get through the bushes. Every little thing about how she described his face. His eyes, his body build. All the details she had for us. The clothing he was wearing. The fact that when she walked over to that area, there was a step there and she had to step down and he pushed her back and she could feel a window at her back. And how she leaned over, had to use the ledge for support while he raped her. From the fact that she told you she took her hat and kept wiping her mouth and that hat tested positive for semen.

To the fact that she went back to the police and showed them, this is where this semen dropped,

right here. And guess what, ladies and gentlemen? When Crime Scene came back, right there, right where Delsy said it was, the ultra violet light lit up.

Because I submit to you, that is how much attention Delsy was paying. That's how good she is in describing and figuring out what went on around her.

If she is so good about all those other details, do you think she would be wrong about the one detail that mattered most; who did that to her? Could she be so right about everything else and so wrong when she identified him?

And the answer is, absolutely not.

Now, we talked about description versus recognition. Remember that? We talked about that it involves different skills to be able to describe someone and then be able to recognize them again later.

Delsy described her attacker, five-nine, strong, not fat, not thin, sad eyes, round face, hair covered. That description is right on.

You will remember I asked you during jury selection to describe me, while you guys were looking at me in a courtroom that is flooded with light, in an environment that is much less stressful than having a gun pointed to your head. And people said I was five-four and five-six, when I'm really closer to

five-eleven.

Do you remember that? Yet, all of you said that if I walked into the restaurant where you were having dinner that night, you would be able to recognize me.

So, despite the fact that some people got my height wrong by more than half a foot, you still would be able to recognize me.

But that's not what we have with Delsy. Delsy said five-nine, stocky, round face, muscular. She was right on. And when she walked into a lineup room, it took her seconds to recognize the man who did this to her. Six men and it took her seconds. Six men with things covering their hair so that hair would be neutralized. Curtains or sheets over their bodies so their body size would be neutralized. Just that face, and she recognized it.

She said, I felt the same fear in that lineup room that I felt that morning as soon as I saw him. She felt it.

Now, I submit to you, in court, I want all of you to remember the moment, because I think you picked it up, the moment when each of those women spotted him in the courtroom. How physically their manifestation would change as soon as they spotted him. How they

were almost transformed back to that place. Their voices became shacky. They became emotional. They couldn't keep their eyes off of him.

Only Shamika who was spared seeing his face, only Shamika didn't have that physical reaction because only Shamika isn't haunted by his face when she goes to sleep at night.

Delsy said to you, and it came during cross-examination, I only have his face engraved in my mind and I remember it every day.

And I submit to you that long after this trial is over she will never be able to erase Ricardo Walters' face from her dreams and her nightmares.

Now, there are other things in Delsy's case that corroborates the fact that she identified the right man. She described him as wearing a uniform. That morning, again in November of 2005, that morning she said, "The person who did this to me is a security guard or he's a cop, he was wearing a uniform. I could tell by the way he handled that gun, by the way he ordered me around, he's in law enforcement."

In 2005 she said that. And guess what, he does wear a uniform. In September of '07 he was wearing his uniform, his corrections officer uniform.

So she didn't just pick that out of anywhere.

She said he wore a uniform, and he does wear a uniform.

On this particular date, on 11/28, he was scheduled to go to work. He was scheduled to work that day. And his shift started at seven a.m. But Investigator Lombardi told you, he called in sick because he had a stomachache. So, it's entirely consistent that on that morning he got up and got dressed in his uniform on his way to work when he spotted Delsy Sanchez and sometime either right before or right after he brutally raped her he called in and said he had a stomachache.

But how convenient that he was off that day. That he had the opportunity to do this to Delsy Sanchez, that he took off that day. That's why he was in his uniform.

And she described his gun. She kept showing you a black automatic. Putting the cartridge in. She didn't know the word. These women don't know guns. She showed you. You have this black gun and two other black guns that look just like it that he owns. The fact that he owns those guns that look just like the one that she described is not a coincidence. It's facts that lead you to believe that the identification that Delsy made was accurate.

The manner in which he attacked her also

tells you that her identification of him is reliable. In Hempstead, he surprises her. He confronts her at gunpoint. He takes her money, but it doesn't stop there. This never stops there. It's not about the money. It doesn't stop there.

He takes her at gunpoint to an area that is secluded, that is private. He places his arm around her and moves her away. He pushes her down by her shoulder, so she's crouching. He forces his penis into her mouth. He also tries not to leave any evidence behind. He tries not to ejaculate anywhere so that it can be tested.

He pulls her up, he tries to unbuckle her pants but he can't. But he's holding the gun. So he tells her, just like he told Shamika, unbutton your pants. And they do. And then he raped her. And then he told her, like he told Shamika and like he told all the others, Do not call the police or I will come back and kill you. And then he walks away. He doesn't drive, he walks, into Hempstead somewhere.

Even the words he said throughout the attack against Delsy corroborates what Delsy says. Because what is it that she says, he kept saying to her, Shut up, don't look at me, don't look at me.

And that also is significant, ladies and

gentlemen. Because if she wasn't looking at him, he wouldn't be saying, Don't look at me. If he hadn't lifted up his mask so that she could see, there wouldn't be a need to say, Don't look at me. Those are facts that remain consistent.

Delsy said, He said don't look at me, but I needed to see him.

Delsy's case, her description is exact. The fact that she said he's in security, he's a corrections officer, not a coincidence. She knew and we know that she got the right person.

The black gun that he owns. The opportunity that he had when he called in sick, not coincidences. These are facts that demonstrate those identifications can be relied upon.

And you can look at those lineups and take them in the back and you will see that all of these men look similar. They all have the same facial characteristics and facial hair. In fact, facial hair changes, it doesn't even matter. Here he's got a full beard. Yet, at the time he was attacking them, sometimes he had a mustache, sometimes he had a goatee, sometimes he had it shaven. Despite that, they were still able to pick him out.

Now, Ilsa and Delmy Morales were stunned when

he sat in their car at ten o'clock in the morning. When Ricardo Walters, like a hardened, brazen criminal, walks over to them in broad daylight, in broad daylight, and leaned into their car and put his gun on Delmy's thigh and said, Give me the money. In broad daylight. And they looked at him, just as if any of us would look at him, like, are you kidding me? He wasn't kidding, give him the money. And Ilsa opened up her purse and he reached in and took her money. And they were scared and they were trying to get someone's attention. And they thought that he would walk away, but he didn't leave. He did not leave. Instead, he gets into their car. He opened the door and gets into their car and sits between them in the back seat.

Do you think they didn't see him? Do you think that can just happen and you wouldn't look to say, my God, what is he doing? Is he really getting into my car?

Yes, in fact he was.

Let's talk about those identification factors.

What was the lighting like? Broad daylight. Broad daylight.

How close were they to him? Again, closer than I am to any of you. And he leaned into the

window, and again when he sat in the back seat Both see his face. Both are pleading with him, Please leave us alone. We have no more money. And he's just saying, Drive. He's using that gun and he's saying, Drive. And they can't get the car started and they're scared and they know they shouldn't start the car and drive away with him in it.

Again, it's not in a dark alleyway. It's over in a second. They told you he was out by the window two or three minutes. He was inside the car what felt to them like an eternity, they said twice as long, seven, eight, nine, ten minutes, having this conversation, he's saying, Drive, and they're saying, no.

Delmy Morales told you, I looked at him and I said, Please, don't, you have a family. She knew that she had to engage him on some human level. She thought she was fighting for her life. She said, Please, would you want someone doing this to your family? Please, just let us go.

And she was looking at him because she wanted to engage him. And they described him, six feet, six-one. He's five-eleven, they're dead on. Hair covered. Again, a hat. On top of the hat a hooded sweat shirt. They don't know what is under there. But

they didn't see his hair because it was covered.

A big, stocky man, round-faced, facial hair, thirty-five to forty years old.

How significant is that, because wouldn't you expect a twenty year old, an eighteen year old? A thirty-five year old criminal? They got that right. Oh, they said thirty-six. Okay, thirty-five years old.

The person that they describe is, again, Ricardo Walters. Their skill at describing was very good. And then they were brought to the lineup. Their lineup was closer in time to when their incident happened. And they walked in and Delmy who engaged him, Delmy who would look into his eyes and say, Please, please, spare us, within seconds she walked in and said Ricardo Walters is the man who robbed us.

Ilsa Morales told you she saw him when he was at the window, she was too frightened to look when he got into the back seat. When she went into that lineup, remember, the number is switched. He switched his position. So, it's not like Delmy went back and said, Hey, Ilsa, pick number four. Delmy went back, it's number four.

Okay, don't worry, I got this covered. He switched his position. And she walked in and she said, I thought they could see me. When she looked through

that window and could see them clearly she said, I thought they could see me, I didn't say anything, I was not sure. As soon as we got outside I told police officer, number five.

Not number four like Delsy had said, it was number five. And she recognized him.

Now, Police Officer Morales, why is he significant? Because he didn't know, he's not involved in this case. He was brought in to be a transporter for witnesses and a translater. He had no idea that he had switched his spot. So when she says to him, I think it's number five, he's like, all right. It means nothing to him because he doesn't know who the subject of the lineup is. It's what we call a double-blind lineup. The person who is running it doesn't know what the number is. And it's not until he mentions it to his sergeant, Listen, she says it was number five. The sergeant says, wait a minute, it was number five. He had switched his seat. Make a note of that, it was number five.

And then they came into this courtroom and looked around this courtroom at all the people in it, at all the faces, and they told you that Ricardo Walters is the person who robbed them at gunpoint that morning in broad daylight, standing just inches away

from them.

You know that there are other things that corroborate their identification of Ricardo Walters. Like this, like this silver gun. Do you think it's just a coincidence that they said the man who robbed them had a silver gun, and then from Ricardo Walters' home a silver gun, this gun, is corroboration again that those women made the correct ID of Ricardo Walters at the lineup and in this courtroom. This isn't a coincidence. He's got three black guns and one silver. This is the one that was pressed against her thigh that morning. You think she will forget it? Silver.

How about the manner in which he conducted that attack? Again, surprising them, at gunpoint. Demanding money. Getting money but not leaving. Getting money but wanting the crime to continue. Getting in the car and saying to them, Drive, drive away from this populated area. Drive away to somewhere more secluded. Just drive.

The robbery was not enough. The robbery was the beginning. But at that point Delmy says, I don't know how, but at that point the car alarm went off and the alarm started sounding there on Fulton Avenue in Hempstead at ten o'clock in the morning. He said, I'm out of here. And he got out of the car and walked

towards Home Depot and never looked back.

The fact that he isn't wearing a uniform is also important. That's not a coincidence. You see, that day he wasn't working. He wasn't working anywhere around that time. So, yeah, he was in jeans and his sneakers. He wasn't working. The fact that this crime was committed on the day when he wasn't working and hadn't been working and he's in jeans is significant. And again, it corroborates the fact that they made the correct identification. He wasn't on his way to work that morning, no need for him to be in his navy cargo utility pants. That helps bolster their identification. It doesn't hurt it. And the fact he wasn't working gives him, again, the opportunity to commit this crime.

So, based on the description which matched, based upon the build that they say, the man that they saw at the window and what they told the police, the age of the man that did that to them, the fact he wasn't working, the fact he had a silver gun, the fact he lives in Hempstead, all of those are not coincidences. All of those facts point to the correct identification of Ricardo Walters in the crime against Delsy -- Delmy and Ilsa Morales.

Sara Sandoval was in her Dunkin Donuts

uniform the morning of September 9th, 2007 when Ricardo Walters spotted who would prove to be his most difficult target. He didn't count on that. This simple woman, who couldn't even tell you in Spanish, who's not literate in Spanish or in English, who can't write a name down, this simple woman described for us what she endured. He took his gun out and he demanded money, which she gave him.

You see, there can be no misunderstanding when you're looking at the butt of a gun. There can be no misunderstanding when someone says to you, Give me your money, and has a gun pointed at you. That's not what we call a conversation, that's what we call a robbery, "Give me your money."

Now, how would Sara Sandoval know that he had a gun unless he took it out? How would Sara Sandoval know that he had a gun unless he took it out for her to see it? And if he was just trying rap to her, there would be no reason for him to be pulling out his nine millimeter, fully loaded, operational weapon, is there? How would Sara Sandoval know he had a gun unless he took it out?

How would Eugene Este know that he had a gun unless Sara Sandoval made the sign, he's got a gun (indicating). You see, she didn't need to speak. And

Officer Este didn't need to speak Spanish or any language, other than looking at this (indicating).

A seasoned street cop sees this in the early morning hours when pedestrian traffic is light, vehicular I traffic even lighter. You've got a hysterical woman in the street screaming, an anguished scream like he he's never heard before, much like the scream that Sandra Dottin heard when her daughter came running in. A scream, a gesture. He was caught in the act.

What else lets us know this wasn't some misunderstanding? How about the fact that her money and her sister's name which she needs for work, Maria Reyes, in block letters, that she needs to copy, why is this in his pocket when Dale Jones is searching him if this isn't a robbery? You think the Hempstead -- the prostitutes in Hempstead give the Johns their money? Is that the way you think it works? I never asked Gene Este whether there were prostitutes working in that area. I said, you have seen prostitutes and was she one. And he said no.

This money, this sheet of paper, most significantly this sheet of paper, with her sister's name is in his pocket minutes, minutes after Sandra said he robbed her. That is corroboration. Her

sister's name in his pocket. Her money that he had just taken when he took out his gun for her to see it, in his pocket.

What else corroborates the fact that this was a robbery? His actions. We spoke at jury selection about the term, actions speak louder than words. What are his actions? A law enforcement officer carrying a weapon, having his shield and his identification, if this was just a misunderstanding he would have said, whoa, take it back a step, this is what is going on; instead, he ran. This law enforcement officer ran from another law enforcement officer. And why is he running? Because he needs to get away. Because he knows it's all over now and he's running.

What else? His car is parked not right there where you would expect it, but parked a block and a half away, doors unlocked, engine running. It's not by a Dunkin Donuts. He didn't run in to get a paper or cup of coffee. It's in an abandoned parking lot. His car engine running. He's running towards that direction so he can get to his car and get away.

Now, if all he wanted to do is talk to her, why wouldn't he just drive up and talk to her? Hell, maybe he could even offer her a ride. She's waiting for the bus. He's got a car. The fact that his car is

parked away idling, waiting, is further indicative of the fact that he committed a robbery. He was up to no good. He had to leave his car so they couldn't really connect him to it and needed a getaway.

Now, the kidnapping count as it pertains to this one, Sara Sandoval, and as to Ilsa and Delmy Morales, listen to the Judge's instructions on kidnapping, okay. Because it's not the kind of kidnapping you're envisioning in the movies with ransom notes and so on. Listen to the Judge's instructions about kidnapping. By moving her, even moving her a few feet, legally he can commit the crime of kidnapping at gunpoint.

Now, the method again that he uses, the manner in which this crime is committed again tells us that Gene Este was not wrong when he interpreted what was going on that morning.

Again, in Hempstead he approaches a Hispanic woman in the early morning hours and surprises her at gunpoint, a gun which she saw. He unnerves her, producing the gun from his waist. He puts it to her. He demands money. She gives him money and he doesn't leave. And at this point he's trying to drag her away toward that building she said. And he's -- I think you can remember the motions that she was making, he was

pulling her hair. There's no injury, he didn't punch her. He didn't slap her. He grabbed her by the hair and he was pulling her. And she resisted. And he didn't count on that. And when a car would pass, she would say that he would put his arm around her, again as if there's nothing wrong here, we're okay. And as the car would pass, he would pull her again and she would fight back.

Now, based on everything that you heard in this case, based on common sense, based on your common life experiences, I submit to you he was pulling her for his own sexual gratification. He needed to get her into a more secluded, private space so he could sexually assault her. That is the basis of the second count, kidnapping as a sexually motivated felony. Based on everything you know about that case and about Ricardo Walters, that is what he was planning on doing.

Now, he's in uniform, again he's in uniform. He was scheduled to work that day. He's wearing his uniform pants. His uniform shirt is hanging in his closet. Perhaps he would have made it to work, perhaps he would have called in sick, but he was scheduled to work that morning.

He was on his way to work, I submit to you, when he spotted Sara Sandoval. His luck ran out when

he met Sara Sandoval. His criminal career cut short when the seasoned police officer knew something terribly wrong was going on. A seasoned cop who chased a perpetrator that's dressed just like he was dressed. A seasoned police officer who drew his weapon and told him to stop, not once, not twice, repeatedly -- there is no misunderstanding -- until he was able to overrun him, but not before this seasoned cop was chasing a person that was dressed just like him, reaching for his back pocket where he had just hidden a weapon that he used to rob a woman. Este still chased him and got in front of him and told him to get down. He -- and he couldn't believe a police officer was demanding that he get down. He's like, All the way down? And Este told him, Yeah, all the way down.

We know that Ricardo Walters is the right man.

We know based on descriptions given.

We know based on identifications made in lineups and in courtrooms.

We know based on the fact that these crimes were committed in one and-a-half miles in Hempstead against mostly Hispanic women.

We know because we know he owns those guns that those women described so perfectly.

We know because he was wearing the uniform that those women said he was wearing and he's required to wear as part of his job.

We know because every time he committed the crime he was either on his way to work or not working so he had the opportunity to commit those crimes.

We know because of the strength of five random women who, I submit to you, you won't forget very soon because of their strength, who came in here and told you just as they had told detectives and police officers sometimes years before they told you what happened to them and who did it.

And because of the professionals who do their jobs every day, regardless, regardless of whether it's a corrections officer that is arrested or a drug dealer that is arrested or no one that is arrested, keep plugging away. Because of their hard work these crimes were solved.

Detectives who seize orange juice containers. Detectives who seize hats which contain semen. Detectives who secure crime scenes. Detectives who put together fair lineups. Detectives and police officers who realize these crimes seem eerily similar.

Lab technicians who extracted years earlier DNA from dried secretion swabs and buccal swabs

because, remember, you don't only have to rely on this orange juice container. There was a confirmatory ID made when Detective Dunn stuck a Q-tip in his mouth the day of the lineup and it was sent to the lab. That's what we see in this chart, People's 60 -- no, not People's 60. That's what we see in this one. The dried secretions and Ricardo Walters. Based on the confirmatory DNA swab.

So, if you wanted to, you can toss aside the orange juice container -- there's no reason to do it -- but they did a confirmatory swab. Detective Dunn told you at the lineup room he took his DNA and he sent that to the lab and the information and the DNA profile and statistics of one in a trillion they were confirmed.

So, because of lab technicians like that, who extract the DNA from buccal swabs and dried secretions and orange juice containers, because of specially trained nurses who collected evidence and try to offer some comfort to women who had just been brutally raped, one of these professionals contributing a little, but together building a case that is impenetrable, solid, reinforced.

The time has come for you to evaluate the evidence in light of the Judge's instructions, in light of your common sense. It is time now to render a

verdict consistent with what you know, what your life experiences have shown you, what your common sense tells you was happening in each of those days, consistent with justice.

It took three years for Ricardo Walters to be brought to justice. While justice was delayed, it will be swift and it will be sure. Tell him with your verdict what he already knows, that he's guilty of every crime in that indictment.

Thank you.

THE COURT: Okay. Thank you, Ms. Singas.

Members of the jury, I will take a break at this point. I will have you back to charge. So, at this point if you will follow my lieutenant in the back, I'll have you back here in ten minutes.

(Whereupon, the sworn jury and alternates leave the courtroom)

(Whereupon, there is a brief pause taken)

THE COURT OFFICER: Bring them back in.

Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE COURT: All right, members of the jury. I have had a change of heart. Rather than have you -- the charge will actually probably be, I would say, at

least an hour. I understand from my lieutenant that lunch is here.

So, I know you have been sitting here for quite a while. What I am going to do, with the cooperation of everybody, you will not deliberate yet, obviously, on your verdict. You haven't heard my instructions on the law. I want you to have your lunch. We will take about forty-five minutes and we'll start with my instructions at about 1:45.

You can't leave the courthouse. If anybody needs to do whatever they have to do, Dave will obviously accommodate you.

So, don't deliberate. Your lunch is here. We will start the charge in about forty-five minutes. Okay.

(Whereupon, the sworn jury and alternates leave the courtroom)

THE COURT: All right, People and defendant, you have seen a copy of the verdict sheet. Anybody have any objections or requests for any modifications or changes?

MS. SINGAS: No, Judge.

MR. LEMKE: No, your Honor.

THE COURT: We will mark that as a court exhibit. We'll see everybody back here at 1:45.

(Whereupon, there is a luncheon recess taken in the proceedings)

A F T E R N O O N S E S S I O N

(Whereupon, the following takes place in open court, all parties being present, the defendant being present)

THE COURT OFFICER: Jury entering.

THE CLERK: The Court is about to charge the jury. Anyone wishing to leave may do so now. No one will be permitted to enter or leave during the charge of the Court.

THE COURT: Okay. All right, members of the jury. I will now begin to instruct you on the law. I will first review the general principles of law that apply to this case and to all criminal cases. You have heard me explain some of these principles at the beginning of the trial, so I'm sure at this time you will appreciate the benefit of me repeating these instructions at this stage of the proceedings.

Then I will next define the crimes charged in this case and explain the law that applies to those definitions and spell out the elements of each crime -- of each charged crime.

Then finally, I will outline the process of jury deliberations.

During these instructions, members of the jury, I will not summarize the evidence. If necessary, I may refer to portions of the evidence to explain the law that relates to it.

My reference to evidence or my failure to refer to evidence expresses no opinion about the truthfulness, accuracy or the importance of any particular evidence. In fact, nothing I have said and no questions I have asked during the course of this trial were meant to suggest that I have an opinion about this case, a witness, the evidence or whether the defendant is guilty or not guilty.

If you have formed an impression that I do have such an opinion, you must put it out of your mind and disregard it.

The level of my voice or intonation may vary during these instructions. If I do that it is to help you understand these instructions. It is not done to communicate any opinion about the law or the facts of the case or of whether the defendant is guilty or not guilty.

Remember, it is not my responsibility to judge the evidence here, it is yours.

You and you alone are the judges of the facts. And you and you alone are responsible for deciding whether the defendant is guilty or not guilty.

In your deliberations you may not consider or speculate about matters relating to sentence or punishment. If there is a verdict of guilty, it will be my responsibility to impose an appropriate sentence.

When you judge the facts you are to consider only the evidence. The evidence in this case includes the testimony of the witnesses, the exhibits that were received in evidence, and the stipulation by the parties.

A stipulation is information the parties agree to present to the jury as evidence without calling a witness to testify.

You should evaluate evidence that has been stipulated to in the manner you would evaluate any other evidence.

Testimony which was stricken from the record or to which an objection was sustained must be disregarded by you.

Exhibits that were received in evidence are available upon your request for your inspection and consideration.

Exhibits that were received during the trial

and marked for identification but not received in evidence are not evidence and are thus not available for your inspection and consideration. But testimony based on exhibits that were not received in evidence may be considered by you. It is just that the exhibit itself is not available for your inspection and consideration.

The charges in this case were set forth in a document known as an indictment. The indictment simply states the charges. Neither the indictment itself nor the fact that an indictment has been filed constitutes evidence.

The defendant has pled not guilty to the charges contained in the Indictment and the trial is thus to decide whether the defendant is guilty or not guilty.

In evaluating the evidence you may consider any fact that is proven and any inference which may be drawn naturally, reasonably and logically from such fact.

To draw an inference means to infer, find, conclude that a fact exists or does not exist based upon proof of some other fact or facts.

For example, if you were to go to bed one night when it is not raining and you wake up in the

morning, you look out your window, you do not see rain but you see that the streets and sidewalks are wet, that people are wearing raincoats and carrying umbrellas, under those circumstances it may be reasonable to infer, conclude, that it had rained during the night.

In other words, the fact of rain during the night is an inference that might be drawn from the proven facts of the presence of water on the street and sidewalk and people in raincoats and carrying umbrellas.

An inference must only be drawn from a proven fact or facts, and then only if the inference flows naturally, reasonably and logically from the proven fact or facts, not if it is speculative.

Therefore, in deciding whether to draw an inference, you must look at and consider all the facts in the light of reason, common sense, and experience.

We now turn to the fundamental principles of our law that apply in all criminal trials: The presumption of innocence, the burden of proof and the requirement of proof beyond a reasonable doubt.

Throughout these proceedings the defendant is presumed to be innocent. As a result, you must find the defendant not guilty unless on the evidence

presented at this trial you conclude that the People have proven the defendant guilty beyond a reasonable doubt.

The defendant is not required to prove that he is not guilty. In fact, the defendant is not required to prove or disprove anything. To the contrary, the People have the burden of proving the defendant guilty beyond a reasonable doubt. That means, before you can find the defendant guilty of a crime, the People must prove beyond a reasonable doubt every element of the crime, including that the defendant is the person who committed that crime.

The burden of proof never shifts from the People to the defendant. If the People fail to satisfy their burden of proof, you must find the defendant not guilty. If the People satisfy their burden of proof, you must find the defendant guilty.

What does our law mean when it requires proof of guilt beyond a reasonable doubt? The law uses the term proof beyond a reasonable doubt to tell you how convincing the evidence of guilt must be to permit a verdict of guilty.

The law recognizes that in dealing with human affairs there are very few things in this world that we know with absolute certainty.

Therefore, the law does not require the People to prove a defendant guilty beyond all possible doubt. On the other hand, it is not sufficient to prove that the defendant is probably guilty.

In a criminal case the proof of guilt must be stronger than that, it must be beyond a reasonable doubt.

A reasonable doubt is an honest doubt of the defendant's guilt for which a reason exists based on the nature and quality of the evidence.

It is an actual doubt, not an imaginary doubt.

It is a doubt that a reasonable person acting in a matter of this importance would be likely to entertain because of the evidence that was presented or because of the lack of convincing evidence.

Proof of guilt beyond a reasonable doubt is proof that leaves you so firmly convinced of the defendant's guilt, that you have no reasonable doubt of the existence of any element of the crime or of the defendant's identity as the person who committed the crime.

In determining whether or not the People have proven the defendant guilty -- defendant's guilt beyond a reasonable doubt you should be guided solely by a

full and fair evaluation of the evidence.

After carefully evaluating the evidence, each of you must decide whether or not that evidence convinces you beyond a reasonable doubt of the defendant's guilt.

Whatever your verdict may be, it must not rest upon baseless speculation, nor may it be influenced in any way by bias, prejudice, sympathy or by a desire to bring an end to your deliberations or to avoid an unpleasant duty.

If you are not convinced beyond a reasonable doubt that the defendant is guilty of a charged crime, you must find the defendant not guilty of that crime.

If you are convinced beyond a reasonable doubt that the defendant is guilty of a charged crime, you must find the defendant guilty of that crime.

As judges of the facts, you alone determine the truthfulness and accuracy of the testimony of each witness. You must decide whether a witness told the truth and was accurate or instead testified falsely or was mistaken.

You must also decide what importance to give to the testimony you accept as truthful and accurate.

It is the quality of the testimony that is controlling, not the number of witnesses who testify.

If you find any witness has intentionally testified falsely as to any material fact, you may disregard that witness's entire testimony, or you may disregard so much of it as you find was untruthful and accept so much of it as you find to be truthfully and accurately given.

There are no particular -- there is no particular formula for evaluating the truthfulness and accuracy of another person's statements or testimony. You bring to this process all of your varied life experiences. In life you frequently decide the truthfulness and accuracy of statements made to you by other people. The same factors used to make those decisions should be used in this case when evaluating the testimony.

In general, some of the factors that you may wish to consider in evaluating the testimony of a witness are as follows:

Did the witness have an opportunity to see or hear the events about which he or she testified?

Did the witness have the ability to recall those events accurately?

Was the testimony of the witness plausible and likely to be true, or was it implausible and not likely to be true?

Was the testimony of the witness consistent or inconsistent with other testimony or evidence in the case?

Did the manner in which the witness testified reflect upon the truthfulness of that witness's testimony?

To what extent, if any, did the witness's background, training, education or experience affect the believability of that witness's testimony?

Did the witness have a bias, hostility or some other attitude that affected the truthfulness of that witness's testimony?

You may consider whether a witness had or did not have a motive to lie.

If a witness had a motive to lie, you may consider whether and to what extent, if any, that motive affected the truthfulness of that witness's testimony.

If a witness did not have a motive to lie, you may consider that as well in evaluating the witness's truthfulness.

You may consider whether a witness has any interest in the outcome of the case or, instead, whether the witness has no such interest.

You are not required to reject the testimony

of an interested witness or to accept the testimony of a witness who has no interest in the outcome of the case.

You may, however, consider whether an interest in the outcome or the lack of such interest affected the truthfulness of the witness's testimony.

You may consider whether a witness made statements at this trial that are inconsistent with each other.

You may also consider whether a witness made previous statements that are inconsistent with his or her testimony at trial.

You may consider whether a witness testified to a fact here at trial that the witness omitted to state at a prior time when it would have been reasonable and logical for the witness to have stated the fact.

In determining whether a witness -- it would have been reasonable or logical for the witness to have stated the omitted fact, you may consider whether the witness's attention was called to the matter and whether the witness was specifically asked about it.

If a witness has made such inconsistent statements or omissions, you may consider whether and to what extent they affect the truthfulness or accuracy

of that witness's testimony here at trial.

The testimony -- the contents of a prior inconsistent statement are not proof of what happened.

You may use evidence of a prior inconsistent statement only to evaluate the truthfulness or accuracy of the witness's testimony here at trial.

You may consider whether a witness's testimony is consistent with the testimony of other witnesses or with other evidence in the case.

If there were inconsistencies by or among witnesses, you may consider whether they were significant inconsistencies relating to important facts or instead were the kind of minor inconsistencies that one might expect from multiple witnesses to the same event.

The fact that the defendant in this case did not testify is not a factor from which any inference unfavorable to the defendant may be drawn.

In this case you have heard the testimony of police officers and detectives. The testimony of a witness should not be believed solely and simply because a witness is a police officer or a detective.

At the same time, a witness's testimony should not be disbelieved solely and simply because the witness is a police officer or a detective.

In other words, you must not believe or disbelieve a police officer or detective just because he or she is a police officer or detective. You must evaluate a police officer's testimony in the same way you would evaluate the testimony of any other witness.

Intent, as you will hear me define later, does not require premeditation. In other words, intent does not require advanced planning nor is it necessary that the intent be in a person's mind for any particular period of time. The intent can be formed and need only exist at the very moment the person engages in prohibited conduct or acts to cause the prohibited result and not at any earlier time.

The question naturally arises as to how to determine whether or not a defendant had the intent required for the commission of a crime.

To make that determination in this case you must decide if the required intent can be inferred beyond a reasonable doubt from the proven facts. In doing so, you may consider the person's conduct and all of the circumstances surrounding that conduct, including but not limited to the following:

What, if anything, did the person do or say?

What result, if any, followed the person's conduct?

And what was -- and was that result the natural, necessary and probable consequence of that conduct?

Therefore, in this case, from the facts you find to have been proven, decide whether or not you can infer beyond a reasonable doubt that the defendant had the intent required for the commission of the crime.

Now, in some of the counts there was more than one -- one witness, I should say, identification, and some other counts you are going to consider more than one witness. The following charge I'm going to give you concerns those counts you find were only one witness that identified the defendant as the perpetrator of the charged crime.

As you know, an issue in the case is whether the defendant has been correctly identified as the person who committed the charged crime. The People have the burden of proving beyond a reasonable doubt not only that a charged crime was committed, but that the defendant is the person who committed that crime.

Thus, even if you are convinced beyond a reasonable doubt that a charged crime was committed by someone, you cannot convict the defendant of that crime unless you are also convinced beyond a reasonable doubt that he is the person who committed that crime.

Our system of justice is deeply concerned that no person who is innocent of a crime be convicted of it. In order to avoid that, a jury must consider identification testimony with great care, especially when the only evidence identifying the defendant as the perpetrator comes from one witness.

Because the law is not so much concerned with the number of witnesses called, as with the quality of the testimony given, the law does permit a guilty verdict on the testimony of one witness identifying the defendant as the person who committed the charged crime.

A guilty verdict is permitted, however, only if the evidence is of sufficient quality to convince you beyond a reasonable doubt that all the elements of the charged crime have been proven and that the identification of the defendant is both truthful and accurate.

With respect to whether the identification is truthful, that is, not deliberately false, you must evaluate the believability of a witness -- of the witness who made an identification. In doing so, you may consider the various factors for evaluating the believability of a witness's testimony that I listed for you a few moments ago.

With respect to whether the identification is accurate, that is, not an honest mistake, you must evaluate the witness's intelligence and capacity for observations, reasoning and memory and determine whether you are satisfied that the witness is a reliable witness who had the ability to observe and remember the person in question.

Further, the accuracy of a witness's testimony identifying a person also depends on the opportunity the witness had to observe and remember that person.

Thus, in evaluating the accuracy of identification testimony, you should also consider such factors as:

What were the lighting conditions under which the witness made his or her observations?

What was the distance between the witness and the perpetrator?

Did the witness have an unobstructed view of the perpetrator?

Did the witness have an opportunity to see and remember the facial features, body size, hair, skin color and clothing of the perpetrator?

For what period of time did the witness actually observe the perpetrator?

During that time, in what direction were the -- were the witness and the perpetrator facing, and where was the witness's attention directed?

Did the witness have a particular reason to look at and remember the perpetrator?

Did the perpetrator have distinctive features that a witness would be likely to notice and remember?

Did the witness have an opportunity to give a description of the perpetrator?

If so, to what extent did it match or not match the defendant as you find the defendant's appearance to have been on the day in question.

What was the mental, physical and emotional state of the witness before, during and after the observation?

To what extent, if any, did that condition affect the witness's ability to observe and accurately remember the perpetrator?

Did the witness ever see the person identified prior to the date in question?

If so, how many times did the witness see that person, under what circumstances? To what extent, if any, did any of those prior observations affect the witness's ability to accurately recognize and identify such person as the perpetrator?

When and under what circumstances did the witness identify the defendant?

Was the identification of the defendant as the person in question suggested in some way to the witness before the witness identified the defendant or was the identification free of any suggestion?

If after careful consideration of the evidence you are not satisfied that the identity of the defendant as the person who committed a charged crime has been proven beyond a reasonable doubt, then you must find the defendant not guilty of that charged crime.

The following charge concerns those counts as you determine in which more than one witness is alleged to have identified the defendant as the perpetrator.

As you know, an issue in this case is whether the defendant has been correctly identified as the person who committed the charged crime. The People have the burden of proving beyond a reasonable doubt not only that a charged crime was committed, but that the defendant is the person who committed that crime.

Thus, even if you are convinced beyond a reasonable doubt that a charged crime was committed by someone, you cannot convict the defendant of that crime unless you are also convinced beyond a reasonable doubt

that he is the person who committed that crime.

In examining the testimony of any witness who identified the defendant as that person, you should determine whether that testimony is both truthful and accurate.

With respect to whether the identification is truthful, that is, not deliberately false, you must evaluate the believability of the witness who made an identification. In doing so, you may consider the various factors for evaluating the believability of a witness's testimony that I listed for you a few moments ago.

With respect to whether an identification is accurate, that is, not an honest mistake, you must evaluate the witness's intelligence and capacity for observation, reasoning and memory and determine whether you are satisfied that the witness is a reliable witness who had the ability to observe and remember the person in question.

Further, the accuracy of a witness's testimony identifying a person also depends on the opportunity the witness had to observe and remember that person.

Thus, in evaluating the accuracy of identification testimony, you should also consider such

factors as:

What were the lighting conditions under which the witness made his or her observation?

What was the distance between the witness and the perpetrator?

Did the witness have an unobstructed view of the perpetrator?

Did the witness have the opportunity to see and remember the facial features, body size, hair, skin color and clothing of the perpetrator?

For what period of time did the witness actually observe the perpetrator?

During that time in what direction were the witness and the perpetrator facing, and where was the witness's attention directed?

Did the witness have a particular reason to look at and remember the perpetrator?

Did the perpetrator have distinctive features that a witness would be likely to notice and remember?

Did the witness have an opportunity to give a description of the perpetrator?

If so, to what extent did it match or not match the defendant as you find the defendant's appearance to have been on the date in question?

What was the mental, physical, emotional

state of the witness before during and after the observation?

To what extent, if any, did that condition affect the witness's ability to observe and accurately remember the perpetrator?

Did the witness ever see the person identified prior to the date in question?

If so, how many times did the witness see that person and under what circumstances?

To what extent, if any, did those prior observations affect the witness's ability to accurately recognize and identify such person as the perpetrator?

When and under what circumstances did the witness identify the perpetrator?

Was the identification of the defendant as the person in question suggested in some way to the witness before the witness identified the defendant, or was the identification free of any suggestion?

You will recall that Sandra Hayn testified as an expert in DNA and forensic evidence and gave opinions on such matters. You also recall Anna Fernandez testified as a Forensic Geneticist and Forensic Examiner and gave an opinion on such matters, as well as Detective Robert Nemeth who testified as a ballistics expert, firearms expert, and gave an opinion

also on those matters.

Ordinarily, a witness is limited to testify about facts and is not permitted to give an opinion. Where, however, scientific, medical, technical and other specialized knowledge will help the jury understand the evidence or to determine a fact in issue, a witness with expertise in a specialized field may render opinions about such matters.

You should evaluate the testimony of any such witness just as you would the testimony of any other witness.

You may accept or reject such testimony in whole or in part, just as you may with respect to the testimony of any other witness.

In deciding whether or not to accept such testimony you should consider the following:

The qualifications and believability of the witness.

The facts and other circumstances upon which the witness's opinion was based.

The accuracy or inaccuracy of any assumed or hypothetical fact upon which the opinion was based.

The reasons given for the witness's opinion.

And whether the witness's opinion is consistent or inconsistent with other evidence in the

case.

At this time, members of the jury, I'm going to turn to the substantive charges contained that you will be considering in this case.

You may have observed in this case that the People have joined in this single indictment what I believe are approximately sixteen counts, of which fourteen you are going to be considering, each of those counts charging a separate crime. These crimes are joined in a single indictment solely for the convenience of the Court.

Ordinarily, the fact that a defendant is charged with one crime constitutes no proof that he committed another crime also charged in a single indictment.

Therefore, you are required to separate in your mind the evidence applicable solely to each crime and to return a verdict on each crime based solely on the evidence applicable to that crime.

You will also notice, it will become apparent once I go over the verdict sheet, that there are two counts that will not be submitted for your consideration. Some of those charges may have been mentioned at the beginning of the trial. The law permits me to do this in order to simplify matters for

your consideration. Thus, my doing this expresses no opinion about the case and must not be considered by you nor are you to speculate as to why you're not considering those counts that are not being submitted to you.

The first, fourth, ninth and fifteenth counts charge a degree of robbery.

Under our law, robbery is defined as forcible stealing.

The term stealing, which the law also calls larceny, and the term forcible stealing have their own special meaning in our law. I will now give you the meaning of those terms.

A person steals property and commits larceny when with the intent to deprive another of property or to appropriate the property to himself or herself or to a third person, such person wrongfully takes, obtains or withholds property from the owner of the property.

A person forcibly steals property and commits robbery when in the course of committing a larceny, such person uses or threatens the immediate use of physical force upon another person for the purpose of compelling the owner of such property or another person to deliver up the property;

Or for the purpose of preventing or

overcoming resistance to the taking of the property;

Or for the purpose of preventing or overcoming the resistance to the taking of the property immediately after the taking;

Or, finally, for the purpose of compelling the owner of such property to engage in other conduct which aids in the commission of the larceny.

I will now define for you the degree of robbery charged in this case specifically with respect to the counts in this particular indictment.

The first count is robbery in the first degree.

Under our law, a person is guilty of robbery in the first degree when that person forcibly steals property, and when in the course of the commission of the crime or the immediate flight therefrom, that person or another participant in the crime is armed with a deadly weapon.

The term deadly weapon means the following:

Any loaded weapon from which a shot readily capable of producing death or other serious physical injury may be discharged;

Or a switchblade knife, defined as any knife having a blade which opens automatically by hand pressure applied to a button, spring or other device in

the handle of the knife;

Or a gravity knife, defined as any knife having a blade which is released from the handle or sheath by the force of gravity or the application of centrifugal force which when released is locked in place by means of a button, spring, lever or other device;

Or a pilum ballistic knife, defined as any knife having a blade which can be projected from the handle by hand pressure applied to a button, lever, spring or other device in the handle of the knife;

Or a dagger, billy, blackjack or metal knuckles.

In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt both of the following two elements:

One, that on or about September 9th, 2007, in the County of Nassau, the defendant, Ricardo Walters, forcibly stole property from Sara Sandoval.

Two, in the course of the commission of the crime or in immediate flight therefrom the defendant was armed with a deadly weapon.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those

elements, you must find the defendant guilty of the crime of robbery in the first degree as charged in the first count.

On the other hand, if you find that the People have not proven beyond a reasonable doubt either one of those elements, you must find the defendant not guilty of the crime of robbery in the first degree.

The second count is sexually motivated felony.

Under our law, a person is guilty of sexually motivated felony when he or she commits kidnapping for the purpose in whole or substantial part of his or her own direct sexual gratification.

Under our law, a person commits the offense of kidnapping when he or she abducts another person.

The term abduct used in this definition has its own special meaning in our law. I will now give you the meaning of that term.

Abduct means to restrain a person with intent to prevent that person's liberation either by secreting or holding him or her in a place where he or she is not likely to be found or by using or threatening to use deadly physical force.

The words restrain, intent and deadly physical force used in this definition of abduct also

have their own special meanings.

Restrain means to restrict a person's movements intentionally and unlawfully in such manner as to interfere substantially with his or her liberty by moving him or her from one place to another or by confining him or her either in a place where the restriction commences or to a place where he or she has been moved without consent and with knowledge that the restriction is unlawful.

A person restricts -- a person restricts another's movements intentionally when his or her conscious objective or purpose is to restrict that person's movements.

A person restricts another person's movements unlawfully when he or she is not authorized by law to do so.

Under our law, with concerns exceptions not applicable here, a person is not authorized to -- is not authorized by law to restrict another person's movements.

A person is moved or confined without consent when such is accomplished by physical force, intimidation or deception.

Intent means conscious objective or purpose.

Thus, a person acts with intent to prevent

another person's liberation either by secreting or holding him or her in a place where he or she is not likely to be found or by using or threatening to use deadly physical force when that person's conscious objective or purpose is to do so.

Deadly physical force means physical force which under the circumstances in which it is used is readily capable of causing death or other serious physical injury.

Serious physical injury means impairment of a person's physical condition which creates a substantial risk of death or to which -- or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ.

In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in this case beyond a reasonable doubt both of the following two elements:

That on or about September 9th, 2007, in the County of Nassau, the defendant, Ricardo Walters, committed the crime of kidnapping;

And that, two, the defendant did so for the purpose in whole or substantial part of his or her own sexual gratification.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of sexually motivated felony as charged in the second count.

On the other hand, if you find the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of the crime of sexually motivated felony as charged in the second count.

All right, the third count is kidnapping in the second degree.

Under our law, a person is guilty of kidnapping in the second degree when he or she abducts another person.

The term abduct used in this definition has its only special meaning. Those meanings I gave to you previously as I defined the term kidnapping in the second count apply to the third count as well.

In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt the following five elements:

One, that on or about September 9th, 2007, in the County of Nassau, the defendant, Ricardo Walters,

restricted Sara Sandoval's movements in such manner as to interfere substantially with her liberty by moving her from one place to another or by confining her either in the place where the restriction commenced or in a place to which she had been moved.

Two, that the defendant did so without consent of Sara Sandoval.

Three, that the defendant did so intentionally.

Four, that the restriction of Sara Sandoval's movements was unlawful and the defendant knew that the restriction was unlawful.

And five, that the defendant restrained Sara Sandoval with intent to prevent Sara Sandoval's liberation by either secreting or holding her in a place which she was not likely to be found or by using or threatening to use deadly physical force.

Therefore, if you find that the People have proven each of those elements beyond a reasonable doubt, you must find the defendant guilty of kidnapping in the second degree as charged in the third count.

On the other hand, if you find that the People have not proven any one or more of those elements beyond a reasonable doubt, you must find the defendant not guilty of the crime of kidnapping in the

second degree as charged in the third count.

Moving to the fourth count. This also charges robbery in the first degree.

Under our law, a person is guilty of robbery in the first degree when that person forcibly steals property, and when in the course of the commission of the crime or immediate flight therefrom that person or another participant in the crime displays what appears to be a revolver, pistol, rifle, shotgun, machine gun or other firearm.

The element that the person displays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm does not require the People to prove that the object displayed was actually a firearm; but the People are required to prove that the person consciously displays or manifested the presence of something that could reasonably be perceived as a pistol, revolver, rifle, shotgun, machine gun or other firearm and to the person whom the item was displays or manifested perceived it as a pistol, revolver, rifle, shotgun, machine gun or other firearm.

In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt

both of the following two elements:

One, that on or about April 17th, 2005, in the County of Nassau, the defendant, Ricardo Walters, forcibly stole property from Shamika Dottin.

And two, that in the course of the commission of the crime or immediate flight therefrom the defendant displayed what appeared to be a pistol, revolver, rifle, shotgun, machine gun, or other firearm.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of the crime of robbery in the first degree as charged in the fourth count.

On the other hand, if you find that the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of robbery in the first degree as charged in the fourth count.

Moving to the sixth count. The sixth count is criminal sexual act in the first degree.

Under our law, a person is guilty of criminal sexual act in the first degree when he or she engages in oral sexual conduct with another person by forcible compulsion.

Under our law, it is also an element of this offense that the sexual act was committed without consent.

Oral sexual conduct takes place without a person's consent when the lack of consent results from forcible compulsion.

Some of the terms used in this definition have their own special meaning in our law. I will now give you the meaning of the following terms: Oral sexual conduct and forcible compulsion.

Oral sexual conduct means conduct between persons consisting of contact between the mouth and the penis, the mouth and the anus, and the mouth and the vulva or vagina.

Forcible compulsion means to intentionally compel either:

One, by the use of physical force;

Or two, by a threat, express or implied, which places a person in fear of immediate death or physical injury to herself or another person, or in fear that she or another person will immediately be kidnapped.

In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt

both of the following two elements:

One, that on or about April 17th, 2005, in the County of Nassau, the defendant, Ricardo Walters, engaged in oral sexual conduct by having Shamika Dottin place her mouth on his penis;

And two, that the defendant did so without Shamika Dottin's consent by the use of forcible compulsion.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of the crime of criminal sexual act in the first degree as charged in the sixth count.

On the other hand, if you find that the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of the crime of criminal sexual act in the first degree as charged in the sixth count.

Okay. The seventh count, sexual abuse in the first degree.

Under our law, a person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact by forcible compulsion.

Under our law, it is also an element of this

offense that the sexual act was committed without consent.

Sexual contact takes place without a person's consent when the lack of consent results from forcible compulsion.

Some of the terms used in this definition have their own special meaning in our law. I will now give you the meaning of the following terms: Sexual contact without a person's consent and forcible compulsion.

Sexual contact means any touching of the sexual or other intimate parts of a person for the purpose of gratifying the sexual desire of either party. It includes the touching of the actor by that person, as well as the touching of that person by the actor whether directly or through clothing.

Forcible compulsion means to intentionally compel either by the use of physical force or by a threat express or implied which takes place -- which places a person in fear of immediate death or physical injury to herself or another person or in fear that she or another person will immediately be kidnapped.

In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt

both of the following two elements:

One, that on or about April 17th, 2005, in the County of Nassau, the defendant, Ricardo Walters, subjected Shamika Dottin to sexual contact by placing his mouth on her breasts.

And two, that the defendant did so without Shamika Dottin's content by use of forcible compulsion.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of the crime of sexual abuse in the first degree as charged in the seventh count.

On the other hand, if you find that the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of the crime of sexual abuse in the first degree as charged in the seventh count.

The eighth count also charges sexual abuse in the first degree.

Under our law, a person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact by forcible compulsion.

Under our law, it is also an element of this offense that the sexual act was committed without

consent.

Sexual contact takes place without a person's consent or when lack of consent results from forcible compulsion.

Some of the terms used in this definition have the same special meaning in our law, the same definitions I gave you with respect to the seventh count which I just finished reading to you with respect to sexual contact and forcible compulsion.

In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt both of the following two elements:

One, that on or about April 17th, 2005, in the County of Nassau, the defendant, Ricardo Walters, subjected Shamika Dottin to sexual contact by placing his finger in her vagina;

And two, that the defendant did so without Shamika Dottin's consent by use of forcible compulsion.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of the crime of sexual abuse in the first degree as charged in the eighth count.

On the other hand, if you find that the

People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of the crime of sexual abuse in the first degree as charged in the eighth count.

The ninth count is also robbery in the first degree.

Under our law, a person is guilty of robbery in the first degree when that person forcibly steals property, and when in the course of the commission of the crime or of immediate flight therefrom that person or another participant in the crime displays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm.

The element that the person displays what appears to be a pistol, revolver, rifle, machine gun or other firearm does not require the People to prove that the object displayed was actually a firearm. But what the People are required to prove is that the person consciously displayed or manifested the presence of something that could reasonably be perceived as a pistol, revolver, rifle, shotgun, machine gun or other firearm, and that the person to whom the item was displayed or manifested perceived it as pistol, revolver, rifle, shotgun, machine gun or other firearm.

In order for you to find the defendant guilty

of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt both of the following two elements:

One, that on or about November 28th, 2005, in the County of Nassau, the defendant, Ricardo Walters, forcibly stole property take from Delsy Sanchez;

And two, that in the course of the commission of the crime or of the immediate flight therefrom the defendant displayed what appeared to be a pistol, revolver, rile, shotgun, machine gun or other firearm.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of the crime of robbery in the first degree as charged in the ninth count.

On the other hand, if you find that the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of the -- not guilty of robbery in the first degree as charged in the ninth count.

Okay, moving to the tenth count.

Under our law, a person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person by forcible compulsion.

Under our law, it is also an element of this

offense that the sexual act was committed without consent.

Sexual intercourse takes place without a person's consent when the lack of consent results from forcible compulsion.

Some of the terms used in this definition have their own special meaning in our law. I will now give you the meaning of the following terms used in that definition: Sexual intercourse and forcible compulsion.

Sexual intercourse means any penetration, however slight, of the penis into the vaginal opening. In other words, any penetration of the penis into the vaginal opening, regardless of the distance of penetration, constitutes an act of sexual intercourse.

Sexual intercourse does not necessarily require erection of the penis, emission or orgasm.

Forcible compulsion means to intentionally compel by the use of physical force;

Or two, by a threat expressed or implied which places a person in fear of immediate death or physical injury to herself or in fear that she will immediately be kidnapped.

In order for you to find the defendant guilty of this crime, the People are required to prove from

all the evidence in this case beyond a reasonable doubt both the following two elements:

That on or about November 28th, 2005 in the County of Nassau, the defendant, Ricardo Walters, engaged in sexual intercourse with Delsy Sanchez;

And two, that the defendant did so without Delsy Sanchez's consent by the use of forcible compulsion.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of rape in the first degree as charged in the tenth count.

On the other hand, if you find that the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of the crime of rape in the first degree as charged in the tenth count.

Okay. The twelfth count is criminal sexual act in the first degree.

Under our law, a person is guilty of criminal sexual act in the first degree when he or she engages in oral sexual conduct with another person by forcible compulsion.

Under our law, it is also an element of this offense that the sexual act was committed without

consent.

Oral or anal sexual conduct takes place without a person's consent when the lack of consent results from forcible compulsion.

Some of the terms used in this definition have their own special meaning in our law. I will now give you the meaning of the following terms: Oral sexual conduct and forcible compulsion.

Oral sexual conduct means conduct between person's consisting of contact between the mouth and the penis, the mouth and the anus or the mouth and the vulva or vagina.

Forcible compulsion means to intentionally compel by either the use of physical force or by a threat, express or implied, which places a person in fear of immediate death or physical injury to herself or in fear that she will immediately be kidnapped.

In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in this case beyond a reasonable doubt both of the following two elements:

One, that on or about November 28th, 2005, in the County of Nassau, the defendant, Ricardo Walters, engaged in oral sexual conduct by having Delsy Sanchez place her mouth on his penis.

And two, that the defendant did so without Delsy Sanchez's consent by the use of forcible compulsion.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of the crime of criminal sexual act in the first degree as charged in the twelfth count.

On the other hand, if you find that the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of the crime of crime sexual act in the first degree as charged in the twelfth count.

Thirteenth count is sexual abuse in the first degree.

Under our law, a person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact by forcible compulsion.

Under our law, it is also an element of this offense that the sexual act was committed without consent.

Sexual contact takes place without a person's consent when the lack of consent results from forcible compulsion.

Some of these terms have their own -- used in this definition have their own special meaning. The same definitions I gave you previously apply with respect to this case, with respect to sexual contact and forcible compulsion.

In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt both of the following two elements:

One, that on or about November 28th, 2005, in the County of Nassau, the defendant, Ricardo Walters, subjected Delsy Sanchez to sexual contact by touching the buttocks of Delsy Sanchez with his hand;

And two, that the defendant did so without Delsy Sanchez's consent by use of forcible compulsion.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of the crime of sexual abuse in the first degree as charged in the thirteenth count.

On the other hand, if you find that the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of the crime of sexual abuse in the first degree as charged in the thirteenth count.

Fourteenth count is also sexual abuse in the first degree.

Under our law, a person is guilty of sexual abuse in the first degree when he or she subjects another person to contact by forcible compulsion.

Under our law, it is also an element of this offense that the sexual act was committed without consent.

Sexual contact takes place without a person's consent when the lack of consent results from forcible compulsion.

Some of the terms used in this definition have their own special meaning in our law. The same definitions I gave you previously with respect to sexual contact and forcible compulsion apply with respect to this count as well.

In order for you to find the defendant guilty of this crime the People are required to prove from all the evidence in the case beyond a reasonable doubt both of the following two elements:

One, that on or about November 28th, 2005, in the County of Nassau, the defendant, Ricardo Walters, subjected Delsy Sanchez to sexual contact by touching the breast of Delsy Sanchez with his hand;

And two, that the defendant did so without

Delsy Sanchez's consent by use of forcible compulsion.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of the crime of sexual abuse in the first degree as charged in the fourteenth count.

On the other hand, if you find that the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of the crime of sexual abuse in the first degree as charged in the fourteenth count.

The fifteenth count is robbery in the first degree.

Under our law, a person is guilty of robbery in the first degree when that person forcibly steals property, and when in the course of the commission of the crime or of immediate flight therefrom that person or another participant in the crime displays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm.

The element that the person displayed what appeared to be a pistol, revolver, rifle, shotgun, machine gun or other firearm does not require the People to prove that the object displayed was actually a firearm. What the People are required to prove is

that the person consciously displays or manifested the presence of something that could reasonably be perceived as a pistol, revolver, rile, shotgun, machine gun or other firearm, and that the person to whom the item was displayed or manifested perceived it as a pistol, revolver, rifle, shotgun, machine gun or other firearm.

In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt both of the following two elements:

One, that on or about November 9th, 2006, in the County of Nassau, the defendant, Ricardo Walters, forcibly stole property from Ilsa Morales;

And two, that in the course of the commission of the crime or immediate flight therefrom, the defendant displayed what appeared to be a pistol, revolver, rifle, shotgun, machine gun or other firearm.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of robbery in the first degree as charged in the fifteenth count.

On the other hand, if you find that the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the

defendant not guilty of the crime of robbery in the first degree as charged in the fifteenth count.

Sixteenth count is attempt to commit the crime of kidnapping.

I shall instruct you first on the definition of the crime of kidnapping, then I shall define for you an attempt to commit a crime. Finally, I shall put both definitions together and list for you the elements of attempt to commit the crime of kidnapping.

Under our law, a person is guilty of kidnapping in the second degree when he or she abducts another person.

The term abducts used in this definition has its own special meaning in our law. I will now give you the meaning of that term.

Abduct means to restrain a person with intent to prevent that person's liberation either by secreting, holding him or her in a place where he or she is not likely to be found or by using or threatening to use deadly physical force.

The words restrain, intent, deadly physical force used in the definition of abduct also have their own special meanings.

Restrain means to restrict a person's movements intentionally and unlawfully in such a manner

as to interfere substantially with his or her liberty by moving him or her from one place to another or by confining him or her either in the place where the restriction commences or to a place which he or she has been moved without consent and with knowledge that the restriction is unlawful.

A person restricts another person's movements intentionally when his or her conscious objective or purpose is to restrict that person's movements.

A person restricts another person's movements unlawfully when he or she is not authorized by law to do so.

Under our law, with certain exceptions not applicable here, a person is not authorized by law to restrict another person's movements.

A person restricts another person's movements with knowledge that the restriction is unlawful when he or she is aware that the restriction is not authorized by law.

A person is moved or confined without consent when such is accomplished by physical force, intimidation or deception.

Intent means conscious objective or purpose.

Thus, a person acts with intent to prevent another person's liberation by secreting him or her in

a place where she is not likely to be found or by using or threatening to use deadly physical force and when that person's conscious objective or purpose is to do so.

Deadly physical force means physical force which under the circumstances in which it is used is readily capable of causing death or serious physical injury.

Serious physical injury means impairment of a person's physical condition which creates a substantial risk of death or which causes death or serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of the function of any bodily organ.

Under our law, a person is guilty of an attempt to commit a crime when with intent to commit a crime he or she engages in conduct which tends to affect the commission of such crime.

Some of the terms used in this definition have their own special meaning in our law. I will now give you the meaning of the following terms: Intent and tends to affect.

Intent means conscious objective or purpose.

Thus, a person acts with intent to commit a crime when his or her conscious objective or purpose is

to commit that crime.

Conduct which tends to affect the commission of a crime means conduct which comes dangerously close or very near to the completion of the intended crime.

If a person intends to commit a crime and engages in conduct which carries his or her purpose forward within dangerous proximity to the completion of the intended crime, he or she is guilty of an intent to commit that crime.

It does not matter that the intended crime was not actually completed. The person's conduct must be directed towards the accomplishment of the intended crime. It must go beyond planning and mere preparation, but it need not be the last act necessary to affect the actual commission of the intended crime. Rather, the conduct involved must go far enough that it comes dangerously close or very near to the completion of the intended crime.

In order for you to find the defendant guilty of an attempt to commit the crime of kidnapping, the People are required to prove from all the evidence in the case beyond a reasonable doubt both of the following two elements:

One, that on or about November 9th, 2006, in the County of Nassau, the defendant, Ricardo Walters,

intended to commit the crime of kidnapping;

And two, that the defendant engaged in conduct which tended to affect the commission of that crime.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of the crime of attempt to commit the crime of kidnapping under the sixteenth count.

On the other hand, if you find that the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of the crime of attempt to commit the crime of kidnapping under the sixteenth count.

Okay, at this point, members of the jury, we're going to turn to that part of my charge dealing with the process of deliberations.

Your verdict on each count, whether guilty or not guilty, must be unanimous, that is, each and every juror must agree to it. No one expects that all jurors will have the same view of the case when they first enter the jury room.

To reach a unanimous verdict you must deliberate with your other jurors. That means you should discuss the evidence and consult with each

other, listen to each other, give each other's views careful consideration, and reason together when considering the evidence. And when you deliberate you should do so with a view toward reaching an agreement, if that can be done without surrendering individual judgment.

Each of you must decide the case for yourself, but only after a fair and impartial consideration of the evidence with your other jurors.

You should not surrender an honest view of the evidence simply because you want the trial to end or you're outvoted. At the same time, you should not hesitate to re-examine your views and change your mind if you become convinced that your position was not correct.

In other words, ladies and gentlemen, when you enter the jury room, you may have individually have reached certain tentative different opinions and conclusions. Before finalizing those opinions and conclusions you should deliberate with your other jurors. You should be open to reason and be willing either to adhere to your opinion and conclusions if persuaded you are correct, or change your opinion or conclusions if persuaded you're not correct.

In the interest of justice please make every

effort consistent with your conscience and the evidence in this case to harmonize your views and decisions in this case with those of your fellow jurors and make every effort to come to a unanimous agreement based on the law and the facts of this case.

To the best of your ability I ask you to apply common sense and good judgment. Do not let fear, favor, sympathy, bias, prejudice or consideration of the possible sentence or punishment sway your mind in analyzing the testimony.

Decide this case, as you promised -- as you have promised, fairly on the evidence and on the law, whether you agree with the law or not.

You may see any or all of the exhibits which were received in evidence. Simply write in a note which exhibit or exhibit you want to see.

You may also have any testimony of the witnesses read back to you in whole or in part. Again, if you want a read back, write me a note telling me what testimony you wish to hear. If you are interested -- if you are interested in hearing only a portion of a witness's testimony, please specify in your note which witness and with as much detail as possible which part of the witness you want to hear. If you want to hear all or a portion of the witness's

testimony only during a particular examination, for example, direct or cross-examination, please also so specify.

Please feel free to identify the particular examination you want to hear by using the name of the lawyer who conducted the examination. The names of the lawyers are listed on the verdict sheet in the order in which they examined the witnesses.

A detailed description of what you want to hear is necessary because we must read each question and answer in order to decide whether it is part of what you asked for. That process normally takes some time. So please, be patient while we search the record to answer your question.

In the alternative, we can respond to a request to read back the entire testimony of a witness or the entire testimony of a witness during a particular examination, and if you wish, you can authorize your foreman to raise her hand when the court reporter has read everything you want to hear.

Of course, when testimony is read back, questions to which an objection was sustained and material otherwise struck from the record is not read back.

If you have a question on the law, please

write me a note specifying what you want me to review with you.

Under our law the first juror selected is known as the foreperson. I believe, Ms. Williams, you are our first person sworn and, therefore, you will be our foreperson.

During deliberations the foreperson's opinions and vote are not entitled to any more importance than that of any other juror. What we ask the foreperson to do during deliberations is to sign any written note that the jury sends to the Court. The foreperson does not have to write the note or agree with its contents. The foreperson's signature only indicates that the writing comes from the jury.

The foreperson may also chair the jury's discussions during deliberations.

When the jury has reached a verdict, guilty or not guilty, the entire jury will be asked to come into court. The foreperson will be asked whether the jury has reached a verdict. If the foreperson says yes, she will then be asked what the verdict is for each charged crime considered in accordance with my instructions. After that, the entire jury will be asked whether that is their verdict and will answer either yes or no.

Finally, upon the request of a party, each juror will be asked individually whether the announced verdict is the verdict of that juror. And then upon being asked, each juror will answer yes or no.

When you retire to begin your deliberations I will give you a form known as a verdict sheet. The verdict shield lists each count submitted for your consideration, the manner in which you are to consider the counts and the possible verdicts.

Please use the form to record your verdict with an X or a check mark in the appropriate place for each count you consider in accordance with my instructions.

The verdict sheet will go in with you into the jury room. It's already been marked as a court exhibit. It has a title of the action, today's date, the indictment number, the attorneys names and the various counts you're going to consider. I'm not going to go through all the counts. They're in the order I just have given them to you. What I tried to do is make the counts a little more distinguishable by putting in the names of those people that are alleged to have been the victims of the crime with respect to each of those counts and the dates of incident. It will become rather self-evident as you go into the jury

room.

You will also notice that count five and eleven, which I did not charge you on, are not to be considered by you. Therefore, you will not be rendering a verdict with respect to both counts five and eleven.

On the third page there will be a signature line for the foreperson.

Finally, there are a few remaining rules which you must observe during deliberations.

One, while you are here in the courthouse deliberating on the case you will be sequestered, meaning you all will be kept together in the jury room under the supervision of a court officer. You may not leave the jury room without permission.

And if you have a beeper or cell phone or other electronic device, please give it to a court officer to hold for you while engaged in deliberations.

Two, you must deliberate about the case only when you are gathered all together in the jury room.

You must not, for example, be discussing the case as you go to and from the courtroom. It's simply important that each juror have the opportunity to hear whatever another juror has to say about the case. And that by law must only be done when you are all gathered

together in the jury room.

Thus, if for any reason all twelve of you are not gathered together in the jury room, please stop deliberating until all twelve of you are present in the jury room.

Three, during your deliberations you must only discuss the case among yourselves. You must not discuss the case with anyone else, including a court officer, or permit anyone other than a fellow juror to discuss the case in your presence.

Four, if you have a question or a request, you must communicate with me by writing a note. The law requires that you communicate with me in writing in part to make sure there are no misunderstandings. Give the note to a court officer who will in turn give it to me. When the jury room door is open to give the court officer the note, please stop deliberating until the officer has left and the door is closed.

Any note that you send me please do not tell me the vote of the jury. I should say, please do not tell me what the vote of the jury is on any count.

Sometimes I may need a note clarified. If that can be done by asking the foreperson a question that can be answered yes or no I may do so. Otherwise, I will ask you to write another note answering my

question.

I should explain that under our law I am not permitted to have a conversation about the facts of the case or possible vote or possible verdict or vote of the jury on any count with any one juror or group of jurors or even all the jurors.

If a juror wants to speak to me during deliberations, an appropriate meeting here in the courtroom with the parties will be arranged. No juror, however, can tell me what is being said about the facts of the case or possible verdict or what the vote of any juror on the jury is on any count.

While I will, of course, listen to whatever a juror has to say that does not involve those subjects, I may not be able to respond to the juror. If the response involves instructions on the law, I may be required to call into court the entire jury and respond by speaking to the entire jury. The reason for that is that our law wants to make sure each and every juror hears at exactly the same time whatever I have to say about the law and our law wants to make sure that the jury hears those instructions from me and not another juror.

That concludes my instructions to you on the law. Before I let you begin to deliberate, I want to

see the attorneys.

(Whereupon, the following takes place at the Bench between the Court and counsel:)

MS. SINGAS: If you can put on the verdict sheet, the sexual abuse, mouth to breast, hand to buttocks, hand to breast -- just to clarify it -- fingers to vagina.

THE COURT: What is your position, Mr. Lemke?

MR. LEMKE: First, did you tell them not to consider count three before they considered count two and only if you've reached a not guilty verdict? I don't believe you did so.

THE COURT: No, you're right. That's a good point.

MR. LEMKE: And as far as putting -- you want to put in the mouth to breast, I have no objection to that.

MS. SINGAS: Just on the counts they're the same, seven and eight, thirteen and fourteen.

THE COURT: They're not going to have this verdict sheet back there for a while.

MR. LEMKE: Then, I don't want it that way. Just charge them regarding count two and three.

THE COURT: Any exceptions?

MR. LEMKE: No, nothing else.

MS. SINGAS: No.

THE COURT: Okay.

(Whereupon, the following takes place in open court:)

THE COURT: Just a couple of things, members of the jury. With respect to the verdict sheet, one thing I failed to mention, with respect to count two, that's the kidnapping as a sexually motivated felony, dealing with Sara Sandoval on the date of September 9th, 2007, you will see -- again, it's self-explanatory. It read as follows:

If your vote should be guilty of that count, you're not to consider count three, which is kidnapping in the second degree.

That also pertains to Sara Sandoval with the same date. Your -- you should proceed directly, if your verdict is guilty on count two, to count four. In other words, you pass count three.

If you your verdict is not guilty with respect to count two, that's the kidnapping as a sexually motivated felony, then you are to consider count three which deals with just kidnapping on its own, kidnapping in the second degree.

Okay. One final thing, if there's any request to see any of the weapons in this case, please

send us a note and I'll have one of my officers in the jury room, should any of those weapons be displayed. I want that to be clear to everybody.

At this point you can follow Tom and begin your deliberations.

(Whereupon, the sworn jury leaves to commence deliberations on the case in chief)

(Whereupon, the alternates leave the courtroom)

THE COURT: Mr. Lemke, just let me know at the end of the day what your position is going to be with respect to the three alternates.

MR. LEMKE: I will do so, your Honor.

THE COURT: Can I see everybody real quick.

(Whereupon, court stands in recess awaiting the verdict of the sworn jury)

THE COURT: All right. On the case on trial, I received two notes from the jury signed by the foreperson. That will be marked a court exhibit in a moment.

The first note reads as follows:

We, the jury, would like the stipulations that must all be present for guilty verdict in the definitions of kidnapping as a sexually motivated felony, charge two, and kidnapping in the second

degree, charge three.

As I indicated to both -- to all counsel, I believe what this refers to is the elements of both of those charges, although they use the word stipulations.

When they come in here I'm going to indicate to them that that is my understanding of the note. I think both counsel would agree with me, that's what they are asking for.

If for some reason they're looking for something else, I'll tell them to indicate to me first thing in the morning. I'm not going to read back anything at this hour since I have to discharge the jury by 4:30.

Do you have any different interpretation of that note, Mr. Lemke?

MR. LEMKE: No. That would be my interpretation. I would not excuse the alternates at this point, that is what I wanted to say.

THE COURT: Fine. The second note we received:

We, the jury, would like Shamika Dottin's direct testimony in its entirety.

And tomorrow we'll give that, as well, following my instructions with regard to the first note.

So, we'll bring the jury down, tell them what we intend to do and let them go for the evening.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE COURT: Okay. Members of the jury, I am in receipt of both of your notes. Both of them have been shared with both counsel. They have been marked as court exhibits. They read as follows, the first note:

We, the jury, would like the stipulations that must all be present for a guilty verdict in the definitions of kidnapping as a sexually motivated felony, in brackets, (charge two) and kidnapping in the second degree, in brackets, (charge three.)

And it's been signed by Ms. Williams, our foreperson.

In discussing this with all the attorneys, it appears as though you're asking for the elements of both of those offenses. That's our interpretation of it, the word stipulations is used here.

If for some reason -- I'm prepared to read you that. We will do that tomorrow morning, given the hour. I don't want to read it to you now and discharge you; you will be asking me to read it back to you

tomorrow. It doesn't make sense.

If for some reason we're wrong in our interpretation of what you're looking for, please, first thing tomorrow morning, send me another note. We'll be glad to, you know, do whatever you're asking for. But right now we feel that what you're asking for is the elements to be read back with regard to kidnapping as a sexually motivated felony and kidnapping in the second degree.

The second note is: Shamika Dottin's direct testimony, in brackets, the word (entirety), which obviously we'll do that for you as well.

So at this point, it's about 4:30, what I'm going to do is ask you to suspend your deliberations. I will excuse you for the evening. We will be back here in this courtroom tomorrow morning. I will ask everybody to come back the same time, ten o'clock. I will have you come here, right away. So please don't begin any deliberations. Once everybody is here and assembled, including -- I will ask my alternates to be back tomorrow.

I'm going to ask you also to be please be here tomorrow.

Also, there will be a lunch order taken and that will be the first order of business. Once that is

done, I will get you back here in the courtroom and we will respond to both of these notes where you can continue deliberations.

My admonitions, please don't discuss the case at this point among yourselves.

And for my jurors, regular jurors, please suspend your deliberations at this particular point.

Have a good night. See you back here first thing tomorrow, ten o'clock.

(Whereupon, the sworn jurors and alternates leave the courtroom)

THE COURT: All right, tomorrow, ten o'clock.

(Whereupon, court stands in recess. The trial is adjourned to 11/18/08 at ten a.m.)

STATE OF NEW YORK : NASSAU COUNTY

SUPREME COURT PART 49

-----------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK TRIAL

- against - IND. 436N-08

RICARDO WALTERS

Defendant.

-----------------------------------------X

November 18, 2008
262 Old Country Road
Mineola, New York

B E F O R E :

HON. JAMES MCCORMACK
Acting Supreme Court Justice

A P P E A R A N C E S:

(Same as previously noted)

KATHLEEN PLAIA
OFFICIAL COURT REPORTER

*** *** ***

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jurors and alternates enter the courtroom)

THE COURT: Okay. Good morning, members of the jury. We're ready to pick up, as I indicated yesterday, by responding to both of your notes that you

gave to us yesterday.

I'm going to first go over those instructions to you with respect to your first note dealing with the second and third counts, which is kidnapping as a sexually motivated felony, and then kidnapping in the second degree.

The second count is sexually motivated felony.

Under our law, a person is guilty of a sexually motivated felony when he or she commits kidnapping for the purpose in whole or substantial part for his or her own direct sexual gratification.

Under our law, a person commits the offense of kidnapping -- under our law, a person is guilty of kidnapping in the second degree, when he or she abducts another person.

The term abducts used in this definition has its own special meaning in our law. I will now give you the meaning of that term.

Abduct means to restrain a person with intent to prevent that person's liberation either by secreting or holding him or her in a place where he or she is not likely to be found or by using or threatening to use deadly physical force.

The words restrain, intent, and deadly

physical force used in the definition of abduct also have their own special meanings.

Restrain means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his or her liberty by moving him or her from one place or another, or by confining him or her either in the place where the restriction commences or in a place to which he or she has been moved without consent and with knowledge that the restriction is unlawful.

A person restricts another's movements intentionally when his or her conscious objective or purpose is to restrict that person's movements.

A person restricts another's movements unlawfully when he or she is not authorized by law to do so.

Under our law, with certain exceptions not applicable here, a person is not authorized by law to restrict another's movements.

A person restricts another's movements with knowledge that the restriction is unlawful when he or she is aware that the restriction is not authorized by law.

A person is moved or confined without consent when such is accomplished by physical force,

intimidation or deception.

Intent means conscious objective or purpose.

Thus, a person acts with intent to prevent another's liberation either by secreting or holding him or her in a place where he or she is not likely to be found or by using or threatening to use deadly physical force when that person's conscious objective or purpose is to do so.

Deadly physical force means physical force which under the circumstances in which it is used is readily capable of causing death or other serious physical injury.

Serious physical injury means impairment of a person's physical condition which creates a substantial risk of death or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ.

In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt both of the following two elements:

One, that on or about September 9th, 2007, in the County of Nassau, the defendant, Ricardo Walters, committed the crime of kidnapping;

And two, that the defendant did so for the purpose in whole or substantial part of his own -- of his own direct sexual gratification.

Therefore, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant guilty of sexually motivated felony as charged in the second count.

On the other hand, if you find that the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendant not guilty of the crime of sexually motivated felony as charged in the second count.

The third count, kidnapping in the second degree.

Under our law, a person is guilty of kidnapping in the second degree when he or she abducts another person.

The term abducts used in this definition has its own special meaning in our law. I will now give you the meaning of that term.

Abduct means to restrain a person with intent to prevent that person's liberation either by secreting or holding him or her in place where he or she is not likely to be found or by using or threatening to use

deadly physical force.

The words restrain, intent and deadly physical force used in this definition of abduct also have their own special meanings.

Restrain means to restrict a person's movements intentionally and unlawful in such manner as to interfere substantially with his or her liberty by moving him or her from one place to another or by confining him or her either in the place where the restriction commences or in a place to which he or she has been moved without consent and with knowledge that the restriction was unlawful.

A person restricts another person's movements intentionally when his or her own conscious objective or purpose is to restrict that person's movements.

A person restricts another's movements unlawfully when he or she is not authorized to do so.

Under our law, with certain exceptions not applicable here, a person is not authorized by law to restrict another's movements.

A person restricts another's movements with knowledge that the restriction is unlawful when he or she is aware that the restriction is not authorized by law.

A person is moved or confined without consent

when such is accomplished by physical force, intimidation or deception.

Intent means conscious objective or purpose.

Thus, a person acts with intent to prevent another's liberation either by secreting or holding him or her in a place where he or she is not likely to be found, or by using or threatening to use deadly physical force when that person's conscious objective or purpose is to do so.

Deadly physical force means physical force which under the circumstances in which it is used is readily capable of causing death or serious physical injury.

Serious physical injury means impairment of a person's physical condition which creates a substantial risk of death or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ.

In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt the following five elements:

One, that on or about September 9th, 2007, in the County of Nassau, the defendant, Ricardo Walters,

restricted Sara Sandoval's movements in such manner as to interfere substantially with her liberty by moving her from one place to another or by confining her either in the place where the restriction commenced or in a place to which she had been moved;

Two, that the defendant did so without consent of Sara Sandoval;

Three, that the defendant did so intentionally;

Four, that the restriction of Sara Sandoval's movements was unlawful and the defendant knew that the restriction was unlawful;

And five, that the defendant restrained Sara Sandoval with intent to prevent Sara Sandoval's liberation either by secreting or holding her in a place where she was not likely to be found or by using or threatening to use deadly physical force.

Therefore, if you find that the People have proven each of those elements beyond a reasonable doubt, you must find the defendant guilty of the crime of kidnapping in the second degree as charged in the third count.

On the other hand, if you find that the People have not proven any one or more of those elements beyond a reasonable doubt, you must find the

defendant not guilty of the crime of kidnapping in the second degree as charged in the third count.

At this time we're going to address the second note, which is your request for Shamika Dottin's direct testimony, which I believe Kathy has ready for us.

(Whereupon, the requested testimony was read back by the reporter)

THE COURT: All right, members of the jury, that concludes the read back with respect to your second note. I'll leave you to continue deliberations.

Follow Tom, if you will.

(Whereupon, the jury retires to continue deliberations)

(Whereupon, court stands in recess awaiting the verdict of the sworn jury)

THE CLERK: This is with regard to the trial case, People versus Ricardo Walters, Indictment 436N of '08.

THE COURT: We received a note from the jury, Mr. Lemke.

I don't think when I concluded my charge, a stipulation from both you and the People with respect to any requests -- any note from the jury with respect to any exhibits that are in evidence, that they ask for

it, they can be provided from my court staff.

In light of that, would you have any objection to any requests that they ask for, in terms of any evidence being received by them without you and your client being present?

MR. LEMKE: No opposition to that whatsoever.

THE COURT: To the extent it is a lineup picture, I do believe --

MR. LEMKE: There are two in evidence.

THE COURT: You have no objection to the jury getting them?

MR. LEMKE: Not at all.

THE COURT: All right, very good.

MR. LEMKE: Thank you, your Honor.

THE COURT: We'll be in contact if we need you.

(Whereupon, court stands in recess awaiting the verdict of the sworn jury)

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury and alternates enter the courtroom)

THE CLERK: Case on trial, The People of the State of New York against Ricardo Walters, Indictment 436N of 2008.

Do both counsel stipulate all the jurors are

present and properly seated?

MS. SINGAS: Yes.

MR. LEMKE: So stipulated, your Honor.

THE COURT: All right, members of the jury, we have received your latest note, marked today's date with the time 2:15 p.m., signed by your foreperson.

We, the jury, have reached a verdict.

At this time the clerk is directed to take the verdict.

THE CLERK: Will the foreperson please rise.

Has the jury reached a verdict.

THE FOREPERSON: We have.

THE CLERK: Will the defendant please rise.

In the case of the People against Ricardo Walters, Indictment 436N of 2008, what is your verdict as to count one, robbery in the first degree, guilty or not guilty?

THE FOREPERSON: Guilty.

THE CLERK: What is your verdict as to count two, kidnapping as a sexually motivated felony, guilty or not guilty?

THE FOREPERSON: Not guilty.

THE CLERK: What is your verdict as to count three, kidnapping in the second degree, guilty or not guilty?

THE FOREPERSON: Guilty.

THE CLERK: What is your verdict as to count four, robbery in the first degree, guilty or not guilty?

THE FOREPERSON: Guilty.

THE CLERK: What is your verdict as to count six, criminal sexual act in the first degree, guilty or not guilty?

THE FOREPERSON: Guilty.

THE CLERK: What is your verdict as to count seven, sexual abuse in the first degree, guilty or not guilty?

THE FOREPERSON: Guilty.

THE CLERK: What is your verdict as to count eight, sexual abuse in the first degree, guilty or not guilty?

THE FOREPERSON: Guilty.

THE CLERK: What is your verdict as to count nine, robbery in the first degree, guilty or not guilty?

THE FOREPERSON: Guilty.

THE CLERK: What is your verdict as to count ten, rape in the first degree, guilty or not guilty?

THE FOREPERSON: Guilty.

THE CLERK: What is your verdict as to count

twelve, criminal sexual act in the first degree, guilty or not guilty?

THE FOREPERSON: Guilty.

THE CLERK: What is your verdict as to count thirteen, sexual abuse in the first degree, guilty or not guilty?

THE FOREPERSON: Guilty.

THE CLERK: And what is your verdict as to count fourteen, sexual abuse in the first degree, guilty or not guilty?

THE FOREPERSON: Guilty.

THE CLERK: What is your verdict as to count fifteen, robbery in the first degree, guilty or not guilty?

THE FOREPERSON: Guilty.

THE CLERK: What is your verdict as to count sixteen, attempted kidnapping in the second degree, guilty or not guilty?

THE FOREPERSON: Guilty.

THE COURT: Okay. You can have a seat.

All right.

THE CLERK: Members of the jury, listen to your verdict as it stands recorded by the Court. You say you find the defendant, Ricardo Walters, guilty of count one, robbery in the first degree; not guilty of

count two, sexual -- kidnapping as a sexually motivated felony; guilty of count three, kidnapping in the second degree; guilty of count four, robbery in the first degree; guilty of count six, criminal sexual act in the first degree; guilty of count seven, sexual abuse in the first degree; guilty of count eight, sexual abuse in the first degree; guilty of count nine, robbery in the first degree; guilty of count ten, rape in the first degree; guilty of count twelve, criminal sexual act in the first degree; guilty of count thirteen, sexual abuse in the first degree; guilty of count fourteen, sexual abuse in the first degree; guilty of count fifteen, robbery in the first degree; and guilty of count sixteen, attempted robbery -- attempted kidnapping in the second degree.

Is that your verdict, so say you all?

(All jurors answer in the affirmative)

THE COURT: All right. Mr. Lemke, do you want the jury polled?

MR. LEMKE: Yes, your Honor.

THE COURT: If you would, Artie.

THE CLERK: Members of the jury, you say you find the defendant, Ricardo Walters, guilty of count one, robbery in the first degree; not guilty of count two, kidnapping as a sexually motivated felony; guilty

of count three, kidnapping in the second degree; guilty of count four, robbery in the first degree; guilty of count six, criminal sexual act in the first degree; guilty of count seven, sexual abuse in the first degree; guilty of count eight, sexual abuse in the first degree; guilty of count nine, robbery in the first degree; guilty of count ten, rape in the first degree; guilty of count twelve, criminal sexual act in the first degree; guilty of count thirteen, sexual abuse in the first degree; guilty of count fourteen, sexual abuse in the first degree; guilty of count fifteen, robbery in the first degree; and guilty of count sixteen, attempted kidnapping in the second degree.

Is that your verdict, juror number one?

THE FOREPERSON: Yes.

THE CLERK: Is that your verdict, juror number two?

JUROR NUMBER 2: Yes.

THE CLERK: Is that your verdict, juror number three?

JUROR NUMBER 3: Yes.

THE CLERK: Is that your verdict, juror number four?

JUROR NUMBER 4: Yes.

THE CLERK: Is that your verdict, juror number five?
JUROR NUMBER 5: Yes.
THE CLERK: Is that your verdict, juror number six?
JUROR NUMBER 6: Yes.
THE CLERK: Is that your verdict, juror number seven?
JUROR NUMBER 7: Yes.
THE CLERK: Is that your verdict, juror number eight?
JUROR NUMBER 8: Yes.
THE CLERK: Is that your verdict, juror number nine?
JUROR NUMBER 9: Yes.
THE CLERK: Is that your verdict, juror number ten?
JUROR NUMBER 10: Yes.
THE CLERK: Is that your verdict, juror number eleven?
JUROR NUMBER 11: Yes.
THE CLERK: Is that your verdict, juror number twelve?
JUROR NUMBER 12: Yes.
THE CLERK: Your Honor, the verdict is

unanimous.

THE COURT: All right. Members of the jury, on behalf of the entire Nassau County Court System I want to express my deepest thanks for your service. Obviously, it has not been an easy case. Certainly, passing judgment on another individual is never an easy task. I want to commend your ability and your service here throughout the course of this trial, for your timeliness and dedication to being here.

I would like to thank you more personally back in my chambers. At this time you will be excused.

Alternates, please come as well and just follow my officers back to my chambers at this time.

Okay.

(Whereupon, all jurors exit the courtroom)

THE COURT: Mr. Lemke, date for sentence?

MR. LEMKE: Your Honor, I ask for a date, I guess, about four weeks, four and-a-half weeks. Perhaps, a Friday, your Honor.

I reserve any motions until that date, your Honor.

THE COURT: Yes.

December 19th is a Friday.

MR. LEMKE: That's fine, your Honor.

THE COURT: So, the defendant will be

remanded pending sentence.

December 19th, 2008 for sentencing.

(Whereupon, there is a discussion held at the Bench, off the record)

THE COURT: All right, December 19th.

THE CLERK: Take charge, officers.

**** ** ****

CERTIFICATION

I hereby certify that the foregoing is a true and accurate transcript of my stenographic notes.

Kathleen Plaia,
Official Court Reporter

Kathi Fedden,
Official Court Reporter

# I - N - D - E - X

## W I T N E S S E S


| | DX | CX | RDX | RCX |
|---|---|---|---|---|
| **FOR THE PEOPLE:** | | | | |
| Eugene Este | 450 | 526 | 542 | |
| PO Dale Jones | 511 | 526 | | |
| Det. Sheila Wimberly | 549 | 566 | 574 | 577 |
| Sara Sandoval | 585 | 622 | | |
| Det-Sgt Nemeth | 633 | | | |
| Inv. Lombardi | 647 | 662 | 672 | 676 |
| Rosa Portillo | 682 | | | |
| Det. Robert Dunn | 688 | 730 | | |
| Det. John Lavelle | 741 | 760 | | |
| PO Rafael Morales | 770 | 779 | | |
| Delsy Sanchez | 795 | 845 | 856 | 859 |
| Shamika Dottin | 862 | | | |
| Ilsa Morales | 923 | 954 | 977 | |
| Allyson Davilar | 984 | 1029 | 1048 | |
| Det. Ferro | 1059 | 1073 | | |
| Sandra Dottin-McCain | 1052 | | | |
| Delsy Morales | 1076 | 1094 | 1108 | 1110 |
| Det. Edmund Moran | 1112 | 1149 | 1162 | 1164 |
| Anna Fernandez | 1165 | | | |
| Sandra Hayn | 1177 | 1261 | 1278 | 1284 |

# E X H I B I T S

| | IDENT | EVID |
|---|---|---|
| **FOR THE PEOPLE:** | | |
| 1. Photo | | 455 |
| 2. Photo | | 455 |
| 3. Photo | | 455 |
| 4. Photo | | 467 |
| 5. Photo | | 467 |
| 6. Photo | | 467 |
| 7. Disk | 469 | 470 |
| 8. Photo | | 475 |
| 9. $11 | 479 | 484 |
| 10. Doo-rag | 483 | 557 |
| 11. Photo | 485 | 486 |
| 12. Map | | 486 |
| 13. Box | 518 | 519 |
| 14. Photo | 523 | 523 |
| 15. Manila Envelope (OJ Container) | 561 | 563/1230 |
| 16. Manila Envelope (Deft's shield) | 563 | 564 |
| 17. Manila Envelope (Pineapple juice can) | 574 | 576 |
| 18. Paper (Maria Reyes) | 595 | |
| 19. Gun (Smith Wesson) | | 604 |
| 20. Gun (Sig) | | 604 |
| 21. Glock | | 604 |
| 22. Time card | | 655 |
| 23. Time card | | 655 |
| 24. Time card | | 655 |
| 25-38 Photos | | 671 |
| 39. Photo of Defendant | 694 | 694 |
| 40. Stipulation | | 698 |
| 41. Photo (lineup) | 712 | 713 |
| 42. Photo (lineup) | 721 | 722 |
| 43. Photo | | 746 |
| 44. Photo | | 746 |
| 45. Photo | | 746 |
| 46. Manilla Envelope (White cap) | 827 | 828 |
| 47. Photo | | 884 |
| 48. Photo | | 884 |
| 49. Photo | | 884 |
| 50. Photo | | 884 |
| 51. Photo | | 884 |
| 52. Photo | | 942 |