UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

-------------------------------------------------------------------X

RICARDO WALTERS,

               Petitioner,

       -against-

**MEMORANDUM AND ORDER**
14-CV-1993 (JMA)

DALE ARTUS,
*Superintendent, Attica Correctional Facility*

              Respondent.

-------------------------------------------------------------------X

**APPEARANCES:**

**FILED**
**CLERK**

12/21/2018 2:46 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

Patrick Michael Megaro, Esq.
Halscott Megaro, P.A.
33 East Robinson Street, Suite 210
Orlando, FL 32801
       *Attorney for Petitioner*

Sarah M. Spatt, Assistant District Attorney
Cristin N. Connell, Assistant District Attorney
Alyson Gill, Assistant Attorney General
Nassau County District Attorney's Office
262 Old Country Road
Mineola, NY 11501
       *Attorneys for Respondent*

**AZRACK, United States District Judge:**

      On November 13, 2008, following a jury trial in state court, Ricardo Walters was convicted of four counts of Robbery in the First Degree, four counts of Sexual Abuse in the First Degree, two counts of Criminal Sexual Act in the First Degree, one count of Rape in the First Degree, one count of Kidnapping in the Second Degree, and one count of Attempted Kidnapping in the Second Degree. On January 13, 2008, Walters received an aggregate sentence of two hundred and three years of imprisonment.

Walters, through counsel, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising the following grounds for habeas relief: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; (3) denial of due process of law by the consolidation of his indictments and the introduction of evidence suggesting he targeted women on the basis of race or national origin; and (4) denial of due process by the imposition of a sentence based on evidence suggesting he targeted women on the basis of race or national origin. For the following reasons, all of Walters' proffered grounds are either procedurally barred or without merit. According, the petition is DENIED in its entirety.

## I. BACKGROUND

### A. Trial and Conviction

Walters' initial arrest was for crimes committed against Sara Sandoval, but he was subsequently charged with crimes against four other women: Delsy Sanchez, Ilsa Morales, Delmy Morales, and Shamika Dottin. The evidence concerning each of the aforementioned crimes, as set out during hearing and trial, are discussed below.[1]

Each of the victims testified at trial concerning the alleged crimes, all of which occurred in Hempstead. Sandoval, Sanchez, Ilsa Morales, and Delmy Morales all identified Walters as their attacker. Although Dottin was unable to identify Walters because her assailant's face was covered during the crime against her, DNA evidence linked Walters to the attack on Dottin.

### 1. Crimes Against Sara Sandoval

On September 9, 2007, at approximately 5:00 A.M., Walters approached Sara Sandoval while she was standing at a bus stop in Hempstead, New York, on her way to work. (Tr. 586-87.)

---

[1] "Hr'g." refers to the hearing transcript, <u>People v. Walters</u> Hr'g. Tr., Apr. 15-17, 23, 2008, ECF No. 12-1-12-3. "Tr." refers to the trial transcript, <u>People v. Walters</u> Trial Tr., Oct. 29-31, Nov. 6-17, 2008, ECF Nos. 12-4-12-14. "S." refers to the transcript for the sentencing proceedings, <u>People v. Walters</u> S. Tr., Jan. 13, 2008, ECF No. 12-15.

Upon approach, Walters removed a firearm from his waistband, held it against Sandoval's stomach, and told her to give him money. (Tr. 592-93.) Sandoval handed Walters single dollar bills; stuck between the bills was a piece of paper with the name "Maria Reyes" written on it.[2] (Tr. 594.) Walters then put his arm around Sandoval's neck and began to pull her by her hair away from the bus stop. (Tr. 610.) Sandoval struggled and broke free from Walters, pushed the gun away from her, and ran into the street, screaming for help. (Tr. 613-19.) Sandoval ran towards a passing police vehicle, yelling in Spanish and motioning with her hands by pulling at her hair and pointing her fingers at her chest as if they were a firearm. (Tr. 453-54, 617-18.) Police Officer Eugene Este observed Sandoval calling for assistance and saw Walters still standing in close proximity to her, but was unable to speak with her because he does not speak Spanish. (Tr. 453-54.) Officer Este then asked what was going on; Walters responded that he was trying to "rap to her, talk to her." (Tr. 462.) Officer Este began to approach Walters to investigate further, at which point Walters fled the scene. (Tr. 463-64.) Officer Este ran after Walters, caught up to him, and ordered him to get on the ground; Walters got on the ground and began stating, "I'm on the job, I'm on the job." (Tr. 464-65.) Ultimately, Officer Este learned that Walters was a New York City Department of Correction officer, observing Walters' Correction Officer uniform inside his nearby car. (Tr. 476-77.) Other Police Officers responded to assist, recovering a loaded firearm and New York City Department of Correction Identification card from Walters' person. (Tr. 514-21.)

Walters was transported to the Hempstead Police Department where he was further searched; eleven one-dollar bills and a piece of paper with the name "Maria Reyes" were recovered

---

[2] Sandoval testified that she carried a card with her sister's name, Maria Reyes, written on it because she needed to write the name down on checks she received from work. (Tr. 594-95.) The trial court speculated that Sandoval may have done this because she did not have a social security number and needed to do so to remember how to write her sister's name. (Tr. 601-02.)

from his person. (Tr. 478-79, 524-26.) During the search, Walters stated, "I am into Spanish chicks." (Tr. 483.)

While Walters was in custody, Detective Wimberly of the Nassau County Police Department was assigned to the investigation. Upon learning that Walters was diabetic, Detective Wimberly offered him juice in a plastic container. (Tr. 550-60.) After Walters drank from the container, it was placed in a paper bag and forwarded to the Forensic Evidence Bureau for DNA testing. (Tr. 560-62.) In addition, while at the Hempstead Police Department, Detective Wimberly asked for Walters' pedigree information, which he provided. Also, Detective Wimberly repeatedly checked in on Walters, asking if he was okay, and in response, Walters offered facts surrounding his arrest freely. (Hr'g. 120-30.) Detective Wimberly wrote down what Walters stated, asked him to sign it, but Walters refused and requested counsel. (Hr'g. 130.) Walters was then read his Miranda warnings and he again requested counsel. (Hr'g. 132.) Further, upon Walters' arrest, the Department of Correction, per protocol, was notified and his registered firearms were surrendered to law enforcement. (Hr'g. 83-87.)

The subsequent investigation revealed four additional victims.

### 2. Crimes Against Delsy Sanchez

On November 28, 2005, at approximately 6:30 A.M., Delsy Sanchez was walking through a parking lot in Hempstead, New York, on her way to work. (Tr. 797-803.) Walters, wearing a ski mask to cover his face, approached Sanchez, grabbed her around her waist, and pointed a firearm at her. (Tr. 803-05.) Sanchez told Walters that she was pregnant. (Tr. 807.) Walters pulled his mask up during the incident, allowing Sanchez to see his face. (Tr. 809.) Walters demanded money from Sanchez, which she provided. (Tr. 806.) Walters then pulled Sanchez into a nearby alleyway at gunpoint, forced her to engage in oral sex and forcibly raped her. (Tr. 814-

25.)  Walters then again removed his ski mask and left the location; Sanchez reported the incident to the police.  (Tr. 824-33.)  Traces of semen were found at the location where Walters raped Sanchez and ejaculated onto the ground, as well as on Sanchez's hat, which she had used to clean off her tongue after the attack.  (Tr. 1173-75.)  However, no DNA evidence could be extracted from these samples.  (Tr. 1173-75.)

On February 29, 2008, Sanchez was brought to the police station to view a lineup during which she identified Walters as the perpetrator of her attack in November of 2005.  (Tr. 843-44.)

### 3.  Crimes Against Shamika Dottin

On April 17, 2005, at approximately 3:00 A.M., Shamika Dottin was walking home in Hempstead, New York, when Walters approached her and then immediately placed a stocking mask over his face.  (Tr. 863-83.)  Walters pulled Dottin into the back of a parking lot, pointed a firearm at her, and demanded money, which she provided.  (Tr. 882-83.)  Walters then forced Dottin to engage in oral sex, inserted his fingers in her vagina, and placed his mouth to her breasts.  (Tr. 891-99.)  After the attack, Walters left Dottin in the parking lot; she then reported the attack to the police.  (Tr. 900-06.)  Dottin described her assailant as an African-American man, approximately five feet eleven inches tall, two hundred pounds, with dreadlocks, but was unable to describe his face as it was covered during the attack.  (Tr. 892-910.)  Additionally, she was able to observe the firearm as a black handgun with two blue lights on the top of the gun.  (Tr. 883.)  Dottin was examined at the hospital and swabs of her body were taken for possible DNA evidence.  (Tr. 1203–04.)  A DNA profile was generated from swabs of her breasts, but at the time of investigation, there was no match in the DNA databank.  (Tr. 1203-24.)  In October of 2007, after obtaining the above-referenced juice container with Walters' DNA, it was determined that

Walters' DNA was a match to the swabs of Dottin's breasts from the night of her assault. (Tr. 1223-61.)

### 4. Crimes Against Ilsa and Delmy Morales

On November 9, 2006 at approximately 10:30 A.M., in Hempstead, New York, sisters Ilsa and Delmy Morales were seated in their parked car intending on traveling to work. (Tr. 923-28.) Walters approached their car, leaned into the front passenger window, and pointed a firearm at Delmy Morales' leg, demanding money. (Tr. 928, 1079-83.) Both Ilsa and Delmy Morales observed Walter's face. (Tr. 930, 1080.) Ilsa Morales gave Walters two hundred dollars, at which point he got into the backseat of their car, pointed the firearm at Delsy Morales' neck and told them to start driving. (Tr. 933-37, 1082-85.) The car keys fell to the floor and the car alarm began to signal; Walters exited the car and fled the scene. (Tr. 940, 1085-89.) Subsequently, Ilsa and Delmy Morales reported the incident to the police, providing a description of the perpetrator, but no subject was identified at that point. (Tr. 948, 1090-91.) Then, on February 29, 2008, both Ilsa and Delmy Morales were brought to the police station to view a lineup, where they identified Walters as the perpetrator.[3] (Tr. 774-79, 950-53, 1091-93.)

### 5. Pre-Trial Proceedings, Trial, and Sentencing

Walters was indicted under three separate indictments: 406N-08, for the crimes against Dottin; 436N-08, for the crimes against Sanchez; and 2512N-07, for the crimes against Ilsa Morales, Delmy Morales, and Sandoval. (See Resp.'s Br., ECF No. 12, at 6.) The prosecution moved to consolidate the three indictments under indictment number 436N-08. The trial court

---

[3] During trial, Ilsa Morales testified that when she initially viewed the lineup she became nervous and afraid, telling the detective that she was not sure and asking to leave the room. (Tr. 950-952, 972.) Once outside the viewing room, Ilsa Morales informed the detective that she recognized the perpetrator in seat number five, where Walters was seated. (Tr. 756–757, 953.) In addition, Ilsa Morales identified Walters in the courtroom during her testimony. (Tr. 953.)

Delmy Morales testified regarding her separate viewing of the lineup, stating that she identified the perpetrator in seat number four, where Walters was seated. (Tr. 756, 1092-1093.)

granted consolidation, stating that "offenses charged in the indictment were independently joinable under two separate provisions of C.P.L. § 200.20(2) and (4) and that a single trial would serve the public interest and would not unduly prejudice the defendant." (See Trial Court Order, Jul. 16, 2008, at 3.) From April 15, 2008 through April 23, 2008, a suppression hearing was held in New York Supreme Court, Nassau County, during which the hearing court heard testimony to resolve evidentiary issues prior to trial. (Hr'g. 2-298.)

Walters' jury trial began on October 29, 2008 in Supreme Court, Nassau County. (Tr. 450.) At trial, the prosecution presented the testimony of all the victims of the aforementioned crimes, police officers who played a role in the investigation of this matter, as well as other civilian witnesses and expert witnesses. (Tr. 450-1285.)

After the close of the prosecution's case, Walters' attorney rested without calling additional witnesses, but made a motion for an order of dismissal and made the following argument regarding the consolidation of Walters' indictments:

> Your Honor, if I may, before I make an application regarding the trial order of dismissal, we have rested. I just want to place on the record that although it has been now a matter of law for the case that the indictment has been consolidated, part of my application in denying and opposing the People's application to consolidate the indictment was, in part, and as I specified in my opposition, was that I expected that in a case such as this, that my client would be able to defend himself and to testify regarding three of the separate dates of incidences other than the September 9th of '07 robbery and attempted kidnapping or kidnapping as it stands now. That the dates that had been recorded as November 9th, November 28th of '05 and I believe 4/17/05, my client would have testified or would have intended to testify and had they been severed from the September 9th of '07. And, in particular, the allegations of the September 9th of '07 matter, there was testimony regarding a weapon that my client may have either been possessing in his back pocket or not holstered, which would be pursuant to protocol as a result of the investigation that had been conducted by the Nassau County District Attorney's Office regarding the shooting and death of an individual. And that shooting and death occurring at I believe its 132 Martin Avenue in

Hempstead. That obviously having my client testify and explain that situation would have opened up the door for cross-examination regarding that.

And so I just want to place on the record, for further appellate review down the road, that again, what I allege and argued in my application to oppose I think became very clear during the consolidation of these counts and for this trial here today and that was the basis for my client not testifying here today, your Honor.

(Tr. 1287-88.)  The trial court denied the trial order of dismissal and rejected the arguments regarding consolidation.

Throughout the trial and during his summation, defense counsel repeatedly attacked the government's evidence, attempting to cast doubt on the reliability of the physical evidence as well as the lineup identifications made by the victims.  (Tr. 1314-1340.)  Defense counsel's strategy was to attack the evidence of each crime separately.  For example, for the attack of Shamika Dottin, defense counsel called into question whether the DNA was truly reliable, argued that Walters did not own the type of car described by Dottin, and pointed out that she could not identify him in court.  (Tr. 1314-1325.)  (As explained earlier, Dottin's attacker wore  stockings over his face during her attack).  (Tr. 880-882.)  Regarding Delsy Sanchez, defense counsel criticized the reliability of the lineup and pointed out that there was a significant passage of time between the time of the crime and the lineup.  (Tr. 1326-1330.)  As to the crime against the Morales sisters, defense counsel criticized the reliability of the lineup and their identifications and argued that their initial description of the perpetrator was not very similar to Walters.  (Tr. 1331-1335.)  Finally, regarding the crime against Sandoval, defense counsel argued that her recitation of the facts is less credible because of her state of panic, and pointed out that there was no sexual element to this incident.  (Tr. 1337-1340.)

Following deliberations, the jury convicted Walters of four counts of Robbery in the First Degree, one count of Kidnapping in the Second Degree, two counts of Criminal Sexual Act in the First Degree, four counts of Sexual Abuse in the First Degree, one count of Rape in the First Degree, and one count of Attempted Kidnapping in the Second Degree. (Tr. 1459-1462.) The jury acquitted Walters of one count of Kidnapping as a Sexually Motivated Felony.

On January 13, 2008, Walters returned to Nassau County Supreme Court for sentencing. The prosecution sought the maximum sentence of two hundred and forty-three (243) years, emphasizing that Walters was convicted of thirteen (13) felonies, involving five (5) victims, the case against Walters was strong, his crimes were egregious, and he abused his position of authority. (S. 2-5.) The prosecution stated, in pertinent part:

> The women in this case, the victims, were young, terrified, unarmed women. Most of them were women who had come to this country for a better life, women who work and continue to work long hours for little pay, not asking for handouts, but trying to make it in a place where, with hard work, they could lead their lives with dignity and hold their head up high.
>
> ***
>
> Each incident represents another woman whose only crime was to cross his path, another woman who, to him, appeared vulnerable and off her guard.

(S. 3-4.) Defense counsel requested a lesser sentence, pointing to Walters' personal background, family support, his maintaining his innocence, and letters submitted on his behalf. (S. 5-12.) Further, Walters made a statement on his own behalf. (S. 13-14.) The trial court then discussed its reasoning for sentence, pointing to the "barbaric [and] premeditated" nature of Walters' crimes and the overwhelming evidence against him. (S. 14-16.) The trial court stated, in pertinent part:

> What I will remember most about the trial, Mr. Walters, is sitting here and watching as these women, one by one, got up here in this courtroom and scanned the courtroom looking, and when they

locked eyes on you, you could see, from my perspective, at least, visibly, their faces begin to change because they were looking at pure evil, the same person who had committed these acts.

There's no doubt about them remembering you, and there's no doubt in my mind that when they pointed you out in this courtroom, that you were in fact, the person who committed these acts upon them.

There's nothing left for me to do but to make sure that somebody like you does not roam in a free society to commit the kind of incredibly barbaric acts that you committed upon these people. You preyed upon people. You chose your victims carefully. You had hope that because of their immigrant status or language barrier that they would never report this to the police. You know something, for a couple of years you were getting away with it and it was working for you until that morning on September 7th of 2007.

(S. 16-17.) The trial court then imposed an aggregate sentence of two hundred and three years of incarceration.[4] (S. 17-19.)

## B. Post-Conviction Proceedings

### 1. The Direct Appeal

Walters, through counsel, appealed his conviction to the New York Appellate Division, Second Department. On appeal, he argued that: (1) he received ineffective assistance of trial

---

[4] The specifics of the imposed sentence are the following: (1) Count One, Robbery in the First Degree, 25 years of incarceration followed by 5 years of post-release supervision; (2) Count Three, Kidnapping in the Second Degree, 25 years of incarceration followed by 5 years of post-release supervision; (3) Count Four, Robbery in the First Degree, 25 years of incarceration followed by 5 years of post-release supervision; (4) Count Six, Criminal Sex Act in the First Degree, 25 years of incarceration followed by 5 years of post-release supervision; (5) Count Seven, Sexual Abuse in the First Degree, 7 years of incarceration followed by 3 years of post-release supervision; (6) Count Eight, Sexual Abuse in the First Degree, 7 years of incarceration followed by 3 years of post-release supervision; (7) Count Nine, Robbery in the First Degree, 25 years of incarceration followed by 5 years of post-release supervision; (8) Count Ten, Rape in the First Degree, 25 years of incarceration followed by 5 years of post-release supervision; (9) Count Twelve, Criminal Sex Act in the First Degree, 25 years of incarceration followed by 5 years of post-release supervision; (10) Count Thirteen, Sexual Abuse in the First Degree, 7 years of incarceration followed by 3 years of post-release supervision; (11) Count Fourteen, Sexual Abuse in the First Degree, 7 years of incarceration with 3 years of post-release supervision; (12) Count Fifteen, Robbery in the First Degree, 25 years of incarceration with 5 years of post-release supervision; and (13) Count Sixteen, Attempted Kidnapping in the Second Degree, 15 years of incarceration followed by 5 years of post-release supervision. (S. 17-19.) The sentences of incarceration for Counts One, Four, Six, Seven, Eight, Nine, Ten, Twelve, Thirteen, Fourteen, and Fifteen were ordered to run consecutively; the sentence as to Count Three was to ordered to run concurrent to Count One; and the sentence as to Count Sixteen was ordered to run concurrent to Count Fifteen. (S. 17-19.)

counsel when his attorney failed to effectively challenge the consolidation of the indictments; (2) his conviction was against the weight of the evidence; and (3) the trial court's reliance on "the uncharged and unproven allegation that [he] 'preyed' on 'immigrant and non-english speaking women'" denied him due process of law.  (See Def.'s App. Div. Br., Mar. 18, 2011, ECF No. 13-7, at 31-59.)  The Second Department affirmed Walters' conviction, determining that "the evidence established that the defendant's counsel provided meaningful representation in opposing the motion [to consolidate]," that his conviction was not against the weight of the evidence, and that the sentence was not excessive.  People v. Walters, 90 A.D.3d 958 (N.Y. App. Div. 2d Dep't 2011).

On January 17, 2012, Walters filed a motion for an order vacating, annulling, or setting aside a portion of the Second Department's decision, arguing that the Second Department failed to rule upon his sentencing claim, improperly characterizing it as an excessive sentence claim. (See Def.'s Mot. to Reargue, Jan. 17, 2012, ECF No. 13-10.)  The Second Department granted the motion to reargue on March 2, 2012, thus amending the final paragraph of its decision from "the sentence imposed was not excessive" to "the defendant's contention that the sentencing court improperly relied on uncharged and unproven allegations is unpreserved for appellate review and, in any event, is without merit."  See Walters, 90 A.D.3d at 959.

Walters requested leave to appeal the Second Department's decision; on April 5, 2012, the New York State Court of Appeals denied Walters' request.  See People v. Walters, 18 N.Y.3d 999 (2012).

### 2. The Section 440.10 Motion

Walters filed a motion pursuant to Section 440.10 of the New York Criminal Procedure Law on July 3, 2013.  (See Def.'s 440.10 Mot., Jul. 3, 2013, ECF No. 14-7.)  In his Section 440.10 motion, Walters argued that he received ineffective assistance of trial counsel when his attorney

failed to: (1) advise him of his right to testify; (2) failed to "discover, examine, consult, and challenge scientific assertions proffered by the government"; and (3) failed to "investigate Department of Corrections' [ ] uniform and equipment specifications and regulations." (Id. at 5-12.) In the alternative, Walters requested discovery "as a preliminary step in the DNA retesting of biological evidence." (Id. at 1.) On October 18, 2013, Walters filed a supplemental motion pursuant to Section 440.10, advancing the same arguments contained in the original 440.10 motion and adding that he received ineffective assistance of counsel "when counsel failed to investigate and prepare an alibi defense, call alibi witnesses who were ready, willing, and able to testify, and denied [him] his right to testify as a witness on his own behalf." (See Def.'s Supp. 440.10 Mot., Oct. 18, 2013, ECF No. 14-9, at 7-16.)

The prosecution opposed the Section 440.10 motions on September 24, 2013 and December 3, 2013. (See Opp. to Def.'s 440.10 Mot., Sept. 24, 2013, ECF No. 14-8; Opp. to Def.'s Supp. 440.10 Mot., Dec. 3, 2013, ECF No. 14-10.) Attached to the December 3rd opposition, the prosecution included an affirmation from trial counsel, Dennis M. Lemke, Esq., which contradicted Walters' allegations and explained Lemke's decisions during trial. (See Lemke Aff., Nov. 19, 2013, ECF No. 14-10, at 14-17.)

On January 13, 2015, the County Court of Nassau County denied the Section 440.10 motions in their entirety. (See Court Order Denying Def.'s 440.10 Mot., Jan. 13, 2015, ECF No. 14-11, at 1-3.) The court stated:

> Defendant's conclusory allegations, unsupported in his original moving papers do not establish he was denied meaningful representation, that he was denied a fair trial or that an alternative outcome could have been reached in light of the overwhelming evidence against him.
>
> Defendant's supplemental papers, regarding an alibi witness has likewise failed to establish a claim for ineffective counsel. They are

> clearly self serving, and strongly contradicted by counsel's affirmation. Specifically, counsel asserts that while he did consider calling Wanda Walter[s] as a character witness, he was never given any reason to believe she would provide exculpatory/alibi testimony. In the light of the overwhelming evidence of [Walters'] guilt, he has not established he was denied the right to effective counsel.

(Id. at 2-3.) On July 31, 2015, the Second Department denied Walters' application for leave to appeal the Nassau County Court's denial of his 440.10 motions. (See Order Denying Leave to Appeal Def.'s 440.10 Mot., Jul. 31, 2015, ECF No. 13-22.) Walters sought further leave to appeal to the New York Court of Appeals—that application was dismissed on October 28, 2015, as the underlying order was not appealable pursuant to Criminal Procedure Law ("C.P.L.") 450.90(1). (See Order Dismissing Appeal Relating to Def.'s 440.10 Mot., Oct. 28, 2015, ECF No. 14-6.)

### 3. The Coram Nobis Petition

On November 4, 2013, while his Section 440.10 motion was still pending, Walters moved for a writ of error coram nobis, asserting that he received ineffective assistance of appellate counsel when his appellate attorney failed to argue that the trial court should have suppressed certain statements and that the motion to consolidate was improperly granted. (See Def.'s Coram Nobis Pet., Nov. 4, 2013, ECF No. 13-13, at 10-29.) The Second Department denied the coram nobis petition, finding that Walters had "failed to establish that he was denied the effective assistance of appellate counsel." See People v. Walters, 114 A.D.3d 997 (N.Y. App. Div. 2d Dep't 2014). Walters did not seek leave to appeal this decision to the New York Court of Appeals.

### 4. The Instant § 2254 Petition

Walters filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on March 28, 2014. (See Pet., ECF No. 1.) Because Walters' Section 440.10 motions and coram nobis petitions were still pending when he filed his habeas petition, Walters requested that the

petition be held in abeyance pending resolution of his outstanding post-conviction collateral proceedings. On June 3, 2014, Judge Bianco ordered the instant habeas petition held in abeyance until final resolution of Walters' state court filings. (See Court Order, June 3, 2014, ECF No. 5.)[5] On November 5, 2015, the Court was notified of the aforementioned resolution of the outstanding state court proceedings. (See ECF No. 9.) Walters asserts the following grounds for relief:

(1) Ineffective assistance of trial counsel for failing to: (a) inform him of his right to testify, (b) investigate and assert an alibi defense at trial, and (c) present evidence regarding uniform regulations at the Department of Corrections;

(2) Ineffective assistance of appellate counsel for failing to argue that: (a) the motion to suppress statements was improperly denied; and (b) the trial court improperly granted the motion to consolidate the indictments;

(3) Denial of due process of law based on the consolidation of the indictments and the use of evidence to suggest he targeted Hispanic women as a basis to establish criminal propensity; and

(4) Denial of due process based on the trial court imposing his sentence based "on the unproven allegation that [he] 'preyed' on 'immigrant and non-English speaking women' and acted with depravity and barbarity when doing so."

## II. DISCUSSION

### A. <u>Standards of Review</u>

#### 1. Overview of AEDPA

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), to restrict "the power of federal courts to grant writs of habeas corpus to state prisoners." <u>Williams v. Taylor</u>, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring). Under AEDPA, a prisoner may file a habeas petition "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To make that showing, the petitioner must demonstrate: (1) the exhaustion of state

---

[5] The instant petition was originally assigned to Judge Bianco. It was transferred to the undersigned on January 16, 2015.

remedies, (2) the absence of a procedural bar, and (3) the satisfaction of AEDPA's deferential review of state court decisions. See id. § 2254.

### 2. Exhaustion

Generally, a court cannot review a habeas petition unless the petitioner "has exhausted the remedies available" in state courts. 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is designed to provide state courts with the "'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" Jackson v. Edwards, 404 F.3d 612, 619 (2d Cir. 2005) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). Therefore, the petitioner must show that he fairly presented his federal claim to the highest state court from which a decision can be rendered. Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 190 n.3 (2d Cir. 1982) (en banc). Although the petitioner need not "'cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'" Jackson v. Conway, 763 F.3d 115, 133 (2d Cir. 2014) (quoting Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011)).

Where, as here, the petition is a "mixed petition," containing both exhausted and unexhausted claims, the court can deny the unexhausted claims if they are meritless. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); Ortiz v. Marshall, No. 08-CV-8815, 2009 WL 3170300, at *5 (S.D.N.Y. Sept. 30, 2009) ("Federal courts retain the discretion to deny a petition including unexhausted claims on the merits when it deems those claims to be patently frivolous." (internal quotation marks and citation omitted)).

### 3. Procedural Default

A federal court cannot review a habeas petition "when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)). For this reason, under the doctrine of procedural default, a federal court will not review "the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." Martinez v. Ryan, 566 U.S. 1, 9 (2012). This procedural bar applies even if the state court addressed a claim's merits in the alternative, but decided that claim on independent procedural grounds. Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (per curiam); see also Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) (observing that "a state court need not fear reaching the merits of a federal claim in an alternative holding" where the court explicitly invokes a procedural rule as an independent ground for its decision) (emphasis in original). When a state court has dismissed a claim based on a state procedural rule, the petitioner is procedurally barred from raising that claim in a § 2254 petition unless the petitioner can meet certain exceptions discussed below.

"The concepts of procedural bar and exhaustion often interact in an important way." Dominguez v. Rock, No. 12-CV-3269, 2016 WL 542120, at *5 (E.D.N.Y. Feb. 9, 2016). "If a § 2254 petitioner has failed to present a claim to a state court but can no longer do so—for example, if the time to file a state-court appeal has passed—then that claim is considered procedurally barred rather than unexhausted." Id. (citing O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999)); Lloyd v. Walker, 771 F. Supp. 570, 574 (E.D.N.Y. 1991) (noting that "[w]hen a petitioner has not properly presented his claim to a state for consideration on the merits, but it is clear that the state court would hold the claim procedurally barred, . . . the exhaustion requirement is satisfied," but the

petitioner is barred from litigating the merits of that claim in federal habeas proceedings) (internal quotation marks and citation omitted).

To overcome a procedural bar, a petitioner must show either (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. To demonstrate cause, a petitioner must put forth that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule": for example, "that the factual or legal basis for a claim was not reasonably available to counsel" or that "some interference by officials … made compliance impracticable." Murray v. Carrier, 477 U.S. 478, 488 (1986) (internal quotation marks and citations omitted). A petitioner may also satisfy the cause requirement by demonstrating that his attorney's failure to comply with state procedural rules denied him constitutionally adequate representation. See Tavarez v. Larkin, 814 F.3d 644, 650 (2d Cir. 2016), cert. denied, 137 S.Ct. 106 (2016); Restrepo v. Kelly, 178 F.3d 634, 640 (2d Cir. 1999).

As for the prejudice requirement, the petitioner must demonstrate that counsel's errors (or any other basis invoked by the petition to establish cause) not only "created a possibility of prejudice, but that they worked to his actual and substantial disadvantage…" United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original).

Even if a petitioner cannot establish cause and prejudice, a federal court may excuse a petitioner's procedural default if he can show that a fundamental miscarriage of justice would result. For example, a petitioner can overcome a procedural bar by showing "that he is actually innocent of the crime for which he has been convicted." Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (citing Schlup v. Delo, 513 U.S. 298, 321 (1995)). To prevail, the petitioner must put

forth "new reliable evidence … that was not presented at trial.  Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup, 513 U.S. at 324.

**4. AEDPA Standard of Review**

If a state court reached the merits of a claim, a federal court may not grant a writ of habeas corpus unless the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court has construed AEDPA "to give independent meaning to 'contrary [to]' and 'unreasonable.'"  Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000).

A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412–13 (2000) (O'Connor, J., concurring).  A decision involves an "unreasonable application" of clearly established federal law when a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case."  Id. at 413. This standard does not require that all reasonable jurists agree that the state court was wrong.  Id. at 409–10.  Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'"  Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

AEDPA "'imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.'" Jones v. Murphy, 694 F.3d 225, 234 (2d Cir. 2012) (quoting Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam)). This standard is "difficult to meet," and for good reason. White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting Metrish v. Lancaster, 133 S. Ct. 1781, 1786 (2013)), reh'g denied, 134 S. Ct. 2835 (2014). A petitioner must show that the "state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 1702.

Furthermore, a state court's determinations of factual issues are "presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006). A state court's findings of fact will be upheld "'unless objectively unreasonable in light of the evidence presented in the state court proceeding.'" Lynn, 443 F.3d at 246–47 (quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)). Thus, a federal court may overrule a state court's judgment only if "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." Williams, 529 U.S. at 389

## B. **Claims for Relief**

As mentioned above, Walters seeks habeas relief on four separate grounds: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; (3) denial of due process by the consolidation of his indictments and the introduction of evidence suggesting he targeted women on the basis of race or national origin, and (4) denial of due process because he was sentenced based on allegedly unproven evidence suggesting he targeted women on the basis of race or national origin. For the following reasons, the petition is DENIED in its entirety.

**1. Ineffective Assistance of Trial Counsel**

Walters contends that he received ineffective assistance of counsel when trial counsel failed to: (1) inform him of his right to testify on his own behalf; (2) investigate and raise an alibi defense at trial; and (3) present evidence regarding the Department of Corrections' uniform policy at the time of the incidents.  (See Pet. at 24-32.)

    *i.    Standard for Ineffective Assistance of Counsel*

To prevail on an ineffective assistance of counsel claim, a petitioner must show that his trial counsel's performance was so inadequate that his Sixth Amendment right to counsel was violated.  See Strickland v. Washington, 466 U.S. 668, 689-90 (1984).  Therefore, the petitioner must "(1) demonstrate that his counsel's performance 'fell below an objective standard of reasonableness' in light of 'prevailing professional norms,' and (2) 'affirmatively prove prejudice' arising from counsel's allegedly deficient representation." United States v. Cohen, 427 F.3d 164, 167 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 688, 693).  First, it must be demonstrated that "'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"  Wilson v. Mazzuca, 570 F.3d 490, 502 (2d Cir. 2009) (quoting Strickland, 466 U.S. at 687).  Next, a petitioner must show that he was prejudiced by said deficient performance, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Rosario v. Ercole, 601 F.3d 118, 123 (2d Cir. 2010) (internal quotation marks and citation omitted).

Under AEDPA, federal courts must grant state courts substantial "deference and latitude" when considering claims for ineffective assistance of counsel already rejected at the state court level.  Harrington v. Richter, 562 U.S. 86, 101 (2011).

Given this deferential standard, Walters' alleged errors by trial counsel do not rise to ineffective assistance of counsel.

### ii. *Failure to Inform of Right to Testify*

Walters' claim that his trial counsel was ineffective for failing to inform him of his right to testify was raised in his Section 440.10 motion. The Nassau County Court denied all of Walters' ineffective assistance of counsel grounds, finding them "conclusory" and that they "do not establish he was denied meaningful representation, that he was denied a fair trial or that an alternative outcome could have been reached in light of the overwhelming evidence against him." (See Court Order Denying Def.'s 440.10 Mot. at 2.) Walters sought leave to appeal the County Court's denial to the Second Department and the New York Court of Appeals. Therefore, this claim was adequately exhausted, and as the state court denied the claim on its merits, the Court proceeds to evaluate this claim and finds that it does not provide a basis for habeas relief.

"It is well settled that a criminal defendant has a constitutional right to testify on his own behalf." Campos v. United States, 930 F. Supp. 787, 790 (E.D.N.Y. 1996) (citing Rock v. Arkansas, 483 U.S. 44, 49–52 (1987). "The ultimate decision whether or not to take the stand in his own defense rests with the defendant" but "[d]efense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify." Jackson v. Bennett, No. 01 Civ. 8971, 2002 WL 1770781, at *5 (S.D.N.Y. Jul. 31, 2002) (internal citations omitted).

Upon review of the underlying proceedings, Walters' contention that counsel failed to inform him of his right to testify is not credible. First, the claim is contradicted in trial counsel's affirmation that the prosecution submitted in opposition to the 440.10 motion. In trial counsel's affirmation, counsel stated that "[i]t is always my practice to advise my clients of their right to testify . . . [and] I did not deviate from that practice in this case." (Lemke Aff. at 2.) Further, trial

counsel explained that Walters' decision not to testify was related to the consolidation of the indictments because Walters would have been cross-examined as to multiple incidents. (Lemke Aff. at 2.) This contention is reflected in the underlying record. During trial, in the presence of Walters, trial counsel stated that Walters would have considered testifying if not for the consolidation of the indictments. (Tr. 1287-88.) Accordingly, it does not follow that Walters was unaware that he had a right to testify. The Court finds that Walters has failed to demonstrate that his counsel committed an error of constitutional magnitude.

In addition, Walters has not shown that he was prejudiced by this alleged error. During the trial, the prosecution presented an overwhelming amount of evidence against Walters, including the following: Walters' DNA match linking him to one of the attacks; multiple victims' identifications, both in and out of court, of Walters as the perpetrator of their attacks; and the fact that Walters was stopped by the arresting officer at the scene of an attack still standing in close proximity to his victim. As such, the Court finds that the state court's determination that Walters did not show "that an alternative outcome could have been reached in light of the overwhelming evidence against him" was not contrary to, or an unreasonable application of clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts. (See Court Order Denying Def.'s 440.10 Mot. at 2; see also 28 U.S.C. § 2254(d)(1).)

iii.     *Failure to Investigate and Assert Alibi Defense*

Walters argues that trial counsel was ineffective as he failed to adequately investigate or present alibi witnesses to testify on his behalf. (See Pet. at 25-31.) Walters contends that Wanda Walters and Sheron Allen should have been called as alibi witnesses. In Walters' supplemental 440.10 motion, he asserted that Wanda Walters and Sheron Allen could have provided an alibi for

the morning of the November 28, 2005, when Delsy Sanchez was attacked.[6]  (See Pet. at 28-30; Def.'s Supp. 440.10 Mot. at 7-16.)

Wanda Walters was Walters' wife in November 2005 and Allen was Walters' mistress in November 2005.  (Def.'s Supp. 440.10 Mot. at 5.)  Although Walters submitted an affidavit from Allen in support of his supplemental 440.10 motion, he did not provide an affidavit from Wanda Walters concerning his alleged alibi.  Notably, Allen eventually married Walters—in fact, Allen was already Walters' wife when she provided an affidavit in support of his supplemental 440.10 motion.

In his supplemental 440.10 motion, Walters argued that he "told trial counsel his whereabouts and schedule for [November 28, 2005], but trial counsel failed to speak to [Allen], . . . who would have established his whereabouts at a place other than the crime scene for the date in question."  (Def.'s Supp. 440.10 Mot. at 5.)

In response to Walter's claims, defense counsel submitted an affirmation refuting Walters' allegations.  With regard to Walters' assertion that trial  counsel "did not investigate his proposed alibi and did not assert the alibi defense because  [trial counsel] did not want the jury to know that he was cheating on his wife," trial counsel stated that "[a]t no time [ ] did Mr. Walters inform [him] that he had cheated on his wife, or that his mistress could provide an alibi for the time during which

---

[6] In Walters' supplemental 440.10 motion, he alleged the following regarding a potential alibi defense:

> On November 28, 2005, [Walters] was planning a surprise party for [his wife], Wanda Walters, to celebrate her 40th birthday.  He left his home at 5:30 a.m. that morning and arrived at Sheron Allen's apartment at 6:00 a.m. in Far Rockaway (Arvern), Queens County.  At approximately 10:00 a.m., he left Sheron Allen's apartment to pick up a flower arrangement for Wanda Walters in Lawrence, Nassau County.  He personally delivered the flowers to [his wife's] place of employment at Grace Lutheran Elementary School in Malverne, Nassau County between 11:00 a.m. and 11:30 a.m.  After he delivered her flowers, he picked up her birthday cake from Riesterer's Bakery on Hempstead Avenue, West Hempstead, Nassau County.  He then spent the remainder of the day at home preparing for her surprise party scheduled for that evening.

(Def.'s Supp. 440.10 Mot. at 4.)

Delsy Sanchez had been raped." (Lemke Aff. at 15.) In addition, trial counsel maintained that had he known about any alibi defense, he would have investigated "regardless of the fact that Mr. Walters was cheating on his wife, particularly in light of the seriousness of the charges against him, and the fact that the prosecution had an overwhelming case (including DNA evidence, eyewitness identifications, and the fact that Mr. Walters was arrested after he was stopped with one of the complainants, after which he ran away from a police officer)." (Lemke Aff. at 15.) Trial counsel stated that he decided not to call Walters' wife as a witness because he had no reason to believe she could provide an alibi and "believed her testimony on cross-examination could have confirmed that Mr. Walters was not home and could not be accounted for during the times of some or all of the crimes, and that he sometimes left the house for work armed with a gun like the one used in the crimes, and dressed as the perpetrator of the crimes had dressed." (Lemke Aff. at 15-16.)

> The Nassau County Court denied this alibi claim on the merits, stating that Walters'
>
> supplemental papers, regarding an alibi witness has [ ] fail[ed] to establish a claim
> for ineffective assistance of counsel. They are clearly self-serving, and strongly
> contradicted by trial counsel's affirmation. Specifically, counsel asserted that while
> he did consider calling Wanda Walters as a character witness, he was never given
> any reason to believe she would provide exculpatory/alibi testimony. In light of
> the overwhelming evidence of Defendant's guilt, he has not established he was
> denied the right to effective counsel.

(Court Order Denying Def.'s 440.10 Mot. at 2-3.) As this decision was then appealed to the highest state court, the Court finds the claim adequately exhausted, and as the state court denied this ground on its merits the Court proceeds to address the substance of the claim.

Generally, it is well established that "[d]efense counsel has a 'duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" Rosario v. Ercole, 601 F.3d 118, 130 (2d Cir. 2010) (quoting Wiggins v. Smith, 539 U.S. 510, 521

(2003)).  However, a reasonable investigation does not "compel defense counsel to investigate comprehensively every lead or possible defense or to scour the globe on the off-chance something will turn up." Greiner v. Wells, 417 F.3d 305, 321 (2d Cir. 2005) (internal quotation marks and citations omitted).  "Post-hoc complaints about the strategy or tactics employed by trial counsel, or complaints that trial counsel did not conduct a sufficiently vigorous pretrial investigation, are typically found to be insufficient to satisfy Strickland." Agyekum v. United States, No. 01 Civ. 5808, 2002 WL 10000950, at *5 (S.D.N.Y. May 16, 2002).  "[C]ounsel's decision as to 'whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation.'" United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (quoting United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 2001), cert. denied, 522 U.S. 846 (1997).  "[H]owever, the decision not to call a witness must be grounded in some strategy that advances the client's interests." Eze v. Senkowski, 321 F.3d 110, 129 (2d Cir. 2003).  "With respect to alibi witnesses in particular, courts have found that 'even if . . . alibi evidence did exist, the trial attorney's decision not to call the purported alibi witnesses was a tactical decision that does not constitute deficient performance.'" Schulz v. Marshall, 528 F. Supp. 2d 77, 92 (E.D.N.Y. 2007) (quoting Dupont v. United States, 224 F. App'x 80, 82 (2d Cir. 2007).

As explained below, Walter's ineffective of assistance claim fails.  First, according to trial counsel's affirmation submitted in state court, counsel had no information that either of the aforementioned witnesses could provide an alibi for Walters.  (Lemke Aff. at 2.)  Trial counsel indicated that he was unaware that Walters had an extra-marital relationship with Sheron Allen or that she could provide any alibi defense.  (Lemke Aff. at 2.)  The Nassau County Court's decision to credit Lemke's version of events over Walter's contrary claims was not an unreasonable

determination of the facts.[7]  As to Wanda Walters, trial counsel stated that he considered calling her as a character witness, but "ultimately decided that it would be detrimental to call Mrs. Walters as a witness [ ] because I believe her testimony on cross-examination could have confirmed that Mr. Walters was not home and could not be accounted for during the times of some or all of the crimes, and that he sometimes left the house for work armed with a gun like the one used in the crimes, and dresses as the perpetrator of the crimes had dressed."  (Lemke Aff. at 2-3.)  Again, the Nassau County Court's decision to credit Lemke's version of events over Walter's contrary claims was not an unreasonable determination of the facts.  In light of those findings, it cannot be said that Lemke acted unreasonably concerning these alleged alibi witnesses.

Second, Walters was not prejudiced by any failure to investigate or call either Allen or Wanda Walters as alibi witnesses.  According to Walters, on November 28, 2005, he left his home in Hempstead that he shared with his wife Wanda Walters at 5:30 a.m. and did not see Wanda Walters again that day until between 11:00 and 11:30 a.m.  (See Def.'s Supp. 440.10 at 4.)  Accordingly, the Court rejects Walters' contention that the testimony of Wanda Walters could provide him a viable defense for the attack on Delsy Sanchez, which occurred on November 28, 2005 at approximately 6:30 A.M. in Hempstead.  (Tr. 797-803.)  Additionally, Walters claimed that he was with his mistress Sheron Allen on November 28, 2005 from 6:00 a.m. until 10:00 a.m.  (See Def.'s Supp. 440.10 at 4.)  However, Sheron Allen's self-serving testimony—which only related to the attack on Delsy Sanchez—could not overcome the DNA evidence linking Walters to Shamika Dottin's attack, the eyewitness identifications for the attacks, including that of Delsy Sanchez, and the fact that Walters was caught immediately after the attack on Sara Sandoval and fled from the police.  When considering the overwhelming evidence against Walters, he has not

_____

[7] Moreover, even without the overlay of AEDPA defense, the Court credits Lemke's affirmation over Walters' self-serving allegations.

shown that but for counsel's alleged error, there is a reasonable probability that the result of the trial would have been different. As the Nassau County Court stressed in rejecting this claim, the evidence against Walter was overwhelming.

In sum, given the highly deferential standards in <u>Strickland</u> and AEDPA, this ineffective assistance of counsel claim fails.

> ### iv. *Failure to Present Evidence Regarding Uniform Practices of Department of Corrections*

Walters contends that he received ineffective assistance of counsel because his attorney failed to present evidence regarding the uniform policies of the New York City Department of Corrections. (Pet. at 31.) Walter claims that although "one witness gave police a description of her assailant as wearing a uniform consistent with that of a New York City Correction Officer . . . [by] decrib[ing] the pants the assailant was wearing as military-style cargo pants," "DOC did not permit its officers to wear military-style cargo pants until 2006" after the date of the assault. (Pet. at 31.) This claim was raised in Walters' Section 440.10 motion; the Nassau County Court did not specifically discuss this ground, but denied all grounds of ineffective assistance of counsel. (<u>See</u> Court Order Denying Def.'s 440.10 Mot. at 2-3.) As discussed above, Walters appealed this decision to the highest state court and it is exhausted. Therefore, as the state court denied the claim on the merits, the Court turns to the substance of the claim.

Crucially, Walters mischaracterizes the testimony at trial regarding his clothing. During Delsy Sanchez's testimony, she did not state that her assailant wore "cargo pants" as Walters suggests, but stated that he wore "blue pants, navy blue like they use for uniforms." (Tr. 805-06.) Therefore, any evidence indicating that Corrections Officers were not permitted to wear cargo pants in 2005 would not have been helpful to Walters.

As discussed prior, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance' [and the petitioner] bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." <u>Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)</u> (quoting <u>Strickland</u>, 466 U.S. at 688-89.). Accordingly, the Court is not convinced that counsel not raising the uniform regulations of the Department of Correction amounts to deficient representation.

Further, for the reasons stated above, even if the Court found that his counsel erred, Walters cannot show prejudice given the overwhelming evidence presented at trial.

### 2. Ineffective Assistance of Appellate Counsel

Walters contends that he received ineffective assistance of appellate counsel when "counsel failed to argue that the trial court improperly consolidate[d] the indictments . . . and failed to argue on appeal that [the] motion to suppress statements was erroneously denied." (<u>See</u> Pet. at 33-40.)

As to both grounds for ineffective assistance of appellate counsel, Walters raised these claims in his coram nobis petition. The Second Department denied all of these claims, stating that "[t]he appellant has failed to establish that he was denied the effective assistance of appellate counsel." <u>Walters</u>, 115 A.D.3d at 997. Walters then failed to seek leave to appeal the denial of his coram nobis petition to the New York Court of Appeals. Accordingly, Walters did not fairly present these claims to the highest state court able to hear them, rendering the claims unexhausted. <u>See</u> <u>Galdamez v. Keane</u>, 394 F.3d 68, 73 (2d Cir. 2005); <u>Santos v. Payant</u>, 538 F. Supp. 2d 549, 553-54 (E.D.N.Y. 2007). However, there remains no state procedural mechanism for Walters to present these claims to the New York Court of Appeals—thus, sending Walters back to state court would be futile. Accordingly, the Court deems these claims exhausted, but procedurally defaulted.

See Reyes v. Keane, 118 F.3d 136, 139-40 (2d Cir. 1997).  In any event, because these claims are plainly meritless, the Court also denies them on the merits for the reasons set forth below.

> i.      *Failure to Argue that Motion to Suppress Statements was Denied in Error*

As a threshold matter, the Strickland standard for ineffective assistance of trial counsel also applies to appellate counsel.  See Smith v. Robbins, 528 U.S. 259, 285 (2000).  "Accordingly, a petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel acted unreasonably in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful before the state's highest court."  Rush v. Artuz, No. CV-99-2840, 2009 WL 982418, at *20 (E.D.N.Y. Apr. 10, 2009).  It is established that "[a]ppellate counsel need not (and should not) raise every nonfrivolous claim, but rather may select them in order to maximize the likelihood of success on appeal."  Rush, 2009 WL 982418, at *21 (internal quotation marks and citations omitted).  To show constitutionally deficient performance in this context, a petitioner must show that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Walters claims that his appellate counsel was ineffective for not appealing the trial court's refusal to suppress certain statements.  (Pet. at 34.)  First, Walters contends that his statement to the arresting officer that he was 'into Spanish chicks' was improperly admitted because he had not been read his Miranda warnings.  (Pet. at 35.)  Additionally, Walters alleges that while he was at the police precinct, Detective Wimberly spoke with him and "during these periods of inquiry [he] made incriminating statements to Detective Wimberly . . . [and] [s]he transcribed those statements," and he had not yet received his Miranda warnings.  (Pet. at 35-36.)

As an initial matter, the Court need not engage in an extensive <u>Strickland</u> analysis regarding any of the abovementioned statements made to Detective Wimberly. These statements, as conceded by Walters, were not introduced at trial—therefore it was plainly not an error when appellate counsel chose not to relitigate the admissibility of these statements on appeal. These statements were never before the jury and, thus, could not possibly have affected the verdict. Furthermore, the Court finds meritless Walters' contention that the trial was tainted because these statements at issue could have been used against him on cross-examination if he had testified.

Turning to the statement made to the arresting officer, this statement was presented at trial during Officer Este's testimony:

> Ms. Singas:    Officer Este, did the defendant say anything at the time that he was being searched?
>
> Officer Este:   Yes.
>
> Ms. Singas:    What was it that he said?
>
> Officer Este:   He says, I am into Spanish chicks.

(Tr. 483.) The circumstances surrounding this statement were litigated at the suppression hearing. Officer Este testified that Walters made this statement while at the police precinct, during a search incident to his arrest. (Hr'g. 19-20.) The testimony surrounding this statement included the following:

> Ms. Singas:    [ ] [A]t the station house, was a more thorough search of the defendant done?
>
> Officer Este:   Yes.
>
> Ms. Singas:    Can you talk to us about that?
>
> Officer Este:   All the property inside the defendant's possession - - clothing was laid out. Officer Almanzar reached into his pockets and took out currency, about $11 and a piece of paper from his, I believe, left pocket.

Ms. Singas:    Was that the front pocket or the back pocket, do you remember?

Officer Este:    Front pocket.

Ms. Singas:    Were you present when Officer Almanzar was conducting the search?

Officer Este:    Yes, I was standing by the doorway and laid it down on the table, counted eleven dollars and Officer Almanzar asked the question, [w]ho's Maria Reyes?

Ms. Singas:    I'm sorry, what is Maria Reyes, tell us about that.

Officer Este:    Because a white piece of paper, a name written on the white piece of paper that was with the $11 in currency.

Ms. Singas:    And then what happened?

Officer Este:    The defendant replied, that's the girl that I met up in Rye, New York. <u>We all looked at each other. And then a moment later he said, I'm into Spanish chicks.</u>

Ms. Singas:    I'm into Spanish chicks.

Officer Este:    I'm into Spanish chicks.

(Hr'g. 19-20 (emphasis added).)

Walters has not shown that failing to appeal the trial court's decision denying suppression of this statement rose to the level of ineffective assistance of counsel. And, he can certainly not show that the Second Department's decision rejecting this ineffective assistance claim was either contrary to, or involved an unreasonable application of, clearly established Federal law or was an unreasonable factual determination. Walters has failed to establish either prong of <u>Strickland</u>, as he has not overcome the "strong presumption" that counsel's decision not to pursue this argument was objectively reasonable given the totality of the representation or that, had this argument been advanced, there is a reasonable probability that he would have succeeded on appeal. <u>See</u>

Strickland, 466 U.S. at 689. Walters makes a conclusory argument that the hearing court erred in not suppressing the "I'm into Spanish chicks" statement because Walters had not received Miranda warnings. However, the record of the suppression hearing does not support this argument— Walters spontaneously volunteered this statement, which was not responsive to the question asked by the officer. See United States v. Thomas, 961 F. Supp. 43, 46 (W.D.N.Y. 1997) (denying suppression of "spontaneous and voluntary" statement that was unresponsive to officer's question, which "was, under all the circumstances, not calculated to induce an admission as to [defendant's] intent"). It is also notable that the prosecution did not reference this statement in either its opening statement or summation. In light of that fact, and the overwhelming evidence against Walters, even if this statement should have been suppressed, any such error by the hearing court would have been harmless. Thus, appellate counsel's decision not to pursue this issue on appeal was reasonable. And, for the same reasons, Walters cannot show that a reasonable probability that this argument would have resulted in the reversal of his convictions.

Considering appellate counsel's representation in its entirety, counsel raised multiple grounds on appeal, including that Walters received ineffective assistance of trial counsel, that his conviction was against the weight of the evidence, and that his due process rights were violated when the trial court relied on allegations that he victimized women based on race and national origin. (See Def.'s App. Div. Br. at 31-59.) Walters has not established that a failure to appeal the admission of the "Spanish chicks" statement rendered appellate counsel constitutionally ineffective.

Walters contends that appellate counsel was ineffective for not raising a particular issue concerning the consolidation of the indictments.  (See Pet. at 38-40.)  Specifically, Walters argues that "[h]ere, the consolidation of the indictments and the multiple charges against [him] violated [his] fundamental right to a fair trial.  The sheer weight of the multitude of the charges greatly prejudiced [him], and prevented the jury from making a reliable judgment about guilt or innocence."  (Pet. at 39.)  Therefore, Walters argues, failing to raise this argument on appeal amounted to ineffective assistance of appellate counsel.

Pursuant to New York state law, criminal charges may be consolidated under a single indictment when they are "defined by the same or similar statutory provisions and consequently are the same or similar in law[ ]."  N.Y. C.P.L. § 200.20(2)(c).  "Joinder of offenses rises to the level of a constitutional violation only if it actually render[s] petitioner's state trial fundamentally unfair and hence, violative of due process."  Herring v. Meachum, 11 F.3d 374, 377 (2d Cir. 1993) (internal quotation marks and citation omitted).  The Second Circuit has stated "[t]here is indeed always a danger when several crimes are tried together that the jury may use the evidence cumulatively."  United States v. Lotsch, 102 F.2d 35, 36 (2d Cir. 1939).  However, the Supreme Court has long upheld the joinder of offenses and finds it "justified on the grounds that (1) the jury is expected to follow instructions in limiting this evidence to its proper function, and (2) the convenience of trying different crimes against the same person . . . in the same trial is a valid governmental interest.  Spencer v. Texas, 385 U.S. 554, 562 (1967).  Accordingly, to succeed on such a claim, a petitioner must "go beyond the potential for prejudice and prove that actual prejudice resulted from the events as they unfolded during the joint trial."  Herring, 11 F.3d at 377-78.  Crucially, "[w]here [a] jury learns of multiple crimes alleged to have been committed by a

defendant, '[t]he defendants' interests are protected by limiting instructions.[ ]'" McKinnon v. Superintendent, Great Meadow Corr. Facility, 422 F. App'x 69, 72 (2d Cir. 2011) (quoting Spencer v. Texas, 385 U.S. 554, 561 (1967)).

Walters has not established that this claim is meritorious—therefore failing to raise this claim on appeal was not unreasonable and is not a basis for a viable claim of ineffective assistance of appellate counsel.

First, the trial court instructed the jury regarding the joinder of offenses, stating:

> You may have observed in this case that the People have joined in this single indictment what I believe are approximately sixteen counts, of which fourteen you are going to be considering, each of those counts charging a separate crime. These crimes are joined in a single indictment solely for the convenience of the Court.
>
> Ordinarily, the fact that a defendant is charged with one crime constitutes no proof that he committed another crime also charged in a single indictment.
>
> Therefore, you are required to separate in your mind the evidence applicable solely to each crime and to return a verdict on each crime based solely on the evidence applicable to that crime.

(Tr. 1403.) It is well-settled that courts "presume that a jury will follow an instruction . . . unless there is an overwhelming probability that the jury will be unable to follow the court's instructions." Greer v. Miller, 483 U.S. 756, 767 n. 8 (1987) (internal quotation marks and citations omitted). In the instant matter, there is no evidence that the jury did anything other than follow the trial court's instructions. In addition, the evidence with respect to each charge was easily distinguishable, and Walters has not shown any potential for jury confusion based on the joinder of the offenses. See Herring, 11 F.3d at 378 (stating that "because the evidence with respect to each [crime] was distinct and easily compartmentalized, the risk of jury confusion at petitioner's trial was significantly limited.") Moreover, as respondent argues, joinder was clearly appropriate here because "evidence

of each offense was material and admissible as to the others in order to prove petitioner's identity, motive, common scheme or plan, and the element of force." (Resp.'s Br. at 42–43.)

In sum, Walters cannot show that appellate counsel would have succeeded on claims relating to the consolidation of the indictments on appeal. Therefore, the Court agrees with the state court and rejects this claim.

### 3. Denial of Due Process to Fair Trial by Consolidating Indictments

Walters claims that he was denied due process of law when the "highly prejudicial and unfounded allegation that he 'targeted Hispanic women' was used as a basis to establish criminal propensity." (See Pet. at 40-45.) Put differently, Walters claims that "[t]he prosecution combined the [ ] attacks by grouping the women into a category based on race, and essentially attempted to lead the jury to believe [he] had a propensity to commit [ ] acts against Hispanic females." (Pet. at 43.) In Walters' state court filings, he makes arguments regarding the alleged improper consolidation of indictments, but this federal habeas petition is the first time he frames his claim in this way. Therefore, this claim was not adequately raised in his state court post-conviction motions, as it has not been presented to the highest state court for review and is therefore unexhausted. However, as this claim is patently meritless, the Court proceeds to reject this claim.

Walters' claim that he was prejudiced by a suggestion that he targeted Hispanic women is a mischaracterization of the underlying record. The prosecution did not suggest that Walters had a propensity to target his victims based on race or national origin. In addition, as discussed above, the "[j]oinder of offenses rises to the level of a constitutional violation only if it 'actually render[s] petitioner's state trial fundamentally unfair and hence, violative of due process.'" Herring, 11 F.3d at 377 (quoting Tribbitt v. Wainwright, 540 F.2d 840, 841 (5th Cir. 1976). It is firmly established that "the potential for prejudice arising from joinder of offenses is insufficient to warrant reversing

a presumptively valid state court conviction." <u>Herring</u>, 11 F.3d at 379. Walters not only has failed to demonstrate that the prosecution improperly grouped these crimes together to create a suggestion of a criminal propensity, but he has also failed to demonstrate actual prejudice from the joinder of these offenses. For all the reasons set forth above, this claim is without merit.

### 4. Denial of Due Process in Determination of Sentence

Walters contends that he was denied due process in his sentencing, arguing his sentence was "based on the unproven allegations that [he] 'preyed' on 'immigrant and non-English speaking women' and acted with depravity and barbarity when doing so." (<u>See</u> Pet. at 46-49.) This claim was raised on direct appeal and following Walters' motion to reargue, the Second Department determined that "[t]he defendant's contention that the sentencing court improperly relied on uncharged and unproven allegations is unpreserved for appellate review [ ], and, in any event, is without merit." <u>Walters</u>, 90 A.D.3d at 959. Even though the state court ruled on the merits of this claim, it also based its decision on the independent procedural ground that it was unpreserved for appellate review. Accordingly, this claim is procedurally barred from habeas corpus review. <u>See</u> <u>Green v. Travis</u>, 414 F.3d 288, 294 (2d Cir. 2005) (finding that "'federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim.'" (quoting <u>Glenn v. Bartlett</u>, 98 F.3d 721, 724 (2d Cir. 1996))). Walters has failed to allege any cause, prejudice, or a fundamental miscarriage of justice resulting if he is barred from habeas review; therefore, Walters is unable to overcome this procedural bar. <u>See</u> <u>Coleman</u>, 501 U.S. at 750. Furthermore, as discussed below, even if this claim was not procedurally barred, it fails on the merits.

"[D]ue process requires that a convicted person not be sentenced on 'materially untrue' assumptions or 'misinformation.'"  United States v. Pugliese, 805 F.2d 1117, 1123 (2d Cir. 1986) (quoting Townsend v. Burke, 334 U.S. 736, 741 (1948)).  However, the Court does not adopt Walters' characterization of the events at sentencing.  The Court is not convinced that the state court's sentence was based on any unproven allegations that Walters had a criminal propensity to prey on Hispanic women.  Considering the totality of the record, the trial court explained its bases for the imposed sentence, emphasizing that the court considered the "barbaric" and "premeditated" nature of the crimes, the depravity of his acts, the overwhelming amount of evidence at trial, the fact that he fled from the arresting officer, his DNA match, the credibility of the victims' recitation of the facts and their identifications of him, and the need for the sentence to prevent him from committing these criminal acts in the future.  (S. 14-17.)  It appears that Walters' argument that the sentence was based on the unproven claim that he targeted Hispanic women is related to the following statement by the court:

> There's nothing left for me to do but to make sure that somebody like you does not roam in a free society to commit the kind of incredibly barbaric acts that you committed upon these people.  You preyed upon people.  You chose your victims carefully.  You had hope that because of their immigrant status or language barrier that they would never report this to the police.  You know something, for a couple of years you were getting away with it and it was working for you until that morning on September 7th of 2007.

(Sentencing 16-17.)  Based on the totality of the record from sentencing, the Court is not convinced that Walters' sentence was based on unproven allegations, nor that it was imposed in violation of his due process rights.  Therefore, this claim is denied.

### III. CONCLUSION

Because the Court has considered all of Walters' arguments and found them either procedurally barred or meritless, the petition is DENIED. A certificate of appealability shall not issue because Walters has not made a substantial showing that he was denied a constitutional right. See 28 U.S.C. § 2253(c)(2). I certify that any appeal of this Order would not be taken in good faith, and thus in forma pauperis status is denied for the purposes of any appeal. Coppedge v. United States, 369 U.S. 438, 444–45 (1962). The Clerk of the Court is respectfully directed to mail a copy of this Order to petitioner and to close this case.

**SO ORDERED.**

Dated: December 21, 2018
Central Islip, New York

                                         _____/s/ (JMA)_____
                                         JOAN M. AZRACK
                                         UNITED STATES DISTRICT JUDGE